Edward H. Rosenthal
Jeremy S. Goldman
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue
New York, New York 10022
Tel.: (212) 980-0120
Fax: (212) 593-9175
erosenthal@fkks.com
jgoldman@fkks.com

*Attorneys for Plaintiffs*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

THE AUTHORS GUILD, INC., THE AUTHORS
LEAGUE FUND, INC., THE AUSTRALIAN SOCIETY
OF AUTHORS LIMITED, UNION DES ÉCRIVAINES
ET DES ÉCRIVAINS QUÉBÉCOIS, AUTHORS'
LICENSING AND COLLECTING SOCIETY,
SVERIGES FÖRFATTARFÖRBUND, NORSK
FAGLITTERÆR FORFATTER- OG
OVERSETTERFORENING, THE WRITERS' UNION
OF CANADA, TROND ANDREASSEN, PAT
CUMMINGS, ERIK GRUNDSTRÖM, ANGELO
LOUKAKIS, HELGE RØNNING, ROXANA
ROBINSON, ANDRÉ ROY, JACK R. SALAMANCA,
JAMES SHAPIRO, DANIÈLE SIMPSON, T.J. STILES
AND FAY WELDON,

                        Plaintiffs,

   - against -

HATHITRUST; JULIA DONOVAN DARLOW,
LAURENCE B. DEITCH, DENISE ILITCH, OLIVIA
P. MAYNARD, ANDREA FISCHER NEWMAN,
ANDREW C. RICHNER , S. MARTIN TAYLOR and
KATHERINE E. WHITE, in their official capacities as
The Regents of The University of Michigan; RICHARD
C. BLUM, DAVID CRANE, WILLIAM DE LA PEÑA,
RUSSELL GOULD, EDDIE ISLAND, ODESSA
JOHNSON, GEORGE KIEFFER, SHERRY L.
LANSING, MONICA LOZANO, HADI
MAKARECHIAN, GEORGE M. MARCUS,

Index No. 11 Civ. 6351 (HB)

**FIRST AMENDED COMPLAINT**

ALFREDO MIRELES, JR., NORMAN J. PATTIZ,
BONNIE REISS, FRED RUIZ, LESLIE TANG
SCHILLING, BRUCE D. VARNER, PAUL
WACHTER and CHARLENE ZETTEL, in their official
capacities as The Regents of The University of
California; JEFFREY BARTELL, MARK J.
BRADLEY, JUDITH V. CRAIN, JOHN DREW,
TONY EVERS, MICHAEL J. FALBO, EDMUND
MANYDEEDS, KATHERINE POINTER, CHARLES
PRUITT, TROY SHERVEN, BRENT SMITH,
MICHAEL J. SPECTOR, S. MARK TYLER, JOSÉ F.
VÁSQUEZ and DAVID G. WALSH, in their official
capacities as The Board of Regents of The University of
Wisconsin System; WILLIAM R. CAST, PATRICK A.
SHOULDERS, MARYELLEN KILEY BISHOP,
BRUCE COLE, PHILIP N. ESKEW, JR., CORA J.
GRIFFIN, THOMAS E. REILLY, JR., DERICA W.
RICE and WILLIAM H. STRONG, in their official
capacities as The Trustees of Indiana University; and
CORNELL UNIVERSITY,

     Defendants.

---------------------------------------------------------------X

  Plaintiffs The Authors Guild, Inc., The Authors League Fund, Inc., The Australian

Society of Authors Limited, UNEQ (Union Des Écrivaines et des Écrivains Québécois),

Authors' Licensing and Collecting Society, Sveriges Författarförbund, Norsk Faglitterær

Forfatter- Og Oversetterforening, The Writers' Union of Canada, Trond Andreassen, Pat

Cummings, Erik Grundström, Angelo Loukakis, Roxana Robinson, Helge Rønning, André Roy,

Jack R. Salamanca, James Shapiro, Danièle Simpson, T.J. Stiles and Fay Weldon (collectively,

"Plaintiffs"), by and through their attorneys, Frankfurt Kurnit Klein & Selz, P.C., for their First

Amended Complaint against defendants HathiTrust; Julia Donovan Darlow, Laurence B. Deitch,

Denise Ilitch, Olivia P. Maynard, Andrea Fischer Newman, Andrew C. Richner, S. Martin

Taylor and Katherine E. White, in their official capacities as the Regents of the University of

Michigan (collectively, the "UM Regents"); Richard C. Blum, David Crane, William De La Peña, Russell Gould, Eddie Island, Odessa Johnson, George Kieffer, Sherry L. Lansing, Monica Lozano, Hadi Makarechian, George M. Marcus, Alfredo Mireles, Jr., Norman J. Pattiz, Bonnie Reiss, Fred Ruiz, Leslie Tang Schilling, Bruce D. Varner, Paul Wachter and Charlene Zettel, in their official capacities as the Regents of the University of California (collectively, the "UC Regents"); Jeffrey Bartell, Mark J. Bradley, Judith V. Crain, John Drew, Tony Evers, Michael J. Falbo, Edmund Manydeeds, Katherine Pointer, Charles Pruitt, Troy Sherven, Brent Smith, Michael J. Spector, S. Mark Tyler, José F. Vásquez and David G. Walsh, in their official capacities as the Board of Regents of the University of Wisconsin System (collectively, the "UW Regents"); William R. Cast, Patrick A. Shoulders, MaryEllen Kiley Bishop, Bruce Cole, Philip N. Eskew, Jr., Cora J. Griffin, Thomas E. Reilly, Jr., Derica W. Rice and William H. Strong, in their official capacities as the Trustees of Indiana University (collectively, the "IU Trustees"); and Cornell University (collectively, "Defendants") allege as follows:

## NATURE OF THE ACTION

1.     This is an action for prospective injunctive and declaratory relief arising from the systematic, concerted, widespread and unauthorized reproduction and distribution of millions of copyrighted books and other works, including books whose copyrights are held by Plaintiffs, by five universities (each, a "University" and collectively, the "Universities") and HathiTrust, a partnership between the Universities and other institutions. Through cooperation agreements entered into with Google Inc. ("Google"), Defendants have engaged in an unprecedented effort to "digitize" – or to create digital copies of – all or a significant portion of the works in their libraries without the permission of their authors or other copyright holders.

2.     In exchange for allowing Google to create, take and commercially exploit millions of digital copies of books and other materials in their university libraries, Google has

agreed to provide and has already provided the Universities with digital copies of Plaintiffs' and millions of others' books for the Universities to exploit. Led by the University of Michigan, the Universities created and joined HathiTrust, a partnership of more than fifty research institutions and libraries that have already begun to and, unless enjoined by this Court, will continue to combine their digital libraries to create a shared digital repository that already contains almost 10 million digital volumes, approximately 73% of which are protected by copyright. This so-called HathiTrust Digital Library ("HDL") is responsible for creating and distributing additional unauthorized digital copies of millions of copyrighted works, including works owned by Plaintiffs, and risking the potentially catastrophic, widespread dissemination of those millions of works in derogation of the statutorily-defined framework governing library books.

