UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
THE AUTHORS GUILD, INC., et al,                  :
                                                 :
                      Plaintiffs,                :        Index No. 11 Civ. 6351 (HB)
                                                 :
       - against -                               :
                                                 :
HATHITRUST, et al.                               :
                                                 :
                      Defendants.                :
-------------------------------------------------------------------X


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR JUDGMENT ON THE PLEADINGS**


FRANKFURT KURNIT KLEIN & SELZ, P.C.
Edward H. Rosenthal, Esq.
Jeremy S. Goldman, Esq.
Amelia Brankov, Esq.
488 Madison Avenue
New York, New York  10022
Tel.:  (212) 980-0120
Fax:  (212) 593-9175
erosenthal@fkks.com
jgoldman@fkks.com
abrankov@fkks.com

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................ 1

I.  THE ASSOCIATIONAL PLAINTIFFS HAVE STANDING ................................... 4

      A.      The Associational Plaintiffs are Ideally Suited to Represent the Largely
             Identical Copyright Claims of their Members .......................................... 4

      B.      The Associational Plaintiffs Satisfy the Three-Part *Hunt* Test .............................. 6

             1.      At Least One Member of Each Associational Plaintiff Would
                     Otherwise Have Standing to Sue in His or Her Own Right ...................... 6

             2.      Neither Plaintiffs' Copyright Claim Nor their Request for
                     Injunctive Relief Requires the Participation of Individual Members
                     in the Lawsuit ............................................................................. 7

      C.      Four Associational Plaintiffs Have Standing Under Foreign Law ...................... 17

      D.      Four Associational Plaintiffs Own Copyrights in Infringed Works ................... 17

II.  PLAINTIFFS' CLAIMS REGARDING THE ORPHAN WORKS PROJECT
    ARE PROPERLY BEFORE THIS COURT .......................................................... 18

      A.      Plaintiffs Have Standing with Respect to the OWP .............................................. 18

      B.      Plaintiffs Cannot Escape Judicial Review By Temporarily Suspending the
             OWP ..................................................................................................... 22

      C.      The OWP Claims Are Ripe ................................................................................. 24

CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ............................................... 14

*Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*,
   651 F.3d 218 (2d Cir. 2011) ............................................... *passim*

*Am. Geophysical Union v. Texaco, Inc.*,
   60 F.3d 913 (2d Cir. 1994) ............................................... 13, 15

*Am. Booksellers Ass'n v. Houghton Mifflin Co., Inc.*,
   No. 94 Civ. 8566, 1995 WL 92270 (S.D.N.Y. March 3, 1995)........................... 8, 11

*Amnesty Int'l USA v. Clapper*,
   638 F.3d 118 (2d Cir. 2011) ............................................... 20

*Banff, Ltd. v. Federated Dep't Stores, Inc.*,
   841 F.2d 486 (2d Cir. 1988) ............................................... 24

*Bldg. & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*,
   448 F.3d 138 (2d Cir. 2006) ............................................... 7, 19, 21

*Bloor v, Carro, Spanbock, Londin, Rodman & Fass*,
   754 F.2d 57 (2d Cir. 1985) ............................................... 4

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*,
   No. 01 Civ. 11295, 2003 WL 21056809 (S.D.N.Y. May 8, 2003)........................... 23

*City of Erie v. Pap's A.M.*,
   529 U.S. 277 (2000)............................................... 22

*Comer v. Cisneros*,
   37 F.3d 775 (2d Cir. 1994) ............................................... 18

*Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*,
   989 F.2d 1305 (2d Cir. 1993) ............................................... 19

*Cortner v. Israel*,
   732 F.2d 267 (2d Cir. 1984) ............................................... 10

*Ctr. for Reprod. Law v. Bush*,
  304 F.3d 183 (2d Cir. 2002) .................................................................. 8

*Dow Jones & Co., Inc. v. Harrods*,
  237 F. Supp. 2d 394 (S.D.N.Y. 2002) ................................................... 4

*Ehrenfeld v. Mahfouz*,
  489 F.3d 542 (2d Cir. 2007) ................................................................ 24

*Harlem Valley Transp. Ass'n v. Stafford*,
  360 F. Supp. 1057 (S.D.N.Y. 1973) ....................................................... 5

*Harris v. Simon & Schuster, Inc.*,
  646 F. Supp. 2d 622 (S.D.N.Y. 2009) .................................................. 10

*Hayes v. Carlin Am., Inc.*,
  168 F. Supp. 2d 154 (S.D.N.Y. 2001) ................................................... 25

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*,
  118 F.3d 199 (4th Cir. 1997) .............................................................. 20

*Hunt v. Wash. State. Apple Adver. Comm'n*,
  432 U.S. 333 (1977) .............................................................................. 6

*In re State St. Bank & Trust Co. ERISA Litig.*,
  579 F. Supp. 2d 512 (S.D.N.Y. 2008) .................................................. 18

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
  153 F.3d 82 (2d Cir. 1998) ............................................................ 12, 16

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................ 21, 23

*McGraw-Hill Cos., Inc. v. Ingenium Techs. Corp.*,
  375 F. Supp. 2d 252 (S.D.N.Y. 2005) .................................................. 24

*Nat'l Ass'n of Freelance Photographers v. Associated Press*,
  No. 97 Civ. 2267, 1997 WL 759456 (S.D.N.Y. Dec. 10, 1997)............... 10

*Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*,
  990 F. Supp. 245 (S.D.N.Y. 1997) ........................................... 5, 8, 9, 16

*Nat'l Ass'n of Letter Carriers v. U.S.P.S.*,
  604 F. Supp. 2d 665 (S.D.N.Y. 2009) .................................................. 15

iii

*Neufeld v. Neufeld*,
    910 F. Supp. 977 (S.D.N.Y. 1996) ....................................................... 22

*Olan Mills, Inc. v. Linn Photo Co.*,
    795 F. Supp. 1423 (N.D. Iowa 1991) (8th Cir. 1994).................................... 11

*Rivera v. Heyman*,
    157 F.3d 101 (2d Cir. 1998) ............................................................... 4

*U.S. v. W.T. Grant Co.*, 345 U.S. 629 (1953) ........................................ 20, 22

*UMG Recordings, Inc. v. MP3.com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) ..................................................... 14

*United Food & Commercial Workers Union Local 751 v. Brown Grp. Inc.*,
    517 U.S. 544 (1996)......................................................................... 7

