UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
THE AUTHORS GUILD, INC., et al.,                                :
                                                                :
                          Plaintiffs,                           :          Index No. 11 Civ. 6351 (HB)
                                                                :
          - against -                                           :
                                                                :
HATHITRUST, et al.,                                             :
                                                                :
                          Defendants.                           :
----------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

FRANKFURT KURNIT KLEIN & SELZ, P.C.
Edward H. Rosenthal, Esq.
Jeremy S. Goldman, Esq.
488 Madison Avenue
New York, New York  10022
Tel.:  (212) 980-0120
Fax:  (212) 593-9175
erosenthal@fkks.com
jgoldman@fkks.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................II

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 3

LEGAL STANDARD ............................................................................................................ 7

ARGUMENT ........................................................................................................................ 9

I.  DEFENDANTS' MASS DIGITIZATION AND ORPHAN WORKS
    PROGRAMS EXCEED SECTION 108 LIBRARY PRIVILEGES ................................. 9

    A.  Legislative History of Section 108 ................................................................. 9

    B.  Defendants Have Violated Every Category of Section 108................................ 12

        1.  Providing Millions of Digital Copies of Works to Google
            Constitutes an "Indirect Commercial Advantage" Under
            Section 108(a) ..................................................................................... 12

        2.  Defendants are Exceeding their Privileges Under Section
            108(c) to Copy Published Works for the Purpose of Replacement .......... 13

        3.  Defendants are Distributing Digital Copies in Violation
            of Section 108(c) ................................................................................. 14

        4.  The Works Are Not Being Copied to Fulfill User Requests ................... 17

        5.  Defendants are Engaging in the "Systematic Reproduction"
            of Works in Violation of Section 108(g) ................................................ 18

        6.  Defendants' Orphan Works Program Violates Section 108(h)................. 18

    C.  Defendants Should Not Be Permitted to Preempt Congress................................ 20

II. DEFENDANTS CANNOT RELY ON FAIR USE (OR OTHER
    LIMITATIONS ON THE RIGHTS OF COYPRIGHT HOLDERS) .............................. 21

CONCLUSION.................................................................................................................... 24

## TABLE OF AUTHORITIES

**Page**

### CASES

*Am. Geophysical Union v. Texaco,*
    60 F.3d 913 (2d Cir. 1994) ................................................................ 12, 21

*Authors Guild v. Google, Inc.,*
    770 F. Supp. 2d 666 (S.D.N.Y. 2011) .......................................... 20

*Bloate v. U.S.,*
    130 S.Ct. 1345 (2010) ........................................................................ 22

*Bradley v. Fontaine Trailer Co., Inc.,*
    No. 06 Civ. 62, 3:06-cv-62 (WWE), 2009 WL 763548 (D. Conn. Mar. 20, 2009) ................. 8

*Chil-Mil Corp. v. W.T. Grant Co.,*
    70 F.R.D. 352 (E.D. Wis. 1976) ........................................................ 8

*Doron Precision Sys., Inc. v. FAAC, Inc.,*
    423 F. Supp. 2d 173 (S.D.N.Y. 2006) ............................................ 4

*Dysart v. Remington Rand, Inc.,*
    31 F. Supp. 296 (D. Conn. 1939) .................................................... 8

*Gibson v. Craigslist, Inc.,*
    No. 08 Civ. 7735 (RMB), 2009 WL 1704355 (S.D.N.Y. 2009) ............... 8

*Golan v. Holder,*
    132 S.Ct. 873 (2012) .................................................................. 20, 21

*Island Software & Computer Serv., Inc. v. Microsoft Corp.,*
    413 F.3d 257 (2d Cir. 2005) ........................................................ 19

*Kidder Peabody & Co., Inc. v. Unigestion Int'l, Ltd.,*
    903 F. Supp. 479 (S.D.N.Y. 1995) .................................................. 8

*Kristensons-Petroleum, Inc. v. Sealock Tanker Co., Ltd.,*
    304 F. Supp.2d 584 n. 2 (S.D.N.Y. 2004) .................................... 8

*Madonna v. U.S.,*
    878 F.2d 62 (2d Cir. 1989) ............................................................ 8

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ................................................................ 21

*Morris v. Bus. Concepts, Inc.*,
   283 F.3d 502 (2d Cir. 2002) ...................................................... 10

*Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co.*,
   712 F. Supp. 2d 84 (S.D.N.Y. 2010) ........................................... 10

*Muller-Paisner v. TIAA*,
   289 F. App'x 461 n. 5 (2d Cir. 2008) ............................................ 4

*Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*,
   166 F.3d 65 (2d Cir. 1999) ........................................................ 23

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*,
   06 Civ. 6278 (SHS), 2006 WL 377101 (S.D.N.Y. Dec. 18, 2006) ......... 19

*Potter v. U.S.*,
   155 U.S. 438 (1894) ................................................................ 23

*Sellers v. M.C. Floor Crafters, Inc.*,
   842 F.2d 639 (2d Cir. 1988) ........................................................ 7

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) ...................................................... 23

*VNA Plus, Inc. v. Apria Healthcare Group, Inc.*,
   29 F. Supp. 2d 1253 (D. Kan. 1998) .............................................. 8

## LEGISLATIVE HISTORY

105th Cong., 2d Sess. at 61 .......................................................... 16

S. Rep. No. 190, 105th Cong., 2D Sess. (1998) .................................. 16

S. REP. NO. 519, 91st Cong., 1st Sess. (1969) .................................... 11

## STATUTES

17 U.S.C. § 106 ....................................................................... 7

17 U.S.C. § 108 ................................................................. *passim*

17 U.S.C. § 121 ...................................................................... 23

17 U.S.C. § 512(c)(1)(B) ................................................................................. 12

Copyright Term Extension Act ................................................................. *passim*

Digital Millennium Copyright Act ........................................................... *passim*

Fed. R. Civ. P. 12(c) ............................................................................... 1, 7, 8

Fed. R. Evid. 201(b)................................................................................. 4, 19

Family Entertainment and Copyright Act of 2005, Pub. L. 109-9,
119 Stat. 218, § 401 (2005)................................................................... 18

## TREATISES

5C CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE &
PROCEDURE § 1369 (3d Ed. 2004) ............................................................ 8

MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT (1989) ................................... 9

## OTHER

John Schwartz, *Open-Access Advocate Is Arrested For Huge
Download*, N.Y. TIMES, July 19, 2011.................................................... 16

