**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

THE AUTHORS GUILD, INC., et al.,     :

     *Plaintiffs,*     :     Case No. 11-cv-6351(HB)

     v.     :

HATHITRUST, et al.,     :

     *Defendants.*     :

-------------------------------------------------------X

**DEFENDANT INTERVENORS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

Daniel F. Goldstein *(admitted pro hac vice)*
Laura Ginsberg Abelson *(admitted pro hac vice)*
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street
Suite 1700
Baltimore, Maryland 21202
Telephone: 410-962-1030
Facsimile:  410-385-0869
dfg@browngold.com
labelson@browngold.com

Robert J. Bernstein (RB 4230)     Peter Jaszi *(admitted pro hac vice)*
THE LAW OFFICE OF ROBERT J. BERNSTEIN     5402 Surrey Street
380 Lexington Avenue, 17th Floor     Chevy Chase, Maryland 20815
New York, New York 10168     Telephone:  301-656-1753
Telephone:  212-551-1068     Facsimile:  301-656-7483
Facsimile:  212-551-1001     pjaszi@wcl.american.edu
rjb@robert-bernsteinlaw.com

*Counsel for National Federation of the Blind,
Georgina Kleege, Blair Seidlitz, and Courtney Wheeler*

## <u>TABLE OF CONTENT</u>

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ....................................................................................................................1

ARGUMENT ..........................................................................................................................2

    I.      Because Plaintiffs do not address affirmative defenses raised in Defendant
            Intervenors' Answer, they fail to meet the requirements for a judgment on the
            pleadings ........................................................................................................................2

    II.     Section 108 may not be read to prevent libraries from meeting their statutory
            obligation to distribute digital copies from their collections to blind patrons .........3

        a.    Section 108 should not be construed to interfere with the obligation of colleges
            and universities to provide accessible materials under the American with
            Disabilities Act and the Rehabilitation Act of 1973 .................................................3

        b.    Section 108 should not be read to preclude libraries' ability to serve blind
            persons in reliance on fair use ...............................................................................6

        c.    The subsequent enactment of § 121 ("Chafee Amendment"), while permitting the
            University Defendants to make some use of the HathiTrust database for the blind,
            does not serve to fully vindicate Intervenor Defendants' interest in equal access to
            library collections ...................................................................................................8

    III.    Congress did not intend § 108 to preclude libraries from fair use ........................10

        a.    The plain meaning of § 108 ensures that fair use applies to libraries ..................10

        b.    The legislative history of the Copyright Act demonstrates that Congress did
            not intend § 108 to preclude libraries from making fair use of copyrighted
            materials .................................................................................................................13

    IV.    Plaintiffs improperly seek to foreclose the Court's examination of the facts,
            legal issues, equities, and public interests bearing upon fair use ..........................17

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
    562 F.3d 630 (2009)...............................................................................20

*Astoria Federal Savings & Loan Ass'n v. Solimino,*
    501 U.S. 104 (1991)...............................................................................11

*Bill Graham Archives v. Dorling Kindersley, Ltd.,*
    448 F.3d 605 (2d Cir. 2006)....................................................................18

*Blanch v. Koons,*
    467 F.3d 244 (2d Cir. 2006)....................................................................18

*Bloate v. U.S.,*
    130 S. Ct. 1345 (2010)...........................................................................10

*Campell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994)...............................................................................18

*Castle Rock Entm't, Inc. v. Carol Publ'g Group,*
    150 F.3d 132 (2d Cir. 1998)....................................................................18

*Christensen v. Harris Co.,*
    529 U.S. 576 (2000)...............................................................................17

*Community for Creative Non-Violence v. Reid,*
    490 U.S. 730 (1989)...............................................................................10

*Doe v. Pfrommer,*
    148 F.3d 73 (2d Cir.1998).........................................................................4

*Field v. Google, Inc.,*
    412 F.Supp. 2d 1106 (D. Nev. 2006).......................................................20

*Golan v. Holder,*
    132 S. Ct. 873 (2012).............................................................................18

*Harper & Row v. Nation Enterprises,*
    471 U.S. 539 (1985)...........................................................................18, 19

*Kelly v. Arriba Soft Corp.,*
    336 F.3d 811 (9th Cir. 2003) ..................................................................18

*McNeill v. New York City Housing Authority,*
     719 F.Supp. 233 (S.D.N.Y.1989)......................................................................2

*Montclair v. Ramsdell,*
     107 U.S. 147 (1883)....................................................................................11

*Morales v. Trans World Airlines, Inc.,*
     504 U.S. 374 (1992)....................................................................................10

*Pellegrin v. Berthelsen,*
     9:11-CV-00125, 2012 WL 10847 (D.S.C. Jan. 3, 2012) ...........................2

*Salinger v. Colting,*
     607 F.3d 68 (2d Cir. N.Y. 2010).................................................................2

*SEC v. Joiner,*
     320 U.S. 344 (1943)......................................................................................8

*Sellers v. M.C. Floor Crafters, Inc.,*
     842 F.2d 639 (2d Cir. 1988).........................................................................2

*Sexton-Walker v. Allstate Ins. Co.,*
     4:10 CV 104-P-S, 2010 WL 5441994 (N.D. Miss. Dec. 28, 2010).........3

*Shady Records, Inc. v. Source Enters.,*
     371 F. Supp. 2d 394 (S.D.N.Y. 2005).........................................................2

*Skidmore v. Swift & Co.,*
     323 U.S. 134 (1944)..............................................................................16, 17

*Sprietsma v. Mercury Marine,*
     537 U.S. 51 (2003)......................................................................................11

*Tufaro v. City of New Orleans,*
     CIV. 03-1429, 2004 WL 1920937 (E.D. La. Aug. 26, 2004) ....................3

