UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

THE AUTHORS GUILD, et al.,       :

                            :

          Plaintiffs,     :        Index No. 11 Civ. 6351 (HB)

                            :             ECF Case

        -against-       :

                            :

HATHITRUST, et al.,          :

                            :

          Defendants.    :

-------------------------------------------------------X

**BRIEF AMICI CURIAE OF AMERICAN LIBRARY ASSOCIATION, ASSOCIATION OF COLLEGE AND RESEACH LIBRARIES, AND ASSOCIATION OF RESEARCH LIBRARIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

Jonathan Band
Jonathan Band PLLC
21 Dupont Circle NW, 8th Floor
Washington, D.C., 20036
202-296-5675
jband@policybandwidth.com

Counsel for Amici

April 20, 2012

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTEREST OF AMICI AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ............................................................................................................... 3

I.   PLAINTIFFS' READING OF SECTION 108 WOULD PROHIBIT LIBRARIES
     FROM FULFILLING THEIR MISSION .......................................................... 3

     A.   Plaintiffs' Interpretation of Section 108 Would Prevent Libraries From Lending
          Books and Other Materials To The Public .................................................... 4

     B.   Plaintiffs' Understanding of Section 108 Would Prevent Libraries From Providing
          Internet Access to Users ............................................................................... 7

     C.   Plaintiffs' Reading of Section 108 Precludes Many Other Important Library
          Activities ........................................................................................................ 9

II.  PLAINTIFFS' INTERPRETATION OF SECTION 108 CONFLICTS WITH THE
     STRUCTURE OF THE COPYRIGHT ACT AND ITS PLAIN LANGUAGE ........... 12

     A.   The Copyright Act's Specific Exceptions Do Not Limit the Applicability of Fair
          Use ................................................................................................................. 12

     B.   Section 108(f)(4) Unambiguously Provides that Section 108 Does Not Limit The
          Applicability of Fair Use to Libraries ......................................................... 14

     C.   Plaintiffs' Reading of Section 108 Conflicts with Section 504(c)(2) ........ 19

     D.   Plaintiffs' Interpretation of Section 108 Is Inconsistent With the Privileged Status
          Congress Has Accorded Libraries In Title 17 ............................................. 20

III. THE ORPHAN WORKS PROJECT IS PERMITTED BY SECTION 108(e) ........... 21

IV.  CONCLUSION ................................................................................................. 22

## TABLE OF AUTHORITIES

### CASES

*Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210 (D. Minn. 2008) ................................... 7

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992) .......................................... 17

*Elektra Entm't Group, Inc. v. Barker*, 551 F. Supp. 2d 234 (S.D.N.Y. 2008) .............................. 7

*Encyclopedia Britannica Educational Corp v. Crooks,* 447 F. Supp. 243 (W.D.N.Y. 1978) ...... 13

*Golan v. Holder*, 132 S. Ct. 873 (2012) ................................................................ 3, 20

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 119 (4th Cir. 1997) ............ 6, 7

*Perfect 10 v. Amazon.com*, 508 F.3d 1146 (9th Cir. 2007) ....................................... 8, 21

*Potter v. U.S.*, 155 U.S. 438 (1894) ................................................................. 19

*Recording Industry Association of America v. Diamond Multimedia Systems*, 180 F.3d 1072 (9th Cir. 1999) ....................................................................................... 20

*Sega v. Accolade*, 977 F.2d 1510 (9th Cir. 1992) .................................................. 20

*Sony v. Universal,* 464 U.S. 417 (1984) ............................................................ 20

*Stewart v. Abend*, 495 U.S. 207 (1990) ............................................................. 12

*UMG Recordings, Inc. v. Hummer Winblad Venture Partners,* 377 F. Supp. 2d 796 (N.D. Cal. 2005) ........................................................................................................ 7

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001) ........................... 19

### STATUTES

17 U.S.C. § 106 ........................................................................................... 1, 4

17 U.S.C. § 107 ............................................................................................ *passim*

17 U.S.C. § 108 ............................................................................................ *passim*

17 U.S.C. § 109 ........................................................................................... 2, 5, 7, 9

17 U.S.C. § 110 ............................................................................................. 9

17 U.S.C. § 117 ............................................................................................. 8

17 U.S.C. § 121 ........................................................................................................ 9

17 U.S.C. § 504 ............................................................................................... 3, 19, 20

17 U.S.C. § 602 ...................................................................................................... 20

17 U.S.C. § 1201 .................................................................................................... 20

17 U.S.C. § 1203 .................................................................................................... 20

17 U.S.C. § 1204 .................................................................................................... 20

## LEGISLATIVE HISTORY

21st Century Department of Justice Appropriations Authorization Act, Sec. 13301 No. 107-685 (2002). ................................................................................................. 13

H.R. Rep. No. 83 (1967). ....................................................................................... 12

H.R. Rep. No. 94-1476 (1976) .......................................................................... 5, 15

Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong. (2008) ................................. 20

S. Rep. No. 91-1219 (1970) .................................................................................... 15

## TREATISES

MELVILLE NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT (2011) ...................................... 16

WILLIAM PATRY, PATRY ON COPYRIGHT (2011) ......................................................... 16

## OTHER AUTHORITIES

An American Time Capsule: Three Centuries of Broadsides and Other Printed Ephemera, http://memory.loc.gov/ammem/rbpehtml/peres.html ............................................... 10

ASSOCIATION OF RESEARCH LIBRARIES, CODE OF BEST PRACTICES IN FAIR USE FOR ACADEMIC AND RESEARCH LIBRARIES (2012) .......................................................................... 9

Jonathan Band, Google and Fair Use, 3 J. BUS. & TECH. LAW 1 (2008) .................................... 21

SAMANTHA BECKER, OPPORTUNITY FOR ALL: HOW THE AMERICAN PUBLIC BENEFITS FROM INTERNET ACCESS AT U.S. LIBRARIES (2010) ......................................................... 7

Alexander Graham Bell Family Papers, http://memory.loc.gov/ammem/bellhtml/bellres.html .. 10

Emile Berliner and the Birth of the Recording Industry, http://memory.loc.gov/ammem/berlhtml/berlres.html ......................................... 10

Civil War Sheet Music Collection, http://lcweb2.loc.gov/diglib/ihas/html/civilwar/civilwar-copyright.html ........................................................................................................... 11

