**KILPATRICK TOWNSEND & STOCKTON LLP**
Joseph Petersen (JP 9071)
Robert Potter (RP 5757)
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800
Email: jpetersen@kilpatricktownsend.com

Joseph M. Beck (admitted *pro hac vice*)
W. Andrew Pequignot (admitted *pro hac vice*)
Allison Scott Roach (admitted *pro hac vice*)
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: jbeck@kilpatricktownsend.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE AUTHORS GUILD, INC., ET AL.,<br><br>                              Plaintiffs,<br><br>            v.<br><br>HATHITRUST, ET AL.,<br><br>                              Defendants. | Case No. 11 Civ. 6351 (HB) |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ......................................................................................................... 1

LEGAL STANDARD ................................................................................................... 2

ARGUMENT ............................................................................................................... 2

I.      Section 108 Does Not Substitute For Section 107 ............................................ 2

        A.      The Plain Language of Section 108 Leaves Application of Section
                107 Unaffected ........................................................................................ 3

        B.      Section 108 Complements Section 107; It Does Not Undermine It. ....... 3

        C.      The Legislative History of Section 108 Reinforces Its Plain
                Meaning. ................................................................................................. 6

        D.      Section 108 Does Not Preempt the First Amendment or Other
                Congressionally Imposed Limits On Copyright Holders' Rights. .......... 7

                1.      First Amendment. ......................................................................... 7

                2.      Other Congressional Limits. ........................................................ 7

II.     Section 108 Applies to Reproductions and Distributions Alleged in
        Plaintiffs' Complaint ....................................................................................... 8

        A.      The Libraries' Limited Uses of Copyrighted Works in the
                HathiTrust Digital Library ...................................................................... 8

        B.      The Breadth and Indefiniteness of Plaintiffs' Claims Precludes
                Judgment for Plaintiffs on the Pleadings. ............................................... 9

        C.      Plaintiffs Have Not Even Satisfied Their Burden To Strike With
                Respect To the Identified Works. .......................................................... 10

                1.      The Libraries Did Not Obtain an "Indirect Commercial
                        Advantage." ............................................................................... 11

                2.      Certain of the Libraries' Reproductions Are Permitted
                        Under Section 108(c). ................................................................ 13

                3.      The Libraries' Reproductions Were Not "Systematic." ............. 16

**TABLE OF CONTENTS**
(Continued)

4.    Section 108(e) Applies To the University of Michigan's
Orphan Works Project..............................................................................17

CONCLUSION.............................................................................................................19

## TABLE OF AUTHORITIES

**Cases**

*Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ..................................... 5

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992)....................................................................... 3

*Eldred v. Ashcroft*, 537 U.S. 186 (2002)................................................................................... 4, 7

*Fowlkes v. Thomas*, 667 F.3d 270 (2d Cir. 2012)........................................................................ 3

*Golan v. Holder*, 132 S. Ct. 873 (2012)..................................................................................... 7

*Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*,
603 F.3d 23 (2d Cir. 2010) ................................................................................................. 14

*Grp. Publishers, Inc. v. Winchell*, 86 F. Supp. 573 (S.D.N.Y. 1949).......................................... 14

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)........................................................ 4

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1993) ............................................. 4

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .......................................................................... 5

*UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 667 F.3d 1022 (9th Cir.
2011) ............................................................................................................................... 14

*Universal City Studios v. Corley*, 273 F.3d 429 (2d Cir. 2001)................................................. 5, 6

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) .............................................................................. 3

*Wireless Ink Corp. v. Facebook, Inc.*, 787 F. Supp. 2d 298 (S.D.N.Y. 2011).................... 2, 10, 13

**Statutes and Rules**

17 U.S.C. § 106(3) ............................................................................................................... 16

17 U.S.C. § 107..................................................................................................................... 4

17 U.S.C. § 108(a)(1)............................................................................................................ 11

17 U.S.C. § 108(c) ............................................................................................................... 13

17 U.S.C. § 108(c)(2)............................................................................................................ 15

17 U.S.C. § 108(d) ............................................................................................................... 16

17 U.S.C. § 108(e) ............................................................................................................... 18

## TABLE OF AUTHORITIES
### (Continued)

17 U.S.C. § 108(f)(4) ................................................................................... 1, 2, 3, 4

17 U.S.C. § 108(g) ........................................................................................ 16

17 U.S.C. § 108(g)(2) ................................................................................... 16

17 U.S.C. § 1201(c)(1) .................................................................................. 5

17 U.S.C. § 121 ............................................................................................. 8

Fed. R. Civ. P. 12(f)(2) ................................................................................. 2

**Legislative History**

138 Cong. Rec. 17958-59 (daily ed. Oct. 8, 1992) ....................................... 11

H.R. Rep. No. 89-2237 (1966) ....................................................................... 6

H.R. Rep. No. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 ............................. 6, 12, 17

S. Rep. 94-473 (1975), *reprinted in* 1975 WL 370213 (Nov. 20, 1975) ...................................... 12

S. Rep. No. 91-1219 (1970) ........................................................................... 6

**Other Authorities**

Airline Deregulation Act of 1978 ................................................................... 4

