UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
THE AUTHORS GUILD, INC., et al.,                    :
                                                    :
               Plaintiffs,                        :     Index No. 11 Civ. 6351 (HB)
                                                    :
   - against -                                    :
                                                    :
HATHITRUST, et al.,                                 :
                                                    :
               Defendants.                        :
------------------------------------------------------------X


### REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
### PLAINTIFFS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS


FRANKFURT KURNIT KLEIN & SELZ, P.C.
Edward H. Rosenthal, Esq.
Jeremy S. Goldman, Esq.
488 Madison Avenue
New York, New York  10022
Tel.:  (212) 980-0120
Fax:  (212) 593-9175
erosenthal@fkks.com
jgoldman@fkks.com

*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

ARGUMENT ............................................................................................................................ 2

I. THE COPYRIGHT ACT DOES NOT ALLOW PREEMPTIVE DIGITIZATION .......... 2

II. DEFENDANTS' SYSTEMATIC MASS DIGITIZATION CANNOT, AS A MATTER OF LAW, CONSTITUTE FAIR USE ................................................................................ 4

III. DEFENDANTS' MASS DIGITIZATION AND ORPHAN WORKS PROGRAMS EXCEED THE LIMITATIONS SET FORTH IN SECTION 108 ..................................... 9

    A. Defendants Overlook the Commercial Motives of their Patron Google ................ 9

    B. None of the Copies Were Permitted Under Section 108(c) .................................. 10

    C. The Mass Digitization Program is "Systematic" in Violation of 108(g) ............... 11

    D. The Orphan Works Project is Not Permitted Under Section 108(e) ..................... 11

IV. INTERVENORS' AND PROPOSED AMICI'S CLAIMED THREATENED HARMS ARE IMAGINARY ............................................................................................................ 12

    A. The Chafee Amendment Does Not Permit Defendants' Mass Digitization ......... 13

    B. Proposed *Amici* See Danger Where None is Present ............................................ 14

CONCLUSION ........................................................................................................................ 15

# TABLE OF AUTHORITIES

Page

### Cases

*Am. Geophysical Union v. Texaco*,
   60 F.3d 913 (2d Cir. 1994) ............................................................................................. 5

*Author's Guild, Inc. v. Google Inc.*,
   770 F. Supp. 2d 666 (S.D.N.Y. 2011) ........................................................................... 12

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
   471 U.S. 539 (1985) ...................................................................................................... 4

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ...................................................................................................... 5

*Sega Enterprises Ltd. v. Accolade, Inc.*,
   977 F.2d 1510 (9th Cir. 1993) ....................................................................................... 5

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) .......................................................................................... 6

### Legislative History

H.R. Rep. No. 94-1476 (1976) ............................................................................................ 9, 10
S. Rep. No. 105-190 (1998) ..................................................................................................... 6

### Rules

Federal Rule of Civil Procedure 12(c) .................................................................................... 1
Federal Rule of Civil Procedure 12(f) .................................................................................... 2

### Statutes

17 U.S.C. § 107 .............................................................................................................. *passim*
17 U.S.C. § 108 .............................................................................................................. *passim*
17 U.S.C. § 117(1) ................................................................................................................... 5
17 U.S.C. § 121 .......................................................................................................... 2, 13, 14
17 U.S.C. § 1201(a) ................................................................................................................. 6
17 U.S.C. § 1201(f) .................................................................................................................. 6

**Other**

Hirtle, Peter B., *Digital ILL and the Open Library*, October 23, 2007, *at*
http://blog.librarylaw.com/librarylaw/2007/10/digital-ill-and.html ............................................ 3

Hirtle, Peter B., Emily Hudson & Andrew T. Kenyon, COPYRIGHT & CULTURAL INSTITUTIONS:
GUIDELINES FOR DIGITIZATION FOR U.S. LIBRARIES, ARCHIVES, AND MUSEUMS 115 (2009),
*available at* http://ssrn.com/abstract=1495365 ...................................................................... 10

