```
      C5HZTAGM                    Motion
```

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   THE AUTHORS GUILD, et al.,

 4                 Plaintiffs,

 5          v.                              11 CV 6351 (HB)

 6   HATHITRUST, et al.,

 7                 Defendants.

 8   ------------------------------x

 9                                          May 17, 20012
                                            1:10 p.m.
10
     Before:
11
                       HON. HAROLD BAER, JR.,
12
                                            District Judge
13
                           APPEARANCES
14
     FRANKFURT KURNIT KLEIN & SELZ PC
15        Attorneys for Plaintiffs
     BY:  EDWARD H. ROSENTHAL
16        JEREMY GOLDMAN

17

18   KILPATRICK TOWNSEND & STOCKTON LLP
          Attorneys for Defendant Hathitrust, et al.
19   BY:  JOSEPH PETERSEN
          W. ANDREW PEQUIGNOT
20        ALLISON SCOTT ROACH

21   BROWN GOLDSTEIN & LEVY
          Attorneys for Defendant NFB
22   BY:  DANIEL F. GOLDSTEIN

23   THE LAW OFFICE OF ROBERT J. BERNSTEIN
          Attorneys for Defendant NFB
24   BY   ROBERT J. BERNSTEIN

25

C5HZTAGM                    Motion

```
 1           THE DEPUTY CLERK:  The Authors Guild versus

 2   Hathitrust.  Counsel for the plaintiffs, state your name for

 3   the record.

 4           MR. ROSENTHAL:  Edward Rosenthal from Frankfurt Kurnit

 5   Klein & Selz, and with me is Jeremy Goldman from my office.

 6           MR. PETERSEN:  Good afternoon, your Honor, Joe

 7   Petersen from Kilpatrick Townsend, my partner Joe Beck is here,

 8   and my colleague Andrew Pequignot and Allison Roach.

 9           MR. BERNSTEIN:  Good morning, your Honor -- good

10   afternoon, your Honor, Daniel Goldstein on behalf of the

11   defendants National Federation for the Blind and the individual

12   defendants.  With me is my associate Laurie Ableson, and Robert

13   Bernstein of the law offices of Robert Bernstein.

14           THE DEPUTY CLERK:  Please be seated.

15           THE COURT:  I have 45 minutes, gentlemen.  I hope you

16   divide up -- and lady -- I trust you divided up your time so

17   that you all get to put in your two cents, since I have nine

18   conferences that follow, 15 minutes apart, beginning at 2:00,

19   and that's without lunch.

20           So, as I understand it, there are a series of semi

21   housekeeping problems, as well as the two motions, one by the

22   defendant for partial judgment on the pleadings.  I guess,

23   essentially, both motions are for that relief.  The plaintiff's

24   motion, as well, claims that the defendants are not shielded,

25   and I should hold, by the First Amendment or fair use defense
```

C5HZTAGM                    Motion

1   or any other provision of the Copyright Act.  Those are the two

2   motions.

3          There's also some discovery concerns.  I have, as you

4   obviously know, the problem with the sick Mr. Salamanca does

5   seem to pretty well be explained by the fact that he's even

6   older than I am.  But then he also has multiple medical

7   problems, and then he lists those variety of problems.  I'm

8   really at least of a mind, until anybody argues -- and I

9   assume, and I assume you've all gotten Dr. Nay's letter -- I

10  assume everybody is of the same mind here as to have to do

11  without him, but I'll listen to anybody who may differ.

12          MR. ROSENTHAL:  Your Honor, just to -- as we said in

13  the letter we wrote to the Court, Mr. Salamanca's literary

14  agent who would have knowledge, to the extent there's any

15  relevant knowledge relevant to the issues in this case, would

16  have knowledge, is willing to testify in the place of

17  Mr. Salamanca.  We've offered that for an extended period of

18  time.

19          MR. PETERSEN:  And, your Honor, I offered to take a

20  train down or drive down to Maryland and depose Mr. Salamanca

21  for a very limited amount of time.  I don't believe the

22  doctor's note actually definitively rules out a deposition.  It

23  talks to physical condition preventing Mr. Salamanca from

24  appearing in New York.  I was willing to take that deposition

25  in Maryland.

1            THE COURT:  I thought that, I thought he understood

2       that you were all ready to this at his bedside.

3            MR. PETERSEN:  I don't believe --

4            THE COURT:  The doctor.

5            MR. PETERSEN:  I don't believe the doctor's note --

6       the doctor's note was --

7            THE COURT:  No, the doctor's note doesn't say that.  I

8       thought that on my endorsement or at least your offer had

9       indicated that.

10            MR. PETERSEN:  That's correct, your Honor.

11            THE COURT:  So that he knew that or should have known

12       that.

13            MR. PETERSEN:  The doctor did not know that, because

14       that doctor's note was tendered prior to your Honor's order.

15            THE COURT:  Oh, my goodness.  Then it really shouldn't

16       count at all.

17            How come you didn't give to it me then before I saw

18       the letter saying how he doesn't want to come by?  If you had

19       the letter, wouldn't that have been helpful?  Did I see it

20       before?  Well, it's of no moment.  You don't think this letter

21       does it, I gather.

22            MR. PETERSEN:  I don't believe the letter does it,

23       although, your Honor, we'd be willing to accede on the

24       deposition of Mr. Salamanca if plaintiff will produce the other

25       named witnesses in New York.  So we're just looking to take

C5HZTAGM                    Motion

some depositions in New York, your Honor.  We believe we're

entitled to do that, and we've had a heck of a hard time

scheduling those depositions.  So if we can get Mr. Stiles in

New York, if we can get Mr. Loukakis -- and I understand from

Mr. Rosenthal's letter earlier today to me that Mr. Loukakis

will come in from Australia -- if we can get Mr. Ronning, we'd

be happy to take Mr. Salamanca's agent's deposition in New York

as well.

          THE COURT:  Very well.

          Well, the other -- I gather you've set the other

depositions for later this month, right?

          MR. PETERSEN:  At this point, your Honor, we've only

scheduled one deposition for this month, that's Ms. Cummings'

deposition.  That will take place on Tuesday, next week.  I

understand that Mr. Loukakis is available in New York between

May 31 and June 8th.  We're happy to take his deposition during

that time period, as long as your Honor has no objection to our

taking that deposition outside the fact discovery period.

          THE COURT:  Yes.  Well, I don't have much choice,

assuming we're going to get -- the depositions are going to

have to come outside the discovery period, right?  So --

          MR. PETERSEN:  Right.

          THE COURT:  -- thanks for nothing.  So, and what about

Ronning?

