**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

THE AUTHORS GUILD, INC., et al.,         :

       *Plaintiffs,*             :       Case No. 11-cv-6351(HB)

    v.                         :

HATHITRUST, et al.,            :

       *Defendants.*           :

-------------------------------------------------------------X

## DEFENDANT INTERVENORS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Daniel F. Goldstein *(*admitted *pro hac vice)*
Laura Ginsberg Abelson *(*admitted *pro hac vice*)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street
Suite 1700
Baltimore, Maryland 21202
Telephone: 410-962-1030
Facsimile:  410-385-0869
dfg@browngold.com
labelson@browngold.com


Robert J. Bernstein (RB 4230)          Peter Jaszi *(*admitted *pro hac vice)*
THE LAW OFFICE OF ROBERT J. BERNSTEIN   5402 Surrey Street
380 Lexington Avenue, 17th Floor        Chevy Chase, Maryland 20815
New York, New York 10168          Telephone:  301-656-1753
Telephone:  212-551-1068          Facsimile:  301-656-7483
Facsimile:  212-551-1001           pjaszi@wcl.american.edu
rjb@robert-bernsteinlaw.com


*Counsel for National Federation of the Blind,
Georgina Kleege, Blair Seidlitz, and Courtney Wheeler*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

    a.    Libraries have historically been inaccessible to the blind. .................................... 3

    b.    What makes a digital book accessible. ................................................................ 3

    c.    Accessible digital books have not been available in the university library setting. ................................................................................................ 4

    d.    The HDL enables research by the blind. ............................................................ 5

    e.    There is no market for accessible university library books for the blind. .......................................................................................................... 6

ARGUMENT ........................................................................................................... 9

    I.    The Americans with Disabilities Act establishes a national policy of equal access to the resources available in our universities and their libraries. ................................................. 9

    II.    The Chafee Amendment permits HathiTrust institutions to reproduce and distribute digital copies of the content of their libraries to the blind. ...................................................... 12

    III.    Use of the HDL to provide blind students and scholars with equal access to university library collections ("accessibility") is a fair use under § 107 of the Copyright Act. ................................................................................................. 14

        A.    Accessibility promotes the "Progress of Science" in furtherance of the constitutional purpose of copyright. .................... 14

        B.    Under the preamble and four nonexclusive factors in § 107, promoting accessibility by means of the HathiTrust database is a fair use. .................................... 17

            1.    The Use is Highly Transformative. ........................................ 18

2.   The nature of the copyrighted works favors fair use. .......................................................................... 22

3.   The amount and substantiality of the works copied is consistent with fair use because the copying was appropriate in light of its transformative purpose. .......................................................... 23

4.   Intervenors' use causes no harm to any actual or potential market for Plaintiffs' work. ...................................... 24

5.   The Overall Balance ............................................................. 25

CONCLUSION ........................................................................................................ 26

# TABLE OF AUTHORITIES

<u>Cases</u>

*A.V. v. iParadigms*,
   544 F. Supp. 2d 473 (E.D. Va. 2008), *aff'd in part* 562 F.3d 630
    (4th Cir. 2009)...........................................................................................21, 22, 23

*Bill Graham Archives v. Dorling Kindersley*,
   448 F.3d 605 (2d Cir. 2006)...............................................................19, 22, 23, 24

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006)...........................................................................1, 23, 24

*Campbell v. Acuff Rose*,
   510 U.S. 569 (1994)................................................................................... passim

*Cf. John Wiley & Sons, Inc. v. Kirtsaeng*,
   654 F.3d 210 (2d Cir. 2011)................................................................................ 14

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991)............................................................................................. 21

*Field v. Google*,
   412 F. Supp. 2d 1106 (D. Nev. 2006) .............................................................22, 23

*Golan v. Holder*,
   132 S.Ct. 873 (2012)........................................................................................... 15

*Harper & Row v. Nation Enterprises*,
   471 U.S. 539 (1985)..........................................................................................21, 22

*Hofheinz v. Discovery Communications, Inc.*,
   No. 00 CIV. 3802 (HB), 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001)................ 18

*Kelly v. Arriba Soft*,
   336 F.3d 811 (9th Cir. 2003) ...................................................................19, 20, 23

*Murphy v. Millennium Radio Group LLC*,
   650 F.3d 295 (3d Cir. 2012)................................................................................ 24

*On Davis v. The Gap, Inc.*,
   246 F.3d 152 (2d Cir. 2001)................................................................................ 18

*Perfect 10, Inc. v. Amazon.com, Inc,.*
   508 F.3d 1146 (9th Cir. 2007). .......................................................................20, 23

*Sega v. Accolade,*
   977 F.2d 1510 (9th Cir. 1993). ................................................................ 20, 21, 23

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
   464 U.S. 417 (1984)........................................................................ 16, 17, 20

*Sony v. Connectix,*
   203 F.3d 596 (9th Cir. 2000). ............................................................... 20, 23, 24

<u>Statutes</u>

17 U.S.C. § 107...................................................................................... passim

17 U.S.C. § 121...................................................................................... passim

7 U.S.C. § 109.......................................................................................... 14

42 U.S.C. § 12101(a)(8) ............................................................................... 9

42 U.S.C. § 12101(b)(1). ............................................................................. 10

42 U.S.C. § 12132 ..................................................................................... 11

42 U.S.C. § 12182 ..................................................................................... 11

<u>Legislative History</u>

142 Cong. Rec. S9066 (daily ed. July 29, 1996)
   (statement of Sen. John H. Chafee) ..................................................... 12

142 Cong. Rec. S9763, S9764 (daily ed. Sept. 3, 1996)........................................ 12

*Copyright Law Revision*, House Rep. No. 94-1476 (1976) ................................... 17

H.R. Rep. 101-485(II) (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 391 ................... 10

S. Rep. No. 101-116 (1989) ........................................................................ 10

<u>Other Authorities</u>

4 PATRY ON COPYRIGHT § 10.52 .................................................................... 14

M. Suzanne Brown & LeiLani Freund, Ass'n of Research Libraries, *SPEC Kit
   321: Services for Users with Disabilities* (Dec. 2010), *available at*
   http://www.arl.org/bm~doc/spec-321-web.pdf................................................. 12

Merriam-Webster Online Dictionary,
    http://www.merriam-webster.com/dictionary/primary ..................................................... 13

Nat'l Library Serv. for the Blind and Physically Handicapped, *NLS Factsheets: Copyright Law Amendment, 1996: PL 104-197 December 1996* (2010),
    *available at* http://loc.gov/nls/reference/factsheets/copyright.html ................................. 13

U.S. Const. art. I, § 8, cl. 8 ........................................................................................................ 15

## PRELIMINARY STATEMENT

Defendant Intervenors submit their summary judgment motion[1] to enforce the right of blind students, scholars and researchers to equal access to the contents of university libraries. Access to the HathiTrust Digital Library ("HDL") permits the blind to fulfill long-held aspirations to true equality of opportunity in higher education, scholarship and research.