3.      Most recently, four of the Universities (all but Indiana University) announced their participation in HathiTrust's "Orphan Works Project," an initiative to identify and make available online to University students, faculty and library patrons full copies of so-called "orphan works" – works that are protected by copyright but whose rights holders theoretically cannot be located by procedures established by HathiTrust (the "HathiTrust Orphans"). Unless enjoined by this Court, Defendants will start to make the copyright-protected HathiTrust Orphans digitally available in full text.

4.      The Universities have publicly defended their unauthorized digitization activities by claiming their conduct benefits society and is permissible under the fair use doctrine set forth in Section 107 of the United States Copyright Act (the "Copyright Act"). This position is without legal support. Section 108 of the Copyright Act explicitly regulates the extent to which libraries may lawfully reproduce copyrighted works without authorization, the circumstances under which digital copies may be created and displayed to library patrons and when copies of orphan works may be released to the public. In short, the systematic digital copying and

distribution of copyrighted works by the University and HathiTrust libraries far exceeds the express limitations of Section 108, which cannot be excused by fair use under Section 107.

5.      In deciding to proceed with the HathiTrust Orphan Works Project, the Universities have taken copyright law into their own hands, ignoring proposed legislative solutions to address the issues as well as the Court's rejection of a privately-negotiated agreement between Google and the Guild (among other parties) in a separate case. That proposed settlement, if approved, would have created a legal framework to display out-of-print books, including so-called orphan works, to the public through a procedure approved by court order after due process of law, with commercial-grade security guarantees. The Court concluded, however, that it did not have the power to create such prospective licenses to use orphan works.

6.      Rather than heeding the Court's words, and allowing Congress, acting in the interest of all communities, to determine the requirements and safeguards that will govern the use of digital libraries and orphan works, Defendants have instead proceeded on their own authority, ignoring the interests of copyright holders.

7.      By digitizing, archiving, copying and now publishing the copyrighted works without the authorization of those works' rights holders, the Universities are engaging in one of the largest copyright infringements in history. The Universities have directly caused millions of works that are protected by copyright to be scanned, stored in digital format, repeatedly copied and made available online for various uses. These actions not only violate the exclusive rights of copyright holders to authorize the reproduction and distribution of their works but, by creating at least two databases connected to the Internet that store millions of digital copies of copyrighted books, the Universities risk the widespread, unauthorized and irreparable dissemination of those works.

## JURISDICTION AND VENUE

8.      This is a civil action seeking injunctive relief for copyright infringement under the United States Copyright Act, 17 U.S.C. § 101 *et seq.* (the "Copyright Act"), as well as declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338(a) (copyright).

10.     This Court has personal jurisdiction over Defendants because Defendants engaged, are engaging and threaten to engage in copyright infringement directed at and harming Plaintiffs, including Plaintiffs located in this District.  Defendants should reasonably expect the digitization of copyrighted works, and the uploading and publication of copyrighted orphan works, to have consequences in this state.  Defendants derive substantial revenue from interstate and international commerce.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

### *Associational Plaintiffs*

12.     Plaintiff The Authors Guild, Inc. (the "Guild") is a not-for-profit corporation organized under New York law with its place of business located at 31 East 32nd Street, New York, New York.  The Guild and its predecessor organization, the Authors League of America (the "League"), have been leading advocates for authors' copyright and contractual interests since the League's founding in 1912.  With more than 8,500 published authors as members, the Guild is the largest advocacy group for book authors in the United States.  The activities of the Guild include reviewing members' publishing and agency contracts; intervening in disputes involving authors' rights; providing advice to members regarding developments in the law and

publishing industry that affect their rights; and supporting legislation in matters affecting copyright, freedom of expression, taxation and other issues impacting professional writers.

13.     Plaintiff the Authors League Fund, Inc., (the "Authors Fund") is a not-for-profit corporation organized under New York law with its place of business located at 31 East 32nd Street, New York, New York. Since its founding in 1917, the Authors Fund, which provides assistance to professional writers and dramatists in severe financial need because of health problems, temporary loss of income or other misfortune, has drawn most of its support from authors, some of whom leave their literary estates to the Fund.  The Authors Fund owns literary estate of Gladys Malvern, including the copyright in "Good Troupers All: The Story of Joseph Jefferson."  Defendant HathiTrust listed "Good Troupers All" as an "orphan work candidate" with a scheduled release date of October 13, 2011.  The Authors Fund owns, among others, the copyright in the book specified in Exhibit A which was, upon information and belief, unlawfully reproduced, digitized and distributed by Defendants.

14.     Plaintiff the Australian Society of Authors Limited ("Australian Society") is a Public Company Limited By Guarantee organized in 1963 under the laws of the Commonwealth of Australia with its principal place of business is in Sydney, Australia.  With more than 3,000 members, the Australian Society is the leading organization representing the professional rights and interests of Australia's literary creators.  The Australian Society sets minimum rates of pay and conditions for authors and illustrators; publishes books, contracts, discussion and policy papers, and information sheets for emerging and established authors; defends the rights of copyright holders; represents authors on inquiries and reviews, and lobbies governments at all levels in matters such as copyright, moral rights, and taxation.

15.     Plaintiff the Authors' Licensing and Collecting Society ("ALCS") is a not-for-profit organization with its principal place of business in London, England.  ALCS is the UK collecting society for authors of all genres of literary and dramatic copyright works. Since its founding in 1977, ALCS has paid more than £250 million to its writer-members for secondary uses of their works, including photocopying, scanning, and digital copying of its member' works. Among its more than 80,000 members, ALCS represents more than 50,000 book authors. ALCS research shows that about half of all books copied under its agreements are out of print.  As a consequence, as part of its routine operations, ALCS identifies and pays authors of out-of-print works.  Over a ten-year period, ALCS has found that it identifies, contacts and pays the contributors to more than 95% of the most commonly copied out-of-print books.  On information and belief, Defendants have digitized without authority more than 35,000 books by ALCS members, including at least two books that Defendants had deemed "orphan works candidates."

16.     Plaintiff UNEQ (Union des Écrivaines et des Écrivains Québécois) is a professional union of writers with its principal place of business located in Montreal, Québec. UNEQ's mission is to defend writers' socio-economic interests and promote Québec's literature. With a membership of 1,400 writers of fiction, poetry, drama, nonfiction, children's and other books, UNEQ is the primary representative for writers in Québec, a status recognized by a 1990 Québec Act (RSQ, chapter S-32.01), and for authors throughout Canada of original French language literary or dramatic works, as certified by the Canadian Artists and Producers Professional Relations Tribunal in 1996.