*Warth v. Seldin*, 422 U.S. 490 (1975) ......................................... 4, 6, 15, 16

## STATUTES

Fed. R. Civ. P. 12 .......................................................................... 4

Fed. R. Civ. P. 15 .......................................................................... 21

17 U.S.C. § 106 ............................................................................ 20

17 U.S.C. § 107............................................................................ *passim*

17 U.S.C. § 108............................................................................ 2

17 U.S.C. § 501(b) ........................................................................ 10

17 U.S.C. § 502(a) ........................................................................ 16, 20

## LEGISLATIVE HISTORY

*Competition and Commerce in Digital Books,* 111th Cong. 101 (2008)........................................ 5

*Copyright Law Revision Part 5: 1964 Revision Bill with Discussions and Comments*,
    89th Cong. 103 (1965).......................................................................... 5

H.R. REP. NO. 94-1476 (1976) ............................................................. 13

Report of the Register of Copyrights, LIBRARY REPRODUCTION OF COPYRIGHTED WORKS (17
    U.S.C. 108), January 1983 ..................................................................... 13

## PRELIMINARY STATEMENT

Plaintiffs submit this memorandum in opposition to Defendants' motion for judgment on the pleadings dismissing certain plaintiffs and certain claims in this litigation for lack of subject matter jurisdiction.  Specifically, Defendants allege that the Associational Plaintiffs lack standing to bring copyright claims on behalf of their members and that the claims based upon Defendants' duplication and threatened distribution of so-called "Orphan Works" are either moot or not ripe for adjudication.

For the reasons set forth in this memorandum, Defendants' motion must be denied in its entirety.  Defendants – university libraries and their collective entity, HathiTrust – admit to having copied literally millions of works, the majority of which are protected by copyright.  The Associational Plaintiffs are ideally suited to protect the rights of their members and to address the legal issues raised by Defendants.  Individual participation by the members of the Associational Plaintiffs is not necessary for the Court to determine the legality of Defendants' mass digitization program and Orphan Works Project or to grant an injunction prohibiting further infringement of Plaintiffs' copyrighted works.  Moreover, many of the Associational Plaintiffs themselves are owners of copyrighted works unlawfully duplicated by Defendants and/or have the right under their respective countries' laws to sue on behalf of their members.

Defendants' motion also claims that the issues arising from Defendants' Orphan Works Project are not ripe for adjudication, merely because Defendants have agreed to temporarily suspend their program to display and distribute copyrighted works – a decision prompted by Plaintiffs' commencement of this action when Defendants were confronted with the fact that their list of supposed "orphan candidates" included copyright-protected works by easily identifiable authors who did not want their works to be made available.  The possibility that

Defendants will back away from their announced plans to bring back the Orphan Works Project does not deprive this Court of jurisdiction to review and address Defendants' infringing conduct.

## FACTUAL BACKGROUND

The relevant facts concerning the Associational and Individual Plaintiffs, Defendants' mass digitization program (the "MDP") and Orphan Works Project ("OWP"), as well as the restrictions set forth in Section 108 of the Copyright Act, 17 U.S.C. § 108, with respect to the permissible level of copying by libraries, are set forth in detail in Plaintiffs' First Amended Complaint ("FAC").[1]

In brief, Plaintiffs have alleged and Defendants admit that in conjunction with Google, Defendants have participated in the digital copying of more than nine million volumes of works as part of the MDP.  FAC and Answer ¶ 39.  Defendants' own records establish that more than seven million of those works are protected by copyright.  *See* HathiTrust Statistics, *at* http://www.hathitrust.org/statistics_info (last visited January 31, 2012).  Nevertheless, Defendants made multiple copies of these digitized works and, in certain instances, permit users of libraries, including students, faculty and visitors, to view, search, print and download full digital copies of these works.  The works selected for digitization are not limited to obscure, rare or out-of-print works, but include bestselling novels that are still in print and are commercially available in both hardcopy and electronic formats.  Answer ¶ 50.

The Associational Plaintiffs are seven organizations located in the United States, the United Kingdom, Canada, Sweden, Norway and Australia.[2]  All of these organizations are

---

[1] Copies of the FAC and Defendants' Joint Answer to the FAC ("Answer") are annexed as Exhibits A and B, respectively, to the declaration of Edward H. Rosenthal, dated January 31, 2011 ("Rosenthal Decl.").

[2] The seven Associational Plaintiffs are The Authors Guild, Inc. (the "Guild"), The Australian Society of Authors Limited ("ASA"), Union Des Écrivaines et des Écrivains

2

dedicated to assisting and defending the rights of authors, including the protection and

enforcement of their copyrights.  All told, the Associational Plaintiffs represent more than 70,000

authors worldwide who hold rights to hundreds of thousands of works, many of which have been

unlawfully digitized as part of the MDP.  There also are twelve individual author plaintiffs (the

"Individual Plaintiffs") who are not the subject of Defendants' motion directed to standing.  FAC

¶¶ 12-20.

With respect to the OWP, Defendants admit that they devised a procedure by which they

identify works that they believe to be orphans – *i.e.*, works where the copyright owner cannot be

readily located – and post a list of those "Orphan Candidates" to a page on HathiTrust's website.

Then, if the copyright owners of the Orphan Candidates do not step forward within ninety days,

digital copies of the works are made available for users to view, download and print in their

entirety.  Defendants further admit that after their list of Orphan Candidates was scrutinized (*i.e.*,

when owners of such works stepped forward to object to Defendants' plan), they suspended the

OWP. [3]  But Defendants have plainly stated their intention to recommence the OWP, agreeing

only to give Plaintiffs notice before implementing a new or revised program.  FAC and Answer

¶¶ 73-78; Petersen Decl., Exs. A, B and C.

---

Québécois ("UNEQ"), the Authors' Licensing and Collecting Society ("ALCS"), Sveriges
Författarförbund ("SFF"), Norsk faglitterær forfatter- og oversetterforening ("NFF") and The
Writers' Union of Canada ("TWUC").  Although the FAC lists The Authors League Fund, Inc.
("ALF") under the "Associational Plaintiffs" heading, ALF does not have any "members" and is
not seeking to bring any claims on anyone's behalf.  Rather, ALF is asserting a claim based only
on its direct ownership of copyrights in works unlawfully digitized by Defendants.