MARY RASENBERGER & CHRIS WESTON, OVERVIEW OF THE LIBRARIES AND ARCHIVES
EXCEPTION IN THE COPYRIGHT ACT (2005)........................................... 9, 10, 18, 19

Office of the Register of Copyrights, *Legal Issues in Mass Digitization:
A Preliminary Analysis and Discussion Document* (2011) ...................... 9

PETER B. HIRTLE, *Copyright Term and the Public Domain in the United States* (2012)............. 19

PETER B. HIRTLE, EMILY HUDSON & ANDREW T. KENYON, COPYRIGHT & CULTURAL
INSTITUTIONS: GUIDELINES FOR DIGITIZATION FOR U.S. LIBRARIES, ARCHIVES, AND MUSEUMS
(2009)........................................................................................................... 15

REGISTER OF COPYRIGHTS, *Priorities and Special Projects of the
U.S. Copyright Office* (2011) ...................................................................... 20

REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS ON THE GENERAL REVISION
OF THE U.S. COPYRIGHT LAW 26 (1961) .......................................................... 11, 17

REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS, LIBRARY REPRODUCTION
OF COPYRIGHTED WORKS (17 U.S.C. 108) (1983) .................................. 10, 18, 22, 23

## PRELIMINARY STATEMENT

Plaintiffs submit this memorandum in support of their motion pursuant to Federal Rule of Civil Procedure 12(c) for partial judgment on the pleadings and an order that Defendants' admitted systematic reproduction, distribution, and use of millions of copyright-protected books are not shielded by the First Amendment, the fair use defense, or any other provision of the Copyright Act. Plaintiffs rarely move for judgment on the pleadings, but this is a highly unusual case in which Defendants, a group of university libraries and their joint online venture, not only concede that they have engaged in the mass book digitization project at issue, but admit to acts that Congress has expressly prohibited under Section 108 of the Copyright Act.

Section 108 provides the ground rules under which libraries and archives may reproduce and sometimes distribute copyright-protected works. Those ground rules are the product of years of discussions and debate among representative academics, archivists, authors, educators, librarians, and publishers; of hundreds of hours of fact-gathering sessions organized by the Copyright Office and the Patent and Trademark Office; and of testimony before House and Senate committees in the 1960s, 1970s, and 1990s. The story of Section 108 as a legislative proposal in the 1960s, its enactment in 1976, and its amendment in 1992, 1998 (twice), and 2005 is the story of stakeholders and legislators grappling with the promise to researchers and peril to literary markets posed by a set of emerging technologies that for the first time made it convenient to create inexpensive, high quality reproductions of literary works.

Broadly, Section 108 permits libraries and archives to reproduce copyright-protected literary works for two purposes: to maintain a library's existing collection (for example, to permit a library to replace damaged, lost, or stolen books that are no longer commercially available) and to fulfill the requests of readers and researchers using a library or, through interlibrary loan arrangements, to fulfill the requests of researchers using other libraries. At

every turn, Section 108 carefully limits the scope of permissible copying – for example, prohibiting the reproduction of an entire book that is commercially available, never permitting a library to retain a reproduction of an entire book for its collection, except as a replacement, and never authorizing the distribution of a digital replacement of a published work outside of the physical premises of the library that houses the original.  These limitations are carefully designed to protect the vital cultural markets that copyright is intended to foster.

Defendants admit to a mass book digitization program and "orphan works" project that violate nearly every restriction imposed by Section 108.  Where Section 108 permits a library to create at most, and under limited circumstances, three duplicates of a work, Defendants admit to routinely making five (actually ten, as shown below).  Where Section 108 allows a library to copy entire books for its own collection solely for the purpose of replacing badly damaged or lost copies, Defendants authorized the copying of entire libraries of books, without regard to their condition, and then retained those copies for their collections.  Where Section 108 permits a library to create such a replacement copy only if the book is not commercially available, Defendants admit to not bothering to check: they authorized the copying of everything.  Where Section 108 permits only the reproduction (not the distribution) of published books except to fulfill the requests of users, and expressly requires that any digital replacement copy be used strictly on the library's premises, Defendants admit to loading digital copies of published books by the million onto servers in Michigan and Indiana and concede that those servers are connected to the Internet.  Where Section 108 explicitly forbids systematic copying, Defendants embraced what is surely the most systematic, comprehensive scheme of reproducing copyright-protected books ever undertaken, creating unauthorized, machine-readable versions of the literary work of millions of authors from all over the world.  And where Section 108 authorizes a library to make

2

uses of "orphan works" during the last twenty years of their copyright term, Defendants threaten to begin exploiting purported orphan works decades before they are permitted to do so.

Given Defendants' admitted conduct, there is no reason for the parties to engage in extensive discovery regarding the defenses they assert. Plaintiffs respectfully urge the Court to hold that Defendants' mass book digitization and orphan works projects are not protected by any defense recognized by copyright law.

## FACTUAL BACKGROUND

The facts are based on the allegations in the Plaintiffs' First Amended Complaint ("FAC") and Defendants' Answer ("Answer") thereto.

As set forth in more detail below, Defendants admit that they have engaged in a mass digitization program ("MDP") through which Google provided the service of converting much of Defendants' libraries -- millions of bound, published books, many of which are protected by copyright -- into machine-readable formats, creating a digital image file (essentially, a photographic reproduction of each page of every book, displayable on any computer or computer tablet device) and a digital text file (the text of the book in machine-readable form, similar to a Word document) of each book. Google provided this format-conversion service, apparently without any charge to Defendants, but it retained a digital image copy and a digital text copy of each book. Google returned the physical books to Defendants' libraries, along with copies of the digital image and digital text files it had created. Defendants then provided copies of these digital image and text files to HathiTrust, their joint online venture, which now hosts on its servers digital copies of nearly ten million books, nearly all of which were created by Google's conversion services. Answer ¶¶ 1, 2, 34-39, 50-54, 62-70.

Specifically, Defendants admit that each of the four university defendants in this case (collectively, the "Universities") entered into Cooperative Agreements with Google to create

digital copies of books collected by their libraries.  Answer ¶¶ 34-38.  Defendants admit that

pursuant to those agreements, Google has provided digital copies of the books to them and that

they have collected and stored a set of those digitized books in a repository called the HathiTrust

Digital Library (the "HDL").  *Id.* ¶¶ 1, 2, 39.  The Universities admit that they are co-founders of

the HathiTrust Service, and that the University of Michigan ("UM") is the largest contributor to

the HDL, the University of California is the second largest contributor, the University of

Wisconsin is the third largest contributor, Indiana University ("IU") is the seventh largest

contributor, and Cornell University ("Cornell") is the fourth largest contributor.  *Id.* ¶¶ 34-38.