*Universal City Studios, Inc. v. Corley,*
     273 F.3d 429 (2nd Cir. 2001).....................................................................12

*Weixel v. Bd. of Educ. of City of N.Y.,*
     287 F.3d 138 (2d Cir. 2002).........................................................................4

## Statutes

17 U.S.C. § 107 ............................................................................................................ passim

17 U.S.C. § 108 ............................................................................................................ passim

17 U.S.C. § 121 ..............................................................................................................3, 7, 8, 9

17 U.S.C. § 1201(c)(1) ....................................................................................................12

42 U.S.C. § 12131(1)(B) ..................................................................................................4

42 U.S.C. § 12132 ..........................................................................................................3

42 U.S.C. § 12181 ..........................................................................................................4

## Regulations

28 C.F.R. § 35.130(b) .....................................................................................................3

34 C.F.R. § 104.4(b) .......................................................................................................3

## Other Authorities

142 Cong. Rec. S. 9763, 9764, Sept. 3, 1996 ...............................................................9

1976 Copyright Act, Pub. L. 94-553, 90 Stat. 2541 (Oct. 19, 1976) ...........................17

1983 Report of the Register of Copyrights:  Library Reproduction of Copyrighted Works ........16

4 Patry on Copyright § 11:3 (2012) ...............................................................................14, 15

Ass'n of College & Research Libraries, The Value of Academic Libraries:  A Comprehensive
Research Review and Report (Sept. 2010), available at
http://www.ala.org/acrl/sites/ala.org.acrl/files/content/issues/value/val_report.pdf .......................4

Copyright Law Revision: Hearings on H.R. 2223 Before the Subcomm. on Courts, Civil
Liberties, and the Administration of Justice of the House Judiciary Comm., 93rd Cong.
1st Sess. 146 (1973) ......................................................................................................7, 12, 14

Copyright Law Revision: Hearings on H.R. 2223 Before the House Judiciary Subcomm.
on Courts, Civil Liberties, and the Administration of Justice, 94th Cong.,
1st Sess. 1797 (1975) .....................................................................................................14

Mary Rasenberger & Chris Weston, Overview of the Libraries and Archives Exception in the Copyright Act: Background, History, and Meaning, (April 2005) at 17, available at http://www.section108.gov/docs/108BACKGROUNDPAPER(final).pdf ..................................13

Nimmer on Copyright (2011), § 8.03[A] ("Limitations on the Reproduction Right--The Exemption for Libraries and Archives – Who May Claim the Exemption) ................................15

Senate Report on the 1976 Copyright Act S.R. Rep. 94-473 ......................................................15

Thomas E. Perez, Civ. Rts. Div., DOJ and Russlyn Ali, Sec. for Civ. Rts., Dept. of Educ., Joint Letter to all College and University Presidents (6/29/2010), available at http://www.ada.gov/kindle_ltr_eddoj.htm ......................................................................................3

Charles A. Wright and Arthur R. Miller,
5C Federal Practice and Procedure § 1368 (3d ed. 2011)..............................................................2

## INTRODUCTION

Plaintiffs' Motion for Judgment on the Pleadings rests on the remarkable -- and remarkably wrong -- proposition that libraries, uniquely, are not permitted to make fair use of copyrighted materials to the full extent permitted by § 107 of the Copyright Act.  To the contrary, in § 108(f)(4) of the Copyright Act, Congress expressly reaffirmed that libraries retained their "right of fair use," codified in § 107, and did so in clear unambiguous language.  Moreover, as set forth below, preventing libraries from making fair use of digital copies would be contrary to the congressionally recognized public interest in providing accessible texts to the blind and would hinder these libraries (and the institutions of which they are a part) from meeting their nondelegable obligations to blind library patrons under the Americans with Disabilities Act and the Rehabilitation Act of 1973.

Defendant Intervenors, on behalf of blind university library patrons, have an acute interest in the fair use of the HathiTrust database:  it is only through the digitization of the university libraries' collections that blind students and faculty are able to conduct their educational pursuits and scholarly activities on a level playing field with the sighted.  By their motion, Plaintiffs attempt to avoid this Court's balancing of the factual, legal, equitable, and public interest considerations applicable to educational fair use of the database.

Plaintiffs' ploy should be summarily rejected not only as contrary to the clear language of § 108(f)(4), but as contrary to the crucial role of the judiciary in weighing private and public interests which here involve copyright, fair use, disability rights, technology and education.  These issues should not be buried under Plaintiffs' blanket of statutory misinterpretation, but

must be considered on the full record required in fair use determinations.[1]  Plaintiffs' Motion should be denied as an unwarranted attempt to evade that scrutiny.

For Defendant Intervenors the stakes could not be higher.  The draconian remedy Plaintiffs seek -- the indefinite impoundment of the entire HathiTrust collection – slams the library doors in the face of blind students, teachers, and researchers who wish nothing more than to obtain accessible versions of the library books available to everyone else.