The Irving Fine Collection, http://memory.loc.gov/ammem/collections/fine/ifres.html .............. 10

Historic Sheet Music Collection, http://memory.loc.gov:8081/cocoon/ihas/html/volcano/volcano-copyright.html ........................................................................................................... 10

INSTITUTE OF MUSEUM AND LIBRARY SERVICES, PUBLIC LIBRARIES SURVEY FISCAL YEAR 2009 (2010) ......................................................................................................................... 5

Joint Comments of American Association of Publishers et al., Rulemaking on Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, No. RM 2008-8 (Feb. 2, 2009) .......................................................... 13

Library of Congress Concerts, http://lcweb2.loc.gov/diglib/ihas/html/concerts/concerts-copyright.html ........................................................................................................... 10

Library of Congress, Mission and History (American Memory), http://memory.loc.gov/ammem/about/index.html ...................................................... 9

The Moldenhauer Archives, http://memory.loc.gov/ammem/collections/moldenhauer/moldres.html .................. 10

The Samuel F.B. Morse Papers, http://memory.loc.gov/ammem/sfbmhtml/sfbmres.html .......... 10

RANDOLPH D. MOSS, OFFICE OF LEGAL COUNSEL, WHETHER AND UNDER WHAT CIRCUMSTANCES GOVERNMENT REPRODUCTION OF COPYRIGHTED MATERIALS IS A NONINFRINGING "FAIR USE" UNDER SECTION 107 OF THE COPYRIGHT ACT OF 1976 (1999).. 18

The Gerry Mulligan Collection, http://lcweb2.loc.gov/diglib/ihas/html/mulligan/mulligan-copyright.html ........................................................................................................... 11

NATIONAL CENTER FOR EDUCATION STATISTICS, U.S. DEPARTMENT OF EDUCATION, ACADEMIC LIBRARIES: 2010 FIRST LOOK (2011) ................................................................... 6

NATIONAL CENTER FOR EDUCATIONAL STATISTICS, U.S. DEPARTMENT OF EDUCATION, CHARACTERISTICS OF PUBLIC AND BUREAU OF INDIAN EDUCATION ELEMENTARY AND SECONDARY SCHOOL LIBRARY MEDIA CENTERS IN THE UNITED STATES: RESULTS FROM THE 2007–08 SCHOOLS AND STAFFING SURVEY (2009) ................................................. 6

Newspaper Pictorials: World War I Rotogravures, http://memory.loc.gov/ammem/collections/rotogravures/rotorights.html .............................. 10

Dolly Parton and the Roots of Country Music, http://lcweb2.loc.gov/diglib/ihas/html/dollyparton/dollyparton-copyright.html .................... 10

Patriotic Melodies, http://lcweb2.loc.gov/diglib/ihas/html/patriotic/patriotic-copyright.html..... 11

Marybeth Peters, Register of Copyrights, Memorandum to James H. Billington, Librarian of Congress (JUNE 11, 2010)........................................................................................................... 14

Prosperity and Thrift, http://memory.loc.gov/ammem/coolhtml/ccres.html ............................... 10

MARY RASENBERGER AND CHRIS WESTON, OVERVIEW OF THE LIBRARIES AND ARCHIVES EXCEPTION IN THE COPYRIGHT ACT 13 (2005) ......................................................... 14

CARRIE RUSSELL, COMPLETE COPYRIGHT: AN EVERYDAY GUIDE FOR LIBRARIANS (2004) .......... 5

THE SECTION 108 STUDY GROUP REPORT (2002) ........................................................ 16

Smithsonian Institution Libraries, Electronic Resources from the Smithsonian Libraries, Proceedings of the National Academy of Sciences of the United States, http://www.sil.si.edu/eresources/silpurl.cfm?purl=10916490………………………………...11

The Wilbur and Orville Wright Papers, http://memory.loc.gov/ammem/wrighthtml/wrightres.html .................................................... 10

U.S. COPYRIGHT OFFICE, REPORT OF THE REGISTER OF COPYRIGHTS, LIBRARY REPRODUCTION OF COPYRIGHTED WORKS (17 U.S.C. 108) (1983) ........................................................ 18

U.S. COPYRIGHT OFFICE, REPORT ON COPYRIGHT AND DIGITAL DISTANCE EDUCATION (1999) .. 13

## INTEREST OF AMICI AND SUMMARY OF ARGUMENT

The American Library Association (ALA), established in 1876, is a nonprofit professional organization of more than 67,000 librarians, library trustees, and other friends of libraries dedicated to providing and improving library services and promoting the public interest in a free and open information society.

The Association of College and Research Libraries (ACRL), the largest division of the ALA, is a professional association of academic and research librarians and other interested individuals. It is dedicated to enhancing the ability of academic library and information professionals to serve the information needs of the higher education community and to improve learning, teaching, and research.

The Association of Research Libraries (ARL) is a nonprofit organization of 126 research libraries in North America. ARL's members include university libraries, public libraries, and government and national libraries. ARL influences the changing environment of scholarly communication and the public policies that affect research libraries and the diverse communities they serve.

Collectively, these three library associations (*amici* library associations) represent over 100,000 libraries in the United States employing over 350,000 librarians and other personnel.

In their motion for partial judgment on the pleadings, Plaintiffs advance a radical and unprecedented interpretation of 17 U.S.C. § 108 that threatens the most routine library operations. When Congress enacted Section 108 in 1976, it provided libraries with a specific set of limitations on copyright liability that addressed some—but certainly not all—of the activities engaged in by libraries at that time. For example, Section 108 did not provide an exception to the Section 106(3) distribution right that would allow libraries to lend the books and other materials

1

in their collections. Rather, the first sale doctrine, codified at Section 109(a), allowed any owner of a lawfully made copy—including a library—to sell or lend that copy without infringing the distribution right.

Nonetheless, Plaintiffs argue that Section 108 defines the boundaries of permissible reproduction and distribution by libraries. They seek to convert an exception intended to benefit libraries into a regulation that restricts libraries. In particular, Plaintiffs assert that Section 108 limits the availability of the fair use right to libraries. They take this position notwithstanding the plain language of Section 108(f)(4) that nothing in Section 108 "in any way affects the right of fair use as provided by section 107…."