Federal Aviation Act of 1958 ......................................................................... 4

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.15(3) (2011) ........................ 11

Register of Copyrights, *Library Reproduction of Copyrighted Works* (Jan. 1983) ........................ 5

*The Section 108 Study Group Report* (Mar. 2008), *Available at*
http://www.section108.gov/docs/Sec108StudyGroupReport.pdf (last visited
Apr. 16, 2012) .............................................................................................. 13

## INTRODUCTION

Plaintiffs' motion astoundingly asserts that libraries, uniquely among all users of copyrighted works, have no defense to claims of copyright infringement (including fair use and the First Amendment) with the sole exception of Section 108 of the Copyright Act.[1]  Plaintiffs press this view despite the fact that Section 108 itself plainly rejects it, confirming that "[n]othing in this section [108] . . . **in any way affects the right of fair use as provided by section 107**," 17 U.S.C. § 108(f)(4) (emphasis added), and despite Congress' intent to grant libraries **greater** rights and defenses. Plaintiffs' unprecedented interpretation of Section 108 would result in a procrustean bed for libraries, denying them constitutionally rooted rights and defenses freely available to every one else, including for-profit companies. Such a result would contravene Congress' direction and defy common sense.

Plaintiffs—whose vague claims against the Libraries appear to encompass all copyrighted works within the HathiTrust repository (the "HathiTrust Digital Library" or "HDL")—also argue that the Libraries cannot claim the Section 108 safe harbor for **any** of the multitude of works and uses presently in suit.[2] Yet Plaintiffs have not even shown that their cherry-picked examples of uses by the Libraries fall outside the protections of Section 108, let alone that **all** uses of **all** works fail to comply. In such circumstances, Plaintiffs' attempt to strip the Libraries of all rights and defenses under Section 108 with respect to all works at issue in this suit must fail. Plaintiffs' motion should therefore be denied in its entirety.

---

[1] The named defendants in this action are the university presidents on behalf of their respective libraries along with "HathiTrust" (a service that is not even a separate entity capable of being sued). For the sake of simplicity, we refer herein to all Defendants as the "Libraries."

[2] The vague scope of Plaintiffs' Complaint is a direct result of the fact that the Complaint includes claims of infringement of unidentified works asserted on behalf of unidentified members of the Plaintiff associations, as well as claims directed to possible future distribution of unidentified works through the University of Michigan's Orphan Works Project. While the Libraries have sought judgment on the pleadings with respect to the Plaintiff associations' right to assert such claims, and with respect to the lack of ripeness of Plaintiffs' claims directed to the Orphan Works Project, pending a ruling on that motion Plaintiffs' claims must be presumed to encompass a broad array of works within the HDL.

**LEGAL STANDARD**

A motion brought under Federal Rule 12(c) for a "partial judgment" denying defendants the opportunity to prove defenses properly asserted in their answer is treated by this Court as a motion to strike under Federal Rule 12(f).[3] *Wireless Ink Corp. v. Facebook, Inc.*, 787 F. Supp. 2d 298, 300 (S.D.N.Y. 2011) (denying plaintiff's motion for judgment dismissing one of defendant's defenses). In *Wireless Ink Corp.*, this court construed a plaintiff's motion to "dismiss" one of the defenses asserted by defendants as a motion to strike under Federal Rule 12(f). *Id.* at 300 n.1. In doing so, the court distinguished between Rule 12(f), which "permits a party to challenge the sufficiency of an affirmative defense," from Rule 12(c), which "permits a party to challenge the sufficiency of a claim or counterclaim." *Id.*

To prevail on such a motion, a plaintiff must establish that no material questions of law or fact exist and the alleged insufficiency of the defense is clearly apparent on the face of the pleading.[4] *Id.* at 314. A motion to strike a defense based on the pleadings is not favored and "will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense." *Id.* (internal quotation marks and citation omitted).

**ARGUMENT**

**I.    Section 108 Does Not Substitute For Section 107.**

Plaintiffs argue that the Libraries cannot rely upon fair use under Section 107 of the Copyright Act because Section 108—which grants libraries minimal and necessary "safe harbors" to reproduce and distribute copyrighted works—precludes such reliance. However, Section 108(f)(4) directly answers the question Plaintiffs pose, stating that "[n]othing in the

---

[3] Plaintiffs presumably contend their motion should be decided under Rule 12(c) because a Rule 12(f) motion is untimely. *See* Fed. R. Civ. P. 12(f)(2) (requiring motion to be filed within 21 days of the answer).

[4] The standard under a Rule 12(c) and a Rule 12(f) motion is the same. (*Cf.* Pls.' Br. at 7.)

section . . . in any way affects the right of fair use as provided by section 107." 17 U.S.C. § 108(f)(4). Thus, while Plaintiffs argue that "[t]his Court will likely be the first to interpret the force of Section 108(f)(4)" (Pls.' Br. at 22), that is so only because the Plaintiffs have ventured an argument that is directly contrary to the express provisions of the Copyright Act.