Maurer, Marc (President of Defendant Intervenor National Federation of the Blind), *Comments
on the Topic of Facilitating Access to Copyrighted Works for the Blind or Persons with Other
Disabilities* (Apr. 21, 2009) 5, *at*
http://www.copyright.gov/docs/sccr/comments/2009/maurer.pdf ...................................... 13, 14

RECOMMENDATION OF THE REGISTER OF COPYRIGHTS (October 27, 2003) 42, *at*
http://www.copyright.gov/1201/docs/registers-recommendation.pdf. ................................... 7, 8

REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS,
LIBRARY REPRODUCTION OF COPYRIGHTED WORKS
(17 U.S.C. 108) 96 (1983) ...................................................................................................... 6, 7

## **PRELIMINARY STATEMENT**

In opposition to Plaintiffs' straightforward motion pursuant to Federal Rule of Civil Procedure 12(c) for partial judgment on the pleadings, Defendants attempt to avoid the legal implications of their conduct by raising numerous straw man arguments that have no bearing on Plaintiffs' motion. Plaintiffs do not claim that the fair use defense is unavailable to libraries and archives. Rather, Plaintiffs contend that Defendants' admitted digitization of millions of copyrighted works in partnership with Google, one of the world's largest commercial enterprises, does not, as a matter of law, constitute fair use or qualify for any other exemption to infringement under the Copyright Act. There is no question that libraries may invoke the fair use defense under different circumstances. But this case is not about individual instances of researchers relying on fair use to make use of a copyrighted work or about visually-disabled library patrons gaining access to a large-print or other specialized format of a book. The issue before this Court on this motion is whether the mass digitization program ("MDP") and Orphan Works Project ("OWP") that Defendants admit to undertaking are permissible under the Copyright Act.

Plaintiffs also do not claim that among the ten million volumes of works that Defendants indiscriminately digitized there are no works that are deteriorating, lost or stolen and unavailable on the market, or works that a person with a print disability may one day ask to have reproduced in a specialized format. Rather, Plaintiffs contend that there is nothing in the law to justify Defendants' preemptive digitization of millions of books without permission, in total derogation of the copyright interests of authors and other rightsholders, just because there is a possibility that a subsequent use of a particular work may later be determined to have been permitted by copyright law. Defendants have no more right to copy every book in a library than they would to copy every record in a music library or every painting in an art museum.

As Judge Chin explicitly stated in the Google Books case involving the same mass digitization program that is at issue in this case, it is up to Congress, not private parties, to determine whether the balance of rights and interests in the copyright law should be changed and how to safeguard the varied interests of copyright creators and users. Defendants should not be permitted to do an end run around Congress and the rights of copyright owners.

## ARGUMENT

Defendants raise procedural quibbles about the timing and standard on a motion for judgment on the pleadings dismissing certain of their affirmative defenses, but provide no meaningful argument as to why this is not exactly the correct procedure to use where the critical facts alleged by Plaintiffs have been admitted and the case raises purely legal questions as to the application of those facts to a statutory scheme.[1] For the reasons set forth below, Defendants' defenses must fail.

### I.

### THE COPYRIGHT ACT DOES NOT ALLOW PREEMPTIVE DIGITIZATION

Defendants argue that the Court cannot decide whether Defendants' MDP or OWP are permissible under Sections 107, 108 or 121 because there is the possibility that Defendants will determine, *after* having indiscriminately digitized millions of books, that copying a particular work happens to fall into one of the exemptions to copyright infringement. In other words, Defendants claim that they are entitled to digitize their entire collections without regard to their physical condition, in-print/out-of-print status, availability for purchase on the market, or whether any particular books have been requested by a patron, another library, or a person with a

---

[1] Defendants cite one case that treated a motion for partial judgment on the pleadings under Rule 12(c) as a motion under Rule 12(f) to strike a specific defense, but then admit that the legal standard for both motions is the same. Def. Mem. at 2, n. 4.