          MR. PETERSEN:  Ronning, your Honor, plaintiffs are

1    only -- are sticking by their position that he's too busy, and

2    he can appear by video.  We should suffice with a video

3    deposition.  We believe --

4              THE COURT:  I really -- video deposition is perfectly

5    all right with me.  So that takes care of Ronning, Loukakis and

6    Cummings, those are the three that had problems and those

7    problems have now been revolved.  And we're doing, at the

8    moment at least, doing with Mr. Salamanca's agent.  We'll see

9    how -- I'll look at this letter more carefully, although I'm

10   not sure it will mean much more to me.

11             MR. PETERSEN:  Your Honor, there's one other witness

12   we haven't spoken about, and that's T.J. Stiles.  He's based in

13   San Francisco.  Counsel, earlier today, has offered to pay for

14   counsel for the Libraries to take that, to travel to San

15   Francisco to take that deposition in San Francisco.  I

16   understand Mr. Stiles cannot appear in New York.  We would be

17   willing to do that under that stipulation, your Honor.

18             THE COURT:  All right, that sounds okay to me.

19             So I assume that's all resolved and the depositions

20   are all going forward in one fashion or another.

21             Is there anything else we need to resolve before we

22   listen to what it is you've written briefs about, which seem to

23   be sort of overwhelming, but --

24             MR. BERNSTEIN:  Your Honor, Robert Bernstein for the

25   NFB.  Simply requested in the letter yesterday --

1          THE COURT:  I haven't read your letter of yesterday.

2     I got here about ten minutes before I started to talk to these

3     three defendants.

4          MR. BERNSTEIN:  The request is, we've subpoenaed

5     Copyright Clearing Center in Boston, which is where they're

6     located, issued out of the District of Massachusetts under the

7     rules.  They intend or actually I think did file a motion for

8     protective order this morning up in Boston, and we simply want

9     your Honor to permit us to take the deposition beyond May 20,

10    if we successfully oppose that motion.

11         THE COURT:  I think we'll just have to review the

12    pretrial scheduling order and provide a little more time.  But

13    it'll certainly provide before, or at least until the end of

14    the month for discovery.

15         And that really goes for all of you.  I mean, I don't

16    want any of these other depositions we've just discussed to

17    take any longer than that either.  So be conscious of the fact

18    that we'll extend the discovery period, but probably not for

19    more than that length of time.

20         MR. PETERSEN:  Your Honor, I had one further

21    scheduling issue if your Honor will entertain.

22         THE COURT:  Sure.

23         MR. PETERSEN:  We're getting to the point now of

24    briefing summary judgment motions, which I believe under the

25    Court's order would be due the latest in late June.

C5HZTAGM                          Motion

1          I've had a discussion with counsel for plaintiffs in

2     which we would agree to a simultaneous filing summary judgment

3     motions at some point, a little bit earlier than that in mid

4     June.

5          But the motions that are before your Honor now,

6     particularly our Rule 12 motion, which would dramatically

7     change the scope of the case, simplify the issues that we

8     believe we would need to brief on summary judgment.  So we did

9     raise as a scheduling issue.  It would obviously be helpful to

10    have your Honor's ruling in advance of moving for summary

11    judgment.

12         THE COURT:  Well, I know how important these motions

13    are to you, at least by volume.  But my view is if there's

14    going to be a summary judgment motion and you're going to make

15    it even earlier than it was, that I'm going to wait for that

16    and not even rule on these.  I'm sure you'll tell me how it

17    wouldn't be any case at all if I ruled on these, because in

18    fact you understand -- as you understand the law, there won't

19    be anything left.  But I am not going to rule or spend the time

20    to rule on the Rule 12 motions if I'm going to get a summary

21    judgment motion within two weeks thereafter.  That would really

22    be absurd.

23         MR. PETERSEN:  Your Honor --

24         THE COURT:  I mean, in terms of Court's convenience.

25    I don't suppose it bothers any of you.

C5HZTAGM                    Motion

1          MR. PETERSEN:  Your Honor, summary judgment motions

2     will be on a different issue than really before the Court on

3     the Rule 12.

4          THE COURT:  You better put it all in, or we'll just

5     combine them.  It doesn't make any difference.

6          What I'm trying to get across, apparently not very

7     well, is you're going to do this once.  So if you want to do

8     them all and keep all the pieces of paper I have already,

9     that's fine.  But when we resolve it, we're going to resolve it

10    all at one time.  Because otherwise we'll just be keeping on

11    trying to keep on the treadmill while you keep on writing,

12    which, for which I'm sure you're being paid by the hour, but I

13    don't have that opportunity.  Is that fairly clear to all of

14    you?  Okay.

15         But I'm glad to hear you and see whether or not, A,

16    anything changes my mind, and, B, whether I learn something,

17    which I certainly hope will be the case.

18         I have no preference as to which we hear first.  The

19    defendant's motion on the pleadings with respect to subject

20    matter jurisdiction is probably an easier one for me to

21    resolve, so why don't we hear that first.

22         MR. PEQUIGNOT:  Hi, your Honor, my name is Andrew

23    Pequignot.  I'm here on behalf of the Libraries, arguing the

24    portion of our motion for judgment on pleadings with respect to

25    associational standing.  My colleague, Allison Roach, will

C5HZTAGM                    Motion

1    actually be arguing the issues with respect to the Orphan Works

2    Project.

3              Before I get started, your Honor, I just wanted to --

4    first time I'm appearing in front of you -- I just wanted to

5    briefly thank you for admitting me pro hac to appear in this

6    case.

7              THE COURT:  My pleasure.  You pay a lot of money to

8    the bench and bar fund.

9              MR. PEQUIGNOT:  Your Honor, at bottom, the Libraries'

10   arguing that each of the plaintiffs in this case should have to

11   satisfy prime facie elements of a copyright infringement claim.

12   The associations concede that they are unwilling and unable to

13   satisfy this burden with respect to each of the works they're

14   claiming to be part of this case.  The associations claim

15   instead that associational standing allows them to circumvent

16   these requirements to assert the rights of tens of thousands of

17   unidentified member authors.

18             The associational plaintiffs' position must fail,

19   however, because the Court lacks federal jurisdiction to

20   resolve their claims.  Federal jurisdiction depends both on

21   constitutional and statutory authority.

22             First, the associations ignore altogether the

23   threshold and dispositive questions of statutory authority.

24   The Court lacks statutory authority to resolve the

25   associations' claims because the plain text of subsection 521,

C5HZTAGM                    Motion

1    as the Second Circuit has interpreted on multiple occasions,

2    limits the class of plaintiffs that can, quote, institute an

3    action to legal and beneficial copyright holders.

4            The associations in this case are not legal or

5    beneficial copyright holders of any of the works identified in

6    the first amended complaint.  For this reason alone, your

7    Honor, we submit that the plaintiffs' motion should be granted.

8    Even if the Court disagrees with us on this issue, the Court

9    still lacks federal jurisdiction.  The constitutional

10   prudential limitations of associational standing are summarized

11   in the three part test set forth in Hunt.  The Hunt --

12           THE COURT:  I'm not sure.  That's essentially brought,

13   in part, at least under the copyright law, right?