Without the HDL, the blind are relegated to second-class academic citizenship – one without the privilege of access to the print collections of university libraries.  With the HDL, the blind have the same comprehensive access to the print collections of university libraries as the sighted, and, as a result, can learn and contribute to learning as do sighted students and scholars.

Equal opportunity for Americans with disabilities is a national imperative that Congress embodied in the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1976. More specifically, Congress recognized the importance of affording the blind access to copyrighted information by providing one avenue through the provisions of § 121 of the Copyright Act, and by highlighting the making of copies for the blind as a particular instance of fair use in the legislative history of § 107.  The implications of these four statutory enactments are several.  First, the ADA and the Rehabilitation Act impose on university libraries the obligation to afford equal access to their collections and, as such, make that access a primary mission of those institutions.  As a result, the universities' reproduction and distribution activities challenged by the Plaintiffs here are, with respect to the blind, activities authorized by the Chafee

---

[1] "Summary judgment should be granted if there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.  Although fair use is a mixed question of law and fact, [the Second Circuit] has on a number of occasions resolved fair use determinations at the summary judgment stage where . . . there are no genuine issues of material fact."  *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006) (internal citations and quotations omitted).

Amendment.  Second, because in determining fair use, great weight is given to the purpose of the use and public benefits derived from it, and because Congress has repeatedly recognized the educational and social benefits that flow from enabling the blind to have equal access to the tools of education and research, these factors strongly favor the application of the fair use doctrine to both the creation of the HDL and its use by the blind.

Congress, when enacting § 107 of the Copyright Act, specifically stated that fair use should continue to be interpreted flexibly and adapt to technological change.  The Supreme Court and the Second Circuit have repeatedly emphasized that this approach is required to advance the constitutional purpose of copyright to allow uses that will benefit the public by encouraging the Progress of Science and the useful Arts.  There is only one direction in which this consideration points:  toward permitting use of the HDL to provide equal access by the blind to the contents of university libraries.  This not only will serve the public interests recognized in the Chafee Amendment to the Copyright Act and the ADA; it also will benefit society in general by fostering contributions by the blind to society's store of knowledge.  In contrast, denying the blind full access to the contents of university libraries would stunt their ability to contribute to the Progress of Science and culture, and thus disserve the purpose of copyright law.

Affording the blind equal access to print library collections by means of the HDL does not damage any actual or potential market for Plaintiffs' works.  Publishers have never considered the blind to be a significant market and do not evidence any intent to develop one. Therefore Plaintiffs, who derive their royalties from publishers' sales of their works, will not suffer any loss of current or reasonably foreseeable potential revenues.

For these reasons, the HDL is protected as a resource for the blind by the Copyright Act and judgment should be entered for the Defendant Intervenors.

## STATEMENT OF FACTS

**a.    Libraries have historically been inaccessible to the blind.**

While the blind have access to individual texts, albeit sparingly, occasionally, and with long delay,[2] the core functions of academic libraries, as collections and concentrations of knowledge, have been inaccessible.[3]  Academic libraries, after all, enable their sighted patrons not only to read individual books in their collections, but to locate accumulated knowledge on specific points, to trace the development of ideas from age to age and scholar to scholar, and to synthesize seemingly unrelated data into startling new results.[4]  The HDL stands to open the gates to blind students and scholars and offer them access to a library collection to the same extent as their sighted counterparts.[5]  Through the HDL, a blind student could search for books and skim them just as a sighted student browses the stacks and flips through titles to gauge their relevance.[6]  And having identified books that may repay future attention, that student could be assured of receiving "readable" electronic copies on a timely basis.[7]  Sight, or lack thereof, could thus become of marginal significance to the successful pursuit of educational studies and individual research.  It is access to the collection, not just access to delayed and occasional individual titles on an ad hoc basis, that makes the HDL revolutionary for the blind.[8]

**b.    What makes a digital book accessible.**

Prior to the development of accessible digital books, the blind could access print

---

[2] Decl. of Marc Maurer (hereinafter "Maurer Decl."), June 28, 2012, ¶¶ 10-11.
[3] Decl. of George Kerscher (hereinafter "Kerscher Decl."), June 27, 2012, ¶ 32.
[4] Decl. of John Wilkin (hereinafter "Wilkin Decl."), June 28, 2012, ¶¶ 11, 33.
[5] Kerscher Decl. ¶ 51.
[6] *Id.* ¶¶ 31, 34.
[7] *See* Wilkin Decl. ¶ 105.
[8] Kerscher Decl. ¶¶ 18, 40.

materials only if the content was converted to braille or through live or recorded human readers.[9] The blind, however, can read an accessible digital book independently, using screen access software, a vast improvement over recorded human narration, because it allows blind readers to access text more quickly, reread passages, annotate and navigate as a sighted reader does text.[10]

While not all digital books are accessible,[11] those in the HDL collection are.[12]  This is in part because the University of Michigan, the lead institution in the HathiTrust, has long made accessibility for the blind a priority in its digitization efforts and it has ensured that the scans for the HDL also prioritized accessibility.[13]

To be accessible, a scanned copy of a print work must be run through optical character recognition (OCR) software, so that screen access software can recognize the text and convey it audibly or tactilely to the blind reader.[14]  The HathiTrust and Google have also taken the necessary steps to ensure that the books in the HDL have been run through optical structural recognition (OSR) software that allows the screen access software to recognize pages, reading order, word boundaries, text block boundaries and, on occasion, headings.[15]  Google's OCR/OSR software, with which the HDL scans were created, is the most sophisticated software available.[16]

     **c.**     **Accessible digital books have not been available in the university library setting.**

Without access to a digital library collection, blind students and scholars cannot

---

[9] *Id.* ¶ 19.

[10] *Id.* ¶¶ 20-21.

[11] *Id.* ¶ 22.