17.     Plaintiff Sveriges Författarförbund ("SFF") is a non-profit organization with its principal place of business in Stockholm, Sweden.  The SFF, first organized in 1893 as the Swedish Association of Authors, has more than 2,750 professional writers and translators as its members and is the leading organization for book authors in Sweden.  In pursuit of its mission of

securing its members' rights to reasonable remuneration and working conditions, the SFF negotiates standard, minimum-terms agreements with book publishers, radio and television broadcasters, film producers and others on behalf of authors and translators. The SFF also defends freedom of expression and of the press by safeguarding the principles of the Swedish Freedom of the Press Act.

18.     Plaintiff Norsk Faglitterær Forfatter- og Oversetterforening ("NFF") is a trade union founded in 1978 with its principal place of business in Oslo, Norway. The NFF is Norway's union for nonfiction writers, representing 5,400 authors and translators. It represents its members' professional interests by, among other activities, negotiating minimum-terms agreements with book publishers and others, negotiating conditions for copying books in schools, libraries and elsewhere, and providing legal assistance to its members in negotiations and conflicts regarding literary rights.

19.     Plaintiff The Writers' Union of Canada ("TWUC") is a non-profit association incorporated under the Canada Corporations Act with its principal place of business in Toronto, Ontario. TWUC has approximately 2,000 members who earn their living from writing books. Since its inception in 1973, TWUC has been an advocate for effective copyright law, protection of freedom of expression, fair publishing contracts, and other issues that affect authors. TWUC's objects include uniting authors for the advancement of their common interests and fostering writing in Canada. Certified by the Canadian Artists and Producers Professional Relations Tribunal, TWUC is the national voice of professional book writers in Canada in the English language.

20.     Plaintiffs the Guild, the Australian Society, UNEQ, ALCS, SFF, NFF and TWUC (collectively, the "Associations") have associational standing to pursue claims for declaratory and injunctive relief on behalf of their members. Members of the Associations would have

standing to sue in their own right as authors. Securing the copyrights and integrity of all copyrighted works – including so-called orphan works whose authors or owners cannot be readily found to speak for themselves – is fundamental to the Associations' missions. Individual participation of each author is not required to determine whether the Universities' systematic digitization of their libraries and planned dissemination of orphan works violates the Copyright Act or to grant injunctive relief for the benefit of all members of the Associations and other authors and owners of copyrighted works.

*Individual Plaintiffs*

21.     The following individual plaintiffs are published, professional authors and the exclusive owners of the copyrights in their books identified in Exhibit A. None of the individual plaintiffs authorized the Universities or Google to digitize, reproduce, distribute or otherwise use his or her works.

22.     Plaintiff Trond Andreassen, a resident of Oslo, Norway, has been Secretary General of plaintiff NFF since 1986, except for 1995-1997 when he served as a publisher for the higher education department of University Press, a Norwegian academic publishing house. Mr. Andreassen owns the copyright in the book specified in Exhibit A that was, upon information and belief, unlawfully reproduced, digitized and distributed by Defendants.

23.     Plaintiff Pat Cummings, a resident of Brooklyn, New York, is a published author and illustrator of numerous children's books. Ms. Cummings won the American Library Association's Coretta Scott King Award for *My Mama Needs Me* and the Boston Globe-Horn Book Award for *Talking With Artists*. Ms. Cummings owns the copyrights in the books specified in Exhibit A that were, upon information and belief, unlawfully reproduced, digitized and distributed by Defendants.

24.     Plaintiff Erik Grundström, a resident of Stockholm, Sweden, is a novelist, short-story writer, playwright and vice president of plaintiff SFF.  Mr Grundström is the former principal of Skrivarakademin, Sweden's leading school for creative writing, and won the Arnold Rörling literary prize in 1993.  Mr. Grundström owns the copyright in the book specified in Exhibit A that was, upon information and belief, unlawfully reproduced, digitized and distributed by Defendants.

25.     Plaintiff Angelo Loukakis, a resident of Sydney, Australia, is a novelist, short-story writer, the author of several non-fiction works, and the Executive Director of Plaintiff ASA.  His short-story collection, *For the Patriarch,* won the New South Wales Premier's Literary Award and he has served on the Literature Board of the Australia Council.  Mr. Loukakis owns the copyright in the book specified in Exhibit A that was, upon information and belief, unlawfully reproduced, digitized and distributed by Defendants.

26.     Plaintiff Helge Rønning, a resident of Oslo, Norway, is a professor in the Department of Media and Communication at the University of Oslo, where he has twice served department chairhead.  Mr. Rønning has published numerous articles on political, economic, and technological aspects of the media, and he has written extensively on copyright and freedom of expression. In 1987, he was a visiting scholar at defendant University of California, at its Santa Barbara campus.  He has published numerous articles on political, economic, and technological aspects of the media, and on copyright and freedom of expression.  Mr. Rønning owns the copyright in the books specified in Exhibit A that were, upon information and belief, unlawfully reproduced, digitized and distributed by Defendants.

27.     Plaintiff Roxana Robinson, a resident of New York, New York, is a novelist, short story writer and biographer.  Four of Ms. Robinson's works have been Notable Books of the Year by the New York Times, and her work has appeared often in *Best American Short*

*Stories.* Ms. Robinson owns the copyrights in the books specified in Exhibit A that were, upon information and belief, unlawfully reproduced, digitized and distributed by Defendants.

28.     Plaintiff André Roy, a resident of Québec, Canada, is a poet, literary critic, film critic, and the Vice President of Plaintiff UNEQ. Mr. Roy won the Canada Council for the Arts Governor General's Poetry Award for *Action Writing*, and he has twice been a finalist for the award. Mr. Roy owns the copyrights in the books specified in Exhibit A that were, upon information and belief, unlawfully reproduced, digitized and distributed by Defendants.

29.     Plaintiff Jack R. Salamanca, a resident of Potomac, Maryland, is Professor Emeritus of the English Department at the University of Maryland. He is the author of six novels, two of which became movies, and is represented by the John White Literary Agency of Cheshire, Connecticut. Defendant HathiTrust listed his first novel, "The Lost Country," as an "orphan work candidate" with a scheduled release date of November 8, 2011. Mr. Salamanca owns the copyright in the books specified in Exhibit A that were, upon information and belief, unlawfully reproduced, digitized and distributed by Defendants.

30.     Plaintiff James Shapiro, a resident of New York, New York, is a Professor of English and Comparative Literature at Columbia University who specializes in Shakespeare and the Early Modern period. Professor Shapiro owns the copyright in the book specified in Exhibit A that, upon information and belief, was unlawfully reproduced, digitized and distributed by Defendants.