[3] One of the main reasons given by Judge Chin for rejecting the settlement agreement in
the Google Books case was that the settlement included a mechanism for making orphan works
available to the public.  Judge Chin stated that a determination as to how to address the issues
raised by the existence of orphan works should be made by Congress, not by "private, self-
interested parties."  *Authors Guild v. Google*, 770 F. Supp. 2d 666, 677 (S.D.N.Y. 2011).

As explained below, well-established law provides that Defendants' temporary and voluntarily cessation of their challenged program – a program whose existence prompted the commencement of this litigation and which included works whose copyrights are owned by Plaintiffs J.R. Salamanca and ALF, as well as two members of the ALCS (FAC ¶¶ 13, 15 and 29) – does not deprive the Court of jurisdiction to determine the legality of the program.

## ARGUMENT

Defendants' motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure must be determined under the same standard as a Rule 12(b)(1) motion to dismiss the complaint.  Under that standard, the Court must accept as true all of Plaintiffs' allegations and draw all inferences in favor of the Plaintiffs.  *Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir. 1985).  Where, as in this case, a motion attacks the facial sufficiency of the pleadings rather than the facts themselves, "the court accepts as true the uncontroverted factual allegations in the complaint."  *Dow Jones & Co., Inc. v. Harrods*, 237 F. Supp. 2d 394, 404 (S.D.N.Y. 2002).

## I

## THE ASSOCIATIONAL PLAINTIFFS HAVE STANDING

### A.    The Associational Plaintiffs are Ideally Suited to Represent the Largely Identical Copyright Claims of their Members

The United States Supreme Court has made clear that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  "The purpose of the associational standing doctrine is 'to facilitate, in a fair and efficient manner, the collective adjudication of the common rights of an

association's members,' a goal which can be served by allowing a collective suit even in situations where a class action would be inappropriate." *Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*, 990 F. Supp. 245, 248 (S.D.N.Y. 1997) ("*NACB*") (quoting *Int'l Union, United Auto. Aerospace & Agr. Implement Workers of Am. v. Brock,* 477 U.S. 274, 288 (1986)). The Supreme Court has observed that associational plaintiffs "can draw upon a pre-existing reservoir of expertise and capital" that will benefit both courts and plaintiffs. *Brock*, 477 U.S. at 289. And, as this Court has recognized, the "interest and expertise" of an associational plaintiff, "when exerted on behalf of its directly affected members, assure 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions.'" *Harlem Valley Transp. Ass'n v. Stafford,* 360 F. Supp. 1057, 1065 (S.D.N.Y. 1973) (quoting *Baker v. Carr,* 369 U.S. 186, 204 (1962)).

The Associational Plaintiffs are ideally suited to provide the "interest and expertise" to help sharpen and simplify the complex legal issues raised by the MDP and OWP. The Authors Guild, for example, has testified before Congress on numerous occasions, and has helped shape copyright law regarding the very matters implicated by Defendants' conduct, including Sections 107 and 108 of the Copyright Act, the orphan works dilemma and the digitization of books. *See, e.g., Copyright Law Revision Part 5: 1964 Revision Bill with Discussions and* Comments, 89th Cong. 103 (1965) (testimony of Irwin Karp, Authors League of America [predecessor of the Authors Guild], (regarding relationship between fair use and library photocopying); *Competition and Commerce in Digital Books*, 111th Cong. 101 (2008) (testimony of Paul Aiken, the Authors Guild, regarding mass digitization and orphan works issues). Moreover, the Guild has been actively involved as an associational plaintiff in the copyright infringement case against Google

that has been pending in this District since 2005, including in the negotiations that led to the proposed settlement rejected by the Court.  *See Google,* 770 F. Supp. 2d at 666 (Chin, J).

The participation of the foreign authors associations also serves the interests of associational standing recognized by the Supreme Court, as Defendants' conduct implicates the rights of authors worldwide, and associations representing those authors are in the best position to help educate this Court regarding copyright law in their respective countries and the impact that the MDP and OWP will have on their members.

**B.**   **The Associational Plaintiffs Satisfy the Three-Part *Hunt* Test**

In *Hunt v. Wash. State. Apple Adver. Comm'n*, 432 U.S. 333 (1977), the Supreme Court articulated the following three-part test that an association must pass to have standing to bring a suit on behalf of its members:  "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Id.* at 343.  Defendants challenge the first and third prongs of the *Hunt* test.  As demonstrated below, those challenges are misplaced.

**1.**   **At Least One Member of Each Associational Plaintiff Would Otherwise Have Standing to Sue in His or Her Own Right**

In *Warth v. Seldin*, the decision from which the three *Hunt* factors were derived, the Supreme Court explained that the first element requires only that the association's members, "*or any one of them*, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."  422 U.S. at 511 (emphasis added).  *See also Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 228 (2d Cir. 2011) ("*AOSI*") (formulating first prong as requiring that "*at least one of the association's members* would otherwise have standing to sue in its own right

– *i.e.*, has constitutional standing"). Furthermore, there is no requirement that "an association must 'name names' in a complaint in order properly to allege injury in fact to its members." *Bldg. & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006) ("*Downtown*"). At the pleading stage, it is enough for the Plaintiff to allege that the members of the association would have standing to sue in their own right. *Id.*

Here, there is no question that at least one member of each Associational Plaintiff would have standing to sue Defendants for copyright infringement in his or her own right. In the case of five of the seven Associational Plaintiffs – The Guild, NFF, SFF, ASA and UNEQ – the FAC includes claims by Individual Plaintiffs who are members of these organizations and have sued for copyright infringement in their own right. *See* FAC ¶¶ 22, 23, 24, 27, 28, 30 and 31. Although Plaintiffs ALCS and TWUC did not identify specific members of their associations whose copyrights were infringed by Defendants, the Second Circuit does not require that they "name names" at the pleading stage and the allegations that "Defendants have digitized without authority more than 35,000 books by ALCS members," FAC ¶ 15, and TWUC's members "would have standing to sue in their own right as authors," *id.* ¶ 20, are sufficient to meet the first element of the *Hunt* test. *See Downtown*, 448 F.3d at 145.