Defendants "further admit that as of October 5, 2011, the HDL contained 9,709,348 volumes,

amounting to 435 terabytes of data."  *Id.* ¶ 39.

There is no dispute that the HDL includes works protected by copyright.  Defendants

admit that each University cooperates with Google to identify books from its collection to be

digitized and that those books "are not limited to works in the public domain, unpublished works

or deteriorating published works that cannot be replaced, *and include in-print books that are*

*commercially available and books that are protected by copyright.*"  *Id.* ¶ 50. (emphasis added).

Defendants deny sufficient knowledge as to whether 73% of the works in the HDL are protected

by copyright, *id.* ¶ 2, but their own records establish that more than *seven million* of those works

are so protected.  *See* HathiTrust Digital Library, *HathiTrust Statistics and Visualizations*,

http://www.hathitrust.org/statistics_info (last visited January 31, 2012).[1]  Defendants also admit

---

[1] The Court may take judicial notice of the information publicly disclosed on Defendants'
website, so long as Defendants do not dispute the website's authenticity and "it is capable of
accurate and ready determination."  Fed. R. Evid. 201(b); *see Muller–Paisner v. TIAA,* 289 F.
App'x 461, 466 n. 5 (2d Cir. 2008) ("Judicial notice may be taken of the defendants' website for
the fact of its publication."); *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179
(S.D.N.Y. 2006) (taking judicial notice of information published on defendant's website on Rule
12(b)(6) motion).

that some libraries have estimated the cost of converting physical books into digital formats is approximately $100 per volume, Answer ¶ 53, which places the value of Google's digital conversion and duplication services in the hundreds of millions of dollars.

Defendants admit that more than fifty institutions, including universities, libraries and consortia from around the world, participate in the HathiTrust Service, *id.* ¶ 62, and that digital copies created from books in the Universities' libraries have been deposited into the HDL. *Id.* ¶ 63. Defendants admit that certain users may view, search, print and download full digital copies of certain volumes in the HDL, *id.* ¶ 69, and that multiple copies of the HDL digital files are stored in various locations. *Id.* ¶ 66. All told, Defendants admit that through their MDP, at least five digital copies of each work are created, including digital copies (1) retained by Google, (2) hosted on HathiTrust's primary servers in Ann Arbor, (3) hosted on HathiTrust's mirror site in Indianapolis, (4) stored on backup tapes in Ann Arbor, and (5) stored on a duplicate set of backup tapes in Ann Arbor. *Id.* ¶¶ 34-38, 50, 64 and 66.

There is no question that Defendants have created digital copies of Plaintiffs' books. Specifically, Defendants admit to having digitized and included in the HDL books identified on Exhibit A to the FAC, including works by Plaintiffs Trond Andreassen, *id.* ¶ 22; Pat Cummings, *id.* ¶ 23; Erik Grundström, *id.* ¶ 24; Angelo Loukakis, *id.* ¶ 25; Helge Rønning, *id.* ¶ 26; Roxanna Robinson, *id.* ¶ 27; André Roy, *id.* ¶ 28; Jack R. Salamanca, *id.* ¶ 29; James Shapiro, *id.* ¶ 30; Danièle Simpson, *id.* ¶ 31; T.J. Stiles, *id.* ¶ 32; and Fay Weldon, *id.* ¶ 33.[2]

---

[2] In addition to the claim of copyright in the works included on Schedule A to the FAC, the Associational Plaintiffs claim copyright ownership of other works as well as the right to bring claims for copyright infringement on behalf of their tens of thousands of members. FAC ¶¶ 12-20. Whether the Associational Plaintiffs have standing to assert their members' claims and whether Plaintiffs have standing with respect to the OWP are the subjects of Defendants' pending Motion for Judgment on the Pleadings.

Regarding the so-called Orphan Works Project ("OWP"), Defendants admit that on May 16, 2011, the UM Library ("MLibrary") announced the launch of the OWP (*id.* ¶ 73). Defendants admit that the project called for OWP staff to follow a multi-step procedure to determine whether certain copyright-protected works were commercially available and, if not, to attempt to find and contact the copyright owner. *Id.* ¶ 74. Defendants admit that if they were unable to locate a copyright owner using these procedures, they would list the work on HathiTrust's website for 90 days, and that, if no copyright owner had by then emerged and UM owned a physical copy of the work, the work would be made available for viewing and downloading by UM students, faculty and other library users and visitors. *Id.* ¶ 74.

Defendants admit that Gladys Malvern's "Good Troupers All: The Story of Joseph Jefferson" was digitized and included in the OWP, which scheduled its digital release to UM students, faculty and other library users (had the copyright owner not been identified) for October 13, 2011. *Id.* ¶ 13.[3] Defendants also admit that they digitized and included in the OWP Plaintiff Jack R. Salamanca's book "The Lost Country" and set its digital on-campus release (had the copyright owner not been identified) for November 8, 2011. *Id.* ¶ 29. After a list of Orphan Work candidates was posted on HathiTrust's website on or about July 15, 2011 (*Id.* ¶ 76), Defendants admit that they announced the suspension of the OWP three months later when "scrutiny of the list of potential orphan works revealed a number of errors, some of them serious." *Id.* ¶ 78. Defendants nonetheless admit their announced intention to proceed with the OWP. *Id.*

In short, with respect to Plaintiffs' *prima facie* case for copyright infringement, Defendants admit that they created digital copies of Plaintiff's books, *see* Answer ¶¶ 13, 22-33,

---

[3] Defendants claim to lack knowledge or information with respect to the allegation that Plaintiff Authors League Fund owns the copyright in this work.

and that there is no genuine dispute that these works are protected by copyright. *Id.* ¶¶ 50, 70.

Defendants further admit that they planned to make supposed "orphan works," including two of

Plaintiffs' works, available for UM library patrons to view, print and download in full. *Id.* ¶¶ 13,

29 and 74.  Thus, based solely on the pleadings, Defendants infringed or have threatened to

infringe the exclusive rights of the copyright holders of those works to reproduce, distribute and

display the works.  *See* 17 U.S.C. §§ 106(1), (3) and (5).  Defendants claim, however, that they

lack sufficient information "to form a belief about whether *Plaintiffs* hold a copyright in any

work used by Defendants and thus deny" Plaintiffs' allegations that they own their works.