## ARGUMENT

I.   **Because Plaintiffs do not address affirmative defenses raised in Defendant Intervenors' Answer, they fail to meet the requirements for a judgment on the pleadings.**

A court may not grant a plaintiff's motion for judgment on the pleadings, where, as here, defendants have raised factual issues from which the Court could conclude that their actions were legally justified.  Rather, the Court could grant the motion only "where material facts are undisputed and . . . judgment on the merits is possible merely by considering the contents of the pleadings," as a matter of law.[2]

Historically, the federal courts have followed a restrictive standard in ruling on 12(c) motions, because "hasty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense."[3]  Consequently, the Court may not grant judgment on the pleadings if Defendants

---

[1] As the courts of the Second Circuit have recognized, "[d]eterminations of fair use are highly fact-intensive decisions."  *Shady Records, Inc. v. Source Enters., Inc*., 371 F. Supp. 2d 394, 397 (S.D.N.Y. 2005); see also *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. N.Y. 2010) ("[arguments in a] typical copyright trial … about why one work isn't substantially similar in its expression to another, or about why it's a fair use of another, are often sophisticated and fact-intensive").
[2] *Sellers v. M.C. Floor Crafters, Inc*., 842 F.2d 639, 642 (2d Cir. 1988).
[3] *See* 5C Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1368 (3d ed. 2011); *McNeill v. New York City Housing Authority,* 719 F.Supp. 233, 256 (S.D.N.Y.1989) (quoting Wright & Miller); *see also, e.g., Pellegrin v. Berthelsen*, 9:11-CV-00125, 2012 WL

and Defendant Intervenors have raised any factual or legal defenses that require discovery or further factual development outside the four corners of the pleadings.

In their Answer, Defendant Intervenors have asserted that vindication of their civil rights is a fair use of the HathiTrust database.  Moreover, Defendant Intervenors' Answer also asserts that the University Defendants' actions are authorized by § 121 of the Copyright Act.  Because the pleadings raise these issues of fact and law and Plaintiffs' Motion does not address them, judgment on the pleadings must be denied.

**II.**   **Section 108 may not be read to prevent libraries from meeting their statutory obligation to distribute digital copies from their collections to blind patrons.**

    **a.**   **Section 108 should not be construed to interfere with the obligation of colleges and universities to provide accessible materials under the Americans with Disabilities Act and the Rehabilitation Act of 1973.**

The Americans with Disabilities Act and the Rehabilitation Act of 1973 clearly establish the right of persons with disabilities to have equal access to the programs and activities of public and private universities, including academic libraries, except to the extent that affording equal access may be unduly burdensome, fundamentally alter the nature of the program or activity or, in limited circumstances, be unreasonable.[4]  Separate access is only permissible when necessary to afford integration into the program or activity.[5]

---

10847 (D.S.C. Jan. 3, 2012) (citing Wright and Miller); *Sexton-Walker v. Allstate Ins. Co.*, 4:10 CV 104-P-S, 2010 WL 5441994 (N.D. Miss. Dec. 28, 2010) (same); *Tufaro v. City of New Orleans*, CIV. 03-1429, 2004 WL 1920937 (E.D. La. Aug. 26, 2004) (same).

[4] Title II, for example, of the ADA states that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

[5] 28 C.F.R. § 35.130(b)(1)(iv) and 34 C.F.R. § 104.4(b)(1)(iv) (2009); Thomas E. Perez, Civ. Rts. Div., DOJ and Russlyn Ali, Sec. for Civ. Rts., Dept. of Educ., Joint Letter to all College and University Presidents (6/29/2010), available at http://www.ada.gov/kindle_ltr_eddoj.htm.

Library lending, reference, and other services are among the key programmatic activities of any institution of higher learning.[6]  The public institutions among the University Defendants all are obligated to provide the Defendant Intervenors with access to their library collections that is equal to that which they afford sighted members of their communities.[7]  As a private university, Cornell is required to provide access to its library collection under Title III.[8]

For many years, blind persons could not have equal access to library materials, because print was inherently visual.  They accessed library materials through volunteer readers and technology for separate access, such as braille and performed audio books.  The expense and time involved in producing these alternate formats limited the quantity of content that could be made accessible and, in the case of performed audio, provided a research and learning tool that was markedly inferior to print.  Universities typically have met their obligations under the ADA and the Rehabilitation Act, as best they could, by creating braille, audio recordings, and (more recently) digital copies on demand in response to individual requests.

With the advent of scanning and optical character recognition ("OCR") technology, it became possible to create digital content that a blind reader could "read" in a way very similar to visual reading.  Now when a blind student wishes to access print books, he must contact his university's student disability services office, which must then scan the work into a digital

---

[6]  *See generally,* Ass'n of College & Research Libraries, The Value of Academic Libraries:  A Comprehensive Research Review and Report (Sept. 2010), available at http://www.ala.org/acrl/sites/ala.org.acrl/files/content/issues/value/val_report.pdf (last visited April 16, 2012).

[7]  Public entities include "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  42 U.S.C. § 12131(1)(B).

[8]  Title III of the ADA states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ."  Both "places of education" and libraries are "public accommodations" under Title III.  *See* 42 U.S.C. § 12181.  *See Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 146-47 (2d Cir. 2002) (quoting *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir.1998)).

format and run it through optical character recognition software and, perhaps, proofread it for scanning errors.  However, the time involved to create such content, the lack of skilled university personnel with time to insert metadata (distinguishing, for example, Chapter 9, page 9, figure 9 and footnote 9), label images and ensure proper reading order on pages with complicated layouts, means that blind students still are not on an equal footing.  Most important, the time span between an assignment and its due date in an academic setting is generally too short to provide a blind student timely access to the necessary resources on an "on demand" basis.  Without timely access to digital copies, blind students are generally thrown back to using human readers, a resource that is limited both in supply and utility.  More particularly, absent a digital database such as the HathiTrust maintains, blind students engaging in research are denied equal access; they cannot, as can sighted researchers, access any book in the library on demand and peruse many possibly helpful titles to determine their relevance and then, within a specific volume, focus on the relevant pages as they may appear at disparate points within that volume.[9]  They are therefore deprived of equal access to library collections in an era where such access is possible.