Plaintiffs' interpretation of Section 108 would not just prevent HathiTrust from engaging in socially beneficial activities such as providing print disabled students with unparalleled access to books. Rather, their interpretation would prevent libraries from performing their most basic functions. Under Plaintiffs' reading of Section 108, libraries could no longer rely on the first sale doctrine to permit the more than four billion circulation transactions that occur annually. Libraries could not invoke the fair use right to allow the reproductions incidental to libraries providing Internet access to more than 70 million Americans. Plaintiffs' interpretation of Section 108 also would prevent libraries from engaging in a wide range of other activities such as the exhibition of photographs, the preservation of musical works and motion pictures, the archiving of websites, and the reproduction of multiple copies of articles for classroom use. Indeed, Plaintiffs' understanding of Section 108 would render the Library of Congress a serial infringer for its display of orphan works in its American Memory project.

Plaintiffs' interpretation of Section 108 conflicts with the legislative history and the structure of the Copyright Act. As Congress made abundantly clear during the drafting of the

Copyright Act, the specific exceptions in Sections 108–122 supplement, and do not supplant, the fair use right in Section 107. The legislative history of Section 108 further makes clear that Congress included the savings clause in Section 108(f)(4) to eliminate the possibility of Section 108 being applied in a manner that restricted fair use. Plaintiffs' denial of fair use to libraries contradicts Section 504(c)(2), which requires the remission of statutory damages when a library reasonably believed that its reproduction constituted a fair use. If Section 108 denies the availability of fair use to libraries, a library's belief that a reproduction it made was a fair use could not, by definition, be reasonable. Plaintiffs' withholding of fair use from libraries also runs contrary to the privileged status granted libraries by Congress in Title 17. It defies belief that Congress intended to deny libraries the benefit of fair use, which the U.S. Supreme Court recently described as part of "the traditional contours of copyright protection." *Golan v. Holder*, 132 S. Ct. 873, 876 (2012).

Finally, contrary to Plaintiffs' assertions, HathiTrust's proposed orphan works project satisfies the provisions of Section 108(e).

## ARGUMENT

## I.    PLAINTIFFS' READING OF SECTION 108 WOULD PROHIBIT LIBRARIES FROM FULFILLING THEIR MISSION.

Plaintiffs contend that libraries may not rely upon fair use, as codified in Section 107, because Section 108 provides the totality of the limitations to the Copyright Act available to libraries. In their Complaint, Plaintiffs allege that "Section 108 of the Copyright Act explicitly regulates the extent to which libraries may lawfully reproduce copyrighted works without authorization, the circumstances under which digital copies may be created and displayed to library patrons and when copies of orphan works may be released to the public." Complaint at ¶ 4. This view of Section 108 as the comprehensive copyright regulation of libraries continues in

the Memorandum in Support of the Plaintiffs' Motion for Partial Summary Judgment on the Pleadings, which states that "Section 108 provides the ground rules under which libraries and archives may reproduce and sometimes distribute copyright-protected works." Pls.' Mem. Supp. Part. J. 1. Plaintiffs believe that "Congress included these rules to carefully delineate the boundaries of fair use in the context of library copying." Pls.' Mem. Supp. Part. J. 21. Likewise, fair use cannot "supplant the specific limitations on library copying contained in Section 108." Plaintiffs contend that library activities that exceed Section 108 are "acts that Congress has expressly prohibited under Section 108." Pls.' Mem. Supp. Part. J. 1.[1]

If the Plaintiffs are correct that Section 108 provides the ground rules for library reproduction and distribution of copyrighted works, that it delineates the boundaries of permissible activities by libraries with respect to such works, then libraries across the country infringe copyright millions of times every day. This is because Section 108 does not address libraries' lending of books and other materials, nor the temporary copies libraries make when providing Internet access to users. This Court should reject an interpretation of Section108 that would require libraries to curtail much of their activities.

### A.   Plaintiffs' Interpretation of Section 108 Would Prevent Libraries From Lending Books and Other Materials To The Public.

One of the most basic functions of libraries is lending books and other materials to the public.[2] Section 106(3) of the Copyright Act grants the copyright holder the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by … lending." 17

---

[1] The Motion also states that "Section 108 provides highly-specific rules governing the extent to which libraries are permitted to make digital copies of works in their collections for purposes of preservation, replacement, or fulfilling patron requests, as well as the circumstances under which they may make use of orphan works." Pls.' Mem. Supp. Part. J. 21.
[2] Libraries circulate a wide variety of materials in addition to books, including journals, dissertations, computer programs, phonorecords, and audiovisual works. References in this brief to books could include these other materials.

U.S.C. § 106(3). However, the first sale doctrine, codified at Section 109(a) of the Copyright Act, exhausts the copyright holder's distribution right in a particular copy "lawfully made under this title" after the first sale of that copy. 17 U.S.C. § 109(a). The first sale doctrine thus is critical to the operation of libraries: "[w]ithout this exemption, libraries would be unable to lend books, CDs, videos, or other materials to patrons." CARRIE RUSSELL, COMPLETE COPYRIGHT: AN EVERYDAY GUIDE FOR LIBRARIANS 43 (2004).

Congress was well aware of the importance of the first sale doctrine to libraries when it adopted the 1976 Copyright Act. The House Judiciary Committee Report on the 1976 Act explains that under Section 109(a), "[a] library that has acquired ownership of a copy is entitled to lend it under any conditions it chooses to impose." H.R. Rep. No. 94-1476, § 109, at 79 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5693. Clearly, Congress intended for the general provisions of Section 109(a) to apply to libraries, belying Plaintiffs' suggestion that "Section 108 provides the ground rules under which libraries and archives may … sometimes distribute copyrighted works."[3]

Notwithstanding the spread of digital technology, millions of Americans check out books and other materials from libraries. The collections of the over 9,225 public libraries in the country contain more than 934.8 million materials of which 88.3 percent are printed materials, 5.7 percent are audio materials, 5.4 percent are video materials, and 1.6 percent are e-books. INSTITUTE OF MUSEUM AND LIBRARY SERVICES, PUBLIC LIBRARIES SURVEY FISCAL YEAR 2009

---

[3] Further underscoring the applicability of Section 109(a) to libraries is Computer Software Rental Amendments Act of 1990, codified at Section 109(b). Section 109(b)(1) excludes the rental of computer software from the first sale doctrine. Section 109(b)(2) establishes an exception to that exclusion for libraries. In other words, Section 109(b)(2) provides that the first sale doctrine continues to apply to libraries with respect to software, notwithstanding Section 109(b)(1).