### A. The Plain Language of Section 108 Leaves Application of Section 107 Unaffected.

The only plausible interpretation of Section 108(f)(4) is that it means what it says, *viz.*, that "[n]othing in this section [108] . . . **in any way affects the right of fair use as provided by section 107.**" 17 U.S.C. § 108(f)(4) (emphasis added). Plaintiffs attempt to manufacture ambiguity where none exists by relying on selected canons of statutory construction (Pls.' Br. at 21-23), but they ignore the most important canon of all: "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Because Section 108(f)(4) is unambiguous on its face, "this first canon is also the last: judicial inquiry is complete." *Id.* at 254 (internal quotation marks and citation omitted); *see also Fowlkes v. Thomas*, 667 F.3d 270, 272 (2d Cir. 2012) ("Where the words of a statute are unambiguous, our inquiry is generally confined to the text itself.").

### B. Section 108 Complements Section 107; It Does Not Undermine It.

Even were there ambiguities in Section 108(f)(4), the canon that "the specific governs the general" (Pls.' Br. at 21) does not support Plaintiffs' interpretation of Section 108. The rationale of this canon is to avoid "applying a general provision when doing so would **undermine** limitations created by a more specific provision." *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996) (emphasis added). Here, fair use, as codified in Section 107, does not undermine Section

108; rather, the two sections are entirely complementary.[5] *See Eldred v. Ashcroft*, 537 U.S. 186, 220 (2002) (noting that Section 108(h) "**supplements** [the] traditional First Amendment safeguards," including fair use as codified in 17 U.S.C. § 107) (emphasis added).

As the Ninth Circuit explained in response to a similar argument that the Section 117 limitation for copying computer programs preempted fair use:

> [S]ections 107 and 117 serve entirely different functions. Section 117 defines a narrow category of copying that is lawful *per se*. Section 107, by contrast, establishes a *defense* to an otherwise valid claim of copyright infringement. . . . The fact that Congress has not chosen to provide a *per se* exemption to section 106 for disassembly [of software code] does not mean that particular instances of disassembly may not constitute fair use.

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1521 (9th Cir. 1993) (citation omitted) (holding that Section 117, which permits the owner of a computer program to make certain copies, had no effect on the defendant's additional right to make other copies under fair use, noting that plaintiff's argument to the contrary—identical to Plaintiffs' argument here—"verges on the frivolous").

Here too, Section 108 defines categories of copying by libraries that are lawful *per se* while Section 107 establishes a defense to a claim of infringement. Indeed, Plaintiffs' argument is even more untenable than the almost-"frivolous" argument rejected in *Sega* because Section 108, in contrast to Section 117 (which was at issue in *Sega*), expressly confirms that it does not affect fair use "in any way." *See* 17 U.S.C. § 108(f)(4).

Plaintiffs attempt to create ambiguity in the interrelationship between Section 108 and fair use by selectively quoting from a 1983 Report from the Register of Copyrights.[6] (Pls.' Br. at

---

[5] Plaintiffs cite *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), as authority for applying "the specific governs the general" canon to a savings clause such as Section 108(f)(4). (Pls.' Br. at 21-22.) In *Morales* the Court determined that the statutory scheme at issue evinced a clear intent by Congress to supersede the Federal Aviation Act of 1958 when it enacted, *twenty years later*, the Airline Deregulation Act of 1978. *Id.* at 385. Here, in marked contrast, it is crystal clear that Congress did not intend to preempt fair use in Section 108; otherwise, it would not have seen fit to include a savings clause expressly providing that Section 108 does not affect fair use "in any way."

22-23.) Plaintiffs argue that in the 1983 Report the Copyright Office "rejected an interpretation of Section 108(f)(4) that would permit libraries to engage in copying on a 'broad and recurring basis.'" (Pls.' Br. at 22.)

The 1983 Report, however, merely concludes that courts should take "into account the '108' copying that has already occurred" when evaluating an assertion of fair use for library photocopying.[7] Register of Copyrights, *Library Reproduction of Copyrighted Works* at 98 (Jan. 1983). The Register's conclusion, contrary to Plaintiffs' assertion, necessarily recognizes that fair use is available to libraries—otherwise there would be no need for the Register to address the supposed effect of Section 108 on the fair use calculus, nor for a court to consider fair use at all. The 1983 Report did not adopt the radical position espoused by Plaintiffs here, namely that fair use should not apply at all.

Plaintiffs' reliance upon the Second Circuit's decision in *Universal City Studios v. Corley*, 273 F.3d 429 (2d Cir. 2001), is also misplaced. The case involved claims under Section 1201 for circumventing technical measures that control access to a copyrighted work. The savings clause in Section 1201 states that "[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." 17 U.S.C. § 1201(c)(1). The Second Circuit interpreted the savings clause to mean that fair use was still available as a defense to a claim of "copyright infringement" for the use of materials obtained through circumvention, though it did not provide a defense to the unlawful circumvention itself.

---

[6] The deference afforded an opinion from the Copyright Office is limited to its "power to persuade." *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 129 (2d Cir. 2008) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)) (noting that "because the Office's interpretation does not explain why Congress would include language in a definition if it intended courts to ignore that language, we are not persuaded.").