2

print disability, and then to justify their actions after the fact by cherry picking from the list of exemptions available under the Copyright Act. But the Copyright Act does not countenance the preemptive digitization scheme adopted by Defendants. Rather, each exemption under which Defendants seek refuge sets forth particular conditions that must be satisfied *before* any copies are made. *See, e.g.*, 17 U.S.C. §§ 108(c) (library must first determine that (1) the work is "damaged, deteriorating, lost, or stolen" and (2) "an unused replacement cannot be obtained at a fair price"), 108(d) & (e) (library must have first received a request from a "user" or "another library or archives").

Defendants knew that their *post hoc* rationalization would be illegal under copyright law. Indeed, one of Defendants' own representatives, Peter Hirtle, Defendant Cornell University's Senior Policy Advisor and an expert on intellectual property issues relating to libraries, coined the term "pre-emptive digitization" to describe a program launched by several libraries, pursuant to which they would scan out-of-print, in-copyright works and offer those works to library patrons through the interlibrary loan ("ILL") system. *See* Peter B. Hirtle, *Digital ILL and the Open Library*, October 23, 2007, *at* http://blog.librarylaw.com/librarylaw/2007/10/digital-ill-and.html (last visited May 7, 2012). While Mr. Hirtle believes that "[d]igitizing ILL requests *is* a valuable public service, which is why some libraries have been doing it for quite awhile," he concluded that such programs constitute impermissible "pre-emptive digitization[.]" *Id.* Mr. Hirtle wrote that before "a library may use Section 108(e) of the Copyright Act to make a copy of an entire book for delivery to a patron either directly or through ILL, and that copy can be digital . . . the library has to clear some hurtles first." *Id.* (listing § 108(e) requirements).

> *Is this inefficient? Yes. Would it be better if libraries could pre-emptively digitize copyrighted works, store them safely, conduct the market test when an ILL request arrives, and then deliver the book to the user if no copy can be found? Yes. But this is not what the law currently allows.*

3

*Id.* (emphasis added).

Defendants' and Intervenors' reliance on the various exemptions in the Copyright Act to justify their mass digitization and proposed distribution of orphan works is similarly misplaced, however economical, convenient and desirable it may be to create a shared digital repository of millions of copyrighted books or to begin sharing so-called "orphan" works with the public. *Cf. Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 559 (1985) ("To propose that fair use be imposed whenever the social value of dissemination outweighs any detriment to the artist, would be to propose depriving copyright owners of their right in the property precisely when they encounter those users who could afford to pay for it.") (brackets, quotation marks and ellipses omitted).

Defendants may not copy first and ask questions later.

## II.

## DEFENDANTS' SYSTEMATIC MASS DIGITIZATION CANNOT, AS A MATTER OF LAW, CONSTITUTE FAIR USE

Defendants contend that it would be procedurally improper to grant judgment on the pleadings because irrespective of whether their conduct falls within the protections of Section 108, it qualifies as fair use under Section 107. As predicted in Plaintiffs' opening brief, Defendants base this argument almost entirely on the so-called savings language included in Section 108(f)(4), which provides that "nothing in this [Section 108] in any way affect the right of fair use as provided by section 107." Defendants miss the point of this provision.

*First*, as explained in Plaintiffs' opening brief, rather than permitting libraries to continue to conduct their activities under the general framework of fair use, Congress enacted Section 108 to codify the boundaries of a library's right to reproduce copyrighted works for purposes of preservation and replacement, as well as the factors they must consider and the order in which

4

they must consider them to avoid liability for copyright infringement. *See* Pl. Mem. at 9-11; *Am. Geophysical Union v. Texaco*, 60 F.3d 913, 917 (2d Cir. 1994) ("Congress has thus far provided scant guidance for resolving fair use issues involving photocopying, *legislating specifically only as to library copying*[.]") (emphasis added). Although Section 108(f)(4) leaves room for libraries to assert a fair use defense under certain fact scenarios such as a limited use of a particular work for purposes not specifically addressed by Section 108, when it comes to mass and systemic copying, the limits of fair use must be determined by reference to Section 108. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ("[T]he specific governs the general.").