14           MR. PEQUIGNOT:  Your Honor --

15           THE COURT:  This lawsuit?

16           MR. PEQUIGNOT:  Yes, the suit is brought under the

17   Copyright Act.

18           THE COURT:  And you don't argue, but that that

19   provides subject matter jurisdiction for the lawsuit, at least

20   the copyright law does provide that opportunity.

21           MR. PEQUIGNOT:  The Copyright Act supplies federal

22   jurisdiction, if the requirements of Section 501 are satisfied.

23           THE COURT:  You have a problem with whether they're

24   satisfied.

25           MR. PEQUIGNOT:  Yes.  The individual plaintiffs in

C5HZTAGM                    Motion

1   this case -- we don't have any argument with respect to the

2   individual plaintiffs.  It's simply the associations in this

3   case.

4           THE COURT:  I just wanted to make sure at least I was

5   on the same page.  Go ahead.

6           MR. PEQUIGNOT:  So, your Honor, we contend the

7   associations lack federal jurisdiction because there's no

8   statutory authority.

9           We also argue there is no constitutional authority.

10  The constitutional and prudential limitations of associational

11  standing are summarized in the three part test set forth in the

12  Supreme Court's decision in Hunt.  The Hunt test requires that

13  at least one member of the associations have standing in their

14  own right; that the issues in the case are germane to the

15  associations' purpose, and that the participation of the

16  individual members will not be required to adjudicate the

17  claims and defenses.

18          The parties have argued with respect to the first and

19  the third factor of this test.

20          Under the first test, which addresses the article

21  three requirement of injury in fact, the associations would

22  have to establish standing on behalf of their members, prime

23  facie case of copyright infringement.

24          Your Honor, under the Hunt test, while the test on its

25  face only requires them to establish standing on behalf of one

1   of their members, this does not have the import that the

2   associations argue in their briefs.  The associations cannot

3   blindly assert standing on behalf of tens of thousands of

4   unidentified member authors.

5           THE COURT:  But they don't have to, right?

6           MR. PEQUIGNOT:  Well, they can not and -- no.  We

7   argue that they, that they -- that under the Hunt test, while

8   asserting the rights of one member may get them in the door,

9   their standing is coextensive with the standing of their

10  members.  In other words, article three prevents them from

11  going beyond the standing of their members.

12          THE COURT:  Let's assume that you're right and there

13  was only one.  I assume -- well, let's assume that there was a

14  member who had standing and we proceeded that way.  How would

15  that help you if, indeed, you lost, when we had explored the --

16  or the jury -- I think you asked for a jury, although I

17  wouldn't like to be part of it, but be that as it may -- when

18  we get a verdict and you lose, what would that do to you or to

19  the associations' position?  Everybody would simply follow

20  getting some sort of standing in order to proceed.

21          MR. PEQUIGNOT:  I'm not sure I fully understand the

22  question.  If the associations are dismissed from this case,

23  the individual plaintiffs will go forward, and the same issue

24  issues will be resolved.

25          THE COURT:  Right.  And that's agreeable with you?

C5HZTAGM                    Motion

1          MR. PEQUIGNOT:  Yes, that the individual plaintiffs go

2    forward on these claims, yes, with respect to the works that

3    are identified in the first amended complaint, and for which a

4    prime facie case of copyright infringement has been alleged.

5          Your Honor, really this is the -- this is the crux of

6    the issue.  Because the associations -- the associations cannot

7    allege or cannot prove standing with respect to each of their

8    individual members.  The associations, without their members'

9    participation, the associations cannot establish for the

10   copyrights and the millions of works that have been digitized

11   by the libraries, whether copyrights are held by a member

12   author.  They can't say whether it's owned by the member

13   author's grandchildren, or an ex-spouse or creditor or

14   assignee, an employer for hire.  They can't say whether there

15   is a registration, whether the registration has been renewed or

16   renewed at the right time by the right party.

17         Your Honor, we contend that we need all these

18   individualized facts with respect to each work that's going to

19   be part of this case.  And, your Honor, it's this

20   individualized proof that also dooms the associations' ability

21   to satisfy the third factor in the Hunt test, because

22   individualized proof will be necessary.

23         Judge Cote's opinion of National Association of

24   Freelance Photographers, and the recent decision in the AIME

25   case in The Central district of California, both deny

C5HZTAGM                    Motion

1   associational standing on this basis.

2          And, your Honor, individualized proof may also be

3   necessary for the libraries to -- for the libraries to

4   establish their activities are protected for uses.  As your

5   Honor knows, under the flexible fair use test, the Court will

6   need to consider, among other things, whether the works are in

7   print or out of print, whether they're creative or factual in

8   nature, and whether there is an actual or potential market for

9   the works.

10          Your Honor, the associations in this case make it

11  sound like every work digitized by the libraries is a New York

12  Times best seller for 2011, but they fail to mention the 1958

13  book on disease control in corn production or the 1939 book on

14  tuberculosis treatments.

15          Your Honor, to the extent that the associations can

16  establish any viable market for any of the libraries' uses,

17  either actual or potential, which is certainly something that

18  the libraries will contest vigorously, the likelihood of any

19  market harm for these types of works in particular is slim to

20  none.  Your Honor, this is the type of individualized proof

21  that we will need to look at, and the libraries will be

22  prejudiced if they can not look at this evidence and make these

23  arguments.

24          Your Honor, for all these reasons, we submit that the

25  association should be denied associational standing.

C5HZTAGM                         Motion

1           THE COURT:  All right, why don't we discuss that

2   aspect first before we hear your colleague, if you don't

3   have -- unless you agree.

4           MR. ROSENTHAL:  No, we certainly don't agree.  Your

5   Honor, if the Court's --

6           THE COURT:  Let's talk about where he spent most of

7   his time, which is the individual proof problem.

8           MR. ROSENTHAL:  I think, your Honor, that actually

9   goes, in many ways, to the crux of this case.

10          This is a case where the defendants have copied

11  millions of books.  They've copied ten million books in

12  conjunction with Google, seven million of which are protected

13  by copyright.  And this partly goes to the motion we made this

14  in this case.

15          So, your Honor, they engage in this preemptive mass

16  digitization.  And they justify that somehow that is justified

17  as a fair use or otherwise, and somehow we have to look at each

18  individual work to determine whether the books he mentioned

19  about farming or the best sellers are, themselves, there's some

20  fair use defense for that.