[12] *Id.* ¶ 30.

[13] *Id.* ¶ 30; Maurer Decl. ¶ 13; Wilkin Decl. ¶ 103.

[14] Kerscher Decl. ¶ 23.

[15] *Id.* ¶¶ 23, 31.

[16] *Id.* ¶ 31.

effectively conduct library research.[17]  A university's disability student services office (DSS) is responsible for scanning print materials submitted by blind students and converting them into accessible digital copies, but the vast majority of these offices will only provide the works listed on the students' syllabi.[18]  They lack the resources to create accessible copies of books that are not required reading.[19]  Moreover, because university libraries typically do not have digital book indices and tables of contents that blind students can independently review, they cannot identify relevant research materials for a DSS office to scan.[20]

Apart from ad hoc digitization by libraries and DSS offices, the blind can borrow accessible digital books from Learning Ally, Bookshare, and the National Library Service for the Blind and Physically Handicapped (NLS).[21]  Their combined collection numbers approximately 200,000 titles, many of which are popular "trade" books or textbooks, but not the academic works that populate a university library.[22]  Thus, these alternatives cannot facilitate the type of broad-based academic research regularly conducted by sighted students.

### d.      The HDL enables research by the blind.

From the outset, the HDL has had a primary mission of making a digital version of its collections accessible.  The University of Michigan recognizes that "access to the written record is at the heart of most scholarly pursuits"[23] and advised the National Federation of the Blind

---

[17] *Id.* ¶ 32.
[18] *Id.* ¶ 32.
[19] *Id.* ¶ 36; Decl. of Blair Seidlitz (hereinafter "Seidlitz Decl."), December 6, 2011, ¶¶ 5-7 (attached as Abelson Decl. Ex. D); Decl. of Courtney Wheeler (hereinafter "Wheeler Decl."), December 6, 2011, ¶¶ 6-8 (attached as Abelson Decl. Ex. E).
[20] Kerscher Decl. ¶¶ 34-35.
[21] *Id.* ¶ 37.
[22] *Id.* ¶¶ 37-38; Decl. of James Fruchterman (hereinafter "Fruchterman Decl."), June 28, 2012, ¶ 16.
[23] Wilkin Decl. ¶ 101.

(NFB) in 2006, when NFB first expressed concern about the accessibility of Google scans, that it intended the scans to be accessible and available to the blind.[24]  To that end, in 2008, the University of Michigan invited representatives from the NFB to campus to demonstrate the accessibility features of the digital library they had established.[25]  Since the HDL has been "live," print-disabled students and staff at the University of Michigan have had full access to the collection, through a secure, password-protected system that allows students with certification of their disabilities from a qualified expert (and only those students) to access the full text of the collection.[26]

In the HDL collection, most of the tables of contents have been manually tagged, allowing blind students to recognize them and navigate to a relevant section with a screen reader the way a sighted person would open the book, flip to the table of contents, and then flip to the relevant chapter.[27]  Thus, blind students with access to the HDL are the first in history to have the opportunity to use a library in the same way as their sighted counterparts.

    **e.**    **There is no market for accessible university library books for the blind.**

The HDL is the only available source of a comprehensive accessible digital library, in part because there is no market for the creation of such a collection for use by the blind.[28] As the Association of American Publishers has recognized, there is no market for the creation even of popular books that are accessible to the blind,[29] let alone the creation of a database of accessible

---

[24] Maurer Decl. ¶ 13.
[25] *Id.* ¶ 14.
[26] Wilkin Decl. ¶ 105.
[27] Kerscher Decl. ¶ 34.
[28] *Id.* ¶ 17.
[29] *Id.* ¶ 42.

academic works from the fifteenth century (or before) to the present day like those in the HDL.[30]

The publishing industry's lack of interest in enabling access by blind readers is well documented. While new, "born-digital," books can more readily be made accessible by (or with permission from) copyright holders, they rarely are.[31] Authors, publishers, and e-book platform developers not only consistently ignore e-book accessibility, but have actively worked to prevent accessibility.[32] Since the advent of commercial e-books, companies involved with creating them have decided that the effort to make them accessible to the blind was not economically worthwhile.[33] They have recognized that people with disabilities would be left out, but have not been willing to develop the means for the blind to access the information they control.[34]

Indeed, before Amazon came out with the Kindle 2, the NFB actively lobbied Amazon to make the Kindle 2 accessible, pointing out the economic benefits that would flow from making content audible to all users and the marginal additional cost required to make the menus on the Kindle accessible to the blind.[35] But, when Amazon announced that it had released the Kindle 2 with a text-to-speech function for the content, (albeit without accessible menus), the Authors Guild, a plaintiff in this litigation, actively opposed making the content accessible.[36] Amazon capitulated, allowing individual publishers to turn off text-to-speech on the Kindle for, at their selection, all or some of their booklists.[37]

---

[30] Kerscher Decl. ¶¶ 17, 50-51; Wilkin Decl. ¶ 61.
[31] Fruchterman Decl. ¶ 16; Kerscher Decl. ¶ 17.
[32] Kerscher Decl. ¶ 43; Maurer Decl. ¶¶ 20-39.
[33] Kerscher Decl. ¶ 44.
[34] *Id.* ¶ 44; Maurer Decl. ¶¶ 23, 36-39.
[35] Kerscher Decl. ¶ 46. Maurer Decl. ¶¶ 25-26.
[36] Maurer Decl. ¶ 27.
[37] *Id.* ¶ 28.

No for-profit entity is creating digital books from print books for the blind.[38]  The publishing industry has expressed strong resistance to making e-books accessible,[39] and there is no evidence that any commercial entity would assume the costs associated with selling digitized versions of print books to the blind.  As authors, publishers, and e-book platform developers find no market value in making born-digital material accessible, a relatively simple and inexpensive task, it is apparent that there is even less of a perceived market value to making millions of print library volumes, many of which are old and out of print,[40] accessible to the blind.  The market, in short, has not offered universities a way to purchase or acquire the right to create a database of accessible academic books for the blind.