31.     Plaintiff Danièle Simpson, a resident of Québec, Canada, is a children's book author, novelist, short story writer, poet, and the President of Plaintiff UNEQ. Ms. Simpson owns the copyrights in the books specified in Exhibit A that were, upon information and belief, unlawfully reproduced, digitized and distributed by Defendants.

32.    Plaintiff T.J. Stiles, a resident of San Francisco, California, is the author of numerous books about American history. Mr. Stiles won a National Book Award and Pulitzer Prize for his most recent book, *The First Tycoon: The Epic Life of Cornelius Vanderbilt*. Mr. Stiles owns the copyrights in the book specified in Exhibit A that, upon information and belief, was unlawfully reproduced, digitized and distributed by Defendants.

33.    Plaintiff Fay Weldon, a resident of Dorset, England, is an influential novelist, short-story writer, essayist and playwright. She is a professor of creative writing at Brunel University in London and has served as the Chair of Judges for the Booker Prize for Fiction. Ms. Weldon owns the copyrights in the books specified in Exhibit A that, upon information and belief, were unlawfully reproduced, digitized and distributed by Defendants.

### University Defendants

34.    Upon information and belief, defendants the UM Regents govern the University of Michigan ("UM"), a state university system comprising three campuses with its principal place of business in Ann Arbor, Michigan. UM owns, operates and controls the University of Michigan Library in Ann Arbor (the "MLibrary"), one of the largest university library systems in the United States, holding more than 8.5 million volumes and serving more than 3 million patrons per year. On or about December 14, 2004, the UM Regents and MLibrary entered into a Cooperative Agreement with Google to digitize MLibrary's collection. MLibrary is the co-founder, host and primary administrator of Defendant HathiTrust and is its largest contributor, having distributed almost 4.5 million digital volumes to the HDL. MLibrary launched and administers the HathiTrust Orphan Works Project and, unless enjoined by this Court, intends to be the first institution to grant MLibrary's patrons "full view" (as defined below) to digital copies of its orphan works.

35.     Upon information and belief, defendants the UC Regents govern the University of California ("UC"), a state university system comprising ten campuses with its principal place of business in Oakland, California.  UC owns, operates and controls the University of California library system, which includes more than 100 libraries on ten UC campuses and claims to be, collectively, the largest library in the world.  On or about August 9, 2006, the UC Regents, on behalf of its California Digital Library ("CDL"), entered into a Cooperative Agreement with Google to digitize UC's library books.  CDL is a co-founder of HathiTrust and is its second largest contributor, having distributed almost 3 million digital volumes to the HDL.  UC announced its participation in the HathiTrust Orphan Works Project on August 24, 2011.

36.     Upon information and belief, defendants the UW Regents govern the University of Wisconsin System, a state university system comprising twenty-six campuses, including the University of Wisconsin-Madison ("UW"), with its principal place of business in Madison, Wisconsin.  UW owns, operates and controls the UW library system, which has the eleventh largest research library collection in North America with more than 8 million volumes.  On or about October 12, 2006, the UW Regents entered into a Cooperative Agreement with Google to digitize UW's library books.  UW is a co-founder of HathiTrust and is its third largest contributor, having distributed almost 500,000 digital volumes to the HDL.  UW's participation in the HathiTrust Orphan Works Project became public in June 2011.

37.     Upon information and belief, defendants the IU Trustees govern Indiana University ("IU"), a state university system comprising eight campuses with its principal place of business in Bloomington, Indiana.  IU owns, operates and controls the IU library system, which includes over 7.8 million books in over 900 languages.  IU is a member of the Committee on Institutional Cooperation (the "CIC"), a consortium of the Big Ten universities (including Defendants UM and UW) plus the University of Chicago.  On or about June 6, 2007, the IU

14

Regents, acting through The Board of Trustees of the University of Illinois on behalf of the CIC, entered into a Cooperative Agreement with Google to digitize IU's library books.  IU is HathiTrust's seventh largest contributor, having distributed almost 200,000 digital volumes to the HDL.  A fully operational, synchronized and live "mirror site" of the HathiTrust Digital Library is located on IU's Indianapolis campus.

38.      Upon information and belief, defendant Cornell University ("Cornell") is a corporation and private land-grant university with its principal place of business in Ithaca, New York.  Cornell owns, operates and controls the Cornell University Library, one of the leading academic research libraries in the United States with a collection of almost 8 million volumes. Cornell has been a Google partner since October 2007 and is a member of HathiTrust.  Cornell is HathiTrust's fourth largest contributor, having distributed almost 350,000 digital volumes to the HDL.  Cornell announced its participation in the HathiTrust Orphan Works Project on August 24, 2011.

### *Defendant HathiTrust*

39.      Upon information and belief, defendant HathiTrust is a partnership of more than fifty universities, educational institutions and consortia collaborating to create an online repository of their partnering members' digital collections of books and other works. HathiTrust's principal place of business is in Ann Arbor, Michigan.  As of October 5, 2011, HathiTrust claimed that its shared digital repository, the HDL, contained 9,709,348 total volumes, amounting to 435 terabytes (445,440 gigabytes) of data.  HathiTrust admits that approximately 73% of its works (over 7 million volumes) are protected by copyright.

## GENERAL ALLEGATIONS

### The Library Exemption Under the Copyright Act

40.     Recognizing the tremendous societal value provided by our nation's libraries and archives in preserving and securing works of art, literature and science, Congress included in the 1976 Copyright Act a special exemption to allow those institutions to engage in the limited reproduction and distribution of in-copyright works that would otherwise violate the exclusive rights of the copyright holders, fair use notwithstanding.  Section 108 of the Copyright Act embodies the compromise adopted by Congress following decades of heated debate between authors, publishers and copyright holders, on the one hand, and libraries, on the other.

41.     Section 108 specifies the limited circumstances under which libraries are permitted to reproduce and distribute copyrighted works for purposes of preservation, replacement copies and the fulfillment of patron requests.  For example, under Section 108(b), a library is permitted to make three copies of any *unpublished* work in its collection for preservation and security purposes.  With respect to *published* works, Section 108(c) also permits a library make three copies.  The copies of published works, however, may only be made to *replace* a work in the library's collection that is (or was) damaged, deteriorating, lost or stolen, and only if the library is unable to obtain a new copy at a fair price.

42.     Under the original version of Section 108 passed in 1976, libraries were not permitted to make copies of works in "machine-readable," or digital, format.  In 1998, Congress passed the Digital Millennium Copyright Act ("DMCA").  Among other things, the DMCA amended Section 108 to permit libraries to make digital copies of unpublished works for preservation purposes and as replacements for published works.  The statute, however, placed two restrictions on the permissible use of digital copies:

(a) There can be no further distribution of the digital format; and

(b) The digital copy cannot be used "outside the premises of the library or archives."