**2.    Neither Plaintiffs' Copyright Claim Nor their Request for Injunctive Relief Requires the Participation of Individual Members in the Lawsuit**

In a recent Second Circuit decision, the court observed that "the third prong of the associational standing test is 'prudential,' not constitutional, and is 'best seen as focusing on . . . matters of administrative convenience and efficiency.'" *AOSI*, 651 F.3d at 229 (quoting *United Food & Commercial Workers Union Local 751 v. Brown Grp. Inc.*, 517 U.S. 544, 555-56 (1996) ("[O]nce an association has satisfied *Hunt*'s first and second prongs assuring adversarial vigor in pursuing a claim for which member Article III standing exists, it is difficult to see a

constitutional necessity for anything more.") (emphasis added). Thus, "district courts possess a degree of discretion in applying" the third prong of the *Hunt* test. *AOSI*, 651 F.3d at 229; *see Ctr. for Reprod. Law v. Bush*, 304 F.3d 183, 196 (2d Cir. 2002) ("[T]he prudential requirements of standing have been developed by the Supreme Court on its own accord and applied in a more discretionary fashion as rules of judicial self-restraint further to protect, to the extent necessary under the circumstances, the purpose of Article III.") (internal quotation marks omitted).

Here, it is clear that judicial economy and efficiency are well served by having the Associational Plaintiffs participate in this important copyright case.

### (a) Plaintiffs' Sole Copyright Claim Based on the MDP and OWP Does Not Require Individual Participation

The gravamen of Defendants' standing argument is that the Associational Plaintiffs' "claims for declaratory relief and injunctive relief regarding the Universities' alleged copyright infringement require individualized proof." Def. Mem. at 10. Plaintiffs, however, attack the legality of the MDP and OWP as a whole. The individual participation of each of the millions of authors similarly impacted by Defendants' unauthorized, systematic digitization of their copyrighted works and planned dissemination of purported orphan works is not necessary for the Court to determine whether, under the Copyright Act, those activities are prohibited. Defendants' assertion that two issues – copyright ownership and their fair use defense – require individualized proof and therefore preclude associational standing must be rejected.

As a general matter, "[t]he fact that a limited amount of individuated proof may be necessary does not in itself preclude associational standing." *NACB*, 990 F. Supp. at 250 (citing *New York State Nat'l Org. of Women v. Terry*, 886 F.2d 1339, 1349 (2d Cir. 1989) (associational standing present though evidence from some individual members required)). Thus, in *American Booksellers Association v. Houghton Mifflin Co., Inc.*, No. 94 Civ. 8566, 1995 WL 92270

8

(S.D.N.Y. March 3, 1995), the American Booksellers Association ("ABA"), representing over 4,500 independent bookstores, sought to assert claims on behalf of its members under the Robinson-Patman Act against publishers accused of granting more favorable terms to large, national booksellers.  The publishers moved to dismiss the ABA on standing grounds, arguing, similar to Defendants' arguments here, that "scrutiny of Robinson-Patman violations requires highly individualized proof" – in particular, the need to show proof of the violations and the impact on each store.  *Id.* at *4-5.  The court denied defendants' motion, holding that despite the need for some individual proof, participation by the individual members was unnecessary:

> To enjoin unlawful practices, it is not necessary for the ABA to show impact on each and every independent bookstore member.  It is enough that the ABA prove the Robinson–Patman violations and the impact those violations have had on at least some independent bookstores.  *At some point, the proof of impact will become redundant.*  The Court can see no reason why proof of each and every impact is required to enjoin unlawful practices.

*Id.* at *5 (emphasis added).  *See also NACB*, 990 F. Supp. at 250 (associational standing "will better facilitate fair and efficient adjudication" than "requiring duplicative proof" of every member); *AOSI*, 651 F.3d at 229-230 (finding associational standing even where plaintiffs' claim would "require a more thorough factual development" of the burdens on the association's members to comply with the guidelines at issue).

### (i)      Copyright Ownership

Defendants' claim that a variety of factual issues concerning the copyright ownership by particular members in particular works "could arise" – including validity, reversion, registration, work-for-hire status, copyright notice and authorization (*See* Def. Mem. at 11-12) – is an attempt to create issues where none really exist.  First, Defendants admit that their database of digitized works records the copyright status of each work and whether the work's rights holder granted permission to distribute the work electronically.  Answer ¶ 70.  Accordingly, the critical

9

information concerning the status of the copyrights already is in Defendants' possession.

Second, in their Answer, "Defendants admit that the books selected for digitization pursuant to

[their agreements with Google] are not limited to works in the public domain, unpublished works

or deteriorating published works that cannot be replaced," *i.e.*, works that Section 108 of the

Copyright Act authorizes libraries to reproduce under certain conditions, but "*include in-print*

*books that are commercially available and books that are protected by copyright*."  *Id*. ¶ 50

(emphasis added).

      Third, Defendants' assertion that individualized proof is necessary to determine whether

the rights to a particular work have reverted from the publisher ignores well-established

copyright law providing either "the legal *or* beneficial owner of an exclusive right under a

copyright" has standing to sue for copyright infringement.  17 U.S.C. § 501(b).  The Second

Circuit has made clear that a "beneficial owner" includes an author who grants a third party

exclusive rights in his or her work in exchange for the payment of royalties and retains standing

to sue for copyright infringement, even if those rights have not "reverted" back to the author

(which may occur when the book goes out of print).  *See Cortner v. Israel,* 732 F.2d 267, 271 (2d

Cir. 1984) (holding that composer who assigned copyright title to a publisher in exchange for

payment of royalties retains standing to sue for infringement of that copyright); *Harris v. Simon*

*& Schuster, Inc.*, 646 F. Supp. 2d 622, 632 (S.D.N.Y. 2009) (author who granted publishing

rights in exchange for royalties retains standing).