Answer ¶ 1 (emphasis added).[4]

Finally, Defendants assert numerous affirmative defenses to the claims against them,

including that their activities are protected by the First Amendment (Affirmative Defense ¶ I)

and are non-infringing or otherwise defensible under Sections 107, 108, 109, 110 and 121 of the

Copyright Act (*id.* ¶¶ J, K, L, M and N).

## **LEGAL STANDARD**

The Federal Rules of Civil Procedure permit a party to move for judgment on the

pleadings after the pleadings are closed.  *See* Fed. R. Civ. P. 12(c).  "Judgment on the pleadings

is appropriate where material facts are undisputed and where a judgment on the merits is possible

merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842

F.2d 639, 642 (2d Cir. 1988).  The standard for ruling on a Rule 12(c) motion mirrors a motion

---

[4] While at this point, Plaintiffs are not asking the Court to issue a judgment on the issue
of ownership, Plaintiffs question whether Defendants seriously intend to challenge the claims
made by Plaintiffs in the FAC with respect to ownership.  Given that most of the Plaintiffs in this
case are the authors of the works at issue and there are copyright registrations for the works first
published in the United States, disputing ownership seems to be more a tactical effort to burden
Plaintiffs and the Court with technical issues than a serious defense that can justify Defendants'
conduct, including digitizing millions of copyrighted works.

to dismiss under Rule 12(b), in that "the court must view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party." *Madonna v. U. S.*, 878 F.2d 62, 65 (2d Cir. 1989).

Courts in the Second Circuit have regularly addressed and granted motions for partial judgment on the pleadings under Fed. R. Civ. P. 12(c) with respect to particular affirmative defenses. *See, e.g., Gibson v. Craigslist, Inc.*, No. 08 Civ. 7735 (RMB), 2009 WL 1704355 (S.D.N.Y. 2009) (holding that affirmative defenses are generally addressed on a motion under Rule 12(c) or 56); *Bradley v. Fontaine Trailer Co., Inc.*, No. 06 Civ. 62, 3:06-cv-62 (WWE), 2009 WL 763548 (D. Conn. Mar. 20, 2009) (granting plaintiff's motion for partial judgment on the pleadings under Rule 12(c) as to two of defendant's affirmative defenses); *Kristensons-Petroleum, Inc. v. Sealock Tanker Co., Ltd.*, 304 F. Supp.2d 584, 590 n. 2 (S.D.N.Y. 2004) (noting that plaintiff's motion to strike certain affirmative defenses was more appropriately construed as a Rule 12(c) motion); *Kidder Peabody & Co., Inc. v. Unigestion Int'l, Ltd.*, 903 F. Supp. 479 (S.D.N.Y. 1995) (granting plaintiff's motion for judgment on the pleadings as to five of defendant's affirmative defenses).[5]

---

[5] In *Bradley*, the court held that notwithstanding cases such as *Dysart v. Remington Rand, Inc.*, 31 F. Supp. 296, 297 (D. Conn. 1939), in which the court decided that a Rule 12(c) motion was not the proper means by which to challenge only some special defenses, "the modern view of rule 12(c) is to permit a motion for partial judgment on the pleadings." 2009 WL 763548, at *3 (citing *VNA Plus, Inc. v. Apria Healthcare Group, Inc.*, 29 F. Supp. 2d 1253, 1258 (D. Kan. 1998)); *Chil-Mil Corp. v. W.T. Grant Co.*, 70 F.R.D. 352, 357-58 (E.D. Wis. 1976)). Thus, while courts may discourage the granting of motions to strike affirmative defenses under Rule 12(f), courts and commentators now agree that the trend of addressing affirmative defenses as a matter of law under Rule 12(c), where the pleadings so allow, "seems sound in terms of giving the district judge greater flexibility and promoting efficiency and economy." 5C CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1369 (3d Ed. 2004).

# ARGUMENT

## I.

## DEFENDANTS' MASS DIGITIZATION AND ORPHAN WORKS PROGRAMS EXCEED SECTION 108 LIBRARY PRIVILEGES

Defendants' admitted digitization and planned use of millions of copyrighted works wildly exceed the privileges Section 108 of the Copyright Act accords libraries to make a limited number of copies of certain works for specified purposes.   To understand how thoroughly Defendants have breached the boundaries of this carefully crafted provision of the Copyright Act, especially since relevant case law is lacking, it is crucial to understand the statute's extensive legislative history, which spans decades, and its historical context.[6]   *See* Office of the Register of Copyrights, *Legal Issues in Mass Digitization: A Preliminary Analysis and Discussion Document* (2011), http://www.copyright.gov/docs/massdigitization/USCOMassDigitization_October2011.pdf (accessed Feb. 23, 2012)  ("Any review of mass book digitization would need to consider, if not compare, the activities that currently are, or should be, permissible for libraries under Section 108.").

## A.   Legislative History of Section 108

Recognizing that our libraries and archives provide a great societal service in collecting, preserving and making literary and other works available to the public, Congress included in the 1976 Copyright Act special privileges to allow those institutions to engage in the limited

---

[6] For a concise but comprehensive description of the legislative history and background of Section 108, *see* MARY RASENBERGER & CHRIS WESTON, OVERVIEW OF THE LIBRARIES AND ARCHIVES EXCEPTION IN THE COPYRIGHT ACT (2005), *at* http://www.section108.gov/papers.html ("SECTION 108 OVERVIEW"), which was "prepared for the [Section 108] Study Group by the U.S. Copyright Office in order to provide historical and other background information on Section 108, as well as an explanation of its provisions," *id. See also* MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8.03 (1989).

reproduction and distribution of copyright-protected works that "would otherwise be infringements of copyright, fair use notwithstanding." *See* 17 U.S.C. § 108 (2005); REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS, LIBRARY REPRODUCTION OF COPYRIGHTED WORKS (17 U.S.C. 108) 92 (1983) (the "1983 REPORT").[7]

Congress added Section 108 to our copyright law after decades of frequently contentious debate and negotiation among representatives of stakeholders in the literary marketplace, including academics, authors, librarians, and publishers. The story begins with the "Gentlemen's Agreement," a non-binding, voluntary agreement entered into by a publishing association and a libraries' committee in 1935. *See* SECTION 108 OVERVIEW at 3. The agreement, prompted by the advent of early photo-duplication technology that was increasingly supplementing manual transcription as a means for researchers to copy literary works, permitted libraries to "deliver a single photographic reproduction or reduction of a part thereof" upon the written request of a library patron. *Id.* at 4. For over thirty years the Gentlemen's Agreement helped define the extent to which a library could permissibly reproduce a copyright-protected work in its collection; it provides the basis for today's Sections 108(d) and (e) governing library copying in response to user requests. *Id.* at 3-4.