The HathiTrust collection changes all of that.  For the first time, the same corpus of knowledge that is available to nondisabled patrons of HathiTrust school libraries can be available to blind patrons immediately on demand, that is to say, blind students will have equal access to the library programs at these major educational institutions, thereby delivering the commitment made by these civil rights statutes.  Because the scans were meant to be searched, the metadata is there; as a result, blind students will truly have access to content comparable to the access of sighted students to the print collections of libraries.

---

[9] *See* Declaration of Blair Seidlitz ¶¶ 5-8, Dec. 6, 2011, ECF No. 24-2; Declaration of Courtney Wheeler ¶¶7-8 Dec 6, 2011, ECF No. 24-3; Declaration of Georgina Kleege ¶¶4-7 Dec. 5, 2011, ECF No. 24-4, all submitted in support of Defendant Intervenors Motion to Intervene.

Considerations of undue burden to the universities might have posed a barrier to disabled students seeking to require the universities to expend the funds to create this 9 million title digital database.  But now that this corpus exists, it is not unduly burdensome for the universities to allow blind students to compete on a basis of true equality.

Judgment for Plaintiffs would have the effect of barring blind students and faculty access to these digital files and thus prevent the universities from fulfilling their obligations of equal access under federal civil rights law—an issue that was raised as an affirmative defense in Defendant-Intervenors' Answer.[10]  But Plaintiffs' Motion for Judgment on the Pleadings fails to address this issue, much less explain why their reading of copyright law should trump civil rights law.  Because Plaintiffs fail to address all issues raised by the pleadings, their motion must be denied.

### b.   Section 108 should not be read to preclude libraries' ability to serve blind persons in reliance on fair use.

Plaintiffs' untenable reading of § 108 would preclude libraries and universities from providing accessible texts to blind persons, even though, bizarrely, every other entity may do so as a fair use under § 107.  Section 108 provides no assistance to blind library patrons.  It does not address, directly or indirectly, libraries distributing accessible texts to the blind and other blind students.  In 1976, Congress was aware, however, that the doctrine of fair use included the reproduction and distribution of print books in formats accessible to the blind.  In the legislative history of the Copyright Act pertaining to § 107, Congress emphasized that providing access to copyrighted works for the blind is a paradigmatic example of fair use.  The Report of the House Judiciary Committee describes "the making of copies or phonorecords of works in the special forms needed for the use of blind persons" as a "special instance illustrating the application of

---

[10] Def. Intervenors' Jt. Answer and Defenses, Dec. 9, 2011, ECF No. 58.

the fair use doctrine."[11]  Libraries and universities, both subject (as recipients of federal funds) to the Rehabilitation Act, were likely entities to engage in making and distributing accessible copies.  To adopt Plaintiffs' position that § 108 presents an exclusive set of conditions for library copying would have the absurd result of allowing private parties to create accessible fair use copies for blind people, but precluding public libraries and universities that have library collections from making those same copies in fulfillment of their educational mission and in accordance with their legal rights and obligations.  This is especially absurd in the context of the HathiTrust database, which was constructed deliberately with an intention to make works accessible to blind patrons.

Section 108 does not contain any provision for making copies accessible to blind users. Accordingly, libraries have met their ADA and Rehabilitation Act obligations by relying on two other features of copyright law that serve, in part or whole, to promote access to print content: both before and after its codification in 1976, "fair use" has served this function, and since 1998, the so-called "Chafee Amendment," codified in 17 US.C. § 121, provides limited additional support for certain accessibility services by universities and their libraries.  In effect, universities have a well-established legal safety net for these activities, and § 108 is and never has been part of it.  To hold that libraries may only make copies expressly permitted by § 108 would prevent the University Defendants from making copies outside of the limited circumstances covered by § 108, even if made for blind library patrons, thus preventing the universities from meeting its ADA and the Rehabilitation Act obligations.

---

[11] House Report 94-1476 (hereinafter "House Report") at 73 (emphasis added).

The ultimate goal of federal statutory interpretation is to apply the intent of Congress,[12] and it would be perverse to read a provision that provided new latitude for certain practices of reproduction, but failed to address issues of disability access in any way, to casually negate the ability of libraries and (by extension) their blind patrons, to rely on another, independent right, fair use, that had traditionally been understood to afford the blind access to copyrighted content. Thus, the absurd consequence of Plaintiffs' argument that § 108 precludes fair use is to deny the blind access to all of the content of all library collections. Nothing in the language of the 1976 Copyright Act, in its legislative history, in the legislated policies of this country that address equal opportunity for persons with disabilities, and -- indeed -- nothing in reason, logic or fairness, supports such a conclusion. It is perhaps for this reason that Plaintiffs' Motion for Judgment on the Pleadings failed to address the question of fair use for the blind, an issue that Defendant Intervenors had put at issue in their Answer.

> **c. The subsequent enactment of § 121 ("Chafee Amendment"), while permitting the University Defendants to make some use of the HathiTrust database for the blind, does not serve to fully vindicate Intervenor Defendants' interest in equal access to library collections.**

The 1998 enactment of the Chafee Amendment carves out a limitation on the copyright holders authorization rights to enable "authorized entit[ies] . . . to reproduce or distribute copies . . . of a previously published, non-dramatic literary work . . . in specialized formats exclusively for use by the blind or other persons with disabilities." If an entity meets the other conditions of the provision (which requires certain forms of notice and specifically excludes standardized tests and computer programs), its covered reproduction and distribution activities are categorically non-infringing, whether or not they otherwise would qualify as fair use. In these cases, as Senator Chafee put it on the Senate floor, "groups that produce specialized formats for the blind

---

[12] *See SEC v. Joiner*, 320 U.S. 344 (1943), at 350-51 (Jackson, J.).

no longer are required to gain permission from the copyright holder before beginning production."[13]  In its Answer, Defendant Intervenors pointed to the Chafee Amendment as a third reason why the HathiTrust may make its database available to the blind.  Again, because Plaintiffs' Motion for Judgment on the Pleadings fails to address why this issue may be resolved in its favor, their motion must be denied.