10 (2010). For these materials, there were a total of 2.241 billion circulation transactions in 2009. *Id*. at 6.

The collections of 81,920 public school media centers contain 959 million books and 42.6 million phonorecords and audiovisual materials. NATIONAL CENTER FOR EDUCATIONAL STATISTICS, U.S. DEPARTMENT OF EDUCATION, CHARACTERISTICS OF PUBLIC AND BUREAU OF INDIAN EDUCATION ELEMENTARY AND SECONDARY SCHOOL LIBRARY MEDIA CENTERS IN THE UNITED STATES: RESULTS FROM THE 2007–08 SCHOOLS AND STAFFING SURVEY 9 (2009). These materials were checked out 2.05 billion times during the 2007–08 school year. *Id*. at 14.

The collections of 3,689 academic libraries include 1.07 billion copies of printed materials, as well as 112 million phonorecords and audiovisual materials and 158 million e-books. NATIONAL CENTER FOR EDUCATION STATISTICS, U.S. DEPARTMENT OF EDUCATION, ACADEMIC LIBRARIES: 2010 FIRST LOOK (2011). There were a total of 176 million circulation transactions for these materials in 2010. *Id*. at 4.

These libraries and educational institutions purchased these materials for precisely the purpose of preserving them and making them accessible to their users.  However, under Plaintiffs' understanding of Section 108, all these circulation transactions would be infringing because they would exceed the distributions authorized by Section 108. Indeed, Plaintiffs' view of Section 108, when combined with the Fourth Circuit's interpretation of the distribution right in *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 119, 203 (4th Cir. 1997), would lead to the absurd result that a library would infringe copyright simply by allowing the public to access any book *within* a library. The *Hotaling* court held that "[w]hen a public library adds a work to its collection, lists the work in its index or catalog system, and makes the work available to the borrowing or browsing public, it has completed all the steps necessary for

distribution to the public. At that point, members of the public can visit the library and use the work." *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 119, 203 (4th Cir. 1997). If Section 108 precluded a library from relying on Section 109(a), then the library would lose its first sale defense against a claim that it infringed the distribution right by permitting a user to browse a book on the library premises. [4]

### B.   Plaintiffs' Understanding of Section 108 Would Prevent Libraries From Providing Internet Access to Users.

Another major library function threatened by Plaintiffs' interpretation of Section 108 is Internet access for underserved communities. A study performed by the Information School of the University of Washington for the Institute of Museum and Library Services found that in 2009, over 77 million people accessed the Internet from public libraries in the United States. SAMANTHA BECKER, OPPORTUNITY FOR ALL: HOW THE AMERICAN PUBLIC BENEFITS FROM INTERNET ACCESS AT U.S. LIBRARIES 2 (2010), *available at* http://www.imls.gov/pdf/OpportunityForAll.pdf. Forty-four percent of people below the poverty line used library computers for Internet access and other services. Among young adults below the poverty line, the level of usage increased to 61%. Forty-two percent of the people who accessed the Internet from public libraries did so for purposes relating to education, 40% (30

---

[4] *Amici* library associations strongly disagree with the Fourth Circuit that making a book available for browsing and other uses on a library's premises constitutes a distribution for purposes of 17 U.S.C. § 106(3). Additionally, several district courts have criticized the theory of liability in *Hotaling*. *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1225 (D. Minn. 2008) (finding *Hotaling* is not "consistent with the logical statutory interpretation of § 106(3), the body of Copyright Act case law, and the legislative history of the Copyright Act"); *Elektra Entm't Group, Inc. v. Barker*, 551 F. Supp. 2d 234, 243 (S.D.N.Y. 2008) (finding *Hotaling* was "not grounded in the statute"); *UMG Recordings, Inc. v. Hummer Winblad Venture Partners (In re Napster, Inc.)*, 377 F. Supp. 2d 796, 803 (N.D. Cal. 2005) (finding *Hotaling* is "inconsistent with the text and legislative history of the Copyright Act of 1976").

million people) for employment matters, 37% for healthcare, 34% for government and legal matters, and 25% for personal finance. *Id*. at 5-8.

Whenever a person turns on a computer, the computer copies software stored in its hard-drive onto its random access memory (RAM). This copying is permitted by Section 117(a)(1). Under Plaintiffs' interpretation of Section 108, however, a library could not avail itself of Section 117(a). Thus, a library could not turn on its computers without infringing the copyright in the installed software.[5]

Moreover, whenever a user views a website, the browser caches a copy of the website in the computer's RAM. Courts have treated this cache copy as a fair use. *Perfect 10 v. Amazon.com*, 508 F.3d 1146, 1169-70 (9th Cir. 2007). Librarians and library users make hundreds of thousands, if not millions, of such copies every day. Plaintiffs' reading of Section 108 would prevent libraries from relying on the fair use right to permit the making of these digital reproductions. According to Plaintiffs, "[a]t every turn, Section 108 carefully limits the scope of permissible copying" by libraries. Pls.' Mem. Supp. Part. J. 2. The Plaintiffs contend that Section 108 "carefully delineate[s] the boundaries of fair use in the context of library copying." Id. at 21. Because the cache copying by libraries in the course of Internet browsing wildly exceeds that permitted by Section 108, Plaintiffs would treat it as infringing.

Similarly, Section 108 makes no provision for a librarian or a library user to print out a page from a website, an activity otherwise permitted under fair use. The website being reproduced is not part of the library's collection and thus does not fall within Section 108(d) or (e). Plaintiffs' reading of Section 108 renders these copies as infringements.

---

[5] In some cases, this temporary copying may be permitted by license.

C.   **Plaintiffs' Reading of Section 108 Precludes Many Other Important Library Activities.**

Libraries rely upon exceptions different from Section 108 to permit other routine activities that implicate exclusive rights. Significantly, none of these exceptions specifically mention libraries. Thus, libraries use Section 109(c) to allow the display of copyrighted works such as book covers, paintings, photographs, and posters in exhibitions. Libraries employ Section 110(1) to permit the performance of films and other works in the course of face-to-face teaching activities. Likewise, libraries rely on Section 110(2) for performances and displays in distance education. Libraries that meet the definition of an authorized entity with a primary mission of providing specialized services to the visually disabled use Section 121 to authorize the reproduction and distribution of copies in accessible formats such as Braille.