[7] The Register's comments were directed at the fourth fair use factor: "Obviously, in considering the effect of the 'post-108' photocopying upon the potential market for or value of the copyrighted work, 'counting' the 108 photocopying which has previously taken place will often lead to a different result than if one examines the later copying as if no earlier copying had occurred." Register of Copyrights, *Library Reproduction of Copyrighted Works* at 99.

*Id.* at 443. Unlike the Section 1201 savings clause, Section 108(f)(4) is not subject to a different interpretation; indeed, Plaintiffs have not suggested any.

**C.     The Legislative History of Section 108 Reinforces Its Plain Meaning.**

Although the Court need not consider legislative history where there are no ambiguities in the statutory text (*supra* at 3), here the legislative history of the statute evidences Congress' clear intent to leave fair use unaffected by Section 108. For example, in an early draft of the legislation, the House Judiciary Committee stated: "It is the committee's intention that the fair use principle provide a potential limitation on all of the copyright owner's exclusive rights, whether they are subject to other, specific limitations or not. Thus, **while some of the exemptions in sections 108 through 116 may overlap the fair use doctrine, they are not intended to supersede it.**"[8] H.R. Rep. No. 89-2237, at 65-66 (1966) (emphasis added).

The 1969 Senate Report similarly confirmed that "[t]he rights given to the libraries and archives by this provision of the bill are **in addition to those granted under the fair-use doctrine.**" S. Rep. No. 91-1219, at 6 (1970) (emphasis added). And the 1976 House Report once again crystallized the meaning of Section 108(f)(4): "**No provision of section 108 is intended to take away any rights existing under the fair use doctrine.**" H.R. Rep. No. 94-1476, at 74 (1976) (emphasis added), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5688; *see also id.* at 78-79 ("Nothing in section 108 impairs the applicability of the fair use doctrine to a wide variety of situations involving photocopying or other reproduction by a library of copyrighted material in its collections, where the user requests the reproduction for legitimate scholarly or research purposes."). Once again, Congress' intent is unambiguous.

---

[8] The limitations on exclusive rights in Sections 117 through 122 of the Copyright Act were added later.

**D.**     **Section 108 Does Not Preempt the First Amendment or Other Congressionally Imposed Limits On Copyright Holders' Rights.**

In one conclusory paragraph, Plaintiffs argue that Section 108 also prevents libraries from asserting rights and defenses under Sections 109 (first sale), 110 (exemptions of certain performances and displays), and 121 (reproductions for the blind) and, remarkably, the First Amendment.  (Pls.' Br. at 23.) This argument is as weak as it is lacking in **any** authority.

**1.**     **First Amendment.**

Plaintiffs argue that the Libraries cannot assert a separate First Amendment defense because "the idea/expression dichotomy and the fair use defense are sufficient to take into account First Amendment concerns." (Pls.' Br. at 23 n.17.) But Plaintiffs cannot have it both ways. They cannot argue that the First Amendment is subsumed into fair use and thus not a valid defense while at the same time arguing that fair use (and its First Amendment function) has no role in this case because Section 108 alone governs the Libraries' activities. If fair use were not available, as Plaintiffs argue, then the First Amendment would necessarily play a pivotal role in ensuring the constitutionality of the Copyright Act as applied to the Libraries' activities. *See Golan v. Holder*, 132 S. Ct. 873, 890-91 (2012) (finding Congress' enactment of Section 514, which restored copyright protection in certain foreign works, was not subject to a heightened standard of review "[g]iven the 'speech-protective purposes and safeguards' embraced by copyright law," including fair use) (citing *Eldred*, 537 U.S. at 219).

**2.**     **Other Congressional Limits.**

As discussed above (*supra* at 3-6), the statutory rights and defenses in the Copyright Act complement rather than supersede each other. For example, a particular work may have been initially digitized by one of the Libraries for replacement or preservation purposes under Sections 108(b) or (c), and that digital copy may be replicated internally within the HDL under

7

Section 107 in order to maintain and preserve the digital work. The Libraries also allow full-text searching of the HDL for educational research—though **none of the protected text of an in-copyright work can be viewed**. Furthermore, a digital copy of the work may be made available by request pursuant to Section 121 to a small number of students and faculty who have print disabilities.[9] Similarly, it is anticipated that a copy someday may be viewed under the Orphan Work Project, a use sanctioned by Section 108(e). In sum, each of these alleged reproductions and distributions may enjoy immunity from a claim under separate sections of the Copyright Act, depending on the specific work involved and the purpose of the reproduction or distribution. The Libraries should be allowed to present these defenses.

## II. Section 108 Applies to Reproductions and Distributions Alleged in Plaintiffs' Complaint.

In addition to their misguided claim that Section 108 precludes reliance by the Libraries on fair use and other rights and defenses, Plaintiffs also argue that the Libraries cannot meet the requirements for the Section 108 safe harbor for **any** of the works in suit. As explained in detail below, neither the pleadings nor Plaintiffs' brief credibly establishes that the Section 108 safe harbor is inapplicable to all of the works presently in suit. Accordingly, this portion of Plaintiffs' motion should be denied as well.