*Second*, Defendants unsuccessfully rely on *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1993), to support their argument that Section 108 merely establishes a "safe harbor" for conduct that is "lawful *per se*" while Section 107 establishes a defense to infringement. Def. Mem. at 4. In that case, Sega, a videogame console manufacturer, argued that Accolade's fair use defense in a case where it had disassembled Sega's computer code in order to understand its non-protectible elements was precluded by Section 117 of the Copyright Act, which permits copying of a computer program if the copy "is created as an essential step in the utilization of the computer program in conjunction with a machine and . . . is used in no other manner." 17 U.S.C. § 117(1). The court rejected Sega's argument that the specific language of Section 117 provided the only exceptions to infringement, holding that "[t]he fact that Congress has chosen not to provide a *per se* exemption to section 106 for disassembly [of code] does not mean that particular instances of disassembly may not constitute fair use." 977 F.2d at 1521.

Defendants attempt to analogize this case to *Sega* by claiming that "[h]ere too, Section 108 defines categories of copying by libraries that are lawful *per se* while Section 107 establishes a defense to a claim of infringement." Def. Mem. at 4. What Defendants overlook,

5

however, is the vast difference between the narrow scope of Section 117, which did not even address the legal ramifications of reverse-engineering computer code, and Section 108, which represents a carefully-negotiated regime for libraries and archives, specifying the precise extent to which they are permitted to copy works for purposes of preservation, replacement and fulfillment of patron requests.  While Section 117 was not specific enough to govern the legality of Accolade's conduct in one case, Section 108 speaks directly to the activities undertaken in the MDP and OWP overall, and must control the Court's analysis.[2]

*Third*, contrary to Defendants' attempt to distinguish *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001), the Second Circuit's interpretation of the DMCA's savings clause in that case is entirely consistent with Plaintiffs' position here:  a savings clause cannot be used to eviscerate another section of the Act, whether that section is the DMCA's anti-circumvention prohibition in Section 1201(a) of the Copyright Act or the detailed regime for systematic copying by libraries laid out in Section 108.  The current situation, in which Congress has carefully considered competing interests and legislated specific restrictions and requirements, is precisely what was before the Second Circuit in *Universal City Studios* when it rejected defendant's attempt to rely on fair use.

*Fourth*, Defendants fail to explain why the Court should not be persuaded by the Register of Copyright's conclusion that "fair use privileges are not available on a broad and recurring basis once the copying permitted by § 108 has occurred" and that "much of '108' photocopying

---

[2] In addition, Defendants ignore the fact that *Sega* preceded the 1998 passage of the Digital Millennium Copyright Act ("DMCA"), which amended the Copyright Act to include a provision expressly permitting the reverse engineering of computer code under certain circumstances. *See* 17 U.S.C. § 1201(f).  Now, the question whether a case of reverse engineering is permitted by copyright law is primarily governed by Section 1201(f) rather than fair use. *See* S. Rep. No. 105-190, at 32 (1998) (Congress intended § 1201(f) to codify *Sega*).

would be infringing but for the existence of that section, thus leaving section 107 often clearly unavailable as a basis for photocopying not authorized by section 108." REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS, LIBRARY REPRODUCTION OF COPYRIGHTED WORKS (17 U.S.C. 108) 96 (1983) (the "1983 REPORT"). Instead, Defendants simply state that "[t]he 1983 Report did not adopt the radical position espoused by Plaintiffs here, namely that fair use should not apply at all." Def. Mem. at 5. But no such "radical position" was asserted by Plaintiffs, who acknowledge that fair use protections can apply to libraries – just not when the use is the copying of millions of books "on a broad and recurring basis," well beyond the specific strictures of Section 108.