21          But what the defendants did here, they copied all

22  these books first.  They digitized all these books.  They saved

23  themselves hundreds of millions of dollars without giving any

24  consideration to any fair use issue with respect to any

25  individual book.  And now they're asking -- they're asking the

C5HZTAGM                    Motion

```
 1   Court and the plaintiffs to come back and say, this particular
 2   work, there is a market for this particular work, there's harm
 3   for this particular work.  They can't have their cake and eat
 4   it too.  They can't digitize millions of books and then come
 5   back and say that we have to show how a particular harm --
 6   there was a particular harm to a particular book, and that goes
 7   to the standing.
 8          THE COURT:  What do you think the law indeed says
 9   about that?
10          MR. ROSENTHAL:  Your Honor, this is a very -- this is
11   a very unusual case.  We have a federal statute, Section 108 of
12   the Copyright Act.  It was specifically written to deal with
13   when libraries and archives can make copies of works.  And
14   they're very specific.  It's for preservation purposes.  It's
15   to replace stolen books.  It's for upon individual library
16   request.  And now what has happened here is that the defendants
17   have just run roughshod over that, and they've come back -- so
18   we haven't -- we have an unusual situation where you have a
19   statute that governs this.  You have admitted conduct by the
20   defendants, because they admit all of this in their answer.
21   They admit that they copied millions of copyrighted books.
22   They admit that they did this in conjunction with Google.  They
23   admit that the cost, that savings were extraordinarily high in
24   having Google do this for them.
25          And so, your Honor, we believe that this is a rather
```

C5HZTAGM                    Motion

1    simple matter of law.  The defendants' conduct goes way way

2    beyond what's permitted by the Copyright Act.  So associations

3    are the perfect plaintiffs to bring this, because associations

4    like the lead plaintiff and the other international plaintiffs

5    represent members who own copyrighted works which are part of

6    the digital data base that has been copied by the defendants.

7    And under the Hunt test there are individual members of those

8    associations who have copyright claims.  It certainly furthers

9    the purposes of the organization to pursue this suit.

10         And the third prong, which is the one that they're

11   really focused on about individualized proof, that's a

12   discretionary element according to the Supreme Court.  The

13   Court has the prudential power to decide whether it feels that

14   that trumps the other issues why associational plaintiff may be

15   worthwhile.

16         So in this case, we have associations on behalf of

17   their members.  Some of those associations, by the way, own

18   copyrighted works, they actually own books that have been

19   violated by the defendants.  And some of those associations are

20   foreign associations where foreign law gives them standing to

21   bring copyright suits on behalf of their members.

22         THE COURT:  So you don't think standing is a problem.

23         MR. ROSENTHAL:  No, I don't think standing is a

24   problem.  It doesn't do anything to narrow the case.  We still

25   have 12 individual plaintiffs.  We have one of the

C5HZTAGM                    Motion

1   organizations in the U.S. owns works and the other

2   organizations either have the rights or own works or are doing

3   it for the benefit of their members.

4           THE COURT:  And that's -- well, okay.  I think I got

5   your argument.

6           Let's hear the other part of the concerns, that I

7   gather you're going to tell us about, right?

8           MS. ROACH:  Yes, your Honor.

9           Your Honor, as my colleague mentioned, my name is

10  Allison Roach, and I also thank you for admitting me pro hac

11  vice in this case.

12          THE COURT:  You're very welcome, as long as you paid

13  your $300.

14          MS. ROACH:  Yes, your Honor.  I will be addressing the

15  libraries' motion to dismiss on standing and ripeness grounds.

16          Plaintiffs claims that making copyright, copyrighted

17  works available through the Orphan Works Project will be an

18  infringement.

19          The core of the motion is this:  Not a single work has

20  been made available through the Orphan Works Project, and

21  plaintiffs do not identify a single work that will be made

22  available, let alone one in which a plaintiff holds the

23  copyright and could assert standing.

24          Moreover, we do not know what works will be made

25  available, if any, ever, and, therefore, there is not a

C5HZTAGM                          Motion

1    concrete ripe infringement dispute before your Honor.

2              THE COURT:  You did go ahead and do all this copying

3    before this lawsuit was begun, right?  I mean, it was -- it's a

4    little like, as your adversary said, putting the cart before

5    the horse.

6              MS. ROACH:  Your Honor, there was -- the digitization

7    of the works that are in the Hathitrust digital library,

8    including those that are being researched to identify Orphan

9    Works, was done before this case begun, yes.

10             The plaintiffs' claims regarding the Orphan Works

11   Project are that making available of those works electronically

12   will be an infringement.  It focuses on the distribution

13   display or making available of those works.

14             The digitization of those works is encompassed in

15   their claims regarding the digitization of all the works in the

16   Hathitrust digital library.  So the Orphan Works claims that we

17   have moved to dismiss here are separate, in that they focus on

18   activity that has not happened yet, and the making available of

19   those works electronically to authenticated University of

20   Michigan library patrons.  But the works that will be made

21   available through the project, through that program have not

22   been identified yet.  And so it is pure conjecture for the

23   plaintiffs to assert that they hold the copyrights in those

24   works and could sue for infringement of them.  And we do not

25   have any facts about those works for this Court to consider in

C5HZTAGM                    Motion

 1   determining whether the use that is intended to be made would

 2   be a lawful use under Sections 107 and 108, or whether it would

 3   be an infringement as the plaintiffs assert.

 4          THE COURT:  Well, I don't want to get into the fair

 5   use doctrine in any depth, because it'll take too long.  But --

 6          MS. ROACH:  I understand.

 7          THE COURT:  -- what bothers me a little, I guess, and

 8   I gather it doesn't bother you at all, is that you did all of

 9   what you've now told us, and admitted in your papers, before

10   there was any opportunity for the plaintiff to complain.  And

11   now you're saying, well, we can't put the genie back in the

12   bottle.  And that, essentially, gives me some pause.  It may

13   not sound like a lot of case law, but it does provide me with

14   some concerns.  But I don't think there's much we can do about

15   it.  I mean, like I said, there's no sense in dwelling on it

16   because there's nothing we can do about it that.  But it colors

17   my thinking is all I suggesting.

18          MS. ROACH:  Right.  And, your Honor, I understand.

19   With respect to the Orphan Works Project, the only activity

20   that has happened to date has been the researching of works to

21   identify potential orphan works to make available through the

22   project.

23          There was a research process that was begun and some

24   initial candidates were identified through that process, and a

25   list of the titles of those candidates was posted on a website

C5HZTAGM                    Motion

 1   last July in an effort to find more information about those

 2   works.  And the intent was not to make that list of candidates

 3   available through the project, but only to make available

 4   through the project those works that the University was not

 5   able to obtain more information about the rights holder during

 6   that 90 days.  But before the 90 days ran on any of the works

 7   on that list, and before any work was made available through

 8   the Orphan Works Project, the University withdrew the list and

 9   issued an announcement that, due to feedback it received, it

10   needed to re-examine its research procedures, and it was going

11   to continue to scrutinize those and come up with a more robust

12   process.