<p style="text-align:center">CONFIDENTIAL</p>


<p style="text-align:center">CONFIDENTIAL - ATTORNEYS' EYES ONLY</p>


,[43] Bookshare, which must destroy books by chopping off the bindings to scan them, averages $40, even for books with relatively basic layouts.[44]  As a result of these costs, Bookshare, a nonprofit subsisting entirely on grants, government funding and contributions, can only digitize approximately 2,000-3,000 books per month.[45]  At that rate, it would more than 200

---

[38] Fruchterman Decl. ¶ 31.
[39] Maurer Decl. ¶¶ 20-39.
[40] Kerscher Decl. ¶ 17; Wilkin Decl. ¶ 66.
[41] Dep. of the Copyright Clearance Center (hereinafter "CCC Dep."), June 4, 2012, at 57 (Abelson Decl. Ex. A).
[42] *Id.* at 50-51.
[43] Dep. of Google, Inc. (hereinafter "Google Dep."), June 1, 2012, at 56, 63-64.
[44] Fruchterman Decl. ¶¶ 23, 25-26.  Obviously, destroying books is not a technology suitable for digitizing library books.
[45] *Id.* ¶ 12.

years to create the ten million volume collection of the HDL.

In sum, the use of the HDL by the blind represents the first, and the only foreseeable, opportunity for equal access to university library collections, equal opportunity in higher education and research, and the realization of their true potential to contribute to the academic, cultural and scientific advancement of society.

## ARGUMENT

I.   **The Americans with Disabilities Act establishes a national policy of equal access to the resources available in our universities and their libraries.**

The ADA's command that colleges and universities provide equal access to their programs and activities comes into play in two significant ways.  First, it requires that libraries of educational institutions have as a primary mission the reproduction and distribution of its collection to its blind patrons, thereby making each library an actual or potential "authorized entity" for the purposes of the Chafee Amendment.  Second, the ADA as a statement of national policy must weigh heavily in the analysis of whether a use allowing access by the blind to the collections of university libraries is a fair one.  By contrast, the Authors Guild's sweeping demand for relief amounts to a repudiation of decades of steady progress in using available technologies to meet the congressionally mandated goal of providing equality of access to educational and research materials for blind students and scholars.

The ADA embodies a collective commitment to the principle that access to essential facilities and resources must be afforded on equal terms to all members of our society.  Congress, having found that people with disabilities have been denied "the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous,"[46]

---

[46] 42 U.S.C. § 12101(a)(8).

declared that the purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."[47]  As such, the ADA is a national normative statement that the public interest lies with providing people with disabilities equal opportunity.  Congress has noted that this directive does not mean that people with disabilities must obtain the same result or the same level of achievement as nondisabled people; it "does mean that persons with disabilities must be afforded *equal opportunity* to obtain the same result."[48] Congress defined "discrimination" as the denial of benefits, services or opportunities "that are *as effective and meaningful* as those provided to others."[49]

Congress imposed the institutional obligation to afford equal opportunity on, among others, public and private educational institutions and, in doing so, recognized that as technology advanced, new opportunities for equal access could develop.[50]  At the same time, the ADA is not a blank check, requiring institutions to act in ways that are unduly burdensome.  Thus, before the HathiTrust institutions found a mechanism and a partner with the technology to create a digital archive of library collections, academia had not offered the blind the opportunity afforded others: to have full access to the trove of knowledge that has been committed to print over human history, and to readily search and retrieve from that vast array of books the specific titles that may allow the blind knowledge-seeker to advance his own understanding and perhaps even the

---

[47] 42 U.S.C. § 12101(b)(1).

[48] S. Rep. No. 101-116, at 60 (1989) (emphasis added).

[49] *Id.* at 6 (emphasis added).

[50] "[T]echnological advances can be expected to further enhance options for making meaningful and effective opportunities available to individuals with disabilities.  Such advances may require public accommodations to provide auxiliary aids and services in the future which today they would not be required because they would be held to impose undue burdens on such entities. Indeed, the Committee intends that the types of accommodations and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times."  H.R. Rep. 101-485(II), at 108 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 391.

understanding of others.

For the blind, the development of the technologies that created the HDL is akin to Gutenberg's invention of the printing press for the sighted.  Information that had been foreclosed to the blind is now available, and at a time in history when access to information has become ever more critical to full participation in social, cultural and economic life.  If the Authors Guild succeeds in its quest to impound these digital archives, blind scholars at HathiTrust institutions will again be relegated to second-class status, although all that information will continue to be available to sighted members of the University Defendants' communities in its print form.

As the attached declarations of NFB President Marc Maurer, the Individual Defendant Intervenors, and experts George Kerscher and James Fruchterman attest, it is impossible to engage in meaningful library research with an inaccessible corpus, and access to identified individual titles, if obtainable at all, is generally too little and too late.  Because access to an existing digital archive is not unduly burdensome and does not fundamentally alter the nature of the program or activity, barring blind students access to these digital files would prevent the universities from fulfilling their obligations of equal access.[51]

---

[51] Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  As public universities, the University of California, Indiana University, the University of Michigan, and the University of Wisconsin are all obligated to provide the Intervenors with equal access to their library collections as they afford sighted members of their communities.  *Id.*  Likewise, Title III of the ADA states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ."  § 12182.  As a private university, Cornell is required to provide access to its library collection under Title III.  *See id.*

**II.     The Chafee Amendment permits HathiTrust institutions to reproduce and distribute digital copies of the content of their libraries to the blind.**

In 1996, to "end the unintended censorship of blind individuals' access to current information" that is "readily available to sighted individuals in libraries, bookstores," and the like,[52] Congress enacted the "Chafee Amendment."[53]  This provision permits "authorized entitie(s) . . . to reproduce or distribute copies . . . of a previously published, non-dramatic literary work . . . in specialized formats exclusively for use by the blind or other persons with disabilities."[54]  An "authorized entity means a nonprofit organization or a governmental agency that has a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities."[55]

Thus, the ADA imposes on university libraries a "primary mission" to provide equal access to the blind, while the Chafee Amendment provides a mechanism by which universities and their libraries can efficiently and effectively discharge that statutory obligation, making use of the most effective technologies available to do so.[56]  The provision of these services under the ADA, when feasible, is not optional, and it is well-documented that academic libraries have historically treated services to patrons disadvantaged by disabilities as a basic or fundamental function.[57]  Accordingly, what the University of Michigan has already done and what the other HathiTrust institutions may do as well, fits squarely within the authorization of the Chafee

---

[52] 142 Cong. Rec. S9763, S9764 (daily ed. Sept. 3, 1996).

[53] 17 U.S.C. § 121.

[54] § 121(a).

[55] § 121(d)(1).