43.     In passing the DMCA, Congress explained the reasons for restricting the libraries' use of digital copies:

> *In recognition of the risk that uncontrolled public access to the copies or phonorecords in digital formats could substantially harm the interests of the copyright owner by facilitating immediate, flawless and widespread reproduction and distribution of additional copies or phonorecords of the work*, the amendment provides that any copy of a work that the library or archive makes in a digital format must not be otherwise distributed in that format and must not be made available in that format to the public outside the premises of the library or archives. In this way, the amendment permits the utilization of digital technologies solely for the purposes of this subsection.
>
> * * *
>
> In the view of the Committee, *this proviso is necessary to ensure that the amendment strikes the appropriate balance, permitting the use of digital technology by libraries and archives while guarding against the potential harm to the copyright owner's market from patrons obtaining unlimited access to digital copies from any location.*

S. Rep. Nos. 105-190, at 61-62 (1998) (emphasis added).

44.     Congress also addressed the libraries' desire to make "orphan works" more broadly available to the public.  In 1998, Congress added Section 108(h) to the Copyright Act in response to libraries' concerns that the twenty-year extension granted to copyrights through passage of the Copyright Term Extension Act would deprive the public of the availability of older, out-of-print works that otherwise would have been placed in the public domain.  Section 108(h) permits libraries to reproduce, distribute and perform published copyrighted works that are in the last 20 years of their copyright term and are not commercially exploited or otherwise reasonably available during the extended term.

45.     Notwithstanding the more expansive reproduction and distribution rights granted to libraries, in Section 108(g), Congress made clear that those rights "extend only to the isolated and unrelated reproduction or distribution of a single copy or phonorecord of the same material on separate occasions[.]"  Libraries are expressly prohibited from "engaging in the related or concerted reproduction or distribution of multiple copies or phonorecords of the same material" or "the systematic reproduction or distribution of single or multiple copies or phonorecords. . ." 17 U.S.C. § 108(g)(1) and (2).

46.     Since the 1998 updates, significant efforts have been made to further amend Section 108 to address the preservation practices of libraries in an increasingly digital environment.  For example, in 2005, the Library of Congress, in cooperation with the U.S. Copyright Office, sponsored a "Section 108 Study Group" to prepare findings and make suggestions to the Library of Congress for modifications to Section 108 to reflect new technology.  On March 31, 2008, the Group released its final report, which recommended, among other things, that Section 108 be amended to expand a library's right to create and store digital copies of published works in their collections for preservation purposes.

47.     Despite receiving numerous recommendations from the Section 108 Study Group and other interested parties, since 1998, Congress has not amended Section 108.

### The Universities Engage in Systematic Digitization of Copyright Works

48.     In blatant derogation of Plaintiffs' exclusive rights under Section 106 and the express regulations governing libraries' rights under Section 108 of the Copyright Act, Defendants have engaged in a concerted, systematic and widespread campaign to digitize, reproduce, distribute and otherwise exploit millions of copyrighted works in their libraries without permission from the copyright holders associated with those works.

49.     On December 14, 2004, Google announced that it was working with four U.S. libraries, including MLibrary, to digitally scan books from their collections.  Upon information and belief, partnerships between Google and other universities and institutions followed over the next several years, including partnerships with UC on or about August 9, 2006, UW on or about October 12, 2006, IU (through its membership in CIC) on or about June 6, 2007 and Cornell on or about August 7, 2007.  Since commencing the digitization project, Google and its partners have digitized more than 12 million books.

50.     Upon information and belief, pursuant to separate Cooperative Agreements entered into by Google and each University, the parties cooperate to identify books from the University's collection to be digitized.  The books selected for digitization are not limited to works in the public domain, unpublished works or deteriorating published works that cannot be replaced, but include in-print books that are commercially available and are protected by copyright.  The University then collects the works and has them delivered to a facility located either on or off the school's campus that is occupied by Google personnel and scanning equipment.

51.     Upon information and belief, Google is responsible for digitizing the content of the works.  After a work has been digitized, Google retains at least one copy for commercial exploitation through "Google Books," an online system that allows users to search the content and view "snippets" of millions of digitized books.

52.     Upon information and belief, Google also provides a digital copy of the work to the University.  The digital copy comprises a set of scanned image files, files containing the text of the work extracted through optical character recognition ("OCR") technology, and data associated with the work indicating bibliographic and other information.  By creating both scanned image files of the pages and a text file from the printed work, the digitization process,

and each subsequent copy thereof, includes two reproductions of the original. After digitization, the original works are returned to the source library.

53.    In light of the high-priced and sophisticated scanning technology and amount of staff required to digitize the works, the digital copies obtained by the Universities carry significant economic value. Prior to Google's involvement, libraries estimated their costs of digitization at approximately $100 per volume. Thus, the value of the digitization project is measured in the hundreds of millions of dollars.

54.    Upon information and belief, certain Universities, including MLibrary, also digitize works in their collections, including copyrighted works, "in-house," meaning they create digital copies of works using their own equipment and personnel and without Google's assistance.

55.    Neither Google nor the Universities obtained permission from the vast majority of copyright holders to digitize their books.

**Google Books Lawsuit**

56.    On September 20, 2005, the Guild and several published authors filed a class action lawsuit against Google in the United States District Court for the Southern District of New York (the "Google Books Lawsuit"), alleging that Google's digitization and commercial exploitation of copyrighted works constituted massive copyright infringement. *See The Authors Guild, Inc., et al. v. Google Inc.*, Case No. 05 Civ. 8136 (S.D.N.Y.).

57.    On October 28, 2008, after extended negotiations, the parties filed a proposed settlement agreement to resolve the dispute. On November 13, 2009, the parties filed for final court approval an Amended Settlement Agreement (the "ASA"), pursuant to which, *inter alia*, Google agreed to compensate authors and publishers in exchange for the right to make the digitized books available to the public. If approved, the ASA would have established a "Book

Rights Registry" to maintain a database of copyright holders and administer distributions of revenues. The ASA also would have created an "Unclaimed Works Fiduciary" to represent the interests of unclaimed, or "orphan," works, and offered a framework to make orphan works available to the public.

58.    On March 22, 2011, the ASA was rejected, with now Circuit Judge Denny Chin concluding that "[w]hile the digitization of books and the creation of a universal digital library would benefit many, the ASA would simply go too far." *Authors Guild v. Google, Inc.,* 770 F. Supp. 2d 666, 669 (S.D.N.Y. 2011).