      Defendants rely on two copyright cases where associational standing was denied, both of

which are easily distinguishable.  In *National Association of Freelance Photographers v.*

*Associated Press*, No. 97 Civ. 2267, 1997 WL 759456 (S.D.N.Y. Dec. 10, 1997), the issue was

whether photographers had transferred their copyrights to the Associated Press ("AP") by

10

endorsing checks issued by the AP that bore a legend purporting to effect an assignment of copyright.  The court found that particularized fact issues concerning the check transactions at the center of the lawsuit – including issues with respect to each photographer's prior dealings with the AP, each photographer's understanding of the endorsement practice, any side-agreements that might govern a particular transaction and allegations that the photographers misunderstood or were defrauded by the AP – required the participation of each member of the photographers' association.  Here, in stark contrast, the central issues are not about copyright ownership or particular transactions with Defendants, but rather the legality under the Copyright Act of the MDP and OWP as a whole.  Whether these programs are lawful does not depend on who owns the copyright.[4]

*AIME v. UCLA*, No. 10 Civ. 9378 (C.D. Cal. Oct. 3, 2011), an unpublished, non-binding decision cited by Defendants, is also inapposite.  The court in that case denied associational standing to the Association for Information Media and Equipment ("AIME"), a national trade association whose mission is to help ensure copyright education and compliance.  The court ruled, without analysis, that the scope of the declaratory relief sought by AIME "would be

---

[4] A more analogous case is *Olan Mills, Inc. v. Linn Photo Co.*, 795 F. Supp. 1423, 1426-28 (N.D. Iowa 1991), *rev'd on other grounds*, 23 F.3d 1345 (8th Cir. 1994).  There, the defendants argued that the Professional Photographers of America ("PPA") did not have standing to assert its members' copyright claims because there was no evidence that the members had registered their photographs.  The court rejected that argument, holding that because one of the named plaintiffs, who was a member of the PPA, had registered his photographs, "[a] reasonable inference can be drawn from the complaints that other members of PPA have registered their copyrights."  Here, copyright ownership is alleged with respect to the works of twelve Individual Plaintiffs, including members of the Associational Plaintiffs, as well as four Associational Plaintiffs.  Defendants may test the copyright ownership with respect to those works, but "[a]t some point, the proof of [copyright ownership] will become redundant."  *Am. Booksellers*, 1995 WL 92270, at * 5.  Given that more than 7 million volumes of copyrighted works have been digitized by Defendants, a "reasonable inference" can be drawn from the FAC that other members of the Associational Plaintiffs have copyright ownership over the works they authored and that those works were digitized by Defendants.  *Olan Mills*, 795 F. Supp. at 1428.

limited by the rights that members have over the copyrights" and that AIME had failed to establish associational standing because it could not meet the third prong under *Hunt*. Here, as discussed below, the Associational Plaintiffs are providing lists of their members, which the Second Circuit has determined is more than adequate for the Court to fashion an injunction preventing further infringement of Plaintiffs' copyrights. *See Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 94 (2d Cir. 1998).

### (ii)   Fair Use

Defendants claim that their fair use defense requires individualized proof as to each work allegedly infringed, therefore precluding associational standing. This is incorrect. As an initial matter, the extent to which Defendants, which are libraries, are permitted to duplicate copyrighted works without authorization is expressly governed by Section 108, *not* Section 107, of the Copyright Act. Section 108 gives libraries a limited right to make digital copies of works for very limited purposes, including to preserve unpublished works and replace published works under certain conditions. Although Section 108(f)(4) provides that nothing in Section 108 "in any way affects the right of fair use as provided by section 107," it was not Congress's intent to allow libraries to rely on fair use as a justification for engaging in precisely the type of mass reproduction of copyrighted works that is expressly prohibited by Section 108.

In 1983, the Register of Copyrights issued a comprehensive report concerning the implementation of Section 108, which makes clear that Section 107 is not available as a defense to the MDP:

> On certain infrequent occasions, [fair use copying "beyond" § 108] may be permitted. *But fair use privileges are not available on a broad and recurring basis once the copying permitted by § 108 has occurred.* Section 108 was enacted to make lawful some types of copying which would otherwise be infringements of copyright, fair use notwithstanding. This means that "108" photocopying would be infringing but for the existence of that section, thus leaving section 107 often

12

> clearly unavailable as a legal basis for photocopying not authorized by section
> 108.

Report of the Register of Copyrights, LIBRARY REPRODUCTION OF COPYRIGHTED WORKS (17

U.S.C. 108), January 1983, *available at* http://www.copyright.gov/reports/library-reproduction-

1983.pdf, at 96 (emphasis added).

Even assuming that the MDP and OWP are subject to analysis under Section 107,

Defendants' fair use defense does not preclude the Associational Plaintiffs from having standing.

"Fair use serves as an affirmative defense to a claim of copyright infringement, and thus the

party claiming that its secondary use of the original copyrighted work constitutes a fair use

typically carries the burden of proof as to all issues in the dispute." *Am. Geophysical Union v.*

*Texaco, Inc.*, 60 F.3d 913, 918 (2d Cir. 1994). Due to "the endless variety of situations and

combinations of circumstances that can rise in a particular case . . . especially during a period of

rapid technological change," Congress intended the fair use analysis to be malleable, leaving

courts "free to adapt the doctrine to particular situations on a case-by-case basis." H.R. REP. NO.

94-1476, at 66 (1976).

Defendants suggest that the Court must dismiss this action because it would be too

complicated to apply the fair use factors to each copyrighted work in the MDP. This is a

peculiar argument for Defendants to make, considering that they participated in the MDP without

giving any consideration to the reason why a particular work should be copied. Plaintiffs allege

and Defendants admit that "[t]he books selected for digitization are not limited to works in the

public domain, unpublished works or deteriorating published works that cannot be replaced, but

include in-print books that are commercially available and are protected by copyright." *See* FAC

and Answer ¶ 50. In other words, Defendants made no attempt whatsoever to conduct a fair use

analysis on each work to determine, for example, whether the work is "out of print" or digitizing

the work and uploading it to HathiTrust was likely to have an effect "upon the potential market

for or value of the copyrighted work." Def. Mem. at 13-14 (citing 17 U.S.C. § 107(4)). Rather,

Defendants indiscriminately selected works for digitization by the library, room or bookcase,

which is why Defendants were just as likely to have digitized copies of recently published,

bestselling novels such as J.K. Rowling's *Harry Potter and the Deathly Hallows*

(http://catalog.hathitrust.org/Record/005542040), as out-of-print, lesser-known foreign works.

*Cf. Cambridge Univ. Press v. Becker*, No. 08 Civ. 1425 (N.D. Ga. Sep. 30, 2010) (describing

"Fair Use Checklist" that instructors at Georgia State University must complete before any

particular reading is digitized for inclusion in the school's electronic reserves system).