---

[7] In Section 108(i), Congress directed the Copyright Office to consult with the parties affected by Section 108 and to issue a report in 1983 and every five years thereafter analyzing whether Section 108 had achieved the intended balance between the interests of copyright holders and the needs of libraries and archives. The resulting 1983 Report was a prodigious, seven-volume effort. The Copyright Office's interpretations of Section 108 should be afforded deference. *See Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co.,* 712 F. Supp. 2d 84, 91 (S.D.N.Y. 2010) (Copyright Office's interpretation should be afforded "*Skidmore* deference, so long as the Copyright Office's interpretations do not conflict with the express statutory language of the Copyright Act") (citing *Morris v. Bus. Concepts, Inc.,* 283 F.3d 502, 505-06 (2d Cir. 2002) (finding the Copyright Office's interpretation as set forth in the *Circular for Copyright Registration on Form SE* "persuasive" as to whether a copyright claimant's registration of a collective work covers the constituent works)).

A far more transformative technological change, the proliferation of high-speed photocopiers, which made possible the ready creation of inexpensive reproductions of literary works, provided the impetus for the introduction and eventual passage of Section 108. "By the 1960s, the technology had advanced substantially, increasing the means and ease by which libraries could serve the public, and thus, the means and ease by which copyrights could be infringed." *Id.* at 10. Although both librarians and rightsholders initially opposed a statutory scheme governing library photocopying, each side content with its own view of "fair use," the Copyright Office pushed for new legislation with the general concept that "photocopying should not be permitted where it would compete with the publisher's market." REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW 26 (1961). Libraries supported a blanket right to photocopy works for noncommercial purposes, S. REP. NO. 519, 91st Cong., 1st Sess. 8-9 (1969), but Congress rejected that approach, instead opting for a regime, embodied in Section 108, that carefully delineates the rules under which libraries may duplicate and distribute copyrighted works without permission.

Since 1976, Congress has modified Section 108 four times, including amendments enacted in 1998 as part of the Digital Millennium Copyright Act ("DMCA") and of the Copyright Term Extension Act ("CTEA") that are highly relevant to the issues presented by this litigation. The DMCA amendment to Section 108 increased the number of replacement copies libraries are permitted to make from one to three and, most pertinently, allowed any of those three copies to be stored in digital format, subject to certain limitations. The CTEA added to Section 108 a new subsection (h), which grants libraries expansive rights to use orphan works during the last twenty years of their copyright term.

**B.**   **Defendants Have Violated Every Category of Section 108**

"[S]ection 108 of the Copyright Act narrowly circumscribes the conditions under which libraries are permitted to make copies of copyrighted works." *Am. Geophysical Union v. Texaco*, 60 F.3d 913, 931 (2d Cir. 1994).  In its current form, Section 108 can be divided into four main categories:

| Section(s) | Category |
|---|---|
| 17 U.S.C. § 108(a) | General conditions for libraries to qualify for Section 108 protections |
| 17 U.S.C. §§ 108(b) & (c) | Reproduction and distribution for purposes of preservation and replacement |
| 17 U.S.C. §§ 108(d) & (e) | Reproduction and distribution for purposes of fulfilling patron requests |
| 17 U.S.C. § 108(h) | Reproduction, distribution, display and performance of orphan works during the last twenty years of their copyright term |

As shown below, by systematically copying millions of works in their collections and promising to distribute copyrighted "orphan works" to the public, Defendants are vastly exceeding the special privileges granted to them under Section 108 in direct derogation of the exclusive rights of copyright holders.

**1.**   **Providing Millions of Digital Copies of Works to Google Constitutes an "Indirect Commercial Advantage" Under Section 108(a)**

Section 108(a) sets forth the general conditions for libraries to qualify for Section 108 rights, including that a library may make only one copy of a work (unless Section 108(b) or (c) specifies otherwise) and that copies cannot be made "with any purpose of direct or indirect commercial advantage." §§ 108(a), 108(a)(1).[8]  By allowing Google, one of the world's most

---

[8] The statute does not elaborate on what constitutes "indirect commercial advantage" and there is no case law directly on point.  However, when compared with other sections of the Copyright Act, it is clear that Congress intended the phrase to be read broadly. *Cf.*, 17 U.S.C. § 512(c)(1)(B) (protecting online service providers from liability for their users' copyright infringement provided, *inter alia*, that the provider "does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity").

successful commercial enterprises, to make and keep digital copies of millions of Defendants'

library books in exchange for Google's digital book conversion services, valued in the hundreds

of millions of dollars, Defendants run afoul of Section 108(a)(1)'s prohibition against copying

library books for direct or indirect commercial advantage.[9]   Although Defendants will surely

argue that they are engaging in the mass book digitization program purely for academic, non-

commercial purposes, their partner Google's interests are palpably commercial, and the

Universities obtain a clear financial advantage through the arrangement.

### 2.   Defendants are Exceeding their Privileges Under Section 108(c) to Copy Published Works for the Purpose of Replacement

Section 108(c) delineates the boundaries of a library's right to make unauthorized

reproductions of published books to replace works in its collection.  It permits a library to make

up to three copies; however, the copies of published works may be made only for the purposes of

*replacing* a work in the library's collection that is (or was) damaged, deteriorating, lost or stolen,

and only if the library is unable to obtain a new copy at a fair price.  17 U.S.C. § 108(c).

Based on the pleadings alone, there is no question that Defendants have exceeded the

express limitations set forth in Section 108(c).  *First*, Defendants admit to having digitized and

uploaded to the HDL each of Plaintiffs' works set forth on Exhibit A of the FAC, *see* Answer ¶¶

22-33, and they do not dispute that each such work is published.  *See* FAC, Exhibit A

(identifying publisher for each work); Answer ¶ 50 ("Defendants admit that the books selected

for digitization . . . are not limited to . . . unpublished works," but "include in-print books that are

commercially available[.]").[10]

---

[9] Google's liability for its digitization, distribution and display uses of the works through
its Google Library Project is the subject of a separate lawsuit. *See Authors Guild v. Google*, No.
05 Civ. 8136 (D.C.) (S.D.N.Y.).