Despite the availability of the Chafee Amendment to the University Defendants, library fair use remains critical to the fulfillment of blind persons' interest in access to texts on terms of equality with others.  Section 121 is subject to various categorical restrictions on subject-matter.  By its own terms, it does not apply to "dramatic" literary works, for example, so a blind student doing a term paper on Eugene O'Neill's late plays would be unable to claim its benefit (and that is to say nothing of the blind drama student or theater historian).  Likewise, even though technology may render musical scores accessible, the Chafee Amendment does not apply to music.  Thus, it provides no benefit to the blind conservatory student or music historian.  Nor does it apply to "unpublished" works, putting large parts of the contents of university research archives out of reach, insofar as this provision is concerned, to the disadvantage of blind graduate students (and instructors) doing research in a range of disciplines.[14]  Libraries and cooperating university offices must still rely on fair use so that they may provide any of these important categories of works in accessible formats so that blind people can work, research, study and learn.

---

[13] 142 Cong. Rec. S. 9763, 9764, Sept. 3, 1996.
[14] By contrast, a 1992 amendment to § 107 clarified the applicability of fair use to unpublished materials:  "The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors."

III.    **Congress did not intend § 108 to preclude libraries from fair use.**

      a.   **The plain meaning of § 108 ensures that fair use applies to libraries**.

Section 108 of the Copyright Act, enacted in 1976, authorizes certain library uses of copyrighted works, the legitimacy of which was then disputed.  It did not remove the availability to libraries of uses permitted by § 107.  Congress said so plainly:  "Nothing in this section . . . in any way affects the right of fair use as provided by § 107 . . . ."[15]

This crystal clear language is dispositive of Plaintiffs' Motion.  In the absence of ambiguity, the common shared understanding of the terms used in the statute should control.[16]  There is no detectable ambiguity in Congress's choice of language.  Plaintiffs nonetheless insist that "Nothing . . .  in any way affects . . . ." should be read to mean "Some things in some ways affect," but they have not suggested anything in the text of the section or any basis in common or legal usage for this reading of the statute's plain language.  Alternate readings of a statute must be grounded in language; Plaintiffs' is not.

Instead, Plaintiffs try to argue that § 108(f)(4) is in conflict with the balance of the statute and cite cases for the unremarkable proposition that where two provisions of a statute appear to be in conflict, the specific provision controls.[17]  To the contrary, there is no inconsistency between § 108 (f)(4) and the balance of § 108.  Each means exactly what it says:  § 108 permits certain specified activities of libraries AND the libraries' pre-existing rights of fair use are

---

[15] 17 U.S.C. § 108 (f)(4).

[16] *See, e.g.*, *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 739-40 (1989) (relying on traditional common law agency principles for meaning of term "employee" as used without definition in the Copyright Act.)

[17] *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) and *Bloate v. U.S.*, 130 S. Ct. 1345 (2010), cited at page 21 of Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Partial Judgment on the Pleadings (hereafter "Plaintiffs' Brief"), Feb. 28, 2012, ECF No. 55.

unaffected.  That reading may be unpalatable to Plaintiffs; however, unlike theirs, it does no violence to any of the language of the statute.

More important, reading § 108(f)(4) to couple authorization of the specific uses outlined in § 108 with the preservation of  traditional fair use gives substantial effect to all parts of the statute.  By contrast, Plaintiffs' proposed resolution of the purported conflict runs afoul of another widely-accepted canon of interpretation:  that no statutory language is to be treated as mere surplusage when, by contrast, all parts of a statute can be given meaning.  The classic Supreme Court formulation is that courts should "give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed."[18]  To interpret Section 108 as the sole source of exceptions to copyright available to libraries would unnecessarily render Section 108(f)(4) meaningless.

Giving effect to § 108(f)(4)'s plain language does not, as Plaintiffs claim "supplant the specific limitations on library copying contained in Section 108."[19]  To the contrary, § 108 operates with full force in circumstances specified therein and simultaneously confirms that the right of fair use, as set forth in § 107, remains fully available in other non-enumerated circumstances, such as creating digital, accessible, copies for blind patrons.  Plaintiffs' argument misunderstands the fundamental purpose of the provision:  Section 108 was not a "limitation on library copying" but an acknowledgement that libraries' copying rights were greater than those of other entities.

---

[18] *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883); see also *Astoria Federal Savings & Loan Ass'n v. Solimino,* 501 U.S. 104, 112 (1991); *Sprietsma v. Mercury Marine,* 537 U.S. 51, 63 (2002) (interpreting word "law" broadly could render word "regulation" superfluous in preemption clause applicable to a state "law or regulation").
[19] Plaintiffs' Brief at 21.

Strangely, Plaintiffs cite *Universal City Studios, Inc. v. Corley*,[20] which interpreted the fair use savings provision of the Digital Millennium Copyright Act ("DMCA"). *Corley* gives full meaning to that clause, holding that the savings clause "ensures that the DMCA is not read to prohibit the 'fair use' of information just because that information was obtained in a manner made illegal by the DMCA."[21] Thus, the Second Circuit interpreted a clause providing, as here, that "[n]othing in this section shall affect rights . . . including fair use,"[22] as distinguishing the question of use from the manner in which the copyrighted material was obtained. *Corley* rejected the notion that fair use could justify otherwise unlawful copying but confirmed that it was an entirely separate question whether there were uses of the unlawfully obtained copies that could be fair use.[23] Accordingly, *Corley* must be read as counter to, not supportive of, Plaintiffs' reading of the savings clause of § 108 as saving nothing.