Libraries also regularly employ fair use to excuse a wide range of completely non-controversial practices in addition to the caching while Internet browsing mentioned above. For instance, libraries make preservation copies of musical works, pictorial, graphic or sculptural works, and motion pictures—all categories of works not covered by Section 108. *See* 17 U.S.C. § 108(i); ASSOCIATION OF RESEARCH LIBRARIES, CODE OF BEST PRACTICES IN FAIR USE FOR ACADEMIC AND RESEARCH LIBRARIES (2012) at 17-18. Libraries archive websites of significant cultural or historical interest. *Id*. at 26. They reproduce selections from collection materials to publicize their activities, or to create physical and virtual exhibitions. *Id*. at 15. Academic libraries copy material into institutional digital repositories, and make deposited works publicly available. *Id.* at 23. School libraries make multiple copies of appropriate portions of works for classroom use. *See* 17 U.S.C. 107.

The Library of Congress, where the Copyright Office resides, relies heavily on fair use. For example, the American Memory project "provides free and open access through the Internet

to written and spoken words, sound recordings, still and moving images, prints, maps, and sheet music that document the American experience." Library of Congress, Mission and History (American Memory), http://memory.loc.gov/ammem/about/index.html (last visited April 19, 2012). For many of the collections within American Memory, the Library of Congress states that it is providing online access to items "under an assertion of fair use" if "despite extensive research, the Library has been unable to identify" the rightsholder. *See, e.g.,* Prosperity and Thrift, http://memory.loc.gov/ammem/coolhtml/ccres.html. Similar language appears on the copyright pages of the following American Memory collections: The Irving Fine Collection, http://memory.loc.gov/ammem/collections/fine/ifres.html ("an exercise of fair use"); The Wilbur and Orville Wright Papers, http://memory.loc.gov/ammem/wrighthtml/wrightres.html ("an exercise of fair use"); American Women, http://memory.loc.gov/ammem/awhhtml/awcopy.html ("an exercise of fair use"); An American Time Capsule: Three Centuries of Broadsides and Other Printed Ephemera, http://memory.loc.gov/ammem/rbpehtml/peres.html ("an exercise of fair use"); Alexander Graham Bell Family Papers, http://memory.loc.gov/ammem/bellhtml/bellres.html ("an exercise of fair use"); The Samuel F.B. Morse Papers, http://memory.loc.gov/ammem/sfbmhtml/sfbmres.html ("an exercise of fair use"); The Moldenhauer Archives, http://memory.loc.gov/ammem/collections/moldenhauer/moldres.html ("an exercise of fair use"); Emile Berliner and the Birth of the Recording Industry, http://memory.loc.gov/ammem/berlhtml/berlres.html ("an exercise of fair use"); Newspaper Pictorials: World War I Rotogravures, http://memory.loc.gov/ammem/collections/rotogravures/rotorights.html ("an exercise of fair use").

In many other projects, the Library of Congress also provides online access—under a fair use theory—to works with unidentified or unlocated rightsholders. *E.g.,* Historic Sheet Music Collection, http://memory.loc.gov:8081/cocoon/ihas/html/volcano/volcano-copyright.html ("an exercise of fair use"); Library of Congress Concerts,

 http://lcweb2.loc.gov/diglib/ihas/html/concerts/concerts-copyright.html ("an exercise of fair use"); Dolly Parton and the Roots of Country Music,

http://lcweb2.loc.gov/diglib/ihas/html/dollyparton/dollyparton-copyright.html ("an exercise of fair use"); The Gerry Mulligan Collection,

http://lcweb2.loc.gov/diglib/ihas/html/mulligan/mulligan-copyright.html ("an exercise of fair use"); Civil War Sheet Music Collection,

http://lcweb2.loc.gov/diglib/ihas/html/civilwar/civilwar-copyright.html (an "exercise of fair use"); Patriotic Melodies, http://lcweb2.loc.gov/diglib/ihas/html/patriotic/patriotic-copyright.html ("an exercise of fair use").

The Library of Congress, therefore, has done with these orphan works far more than what HathiTrust proposed to do in its orphan works project. The Library of Congress has digitized them and posted them online (without prior notice) where they can be freely downloaded by the entire world. Under Plaintiffs' interpretation of Section 108, the Library of Congress is a serial copyright infringer.[6]

---

[6] Other federal libraries also rely on fair use.  The website of the Smithsonian Institution Libraries, for example, states that interlibrary loan requests (an issue addressed by Section 108(d) and (e)) "are to be filled in compliance with the U.S. Copyright Act and fair use provisions of the federal Copyright Act." *See, e.g.,* Electronic Resources from the Smithsonian Libraries, Proceedings of the National Academy of Sciences of the United States, http://www.sil.si.edu/eresources/silpurl.cfm?purl=10916490 (last visited April 19, 2012).

## II.   PLAINTIFFS' INTERPRETATION OF SECTION 108 CONFLICTS WITH THE STRUCTURE OF THE COPYRIGHT ACT AND ITS PLAIN LANGUAGE.

The legislative history of the Copyright Act indicates that Congress did not intend for the specific limitations in the Act to constrain the availability of the fair use privilege to defendants. This legislative intent is especially clear with respect to Section 108, where Congress included a specific savings clause that provides that nothing in Section 108 "in any way affects the right of fair use as provided by section 107." 17 U.S.C. § 108(f)(4). Plaintiffs' interpretation of Section 108 asks this Court to ignore the plain meaning of Section 108, legislative intent, and common sense.

### A.   The Copyright Act's Specific Exceptions Do Not Limit the Applicability of Fair Use.

The Copyright Act's specific exceptions narrowly define which uses of which works may be made by which actors under which circumstances. In contrast, Section 107 lists four general, nonexclusive factors a court must weigh in evaluating whether a particular use is fair. While the specific exceptions provide courts with no discretion, fair use is "'an equitable rule of reason' which permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which the law is designed to foster." *Stewart v. Abend*, 495 U.S. 207, 237 (1990).