### A. The Libraries' Limited Uses of Copyrighted Works in the HathiTrust Digital Library

As summarized by counsel for the Libraries at the November 18, 2011 status conference, the limited uses of copyrighted works in the HDL that are being made or, in the case of the Orphan Works Project, that are under consideration are as follows.

---

[9] Plaintiffs contradict themselves when they admit that these sections of the Copyright Act might, in fact, apply to particular situations based on their broad allegations in the First Amended Complaint. Despite acknowledging "the possibility that there could be a situation where a visually-impaired student might have a basis for seeking access to a work for purposes permitted by Section 121 of the Copyright Act, 17 U.S.C. § 121, or that there could be other instances where a particular use of a specific work is not an infringement" (Pls.' Br. at 23), Plaintiffs' insist that all of these uses infringe because they are not authorized by Section 108.

(1)     Providing bibliographic information—but not the protected text—(e.g., the name of the author and the title of the book) (*see* FAC ¶ 68);

(2)     Providing visually-impaired students and faculty at the University of Michigan with access to the digital text of the works (*see* Ans. ¶ 69);

(3)     Search—the pages of a work on which the searched term appears and the number of times it appears on each page are reported, but there is no display of the protected text itself (*see* Ans. ¶ 68); and

(4)     Orphan Works Project—still being developed, but if and when out-of-print works are identified and made available, it will be to a tightly circumscribed and limited number of simultaneous University of Michigan users in compliance with 17 U.S.C. 108(e) (*see* Ans. ¶¶ 74, 78).

Some of these uses do not implicate a right under copyright, and others are permitted by various statutory limitations on copyright including, as discussed below, Section 108.

**B.     The Breadth and Indefiniteness of Plaintiffs' Claims Precludes Judgment for Plaintiffs on the Pleadings.**

In asserting that the Libraries do not satisfy the elements for the Section 108 safe harbor, Plaintiffs focus on the specific works identified in their Complaint (the "Identified Works") while ignoring their own allegations regarding the unidentified copyrights allegedly held by "tens of thousands" of unnamed association members[10] (Pls.' Br. at 5 n.2), and the vaguely described "copyrights of . . . others likely to be affected"[11] (FAC at 27).

There is simply no basis for determining whether Section 108 applies, or does not apply, to works that remain unidentified in the Complaint (the "Unidentified Works"). The pleadings provide no facts regarding these works or the circumstances regarding their alleged infringement. It cannot be determined, for example, (1) whether an Unidentified Work is unpublished and therefore whether such reproductions could be or could have been made for preservation,

---

[10] Plaintiffs' assertion of claims on behalf of unidentified members who allegedly hold copyright in unidentified works alleged to be infringed by the Libraries is the subject of the Libraries' pending motion for judgment on the pleadings for lack of standing. (*See* Defs.' Mot. for J. on the Pleadings.)

[11] The injunctive relief sought by Plaintiffs reaches even further, seeking to enjoin activities with respect to any copyrighted works and to impound allegedly "unauthorized" digital copies of all copyrighted works in the Libraries' possession, custody, or control, without any limitation. (FAC at 28.)

9

security, or deposit for research in another library or archive under Section 108(b); or (2) whether such reproductions could be or could have been made because an Unidentified Work deteriorated or has been damaged, lost, or stolen, or whether an unused replacement could be found at a fair price after a reasonable investigation, such that copies could be created for replacement under Section 108(c). In fact, it cannot even be determined whether any of the Libraries made a reproduction or distribution of the Unidentified Works at all, let alone what the purpose was for any such reproduction or distribution.[12]

Without any facts regarding the Unidentified Works, Plaintiffs cannot credibly establish—drawing all inferences in the Libraries' favor—that there are no material issues of fact as to whether the Libraries' Section 108 rights and defenses apply to **any** of their activities with respect to **any** of the Unidentified Works. *See Wireless Ink Corp.*, 787 F. Supp. 2d at 314 ("A motion to strike an affirmative defense . . . will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense.") (internal quotations marks and citations omitted).  Accordingly, the Court has no basis for stripping the Libraries of their Section 108 rights and defenses with respect to the Unidentified Works.

### C.   Plaintiffs Have Not Even Satisfied Their Burden To Strike With Respect To the Identified Works.

Plaintiffs fail to establish on the pleadings that the Libraries' Section 108 rights and defenses do not apply to the Identified Works. To the contrary, Section 108 (in addition to

---

[12] Moreover, there is an entire class of works—works not digitized in cooperation with Google—for which there is in fact no record evidence whatsoever. This is because Plaintiffs' claims specifically include the digitization of works by the Libraries *without* Google's involvement (*see* FAC ¶ 54) but the pleadings do not identify which works were digitized *with* Google's involvement and which were digitized *without* Google's involvement, **a strange omission for lead Plaintiff Authors Guild, which has been in copyright infringement litigation with Google for almost seven years.** Nonetheless, Plaintiffs' Section 108 arguments turn on the Libraries' pleadings with respect to the works digitized in cooperation with Google. Accordingly, the record before the Court contains a fatal lacuna by itself justifying denial of Plaintiffs' motion.