*Fifth*, if the 1983 REPORT were not clear enough, in 2003 the Register of Copyrights addressed the same issue and reached the same conclusion. In that year, the Internet Archive – "a non-profit library that maintains a collection of websites, software and other works in digital formats in a digital archive" – sought to obtain an exemption to the DMCA's anti-circumvention provisions that would sanction the Internet Archive's preservation of software applications stored on outdated media (*e.g.*, the migration of data from floppy disks to hard drives) by allowing the Internet Archive to circumvent once prevalent anti-copying mechanisms. RECOMMENDATION OF THE REGISTER OF COPYRIGHTS (October 27, 2003) 42, *at* http://www.copyright.gov/1201/docs/registers-recommendation.pdf.

Just as Defendants argue here, the Internet Archive asserted that its proposed preservation activity was a non-infringing use under Sections 107 and 108 of the Copyright Act. *Id.* at 51. The Register disagreed, observing that "[b]ecause §108 was enacted specifically to address reproduction by libraries and archives, and was amended by the Digital Millennium Copyright Act to address certain digital issues, analysis of noninfringing archival and preservation activities logically begins with that section." *Id.* Turning to Section 108(c), the provision covering the

7

extent to which libraries may copy published works for replacement purposes, the Register noted that "*Section 108(c) does not authorize generalized preservation activities; it is limited by its terms.*" *Id.* at 52 (emphasis added). Under Section 108, libraries are permitted to make digital copies of works only *after* they have determined that the works to be copied have been damaged, lost or stolen. *Id.* Because the Internet Archive sought an exemption that would allow it to make preservation copies of older software *without* having first determined that the works to be copied were damaged, lost or stolen, or that unused replacements could not be obtained at a fair price, the Internet Archive's proposed copying surpassed the limits of Section 108(c). *Id.* at 52-54.

The Register then rejected the Internet Archive's argument that its use was non-infringing fair use under Section 107:

> The Register does not recommend broadening the exemption based on fair use, which is codified in §107. *In determining whether libraries and archives may circumvent access controls for the purpose of systematic preservation of digital works, the Register believes that reliance on §107 is inappropriate. While it is true that some preservation activity beyond the scope of §108 may well constitute a fair use, it is improper in this context to generalize about the parameters of §107.*

*Id.* (emphasis added). The Court should likewise reject Defendants' identical fair use argument.

*Finally*, contrary to Defendants' assertions, the legislative history of Section 108 confirms that the fair use savings clause was included to address the isolated creation of copies made by or at the request of individual library patrons under circumstances that are not addressed in Section 108. *See* 1983 REPORT at 96 ("The Copyright Office does not believe that Congress intended that there should never be fair use photocopying "beyond" § 108. On certain infrequent occasions, such copying may be permitted.") (emphasis in original). The House Judiciary Committee Report on the 1976 Act, cited by Defendants and *Amici* (Def. Mem. at 6; Amici Br. at 15) is clear in this regard: "Nothing in section 108 impairs the applicability of fair use to a

8

wide variety of situations involving photocopying or other reproduction by a library of copyrighted material in its collection, *where the user requests the reproduction for legitimate scholarly or research purposes.*" *See* H.R. Rep. No. 94-1476 (1976), at 78 (emphasis added). To drive the point home, contrast the Section 108(f)(4) fair use illustration provided by the House Report – "In the case of music, for example, it would be fair use for a scholar doing musicological research to have a library supply a copy of a portion of a score or to reproduce portions of a phonorecord of a work," *id.* – with Defendants' claim that it is fair use for libraries to contract with Google to digitize, copy and share millions of works in their collections.