13           But at this stage where no works have been selected to

14   be made available through the Orphan Works Project, we do not

15   have the facts needed to determine whether the intended limited

16   use, which would be to make these works available for

17   educational use by authenticated University of Michigan library

18   patrons.

19           What the plaintiffs are asking here is that your Honor

20   judge and enjoin the Orphan Works Project in its entirety as a

21   concept without any concrete facts to analyze.  They're not

22   asking for a judgment enjoining the distribution of a

23   particular work in which they hold copyright.  They're asking

24   that the judgment be made on the project as a whole, when today

25   all it is involved is the researching of works to try to

C5HZTAGM                         Motion

1    identify orphan works.

2           THE COURT:  All right - go ahead.  I think I have your

3    drift, but I'll be glad to listen to some more.

4           MS. ROACH:  Well, I can move onto our standing

5    argument, which is a related issue, but I can address that now

6    if your Honor --

7           THE COURT:  That's all right.  I just want don't want

8    everybody to tell me how they need more time.  We have 15

9    minutes left.

10          MS. ROACH:  Understood, understood.  I'll wrap up

11   shortly if your Honor doesn't have any specific questions about

12   the issues that I'm --

13          THE COURT:  I'm trying to control myself in the

14   same -- for the same reason.  But anything that's new and

15   different that I don't have in your brief, I think that's what

16   oral argument is about.

17          MS. ROACH:  Understood.

18          I think something important to consider is that the

19   elimination of these issues, the Orphan Works Project issues

20   from this case will greatly streamline issues that will be

21   before your Honor going forward, and we can focus the case on

22   the issues on which we have facts, the activities that have

23   occurred, and where there are sufficient information to apply

24   the law.

25          With respect to the Orphan Works Project, we don't

C5HZTAGM                     Motion

know what works, if any, ever will be made available, and to
make a determination now whether the intended use of these
unknown works will be an infringement, would be merely
advisory.  And because we don't know what works we made
available, we do not know if the plaintiffs own copyrights in
those works and can assert infringement claim based on that.

         For these reasons, the libraries respectfully request
that these claims be dismissed.

         THE COURT:  Very well.

         What's the other side got to say about all that?

         MR. ROSENTHAL:  Let me just try to be pretty brief
here.

         So the Orphan Works as I think the Court knows, those
are works where you can't find the copyright rights holder.  So
what the University of Michigan does is it comes up with a
mechanism where it's going to provide, going to do research,
apply certain criteria, and it's going to publish a list and
say, if nobody comes forward in 90 days to say that you're in
fact the owner of one of these works, we're going to make this
work available.  And what happens after they make this list is
that we bring this lawsuit because, among other things, it
turns out that some of our -- Mr. Salamanca and one of the
other plaintiffs has a work that's on this list of supposed
Orphan Works.  Other people say, hey, wait a minute, those
books aren't Orphan Works.  So we bring the lawsuit.  They

C5HZTAGM                    Motion

1    suspend the Orphan Works program and they say, you know what,

2    we've got big problems with it, so we've got to fix that.  And

3    now they come into court and say, well, you don't have right to

4    bring a claim based on Orphan Works, because there is no

5    current Orphan Works program, plus how can you be an orphan if

6    you've -- how can you be an orphan if you've come out of the

7    woodwork and said, you know, I'm the father.

8           So, you know, under their theory there would never be

9    a circumstance under which anybody could ever address the

10   Orphan Works program because they simply will pull back the

11   books if somebody comes forward.  And our position is they

12   don't get to do this.

13          Judge Chin had this exact issue in the Google books

14   case.  And in the Google books settlement he said -- and this

15   applies broadly to our entire case here -- he said, these

16   issues about the balance between rights holders and users are

17   best left to Congress, and Congress has wrestled with the

18   Orphan Works issue.  It hasn't come up with a resolution, and

19   it's not up to private parties, like the University of

20   Michigan, to say we're going to come up with our own Orphan

21   Works program and we're going to -- and we're going to hold you

22   to it.  It's up to Congress, not to the defendants in this

23   case.  But there's clearly standing to bring these claims.

24          THE COURT:  All right.  We have another motion, and

25   I'll continue to try and control myself, which really is a

C5HZTAGM                    Motion

 1 little more difficult for me to decide, I suppose, but it talks

 2 about how the defendants' programs are not shielded by the

 3 First Amendment or fair use, and I'd like to hear what the

 4 plaintiff has to say about that.

 5          MR. ROSENTHAL:  Your Honor, that goes back to my

 6 points earlier.  This is a situation where Congress

 7 specifically enacted a statute, Section 108, to deal with when

 8 libraries and archives can make copies of copyrighted works.

 9          What defendants have done here is they have copied --

10 it disregarded that section and copied literally seven plus

11 million copyrighted works.  And now they're claiming, well,

12 maybe this particular work meets a 108 criteria because that

13 work may be deteriorating or missing, or maybe this particular

14 work meets another section of the Copyright Act that allows

15 access to visually disabled people, or maybe this other work

16 is -- should be allowed under some other theory.

17          Our position in this case is there cannot be, under

18 the Copyright Act, any possible justification for copying seven

19 million copyrighted works, essentially, in conjunction with a

20 major commercial entity, saving themselves hundreds of millions

21 of dollars, harming the plaintiffs, and then coming back and

22 saying, well, maybe there's a justification for one work or

23 another.  And, you know, I don't know if your Honor has read

24 all of the papers submitted by the intervenors and amicus and

25 so on, but there's this attack as if we're trying to stop

C5HZTAGM                    Motion

1    libraries from doing their business, like there's this notion

2    that we're trying to stop libraries from inter-library loans or

3    from making books available under the provisions of the

4    Copyright Act that permit it for visually disabled people.

5    That's not our intention here.  This is a case about a

6    preemptive mass digitization program, where defendants just

7    blithely copied millions of works belonging to authors.  And

8    the whole Copyright Act is designed to protect authors from

9    people taking their works and copying them.

10            THE COURT:  Well, there are some exceptions, right?

11            MR. ROSENTHAL:  There certainly are exceptions, and we

12   don't argue that there aren't exceptions, possible exceptions

13   on a work-by-work basis, that there might be uses of some works

14   that will be covered by fair use or by some other exception to

15   the Copyright Act.

16            But they can't digitize every book in the library

17   under some sort of fair use analysis, we're allowed to do that

18   and then come back and say, well, but we, the plaintiffs, have

19   to prove how this particular work, whether it's Harry Potter or

20   some dissertation is somehow not a fair use.  The burden should

21   be on them to prove fair use.  That's what the Second Circuit

22   says.  And they have to do -- they have to lie in the bed

23   they've made.  They have to justify it on the basis of their

24   entire mass digitization program.