[56] In introducing the legislation, Senator Chafee specifically referred to "new digital formats that can be used with special software."  142 Cong. Rec. S9066 (daily ed. July 29, 1996) (statement of Sen. John H. Chafee).

[57] *See generally* M. Suzanne Brown & LeiLani Freund, Ass'n of Research Libraries, *SPEC Kit 321:  Services for Users with Disabilities* (Dec.  2010), *available at* http://www.arl.org/bm~doc/spec-321-web.pdf.

Amendment to reproduce and distribute content in accessible formats.

Insofar as the University of Michigan is concerned, it also is clear that from the inception of the plan to scan its millions of library books, a paramount goal of that project was to better fulfill its mission to serve its blind students and faculty.[58]  The HDL allows the University of Michigan and others[59] to address the severe shortage of digital copies of books of specialized interest to students and faculty, including those that are assigned as secondary readings in a university class or that are sought out by a student writing a term paper or dissertation.[60]

That HathiTrust universities do not have the reproduction and distribution of accessible books as its only primary mission, is no occasion for pause.  Section 121 states only that providing "specialized services relating to . . . information access needs of blind or other persons with disabilities" must be "*a primary mission*" of a qualifying institution, using the indefinite article in preference to the definite one.[61]  This corresponds to a conventional dictionary definition of the word "primary."[62]  The legislative history does not indicate that the phrase "a primary mission" can or should be given a different sense.  Nor is this a case of statutory ambiguity in which the plain meaning of the term, as evidenced by a dictionary definition, can be

---

[58] Kerscher Decl. ¶ 30; Maurer Decl. ¶ 13; Wilkin Decl. ¶ 103.

[59] The HathiTrust, in turn, could be covered by the § 121 exemption as the agent of one or more qualifying universities when it participates in serving accessible electronic copies to their blind and otherwise print-disabled faculty and students on request. The Chafee Amendment "Fact Sheet" prepared by the Library of Congress' National Library Service for the Blind and Physically Handicapped states that "[t]o the extent that authorized agencies and organizations use or delegate authority . . . to produce and distribute works under the exemption , . . ., those activities appear to be fully covered by the exemption."  Nat'l Library Serv. for the Blind and Physically Handicapped, *NLS Factsheets: Copyright Law Amendment, 1996: PL 104-197 December 1996* (2010), *available at* http://loc.gov/nls/reference/factsheets/copyright.html.

[60] *See, e.g.*, Seidlitz Decl. ¶ 7; Wheeler Decl. ¶¶ 7-8; Decl. of Georgina Kleege (hereinafter "Kleege Decl."), December 5, 2011, ¶¶ 6-7 (attached as Abelson Decl. Ex. D).

[61] There are no judicial decisions addressing the Chafee Amendment.

[62] "2(b):  *basic, fundamental* ," *Primary Definition*, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/primary.

avoided.[63]

Without question, § 121 does not authorize the university defendants to reproduce and distribute "dramatic" literary works, musical scores or "unpublished" works. To provide any of these in accessible formats, libraries must rely on fair use, which has been recognized for at least 35 years as a basis for providing accessible texts in response to user requests. However, § 121 is complementary to the fair use principle codified in 17 U.S.C. § 107. Section 121 was intended to give a clear safe harbor to libraries and other authorized entities without the necessity of the more particularized analysis required by § 107.[64] Activities analogous to those specifically authorized in § 121 may constitute fair use even when they fall outside the latter's technical coverage or if engaged in by entities that do not qualify for a § 121 exemption. Reading Title 17 in this way gives separate purposes to §§ 121 and 107, thereby giving substantial effect to all parts of the statute and avoiding redundancy, as required by the canons of statutory interpretation.

III.  **Use of the HDL to provide blind students and scholars with equal access to university library collections ("accessibility") is a fair use under § 107 of the Copyright Act.**

A.   **Accessibility promotes the "Progress of Science" in furtherance of the constitutional purpose of copyright.**

Providing blind students and scholars access to university library collections through

---

[63] *Cf. John Wiley & Sons, Inc. v. Kirtsaeng*, 654 F.3d 210, 220 (2d Cir. 2011) (parsing meaning of "made" in 17 U.S.C. § 109(a)).

[64] The Chafee Amendment was designed to create a clear zone of exemption around certain practices in the field of accessibility that might not otherwise qualify as fair use, including the making of multiple accessible copies in anticipation of possible user requests. *See* 4 PATRY ON COPYRIGHT § 10.52 ("Specific types of uses – Blind persons:") at 10-155, 156.

digital copies goes to the very heart of the overall purpose of both the Copyright Clause[65] and the

fair use doctrine.  As the Supreme Court explained in *Campbell v. Acuff Rose*,[66]

> From the infancy of copyright protection, some opportunity for fair use of copyrighted
> materials has been thought necessary to fulfill copyright's very purpose, "[t]o promote the
> Progress of Science and useful Arts" . . . .
>
>         \*      \*      \*
>
> The fair use doctrine thus permits [and requires] courts to avoid rigid application of
> the copyright statute when, on occasion, it would stifle the very creativity which that
> law is designed to foster.

*Campbell* thus instructed that the four statutory factors "are to be explored, and the results

weighed together, in light of the purposes of copyright."[67]

The "Progress of Science," as Justice Ruth Bader Ginsburg observes in *Golan v.*

*Holder*,[68] was used by the framers of the constitution to "refer[ ] broadly to the creation and

spread of knowledge and learning."  It is therefore incumbent upon the Court, when considering

fair use, to weigh the factors in light of whether the use serves to promote the growth of

knowledge and learning.  Accordingly, Congress underscored in the preamble to § 107 that in

evaluating fair use, special consideration be given to uses that are for "for purposes such as

criticism, comment, news reporting, teaching (including multiple copies for classroom use),

scholarship, or research. . . ."

Fair use is integral to copyright and is one of its "traditional contours."[69]  It is an

---

[65] Article I, section 8, clause 8 of the Constitution provides that Congress shall have the power
"[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors
and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art.
I, § 8, cl. 8.

[66] 510 U.S. 569, 575, 577 (1994) (brackets in original) (citation and internal quotations omitted).

[67] *Id*. at 578.

[68] 132 S. Ct. 873, 888 (2012) (citation and second internal quotations omitted).

[69] *Id.* at 890.