59.    One of Judge Chin's chief rationales for rejecting the ASA was his concern that "the establishment of a mechanism exploiting unclaimed books is a matter more suited for Congress than this Court." The Court reasoned:

> *The questions of who should be entrusted with guardianship over orphan books, under what terms, and with what safeguards are matters more appropriately decided by Congress than through an agreement among private, self-interested parties.* Indeed, the Supreme Court has held that "it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives."

*Id.* at 677.

60.    The Court noted "longstanding efforts" by Congress to pass legislation to address the orphan works problem, including "Orphan Books" bills that were proposed in 2006 and 2008 but were never enacted. *Id.* at 678. The Court also concluded that the ASA raised significant international law concerns.

61.    The Google Books Lawsuit is still pending in this Court.

**HathiTrust**

62.    On October 13, 2008, the thirteen universities comprising the CIC, led by MLibrary, the UC library system, led by the CDL, and the University of Virginia announced the launch of HathiTrust to construct a shared repository of their combined digitized collections.

HathiTrust soon expanded to include over fifty universities, consortia and research institutions from around the world. According to its website, HathiTrust's mission is "to contribute to the common good by collecting, organizing, preserving, communicating, and sharing the record of human knowledge."

63.    Upon information and belief, members of HathiTrust "contribute" to the HathiTrust Digital Library digital copies of works in their libraries that were scanned by Google, other organizations such as the Internet Archive, or the libraries' own staff. In derogation of the restrictions of Section 108 on the number of digital copies libraries are permitted to make, HathiTrust members *copy*, rather than *transfer*, their digital works to HathiTrust, meaning that at least two further reproductions are made (one image file, one digital-text OCR file) when a digital object is delivered to HathiTrust. Upon information and belief, digital objects are generally copied to HaithiTrust by uploading the files over the Internet or delivering them on removable media.

64.    Upon information and belief, the "ingestion" of digital works and their associated metadata into the HDL is performed at MLibrary. As explained below, the digital objects are then replicated to HathiTrust's active mirror site located on IU's Indianapolis campus, and stored on backup tapes located at different UM facilities.

65.    Upon information and belief, HathiTrust thereafter provides three primary services to its constituent members, their patrons and the general public.

66.    *First*, HathiTrust provides a clustered storage system to hold more than 435 terabytes of combined digital files deposited to date by HathiTrust's 50+ members. Upon information and belief, HathiTrust's storage architecture employs two synchronized instances of server farms (each including at least two web servers, a database server and a storage cluster), with the primary site located at UM's Ann Arbor, Michigan campus where ingestion occurs, and

a redundant mirror site located at IU's Indianapolis campus. HathiTrust also routinely creates tape backups of all data contained in the HDL. The tapes are stored at a different facility on UM's campus and, upon information and belief, these tapes are replicated and the copies are stored at yet another facility on UM's campus. Thus, once a University distributes a digital object to the HDL, at least eight digital copies of the work (four image files, four digital-text OCR files) are generated.

67.     *Second*, according to HathiTrust's website, "HathiTrust provides secure, reliable, long-term preservation for deposited materials." Upon information and belief, HathiTrust preserves and secures not only unpublished or difficult-to-replace published works as permitted by Sections 108(b) and (c) of the Copyright Act, but also works that are in-copyright, published and commercially-available.

68.     *Third*, HathiTrust provides a variety of tools to allow its users to access content in the HDL. For example, all users may search and identify bibliographic information (title, author, subject, ISBN, publisher, and year of publication) for the works contained in the HDL. HathiTrust also permits all users to search the entire text of all works in the HDL (including public domain and in-copyright works) to determine the number of times and page location(s) of any keyword or phrase found in a book.

69.     In addition, HathiTrust permits users to view, search, print and download full copies of certain volumes in the HDL. Whether a user may access this "full view" of a digital object is determined by the identity of the user seeking access to the work (*e.g.*, whether the user is from a HathiTrust university), and the work's purported copyright status according to the "HathiTrust Rights Database."

70.     The HathiTrust Rights Database specifies the purported copyright status of each work in the HDL, as determined through automated and manual processes conducted by

HathiTrust, including whether the work is (i) in the public domain, (ii) in-copyright, (iii) in-copyright but has been authorized for certain uses by the associated rights holder, (iii) in-copyright but too brittle to circulate, (iv) of unknown copyright status, or (v) an orphan work. For example, UM students, faculty and patrons of MLibrary, wherever they may be located worldwide, may obtain "full view" access of works that are specified as being in the public domain and originated from MLibrary.

71.     Upon information and belief, the HDL is capable of providing public access to the "full view" of every digital object in the database, even if access is purportedly restricted by settings in the HathiTrust Rights Database. Thus, if the copyright status of a work is misidentified in the HathiTrust Rights Database, the HDL malfunctions or a user obtains unauthorized access to the HDL, the work may become fully viewable, printable and downloadable by the general public.

72.     In all, through their systematic and concerted digitization efforts, the Universities and HathiTrust are responsible for the creation of at least twelve unauthorized digital copies (six image files, six digital-text files) of every physical work in their libraries that is selected for digitization: two copies for Google, two copies for the originating University, two copies for the HDL servers at UM, two copies for the HDL servers at IU and two tape backups of the image and digital text files at separate UM facilities. Each pair of digital copies is stored at a different location and is accessible by different individuals. It is likely that additional copies are made at some or all of the locations.

## HathiTrust Orphan Works Project

73.     On May 16, 2011, MLibrary announced the launch of the HathiTrust Orphan Works Project – an initiative to identify so-called orphans amongst the in-copyright works in the HDL, with an initial focus on works published in the United States between 1923 and 1963.

John Wilkin, executive director of HathiTrust, published an article estimating that as many as 50% of the volumes in the HDL may be "orphan works."

74.     To identify an in-copyright work as a work HathiTrust will treat as an "orphan," the HathiTrust Orphan Works Project purports to follow a multistep due diligence process to check whether the work is commercially available for sale and, if it is not, to attempt to locate and contact the copyright holder.  If HathiTrust fails to contact the copyright holder, it then lists the bibliographic information for the work on the HathiTrust Orphan Candidates webpage for ninety days.  If no copyright holder emerges during that time, the work will become available for "full view" on HathiTrust to UM's students, professors and other authenticated users and visitors to the libraries at UM's campuses, allowing them to view, download and print the entire copyrighted work.

75.     In July and August 2011, other HathiTrust members, including Defendants UW, UC and Cornell, announced their participation in the HathiTrust Orphan Works Project and their intent to make works in their collections identified as HathiTrust Orphans available to their respective students, faculty and library patrons.

76.     The first list of HathiTrust Orphan Candidates was posted on the HathiTrust website on or about July 15, 2011.

77.     The initial complaint in this action was filed on September 12, 2011.  The filing of the complaint directly led to the identification and emergence of numerous authors and copyright holders whose works were scheduled to become available for "full view" on HathiTrust beginning October 13, 2011.