  The circumstances of this case, in which Plaintiffs challenge the legality of the

Defendants' MDP and OWP as a whole, call for a fair use analysis of the programs as a whole,

not a work-by-work approach.   In parallel cases addressing mass copyright infringement claims,

other courts have done exactly this, applying the fair use factors to the defendants' enterprises as

a whole.  *See, e.g.*, *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 350-51

(S.D.N.Y. 2000) (granting summary judgment to plaintiffs after applying fair use factors to

entire website that permitted users to download "tens of thousands of popular CDs"); *A&M

Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014–15 (9th Cir. 2001) (affirming lower court's

"general analysis of Napster system uses" under 17 U.S.C. § 107).  The contrary rule – requiring

a work-by work fair use analysis – essentially would immunize defendants engaged in wholesale

copying of protected rights from scrutiny because they could claim that it was theoretically

possible that the copying of some portion of some work might in some circumstance be protected

by fair use.

14

In the case before this Court, the works whose copyrights are owned by the Individual Plaintiffs and four of the Associational Plaintiffs provide examples of categories of books, including books that are in-print and books that are out-of print; books that have been digitized and sold as electronic books; books that were first published many decades ago and books that were released in the last few years; books published abroad and written in foreign languages, and books published here in New York.  To the extent the Court believes additional samples of works would be useful for its analysis, Plaintiffs are willing to identify additional works of members of the Associational Plaintiffs on a random sampling basis – which the Second Circuit has sanctioned as an efficient and cost-effective procedure under similar circumstances.  *See Texaco*, 60 F.3d at 915 (describing random sampling process used "to spare the enormous expense of exploring the photocopying practices" of hundreds of scientists).  *See also Nat'l Ass'n of Letter Carriers v. U.S.P.S.*, 604 F. Supp. 2d 665, 676 (S.D.N.Y. 2009) (although court might "indeed have to categorize plaintiffs' members into large groups – *e.g.*, investigations related to criminal conduct and those not related to criminal conduct," this would not "require individualized proof, nor the participation of individual members").

### (b)   The Relief Requested Does Not Require Individual Participation

Plainly, the relief requested by Plaintiffs for a declaratory judgment and prospective, injunctive relief does not require the participation of individual members of the Associational Plaintiffs.  Defendants do not contend otherwise, which is not surprising, given the Supreme Court's pronouncement that where a suit seeks "a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."  *Warth*, 422 U.S. at 515; *see also AOSI*, 651 F.3d at 229 (standing where "the Associations seek an injunction barring enforcement

of the [challenged regulation], which will not necessitate the participation of individual members in the lawsuit"); *NACB*, 990 F. Supp. at 248 ("Because NACS seeks only injunctive relief, it could prevail without a showing by its members as to what damages each suffered.").

The Copyright Act gives courts broad authority to award injunctive relief "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).  Should Plaintiffs prevail in this lawsuit, and it is found that Defendants did not have the right to proceed with the MDP and/or OWP without the consent of copyright owners, the Court will be able to fashion an injunction that "will inure to the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515.  It is not necessary to have the participation of each and every one of these tens of thousands of copyright owners in order to resolve this legal question and fashion an appropriate remedy.

The Second Circuit has made clear that individual participation is not necessary for a court to fashion an appropriate remedy in this type of situation.  In *Itar-Tass*, the Union of Journalists of Russia ("UJR") had standing on behalf of its members to sue a Russian newspaper published in the United States for copying materials authored by UJR members without their authorization. *See* 153 F.3d at 82.  The Second Circuit held that "[d]espite UJR's unwillingness to disclose its entire membership list, it might be possible to frame some form of injunctive relief that affords protection to those author-members that UJR is willing to identify." *Id.*  Here, the Associational Plaintiffs already have agreed to produce documents sufficient to identify the full names of each of their members, which is far more identifying information than the UJR was willing to provide in *Itar-Tass*.  Accordingly, this Court will have a sufficient basis from which "to frame some form of injunctive relief that affords protection to those author-members that [the Associational Plaintiffs are] willing to identify." *Id.*

16

C.      **Four Associational Plaintiffs Have Standing Under Foreign Law**

  *Itar-Russ* also stands for the proposition that the law of the country in which a foreign

association is located should govern the question of whether the association has standing to bring

a copyright claim on behalf of its members.  *See Id.* at 92-93.  In that case, the court observed

that "Russian copyright law authorizes the creation of organizations 'for the collective

administration of the economic rights of authors . . . in cases where the individual exercise

thereof is hampered by difficulties of a practical nature.'  Russian Copyright Law, Art. 44(1).

Indeed, UJR, the reporters' organization, may well be able in this litigation to protect the rights

of the reporters whose articles were copied by [the defendant newspaper]."  *Id.* at 93.

Accordingly, the court affirmed the district court's ruling that the UJR had standing.  *Id.* at 94.

In this case, at least four of the Associational Plaintiffs have the right, by virtue of a mandate

from their members and/or under their respective country's laws, to bring suits for copyright

infringement on behalf of their members.[5]  *See* Rosenthal Decl., Exs. C, (ALCS: Art. of Ass'n §

7(g)(4) & U.K. Copyright, Designs and Patents Act (1988) § 101A), D (UNEQ: Québec

Professional Syndicates Act, R.S.Q., ch. S-40, § 9(11)) and E (NFF: Statutes § 1-3 & Norwegian

Copyright Act §§ 38a, 38b), F (SFF: Member Agreement §§ 1, 2, 5).

D.      **Four Associational Plaintiffs Own Copyrights in Infringed Works**

  In the event that the Court determines that any of the Associational Plaintiffs do not have

standing to sue on behalf of their members, the Guild, ALF, TWUC and ASA own and control

copyrights in works that were unlawfully digitized by Defendants.  These organizations thus

have standing to sue Defendants in their own right.  The FAC identifies one such work owned by

the ALF, *see* FAC ¶ 13, Ex. A, and the others are being disclosed to Defendants in discovery.

---

  [5] Defendants concede that some of the Associational Plaintiffs may have standing by
virtue of foreign law.  *See* Def. Mem. at 7 n. 4.

To the extent the Court is inclined to dismiss the Guild, the ASA or TWUC for lack of associational standing, Plaintiffs respectfully request leave to file a Second Amended Complaint to add allegations concerning the specific works owned by those Associational Plaintiffs.

**II**

**PLAINTIFFS' CLAIMS REGARDING THE ORPHAN<br>WORKS PROJECT ARE PROPERLY BEFORE THIS COURT**

According to Defendants, the temporary suspension of the OWP renders Plaintiffs' claims regarding the OWP non-justiciable.  In a nutshell, Defendants' position is that because they never actually made the posted Orphan Candidates available for display, download or distribution (they suspended the OWP in the face of this lawsuit), they never actually committed any act of copyright infringement and that, as a result, there is no actual case or controversy.