[10] For unpublished works that Defendants and Google may have digitized, the legal
analysis is nearly identical.  Section 108(b) sets the rules for library duplication of unpublished

*Second*, Defendants admit that their digitization process results in the creation of *at least five digital copies of each work*,[11] including (1) a copy kept by Google for its own commercial purposes, (2) a copy hosted at the HDL's primary server farm in Ann Arbor, Michigan, (3) a copy hosted at the HDL's secondary server farm in Indianapolis, Indiana, (4) a tape backup copy stored at a facility on UM's campus, and (5) a second tape backup copy stored at a separate facility on UM's campus. *See* Answer ¶¶ 34-38, 50, 64 and 66. Accordingly, Defendants have admittedly made more copies than they are entitled to make under Section 108(c).

*Third*, even if the MDP resulted in the creation of only three copies of each copyrighted work, Defendants admit that the books selected for digitization are not limited to "deteriorating published works that cannot be replaced," but include "in-print books that are commercially available and books that are protected by copyright." Answer ¶ 50. Thus, Defendants admit to having made copies of books that are not necessarily "damaged, deteriorating, lost or stolen," nor have they limited the copying to books for which they have determined that "an unused replacement cannot be obtained at a fair price." 17 U.S.C. § 108(c); 17 U.S.C. § 108(c)(1).

### 3.  Defendants are Distributing Digital Copies in Violation of Section 108(c)

In addition to creating digital copies of published works under conditions and in quantities that far exceed libraries' reproduction rights under Section 108(c), Defendants admit to distributing those digital copies in direct violation of that section. The DMCA amended

---

works, permitting libraries to make up to three preservation copies. Unlike Section 108(c), 108(b) permits an archive or library to not only reproduce a copyright-protected work, but to distribute it to another library or archive.

[11] As Defendants admit that each digital copy includes "a set of image and OCR files," it may be more accurate to state that Defendants have created at least *ten copies* of each work, comprising five sets of image files (i.e., photographic reproductions of the printed pages) and five sets of text files containing the text of the book obtained through "OCR," or optical character recognition, technology. Answer ¶ 52.

14

Section 108 by removing the prohibition against making copies in "machine-readable" format, permitting libraries to make replacement digital copies of published books only if such digital copies are not "made available to the public in that format outside the premises of the library[.]" 17 U.S.C. § 108(c)(2).[12] This prohibition against making a digital replacement copy available outside of the premises of the library is slightly redundant, *since Section 108(c), unlike Section 108(b), permits libraries to only reproduce, not distribute, replacement copies.* §§ 108(b)(2), 108(c)(2).

In passing the DMCA, Congress explained the reasons for so clearly prohibiting libraries from distributing digital copies:

> *In recognition of the risk that uncontrolled public access to the copies or phonorecords in digital formats could substantially harm the interests of the copyright owner by facilitating immediate, flawless and widespread reproduction and distribution of additional copies or phonorecords of the work,* the amendment provides that any copy of a work that the library or archive makes in a digital format must not be otherwise distributed in that format and must not be made available in that format to the public outside the premises of the library or archives. In this way, the amendment permits the utilization of digital technologies solely for the purposes of this subsection.
>
> * * *
>
> In the view of the Committee, *this proviso is necessary to ensure that the amendment strikes the appropriate balance, permitting the use of digital technology by libraries and archives while guarding against the potential harm to the copyright owner's market from patrons obtaining unlimited access to digital copies from any location.*

---

[12] The digital copy restrictions found in Section 108(b) and 108(c) differ slightly, but legislative history and legal scholars, including a professor at Defendant Cornell, interpret Section 108 as prohibiting libraries from subsequently distributing either published or unpublished works beyond the physical premises of the library. *See* 105th Cong., 2d Sess. at 61 ("the amendment provides that any [digital copy] of a work . . . must not be otherwise distributed in that format"); PETER B. HIRTLE, EMILY HUDSON & ANDREW T. KENYON, COPYRIGHT & CULTURAL INSTITUTIONS: GUIDELINES FOR DIGITIZATION FOR U.S. LIBRARIES, ARCHIVES, AND MUSEUMS 115 (2009), *available at* http://ssrn.com/abstract=1495365 ("there can be no subsequent distribution of the digital format").

S. Rep. No. 190, 105th Cong., 2d Sess. 61-62 (1998) (emphasis added).

Defendants have trampled over the express language and spirit of Section 108's digital copy restrictions. Section 108 contemplates that, to the extent a library makes any of its three permissible copies in digital format, those digital copies *will not be distributed, and will stay in the physical library*. *See* HIRTLE ET AL. at 115 ("There is no definition of what constitutes 'premises,' but most analysts assume that this restricts use to a specific library building."). Defendants, in contrast, admit that once a digital copy of a University's library book is created at a facility operated by Google, a digital copy is (a) retained by Google, (b) reproduced and distributed to HathiTrust's main ingestion site at MLibrary in Ann Arbor, which is then (c) reproduced and distributed by Internet transmission or delivery of physical storage media to HathiTrust's mirror site at IU's library in Indianapolis and (d) reproduced on a backup tape and distributed to one UM location, which is then (e) reproduced on a backup tape and distributed to a second UM location (Answer ¶¶ 34-38, 50, 64 and 66).

As Congress recognized, digitizing works and disseminating them beyond the bounds of the physical premises of the library places them at risk of widespread digital piracy should they fall into the wrong hands.[13] Section 108's restrictions on digital copying exist to ensure that, in the digital age, library copying "should not be permitted where it would compete with the publisher's market." REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS ON

---

[13] Congress's concerns in 1998 that digitized library works would be subject to a far greater risk of piracy proved prescient last year, when Aaron Schwartz, a "civil liberties activist who crusades for open access to data," was indicted and arrested for allegedly hacking into M.I.T.'s computer network and downloading 4.8 million files from an electronic database of scholarly works protected behind a "pay wall." John Schwartz, *Open-Access Advocate Is Arrested For Huge Download*, N.Y. TIMES, July 19, 2011, *at* http://www.nytimes.com/2011/07/20/us/20compute.html .

THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW 26 (1961).  By putting Plaintiffs' works at digital risk, Defendants are plainly contravening Congressional limits.