Any lingering doubt as to Congress's intent cannot withstand Congress's decision to characterize "fair use" as a "right" in § 108(f)(4). By doing so, Congress made clear the importance it attached to the role of § 107 in libraries and archives as a core affirmative entitlement conferred on cultural institutions.[24]

---

[20] 273 F.3d 429 (2nd Cir. 2001).

[21] *Id.* at 443.

[22] 17 U.S.C. § 1201(c)(1).

[23] As the Court held, subsection 1201(c)(1) "simply clarifies that the DMCA targets the *circumvention* of digital walls guarding copyrighted material (and trafficking in circumvention tools), but does not concern itself with the *use* of those materials after circumvention has occurred. Subsection 1201(c)(1) ensures that the DMCA is not read to prohibit the "fair use" of information just because that information was obtained in a manner made illegal by the DMCA." 273 F.3d at 443.

[24] The choice of terminology in § 108(f)(4) was enacted over the protests of publishers. In the 1973 House Hearings Charles Lieb, copyright counsel to the Association of American Publishers, stated:

> The Section should not refer to "rights." Rather, as indicated in the title of Section 108, and of Section 107 as well, the permitted copying and distribution are "limitations" on the exclusive rights of the owner of the copyright. These subsections therefore should

**b.  The legislative history of the Copyright Act demonstrates that Congress did not intend § 108 to preclude libraries from making fair use of copyrighted materials.**

The legislative history of § 108 further establishes that it was not intended to limit or condition libraries' ability to rely on fair use.  Section 108 was a creation of the general reform of the Copyright Act completed in 1976.  It arose out of protracted discussions among and between congressional committees, the U.S. Copyright Office, and representatives of authors, publishers, libraries and archives over the reproduction of collection material as enabled by new photocopying technologies.[25]  The result was a provision that affirmatively authorized non-profit libraries and archives to engage in certain then-controversial practices, including reproduction for preservation and in connection with so-called "interlibrary loans."  At the same time, in § 108(f)(4),  Congress maintained for libraries the full scope of fair use, as that right might prove applicable in the future.

A review of the legislative history reveals, in particular, three non-controversial propositions:  (1) At all times it was broadly understood by many participants in the process that § 108 was not a mere restatement of fair use as applied to libraries, and that – to the contrary – various specific library uses authorized in § 108 fell beyond the ambit of "fair use" as it was then understood, (2) the Register of Copyrights sought clarification of the relationship from the

---

state that the kinds of reproduction and distribution referred to therein "are not infringements of copyright" and the reference to "rights" should be eliminated. Copyright Law Revision: Hearings on H.R. 2223 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Judiciary Comm., 93rd Cong. 1st Sess. 146 (1973).  Obviously, Congress did not see fit to follow Mr. Lieb's instructions.

[25] See generally Mary Rasenberger & Chris Weston, Overview of the Libraries and Archives Exception in the Copyright Act:  Background, History, and Meaning, (April  14, 2005) at 17, available at http://www.section108.gov/docs/108BACKGROUNDPAPER(final).pdf (last visited April 16, 2012) (pointing out that the basic structure of the compromise represented by § 108, including the provision now found in § 108(f)(4), was in place by 1969).

Congress, and (3) Congress provided that clarification in terms that directly contradict Plaintiffs' reading of the Copyright Act.

William F. Patry, in his authoritative, historically-oriented treatise on copyright law, details the story's final, and crucial, episodes:

> [In 1975] Charles Lieb, representing the Association of American Publishers, testified:
>
>> The position of the Publishers Association in brief is that we support the provisions of section 107 of H.R. 2223 with respect to fair use and we support the provisions of section 108(f)(3) [now (f)(4)], which make clear that libraries are entitled to the benefits of this doctrine. We support, also, the additional copying privileges extended to libraries in section 108, but we are opposed to any further limitations on the rights of authors and other copyright owners . . . .[26]

Patry concludes that "Mr. Lieb's remarks indicate that the publishers interpreted section 108(f)(3)" as meaning that "libraries can exercise fair use on equal terms with other users when the conditions of § 107" are met, while at the same time "section 108 itself allows libraries special copying privileges that would not otherwise qualify as fair use."[27]  He further notes that "[t]his view was also taken by other parties."[28]

Barbara Ringer, the Register of Copyrights, however, argued to Congress that "some limitations are essential if section 108 is to settle anything, [and] as long as the revision bill contains both a § 107 and a § 108, the latter must put some express limitations on the express

---

[26] Copyright Law Revision:  Hearings on H.R. 2223 Before the Subcomm. on Courts, Civil Liberties and the Administration of Justice of the House Judiciary Comm. 93th Cong. 1st Sess. 225 (1975) (hereinafter "1975 House Hearings").
[27] 4 Patry on Copyright § 11:3 (2012) (section entitled "Library photocopying: section 108—Relationship between sections 107 and 108") at 11-19.
[28] *Id* (footnote omitted).

exemptions it provides."[29]  At the same testimony, she also suggested that the legislative reports

contain a clear statement on the relationship between §§ 107 and 108."