The legislative history of the Copyright Act stresses that a specific exception does not limit the availability of fair use for conduct that does not fall within the scope of the exception. A congressional report produced during the drafting of the Copyright Act noted that "[a] question that came up several times during the hearings was whether the specific exemptions for certain uses…should be in addition to or instead of fair use…. [W]hile some of the exemptions in sections 108 through 116 may overlap the fair use doctrine, they are not intended to supersede

it." H.R. Rep. No. 83 at 36-37 (1967). The Register of Copyrights, in her Report on Copyright

and Digital Distance Education (the impetus for the TEACH Act), stated: "Fair use could apply

as well to instructional transmissions not covered by the changes to section 110(2) recommended

above. Thus, for example, the performance of more than a limited portion of a dramatic work in

a distance education program might qualify as fair use in appropriate circumstances." U.S.

COPYRIGHT OFFICE, REPORT ON COPYRIGHT AND DIGITAL DISTANCE EDUCATION 162 (1999). The

Conference Report that accompanied the enactment of the TEACH Act cited this portion of the

Copyright Office analysis and reiterated that the "continued availability of the fair use doctrine"

was critical to the Office's recommendation that Congress pass the Act. 21st Century

Department of Justice Appropriations Authorization Act, Sec. 13301 No. 107-685, at 234 (2002).

Similarly, judicial opinions addressing the relationship between the specific exceptions

and fair use state that a defendant's failure to qualify for a specific exception does not prejudice

its fair use rights. *See, e.g., Encyclopedia Britannica Educational Corp v. Crooks,* 447 F. Supp.

243, 249 n. 7 (W.D.N.Y. 1978) ("The legislative history, however, makes clear that the statutory

exemptions were intended to supplement rather than supersede the doctrine of fair use.

Therefore, one cannot infer that a use is prohibited merely because it was not exempted by the

statute."). That is, the existence of a specific exception, and its unsuccessful invocation, cannot

have a negative effect on a defendant's fair use argument.[7]

---

[7] In the context of the rulemaking to create exemptions to section 1201(a) of the Digital
Millennium Copyright Act, copyright holders argued that "where Congress has already legislated
comprehensively and in detail on the circumstances in which circumvention should be allowed,
this rulemaking, which is focused on making temporary adjustments and applying the prohibition
flexibly in circumstances not anticipated by Congress, has little if any role to play." Joint
Comments of American Association of Publishers et al. at 36, Rulemaking on Exemption to
Prohibition on Circumvention of Copyright Protection Systems for Access Control
Technologies, No. RM 2008-8 (Feb. 2, 2009), *available at*
http://www.copyright.gov/1201/2008/responses/association-american-publishers-47.pdf. The

### B.   Section 108(f)(4) Unambiguously Provides that Section 108 Does Not Limit The Applicability of Fair Use to Libraries.

Section 108(f)(4) makes explicit what is implicit in the Copyright Act's other specific exceptions: that nothing in Section 108 "in any way affects the right of fair use as provided by section 107…." The legislative history of this savings clause underscores that it means exactly what it says – that the exceptions enumerated in Section 108 do not restrict the availability of fair use to libraries and archives for actions that do not fall within those exceptions. In other words, libraries and archives can freely rely on fair use to engage in activities whether or not they are explicitly permitted under Section 108. Moreover, libraries and archives can exercise their rights under both Sections 107 and 108 simultaneously, in concert, in succession, or independently. While Section 108 creates a safe harbor where libraries can make settled uses without having to engage in fair use analysis, nothing in Section 108 precludes libraries from making fair uses.

The 1909 Copyright Act did not contain any exceptions for libraries; instead, libraries relied entirely on the federal common law of fair use. When the possibility of a specific exception for libraries was raised during the lengthy process that resulted in the 1976 Copyright Act, library representatives expressed concern that the specific exception might limit the availability of fair use to libraries. MARY RASENBERGER AND CHRIS WESTON, OVERVIEW OF THE LIBRARIES AND ARCHIVES EXCEPTION IN THE COPYRIGHT ACT 13 (2005), *available at* http://www.section108.gov/papers.html ("Library representatives … asserted that there was 'great danger' in the statutory language, because it would freeze what was allowable at the very moment that technology is advancing.") (citing *Copyright Law Revision Part 2: Discussion and*

---

Register of Copyrights rejected this argument, observing that "this rulemaking is the appropriate forum to address whether an exemption to the prohibition is warranted as a result of the adverse effects on non-infringing uses." Memorandum from Marybeth Peters, Register of Copyrights, to James H. Billington, Librarian of Congress 85 (June 11, 2010), *available at* http://www.copyright.gov/1201/2010/initialed-registers-recommendation-june-11-2010.pdf.

*Comments on Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, Printed for the Use of the House Comm. On the Judiciary*, 88th Cong. 34 (1963)(statement of William H. Hogeland, Jr., Joint Libraries Comm. on Fair Use in Photocopying, Sept. 14, 1961)).

Accordingly, when the Senate Subcommittee on Patents, Trademarks, and Copyrights reported out the bill in December, 1969, with the basic elements of what is currently Section 108(a), (b), (c), (f), and (g), it included the language now in Section 108(f)(4). The Subcommittee report's discussion of Section 108 stated: "The rights given to the libraries and archives by this provision of the bill are in addition to those granted under the fair-use doctrine." S. Rep. No. 91-1219 at 6 (1970). This sentence makes clear that Section 108(f)(4) was intended to insure that Section 108 had no negative impact on fair use.

The House Judiciary Committee Report on the 1976 Act quoted the language of Section 108(f)(4) and then explained that "[n]o provision of section 108 is intended to take away any rights existing under the fair use doctrine." H.R.Rep. No. 94-1476, at 74. The House Report's discussion of other parts of Section 108 reinforces the point that Section 108(f)(4)'s purpose was to prevent the implication that Section 108 limited fair use. In the context of Section 108(h), the House Report observed:

> Although subsection (h) generally removes musical, graphic, and audiovisual works from the specific exemptions of section 108, it is important to recognize that the doctrine of fair use under section 107 remains fully applicable to the photocopying or other reproduction of such works. In the case of music, for example, it would be fair use for a scholar doing musicological research to have a library supply a copy of a portion of a score or to reproduce portions of a phonorecord of a work. Nothing in section 108 impairs the applicability of the fair use doctrine to a wide variety of situations involving photocopying or other reproduction by a library of copyrighted material in its collections, where the user requests that reproduction for legitimate scholarly research purposes.

H.R. Rep. No. 94-1476, at 78.