Section 107) applies to the Identified Works as explained below.

>    **1.    The Libraries Did Not Obtain an "Indirect Commercial Advantage."**

Section 108(a) provides a threshold requirement for application of Section 108: the reproduction or distribution at issue must have been made "without any purpose of direct or indirect commercial advantage." 17 U.S.C. § 108(a)(1). Plaintiffs argue that the Libraries cannot satisfy this requirement because they received an indirect commercial advantage in the form of "Google's digital book conversion services." (Pls.' Br. at 13.) Even assuming that Google scanned the Identified Works—which the pleadings in fact do not establish[13]—any cost savings to the Libraries is not a "commercial advantage" for purposes of Section 108(a), particularly because the Universities are non-profit educational institutions. *Cf.* 2-8 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.15(3) (2011) (where identical language is used in another section of the Copyright Act, Nimmer asserts that Section 110(4)'s exemption may apply to public performances by nonprofit institutions for the purpose of pecuniary advantage **because such an advantage is not a "commercial" one**) (emphasis added); 138 Cong. Rec. 17958-59 (daily ed. Oct. 8, 1992) (statements of Sen. Hatch) (discussing the meaning of "for purposes of commercial advantage or private financial gain" in the context of a criminal copyright provision, the Senate sponsor of the act explained "**the copying must be undertaken to make money**, and even incidental financial benefits that might accrue as a result of the copying should not contravene the law where the achievement of those benefits [was] not the motivation behind the copying.").

---

[13] As noted above, *supra* n.12, there is no support of record for the proposition that *all* of the Identified Works were digitized in cooperation with Google. Thus, the entire premise of Plaintiffs' "indirect commercial advantage" argument—that Google scanned all of the Identified Works (or any other particular work at issue)—is in fact outside the record on the instant motion.

11

Congress' purpose in adopting the "without any purpose of direct or indirect commercial advantage" language in Section 108(a) was to allow for-profit entities to rely on Section 108 under certain limited circumstances, not to hamstring non-profit libraries exercising their Section 108 rights. S. Rep. 94-473 (1975), *reprinted in* 1975 WL 370213 (Nov. 20, 1975). Indeed, the legislative history of Section 108 explains:

> The limitation of section 108 to reproduction and distribution by libraries and archives "without any purpose of direct or indirect commercial advantage" is intended to preclude a library or archives in a profit-making organization from providing photocopies of copyrighted materials to employees engaged in furtherance of the organization's commercial enterprise, unless such copying qualifies as a fair use, or the organization has obtained the necessary copyright licenses.

*Id.*

It also is clear that the Libraries' activities do not confer the type of "commercial **advantage**" Congress intended to exclude from the rights provided in Section 108. The examples of "indirect commercial advantage" in the legislative history focus on organizations that make copies to supplant the need for subscriptions. H.R. Rep. No. 94-1476, at 74-75 (listing examples of uses by libraries in profitmaking organizations that would constitute uses for the purpose of indirect commercial advantage, such as using a single copy to supply employees with multiple copies of material relevant to their work). Moreover, as discussed further below, digitized copies of copyrighted works in the HDL **cannot** act as substitutes for the hardcopy works themselves because, generally speaking, **HathiTrust users are not able to view any of the protected text of copyrighted works**. (*See* Ans. ¶¶ 68-69.) Rather, the Libraries' activities are in furtherance of their educational mission.

Thus, Plaintiffs cannot use this as a basis for stripping the Libraries' of their Section 108 rights and defenses.

### 2.      Certain of the Libraries' Reproductions Are Permitted Under Section 108(c).

Section 108(c) provides that libraries can create three copies of a published work "for the purpose of replacement of a copy . . . that is damaged, deteriorating,[14] lost, or stolen" if they satisfy two conditions: first, "an unused replacement" must not be available "at a fair price," and second, the copy in digital format must not be "made available to the public in that format outside the premises of the library." 17 U.S.C. § 108(c).

Plaintiffs dismiss any possible application of Section 108(c) by pointing to a statement in the Libraries' Answer: that the Libraries' digitization activities conducted in cooperation with Google are "**not limited to** . . . deteriorating published works that cannot be replaced and **include** in-print books that are commercially available." (Pls.' Br. at 13-14; Ans. ¶ 50 (emphasis added).) Such a statement is plainly insufficient to meet Plaintiffs' burden to show that **none** of the works were copied for the purpose of replacement under Section 108(c). *See Wireless Ink Corp.*, 787 F. Supp. 2d at 314. Indeed, rather than excluding the possibility that the Libraries have digitized books that are deteriorating—as permitted under Section 108(c)—the clear meaning of the "not limited to" statement relied upon by Plaintiffs is that **such works are also included in the Libraries' digitization activities at issue**.

Plaintiffs also argue that the Libraries cannot satisfy Section 108(c) because the Libraries admit to creating five copies rather than the three mentioned in the statute (Pls.' Br. at 14). The three-copy authorization in Section 108(c) is based on the national microfilm standards, *The Section 108 Study Group Report*, at 53 (Mar. 2008),[15] which still is the most common form of preservation for libraries. When Congress expanded Section 108 to cover digital copies,

---

[14] Section 108 does not require a work to be "badly damaged," as Plaintiffs assert in their brief. (Pls.' Br. at p. 2.)