### III.

### DEFENDANTS' MASS DIGITIZATION AND ORPHAN WORKS PROGRAMS EXCEED THE LIMITATIONS SET FORTH IN SECTION 108

Given that Defendants' admitted conduct indisputably goes well beyond the permitted limits of Section 108 in terms of, among other things, the circumstances of the copying, the number of copies made and the failure to search for replacement copies, one would think that they would stick with their fair use argument and not address the other reasons set forth by Plaintiffs as to why their conduct is not protected by Section 108. In other words, if Defendants concede that their actions are outside of the scope of Section 108 for two or three reasons, it should not matter if there are two or three other reasons as well. But perhaps suggesting some discomfort with the fair use argument, Defendants dispute Plaintiffs' other arguments as to why Section 108 prohibits their conduct. These arguments also fail.

### A.  Defendants Overlook the Commercial Motives of their Patron Google

Defendants claim that they satisfy Section 108(a)(1)'s requirement that any copy must be "made without any purpose of direct or indirect commercial advantage" because they are non-profit educational institutions without commercial motive. Def. Mem. at 11. But this argument

ignores the role of Google in this project. Nothing in the statute supports Defendants' interpretation of the term "direct or indirect commercial advantage" as applying only to the libraries and not their patrons as well. Indeed, the legislative history cited by Defendants supports Plaintiffs' position that Section 108 prohibits libraries from making copies in response to a patron request with the knowledge that the copies are to be used for that *patron*'s commercial advantage. *See* H.R. Rep. No. 94-1476 (1976), at 74 (copies made for "indirect commercial advantage" include "photocopying done *by or for* libraries or archival collections within industrial, profit-making, or proprietary institutions[.]") (emphasis added). Plainly, the copies made here are to the commercial advantage of Google.

**B.     None of the Copies Were Permitted Under Section 108(c)**

As explained above, Defendants cannot justify their MDP by claiming, after digitizing millions of works without discrimination, that certain works may have satisfied the conditions of Section 108(c). Their attempt to evade Section 108(c)'s three-copy limitation (Defendants admit to making at least five copies) is even less persuasive. While they claim the three-copy limit was based on the "national microfilm standards" [Def. Mem. at 13], the number of permissible copies increased from one to three as part of the DMCA – the same statute that amended Section108 to permit copying in digital format. Congress thus understood that the three-copy limit would govern digital copies as well, and commentators caution libraries to adhere to that limitation. *See* PETER B. HIRTLE, EMILY HUDSON & ANDREW T. KENYON, COPYRIGHT & CULTURAL INSTITUTIONS: GUIDELINES FOR DIGITIZATION FOR U.S. LIBRARIES, ARCHIVES, AND MUSEUMS 115 (2009), *available at* http://ssrn.com/abstract=1495365 ("If the library has one copy on a server and one copy on a backup tape, then only one patron at a time would be able to generate a third copy by copying the server copy to a local machine."). Defendants' feigned concern that the three-copy limit would not permit them to make "transient" copies is unfounded, Def. Mem. at

14, as such copies are expressly permitted under Section 117. In any event, the millions of works digitized, stored and shared by Defendants are *preservation* copies – the exact opposite of *transient* copies, which are by nature ephemeral.[3]

### C. The Mass Digitization Program is "Systematic" in Violation of 108(g)

In their opposition, Defendants take the incredible position that their assembly-line digitization of millions of books with Google was not "systematic," arguing that Section 108(g) does not prohibit "the digitization of millions of different works." Def. Mem. at 16. The Court should reject this tortured reading of Section 108(g). The introduction to that section expressly states that a library's reproduction rights under Section 108 "extend to the isolated and unrelated reproduction or distribution of a single copy [] of the same material on separate occasions. . . ." 17 U.S.C. § 108(g). Defendants' argument that each of the digital copies created as part of the MDP were "isolated and unrelated" from the other millions of copies is absurd. Moreover, Section 108(g)(1), which Defendants do not address, forbids "the related or concerted reproduction or distribution of multiple copies [ ] of the same material. . . ." As discussed above, Defendants' admitted creation of at least five digital copies of each digital work as part of a coordinated MDP involving multiple parties blatantly violates that provision.