25            And, again, this is something that Congress may have

1    to wrestle with.  It's wrestled with it before.  It came up

2    with Section 108.  It amended Section 108 as part of the DMCA

3    to deal with digital copies.  It dealt with security issues.

4    It dealt with balancing all of these interests.  Section 108

5    came out of years of discussions between libraries and archives

6    and rights holders and educators about this balance between the

7    rights of the copyright holders and the rights of libraries and

8    archives and the needs of people to use books.  And defendants,

9    once again, have just simply decided they're going to do

10   whatever they want and then come back and try to figure out

11   ways to avoid the results of their actions.

12        THE COURT:  Okay, what's your adversary have to say?

13   I guess too -- we also have of an intervenor defendant,

14   Federation of the Blind.  I'll be glad to hear both of you.

15        MR. PETERSEN:  Sure, your Honor.  I'll begin, if

16   that's okay.  Joe Petersen.

17        Your Honor, I just want to address up front this whole

18   notion that the libraries went ahead and digitized their

19   collections and then asked questions later as to how to justify

20   it.  It's fundamentally not true.  As your Honor will see in

21   summary judgment, the entire project, your Honor, was

22   designed --

23        THE COURT:  Well, while we have you on the summary

24   judgment concept, let me make sure we do have a schedule here

25   so that we're all on the same page in this case.

C5HZTAGM                         Motion

1              In terms of discovery -- just keep your thought, I

2      don't mean to discombobulate your thinking.  In terms of

3      discovery, you have only three or four depositions that's left,

4      as I understand it, and then your discovery will be complete.

5      Is that fair?

6              MR. PETERSEN:  That's correct, your Honor.

7              THE COURT:  So, and you're going to get all of that

8      done at least in the next two weeks, is that right?

9              MR. PETERSEN:  That's certainly our intention.

10             THE COURT:  All right.  Well, I'm suggesting that it's

11     also mine.

12             MR. PETERSEN:  Thank you, your Honor.  It's helpful.

13     Thank you.

14             THE COURT:  If you need an order, you can just provide

15     me with one.

16             MR. PETERSEN:  Thank you.

17             THE COURT:  And, obviously, on notice.

18             And so let's assume that that's over by the end of the

19     month, and I now have, obviously, these motions for judgment on

20     the pleadings, how -- I don't want a big hiatus.  And you

21     indicated that the summary judgment motions would be earlier

22     than had otherwise been expected or at least.  When is it that

23     you all can give me fully briefed summary judgment motions?

24             MR. PETERSEN:  Well, your Honor's scheduling order

25     calls for the motions to be fully briefed by July 20th.

C5HZTAGM                    Motion

1          THE COURT:  Yes, that's very long.  I mean, since we

2     already have the judgment on the pleadings motion, which I've

3     now told you I'd like to consolidate, can you move that up a

4     little bit so that we're in a position to at least have

5     everything at the beginning of July?

6          MR. PETERSEN:  Your Honor, the summary judgment

7     motions really will be on the 107 right, fair use --

8          THE COURT:  So, I understand that's partially why I

9     said what I said about trying to put them together.  But there

10    is really no reason to delay it till the end of July, unless

11    there is something I don't know.

12         MR. PETERSEN:  Well, your Honor, I think it -- in

13    terms of once we complete the depositions, we need to put

14    together declarations, there's expert testimony on the four

15    fair use factors, there is a significant amount of facts that

16    we want to put before your Honor to talk about why the

17    libraries' steps to digitize their collections for purposes of

18    preservation and for purposes of allowing search functionality

19    and providing access to people with print disabilities, are

20    entirely lawful under Section 107 and other sections of the

21    Copyright Act.  There is a lot of factual -- see, Mr. Rosenthal

22    stands up and talks about this like there's some brightline

23    rule and your Honor can rule.  That's really an invitation to

24    judicial error, your Honor.  The Supreme Court --

25         THE COURT:  I don't think he said that.

C5HZTAGM                    Motion

1          MR. PETERSEN:  Your Honor, he's saying -- he's in the

2     context of a Rule 12 motion saying brightline rule that

3     libraries can't do what they've done.  That's not the way fair

4     use works, your Honor.  It's --

5          THE COURT:  I don't want to argue fair use.  I mean

6     there will be -- I'll have enough of it from you.

7          All I want now is some dates that we can count on for

8     fully briefed summary motions.  And your pretrial scheduling

9     order now says July 21st.  Is there a way we can do it earlier?

10          MR. PETERSEN:  Your Honor, given the papers that I

11     anticipate will be filed, in my mind it makes sense, and I

12     think plaintiffs' counsel agrees with this, that three weeks to

13     oppose -- we will move, I assume they will move, there will be

14     three weeks to get opposition papers in, and then a week and a

15     half or so of reply.

16          Based upon that timetable, and to meet your Honor's

17     scheduling order, that would call for us to move in mid June.

18     We were not going to complete the depositions until the first

19     week of June.

20          THE COURT:  I thought the end of this month, two

21     weeks, this is the 16th of --

22          MR. PETERSEN:  Your Honor, they're not making, at

23     least one witness, I'm not sure of the scheduling of others, at

24     least one witness they're not making available to me until the

25     week of May 31 to June 8th.  So I do see there's some --

1          THE COURT:  Well, as I said before, I'm prepared to

2     make that happen, so far as I have any authority to do so,

3     certainly no later than the 31st of May.  And if there is a

4     reason why somebody can't -- we can't get them done, then you

5     can talk to me about it.  But I'm not interested in talking

6     about it now.

7          MR. ROSENTHAL:  I just, your Honor, I just -- at the

8     very outset when we talked about Mr. Loukakis from Australia,

9     he's trying to arrange his schedule, and he has some health

10    issues and he said he could be here between May 31st and

11    June 8th.  So that's the reason for the -- so we're just trying

12    to see if -- and I don't think that changes the schedule, by

13    the way.

14         THE COURT:  And I really don't think you need all of

15    this all finished before you draft your summary judgment --

16         MR. ROSENTHAL:  Right.

17         THE COURT:  -- motion.

18         MR. ROSENTHAL:  Right.  So that's why I think, your

19    Honor, if we could just have until that the end of that week,

20    whatever week, I think June 8 is a Friday, I'm not sure about

21    that.

22         THE COURT:  I don't want to delay this.

23         MR. ROSENTHAL:  I don't --

24         THE COURT:  It's just not worthwhile.  If you need

25    until July 21st, let's leave it at July 21st for fully briefed

C5HZTAGM                          Motion

 1  motions.  The problem is I won't be here in July.  So you can

 2  take till the end of July.

 3          If I can't get it by the 1st of July, it's not going

 4  to do you or me any good to have it in the middle of the month.