"equitable rule of reason"[70] that enables the courts to balance the copyright holder's economic

interest with the public interest in access to prior works in order to advance the "Progress of

Science" by creating new ones.  Thus, as stated by the Supreme Court in *Sony*,

> The monopoly privileges that Congress may authorize are neither
> unlimited ***nor primarily designed to provide a special private benefit.***
> ***Rather, the limited grant is a means by which an important public***
> ***purpose may be achieved***. It is intended to motivate the creative activity
> of authors and inventors by the provision of a special reward, and to allow
> the public access to the products of their genius after the limited period of
> exclusive control has expired.[71]

In this regard, it bears remembering that for the blind public (i) access is denied without

accessibility (i.e., converting printed works into a format from which they can be read by the

blind); (ii) there is no accessibility to the vast contents of university libraries without

comprehensive digitization; and (iii) there is no digitization of university libraries without the

HathiTrust.

As already noted, § 121 authorizes many pro-accessibility uses of the HDL by

universities and their libraries.[72]  But even were these institutions not "authorized entities" for

Chafee Amendment purposes, those same uses would be considered fair under § 107.  Providing

accessible copies of books to the blind has long been recognized as a lawful, non-infringing fair

use.  It was the intent of Congress, in codifying the fair use doctrine, to make its application to

copying for accessibility clear beyond any doubt.  Reporting on enactment of § 107, the House

Judiciary Committee took note that "the making of copies or phonorecords of works in the

---

[70] *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 448 (1984).
[71] *Id.* at 429 (emphasis added).
[72] *See* discussion, *infra*, in Point II.

special forms needed for the use of blind persons" qualifies as a fair use.[73]  Thirty-six years later,

through the HDL, this recognized fair use can finally be made in a manner that will permit full

use of university resources by the blind.  This, in turn, will greatly expand their contributions to

learning and knowledge in furtherance of the purpose of copyright.

The public benefits generated by use of the HDL for accessibility are not counterbalanced

by harm to copyright holders, who have never considered the blind to be a significant market and

thus will not experience a reduction in their economic incentives to create new works.[74]  As a

result, a holding of fair use here will fully serve the copyright's constitutional purpose.

### B.     Under the preamble and four nonexclusive factors in § 107, promoting accessibility by means of the HathiTrust database is a fair use.

The preamble to § 107 specifies certain nonexclusive purposes for which a fair use may

be made:  "the fair use of a copyrighted work, including such use by reproduction in copies  . . .

for purposes such as criticism, comment, news reporting, teaching (including multiple copies for

classroom use), scholarship, or research, is not an infringement of copyright."  The use of the

HDL by blind students, scholars, and researchers clearly qualifies under at least three of the

enumerated reasons for which a fair use may be made (teaching, scholarship, and research).

Such use will often also qualify as criticism and comment, because without accessibility there is

no opportunity to engage in critique.

As discussed below, this Court has observed that uses of the kind specified in the

preamble are heavily weighted toward fair use.  In addition, of course, every claimed fair use still

must be evaluated under the four nonexclusive factors set forth in § 107.  Such factorial analysis

---

[73] *Copyright Law Revision*, House Rep. No. 94-1476 at 73 (1976); *see also Sony*, 464 U.S. at 464-465 (citing this section of House Report with approval).
[74] *See* discussion, *infra*, in Point III.B.4.

strongly favors fair use in view of the highly transformative nature of Intervenors' use (factor 1);

the absence of any harm to Plaintiffs' market (factor 4); the predominance of informational

content in the HDL database (factor 2); and the necessity for comprehensive digitization in order

to provide equal access to the university library collections (factor 3).

### 1.    The Use is Highly Transformative.

Pursuant to *Campbell*, the first § 107 fair use factor – "the purpose and character of the

use, including whether such use is of a commercial nature or is for nonprofit educational

purposes" – is primarily determined by the degree to which a use is "transformative."  The more

transformative the use, the less importance is accorded to the remaining fair use factors.[75]

This Court has recognized that uses, such as educational ones, that are among the

illustrative uses specified in the preamble to § 107 weigh heavily in favor of transformative

use.[76]  *Campbell*, too, instructs that the first factor enquiry "may be guided by the examples in

the preamble to § 107, looking to whether the use is for criticism, or comment, or news

reporting, and the like . . . ."[77]  Educational purposes that also implement other important public

policies, such as equal access for the blind, must be weighed even more heavily in favor of fair

use.[78]

To be transformative, a use need not alter a work.  Rather, there are many roads to

transformation, including changing the context in which a work is used or having a different

---

[75] *Campbell*, 510 U.S. at 579 ("The more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use"); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001); *Hofheinz v. Discovery Communications, Inc*., No. 00 CIV. 3802 (HB), 2001 WL 1111970, at *5 (S.D.N.Y. Sept. 20, 2001).

[76] *Hofheinz,* 2001 WL 1111970, at *5.

[77] *Campbell*, 510 U.S. at 578-79.

[78] *See* discussion, *supra*, in Point III.A.

purpose for the use of the work.  Thus, in *Bill Graham Archives v. Dorling Kindersley*, 448 F.3d

605 (2d Cir. 2006),[79] the Second Circuit held that copying posters of Grateful Dead concerts and

transforming them into smaller versions for use in a written and pictorial history of the band was

a transformative and fair use.  Similarly, because they are copied for a different purpose,

digitizing university library books to facilitate their accessibility to the blind is transformative.

Moreover, because copyright holders have never considered the blind to be a significant

market or potential market,[80] digitization for accessibility does not reduce the incentive to create

new works.  In this respect, factors one and four overlap:  that authors and publishers did not

have the blind in mind when creating and distributing the books demonstrates that a decision to

digitize them for accessibility is driven by a new purpose and aims to serve a new audience.  For

that same reason there is no market harm to the copyright holders.

In *Bill Graham Archives*, the Second Circuit explicitly relied on[81] the Ninth Circuit

opinion in *Kelly v. Arriba Soft*,[82] which involved the wholesale copying of entire works to create

an enormous database of photographs for research purposes.  In *Arriba Soft,* the Ninth Circuit

affirmed the district court's holding that use of a web crawler to create a huge database of

photographs displayed in thumbnail form on defendant's website was "significantly

transformative."[83] More specifically, the Ninth Circuit found that "Arriba's use of the images

serves a different function than Kelly's use improving access to information on the internet

---

[79] 448 F.3d 605 (2d Cir. 2006).
[80] *See* discussion, *infra*, in Point III. B. 2.
[81] *Bill Graham Archives*, 448 F.3d at 611 (noting that the Ninth Circuit found Arriba Soft's "online search engine's use of thumbnail-sized images to be ***highly transformative***") (emphasis added).
[82] 336 F.3d 811, 818-20 (9th Cir. 2003) ("*Arriba Soft*").
[83] *Id*. at 817-20.