78.     On September 16, 2011, MLibrary announced that "[t]he close and welcome scrutiny of the list of potential orphan works has revealed a number of errors, some of them serious," and that "we have already begun an examination of our procedures to identify the gaps

that allowed volumes that are evidently not orphan works to be added to the list." MLibrary promised, however, that it would "proceed with the work" without specifying a date certain.

79.     Unless enjoined by this Court, copyright protected works deemed to be orphans by the HathiTrust process will become available for "full view" to hundreds of thousands of users affiliated with the Universities.

## CLAIM FOR RELIEF

80.     Plaintiffs incorporate by reference paragraphs 1 through 79 as if set forth herein.

81.     Plaintiffs' copyrights specified in Exhibit A are valid and enforceable.

82.     By scanning, creating multiple digital copies of and distributing copyrighted works – including without limitation each of Plaintiffs' copyrighted works identified on Exhibit A – on a systematic, continuous and unauthorized basis, Defendants have violated and are continuing to violate Section 108 of the Copyright Act and have infringed and are continuing to infringe Plaintiffs' copyrights and exclusive rights under Section 106 of the Copyright Act.

83.     Defendants' infringing acts have been and continue to be willful, intentional and purposeful, in disregard of the rights of Plaintiffs.

84.     Defendants' conduct has caused, is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot be remedied with money. Plaintiffs have no adequate remedy at law.

85.     An actual controversy presently exists between the parties regarding whether Defendants' ongoing, systematic digitization of copyrighted works without authorization and their threat to imminently display the HathiTrust Orphans without authorization constitute and, unless enjoined by this Court, will constitute violations of Sections 106 and 108 of the Copyright Act.

86.     Because of Defendants' actions and threatened actions as described herein, including the threat by Defendants HathiTrust and UM to begin displaying copyrighted HathiTrust Orphans, there is a substantial controversy between the parties with adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

87.     Plaintiffs are entitled to prospective, injunctive and declaratory relief to enjoin Defendants from their continuous, ongoing and threatened violations of federal copyright law as described herein.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs demand that:

(a)     Pursuant to 28 U.S.C. § 2201, this Court declare that:

     (i)     Defendants' systematic digitization and distribution of copyrighted materials without authorization constitutes unlawful copyright infringement in violation of Sections 106 and 108 of the Copyright Act;

     (ii)    Defendants' distribution and display of copyrighted works through the HathiTrust Orphan Works Project will infringe the copyrights of Plaintiffs and others likely to be affected;

(b)     Pursuant to 17 U.S.C. § 502, this Court issue an injunction enjoining Defendants from:

     (i)     systematically reproducing, distributing and/or displaying Plaintiffs' or any other copyrighted works without authorization except as specifically provided by 17 U.S.C. § 108;

     (ii)    providing to Google for digitization copyrighted works without authorization;

     (iii)     proceeding with the HathiTrust Orphans Work Project, including without limitation, from displaying, distributing or otherwise making available any so-called orphan work protected by copyright.

     (c)     Pursuant to 17 U.S.C. § 503, this Court order the impoundment of all unauthorized digital copies of works protected by copyright within Defendants' possession, custody or control, including works whose copyrights are held by Plaintiffs, to be held in escrow under commercial grade security, with any computer system storing the digital copies powered down and disconnected from any network, pending an appropriate act of Congress.

     (d)     Pursuant to 17 U.S.C. § 505, this Court award Plaintiffs their attorneys' fees and costs; and

     (e)     Plaintiffs be granted such other relief as may be deemed just and equitable.

Dated: New York, New York
       October 5, 2011

                        FRANKFURT KURNIT KLEIN &SELZ, P.C.

                        By:                                       
                              Edward H. Rosenthal, Esq.
                              Jeremy S. Goldman, Esq.

                        488 Madison Avenue
                        New York, New York  10022
                        Tel.:  (212) 980-0120

                        *Attorneys for Plaintiffs*

## EXHIBIT A

| COPYRIGHT HOLDER | TITLE | PUBLISHER | PUB. DATE | U.S. COPYRIGHT REGISTRATION NO. | DEFENDANT UNIVERSITY |
|---|---|---|---|---|---|
| Authors League Fund | Good troupers all: the story of Joseph Jefferson | Macrae Smith Company | 1945 | A189587 | University of California |
| Trond Andreassen | Bok-Norge : en litteratursosiologisk oversikt | Universitetsforlaget | 2000 | | University of Michigan |
| Pat Cummings | C.L.O.U.D.S. | Lothrop, Lee & Shepard Books | 1986 | TX0001806038 | University of Michigan |
| Pat Cummings | Clean Your Room, Harvey Moon! | Bradbury Press | 1991 | TX0003159777 | University of Michigan |
| Pat Cummings | Jimmy Lee Did It | Lothrop, Lee & Shepard Books | 1985 | TX0001650936 | University of Michigan |
| Pat Cummings | Talking With Artists: Volume 1 | Bradbury Press | 1992 | TX0003422950 | University of Michigan |
| Pat Cummings | Talking With Artists: Volume 2 | Simon & Schuster Books for Young Readers | 1995 | TX0004242559 | University of Michigan |
| Pat Cummings | Talking With Adventurers | National Geographic Society | 1998 | VA000092461 VA000092460 | University of California |
| Erik Grundstrom | Oss mälvakter emellan | Alba | 1988 | | University of Wisconsin |
| Angelo Loukakis | Vernacular Dreams | University of Queensland Press | 1986 | TX0001967553 | University of Michigan |
| Roxana Robinson | Summer light | Viking | 1988 | TX0002346979 | University of Michigan |
| Roxana Robinson | Georgia O'Keeffe : a life | Harper & Row | 1989 | TX0002736171 | University of Michigan |
| Roxana Robinson | A glimpse of scarlet and other stories | E. Burlingame Books | 1991 | | University of Michigan |
| Roxana Robinson | A glimpse of scarlet and other stories | HarperPerennial | 1992 | | University of Michigan |
| Roxana Robinson | Asking for love and other stories | Random House | 1996 | TX0004268621 | University of Michigan |
| Roxana Robinson | Sweetwater : a novel | Random House | 2003 | TX0005905727 | University of Michigan |