As shown below, courts routinely have rejected similar motions on the grounds that standing is determined as of the filing of the complaint and a defendant cannot shield its misconduct from judicial review by subsequently ceasing the misconduct.  Additionally, Defendants' argument that Plaintiffs' claims are unripe is fatally flawed.  Even if Defendants' procedures are being revised in some unspecified way, they still plan to proceed with the unauthorized display and distribution of copyrighted books.  Thus, Plaintiffs' claims are ripe for judicial review.

**A.**    **Plaintiffs Have Standing with Respect to the OWP**

In determining whether Plaintiffs have standing to challenge the OWP, the Court must assess the facts as they existed at the time of the filing of the complaint.  *See, e.g., Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir. 1994); *In re State St. Bank & Trust Co. ERISA Litig.*, 579 F. Supp. 2d 512, 516 (S.D.N.Y. 2008).  "The critical time for determining whether there is an

18

ongoing violation is when the complaint was filed." *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305, 1311 (2d Cir. 1993).

In order to establish standing under Article III of the United States Constitution, a plaintiff must allege that: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Downtown*, 448 F.3d at 151 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.* (*TOC*)*, Inc.*, 528 U.S. 167, 180-81 (2000)). Defendants concede that the FAC adequately alleges traceability and that the alleged injury will be redressed by a favorable decision. They argue only that Plaintiffs have not sufficiently alleged "injury in fact" with respect to the OWP.

Plaintiffs filed this action, in part, to stop Defendants from distributing copies of supposed orphan works without the permission of the authors or copyright holders. Under the OWP, copyrighted works identified by Defendants as so-called "orphans" will be made available to hundreds of thousands of users unless affected copyright holders, who happen to learn about the existence of the webpage containing the list of Orphan Candidates, step forward to opt out of the program. FAC ¶ 79. Two of the Plaintiffs in this case are the owners of copyrights in works that Defendants erroneously listed as Orphan Candidates. Plaintiff ALF owns the literary estate of Gladys Malvern, including the copyright in "Good Troupers All," which Defendant HathiTrust listed as an Orphan Candidate with a scheduled release date of October 13, 2011. *Id.* ¶ 13. HathiTrust also listed Plaintiff J.R. Salamanca's novel entitled "The Lost Country" as an Orphan Candidate with a scheduled release date of November 8, 2011. *Id.* ¶ 29. Additionally, Plaintiff ALCS has two members whose works Defendants deemed Orphan Candidates. *Id.* ¶ 15.

19

Defendants' distribution of these Orphan Candidates by making them available for users to view, print, and download from the HathiTrust website would have violated their owners' exclusive distribution and reproduction rights under 17 U.S.C. § 106. *See Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997) ("When a public library adds a work to its collection, lists the work in its index or catalog system, and makes the work available to the borrowing or browsing public, it has completed all the steps necessary for distribution to the public."). Plaintiffs have thus satisfied the Article III injury requirement.

Defendants argue that Plaintiffs lack standing because Plaintiffs cannot establish "any actual injury," as "no works have been made publicly available yet through the OWP." Def. Mem. at 15. However, Defendants do not need to allege that an "actual" injury (*i.e.* infringement) occurred. Rather, an "imminent" injury is sufficient for justiciability under Article III. Indeed, Section 502 of the Copyright Act explicitly gives courts the power to issue injunctions to *prevent* infringement of a copyright. 17 U.S.C. § 502(a). *See Friends of the Earth*, 528 U.S. at 180 (injury must be "actual *or* imminent" (emphasis added)); *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations . . . and, of course, it can be utilized even without a showing of past wrongs."); *Amnesty Int'l USA v. Clapper*, 638 F.3d 118, 138 (2d Cir. 2011) (plaintiffs had standing where "the fact that the government has authorized the potentially harmful conduct means that the plaintiffs can reasonably assume that government officials will actually engage in that conduct by carrying out the authorized surveillance").

Here, the threat of infringement was and remains imminent. At the time of the filing of the initial complaint, Defendants planned to distribute full copies of the Orphan Candidates, including works whose copyrights are held by Plaintiffs Salamanca and ALF and members of

Associational Plaintiff ALCS, ninety days after they were listed on the HathiTrust website.  *See* FAC ¶¶ 13, 29.  Even now, Defendants refuse to end the OWP.  To the contrary – they have made clear their intention to release copyrighted works to their users once the OWP resumes. Just because Defendants have yet to distribute copies of any works through the OWP does not mean the threat is not imminent; indeed, the purpose of the OWP is to exploit "orphan works" unless the copyright holders opt out of the program.[6]

Defendants' argument that their actions are immune from scrutiny because they suspended the OWP between the filing of the initial complaint and the FAC misapprehends applicable law.  "[A]n amendment of a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set forth -- or attempted to be set forth -- in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B) *see Downtown*, 448 F.3d at 138 (reversing dismissal of claim where initial complaint was filed before violation was rectified and amended pleading related back to the initial complaint).  Here, the fact that Defendants removed the initial list of Orphan Candidates from the HathiTrust website on September 16, 2011, between the time of the filing of the two complaints, does not deprive Plaintiffs of standing.  The FAC amplified the pleadings, but was still aimed at challenging the legality of the OWP.  As such, the FAC relates back to the filing of the initial complaint and subsequent acts taken by Defendants are irrelevant to standing.[7]

---

[6] At the very least, Plaintiffs' claims should survive this motion on the pleadings.  As the Supreme Court has made clear, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Downtown*, 448 F.3d at 145.

[7] Although Plaintiffs ALF, Salamanca and ALCS were not added as Plaintiffs until after Defendants removed their works as Orphan Candidates, their claims relate back to the filing of the original complaint because Defendants knew that Plaintiffs were challenging the legality of

**B.**   **Plaintiffs Cannot Escape Judicial Review By Temporarily Suspending the OWP**

A defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.  *See W.T. Grant Co.*, 345 U.S. at 632; *Friends of the Earth*, 528 U.S. at 189.  Otherwise, "courts would be compelled to leave the defendant free to return to its old ways."  *Id.*  A case is only moot, and therefore non-justiciable, when the challenged conduct ceases and "it becomes impossible for the court to grant any effectual relief whatever to the prevailing party."  *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (claim challenging constitutionality of law prohibiting nude dancing establishments was not moot simply because claimant closed his dance club; claimant could decide to open a new club) (brackets and quotation marks omitted).  The Supreme Court has stated:

> The standard . . . for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." . . . The "heavy burden of persua[ding]" the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.