### 4.     The Works Are Not Being Copied to Fulfill User Requests

The MDP is also not sanctioned by Sections 108(d) or (e), which allow libraries to respond to requests from users by providing copies of either all or part of copyrighted works that are held in their collections.  The permissions set forth in Sections 108(d) and (e) are limited to situations in which "the user makes his or her request" for a particular work found in the library's collection.  17 U.S.C. § 108(d) & 108(e).  Here, the Universities admit that the digitized works were selected and collected by them and/or Google pursuant to a Cooperative Agreement calling for millions of books to be digitized *en masse*.  Defendants do not and could not contend that the works were requested by any particular library "user," as required by the statute.

Even if the copies had been made in response to user requests, Defendants' conduct exceeds the scope of other limitations in Sections 108(d) and (e).  For example, where the statute requires that a copy made in response to a user request to become the property of the user, Defendants admit that once a digital copy is created, it is reproduced, disseminated to and retained by multiple parties, including Google and HathiTrust.  *See* 17 U.S.C. § 108(d)(1) & (e)(1).  Also, where, a copy of an "entire work" is requested by a user, a library is permitted to make a reproduction only after the library "has first determined, on the basis of a reasonable investigation, that a copy [] of the copyrighted work cannot be obtained at a fair price[.]"  Here, Defendants admit that the millions of works they digitized in full include "in-print books that are commercially available and books that are protected by copyright."  Answer ¶ 50.

17

**5.     Defendants are Engaging in the "Systematic Reproduction" of Works in Violation of Section 108(g)**

By digitizing and reproducing millions of library books as part of a mass digitization program involving the coordination and cooperation of numerous parties, Defendants are also circumventing a global "backstop" contained in Section 108(g) that restricts libraries to making only "isolated and unrelated" copies "on separate occasions," and expressly forbids them from "engaging in the related or concerted reproduction or distribution of multiple copies [] of the same material" or "the systematic reproduction or distribution of single or multiple copies[.]"  17 U.S.C. § 108(g)(1) & 108(g)(2).[14]  Although the statute does not define what constitutes "systematic reproduction," Defendants cannot credibly argue that the MDP does not fall within this category.  Moreover, the Copyright Office has suggested that "the creation of the system is enough to render all copying done via that system infringing, unless authorized by the copyright owner. . . . [T]he greater the commonality of a plan, the more regular the interaction, the more organized the network or procedure then the more likely it is that the copying done is 'systematic.'"  1983 REPORT at 139.

**6.     Defendants' Orphan Works Program Violates Section 108(h)**

Referred to by Congress as the "Preservation of Orphan Works" provision,[15] Section 108(h) permits libraries to reproduce, distribute and perform published copyrighted works that are in the last 20 years of their copyright term and are not commercially exploited or otherwise reasonably available during the extended term.  Congress added Section 108(h) to the Copyright Act in 1998 in response to libraries' concerns that the twenty-year extension granted to

---

[14] It is noteworthy that Congress included the Section 108(g) backstop over "howls of outrage" by the library lobby.  *See* SECTION 108 OVERVIEW at 20.

[15] Family Entertainment and Copyright Act of 2005, Pub. L. 109-9, 119 Stat. 218, § 401 (2005).

copyrights through passage of the Copyright Term Extension Act would deprive the public of the use of "orphan works" -- older, out-of-print works that otherwise would have been placed in the public domain. *See, e.g.*, SECTION 108 OVERVIEW at 30.

Defendants' OWP completely ignores Section 108(h) by threatening to make purported orphan works, including Plaintiffs' works, available to University patrons before the commencement of the final twenty year period of each work's respective copyright term. Specifically, under existing copyright law, works published between 1923 and 1963 whose copyrights were renewed are entitled to copyright protection for the 95 year period following their publication date. *See* Peter B. Hirtle, *Copyright Term and the Public Domain in the United States* (2012) (*available at* http://www.copyright.cornell.edu/resources/publicdomain.cfm). Defendants admit that *Good Troupers All* by Gladys Malvern, a work whose copyright is owned and controlled by Plaintiff ALF, and *The Lost Country* by Plaintiff J.R. Salamanca, were "digitized and included in the HDL and [were] preliminarily identified as [] book[s] that UM planned to make available on the limited basis contemplated as part of the OWP if the copyright holder[s] [were] not identified[.]" Answer ¶¶ 13 and 29. These two works, respectively, were first published in 1945 and 1958 and their copyright registrations were renewed in 1972 (Reg. No. RE535400) and 1986 (Reg. No. RE0000313041).[16] *See* FAC, Ex. A. Thus, the copyright term for *Good Troupers All* extends to 2040 and *The Lost Country*'s copyright term extends to 2053. Provided that the other criteria of the provision are met, Section 108(h) would permit

---

[16] Under Fed R. Evid. 201(b), the Court may take judicial notice of the copyright registrations for these works, *see Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005), as well as their dates of publication, *see O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 06 Civ. 6278 (SHS), 2006 WL 3771013, at *2 (S.D.N.Y. Dec. 18, 2006).

libraries and archives to begin making uses of these two works in the years *2020* and *2033*,

respectively, *not* in 2011 as Defendants intended.

**C.      Defendants Should Not Be Permitted to Preempt Congress**

  In deciding to proceed with the MDP and OWP, Defendants have taken copyright law

into their own hands, ignoring recent efforts by the Copyright Office and Congress to address

both the mass digitization and orphan works issues. *See, e.g., Golan v. Holder*, 132 S. Ct. 873,

894 (2012) (identifying mass digitization and orphan works issues as matters appropriately

addressed "through overarching legislation of the sort proposed in Congress," not "judicial . . .

resolution"); Register of Copyrights, *Priorities and Special Projects of the U.S. Copyright Office*

5,7 (2011), (*available at* http://www.copyright.gov/docs/priorities.pdf) (describing recent studies

on mass digitization and orphan works issues); FAC and Answer ¶ 46 (admitting that the

"Section 108 Study Group" appointed by the Library of Congress recommended "that Section

108 be amended to expand a library's right to create and store digital copies of published works

in their collections for preservation purposes").  Indeed, one of the reasons Judge Chin rejected

the Google Books Settlement Agreement was his concern that "the establishment of a

mechanism exploiting unclaimed books is a matter more suited for Congress than this Court."

The Court reasoned:

> The questions of who should be entrusted with guardianship over orphan books,
> under what terms, and with what safeguards are matters more appropriately
> decided by Congress than through an agreement among private, self-interested
> parties.  Indeed, the Supreme Court has held that "it is generally for Congress, not
> the courts, to decide how best to pursue the Copyright Clause's objectives."