Congress did provide the clarification, though not in the terms the Register had

recommended.  Responding to the Register's request for clarification, the Senate Report in

its discussion of § 107 remarked:

> The Register of Copyrights has recommended that the committee report
> describe the relationship between this section and the provisions of section 108
> relating to reproduction by libraries and archives.  The doctrine of fair use
> applies to library photocopying, and nothing contained in section 108 "in any
> way affects the right of fair use."  No provision of section 108 is intended to
> take away any rights existing under the fair use doctrine.  **To the contrary,
> section 108 authorizes certain photocopying practices which may not
> qualify as a fair use.** [30]

As Patry concludes:

> The last sentence of the first paragraph clears up, as requested, the relationship
> between the two sections: section 108 authorizes photocopying that would not
> otherwise be permitted under section 107. The last paragraph indicates that if for
> one reason or another, certain copying by a library does not qualify for the section
> 108 exemption (e.g., the collections are not open to the public; no notice of
> copyright is included; the copy does not become the property of the user), the
> library's photocopying would be evaluated under the same criteria of section 107
> as other asserted fair uses. This interpretation not only gives meaning to both
> sections but is fully in line with the earlier committee reports.[31]

---

[29]  The following documentary note appears in connection with this quotation in 4 Patry on
Copyright § 11:3 at 11-18:

> n.27.   [Copyright Law Revision: Hearings on H.R. 2223 Before the House
> Judiciary Subcomm. on Courts, Civil Liberties, and the Administration of Justice,
> 94th Cong., 1st Sess. 1797 (1975)], at 1800–1801.  *But cf.* Copyright Office
> briefing paper submitted at this time (and reproduced in the hearing transcripts),
> which stated regarding § 108(f)(3) [which subsequently would be renumbered as
> (f)(4)] : "[S]ection 108 is subordinated to the fair use doctrine of Section 107 and
> to any existing contractual obligations." *Id.* at 2059. *See also* Draft Second
> Supplementary Report of the Register of Copyrights on the General Revision of
> the U.S. Copyright-Law, Ch. III (1975).

[30] The quotation (emphasis added) is from the final Senate Report on the 1976 Copyright Act
S.R. Rep. 94-473 at 81.  Identical language then appeared in the House Report at 74.

[31]  4 Patry on Copyright § 11:3 at 11-20.  *Accord,* Nimmer on Copyright (2011), § 8.03[A] at 8-
36.2-36.3 ("Limitations on the Reproduction Right--The Exemption for Libraries and Archives –

It is difficult to envisage a clearer expression of congressional intent with respect to the relationship of § 108 and § 107. Plaintiffs' reading, by contrast, cuts directly against both the plain meaning of the statute and unambiguous evidence of legislative intent in the statute's legislative history.

To attempt to overcome this statutory history, Plaintiffs quote the 1983 Report of the Register of Copyrights: Library Reproduction of Copyrighted Works (the "1983 Report"). Although the 1983 Report misconstrues the relationship between the two statutory sections, it does so in a way that is much less far-reaching than Plaintiffs claim. Far from asserting that § 108 occupies the field of library copying, the report merely concludes that in considering whether a library can engage in a particular course of fair use copying "beyond" § 108, a decision-maker should take into account how much related copying already has occurred under § 108.[32] Thus, contrary to Plaintiffs' assertions, the 1983 Report's gloss on § 108 would not prevent a library from delivering an accessible copy of an entire book to a blind student pursuant to § 107, even though § 108 itself may not expressly authorize reproduction of this kind.

At all events, the 1983 Report is not entitled to *Skidmore* deference as an agency interpretation of an ambiguous statutory provision, because, as discussed above, the language of § 108(f)(4) is clear and unambiguous. Further, Congress had not given the Copyright Office any statutory mandate, as required for judicial deference, to interpret the interplay between §§ 108 and 107. Rather the 1983 Report was merely to "set [] forth the extent to which this section has achieved the intended statutory balancing of the rights of creators, and the needs of users . . .

---

Who May Claim the Exemption): "This exemption for libraries and their employees is in addition to any exemption that they might have for such activities under the doctrine of fair use" (citing § 108[f][4].)

[32] *See* 1983 Report at 97-98.

[and] describe any problems that may have arisen, and present legislative or other recommendations, if warranted."[33]

Finally, an agency's informal opinion letters receive *Skidmore* deference only if the opinions are persuasive interpretations of the relevant statutes.[34]  The 1983 Report is not persuasive on its own ground.  It fails to acknowledge in any way the critical clarifying committee language in the legislative history of § 108(f)(4), quoted above; instead, the report repeats arguments about the relationship of § 108 and § 107 that were soundly rejected by the Senate and House Judiciary Committee reports on the 1976 Copyright Act.  Specifically, it adopts the false premise that "permitting 'post-108' reliance on fair use as if no § 108 copying had occurred is to come dangerously close to reading § 108 out of the statute."[35]  As discussed above, it is both possible and necessary to read the two provisions so as to give separate and non-conflicting meaning to each, and the most straightforward way to accomplish that goal is to recognize that § 108 applies to the specific library activities set forth therein while preserving the full force of the fair use doctrine embodied in § 107.

## IV.   Plaintiffs improperly seek to foreclose the Court's examination of the facts, legal issues, equities, and public interests bearing upon fair use.

Plaintiffs' attempt to write § 107 out of the Copyright Act insofar as libraries are concerned is wrong not only for all of the reasons discussed above, but for an even more fundamental one:  the purpose of fair use itself.  Codified in § 107 of the 1976 Copyright Act and developed as a matter of federal common law since the mid-1800's, fair use is the fulcrum upon

---

[33] Section 108(i) of the 1976 Copyright Act, as enacted, Pub. L. 94-553, 90 Stat. 2541 (Oct. 19, 1976).

[34]  "[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' under . . . *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944), but only to the extent that those interpretations have the 'power to persuade.'"  *Christensen v. Harris Co.*, 529 U.S. 576, 587 (2000).