In 2008, the Copyright Office and the National Digital Information Infrastructure and Preservation Program of the Library of Congress sponsored an independent report by a study group consisting of publishers and librarians. The Study Group observed that "in addition to section 108, libraries and archives rely upon fair use to make copies of copyrighted works for preservation and other purposes." The Study Group stated that

> Section 108 was not intended to affect fair use. Certain preservation activities fall within the scope of fair use, regardless of whether they would be permitted by section 108. For example, the House Report accompanying the 1976 Copyright Act specifically mentions copying deteriorating prints of motion pictures produced before 1942 for archival preservation, an activity not addressed by section 108, as an example of fair use.

THE SECTION 108 STUDY GROUP REPORT 22 (2008), *available at* http://www.section108.gov.

Copyright scholars agree that Section 108 does not limit the availability of Section 107 to libraries. 4 WILLIAM PATRY, PATRY ON COPYRIGHT § 11:3 (2011) ("[I]f for one reason or another, certain copying by a library does not qualify for the section 108 exemption (*e.g.*, the collections are not open to the public; no notice of copyright is included; the copy does not become the property of the user), the library's photocopying would be evaluated under the same criteria of section 107 as other asserted fair uses. This interpretation not only gives meaning to both sections but is fully in line with the earlier committee reports."); 2-8 MELVILLE NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8.03 (2011) ("This exemption for libraries and their employees is in addition to any exemption that they might have for such activities under the doctrine of fair use"); 4-13 NIMMER ON COPYRIGHT § 13.05 (2011) ("[I]f a given library or archive does not qualify for the Section 108 exemption, or if a qualifying library or archive engages in photocopying practices that exceed the scope of the Section 108 exemption, the defense of fair use may still be available. Nothing in Section 108 'in any way affects the right of

fair use as provided by Section 107....' For these purposes, then, it is necessary to look beyond the Section 108 exemption to the general law of fair use as applied to photocopying.").

Plaintiffs completely ignore the savings clause until page 21 of their Memorandum. They then argue that interpreting the savings clause as permitting post-108 reliance on fair use would read Section 108 out of the Copyright Act. Pls.' Mem. Supp. Part. J. 23. However, it is Plaintiffs who seek to read Section 108(f)(4) out of the statute. They do not offer an alternative interpretation; they simply contend that it does not mean what it clearly says.[8]

Contrary to Plaintiffs' assertions, the plain language of Section 108(f)(4) does not read Section 108 out of the statute. Section 108 sets forth certain situations where a library can always make reproductions and distributions without the right holder's authorization. Some of these actions might be fair uses, but a specific exception provides legal certainty that encourages the library to proceed without having to conduct the more complex fair use analysis. Other actions under Section 108 might be beyond what fair use would allow, yet Congress in its balancing of competing interests decided to permit them. Section 108(f)(4) clarifies that libraries can rely on Section 108 when they meet its detailed criteria; and on Section 107 in other circumstances,

---

[8] In their efforts to avoid the plain text of Section 108(f)(4) and the clear import of the legislative history, Plaintiffs rely heavily on a general canon of statutory interpretation that "the specific governs the general." Pls.' Mem. Supp. Part. J. 21. Ironically, Plaintiffs have overlooked a similar principle that governs the use of the canons themselves: that recourse to such general canons is only appropriate where more specific aids to interpretation, such as the plain text and legislative history of the disputed provision, are unavailing. *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("canons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.") (citation omitted). In this case, the statutory text could not be clearer. And, if the plain text were somehow ambiguous (which it is not), recourse to legislative history would further establish the clear intent of Congress that the full range of rights under fair use remain available to libraries in addition to the safe harbors created by Section 108.

when they satisfy its more general criteria.

Plaintiffs mischaracterize the Copyright Office's 1983 report on Section 108 as supporting their interpretation. The report actually recognizes that fair use is indeed available to libraries in situations not authorized by Section 108. Read in context, what the 1983 report suggests is not that the exhaustion of Section 108 rights should act as a bar to fair use, but rather that the copying done under Section 108 should be considered in the equitable balancing that constitutes a fair use evaluation.[9] That is, when determining whether a particular use is fair, a library (or a judge) need not ignore whatever copying may have been done under the aegis of Section 108. Instead, the report suggests that all relevant activity regarding a particular work be considered in the fair use balancing, *even if that activity is also protected by Section 108*. This is a far cry from the Plaintiffs' proposed rule that all library copying must take place within the narrow confines of Section 108.[10]

Plaintiffs' argument concerning the savings clause in the DMCA has no merit. The

---

[9] *See, e.g.,* 1983 Report at 98 ("[Section 108(f)(4)] means that the 'tests' implicit in § 107 may be applied to photocopying beyond § 108…").

[10] Moreover, the Office of Legal Counsel of the U.S. Department of Justice, in a 1999 memorandum for the General Counsel of the U.S. Department of Commerce, specifically rejected the notion that interpreting Section 107 as also allowing practices permissible under Section 108 would "render § 108 superfluous." U.S. COPYRIGHT OFFICE, REPORT OF THE REGISTER OF COPYRIGHTS, LIBRARY REPRODUCTION OF COPYRIGHTED WORKS (17 U.S.C. 108) (1983) at 96 n.4. "Section 108 identifies ('spell[s] out') as noninfringing a category of library photocopying that may, or may not, constitute fair use. Section 108 thus fairly can be viewed as a very valuable -- and not superfluous -- safe harbor: If a certain library practice is noninfringing under the specific and detailed provisions of section 108(a) (as confined by section 108(g)(2)), a library need not be concerned about how that particular photocopying practice would fare under section 107's more complex and indeterminate fair use standards." RANDOLPH D. MOSS, OFFICE OF LEGAL COUNSEL, WHETHER AND UNDER WHAT CIRCUMSTANCES GOVERNMENT REPRODUCTION OF COPYRIGHTED MATERIALS IS A NONINFRINGING "FAIR USE" UNDER SECTION 107 OF THE COPYRIGHT ACT OF 1976 14 n.12 (1999) *available at* http://www.justice.gov/olc/pincusfinal430.htm. The OLC memorandum further states that "section 108 of the 1976 Act does not narrow the protection for fair use provided by the common law doctrine codified in section 107." Id.