[15] *Available at* http://www.section108.gov/docs/Sec108StudyGroupReport.pdf (last visited Apr. 16, 2012).

however, it surely did not intend for every technical digital copy of a work to count against the three-copy limit. For example, generally speaking, every time a digital work is viewed on a computer a transient, electronic copy is made.[16] *See, e.g., UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 667 F.3d 1022, 1034 (9th Cir. 2011) (discussing the automatic reproductions created as part of the technological processes used to make content available on websites). A strict interpretation of Section 108(c) (and Section 108(b))[17] would render this provision meaningless for digital copies—despite Congress's express references to digital reproductions. *See, e.g., Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 31-32 (2d Cir. 2010) (rejecting a interpretation that would render nugatory certain statutory jurisdictional exceptions in the securities context because "Congress cannot have intended its exceptions to CAFA jurisdiction to be essentially meaningless"); *Grp. Publishers, Inc. v. Winchell*, 86 F. Supp. 573, 577 (S.D.N.Y. 1949) (rejecting interpretation of the language of copyright notice provisions of 1909 Act that "completely emasculates the provision and renders its inclusion within the act meaningless"). Here, to the extent the Libraries have exceeded the number of copies mentioned in the statute, they have the right to assert a defense that the creation of certain copies was dictated by the medium and standards for preserving works in digital form, and therefore, the Libraries have complied with the legislative purpose and intent of Section 108.

Furthermore, even if Section 108(c) alone does not permit each and every one of the Libraries' uses, the pleadings do not bar the Libraries from relying on Section 108(c) for certain of the uses and fair use (or other limitations of Plaintiffs' rights) for other uses. For example, if

---

[16] Through the HathiTrust service, however, users are not able to view any protected portion of copyrighted works, other than a small number University of Michigan students and faculty with print disabilities who are authorized to access digital copies of copyrighted works.

[17] As discussed above, Section 108(b) may also apply to some of the Libraries' activities at issue, as the Court cannot determine based on the pleadings whether the Unidentified Works are published or unpublished.

14

the Court were to find that the initial scan of a published book was for replacement purposes but the subsequent copies were for preservation purposes, the different purpose of the subsequent copies could be evaluated under fair use. The Court still may consider the total number of copies in its fair use analysis. Thus, the Court can use these two provisions in conjunction with one another in evaluating the totality of the Libraries' activities.

Plaintiffs also have not satisfied their burden to demonstrate on the pleadings that the Identified Works were not reproduced for replacement purposes, or that the Libraries did not make a reasonable effort to determine if an unused replacement could be obtained at a fair price. Plaintiffs simply argue that **some** of the works do not satisfy these requirements (Pls.' Br. at 14), but they cannot establish on the pleadings that **all** of the Identified Works do not satisfy these requirements.

Moreover, Plaintiffs have not established on the pleadings that the Identified Works were "made available to the public in [digital] format outside the premises of the library." 17 U.S.C. § 108(c)(2). Plaintiffs assert that the provision requires that copies reproduced in digital format pursuant to the subsection must "stay in the physical library" (Pls.' Br. at 16), while the statutory language plainly provides only that they "not [be] made available to the public in that format outside the premises of the library or archives." 17 U.S.C. § 108(c)(2). The language of Section 108(c) places no restrictions on the location in which the digital copies themselves may be **stored**; it only addresses the physical area in which the digital copy may be made **available**, in its digital format, to the **public**.

Further, neither the storage of works in the HathiTrust Digital Library nor the technical internal replication of digital copies within the HathiTrust Digital Library system necessary to operate the HathiTrust Service website amount to a "distribution," within the meaning of the

15

Copyright Act, which requires dissemination to the public. 17 U.S.C. § 106(3) (defining the copyright distribution right as the right "to distribute copies or phonorecords of the copyrighted work *to the public* by sale or other transfer of ownership, or by rental, lease, or lending") (emphasis added). For copyrighted works in the HathiTrust Digital Library, these internal digital copies are not accessible by HathiTrust users; they serve only to maintain the existence and integrity of the work in the HathiTrust Digital Library and to allow lawful activities such as full-text searching, the results of which **do not display any part of the works**.

### 3.   The Libraries' Reproductions Were Not "Systematic."

Plaintiffs argue that "[b]y digitizing and reproducing millions of library books as part of a mass digitization program" the Libraries exceed the "isolated and unrelated" and "on separate occasions" parameters of Section 108(g). (Pls.' Br. at p. 18.) Plaintiffs misunderstand the scope of Section 108(g) and its application to the Libraries' activities.

First, §108(g)'s general requirement of "isolated and unrelated reproduction or distribution" refers to reproductions and distributions of "the **same** material." 17 U.S.C. § 108(g) (emphasis added). This language does not address—nor forbid—the digitization of millions of **different** works. Second, Section 108(g)(2)'s constraint against "systematic reproduction or distribution" specifically applies to uses under Section 108(d), which concerns only copies of individual articles or contributions from periodicals or collections—not copies of entire works. 17 U.S.C. § 108(d), (g)(2).