### D. The Orphan Works Project is Not Permitted Under Section 108(e)

In what seems like a last-ditch effort to salvage the doomed OWP, Defendants attempt to argue that Section 108(e) permits their intended distribution of copyrighted works. Def. Mem. at 17-19. Defendants' own analysis, however, reveals the flaw in their argument. Defendants admit that Section 108(e) permits a library to reproduce and distribute a work only where:

---

[3] As set forth in Plaintiffs' opening brief, Section 108(c)(2) prohibits Defendants from disseminating digital copies outside the physical premises of the library to Google or other universities. *See* Pl. Mem. at 14-17. In any event, it is clear that Congress carefully restricted the library's use of digital copies based upon the same security concerns shared by Plaintiffs. *Id.*

11

> (1) a user makes a request for a copy, (2) before making a copy, the Libraries have "first determine[d], on the basis of a reasonable investigation, that a copy . . . cannot be obtained at a fair price," (3) the copy becomes the property of the user, (4) the Libraries have "no notice that the copy . . . [will] be used for any purpose other than private study, scholarship, or research," and (5) the Libraries display a warning that the work is subject to copyright."

Def. Mem. at 17-18.

While Defendants assert that the OWP "is being designed to satisfy each of these elements," the only support given for that statement is their allegation that the process for identifying orphan works "will unquestionably satisfy the 'reasonable investigation' requirement." *Id.* at 18. That may or may not be the case, but Defendants completely ignore the first element, which requires a *user request* (the OWP will make works available irrespective of a user request), and the condition precedent tied to the second element that the "reasonable investigation" must have occurred "*before* making a copy" (the OWP will make available copyrighted works that were already digitized as part of the MDP). *Id.* The OWP will also run afoul of the fifth element, as the library will still retain multiple digital copies of a purported orphan work even after a user chooses to view or download a copy.

Finally, as set forth in Plaintiffs' opening brief, Congress would not have enacted Section 108(h), which allows libraries certain uses of orphan works in the final twenty years of their copyright term, if such uses were already authorized by Section 108(e). Once again, Defendants are attempting precisely the kind of end run around Congress barred by Judge Chin in his rejection of the Google Books settlement agreement. 770 F. Supp. 2d 666, 677 (S.D.N.Y. 2011).

### IV.

### INTERVENORS' AND PROPOSED AMICI'S CLAIMED THREATENED HARMS ARE IMAGINARY

Intervenors' and Proposed *Amici*'s attempt to cast the Plaintiffs as the enemy of the visually-disabled and libraries is as unfair to Plaintiffs as it is irrelevant to this case. Plaintiffs

12

did not bring an action against Intervenors or every library, and do not contend that the making of digital works available under the circumstances permitted by Sections 108 and 121 in any way infringes Plaintiffs' rights. Rather, Plaintiffs' complaint is against five particular libraries that contracted with Google to create and exploit a massive computerized database of digital copies of Plaintiffs' protected works and now seek to justify their conduct by arguing that certain copies could, in theory, one day provide a benefit to the visually disabled, or serve some other permitted purpose. Defendants' approach, which is to copy everything first and seek a justification later, flies directly in the face of Sections 108 and 121 and must be rejected.

### A. The Chafee Amendment Does Not Permit Defendants' Mass Digitization

There are at least two fundamental problems with Intervenors' claim that the Chafee Amendment (17 U.S.C. § 121) provides a legal basis for Defendants' right to make digitized works available to the blind. *See* Int. Mem. at 9. The Chafee Amendment only permits the creation of copies in "a specialized format exclusively for use by blind or other persons with disabilities," with "specialized format" defined as meaning "braille, audio, or digital text which is exclusively for use by blind or other persons with disabilities." *Id.* §§ 121(b)(1)(A), (d)(4). Defendants admit that the digital files generated as part of the MDP included image files and full text OCR files. *See* Answer ¶ 52. These are not file formats made "exclusively for use by blind or other persons with disabilities," but formats that are commonly used by all people. *See* Marc Maurer (President of Defendant Intervenor National Federation of the Blind), *Comments on the Topic of Facilitating Access to Copyrighted Works for the Blind or Persons with Other Disabilities* (Apr. 21, 2009) 5, *at* http://www.copyright.gov/docs/sccr/comments/2009/maurer.pdf (noting that "[s]everal features of the statutory language raise questions about whether it can be extended to the production of e-texts to meet general accessibility needs" and acknowledging lack of "authoritative support" for the position that it does).