 5  So work it out any way you like.  I prefer to have it when I go

 6  away so I have something to put under my pillow, but it's

 7  really your call.

 8          MR. PETERSEN:  Understood, your Honor.  What I would

 9  suggest that we do is I speak with counsel for plaintiffs and

10  we see if we can work out a workable schedule.  There are a lot

11  of moving parts and pieces.

12          THE COURT:  Yeah, I gather.  That's why I think you

13  should try your best, and if you fail I won't be surprised.

14  I'll be unhappy, but not surprised.

15          Okay, let's go back.

16          MR. PETERSEN:  Sure, your Honor.

17          I represent Library.  Library is one library,

18  succinctly put it, serve as our collective memory.  They

19  empower people regardless of status or wealth to pursue any

20  thought or idea they wish.  So it was for that reason that we

21  were so surprised when we received plaintiffs' moving papers

22  and we saw the argument that libraries uniquely among all users

23  of copyrighted content only have Section 108.  And we were

24  particularly surprised by that, because Section 108 actually

25  answers the question that plaintiffs pose.  It says directly in

C5HZTAGM                    Motion

1    the statute that nothing affects the fair use rights.  So it
2    seems so fundamentally wrong.  And so we put in our opposition
3    papers, we pointed to the statute, we pointed to the
4    legislative history.  And then we're even more surprised when
5    plaintiffs suddenly change and say, no, no, we agree that
6    libraries aren't just left with 108, but really you need
7    circumstances, they don't have the ability to claim 107 fair
8    use.  And the reason we're so surprised by that, this is all in
9    the context of Rule 12 motion on the pleadings.  Fair use is
10   very --

11            THE COURT:  It really isn't any more.

12            MR. PETERSEN:  If that's the case, your Honor, there
13   is a lot of briefing to be done on fair use.  Because the
14   initial scan --

15            THE COURT:  You promised me that.

16            All I want you to understand is that there is a way in
17   which we can expedite the two sets of motions, then it's more
18   likely that we'll be able to keep up with the rest of the
19   schedule I have committed 60 days.  And here we're sitting with
20   an awful lot of paper already, and we haven't started to look
21   at what you have to say in the summary judgment world.  So I
22   just give that you for whatever it's worth, and hopefully it'll
23   all be taken care of on time.

24            MR. PETERSEN:  Thank you, your Honor.

25            Again, I will confer with plaintiffs' counsel about

C5HZTAGM                    Motion

1    the schedule and, your Honor will have on summary judgment all

2    the declarations before your Honor explaining why the initial

3    digitized scans, why they're made under 107, how the

4    transformative purpose, and it doesn't harm the market.  If

5    anything, actually increases the market for these works which

6    otherwise would be lost.  So I think all those proofs are

7    before your Honor.  And if that's the way your Honor wants to

8    deal with this component of the motion, I'll move because there

9    is another side of the motion which they want to knock out and

10   strip the libraries of their 108 defense, and I believe that's

11   entirely improper on this motion, given, A, the breadth of the

12   number of works that are in suit.  Libraries digitize works all

13   the time pursuant to Section one --

14        THE COURT:  Don't misunderstand me, I'm not unhappy

15   about having another oral argument after I have your fully

16   briefed motions on summary judgment.

17        MR. PETERSEN:  Understood.  And I just hate your Honor

18   to say that you want to hear our arguments on 107 in the

19   context of summary judgment.  So for that, my mind -- the

20   argument they're making is you can decide fair use on the

21   pleadings.  We say that's fundamentally incorrect.  And I'm

22   hearing your Honor to agree with our position on that.

23        THE COURT:  Well, don't misunderstand me.  If it turns

24   out when I read these papers, in conjunction with the others,

25   that you don't have a case, I'll tell you for sure.

C5HZTAGM                      Motion

1            MR. PETERSEN:  Understood, your Honor.  Perfectly

2    understood, your Honor.  But it would be on a summary judgment

3    record, not in the context of a Rule 12.

4            THE COURT:  I think so, but -- I think so.  That's my

5    current thinking.

6            MR. PETERSEN:  Thank you, your Honor.  So on that

7    basis I will turn my argument, if I have a few more moments, to

8    the component of their motion which seeks to strip the

9    libraries of their Section 108 rights.  There is a couple

10   fundamental flaws with this argument.

11           First of all, the plaintiffs' complaint is a

12   blunderbuss complaint.  It basically attacks any works that was

13   digitized by the libraries at any time.  Libraries all the time

14   make reproductions under Section 108, and so they can not meet

15   their burden by saying any work the libraries digitize does not

16   meet the requirements for 108 because it's just fundamentally

17   not true.  So if the motion --

18           THE COURT:  Do we have a limited number under 108?

19           MR. PETERSEN:  There is, your Honor, there is a

20   limited number under 108.  A couple of responses on that, and

21   it goes back to what I said initially.

22           The digitize scans, initial scans that were made were

23   made pursuant to Section 107.  Your Honor can -- and they were

24   also made because the library -- these are mammoth

25   institutions, libraries.  They were losing portions of their

C5HZTAGM                    Motion

1    collections every year.  They couldn't get to it.  Written on

2    acid paper, they would try to see what they were losing, see if

3    they could make the 108 right.  Every year they missed pieces

4    of it, and those pieces were gone forever.  So what they did

5    was they digitized those collections solely for purposes of

6    preservation and allowing for search functionality.  And when

7    they determine that a work is in fact damaged, deteriorating,

8    lost or stolen and it is not otherwise available on market at a

9    fair price, they can then make the 108 copies.  So 107

10   compliments 108.  They work hand in hand, your Honor.  And

11   that's why 108 specifically says that nothing affects the right

12   of fair use.  They compliment one another.

13        So your Honor can find the initial digitizations were

14   made pursuant to 107, the one fair use right, therefore lawful.

15   And to the extent the libraries said this is a work from '50s

16   or 60's, our only copy is gone, they can then turn and avail

17   themselves of the 108 rights.

18        Now, I hear -- and this is in the papers and not in

19   argument -- but plaintiffs also argue, well, they can't benefit

20   from 108 because Google was involved in the digitization.

21   Just -- these are nonprofit library organizations.  And when

22   108 speaks to not commercial, indirect or direct commercial

23   advantage, it's speaking to the actor actually claiming the 108

24   right.  Google in this courtroom is not before your Honor

25   claiming that it made these under 108.  The libraries are.  The

1   libraries are non-profits.  It's entirely appropriate for the

2   libraries to assert that.  And Google's involvement has no

3   bearing on that issue.  It would be -- if you accept what

4   plaintiffs are arguing would be to accept that if the library

5   needs to make a 108 copy, and their copier was broken and they

6   ran down the street to Kinkos, they forfeit their 108 rights

7   because they used Kinkos and Kinkos has a commercial purpose.