. . . ."[84]  Thanks to digitization, users of the Arriba Soft database and search tool could research available photographs and then locate the websites from which they could be purchased. Analogously, the digitization of the university library collections transforms the books into a database from which the blind can research, locate and read any book in the database – all culturally positive, non-infringing uses.  The purpose of the digitization here, insofar as NFB and the blind are concerned, is to provide equal access – an entirely different purpose (with barely a few exceptions) than authors have in mind when writing books or publishers when selling them.

In *Sega v. Accolade*,[85] the Ninth Circuit held that Accolade's disassembling of Sega's video game software for the purpose of creating compatible video games was transformational even though it involved copying the entire work.[86]  The court held that the copying (a necessary incident of disassembling) had a transformative purpose – to research elements of Sega's software which had to understood to develop new, interoperable games.  Similarly, the copying here is necessary for a transformative purpose – providing accessibility so that the blind are able to study and research on a par with their sighted colleagues.[87]

The *Sega* analysis of transformative use is of particular relevance to the use at issue here. In *Sega*, the court found that Accolade's "intermediate copying" (as part of the disassembly process) was transformative in part because the object code that Accolade disassembled was in a

---

[84] *Id*. at 819.  *See also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1166 (9th Cir. 2007) (amended decision) (holding that Google search engine's gathering and displaying thumbnail versions of plaintiff's photographs was "significantly transformative," and noting the "importance of analyzing fair use flexibly in light of new circumstances" (citing *Sony*, 464 U.S. at 431–32)).

[85] 977 F.2d 1510 (9th Cir. 1993) (amended decision).

[86] *See also Sony v. Connectix*, 203 F.3d 596, 605 (9th Cir. 2000) (holding that intermediate copying, *i.e.* reverse engineering, of Sony Playstation's basic input output operating system (BIOS) necessary for interoperability was a transformative and fair use; and "declin[ing] to erect a barrier" to the public's access to the ideas contained within copyrighted software programs).

[87] Kerscher Decl. ¶ 18.

format that could not be read by the human eye.[88]  The court approved the disassembly because,

otherwise, Accolade could not gain access to the functional requirements of the video game

software.[89]  Similarly, the digitization of library collections enables the blind to read and research

them in furtherance of their education and on an equal basis with the sighted.  In both cases, (1)

the resulting public benefit was central to the determination of fair use, and (2) the digital

copying was necessary for the defendants to access (literally, to see) the works.

The *Sega* court emphasized the importance of the strong public interest as a factor

favoring fair use, stating, as follows:

> [W]e are free to consider the public benefit resulting from a particular use . . . .  Public
> benefit need not be direct or tangible, but may arise because the challenged use serves a
> public interest . . . .  It is precisely this growth in creative expression, based on the
> dissemination of other creative works, and the unprotected ideas contained in those
> works, that the Copyright Act was intended to promote.[90]

The same observation applies to benefits flowing to the public at large from making library

collections accessible to the blind:  increased educational and research opportunities for the blind

will, in turn, generate substantial new creative expression to the benefit of society.

In *A.V. v. iParadigms*,[91] the court considered whether the creation of a huge database of

student papers for the purpose of detecting plagiarism was a transformative fair use.  The

database was created in part by copying millions of past student papers[92] against which current

student work could be electronically compared for telltale signs of plagiarism.  Plaintiffs were

---

[88] *Sega*, 977 F.2d at 1525 ("[T]he record clearly establishes that humans cannot *read* object
code") (emphasis in original).
[89] *Id.* at 1526.
[90] *Id.* at 1523 (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 349 (1991),
(citing *Harper & Row v. Nation Enterprises,* 471 U.S. 539, 556–57 (1985))).
[91] 544 F. Supp. 2d 473 (E.D. Va. 2008), *aff'd in part* 562 F.3d 630 (4th Cir. 2009).
[92] The district court opinion noted that over 100,000 student papers were submitted daily by over
7,000 educational institutions.  544 F. Supp. 2d at 478.

students who found this objectionable and protested having to "turn it in" as an infringement of their copyright.  The court held:

> This Court finds the "purpose and character" of iParadigms' use of Plaintiffs' written works to be highly transformative.  Plaintiffs originally created and produced their works for the purpose of education and creative expression.  iParadigms, through Turnitin, uses the papers for an entirely different purpose, namely, to prevent plagiarism and protect the students' written works from plagiarism . . . .[iParadigms'] use of the student works adds "a further purpose or different character" to the works, *see Harper & Row*, 471 U.S. at 562, . . . and provides a substantial public benefit through the network of educational institutions using Turnitin.  Thus, in this case, the first factor favors a finding of fair use.[93]

The same analysis applies here:  the different purpose (accessibility) and the important public benefit (equality in educational opportunity) justify both creating the HDL and employing it to promote accessibility for the blind.  In both cases, the use is highly transformative.[94]

In light of the highly transformative nature of use of the HDL as a tool to promote accessibility, and of its educational purposes, the first factor weighs heavily in favor of fair use.

### 2.    The nature of the copyrighted works favors fair use.

Factor two – "the nature of the copyrighted work" – concerns whether the work is at the core of copyright's protective purpose (fiction, painting, poetry, theatrical film, songs) or instead is more in the nature of a factual or idea-based work (historical or scientific works, statistical compilations, maps, political commentaries, sociological studies), with works of a more factual nature more likely to qualify for fair use.[95]  Moreover, the second factor has "limited usefulness"

---

[93] *Id.* at 482.

[94] *See also Field v. Google*, 412 F. Supp. 2d 1106, 1119 (D. Nev. 2006) (holding that "[b]ecause Google serves different and socially important purposes in offering access to copyrighted works through "[c]ached" links and does not merely supersede the objectives of the original creations, the Court concludes that Google's alleged copying and distribution of Field's Web pages containing copyrighted works was transformative").

[95] *See, e.g., Campbell*, 510 U.S. at 585; *see also Bill Graham Archives*, 228 F.3d at 612.

in the case of transformative use.[96]

In the case of most university library collections, such as the University of Michigan Library and others contained in the HDL, a majority of the works will be closer to the factual/idea end of the spectrum rather than the creative end.[97]  Even works of fiction, drama and poetry will be generally retrieved from the HDL by blind scholars as objects of study, rather than sources of entertainment.[98]  Therefore, factor two favors fair use.