| COPYRIGHT HOLDER | TITLE | PUBLISHER | PUB. DATE | U.S. COPYRIGHT REGISTRATION NO. | DEFENDANT UNIVERSITY |
|---|---|---|---|---|---|
| Roxana Robinson | A perfect stranger: and other stories | Random House | 2005 | | University of Michigan |
| Helge Ronning | Den umulige friheten : Henrik Ibsen og moderniteten | Gyldendal | 2006 | | University of Wisconsin |
| Helge Ronning | Dødsdom over et folk? : imperialismen og Biafrakonflikten | Pax | 1969 | | University of California |
| André Roy | Marguerite Duras à Montréal | Spirale | 1984 | | University of Michigan |
| André Roy | Marguerite Duras à Montréal | Editions Spirale | 1981 | | University of California |
| J.R. Salamanca | Southern light : a novel | Knopf | 1986 | TX0001800562 | University of Michigan |
| J.R. Salamanca | Embarkation | Knopf | 1973 | | University of Michigan |
| J.R. Salamanca | The lost country: a novel | Simon & Schuster | 1958 | RE000313041 | University of Michigan |
| J.R. Salamanca | A sea change | Knopf | 1969 | | University of Michigan |
| J.R. Salamanca | That summer's trance : a novel | Welcome Rain | 2000 | | University of Michigan |
| J.R. Salamanca | Lilith | Simon & Schuster | 1961 | RE000459151 | University of Michigan |
| J.R. Salamanca | Lilith | Simon & Schuster | 1961 | RE000459151 | University of California |
| J.R. Salamanca | Embarkation | Knopf | 1973 | | University of California |
| J.R. Salamanca | The lost country: a novel | Simon & Schuster | 1958 | RE000313041 | University of California |
| J.R. Salamanca | A sea change | Knopf | 1969 | | University of California |
| J.R. Salamanca | Southern light : a novel | Knopf | 1986 | TX0001800562 | University of California |
| James Shapiro | Oberammergau | Pantheon Books | 2000 | TX0005234556 | University of Michigan |
| Danièle Simpson | Je cours plus vite que la lycose : poèmes | Naaman | 1983 | | University of Wisconsin |
| T.J. Stiles | Jesse James : last rebel of the Civil War | A.A. Knopf | 2002 | TX0003959406 | University of Michigan |

2

| COPYRIGHT HOLDER | TITLE | PUBLISHER | PUB. DATE | U.S. COPYRIGHT REGISTRATION NO. | DEFENDANT UNIVERSITY |
|---|---|---|---|---|---|
| Fay Weldon | Watching me, watching you | Summit Books | 1981 | TX0000907715 | University of Michigan |
| Fay Weldon | Praxis : a novel | Summit Books | 1978 | TX0000161661 | University of Michigan |
| Fay Weldon | Puffball : a novel | Summit Books | 1980 | TX0000550383 | University of Michigan |
| Fay Weldon | Remember me | Random House | 1976 | | University of Michigan |
| Fay Weldon | The heart of the country | Hutchinson | 1987 | TX0002580673 | University of Michigan |
| Fay Weldon | The hearts and lives of men | Heinemann | 1987 | TX0002176563 | University of Michigan |
| Fay Weldon | The rules of life | Hutchinson | 1987 | TX0002139543 | University of Michigan |
| Fay Weldon | The Shrapnel Academy | Viking | 1987 | TX0001967142 | University of Michigan |
| Fay Weldon | The heart of the country | Viking | 1988 | TX0002580673 | University of Michigan |
| Fay Weldon | Sacred cows | Chatto & Windus | 1989 | | University of Michigan |
| Fay Weldon | The fat woman's joke | Academy Chicago | 1986 | | University of Michigan |
| Fay Weldon | The cloning of Joanna May | Collins | 1989 | TX0002728206 | University of Michigan |
| Fay Weldon | Little sisters | Chivers Press | 1987 | | University of Michigan |
| Fay Weldon | Darcy's utopia | Collins | 1990 | TX0002931605 | University of Michigan |
| Fay Weldon | The cloning of Joanna May | Penguin Books | 1991 | TX0002728206 | University of Michigan |
| Fay Weldon | Moon over Minneapolis, or, Why she couldn't stay | HarperCollins | 1991 | TX0003114513 | University of Michigan |
| Fay Weldon | Life force | Viking | 1992 | TX0003274167 | University of Michigan |
| Fay Weldon | Growing rich | HarperCollins | 1992 | | University of Michigan |
| Fay Weldon | Life force | HarperCollins | 1992 | TX0003274167 | University of Michigan |
| Fay Weldon | Trouble | Penguin Books | 1994 | TX0003682496 | University of Michigan |
| Fay Weldon | Affliction | HarperCollins | 1993 | | University of Michigan |
| Fay Weldon | Splitting | Flamingo | 1995 | TX0004084784 | University of Michigan |
| Fay Weldon | Wicked women : stories | The Atlantic Monthly Press | 1997 | TX0004578645 | University of Michigan |
| Fay Weldon | Leader of the band | Penguin Books | 1990 | TX0002560295 | University of Michigan |
| Fay Weldon | Growing rich | Flamingo | 1992 | | University of Michigan |

3

| Copyright Holder | Title | Publisher | Pub. Date | U.S. Copyright Registration No. | Defendant University |
|---|---|---|---|---|---|
| Fay Weldon | The hearts and lives of men | Flamingo | 1992 | TX0002176563 | University of Michigan |
| Fay Weldon | A hard time to be a father : a collection of short stories | Flamingo | 1998 | | University of Michigan |
| Fay Weldon | Life force | HarperCollins | 1992 | TX0003274167 | University of Michigan |
| Fay Weldon | Nothing to wear and nowhere to hide : stories | Flamingo | 2002 | | University of Michigan |
| Fay Weldon | Big women | Flamingo | 1997 | TX0004843655 | University of Michigan |
| Fay Weldon | Godless in Eden : a book of essays | Flamingo | 1999 | | University of Michigan |
| Fay Weldon | Rhode Island blues | Flamingo | 2000 | TX0005335279 | University of Michigan |
| Fay Weldon | The Bulgari connection | Flamingo | 2001 | | University of Michigan |
| Fay Weldon | Auto da fay | Flamingo | 2002 | TX0005741087 | University of Michigan |
| Fay Weldon | Flood warning : a play | Samuel French | 2003 | PA0001247989 | University of Michigan |
| Fay Weldon | Wicked women : stories | The Atlantic Monthly Press | 1997 | TX0004578645 | University of Michigan |
| Fay Weldon | Mantrapped | Fourth Estate | 2004 | | University of Michigan |
| Fay Weldon | She may not leave | Fourth Estate | 2005 | TX0006444289 | University of Michigan |
| Fay Weldon | The spa decameron | Quercus | 2007 | TX0007138911 | University of Michigan |
| Fay Weldon | The hearts and lives of men | Heinemann | 1987 | TX0002176563 | University of California |
| Fay Weldon | Big women | Flamingo | 1997 | TX0004843655 | University of California |
| Fay Weldon | Life force | Penguin Books | 1993 | TX0003274167 | University of California |
| Fay Weldon | Worst fears | Flamingo | 1996 | TX0004405886 | University of California |

4