*Friends of the Earth*, 528 U.S. at 189.

"A bare promise by a party in the course of litigation to discontinue past or ongoing misconduct does not justify denial of injunctive relief, since such unilateral action hardly suffices to ensure that the party will not, in the future, reverse course and resume its challenged activities."  *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, No. 01 Civ. 11295, 2003 WL 21056809, at *6 (S.D.N.Y. May 8, 2003) (internal citation and quotation omitted) (watch

---

the OWP.  *See, e.g., Neufeld v. Neufeld,* 910 F. Supp. 977, 986 (S.D.N.Y. 1996) (permitting new plaintiff to be added under Fed. R. Civ. P. 15 where "substance of the allegations concerning defendant's conduct toward [the new plaintiff] are fully set forth in the original complaint as acts which were also carried out against [existing plaintiff]").

manufacturer seeking preliminary injunction allowed to amend complaint to bring infringement claims even though defendants agreed to stop selling the watch designs in question).

Defendants have not, and cannot, carry their "heavy" burden to establish that Plaintiffs' claims regarding the OWP are moot.  Far from being "absolutely clear" that Defendants will not resume their program of displaying and distributing copyrighted works they deem orphans, Defendants have *admitted* that they will proceed with the OWP.  *See* Declaration of Joseph Petersen, Ex. C.  Defendants have stated that "[n]ew [Orphan Candidates] will appear 90 days subsequent to a redesign of our orphan works identification process and a review of in-copyright volumes under that redesigned process." *Id.*, Ex. B.[8]  Notably, Defendants' purported "redesign" of the OWP relates only to its process for identifying purported orphan works – there is no indication they intend to withdraw their plans to make full copies of copyrighted works deemed as "orphans" available to online users.

Were Defendants' argument to prevail, law breakers could avoid liability by simply suspending their infringing conduct upon challenge.  Moreover, every time a copyright holder of an Orphan Candidate surfaced, Defendants could strip the copyright holder of the right to challenge the OWP by removing the subject work from the list.  Under this scheme, no one would ever have standing to protect the rights of the supposed orphans – not even those whose

---

[8] Defendants rely on *Lujan v. Defenders of Wildlife,* 504 U.S. at 555, which involved a challenge to the scope of a regulation under the Endangered Species Act on the ground that it did not extend to foreign nations.  The Supreme Court held the possibility that the plaintiffs might be deprived of an opportunity to observe the threatened species at some time in the future did not demonstrate an imminent injury, *id.* at 564, and that it generally is difficult for a plaintiff to establish standing in a case where the plaintiff himself is not the subject of the challenged action. *Lujan* presents a very different situation than the case before this Court, where the challenged conduct by Defendants threatens to directly impair the copyright interests of the owners of the purported orphan works, including works owned by certain of the Plaintiffs.

works were slated for distribution.  Defendants' attempt to evade judicial review is the precise

conduct the voluntary cessation doctrine seeks to prohibit and it should be rejected.

## C.    The OWP Claims Are Ripe

Defendants' argument that Plaintiffs' OWP claims are unripe is meritless.  Article III

ripeness "prevents courts from declaring the meaning of the law in a vacuum and from

constructing generalized legal rules unless the resolution of an actual dispute requires it."

*Ehrenfeld v. Mahfouz*, 489 F.3d 542, 546 (2d Cir. 2007).  In order to assess prudential ripeness,

courts consider: (i) "the fitness of the issues for judicial decision" and (ii) "the hardship to the

parties of withholding court consideration."  *Id.*  Courts routinely hold that infringement claims

are ripe where a defendant has stated an intention and ability to proceed with the alleged

infringement.  *See, e.g., Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 493 (2d Cir.

1988) ("based on Bloomingdale's intention and ability to sell goods under the stylized lower-

case 'b Wear' and ribbon-style 'B Wear" marks, there is an actual controversy ripe for

adjudication"); *McGraw-Hill Cos., Inc. v. Ingenium Techs. Corp.*, 375 F. Supp. 2d 252, 257

(S.D.N.Y. 2005) (copyright claims ripe where "abundantly clear that the two parties are on a

collision course that has already framed the essential disputes in plain terms and that will enable

the Court to determine their respective rights").

Here, Defendants have admitted that they will proceed with the distribution of so-called

orphan works, and have already created a platform through which to do so.  The parties'

respective positions regarding the legality of the OWP are diametrically opposed:  Plaintiffs

claim that the project is illegal, while Defendants are "certain . . . that our proposed uses of

orphan works are lawful."  Petersen Decl., Ex. C.  Were the Court to decline to hear the case,

Plaintiffs would suffer significant hardship.  Absent an injunction, Defendants will proceed with

24

the OWP and infringe the copyrights of Plaintiffs, the Associational Plaintiffs' members and other unsuspecting authors and rights holders.  Accordingly, Plaintiffs' claims challenging the legality of the OWP are ripe.[9]

### CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for judgment on the pleadings based on lack of subject matter jurisdiction.

Dated: New York, New York
   January 31, 2012

        FRANKFURT KURNIT KLEIN & SELZ, P.C.


        By:  /s/ Edward H. Rosenthal
          Edward H. Rosenthal, Esq.
          Jeremy S. Goldman, Esq.
          Amelia Brankov, Esq.

          488 Madison Avenue
          New York, New York  10022
          Tel.:  (212) 980-0120
          Fax:  (212) 593-9175
          erosenthal@fkks.com
          jgoldman@fkks.com
          abrankoc@fkks.com

          *Attorneys for Plaintiffs*

---

[9] *Hayes v. Carlin Am., Inc.*, 168 F. Supp. 2d 154 (S.D.N.Y. 2001) (Def. Mem. at 19) is inapposite.  That case held that a dispute over the ownership of the rights to *future* royalties in a renewal term while the copyrighted work was still in its original copyright term was premature. *Id.* at 159-60.  In contrast, Defendants' imminent re-launch of the OWP threatens to harm Plaintiffs' *present* copyright interests.