*Authors Guild v. Google, Inc.,* 770 F. Supp. 2d 666, 677 (S.D.N.Y. 2011).  The Court noted

"longstanding efforts" by Congress to pass legislation to address the orphan works problem,

including "Orphan Books" bills that were proposed in 2006 and 2008 but were never enacted.

*Id.* at 678; *see Golan*, 132 S. Ct. at 893-894 (favorably citing Judge Chin's conclusion that the orphan works issue requires legislative resolution).

**II.**

**DEFENDANTS CANNOT RELY ON FAIR USE
(OR OTHER LIMITATIONS ON THE RIGHTS
OF COYPRIGHT HOLDERS)**

In light of the clear impermissibility of the MDP and OWP under Section 108, Defendants will undoubtedly seek to defend themselves by arguing that their activities constitute fair use under Section 107 and Section 108(f)(4), which provides that "[n]othing in this section [108] . . . in any way affects the right of fair use as provided by section 107." However, rules of statutory construction, case law and legislative history definitively establish that Section 107 is unavailable to Defendants under these circumstances.

"[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 394 (1992). As shown above, Section 108 provides highly-specific rules governing the extent to which libraries are permitted to make digital copies of works in their collections for purposes of preservation, replacement or fulfilling patron requests, as well as the circumstances under which they may make use of orphan works. 17 U.S.C. § 108. Congress included these rules to carefully delineate the boundaries of fair use in the context of library copying. *See Texaco*, 60 F.3d at 917 ("Congress has thus far provided scant guidance for resolving fair use issues involving photocopying, *legislating specifically only as to library copying*[.]"). Indeed, Congress passed Section 108 notwithstanding the initial preference of both libraries and copyright holders to omit a specific statutory scheme governing library copying and to instead rely on general principles of fair use. *See infra* at 11.

The savings clause cannot be permitted to supplant the specific limitations on library copying contained in Section 108. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 385

21

(1992) ("A general 'remedies' saving clause cannot be allowed to supersede the specific substantive pre-emption provision..."). Further, the "[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." *Bloate v. U.S.*, 130 S.Ct. 1345, 1354 (2010) (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)).

This Court will likely be the first to interpret the force of Section 108(f)(4). However, in *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001), the Second Circuit analyzed a parallel fair use savings clause contained in the DMCA. In that case, several movie studios sued the publishers of a computer program designed to descramble encrypted DVDs under a section of the DMCA prohibiting the trafficking of technology used to circumvent technological measures employed by copyright holders to protect their intellectual property. *See id.* at 441 . The defendants argued that a fair use savings clause similar to the one found in Section 108 could "be read to allow the circumvention of encryption technology protecting copyrighted material when the material will be put to 'fair uses' exempt from copyright liability." *Id.* at 443. The court rejected their expansive reading of the savings clause as "outside the range of plausible readings of the provision" and "clearly refuted by the statute's legislative history." *Id.*

Similarly, reading Section 108(f)(4) to allow Defendants to reproduce and distribute copyrighted works in a manner that is specifically promulgated by and beyond the express limits of Section 108 is "outside the plausible readings of the provision." *Id.* In its 1983 REPORT on Section 108, the Copyright Office rejected an interpretation of Section 108(f)(4) that would permit libraries to engage in copying on a "broad and recurring basis":

> The Copyright Office does not believe that Congress intended that there should never be fair use photocopying "beyond" § 108. *On certain infrequent occasions, such copying may be permitted. But fair use privileges are not available on a broad and recurring basis once the copying permitted by § 108 has occurred.* Section 108 was enacted to make lawful some types of copying which would

22

> otherwise be infringements of copyright, fair use notwithstanding. This means
> that much of "108" photocopying would be infringing but for the existence of that
> section, thus *leaving section 107 often clearly unavailable as a basis for
> photocopying not authorized by section 108.*

1983 REPORT at 96 (underline in original; italics added for emphasis).

Put differently, to read the savings clause as "permitting 'post-108' reliance on fair use as if no § 108 copying had occurred is to come dangerously close to reading § 108 out of the statute." *Id.* at 98; *see Potter v. U.S.*, 155 U.S. 438, 446 (1894) (the presence of statutory language "cannot be regarded as mere surplusage; it means something"). Given that Congress deemed Section 108 "necessary to exempt much library photocopying from copyright liability, and since Congress did not likely intend to construct complex mechanisms in most of the section only to render them moot via subsection (f)(4), that result is implausible." 1983 REPORT at 98.

Defendants' other affirmative defenses under the Copyright Act fail for the same reason. For example, the possibility that there could be a situation where a visually-impaired student might have a basis for seeking access to a work for purposes permitted by Section 121 of the Copyright Act, 17 U.S.C. § 121, or that there could be other instances where a particular use of a specific work is not an infringement, cannot justify the wholesale copying of millions of works in derogation of Section 108. Accordingly, Plaintiffs should be granted judgment on the pleadings that Defendants' conduct exceeds the permitted scope of Section 108, and is not justified by the First Amendment[17] or any of the statutory provisions included in its various affirmative defenses.

---

[17] It is well established that the idea/expression dichotomy and the fair use defense are sufficient to take into account First Amendment concerns. *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65, 74 (2d Cir. 1999). Accordingly, Defendants cannot assert a separate "First Amendment" defense.

## CONCLUSION

Defendants are wildly exceeding the special privileges Congress granted to libraries under Section 108 by systematically digitizing, reproducing, distributing and putting at risk millions of works through their mass book digitization program. Defendants' so-called orphan works program is similarly inimical to the Copyright Act, as it violates Section 108(h)'s explicit limitation of libraries' use of orphan works to the twenty year period preceding the end of their copyright term. Neither fair use under Section 107, nor any other statutory exception under the Copyright Act, can justify Defendants' systematic and concerted digitization, reproduction, distribution and other unauthorized uses of millions of copyright-protected library books.

Accordingly, Plaintiffs urge the Court to grant their motion for partial judgment on the pleadings.

Dated: New York, New York
February 28, 2012

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By: _____
    Edward H. Rosenthal, Esq.
    Jeremy S. Goldman, Esq.

488 Madison Avenue
New York, New York 10022
Tel.: (212) 980-0120
Fax: (212) 593-9175
erosenthal@fkks.com
jgoldman@fkks.com

*Attorneys for Plaintiffs*

24