[35] 1983 Report at 98, quoted in Plaintiff's Brief at 23, ECF No. 55.

which the courts have carefully balanced the interests of rights holders and users of copyrighted works.[36]  This balancing process has been informed by the Copyright Clause of the Constitution, which grants exclusive rights for limited times in order to advance the "Progress of Science" (a term used in 1787 for "knowledge").  The Framers of the Constitution granted exclusive rights in copyrights to encourage the publication of original works so that others would have access to them and could build upon them, thus advancing knowledge and culture.[37]

In any given fair use case, the court must balance the private interest of the copyright holder, the legitimate interests of the users, the equities and the public interest.  Fair use is considered an "equitable rule of reason" applied without "bright line rules."  Instead, it requires ad hoc determinations and fact intensive inquiries so that the non-exclusive statutory factors and other pertinent considerations may be taken into account based upon an appropriate record.[38]

Here, in addition to examining how the statutory fair use factors apply to providing accessible copies of library collections to the blind, the Court must also take into account legislative recognition (e.g., the Rehabilitation Act, the ADA and the Chafee Amendment) of the public interest in granting persons with disabilities equal access to information and education.  It is hardly surprising that Congress has recognized this public interest.  Without accessible copies of educational books and materials, the blind would not be able contribute to the advancement of knowledge by learning from and building upon prior works.  By contrast, providing the blind

---

[36] *See, e.g., Golan v. Holder,* 132 S. Ct. 873, 890-91 (2012); and *Campell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 577 (1994).

[37] *Campbell v. Acuff-Rose, supra,* 510 U.S. at 577; *Harper & Row v. Nation Enterprises*, 471 U.S. 539*,* 549 (1985); *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006); *Bill Graham Archives v. Dorling Kindersley, Ltd.,* 448 F.3d 605, 608 (2d Cir. 2006). *Kelly v. Arriba Soft Corp*., 336 F.3d 811, 820 (9th Cir. 2003); and *Castle Rock Entm't, Inc. v. Carol Publ'g Group,* 150 F.3d 132, 141 (2d Cir. 1998).

[38] *Id.*

with equal access to the same library resources as the sighted would benefit the public through the contributions that would inevitably result.

In addition, when comparing the equities, the court must consider the relative harm to the parties that would arise from affirming or rejecting the University Defendants' exercise of their fair use rights on behalf of the blind.  Although not of record on Plaintiffs' preemptive motion, Defendant Intervenors would, on summary judgment or at trial, present evidence demonstrating that Plaintiffs have never considered blind readers to be a significant market.  Indeed, Defendant Intervenors will demonstrate the substantial and concrete difficulties that the blind have in obtaining accessible copies of a critical mass of educational materials.  The expanding divide between sighted and blind students will continue to grow unless accessible copies of the digitized library collections are made available to the blind.  Although these facts are also not before the Court on Plaintiffs' Motion, they would be of record when the Court considers the merits of fair use.[39]

Defendant Intervenors respectfully submit that Plaintiffs' Motion should be summarily denied not only as contrary to the clear language of § 108(f)(4), but as a misguided attempt to foreclose adjudication of fair use without the benefit of a record or full argument.  This Court stands at the cutting edge of the application of fair use to the complexities of the digital age.  The opportunity to consider the factual and legal issues presented by the competing claims and unique circumstances in this case, and to weigh the public interest in the balance, is too

---

[39] Because "fair use is a mixed question of law and fact," *Harper & Row v. Nation Enters., supra,* 471 U.S. at 560 (1985), the parties must be afforded the opportunity to make a record of the circumstances supporting their positions.

important to allow Plaintiffs to evade the application of § 107 to these issues through a clearly erroneous interpretation of § 108.[40]

How many lawful uses of the HathiTrust database exist, their practical importance, their effect on markets for copyrighted material, and their implications for the public interest are all issues of fact. That they remain unresolved defeats any notion that this case may be adjudged on the pleadings. Defendant Intervenors respectfully submit that they are entitled to demonstrate to the Court, on a full record and on consideration of the relevant factors and legal issues, why such a result would be contrary to the letter, spirit and purpose of fair use.

## CONCLUSION

For the reasons set forth herein, Defendant Intervenors respectfully request that Plaintiffs' Motion for Judgment be denied.

Respectfully submitted,

By:_____/s/_____

        Daniel F. Goldstein (admitted pro hac vice)
        Laura Ginsberg Abelson (admitted pro hac vice)
        BROWN, GOLDSTEIN & LEVY, LLP
        120 E. Baltimore Street
        Suite 1700
        Baltimore, Maryland 21202
        Telephone: 410-962-1030
        Facsimile: 410-385-0869
        dfg@browngold.com
        labelson@browngold.com

---

[40] In addition to the fair use of the HathiTrust collection in providing accessible texts to the blind, the Court will also require a detailed factual record and full explication of the issues surrounding other fair uses of the database, such as the creation of comprehensive search and reference tools. *See, e.g., A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (2009) (affirming district court's conclusion that unauthorized ingestion of copyrighted student papers to help produce anti-plagiarism database constituted "highly transformative" fair use. *Id*. at 638-40). *See also, Field v. Google, Inc.,* 412 F.Supp. 2d 1106 (D. Nev. 2006) (transformative fair use for Google to copy texts freely available on websites, store copies in its servers, and serve snippets of the websites' contents along with hyperlinks to the websites in response to search queries).

Robert J. Bernstein (RB 4230)
THE LAW OFFICE OF ROBERT J. BERNSTEIN
380 Lexington Avenue, 17th Floor
New York, NY 10168
Telephone: 212-551-1068
Facsimile:  212-551-1001
rjb@robert-bernsteinlaw.com

Peter Jaszi (admitted pro hac vice)
5402 Surrey Street
Chevy Chase, Maryland 20815
Telephone: 301-656-1753
Facsimile:  301-656-7483
pjaszi@wcl.american.edu

*Counsel for National Federation of the Blind,
Georgina Kleege, Blair Seidlitz and
Courtney Wheeler*