Second Circuit in *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001) rejected defendants' invocation of the reference to fair use in the savings clause in 17 U.S.C. §1201(c)(1) on the grounds that fair use is a defense to copyright infringement liability, not liability under the DMCA—the claim in that case. In contrast, fair use and Section 108 both provide defenses to copyright infringement liability.

### C.   Plaintiffs' Reading of Section 108 Conflicts with Section 504(c)(2).

Section 504(c)(1) allows a plaintiff in a copyright action to elect to recover statutory damages instead of actual damages. The range of statutory damages is $750 to $30,000 per work infringed, as the court considers just. However, Section 504(c)(2) requires the court to remit the statutory damages if: 1) the infringer is a non-profit library, archives, or educational institution, or an employee thereof acting in the scope of his or her employment; 2) "the infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107;" and 3) the infringement involved a reproduction of the work. In other words, Section 504(c)(2) requires the remission of statutory damages when a library reasonably (but incorrectly) believed that its reproduction was a fair use under Section 107. This implies that a library's reproduction could be a fair use. If Section 107 never applies to a reproduction by a library, as Plaintiffs contend, then a library could never have reasonable grounds for believing that its reproduction was a fair use. This would render Section 504(c)(2)(i) "mere surplusage," in violation of the rule of statutory construction in *Potter v. U.S.*, 155 U.S. 438, 446 (1894), cited by Plaintiffs.

**D.    Plaintiffs' Interpretation of Section 108 Is Inconsistent With the Privileged Status Congress Has Accorded Libraries In Title 17.**

Recognizing the importance of libraries, Congress has accorded them a privileged status in Title 17. In addition to Section 108, the library exception to the prohibition on software rental, *supra* n. 3, and the Section 504(c)(2)(i) remission of statutory damages to libraries, *supra*, Congress has provided libraries with other specific shelters against Title 17 liability. Section 602(a)(3)(C) provides organizations operated for scholarly, educational, or religious purposes with an exception to the importation right for "library lending or archival purposes." Section 1201(d) of the Digital Millennium Copyright Act (DMCA) gives libraries, archives, and educational institutions the right to circumvent technological protection measures on a copy for purposes of determining whether to acquire a copy of the work. Section 1203(c)(5)(B) allows a court to remit statutory damages to libraries, archives, and educational institutions in cases of innocent violations of the DMCA. Section 1204(b) excludes libraries, archives and educational institutions from criminal liability for DMCA violations.[11]

Nonetheless, Plaintiffs would deny libraries the benefit of the most significant privilege of all: fair use. The U.S. Supreme Court recently described fair use as part of "the traditional contours of copyright protection" and one of copyright law's "built-in First Amendment accommodations." *Golan*, 132 S. Ct. at 876. Fair use has enabled copyright law to adapt quickly to rapidly evolving technology. *See, e.g.*, *Sony v. Universal,* 464 U.S. 417 (1984) (permitting the "time-shifting" of television programs by video cassette recorders); *Recording Industry Association of America v. Diamond Multimedia Systems*, 180 F.3d 1072, 1079 (9th Cir. 1999) (permitting the "space-shifting" of music by MP3 players); *Sega v. Accolade*, 977 F.2d 1510 (9th

---

[11] Similarly, the orphan works legislation, which passed the Senate in 2008, contained a special safe harbor for libraries, archives, museums, and educational institutions. Shawn Bentley Orphan Works Act of 2008, S. 2913, 110th Cong. (2008).

Cir. 1992) (permitting the translation of computer programs during the course of reverse engineering); *Perfect 10 v. Amazon.com*, 508 F.3d 1146 (9th Cir. 2007) (permitting the display of images by search engines). It is inconceivable that Congress intended to withhold from non-profit libraries the protection of this crucial right while allowing it to be employed regularly by highly profitable commercial entities. *See* Jonathan Band, *Google and Fair Use*, 3 J. BUS. & TECH. LAW 1 (2008).

### III.    THE ORPHAN WORKS PROJECT IS PERMITTED BY SECTION 108(e).

Although Plaintiffs contend that HathiTrust has "violated" Section 108, the proposed orphan works project is completely compliant with Section 108(e). Under that provision,

- a library (or archives) whose collection is open to the public or other persons doing research in a specialized field
- may reproduce and distribute a copy
- of an entire work in its collection
- to the user of that or another library
- if the library has determined, on the basis of a reasonable investigation, that a copy of the work cannot be obtained at a fair price
- the copy becomes the property of the user
- the library has no notice that the copy would be used for any purpose other than private study, scholarship, or research
- the library makes and distributes the copy without any purpose of direct or indirect commercial advantage, and
- the library displays a copyright warning at the place where orders are accepted as well as a copyright notice on the copies it provides.

The proposed orphan works project falls within the scope of this limitation. The members of HathiTrust are libraries whose collections are open to the public or other persons doing research in a specialized field. Likewise, these libraries may allow unaffiliated researchers on-premises access to the HathiTrust database. The orphan works determination procedure constitutes reasonable investigation that a copy cannot be obtained at a fair price. A user would own the copy he downloads; HathiTrust would have no notice that the user intended to use the copy for a purpose other than private study, scholarship or research; HathiTrust would not

21

receive a direct or indirect commercial advantage from this activity; the HathiTrust website would display a copyright warning; and HathiTrust would insert a copyright notice in every copy it provides.

Plaintiffs' argument that the orphan works program "violates" Section 108(h) reflects the same fundamental misunderstanding of Section 108 that infects Plaintiffs' entire Memorandum. When Congress in 1998 extended the copyright term by 20 years, it adopted Section 108(h) to allow libraries to reproduce and distribute some of the works whose term it had extended. Nothing in the Section 108(h) suggests that Congress intended this provision to regulate pervasively the use of orphan works by libraries. Like the rest of Section 108, Section 108(h) provides libraries with a safe harbor with respect to some uses of some works, without prejudice to the applicability of fair use to other uses of other works.

In sum, contrary to Plaintiffs' contention, Section 108(e) permits HathiTrust to digitally transmit orphan works.

**IV.     CONCLUSION**

For the foregoing reasons, this Court should deny Plaintiffs' motion for judgment on the pleadings.

Respectfully submitted,

/s/ Jonathan Band
Jonathan Band
Jonathan Band PLLC
21 Dupont Circle NW, 8th Floor
Washington, D.C., 20036
202-296-5675
jband@policybandwidth.com

Counsel for Amici

April 20, 2012