Moreover, the legislative history for Section 108 makes clear that the meaning of "systematic" in the context of Section 108(g) is tied to an intent to use the reproduction as a substitute for subscriptions or purchases. *See* H.R. Rep. No. 94-1476, at 74-75 ("There is a direct interrelationship between [the meaning of "indirect commercial advantage" in the context of photocopying done by or for libraries or archival collections within industrial, profitmaking, or

proprietary institutions] and the prohibitions against 'multiple' and 'systematic' photocopying in section 108(g)(1) and (1).”). Here, Plaintiffs have not shown, based on the pleadings, that the Identified Works were digitized by the Libraries,[18] much less that the digitization was intended to substitute for the hardcopy works themselves. Further, the digitized copies of copyrighted works in the HDL[19] **cannot** act as substitutes for the hardcopy works themselves because, with the exception of a small number of University of Michigan students and faculty with print disabilities that prevent them from using the hardcopy work, **no HathiTrust user can view any protected portion of the digitized copies of copyrighted works**. (*See* Ans. ¶¶ 68-69 (HathiTrust search results provide, for works treated as in-copyright, only the page numbers on which the searched term appears and the number of times the term appears on each such page).)

### 4.      Section 108(e) Applies To the University of Michigan's Orphan Works Project.

As the Libraries demonstrate in their motion for judgment on the pleadings (*see* Defs.' Mot. for J. on the Pleadings), Plaintiffs' claims regarding the Orphan Works Project should be dismissed because Plaintiffs lack standing and because the issue is not ripe for adjudication. But even assuming the Orphan Works Project remains part of this case, Plaintiffs have not met their burden of proving that Section 108(e) is not a valid defense.

Section 108(e) permits the Libraries to reproduce and distribute works where (1) a user makes a request for a copy, (2) before making a copy, the Libraries have “first determined, on the basis of a reasonable investigation, that a copy . . . cannot be obtained at a fair price,” (3) the copy becomes the property of the user, (4) the Libraries have “no notice that the copy . . . [will]

---

[18] The pleadings do not even establish that the Libraries were the ones that digitized the Identified Works, only that such works “were digitized and included in the HDL.” (*See* Ans. ¶¶ 22-33.)

[19] Plaintiffs allege that the Identified Works are protected by copyright.

be used for any purpose other than private study, scholarship, or research," and (5) the Libraries display a warning that the work is subject to copyright. 17 U.S.C. § 108(e).

The University of Michigan's Orphan Works Project is being designed to satisfy each of these elements. The process for identifying "orphan works"—the specifics of which still are being determined but which have been the subject of considerable analysis and public scrutiny—will unquestionably satisfy the "reasonable investigation" requirement. (*See* Ans. ¶¶ 3, 74, 78.)

Moreover, the Libraries, through the evolving Orphan Works Project, as well as through digitization and limited uses through the HathiTrust service, are seeking to make works accessible to students and faculty who have print disabilities, to make them more easily discoverable by researchers, and to ensure their preservation for current and future generations. Such efforts are not an attempt to "preempt Congress" (Pls.' Br. at 20-21), but rather efforts by the Libraries to utilize the available technology to make uses **within the current law** in support of their mission to collect and preserve knowledge and make it discoverable for research and education. (*See* Ans. ¶¶ 3-4, 34-40, 67-69, 74, 78.)

Plaintiffs, having pled exceptionally broad claims that at present arguably encompass all copyrighted works within the HDL and the yet-to-be-realized Orphan Works Project, cannot simultaneously establish on the pleadings that the Libraries lack all possible defenses with respect to the multitude of works currently in suit. Indeed, Plaintiffs' motion only serves to highlight the soundness of the Libraries' pending motion requesting that the Court find, among other things, that: (i) the association Plaintiffs lack standing to pursue such amorphous claims of copyright infringement directed to an unknown number of unidentified works stored in the HDL; (ii) no Plaintiffs have standing to assert claims based on potential future distribution of unknown works through the Orphan Works Project; and (iii) claims directed to the Orphan Works Project

18

are not currently ripe for adjudication. Accordingly, Plaintiffs' motion should be denied in its entirety.

## CONCLUSION

Because Section 108 of the Copyright Act does not preclude the Libraries from asserting rights and defenses under Section 107, other sections of the Copyright Act, or the First Amendment, and because Plaintiffs' broad claims include reproductions and distributions of works that may well have been, and likely are, permitted by various subsections of Section 108 and other limitations on copyright, Plaintiffs' motion should be denied.

DATED: April 20, 2012
       New York, New York

Respectfully Submitted,

Joseph Petersen (JP 9071)
Robert Potter (RP 5757)
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800
Email: jpetersen@kilpatricktownsend.com

Joseph M. Beck (admitted *pro hac vice*)
W. Andrew Pequignot (admitted *pro hac vice*)
Allison Scott Roach (admitted *pro hac vice*)
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: jbeck@kilpatricktownsend.com

*Attorneys for Defendants*