13

In addition, the Chafee Amendment only permits copies for the blind to be created by an "authorized entity," which the statute defines as "a nonprofit organization or governmental agency that has a *primary mission* to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities." 17 U.S.C. § 121(d)(1) (emphasis added). None of the Defendants (five universities plus HathiTrust, which Defendants insist is really University of Michigan) have the "primary mission" necessary to qualify as an "authorized entity" under Section 121. See Maurer, at 5 (seeking "support" for interpretation of "authorized entity" that includes university disability offices). Accordingly, the Chafee Amendment does not provide any support for Intervenors' position in this case.[4]

### B. Proposed *Amici* See Danger Where None is Present

Proposed *Amici* claim that Plaintiffs' interpretation of Section 108 "would prevent libraries from performing their most basic functions," such as relying on the first sale doctrine to permit circulation transactions, permitting Internet access to library users, exhibiting photographs and reproducing multiple copies for classroom use. Amici Br. at 2. These hysterical warnings of some dire threat to library function completely misapprehend Plaintiffs' position in this action as well as entire point of their motion for partial judgment on the pleadings.

The gist of *Amici*'s argument is that if Section 108 provides all of the ground rules for permissible activities by libraries, then none of the other provisions of the Copyright Act that serve to limit the exclusive rights of copyright owners under Section 106 will be available. Let

---

[4] Intervenors argue that the American Disabilities Act ("ADA") *requires* universities to create a digital library like HathiTrust in order to grant blind students equal access to library collections. Int. Mem. at 5. Intervenors posit that while the cost of digitizing millions of books may have once permitted universities to avoid their ADA duties, "now that this corpus exists, it is not unduly burdensome for the universities to allow blind students to compete on a basis of true equality." *Id.* at 6. However, this argument overlooks the fact that the "corpus" was derived through a process that violated existing copyright law. As tempting as it may be, Intervenors may not partake of fruit from a poisonous tree.

us be perfectly clear: This is not Plaintiffs' position. Rather, as stated above, Plaintiffs' position is that Section 108 bars libraries and archives from engaging in the systematic duplication of copyrighted works and sets forth the circumstances under which libraries and archives may make duplicate copies of works for preservation and replacement purposes, and to fulfill patron requests. Section 108 has nothing to do with routine lending practices, access to the Internet, or the exhibition of photographs. And while the section might be relevant to the duplication of multiple copies of a work for classroom use, the question whether an isolated reproduction of a particular work could qualify as a fair use is worlds apart from the issues raised in this case. Defendants' participation with Google in their massive and preemptive digitization of millions of copyrighted works is separate and apart from any request for any particular work. Judgment on the pleadings herein would not affect libraries' legitimate day-to-day activities.

## CONCLUSION

For the reasons set forth above, and in Plaintiffs' opening brief, Plaintiffs' motion for partial judgment on the pleadings should be granted.

Dated: New York, New York
      May 11, 2012

                                  FRANKFURT KURNIT KLEIN & SELZ, P.C.

                                  By: _/s/ Edward H. Rosenthal_
                                       Edward H. Rosenthal, Esq.
                                       Jeremy S. Goldman, Esq.

                                       488 Madison Avenue
                                       New York, New York  10022
                                       Tel.: (212) 980-0120
                                       Fax: (212) 593-9175
                                       erosenthal@fkks.com
                                       jgoldman@fkks.com

                                       *Attorneys for Plaintiffs*