8   It doesn't make any sense, your Honor.  It's not what the

9   statute reads.

10       They also talk about the fact that systematic

11   reproduction.  And what they ignore is that language is in

12   there for a very particular point, and it's systematic

13   reproduction of the same work.  And the reason for that

14   language was, that wasn't just happenstance that language

15   appeared.  There was a very good reason.  Because the concern

16   of Congress in putting that language in was that people with

17   libraries are making repeated copies of the same work allow

18   other libraries through inter-library loan to take those copies

19   and they would hurt the publishers' markets.  So it's to a

20   specific work.  It doesn't speak to digitization of the large

21   number of works.

22       And there is another issue too, your Honor, with the

23   three copies.  And that is, that those three copies were made

24   in view of microfilm practices.  They really have no real place

25   in the digital age.  Copies are made on computer in terms of

C5HZTAGM                    Motion

loading into ram, in terms of making sure you have access to it
and to keep up all the time.  And so there's general agreement
that even within its own confines, that three copy limitation
doesn't count against certain copies that by their very essence
need to be made in order to actually have a digital copy.

THE COURT:  I'd like to hear from the Federation of
the Blind for a moment before I leave you.  Is that going to be
possible?

MR. PETERSEN:  Sure, your Honor.  I'll be extremely
brief.  There also -- this is laid out in our papers, I won't
repeat it.  But the Orphan Works Project, which my colleague
Ms. Roach discussed, also meets all the elements for 108(e).
It's they're nonprofit, there's reasonable investigation.

For the copies that are made pursuant to the Orphan
Works Project that never got off the ground, the person
downloading it would own that copy, and there would be proper
copyright notices.  So it actually fits, the Orphan Works
project fits comfortably within 108(e).  And with that, unless
your Honor has any further questions for me I'll pass it off to
counsel for NFB.  Thank you, your Honor.

MR. GOLDSTEIN:  Good afternoon, your Honor, Dan
Goldstein from the National Federation of the Blind.  And since
I paid my 300 bucks also, I appreciate your allowing me the
time.

You may be wondering why the blind have chosen to jump

C5HZTAGM                          Motion

1    into this fight, especially as a defendant.  The answer is

2    this.  The blind had been reading digital text since the late

3    1970's, either through text-to-speech software that vocalizes

4    what you see visually on the screen, or since the 1990s with

5    something called a refreshable brail display, it looks like an

6    object belong pin cushion.  So as the cursor moves across the

7    computer screen, the pins go up and down, and not only a blind

8    person but a deaf blind person can access the text simply by

9    reading the brail.  This is possible because, put it in its

10   simplest terms, digital text is just zeros and ones.  It's not

11   inherently audible or visual or tactile.  It can be rendered

12   just as we listen to CDs and we look at computer screens, zeros

13   and once can be rendered in any, for any of those three senses.

14        Today there are tens of thousands of accessible

15   library books, for the blind, tens of thousands.  We're talking

16   about ten million titles.  The Hathitrust is the single largest

17   endeavor in human history that would make print books

18   accessible to the blind.  Its importance was such that in 2004

19   when Google and the University of Michigan first announced this

20   project, we immediately went to Google and said, would you make

21   these scans accessible.  And when they said it wasn't in their

22   present plans, we went and met with the University of Michigan

23   and five of the other Google partners, that is five other

24   libraries.  And by 2006 with their support, Google had said,

25   okay, we will commit to making these scans accessible.

1          Before this data base was created, no blind scholar,

2     no matter how brilliant energetic, committed curious could walk

3     into a library and examine the wealth of intellectual capital

4     that is routinely available to any sighted person, regardless

5     of their intelligence or industry.  But now today, and indeed

6     since 2008, blind students and other print-disabled students at

7     the University of Michigan who had provided adequate medical

8     documentation to the disability students services office to

9     satisfy -- to show that they are indeed print disabled, are

10    given a secret password that allows them access to the digital

11    data base that is referred to as the Hathitrust data base.  And

12    they can access entire works.  They are, at present, the only

13    group that have access to entire works that the Hathitrust is

14    currently doing.

15         In short, that student today has equal access to the

16    information.  So if he chooses to use his capabilities as a

17    student, he can learn, participate and compete on the same

18    basis as his sighted peers.  We're in this case because the

19    blind are not willing to be a permanently under educated sub

20    class.  And we believe that the plaintiffs, in asserting that

21    categorically, with no consideration by you of fair use, that

22    categorically the limited monopoly granted by the copyright

23    laws is not for the purpose of advancing science and knowledge

24    by providing access, but the contrary; that the purpose of the

25    copyright laws is to advance that only for those who can see

C5HZTAGM                    Motion

1    and to foreclose those who can't.  That is the import of the

2    argument that is offered by the plaintiffs in this case.

3    Because they say 107 does not enable the universities to meet

4    their ADA and Rehab Act requirements by providing equal access.

5    Or they posit that, without any case law or argument, that the

6    copyright laws, if they do have that import, trump the ADA and

7    the Rehab Act; whereas fair use has traditionally been

8    understood to mediate between public access and the limited

9    monopoly.  They say skip that analysis altogether.

10           At the same, they also say, well, you can't get -- and

11   actually it makes the situation worse.  Because their argument,

12   eliminating 107, means that a blind student who has an

13   assignment to read something, goes to the library to get access

14   to what all the other students who are reading.  The library,

15   by their argument, can't even on a retail basis make an

16   accessible copy using the scanner to provide to that student.

17   It would be a step backwards.

18           Their further argument that Chafe would not allow any

19   of this activity, that is Section 121, is based on the notion

20   that the libraries are not authorized entities.  That is a

21   question for evidence and proof in this case.  It's not

22   something that ipsi the plaintiffs are entitled to say we

23   declare this to be so, therefore, there can be no access under

24   Chafe.

25           Unless the Court has questions, that would be my

C5HZTAGM                         Motion

1    submission.

2              THE COURT:  No, but that's thoughtful and helpful.

3              I would like to listen to more, but you've now taken

4    an hour of the 45 minutes that I had.  And we'll be reading a

5    lot from all of you.  And I will reserve decision.  And I think

6    we have a time table.  So we will get all of the papers fully

7    briefed by the 21st, and you will complete all of the discovery

8    by the 8th of June.

9              Thank you again for everything.  I learned a lot.  But

10   we'll meet again when we have your summary judgment motion, and

11   maybe we'll have resolved it already.  I mean, I'm not going to

12   sit with your motions for judgment on the pleadings and do

13   nothing.  I just want you to know that if I don't complete the

14   decision, it will all happen together.

15             MR. PETERSEN:  Thank you, your Honor.

16             MR. ROSENTHAL:  Thank you, your Honor.

17             (Adjourned)

18

19

20

21

22

23

24

25