> ### 3.   The amount and substantiality of the works copied is consistent with fair use because the copying was appropriate in light of its transformative purpose.

The third factor – "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" – concerns whether the amount copied is reasonable in light of the purpose of the use.[99]  Where, as here, the use is highly transformative and the entire work must be copied in order to accomplish the transformative purpose, this factor is fully consistent with a finding of fair use.[100]  Equality of access for the blind cannot be obtained unless the blind have access to university library collections to the same extent that is available to sighted students and scholars, that is, with the capacity to browse and search the collection to identify relevant research materials.  That highly transformative fair use purpose requires comprehensive

---

[96] *Bill Graham Archives,* 228 F.3d at 612 (citing *Campbell*, 510 U.S. at 586).

[97] Wilkin Decl. ¶ 59.

[98]  *See Bill Graham Archives,* 228 .F.3d at 612-13 (even where all works used were "creative," "the second factor has limited weight in our analysis because the purpose of DK's use was to emphasize the images' historical rather than creative value").

[99] *Campbell*, 510 U.S. at 586.

[100] *See* Point III.B.1., *infra,* and especially discussion of *Bill Graham Archives, Arriba Soft, iParadigms, Sega, Sony v. Connectix, Perfect 10 v. Amazon, and Field v. Google,* wherein, in each case, the court found a transformative and fair use even though the entire work or works were copied.  *See also, Blanch v. Koons,* 467 F.3d 244, 258 (2d Cir. 2006) (where copying is "reasonable when measured in light of its purpose . . . [the third factor] weighs distinctly in [defendant's] favor.")

digitization of the library contents so that they can be made available in an accessible format. With one inconsequential exception,[101] in all of the cases discussed above where complete copies of works, including digital databases containing those complete copies, were appropriately made by the defendants in order to implement the transformative purposes, the courts considered factor three to be neutral or, in *Blanch v. Koons,* to favor fair use.  For the reasons stated above, the same result should obtain here.

### 4. Intervenors' use causes no harm to any actual or potential market for Plaintiffs' work.

The fourth factor – "the effect of the use upon the potential market for or value of the copyrighted work" – weighs strongly in favor of fair use for both  legal and  factual reasons.  As *Campbell* and its progeny instruct, where, as here, a use is highly transformative, factor four tends to weigh in favor of fair use because the copyright holder is not entitled to monopolize transformative markets.[102]  Not only is that the case here, but, in addition, as a purely factual matter there is no harm to any actual or potential markets of Plaintiffs.  As set forth above, and in the Declarations of George Kersher, James Fruchterman and Dr. Marc Maurer submitted herewith, there has never been, nor is there ever likely to be, a market for a digital database of library collections accessible to blind students and scholars.  Neither Plaintiffs nor their

---

[101] In *Sony v. Connectix,* 203 F.3d at 606, the court found the third factor to be of "very little weight" in the context of intermediate copying which it held to be a fair use.

[102] *Campbell,* 510 U.S. at 591 ("when…the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred.").  *See also, Bill Graham Archives,* 228 F.3d at 615 ("Since DK's use of BGA's images falls within a transformative market, BGA does not suffer market harm due to the loss of license fees."); *Blanch v. Koons,* 467 F.3d 244, 258 (2d Cir. 2006) ("The fourth fair-use factor greatly favors Koons" because his transformative uses did not "usurp[] the market for the original work."); *Murphy v. Millennium Radio Group LLC,* 650 F.3d 295, 308 (3d Cir. 2012) ("[A] copyright owner cannot claim market harm simply because he would have liked to charge for the use in question.  If that were the case, then it would be difficult indeed for any fair use defense to succeed.").

publishers have ever attempted to develop such a "market" because there is no profit to be made

in it.  University library collections do not abound in best sellers but instead focus on works of

interest to scholars and on creating a comprehensive record of our cultural history.[103]  Indeed,

there is no evidence suggesting copyright holders believe that licensing works in library

collections for accessibility purposes would represent a worthwhile business model, and the

evidence that does exist on this point suggests the opposite.[104] The overwhelming costs to create

the HDL and the lack of a profitable market for accessible books, demonstrate why, but for the

HDL, the opportunity for the blind to obtain comprehensive access to university library

collections would never have occurred.[105]

     In sum, as a matter of law, in view of the transformative and educational nature of the

HDL to afford accessibility, it is not a superseding use that could disfavor fair use.  In addition,

there is no actual or potential market to which Plaintiffs could point that would be impaired by

this highly transformative use.  Factor four, therefore, weighs decidedly in favor of fair use.

### 5.      The Overall Balance

     The factorial analysis requires these conclusions: (i) the use of the HDL to facilitate

accessibility is a fair use (as well as being covered, for the most part, by § 121); and (ii) the

creation of the HDL constitutes fair use because the highly transformative purpose to provide

equal educational access for the blind could not have been accomplished in any other way.  Over

and above the factorial analysis, the legislative mandate that persons with disabilities be provided

equal access in all spheres of life, including education, the constitutional mandate that copyright

---

[103] Wilkin Decl. ¶¶ 11, 86.
[104] CCC Dep. at 50:15-19, 51:16-52:6; Plaintiffs' Responses to Interrogatories Nos. 1 and 5 in
Plaintiffs' Objections and Responses to Defendant-Intervenors' First Set of Interrogatories and
Document Requests, dated May 8, 2012 (Abelson Decl. Ex. C.).
[105] Kerscher Decl. ¶ 17.

serve to promote learning and knowledge, and the congressional and judicial mandates that fair use be interpreted in light of that purpose, unequivocally establish the right to fair use in these circumstances.

## CONCLUSION

For the reasons set forth herein, NFB respectfully  requests that their Motion for Summary Judgment be granted.

Dated:  June 29, 2012                                    Respectfully submitted,


By:_____/s/_____
Daniel F. Goldstein (admitted pro hac vice)
Laura Ginsberg Abelson (admitted pro hac vice)
BROWN, GOLDSTEIN & LEVY, LLP

Robert J. Bernstein (RB 4230)
THE LAW OFFICE OF ROBERT J. BERNSTEIN

Peter Jaszi (admitted pro hac vice)

*Counsel for Defendant Intervenors*