UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
THE AUTHORS GUILD, INC., et al.,       :
                                       :
               Plaintiffs,      :
                                       :
       - against -          :      Index No. 11 Civ. 6351 (HB)
                                       :
HATHITRUST, et al.,             :
                                       :
             Defendants.    :
                                       :
-------------------------------------------------------------X

## EXPERT REPORT OF PROFESSOR DANIEL GERVAIS

     I, Daniel Gervais, declare the following:

### A.    INTRODUCTION AND BACKGROUND

     1.     I have been retained by Plaintiffs as an expert on issues of intellectual property, and, in particular, the collective licensing of copyrights and related rights.  I am familiar with the facts set forth below.

     2.     I am the FedEx Research Professor of Law at Vanderbilt University Law School and Director of the Vanderbilt Intellectual Property Program.  My educational background is set forth as part of my curriculum vitae, which is attached here to as Exhibit A. The materials that I reviewed in preparing this report, in addition to those cited herein, are listed on Exhibit B.  Cases in which I have been retained and testified as an expert in the last four years are listed in Exhibit C.  I am being compensated for my time at the rate of $400 per hour.

     3.     I am an expert in the field of intellectual property law.  I have taught intellectual property law at various institutions in the U.S., Europe, and Canada.  I have edited or contributed to 33 books related to intellectual property and have written on intellectual property law for journals around the world, including the *Journal of the Copyright Society of the USA* (my article

won the Charles B Seton Award in 2002-03), *Columbia Journal of Law & the Arts, Fordham Law Review, Cardozo Arts & Entertainment Law Journal, European Intellectual Property Review*, *American Journal of International Law*, *Chicago-Kent Law Review*, *Vanderbilt Journal of Technology and Entertainment Law* and the *Journal of Intellectual Property Law*. I have been cited in a decision by the Supreme Court of the United States (*Golan v. Holder*, 2011), and in decisions by many other courts. A recent article was republished in *Intellectual Property Law Review* (2011) as one of the best intellectual property articles of 2010.

4.    One of my special interests is in "collective management" of copyright, meaning how aggregations of individual copyrights are legally protected, licensed, and marketed. In January 2011, I gave the keynote talk at an event on collective management of copyright organized by the Kernochan Center for Law, Media and the Arts at Columbia Law School. An updated version of my presentation was published under the title "The Landscape of Collective Management."[1] In addition, I authored the first chapter of "Collective Management of Copyright: Theory and Practice in the Digital Age," a 2010 book of which I served as the editor.

5.    Prior to my teaching career, I served as Head of the Copyright Projects Section at the World Intellectual Property Organization ("WIPO"). In that capacity, I was asked to help establish new, or improve the functioning of existing, Collective Management Organizations ("CMOs") in various countries around the world.

6.    I also served as Deputy Secretary General of the International Confederation of Societies of Authors and Composers, the largest association of copyright collectives in the world; and as Vice-President of Copyright Clearance Center, Inc. ("CCC"), based in Danvers, MA,

---

[1] 24:4 COLUM-VLA J. L & ARTS 423-449 (2011), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1946997.

during which time I was also Deputy Chair of the International Federation of Reprographic

Rights Organizations ("IFRRO"), a worldwide association of CMOs, specializing in reprography

(photocopying and digital reproduction of printed content).  I have spoken at over 130 academic,

professional and other conferences and events, discussing various issues related to intellectual

property, including copyright law of the United States, international copyright law and the

TRIPS Agreement.

7.      I also serve as Editor-in-Chief of the *Journal of World Intellectual Property,*

published by Wiley-Blackwell, a division or affiliate of John Wiley & Sons (New York).

**B.      MY OPINION**

8.      It is my understanding that the Defendants, themselves or in conjunction with

Google, Inc. ("Google"), have engaged in a project to scan books in their library collections and

that the resulting shared digital repository contains approximately 10 million digital volumes, a

significant number of which are protected by copyright.  My further understanding is that

neither Defendants nor Google have obtained the permission of authors or other copyright

holders whose works have been scanned.  As part of this project, which I will refer to below as

the Google Library Project, Google has provided the Defendants with digital copies of Plaintiffs'

works as well as works by others.  In terms of how Defendants are using the digitized works, my

understanding is that they have been or potentially may be made available to users of various

university libraries and others in a number of different ways.  In addition, my understanding is

that if Defendants determine that a work is in the public domain in the United States, it may be

made available to anyone in the United States.  Moreover, pursuant to Defendants' currently

suspended "Orphan Works Program," online access to works determined by Defendants to be

"orphans" will made available to students, faculty and visitors of the university library holding

print copies of the book.

9.      I have been asked my opinion whether (a) collective management systems provide a market-based mechanism by which libraries could compensate authors and rightsholders in exchange for a license to mass digitize and make various uses of copyrighted books in their collections, and (b) unrestricted and widespread conduct of the type described above will harm the development of such systems.  As I discuss in greater detail below, in my opinion, the answer to each of these questions is the affirmative.  In light of the fact that some of the Plaintiffs are foreign-based, I have been asked to consider the above questions from an international perspective.

10.     I believe that if Defendants' digitization and use of copyrighted works is found not to be fair use or otherwise exempt from the rights of copyright owners set forth in the Copyright Act, the market will intervene and one or more CMOs will license the scanning, use and display of copyrighted works such as those copied as part of the Google Library Project.  In fact, as discussed further below, the CCC and similar CMOs presently license the same general type of copyrighted content as the material copied through the Google Library Project.

11.     Moreover, the type of copying involved in this case (mass digitization of library books) is already licensed in a number of other countries, in some cases involving agreements between Google and rightsholders.  This point underscores the fact that there are alternatives to Defendants' (and Google's) unilateral decision to digitize copyrighted works.

12.     Collective management is already used for many categories of content creators and for many types of copyright uses, including online uses.  The value of copyright to authors and other rightsholders is often monetized not in individual transactions (authorizing a specific use of one or more specific works) but in licensing their rights in aggregated form, as part of a

"repertory" of works or rights. This allows markets for those repertoires of works and rights to form and to operate, allowing access to and uses of copyrighted material while compensating creators for their work. Collective licensing markets have often developed in response to new technologies and uses and would likely develop for digital uses of books unless widespread copying of entire books is permitted as a fair use, thus discouraging the development of such collective licenses.

13. I support the creation of digital repositories. I believe that making books and other copyrighted works available online is desirable both for authors and users. Technologically, it is likely that in the future most types of copyrighted content will be exploited online in one form or another. In fact, I believe that it is likely to become a major form of access to content. It may also facilitate access by people with disabilities.

14. The critical question here is whether the rights of authors and other copyright holders to license and/or be compensated for what is likely to become a major form of use of their works should be taken away by Defendants or by others, who claim a right to copy and use copyrighted works without permission from and without compensation to rightsholders.

15. A collective licensing system to license online uses of digitized books would compensate those who created and published the content and whose ability to earn a living often depends on being able to monetize online uses. The actual scope of the uses could be taken into account in determining appropriate rates and licensing terms could evolve to follow technological evolution and market changes. Collective management solutions can be applied to manage this type of licensing transaction, as the existence of successful similar collective systems demonstrates.

16.     Conversely, allowing libraries to scan and make a variety of uses of print books still in copyright without compensation will significantly reduce the compensation available to authors and other copyright holders.

17.     It is my opinion that a collective management system, probably one requiring that rightsholders opt their works in to participate in collective management, would likely develop here if some or all of the Defendants' uses are found not to be fair. Further, it is my opinion that, if conduct such as the Defendants' is permitted and becomes widespread, this can be expected to harm or impede the development of such a collective management model.

### C.     BASES FOR THE OPINION

#### (1)     The Emergence and Basic Operations of Copyright Management Organizations

18.     Collective management reportedly emerged around 1777 in France, when authors of theatrical plays formed an association to license their plays.  In the United States, collective management developed as technology and markets made possible the widespread and dispersed infringement of copyrights.  Indeed, broadcasters were considered "pirates" until their use of music was licensed by performing rights organizations ("PROs").  ASCAP, BMI and SESAC are the three PROs identified as such in 17 U.S.C. §101.  The first PRO, the American Society of Composers and Publishers ("ASCAP"), was formed in 1914.

19.     Collective management provides a number of advantages in licensing uses of copyrights. CMOs are a single-source for the licensing of specific uses, thereby eliminating the need for individually-negotiated licenses from each copyright owner.  By reducing the transaction costs associated with enforcing, on the one hand, and licensing, on the other, they help convert widespread infringement into markets.  This benefits both authors and users.

#### (2)     Collective Management in the Copyright Act

20.     The Copyright Act regulates CMOs in the United States in a variety of ways.  For example, PROs are named in section 101.  Section 115 establishes a compulsory license for making and distributing phonorecords.  When Congress determines that certain uses are desirable but should be subject to a payment to authors, Congress may establish a compulsory license.  By interpreting statutes, courts also play an important role in defining uses which should be subject to license.

21.     The case of *Herbert v. Shanley Co.*, 242 U.S. 591 (1917), provides a good example of a situation in which infringement preceded the establishment of a working collective licensing system.  In that case, the Supreme Court interpreted a provision of the Copyright Act of 1909, which prohibited any unauthorized public performance of music that was done "for profit."  Writing for the Court, Justice Holmes broad defined what constitutes "for profit":

> The defendants' performances are . . . part of a total for which the public pays, and the fact that the price of the whole is attributed to a particular item which those present are expected to order, is not important.  It is true that the music is not the sole object, but neither is the food, which probably could be got cheaper elsewhere.  The object is a repast in surroundings that to people having limited powers of conversation or disliking the rival noise give a luxurious pleasure not to be had from eating a silent meal.  If music did not pay it would be given up.  If it pays it pays out of the public's pocket.  Whether it pays or not the purpose of employing it is profit and that is enough.

22.     The Court thus helped foster a market for public performance licenses that ASCAP and now the other PROs provide.

23.     In the Digital Performance Right in Sound Recordings Act of 1995 (the "1995 Act"), Congress enacted a limited digital public performance right for sound recordings, contained in 17 U.S.C. §114.  Congress then provided a compulsory license for non-interactive transmissions that do not enable a member of the public to receive, on request, a transmission of a particular sound recording or a program specially created for the recipient.  17 U.S.C.

§114(d)(2), (f)(2) (2009); *see also Bonneville Int'l Corp. v. Peters*, 347 F.3d 485, (3d Cir. 2003) (affirming Copyright Office's decision to require a compulsory license for simultaneous transmission of a radio station's broadcast through the Internet).  The 1995 Act also tasked the U.S. Copyright Office to designate a CMO to administer the license, which it did, naming SoundExchange, Inc.[2]

24.   The 1995 Act did not follow the same model that applies to ASCAP and BMI. Instead, Congress opted for a more specialized and modern form of regulation of collective management.  Under this new regulatory model, the Act gave the Library of Congress (of which the Copyright Office forms a part) the authority to set rates and licensing conditions.  The 1995 Act also set a distribution key according to which SoundExchange distributes 50% of the revenues to the sound recording copyright owners, 45% to the featured artists, and 5% to an independent administrator to distribute to non-featured artists and vocalists.  Licensing rates are set by Copyright Royalty Judges appointed by the Librarian of Congress for six-year terms.  17 U.S.C. §§ 801-805.

### (3)   The Copyright Clearance Center

25.   A different, voluntary model emerged when the CCC was formed in 1978 as a New York not-for-profit corporation in the wake of the effective date of the 1976 Copyright Act on January 1, 1978.  Publishers and authors register their works with the CCC and set the fee for use of their works in CCC's several per-use license services.  CCC also offers annual repertory licenses in both the business and academic markets.  For the year ended June 30, 2011, CCC reported payments to right holders in excess of $171 million.  *See*

http://annualreport.copyright.com/management-summary-financial-data.

---

[2] *See* 17 U.S.C. § 114(g)(2); Notice of Designation As Collective Under Statutory License filed with the Licensing Division of the Copyright Office in accordance with Copyright Office regulation 270.5(c), 37 C.F.R. § 270.5(c).

26.    CCC is a specific type of CMO, usually referred to as a Reprographic Rights Organization ("RRO").  The International Federation of RROs, which is a membership organization consisting of 81 members from around the world (including CCC), has been in existence since 1980.

27.    RROs exchange repertoires, which means that an RRO in country A will allow an RRO in country B to license works belonging to authors and publishers in country A to users in country B, and vice versa.  These agreements are usually referred to as Reciprocal Representation Agreements. See www.ifrro.org.

28.    According to its website, CCC licenses business users, under one or more of its repertory or per-use licenses, the right to photocopy an article from a newspaper, magazine, book, journal, research report or other published document; e-mail an online article or PDF; post digital content on their corporate web sites, intranets and extranets; print out web-based and other digital content onto paper and overhead slides; republish content in a newsletter, book or journal; and scan printed content into digital form when an electronic version is not readily available.  *See* www.copyright.com.  For academic institutions, again under one or more of its repertory or per-use services, CCC licenses the right to photocopy material from books, newspapers, journals and other publications for use in coursepacks and classroom handouts; use and share information in library reserves, interlibrary loan and document delivery services; post and share content electronically in e-reserves, course management systems, e-coursepacks and other e-learning environments; distribute content via e-mail or post it to their intranets, Internet and extranet sites; and republish an article, book excerpt or other content in their own books, journals, newsletters and other materials.  *Id*.

### (4)    Other Collective Management Organizations

29.     Today, CMOs in the United States license: (a) musical works (primarily the three PROs and Harry Fox Agency which licenses the reproduction of musical works); (b) sound recordings and the artists' performances they contain (e.g., SoundExchange); and (c) photocopying and digital reprography (e.g., CCC), to name the most well-known organizations. In addition, a form of collective management is used to collect and distribute residuals to certain actors, directors and screenwriters by the audiovisual guilds.  In fact, Google acquired a CMO called Rightsflow, Inc., in December 2011.  Rightsflow pays "royalties […] to songwriters and publishers all around the world."[3]

30.     CMOs typically operate as follows:  Once established (sometimes an authorization is required to operate as a CMO, as was the case for SoundExchange), a CMO needs the authority to license a repertory of works, performances or recordings and/or to collect a license fee.  The authority may be granted by law, as when a compulsory or statutory license is in place, or by contracts with individual right holders or other CMOs.  With that authority, a CMO can license and/or collect fees on the basis of rates (also known as "tariffs"). Those rates may be set by a governmental authority such as by the legislative branch as in provided for in Section 115 of the Copyright Act or by the Judiciary Branch, such as the federal judges operating as rate courts under the ASCAP and BMI consent decrees.[4]  At other times, the rates are set by rightholders, as is the case with CCC.

---

[4] *See, e.g., United States v. Am. Soc'y of Composers, Authors and Publishers*, No. 41-1395, 2001 WL 1589999 (S.D.N.Y. June 11, 2001); Michael A. Einhorn, *Intellectual Property and Antitrust:  Music Performing Rights in Broadcasting*, 24 COLUM.-VLA J.L. & ARTS 349, 361 (2001).

31.     Having thus obtained the authority to license and/or collect fees, the CMO generally will proceed to sign agreements with users that provide for the collection of license fees and usage data.  For example, radio stations (broadcasters) provide logs (often in digital form) of the recordings they used to the PROs in an agreed format.  While a radio station may use computer logs to report the recordings used, for other types of users (hotels, bars, restaurants), it is difficult to require 100% reporting.  Sometimes statistical surveys are used instead. For example, a number of (representative) users may be surveyed for a specific period of time, and the data thus gathered will then be extrapolated to the class of users concerned using statistical regressions and other similar models.

32.     The CMO will process such data and apply them to distribute the funds to copyright holders.[5]  Identification data (metadata) is generally used to match usage data reported by users or generated by the CMO to specific works, recordings or performances and the right holders therein.

33.     I believe that if the Defendants' uses are not determined to be fair uses, the market will provide a collective licensing system for the types of uses that the Defendants have been making so that they would not have to negotiate a transactional license for each book or other work they wish to use.  Congress may also help foster the development of this licensing system through new legislation.  Such an approach would compensate those who created and published the content and whose ability to earn a living increasingly depends on monetizing online uses.

---

[5] Payment to foreign copyright holders often is done through local CMOs in each territory on the basis of a contract usually referred to as a Reciprocal Representation Agreement. Worldwide databases of identification data have been created by CISAC and IFRRO.  This allows their members to identify foreign works, performances and recordings licensed to them under those reciprocal representation agreements.

(5)     **Collective Management and the Digitization of, and Mass Access to, Books Throughout the World**

34.     Often after a new form of use has emerged, collective management systems are established to license uses that have been found to be desirable but are unauthorized.  The purpose of collective management is not to put roadblocks in the utilization of works but rather to reconcile the needs of users and authors, to ensure that copyright rights are duly reflected in new forms of use that do not constitute fair uses or are otherwise exempt.  Using collective management, users can obtain licenses with limited transaction costs (such as the annual licenses granted by the PROs and by CCC) or at least a single interlocutor.  CMOs can also aggregate usage data to protect the privacy of individuals and the confidentiality of institutional and business users.

35.     A number of other countries have adopted a licensing approach to the mass digitization of books, each with a mechanism for some direct or indirect compensation to copyright holders.  In fact, while many of the major trading partners of the United States— nations bound by essentially the same international copyright rules—have found the mass digitization of books that are no longer commercially available to be desirable, I am not aware of any country that has concluded that mass digitization of copyrighted works should be completely exempted from all copyright obligations including the need to compensate authors and other copyright holders for these mass uses of their works.

36.     On the European level, a number of developments are relevant.  On June 8, 2012, the Council of the European Union adopted a "final compromise text" of the "Proposal for a Directive of the European Parliament and of the Council on certain permitted uses of orphan works." http://register.consilium.europa.eu/pdf/en/12/st10/st10953.en12.pdf.  A "directive," once adopted by the Council and Parliament, may be defined as a set of legislative instructions sent by

the European Union authorities to the 27 member States of the European Union to implement the directive in their national law. Failure to implement the Directive by a member State may be referred to the Court of Justice of the European Union.

37.     As the title of the proposed Directive indicates, its purpose is to allow certain uses of "orphan works," defined in draft recital 3 and article 2(1) of the June 8, 2012, proposal as subject matter "protected by copyright or related rights and for which no rightsholder is identified or, even if identified, is not located after a diligent search." *Id.*

38.     A number of policy statements contained in the proposed text strike me as quite persuasive and relevant to the issues in this case. Some of the main ones for the purposes of this report are:

(a)     Recitals 1 and 10, which recognizes that libraries, and other and institutions in Europe are engaged in large-scale digitization of their collections or archives; that technologies for mass scale digitization of print materials and for search and indexing enhance the research value of the libraries' collections; and that the "creation of large online libraries facilitate electronic search and discovery tools which open up new sources of discovery for researchers and academics that would otherwise have to content themselves with more traditional and analog search methods." *Id.*;

(b)     Recital 3b, which provides that "[c]opyright is the economic foundation for the creative industry, since it stimulates innovation, creation, investment and production. Mass digitization and dissemination of works is therefore a means of protecting Europe's cultural heritage. Copyright is an important tool for ensuring that the creative sector is rewarded for its work" *Id.;* and

(c)     Article 6, which provides that the organizations mentioned above may

make a work available and make a copy if it "only in order to achieve aims related to their public interest mission, notably preservation, restoration and the provision of cultural and educational access to works and phonograms contained in their collection"; and further that "Member States shall provide that a fair compensation is due to rightholders that put an end to the orphan status of their works and other protected subject matter." *Id.*

       (d)    Article 1(2c), which provides that the Directive "does not interfere with any arrangements concerning the management of rights at national level." *Id.* This is meant, I believe, to allow Nordic countries that already have a collective management system in place for mass digitization of books to continue to apply such systems. Those systems are discussed in greater detail below.

      39.    Finally, the proposed Directive provides that libraries and other institutions may partner with commercial partners to digitize and make available the content via *c*ontractual arrangements but provides that "the agreements should not impose any restrictions on the beneficiaries of this Directive as to their use of orphan works and should not grant the commercial partner any rights to use or control the use of the orphan works." (recital 18). *Id.*

      40.    The proposed directive is built on a notion of documented "diligent search" to determine whether a copyrighted work is "orphaned." This notion is explained in arts. 3 and 4 of the June 8 text. *Id.* A similar notion (qualifying search) was contained in the proposed legislation in the United States entitled the "Orphan Works Act of 2008." In her testimony before Congress concerning this Bill and the issue of orphan works more generally, then United States Register of Copyrights Marybeth Peters said that her office "recommended a framework whereby a legitimate orphan works owner who resurfaces may bring an action for 'reasonable

compensation' against a qualifying user."[6]

41.     At the national level, a number of European nations have already taken or plan to take similar measures.  For example, France adopted a Law on "unavailable twentieth century books" according to which books published in France before 2001 and not commercially available can be digitized by the French National Library.  A collective management system is part of the law.  Jointly managed by authors and publishers, it is an "opt-out" system in the sense that copyright holders are presumed to be part of the system unless they choose not to, in which case they must notify the CMO entrusted with the management of the system.

42.     Google and French organizations representing authors and publishers recently struck a deal to allow Google to scan books and use the digital copies under license from major French publishers, including Hachette Livre and La Martinière.[7]

43.     Several Nordic countries have been using a form of collective management often referred to as "extended collective licensing" ("ECL").  Under ECL systems, a voluntary system is typically established by a CMO to license a particular use of a category of protected content (for example, radio broadcasting of musical works, or photocopying and digital reproduction of parts of books and articles by and within corporate entities).  After a "substantial number" of right holders for said category of content have voluntarily opted into the system, the law changes the system from an opt in to an opt out for all remaining right holders (this constitutes the

---

[6] Statement of Marybeth Peters, The Register of Copyrights, before the Subcommittee on Courts, the Internet, and Intellectual Property, Committee on the Judiciary, United States House of Representatives, 110th Congress, 2nd Session, March 13, 2008, *available at* http://www.copyright.gov/docs/regstat031308.html.

[7] See http://www.nytimes.com/2012/06/12/technology/french-publisher-group-strikes-deal-with-google-over-e-books.html?_r=1.

"extended" element of the ECL regime).  The determination of whether the "substantiality" threshold has been reached is generally made by a designated governmental authority.

44.     A number of Nordic countries, including Sweden (home of Plaintiff the Swedish Writers' Union) and Norway (home of Plaintiff the Norwegian Non-Fiction Writers' and Translators' Association), have adopted or have announced plans to adopt an ECL model for the mass digitization of books and some other types of content.  Those plans recognize the value of mass digitization and the creation of digital repositories, but with a mechanism to compensate authors and other rightsholders for the use of their works.

45.     Sweden's government has put forward an ECL-based proposal to allow for mass digitization to create the Swedish Digital Library.  A Memorandum of Understanding has been signed by the Swedish Writers' Union, the Swedish Publishers' Association, the National Library of Sweden and the Visual Arts Copyright Society in Sweden. [8]

46.     In Norway, the National Library is in the process of digitizing the complete national literary heritage, not limited to works that are no longer protected by copyright.[9]  Rights were cleared through an agreement between KOPINOR (the RRO for Norway) and the National Library.[10]  The protected material can be viewed but not downloaded or printed.[11]  In exchange for granting these rights as part of the ECL system, the library pays NOK 0.56 per page

---

[8] *See* http://www.slideshare.net/EuropeanaConnectWP4/swedens-digital-library-ecl-a-flexible-modelof-rights-clearance

[9] http://www.nb.no/bokhylla (informal translation provided by Jan Terje, Counsel for NFF.

[10] The agreement is available at http://www.nb.no/pressebilder/Contract_NationalLibraryandKopinor.pdf.

[11] *Id.* § 4.

(approximately \$0.09) per year.[12]  This model is supported by legislation on ECL, namely sections 16a, 17, 17a, 17b, 36 and 38a of the Norwegian Copyright Act.[13]

47.     Denmark was the first Nordic country to use ECL to allow certain digital uses of text, starting in 1998.  In 2002, it adopted a provision allowing public libraries to clear rights in relation to digital reproduction of copyright protected works for interlibrary loans and the reproduction of short excerpts.[14]  A subset of Danish libraries, namely research libraries, concluded an agreement in 2004 with the Danish RRO, CopyDan, to license those uses.[15]

48.     Orphan works legislation was also enacted in Canada, home of Plaintiffs The Writers Union of Canada and the Quebec Union of Writers (UNEQ).  Section 77 of the Canadian Copyright Act (RSC 1985, c C-42, s 77 (Can.)) permits the Copyright Board of Canada to issue licenses to users whose reasonable efforts to locate a copyright holder have been unsuccessful. The Board sets a price for each permitted use, which compensation is generally directed to a designated CMO.

49.     A number of other countries have similar systems. In India, the Copyright Board may issue a license to "publish [an orphan work as defined in the statute] or a translation thereof in the language mentioned in the application subject to the payment of such royalty and subject to such other terms and conditions as the Copyright Board may determine."[16]

---

[12] *Id*. § 7.  Conversion rate provided on June 21, 2012 by www.oanda.com.

[13] http://www.kopinor.no/en/copyright/copyright-act.

[14] Danish Copyright Act, § 16(b).

[15] Tarja Koskinen-Olsson, *The Nordic Countries*, in COLLECTIVE MANAGEMENT OF COPYRIGHT AND RELATED RIGHTS 2d ed (D Gervais ed.) §§ 2.5 and 5.2 (2010).

[16] Copyright Act 1957 (India) s 31A.

50.     In Japan, the Commissioner of the Agency for Cultural Affairs may issue a license to use a work when the identity of the copyright holder "is unknown or for other [similar] reasons."[17]

51.     In Korea, the "Minister of Culture, Sports and Tourism as prescribed by Presidential Decree" may determine the remuneration payable to use a work "where any person, despite his considerable efforts in accordance with the criteria prescribed by Presidential Decree, cannot identify the owner of author's property rights."[18]

52.     The United Kingdom has a provision limited to orphan performances, but a number of proposals to have licensed for orphan works are under consideration.[19] For instance, a May 2011 report by Professor Ian Hargreaves requested by Prime Minister David Cameron entitled "Digital Opportunity: A Review of Intellectual Property and Growth" ("Hargreaves Report") recommends that "the Government should legislate to enable licensing of orphan works. This should establish extended collective licensing for mass licensing of orphan works, and a clearance procedure for use of individual works."[20]

53.     In all of the examples set forth above, there is a mechanism for payments to be made for use of digitized materials, with compensation to individual rights holders.

---

[17] Copyright Act of Japan (Act No. 48 of May 6, 1970, as last amended by Act No. 121 of 2006), §67. Translation at http://www.wipo.int/wipolex/en/.

[18] Copyright Act of 1957 (Korea) (Law No. 432, as last amended by Law No. 9625 of April 22, 2009). Translation at http://www.wipo.int/wipolex/en/.

[19] Copyright, Designs and Patents Act 1988 (UK) s 190 (UK Act 1988). See also Orphan Works and Orphan Rights: A Report by the British Screen Advisory Council (BSAC) Working Group (July 2011), available at http://www.bsac.uk.com/policy-papers.html;

[20] http://www.ipo.gov.uk/ipreview-finalreport.pdf.

## CONCLUSION

54.   Allowing practices such as the mass copying of millions of in-copyright books is very likely to thwart the development of collective management systems for the digital uses of books that authors and publishers would otherwise likely develop, join or license others to develop.

Dated: June 28, 2012

_____
Daniel Gervais, Ph.D.

## EXHIBIT A

**Daniel Gervais – *Curriculum Vitae***

*CURRICULUM VITAE*

---

# Daniel J. Gervais

## PART I – EMPLOYMENT & HONORS

### a) CURRENT POSITION

FedEx Research Professor of Law
Co-Director, Vanderbilt Intellectual Property Program
Vanderbilt University Law School

### b) EDUCATION

- Doctorate, University of Nantes (France), 1998
  - *magna cum laude* ("*très honorable*")
- Diploma of Advanced International Studies, Geneva (Switzerland), 1989
  - *summa cum laude* ("*très bien*")
- LL.M., University of Montreal, 1987
- Computer science studies University of Montreal, 1984-1985
- LL.B. (McGill University/University of Montreal), 1984
- D.E.C. (Science, Jean-de-Brébeuf College, Montréal), 1981

### c) PREVIOUS EMPLOYMENT & OTHER ACADEMIC EXPERIENCE

- Acting Dean, Common Law Section, University of Ottawa (Feb-Jul 2006 and Sep-2007-July 2008)
- University Research Chair, Common Law Section, University of Ottawa (2006-2008)
- Vice-Dean, Research, Common Law Section, University of Ottawa (2003-2006)
- Full Professor, Common Law Section, University of Ottawa (2005-2008)
- Associate Professor, Common Law Section, University of Ottawa (2001-2005)
- Vice-President, International, Copyright Clearance Centre, Inc., Massachusetts, USA, 1997-2000
- Consultant, Organization for Economic Cooperation and Development (OECD), Paris, 1997
- Assistant Secretary General, International Confederation of Societies of Authors and Composers (CISAC), Paris, 1995-1996
- Head of Section, World Intellectual Property Organization (WIPO), Geneva, 1992-1995

- Consultant & Legal Officer, General Agreement on Tariffs and Trade (GATT/WTO), Geneva, 1990-1991
- Lawyer, Clark, Woods, (Montreal), 1985-1990

*Visiting professorships:*

- Gide Loyrette Nouel Visiting Chair, *Institut d'études politiques de Paris* (Sciences Po Law School), Feb.-Apr. 2012
- Visiting Lecturer, Washington College of Law, American University, June 2011
- Visiting Professor, *Université de Liège* (Belgium), March 2010 and 2011
- Visiting Professor, *Université de Strasbourg* (Centre for International Intellectual Property Studies (CEIPI), France), Nov.-Dec. 2009 and March 2012
- Visiting Professor, *Université de Montpellier*, France (Feb. 2007 and Apr. 2008)
- Visiting Professor, Univesity of Haifa (2005)
- 2004 Trilateral Distinguished Scholar-in-Residence, Michigan State University, Detroit College of Law (April-May 2004)
- Visiting Scholar, Stanford Law School, Feb-Apr. 2004
- Visiting Professor, DEA (graduate) program, Faculty of Law, University of Nantes, France (May 2003)
- Visiting Professor, Faculty of Law, Graduate program in intellectual property (DESS), Centre universitaire d'enseignement et de recherché en propriété intellectuelle (CUERPI), *Université Pierre Mendès-France* (Grenoble II), France
- Visiting Professor, Faculty of Law, University of Puerto Rico (June-July 2002--instruction in Spanish and English)
- Lecturer, Institute for Information Law, Faculty of Law, University of Amsterdam, Postdoctoral Summer Program in International Copyright Law (every year since 2000; last in July 2011)
- 

**d) HONORS**

- FedEx Research Professorship, Vanderbilt University Law School (2011-2012)
- Ontario Research Excellence Award (ex PREA), 2005[1]
- Charles B. Seton Award, 2003 (see under "Articles in English" below)
- Quebec Bar 1985.  Finished first ex aequo out of 600+ candidates—received all available awards, including:
  - Quebec Bar Award
  - Quebec Young Bar Award
  - Paris Bar Prize
- Two Excellence Awards, Faculty of Law, University of Montreal, 1984

**e) OTHER RELEVANT INFORMATION**

1. Editor-in-Chief, *Journal of World Intellectual Property*, peer-reviewed, published by Wiley-Blackwell (2006-)
2. Member, Editorial Board, *WIPO-WTO Colloquiums for Intellectual Property Teachers*

---

[1] Of the 64 awards in that round, only one to a Law Professor.

3. Member, Executive Committee, International Association for the Advancement of Teaching and Research in Intellectual Property (ATRIP)  (2011-)
4. Member, Advisory Board, Digital Library Project Advisory Board (Berkeley) (2011-)
5. Panelist, UDRP, WIPO Arbitration and Mediation Center
6. International editor, *Journal of Intellectual Property Law & Practice* (Oxford Univ. Press) (2005-2008)
7. Member of the Law Society of Upper Canada (Ontario Bar) and of the Bar of Quebec
8. Languages: English, French, Spanish.  German (functional). One year of Mandarin.

## ACADEMIC EVENTS

- Speaker, Chicago IP Colloquium, Loyola Law School, Chicago, April 17, 2012
- Participant, Workshop "Intellectual Property at the Edge," Columbia Law School, April 13, 2012
- Panelist, Fordham International Intellectual Property Law & Policy Conference, New York, April 12, 2012
- Speaker, Faculty of Law, University of Nantes, Nantes (France), March 23, 2012
- Speaker, European and International IP Center (CEIPI), Strasbourg (France), March 19, 2012
- Speaker, IP Colloquium, Washington University, St. Louis, Feb. 27, 2012
- Speaker, Canada-Israel Israeli Canadian Workshop on Copyright Law Reforms & Developments, The Hebrew University Of Jerusalem,  Feb. 20 -21, 2012
- Moderator, Vanderbilt Intellectual Property Association/Hyatt Fund event,  Lockdown on Password Sharing, Feb. 1, 2012
- Moderator, 2011-2012 Symposium of the Vanderbilt Journal of Entertainment and Technology Law (JETLaw), Copyright & Creativity: Perspectives on Fixation, Authorship, & Expression, Jan. 27, 2012
- Moderator & organizer, Melbourne-Vanderbilt Global Debate,  Vanderbilt Law School, Nashville, November 15, 2011
- Speaker, IP Colloquium, Indiana University Maurer School of Law, Bloomington, IN, November 3, 2011
- Speaker, Copyright in a borderless online environment Symposium, Thoresta Herrgård, Bro, Sweden, October 27-28, 2011
- Speaker, International Law Weekend, Intellectual Property Law in National Politics and International Relations, New York, NY, Oct. 21-22, 2011
- Panelist, American Intellectual Property Law Association (AIPLA), Annual Meeting, Washington DC, October 20, 2011
- Speaker, Golan v. Holder Roundtable, Harvard Law School, September 23, 2011
- Moderator,  Max-Planck Institute Workshop on Economic Partnership Agreements of the EU: A Step Ahead an International IP Law?", Frauenchiemsee, Germany, June 26-28, 2011
- Keynote speaker, 39e Colloque annuel International de l'AFEC, Stretching borders: How far can Canada Go?, Montpellier, France, June 15-17, 2011
- Moderator, Vanderbilt University Law School Program, Beijing, China, May 21, 2011
- Moderator and panelist, 19th Annual Conference on Intellectual Property Law & Policy, Fordham University Law School, New York, April 28-29, 2011
- Chair, Invitation-only Intellectual Property Workshop, Canadian International Council, Ottawa, March 31-April 1, 2011
- Moderator, Patent Unrest, Vanderbilt Law School. February 24, 2011
- Keynote speaker, Annual Symposium of the Kernochan Center for Law, Media & the Arts, Columbia Law School, New York, January 28, 2011

- Speaker, Intellectual Property Institute of Australia (IPRIA), University of Melbourne, Australia, December 13, 2010
- Speaker, Trade, Intellectual Property and the Knowledge Assets of Indigenous  Peoples: The Developmental Frontier, Victoria University, Wellington, New Zealand, December 8-10, 2010
- Speaker, Computer Programs and TRIPS, TRIPS@10 Conference, Columbia University, November 16-18, 2010
- Speaker, International Law Weekend, American Branch of the International Law Association, Fordham Law School, New York, October 22-23, 2010
- Speaker, Bits Without Borders conference, Michigan State University, East Lansing, MI, September 25-26, 2010
- Speaker, World Trade Forum, Bern, Switzerland, September 3-4, 2010
- Speaker, Copyright @ 300, UC Berkeley School of Law, Berkeley, CA, April 9-10, 2010
- Speaker, The Statute of Anne 300 Birthday, Cardozo Law School, New York, March 24-25, 2010
- Panelist,  Access to Knowledge (A2K) conference, Yale Law School, February 12-13, 2010
- Speaker, IUS COMMUNE, Reinventing the Lisbon Agreement, Maastricht University, The Netherlands, November 26, 2009
- Speaker, The Lisbon Agreement, CEIPI (Université de Strasbourg, France), November 17, 2009
- Keynote speaker, Signifiers in Cyberspace: Domain Names and Online Trademarks Conference, Case Western Reserve University, Cleveland, Ohio, November 12, 2009
- Speaker, Beyond TRIPS: The Current Push for Greater International Enforcement of Intellectual Property, American University (Washington College of Law), November 5, 2009
- Speaker, Intellectual Property Developments in China: Global Challenge, Local Voices conference, Drake University, Des Moines, Iowa, October 15-16, 2009
- Speaker, University of Hong Kong, June 12-13, 2009
- Speaker, Conference on  100th Anniversary of the 1909 Copyright Act, Santa Clara University, April 27, 2009
- Panelist, Fordham International Intellectual Property law & Policy Conference, Cambridge, England, April 15-16, 2009
- Participant, University of Cambridge-University of Queensland Copyright History Roundtable, Cambridge, England, April 15, 2009
- Commentator, Vanderbilt Roundtable on User-Generated Content, Social Networking & Virtual Worlds, Nashville, November 14, 2008
- Distinguished Finnegan Lecturer, Washington College of Law, Washington, D.C., October 18, 2008
- Panelist, International Law Weekend, New York, October 16, 2008
- Speaker, IP Speaker Series, Cardozo Law School, September 22, 2008
- Lecturer, Intellectual Property Research Institute of Australia (IPRIA),  Melbourne, June 3, 2008
- Speaker, International Conference on Patent Law, University of New Zealand, Wellington, May 29-30, 2008
- Speaker, Law School of National Taiwan University, March 21, 2008
- Commentator, EDGE Project Conference on Intellectual Property and Development, Hong Kong, March 17-18, 2008
- Speaker, Cardozo Law School Conference on Harmonizing Exceptions and Limitations to Copyright Law, New York, March 30-31, 2008
- Panelist, Fordham Conference on International Intellectual Property Law & Policy, New York, March 27-28, 2008
- *Rapporteur*, International Literary and Artistic Association Biennial Congress (ALAI), Punta del Este, Uruguay, Oct. 31 – Nov. 3 2007
- Speaker, Vanderbilt University, Nashville, Tennessee, Oct. 16-17, 2007. "Collective Management of Copyright in North America", (conference organized in cooperation with WIPO)
- Speaker, University of South Carolina, Columbia, SC, October 12, 2007 "The Future of Copyright Law"

- Panelist, Fordham University Conference on International Intellectual Property Law & Policy, New York, April 12-13, 2007
- Speaker, Dean's lectures on intellectual property, George Washington University School of Law, Washington D.C., March 13, 2007
- Speaker, UCLA Conference on the WIPO Development Agenda, Los Angeles, March 9-11, 2007
- Speaker, International Conference on Impact of TRIPS: Indo-US Experience. NALSAR University of Law, Hyderabad (India), Dec. 15-16, 2006
- Speaker, International intellectual property conference, University of Chicago-Kent, October 12-13, 2006
- Speaker, Study days of the International Literary and Artistic Association, Barcelona, June 18-21, 2006
- Moderator, Fourteenth Annual Conference on International Intellectual Property Law & Policy, New York, April 20-21 2006
- Speaker, University of Michigan, Ann Arbor. Intellectual Property & Development, April 14 2006
- Speaker, Michigan State University College of Law (MSU), East Lansing, The International
- Intellectual Property Regime Complex, April 7-8 2006
- Roundtable participant, Vanderbilt University Law School, Nashville, Tennessee. Private International Law and Intellectual Property Law: Theory and Practice, March 24-25, 2006
- Panelist, Federalist Society, Annual Lawyers Convention. Washington, D.C., November 2005
- Panel Chair, Annual meeting of the International Association for the Advancement of Teaching and Research in Intellectual Property (ATRIP), Montréal, July 11-13, 2005
- Lecturer, Institute of European Studies, Macau (IEEM), Advanced IP course (25 June-1 July 2005)
- Lecturer, Advanced IP conference, Macau, June 27-30, 2005
- Speaker, Conference on the Relationship between international and domestic law McGill University, June 15-16, 2005
- Speaker, Conference on the Collective Management of Copyright, Oslo, May 19-21, 2005
- Keynote speaker, Conference of the Department of Justice on intellectual property and Internet Law, Ottawa, April 21, 2005
- Keynote speaker, LSUC Annual Communications Law Conference, Toronto, April 8-9, 2005
- Speaker, Law & the Information Society Conference, Fordham University, New York, April 6-7, 2005
- Panelist, Fordham International Intellectual Property Law & Policy Conference, New York, March 31-Apirl 1, 2005
- Speaker, Shanghai 2004: Intellectual Property Rights and WTO Compliance. University of East China, Shanghai, China, Nov. 24, 2004
- Speaker, "The Internet: A Global Conversation" Conference, University of Ottawa, Oct. 1-2, 2004
- Lecturer, Office for Harmonization in the Internal Market (Trade Marks and Designs). Alicante (Spain), July 2004
- Organizer and Speaker, Rethinking Copyright Conference, University of Ottawa, May 20-21, 2004
- Panelist, American Intellectual Property Lawyers Association (AIPLA), Dallas TX, May 13-14, 2004
- Speaker , 2004 Computers Freedom & Privacy Conference, Berkeley, California Apr. 20-23, 2004
- Speaker, Intellectual Property, Sustainable Development & Endangered Species Conference. Detroit College of Law, Michigan State University, March 26-27, 2004
- Speaker, Securing Privacy in the Internet Age Symposium, Stanford Law School, March 13-14, 2004
- Keynote speaker, "US Copyright Office Comes to California" Conference, Hastings College of Law, San Francisco, CA, March 3, 2004
- Speaker, Global Arbitration Forum, Geneva, Switzerland, Dec. 4-5, 2003
- Panel Chair and Speaker, "Copyright and the Music Industry: Digital Dilemmas", Institute for Information Law, Amsterdam, July 4-5, 2003. Topic: "Collective Rights Management & the Future of Copyright"
- Conference Fellow, "International Public Goods and Transfer of Technology under a Globalized Intellectual Property Regime" Conference, Duke Law School, Raleigh, NC, USA, Apr. 4-6, 2003

- Speaker, Roundtable on questions arising out of the intersections of technology and questions of social justice, University of Ottawa, March 28, 2003. Topic: "Democracy, Technology and Social Justice" (available at commonlaw.uottawa.ca)
- Speaker, Conference of Copyright Law Association of Japan (CLAJ), Tokyo, Dec. 7, 2002. Topic : "Transactional Copyright: Licensing Tailored Uses"
- Speaker, Facultés universitaires de Saint-Louis, Belgique, May 25-26 2002. Topic : «De l'œuvre à l'auteur »
- Speaker.  Institutions administratives du droit d'auteur, colloquium organized by the Université de Montréal, Montreal, Oct. 2001. Topic : « La gestion collective au Canada : fragmentation des droits ou gestion fragmentaire »
- Speaker, Annual Meeting of the International Literary and Artistic Association (ALAI International), Columbia University, New York, 2001. Topic: " Rights Management Systems"
- Lecturer, Swedish School of Economics and the Finnish IPR Institute, Helsinki, Finland, 2000. Topic: "Copyright and Electronic Commerce", lecture presented to graduate students
- Speaker, Fordham University Conference on International Intellectual Property, New York, April 2001. Topic "Electronic Commerce and Copyright"
- Speaker, Fordham University Conference on International Intellectual Property, New York, April 2000. Topic: "The TRIPS Agreement After Seattle"
- Speaker, Ohio State University, Columbus, Ohio, 2000.  Topic:  "Digital Licensing of Copyright"
- Speaker, Fordham University Conference on International Intellectual Property, New York, April 1999. Topic: "Digital Distance Education: Exemption or Licensing?"
- Speaker, Fordham University Conference on International Intellectual Property, New York, April 1999. Topic: "An Overview of TRIPS: Historical and Current Issues"

**g) PUBLIC LECTURES & NON-ACADEMIC EVENTS**

- Speaker, The Copyright Office Comes to Music City, Nashville, TN, April 26, 2012
- Panelist, ABA IP Section, Annual Meeting, Crystal City VA, March 29, 2012
- Speaker, Practising Law Institute, New York, March 28, 2012
- Speaker, Gide Loyrette Nouel, Paris (France), March 14, 2012 ("Non Traditional Trademarks")
- Speaker, Leadership Music, Nashville, TN, March 9, 2012
- Moderator,  Canadian International Council conference on Innovation ("Right and Rents"), Ottawa, October 5-7, 2011
- Chair and Speaker, Canadian International Council Workshop on Innovation, Ottawa, March 31 and April 1st, 2011
- Speaker and session leader, High-level (Ministerial) Forum on Intellectual Property for the Least-Developed Countries, WIPO, Geneva, July 24-25, 2009
- Moderator, Copyright Counseling, Management, and Litigation Law Seminar, Seattle, WA, April 26-27, 2009
- Speaker, Annual Meeting. Commission on Intellectual Property, International Chamber of Commerce, Cambridge, England, April 17, 2009
- Keynote speaker, Asian Copyright Seminar, Tokyo, Japan, February 25-27, 2009
- Speaker, International Copyright Institute, Washington DC, Nov. 28, 2006
- Speaker, International Trademark Association, Trademarks Administrators Conference, Crystal City, Virginia, September 19-20, 2006

- Speaker, General Assembly of the National Association of Publishers (ANEL), Montréal, September 14, 2006
- Speaker, Federalist Society Annual Lawyers Convention, Washington D.C. November 2005.
- Keynote speaker. InSIGHT, Old Mill Inn, Toronto, September 2005. Topic: "Copyright Reform in Canada"
- Speaker. Canadian Institute, , Montréal, 5-6 June, 2005
- Speaker, Canadian Bar Association, Montreal, Nov. 9, 2004. Topic: "Recent developments in Canadian copyright law"
- Speaker, Peer-to-Peer Luncheon speech, The 45th Circuit, Ottawa Centre for Research and Innovation (OCRI), Oct. 5, 2004. Topic: "Peer-to-Peer File-Sharing"
- Speaker, Luncheon conference, ALAI Canada, Toronto, Sept. 13, 2004. Topic: "The Supreme Court decision in *SOCAN v. Can. Ass'n of Internet Providers*"
- Lecturer, International Copyright Institute, Washington, D.C., May 5, 2004. Topic: "Collective management of copyright"
- Speaker, Biannual Canadian Bar Association/Law Society of Upper Canada Communications Law Conference, Ottawa, April 23-24, 2004. Topic: "The Supreme Court decision in *CCH v. Law Society of Upper Canada"*
- Speaker, Association pour l'avancement des sciences et des techniques de la documentation (ASTED), Annual Meeting, Gatineau, Quebec, Nov. 7, 2003. Topic : "Copyright Exceptions and Librarians"
- Keynote speaker, International Conference on National Copyright Administrative Institutions, Ottawa, Oct. 8-10, 2003. Topic: "Status Report on Internet Tariffs"
- Panelist, Intellectual Property Institute of Canada (IPIC), Annual Meeting, Halifax, Sept. 19, 2003. Topic: "Technical Protection Measures and Copyright"
- Speaker, North American Workshop on Intellectual Property and Traditional Knowledge, Ottawa, Sept. 7-9, 2003. Topic: Traditional Knowledge and Intellectual Property: The Issues"
- Speaker, Association des juristes d'expression française de l'Ontario (AJEFO), Ottawa, June 21, 2003. Topic: Law & Technology
- Speaker, Editors Association of Canada, Ottawa, June 15, 2003. Topic : "A Walk Through the Copyright Labyrinth"
- Keynote speaker, Computer Assisted Language Instruction Consortium (CALICO), Ottawa, May 22, 2003. Topic : "Copyright, Copyleft, Copywrong?"
- Speaker, Expert Roundtable on Transactions in Intellectual Property, Amsterdam, May 17-18, 2003. Topic: "Fragmentation of Copyright and Rights Management"
- Speaker, "The 45th Circuit" (OCRI), Ottawa, Apr. 1, 2003. Topic : "Emerging Issues in Digital Rights Management"
- Speaker, Information Highways Conference, Toronto, March 24, 2003. Topic : Digital Rights Management : Balancing Creators Rights and User Interests"
- Speaker, Literary and Artistic Association (ALAI Canada), Montreal, Oct. 22, 2002. Topic : « La gestion collective es-elle en crise? »
- Instructor, World Trade Organization (WTO), Nairobi, Sept. 2002. Topic: The TRIPS Agreement after Doha"
- Instructor, World Trade Organization (WTO), Casablanca, Sept. 2002. Topic: "The TRIPS Agreement After Doha"

- Speaker, Literary and Artistic Association (ALAI Canada), Montreal, May 7, 2002. Topic: « La décision de la Cour suprême dans l'affaire *Galeries d'art du Petit Champlain Inc. c. Théberge* »
- Instructor. International Copyright Institute (Washington, D.C.), Nov. 2000 and Nov. 2001. Topic: "Collective Management of Copyright in the Digital Age"
- Speaker. Annual Meeting of the International Trademark Association (INTA), Denver, CO, USA, May 2000. Topic: "The TRIPS Agreement: Implementation and Dispute Settlement Issues"
- Speaker, New York Bar (NYCLA), 2000.  Topic : "Current Rights Clearance Issues"
- Speaker, Society of Scholarly and Professional Publishers (SSP), Boston, Mass.,  1999. Topic: "Copyright Licensing Issues"
- Speaker, Canadian Writers Union Conference, Toronto, 2000. Topic: "Copyright Management in the Digital Age"
- Speaker, Heritage Canada Roundtable on Copyright Management, Ottawa, 1999. Topic: "Copyright Management: US Practices"
- Speaker, International Publishers Association (IPA) Congress, Tokyo, Japan, 1998. Topic: "Copyright, Publishing in the Face of Technological Change"
- Speaker, Marché international du multimédia (MILIA), Cannes, France, 1995. Topic : "Droit d'auteur et multimédia"
- Speaker, Chilean Book Fair, Santiago, Chile, 1999. Topic: "El papel de las sociedades de derechos reprográficos y de la IFRRO"
- Speaker, Sydney Bar, NSW, Australia, 1996. Topic: "Intellectual Property and Technology"
- Speaker, Congress of the International Publishers Association, Barcelona, Spain, 1996. Topic: "Online Copyright Licensing"
- Speaker, Pan African Film Festival (FESPACO), Ouagadougou, Burkina Faso, 1994. Topic: "Protection of Intellectual Property in Film"
- Speaker, Chambre française du commerce et de l'exportation (CFCE), Paris, 1990. Topic : "TRIPS: Le point à dix semaines de Bruxelles"

h)     **Publications** [2]


i)     **Summary**

Books authored ........................................................................................................................... 8

Books edited ............................................................................................................................... 3

Book chapters ...................................................................................................................... 23+7

Articles  ............................................................................................................................... 53+1

Conference proceedings (refereed) ......................................................................................... 1

Book reviews ............................................................................................................................. 2

---

[2] Where possible, titles are hyperlinked. *See also* http://bit.ly/tsGP0y.

Other publications ................................................................................................................... 29

Technical Reports, Law Reform, and Commissioned Research Work .................................... 6

ii)    **Detailed description**

**Books (authored)**

1.    INTELLECTUAL PROPERTY: THE LAW IN CANADA, 2$^d$ ed. (Carswell, 2011) --with Prof. Elizabeth Judge, 1223 p.

2.    L'ACCORD SUR LES ADPIC: PROPRIÉTÉ INTELLECTUELLE À L'OMC (Larcier, 2010), 733 p.

3.    THE TRIPS AGREEMENT: DRAFTING HISTORY AND ANALYSIS, 3rd ed. (Sweet & Maxwell, December 2008), 785 p.

      - **Cited by the Supreme Court of the United States (majority opinion) in Golan v. Holder (2011)**

4.    LE DROIT DE LA PROPRIETE INTELLECTUELLE, (Yvon Blais, 2006). 702 pages--with Professors Elizabeth Judge and Mistrale Goudreau

5.    INTELLECTUAL PROPERTY: THE LAW IN CANADA (Carswell, 2005), with Prof. Elizabeth Judge

6.    THE TRIPS AGREEMENT: DRAFTING HISTORY AND ANALYSIS, 2ND ed. (Sweet & Maxwell, June 2003). 590 p.

7.    THE TRIPS AGREEMENT: DRAFTING HISTORY AND ANALYSIS. (Sweet & Maxwell, 1998). 444 p.

8.    LA NOTION D'ŒUVRE DANS LA CONVENTION DE BERNE ET EN DROIT COMPARÉ. (Librairie Droz, 1998). 276 p.

**Books (edited)**

1.    COLLECTIVE MANAGEMENT OF COPYRIGHT AND RELATED RIGHTS, 2nd ed. (Kluwer Law International, 2010) 495 p.

2.     INTELLECTUAL PROPERTY, TRADE AND DEVELOPMENT (Oxford Univ. Press, 2007). 564 p.

3.    COLLECTIVE MANAGEMENT OF COPYRIGHT AND RELATED RIGHTS (Kluwer Law International, 2006), 464 p.

**Book chapters**[3]

1.    **R** *The TRIPS Agreement*, in MAX PLANCK ENCYCLOPEDIA OF PUBLIC INTERNATIONAL LAW (*forthcoming*)

2.    **R** *Traditional Innovation and the Ongoing Debate on the Protection of Geographical Indications*, INTELLECTUAL PROPERTY AND INDIGENOUS INNOVATION (PETER DRAHOS AND SUSY FRANKEL, EDS) (*forthcoming*)

---

[3] R= double-blind refereed publication.

3. *The International Legal Framework of Border Measures in the Fight against Counterfeiting and Piracy*, ENFORCEMENT OF INTELLECTUAL PROPERTY RIGHTS THROUGH BORDER MEASURES (2D ED., OLIVIER VRINS AND MARIUS SCHNEIDER EDS.).  Oxford Univ. Press (*forthcoming*)

4. *Adjusting Patentability Criteria to Optimize Innovation: A Look at China and India*, GLOBAL PERSPECTIVES ON PATENT LAW (MARGO BAGLEY AND RUTH OKEDIJI, EDS). Oxford Univ. Press (*forthcoming*)

5. *The TRIPS Agreement and Climate Change,* in RESEARCH HANDBOOK ON INTELLECTUAL PROPERTY AND CLIMATE CHANGE (JOSHUA SARNOFF, ED.) (*forthcoming*)

6. *Copyright, Culture and the Cloud*, in BITS WITHOUT BORDERS (SEAN PAGER & ADAM CANDEUB, eds.) (*forthcoming*)

7. *Country Clubs, Empiricism, Blogs and Innovation: The Future of International Intellectual Property Norm-Making in the Wake of ACTA,* TRADE GOVERNANCE IN THE DIGITAL AGE (MIRA BURRI AND THOMAS COTTIER, EDS). Cambridge University Press, 2011 (*forthcoming*)

8. *TRIPS Articles 10; 63-71*, in CONCISE INTERNATIONAL AND EUROPEAN IP LAW, 2D ED. (THOMAS COTTIER AND PIERRE VÉRON, EDS). Kluwer Law International, 2011, pp. 38-42 and 168-186

9. *User-Generated Content and Music File-Sharing: A Look at Some of the More Interesting Aspects of Bill C-32*, in FROM "RADICAL EXTREMISM" TO "BALANCED COPYRIGHT": CANADIAN COPYRIGHT AND THE DIGITAL AGENDA (MICHAEL GEIST, ED., Irwin Law, 2010 )

10. *Of Silos and Constellations: Comparing Notions of Originality in Copyright Law*, in INTELLECTUAL PROPERTY PROTECTION OF FACT-BASED WORKS (ROBERT F. BRAUNEIS, ED, Edward Elgar, 2010) 74-106—coauthored with Professor Elizabeth Judge;

   - Also published as an article (see below)

11. *Policy Calibration and Innovation Displacement*, *in* DEVELOPING COUNTRIES IN THE WTO LEGAL SYSTEM (JOEL TRACHTMAN, AND CHANTAL THOMAS, EDS.)  (Oxford Univ. Pr., 2009) 363-394;

12. *TRIPS 3.0*, *in* THE DEVELOPMENT AGENDA: GLOBAL INTELLECTUAL PROPERTY AND DEVELOPING COUNTRIES (NEIL W. NETANEL, ED) 51-75. (Oxford Univ. Pr., 2009)

13. **R** *A Uniquely Canadian Institution: The Copyright Board of Canada*, *in* A NEW INTELLECTUAL PROPERTY PARADIGM: THE CANADIAN EXPERIENCE (YSOLDE GENDREAU ED). (Edward Elgar, 2009)

14. *TRIPS Article 10; Articles 63-71*, *in* CONCISE INTERNATIONAL AND EUROPEAN IP LAW (THOMAS COTTIER AND PIERRE VÉRON, EDS). (Kluwer Law International, 2008), 39-42 et 153-170

15. *Intellectual Property and Human Rights: Learning to Live Together*, *in* INTELLECTUAL PROPERTY AND HUMAN RIGHTS (PAUL TORREMANS, ED). (Wolters Kluwer, 2008) 3-24

16. **R** *A Canadian Copyright Narrative*, *in* COPYRIGHT LAW: A HANDBOOK OF CONTEMPORARY RESEARCH. (PAUL TORREMANS, ED.) (Edward Elgar, 2007) 49-82;

17. *The Changing Landscape of International Intellectual Property*, *in,* INTELLECTUAL PROPERTY AND FREE TRADE AGREEMENTS. (CHRISTOPHER HEATH AND ANSEL KAMPERMAN SANDERS, EDS) (Oxford: Hart Publishing, 2007), 49-86;

18. *TRIPS and Development*, *in* INTELLECTUAL PROPERTY, TRADE AND DEVELOPMENT (D. GERVAIS, ED, 3-60

   - See under Books (edited) above

19. *A TRIPS Implementation Toolbox, in idem*, 527-545

20. *Traditional Knowledge and Intellectual Property; A TRIPS Compatible Approach*, *in*, IPR PROTECTION AND TRIPS COMPLIANCE. (VEENA, ED.) (Amicus/ICFAI University Press, 2007), 146-178;

   - Republication of article listed under No. 25 below

21. *Em busca de uma Norma Internacional para os Direito de Autor: O 'Teste dos Três Passos Reversos', in* PROPIEDADE INTELECTUAL (EDSON BEAS RODRIGUES JR ET FABRÍCIO POLIDO, EDS), (Rio de Janeiro, Elsevier, 2007), 201-232 (republication of article listed under No 23 in list below)

22. *The TRIPS Agreement and the Changing Landscape of International intellectual Property*, *in* INTELLECTUAL PROPERTY AND TRIPS COMPLIANCE IN CHINA. (PAUL TORREMANS ET AL., EDS). (Edward Elgar, 2007), 65-84

23. *The TRIPS Agreement and the Doha Round: History and Impact on Development*, *in* INTELLECTUAL PROPERTY AND INFORMATION WEALTH. (PETER YU, ED), (Praeger, 2006), vol. 3, 23-72.

24. *The Changing Role of Copyright Collectives*, *in* COLLECTIVE MANAGEMENT OF COPYRIGHT AND RELATED RIGHTS. (DANIEL GERVAIS, ED.) (Kluwer Law International, 2006), 3-36

25. **R** *The Role of International Treaties in the Interpretation of Canadian Intellectual Property Statutes*, *in* THE GLOBALIZED RULE OF LAW: RELATIONSHIPS BETWEEN INTERNATIONAL AND DOMESTIC LAW. (O. FITZGERALD, ED), (Toronto: Irwin Law, 2006), 549-572

26. **R** *Le rôle des traits internationaux dans l'interprétation des lois canadiennes sur la propriété intellectuelle, in* RÈGLE DE DROIT ET MONDIALISATION : RAPPORTS ENTRE LE DROIT INTERNATIONAL ET LE DROIT INTERNE (O. FITZGERALD, ED) (Yvon Blais, 2006), 679-712;

   - French version of previous item in list

27. **R** *The TRIPS Enforcement Provisions*, *in*, CONCISE COMMENTARY OF EUROPEAN INTELLECTUAL PROPERTY LAW (THOMAS DREIER, CHARLES GIELEN, RICHARD HACON, EDS.) (Kluwer Law International, 2006)

28. *The TRIPS Agreement*, *in* BORDER MEASURES IN THE EUROPEAN UNION. (OLIVIER VRINS AND MARIUS SCHNEIDER, EDS.), (Oxford University Press, 2006), 37-62;

29. **R** *Use of Copyright Content on the Internet: Considerations on Excludability and Collective Licensing*, *in* IN THE PUBLIC INTEREST: THE FUTURE OF COPYRIGHT LAW IN CANADA (MICHAEL GEIST, ED). (Toronto: Irwin Law, Oct. 2005);

30. *Copyright and eCommerce: License or Lock-up?*, *in* INTELLECTUAL PROPERTY IN THE GLOBAL MARKETPLACE : 2001 UPDATE. (NEIL WILKOF ET AL. EDS.),  (New York: John Wiley & Sons, 2002). 18 p.


## Articles

1. *Cloud Control: Copyright, Global Memes and Privacy,* J. TELECOM. & HIGH TECH L. (2011) (coauthored with Dan Hyndman)

2. *Golan v. Holder, A Look at the Constraints Imposed by the Berne Convention,* 64 VANDERBILT LAW REVIEW EN BANC 147-163(2011)

   - **Cited by the SCOTUS in Golan v Holder (2011)**

3. *The Landscape of Collective Management,* 24:4 COLUM-VLA J. L & ARTS 423-449 (2011)

4. Pamela Samuelson et al., *The Copyright Principles Project*, 25:3 BERK. TECH. L.J. 1175-1246 (2010)

5. *Making Copyright Whole: A Principled Approach to Copyright Exceptions and Limitations*, 5:1/2 UNIV. OTTAWA L. & TECH. J. 1-41 (2008)*

   - Published in March 2011

6. *The Google Book Settlement and the TRIPS Agreement*, 2011 STAN. TECH. L.R. 1-11;

7. *Fair Use, Fair Dealing, Fair Principles: Efforts to Conceptualize Exceptions and Limitations to Copyright*, 57:3 J. COPYRIGHT. SOC.Y OF THE USA 499-520 (2010);

   - **Reprinted in INTELLECTUAL PROPERTY LAW REVIEW (2011) as one of best intellectual property articles of 2010**

8. *Reinventing Lisbon: The Case for a Protocol to the Lisbon Agreement* , 11:1 CHICAGO J. INT'L L.67-126 (2010);

9. *The Regulation of Inchoate Technologies*, 47 HOUSTON L. REV. 665 (2010);

10. *The 1909 Copyright Act in Historical Context*, 26:2 SANTA CLARA HIGH TECH L.J.185-214 (2010);

11. *Towards a Flexible International Framework for the Protection of Geographical Indications*, 1:2 WIPO JOURNAL 147-158 (2010) (coauthored with Prof. Christophe Geiger, Norbert Olszak and Vincent Ruzek)

12. *The Misunderstood Potential of the Lisbon Agreement*, 1:1 WIPO JOURNAL 87-102 (inaugural issue - on invitation) (2010)

13. *Of Silos and Constellations: Comparing Notions of Originality in Copyright Law*, 27:2 CARDOZO ARTS & ENTERTAINMENT L. J. 375-408 (2009)--with Professor Elizabeth Judge;

14. *Traditional Knowledge: Are We Closer to the Answers?,* 15:2 ILSA J. OF INT'L. AND COMP. LAW 551-567 (2009);

15. *The Tangled Web of User-Generated Content*, 11:4 VAND. J. OF TECHNOLOGY AND ENTERTAINMENT LAW 841-870 (2009);

16. *World Trade Organization panel report on China's enforcement of intellectual property rights*, 103:3 AM. J. INT'L L.549-554  (2009) (International Decision--on invitation);

17.  *Of Clusters and Assumptions: Innovation as Part of a Full TRIPS Implementation*, 77:5 FORDHAM L. R. 2353-2377 (2009)

18. **R** *A Canadian Copyright Narrative*, 21 INT. PROP. J. (Can.) 269 (2009)

    - Republication of book chapter with same title

19. *The Protection of Databases*, 82:3 CHI-KENT L. REV. 1101-1169 (2007);

20. **R** *The Purpose of Copyright Law in Canada*, 2:2 UNIV. OTTAWA. J. L. & TECH. 315-356 (2006);

21. **R** *The Changing Landscape of International Intellectual Property*, 2 J. OF INTELL. PROP. LAW & PRACTICE 1-8 (2006);

22. *Intellectual Property and Development: The State of Play*, 74 FORDHAM LAW REVIEW *505-535* (2005);

23. *Towards A New Core International Copyright Norm:  The Reverse Three-Step Test*, 9 MARQ. INTELL. PROP. L. REV. 1-37 (2005);

24. *Copyright in Canada: An Update After* CCH, REVUE INT. DROIT D'AUTEUR RIDA 2-61(2005);

- Also published in French (see below)

25. *Traditional Knowledge & Intellectual Property:  A TRIPS-Compatible Approach*, [2005] MICH. ST. L. REV. *137-166;*

26. **R** *International Intellectual Property and Development: A Roadmap to Balance?*, 2:4 J. OF GENERIC MEDICINES *327-334* (2005)*;*

27. *The Price of Social Norms: Towards a Liability Regime for File-Sharing*, 12 J. INTELL. PROP. L. 39-74 (2004);

28. **R** *The Compatibility of 'Skill & Labour' with the Berne Convention and the TRIPS Agreement*, [2004] 2 EUR. INT. PROP REV. 75-80;

29. *Canadian Copyright Law Post* CCH, 18:2 INTELL. PROP. J. (Can.) 131-168 (2004);

30. *Spiritual but Not Intellectual? The Protection of Sacred Intangible Traditional Knowledge*, 11 CARDOZO J. OF INT'L & COMP. LAW 467-495(2003);

31. **R** *TRIPS, Doha & Traditional Knowledge: A Proposal*, 6 J. WORLD INT. PROP. 403-419 (2003);

32. **R** *Fragmented Copyright, Fragmented Management: Proposals to Defrag Copyright Management*, 2 CAN .J. OF L. & TECH 15-34 (2003) (with Prof. Alana Maurushat)

33. **R** Feist *Goes Global: A Comparative Analysis of the Notion of Originality in Copyright Law*, 49:4 J. COPYRIGHT. SOC.Y OF THE USA 949-981(2002);*

- Winner, **Charles Best Seton Award,** Best Article of 2002-3, Copyright Society of the USA
- Article cited by the Chief Justice of Canada in *CCH Canadian Inc. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339 (Can.), at para. 18.

34. *The Internationalization of Intellectual Property: New Challenges from the Very Old and the Very New*, 12:4 FORDHAM INTELL. PROP., MEDIA & ENTERTAINMENT L. J. 929-990 (2002);

35. **R** *Collective Management of Copyright and Neighboring Rights in Canada: An International Perspective*, 1 CAN. J. OF LAW & TECH. 21-50 (2002);

36. *Transmission of Music on the Internet: A Comparative Study of the Laws of Canada, France, Japan, the U.K. and the United States*, 34:3 VANDERBILT J. OF TRANSNAT'L L. 1363-1416 (2001);

- Article cited in the majority opinion of the Supreme Court of Canada in *Society of Composers, Authors and Music Publishers of Canada v. Canadian Association of Internet Providers*, 2004 SCC 45 (Can.), at para. 75.

37. **R** *The TRIPS Agreement After Seattle: Implementation and Dispute Settlement Issues* 3 J. OF WORLD INT. PROP. 509-523(2000);

38. **R** *Electronic Rights Management Systems*, 3 J. OF WORLD INT. PROP. 77-95 (2000);

39. **R** *The TRIPS Agreement: Interpretation and Implementation*, 3 EUR. INT. PROP. REV., 156-162 (1999);

40. **R** *Intellectual Property in the MAI: Lessons to Be Learned*, 2 J. WORLD INT. PROP. 257-274 (1999) (with Vera Nicholas)

41. **R** *Electronic Rights Management and Digital Identifier Systems*, J. ELEC. PUBLISHING, online only, March 1999.  Available at http://www.press.umich.edu/jep/04-03.  (18 pages)

42. *R The Protection Under International Copyright Law of Works Created with or by Computers*, 5 IIC INTERN'L REV. INDL PROP. AND COPYRIGHT L. 629-660 (1991).

## Articles in other languages

1. *L'Arrangement de Lisbonne, un véhicule pour l'internationalisation du droit des indications géographiques ?* 35 PROPRIÉTÉS INTELLECTUELLES  691 (2010) (coauthored with Prof. Christophe Geiger, Norbert Olszak and Vincent Ruzek

    o   French version of article mentioned at no 11 in list above

2. *Trente ans de droit d'auteur à la Cour suprême du Canada*, 21 :2 CAHIERS DE PROPRIÉTÉ INTELLECTUELLE 419-448  (2009)

3. *Propiedad intelectual y derechos humanos: aprendiendo a vivir juntos*, 3:5 REVISTA IBEROAMERICANA DE DERECHO DE AUTOR (2009)

    o   Edited translation of book chapter with same title

4. Roberston c. Thomson Corp. : *Un commentaire sur le droit des pigistes à la lumière de l'intervention de la Cour suprême du Canada*, 3 :2  REVUE DE DROIT & TECHNOLOGIE DE L'UNIVERSITÉ D'OTTAWA/UNIVERSITY OF OTTAWA LAW & TECHNOLOGY JOURNAL, 601-614 (2006)*;*

    o   French version of article mentioned at no 25 in list above

5. **R** *Le droit d'auteur au Canada après* CCH, 203 REVUE INT. DROIT D'AUTEUR RIDA 2-61(2005);

6. **R** *Essai sur la fragmentation du droit d'auteur : Deuxième partie* 16 CAHIERS DE PROPRIÉTÉ INTELLECTUELLE 501-536 (2004);

7. **R** *Être au parfum: La protection des marques olfactives en droit canadien,*  15 CAHIERS DE PROPRIÉTÉ INTELLECTUELLE 865-904*(2003);

8. **R** *Essai sur la fragmentation du droit d'auteur : Première partie*, *15 CAHIERS DE PROPRIÉTÉ INTELLECTUELLE 501-536 (2003);*

9. **R**  *L'affaire* Théberge, 15 CAHIERS DE PROPRIÉTÉ INTELLECTUELLE 217-240 (2002);

10. *R Los sistemas básicos de derecho de autor y copyright: La noción de obra y la gestión de los derechos de autor*, 26 REVISTA DE DERECHO PRIVADO, 15-27(2001);

11. **R** *La Responsabilité des États à l'égard des actes des organes judiciaires,* 6 R.Q.D.I. 71-82 (1989-1990);

12.  **R** *Le Droit de refuser un traitement psychiatrique au Québec*; 26 CAHIERS DE DROIT 807 (1985)

## Conference Proceedings (Refereed)

-   **R** *Le droit d'auteur au Canada: fragmentation ou gestion fragmentaire*, *in* INSTITUTIONS ADMINISTRATIVES DU DROIT D'AUTEUR (Y. Gendreau, ed., Cowansville : Éditions Yvon Blais, 2002),  459-477

**Other Publications—All languages**

1. *The International Legal Framework for the Civil Enforcement of Copyright & Criminal Enforcement of Copyright in the United States*, IP ENFORCEMENT AND LITIGATION 2012, PLI, 2012, 361-399

2. *How Canada can Be an Innovation Leader,* THE GLOBE AND MAIL, November 30, 2011

3. *The Rise of 360 Deals in the Music Industry*, 3:4 LANDSLIDE 1-6 (2011)

4. *The Google Book Settlement and International Intellectual Property Law*, 15:9 ASIL INSIGHT (Apr, 11, 2011)

5. *Foreword, in* IMPLEMENTING THE WIPO DEVELOPMENT AGENDA (Jeremy DeBeer, Ed.). Ottawa: Wilfrid Laurier University Press. 2009. *ix-xii*

6. *Collective Management of Copyright and Related Rights in North America, in* ASIAN COPYRIGHT SEMINAR, (Tokyo, Feb. 25, 2009) 17-72

7. *La Parodie et le moyen de défense fondé sur l'« intérêt du public »,* in DROIT D'AUTEUR ET LIBERTÉ D'EXPRESSION/COPYRIGHT AND FREEDOM OF EXPRESSION, 2006 Barcelone, (ALAI, 2008)

8. *Litigation, not politics, drives change in IP*, 25:28, THE LAWYERS WEEKLY (November 25, 2005) 2 pages

9. *TRIPS: A Question of Balance.* IPR INFO (Helsinki: Immateriaalioikeuinstituutti), 2/2005, 26-27

10. ***The Realignment of Copyright in Canada*. Twelfth National Conference on Communications Law, Toronto, April 7, 2005 (51 pages)**

11. *The Changing Face of Copyright*, 7:4  COPYRIGHT & NEW MEDIA LAW NEWSLETTER, 3 pages (2003)

12. *Arbitration Concerning Intellectual property Rights: A Key to the Success of the Doha Round*, 7:2 J. OF WORLD INT. PROP. 245-248 (2004)

13. *The Evolving Role(s) of Copyright Collectives, in* DIGITAL RIGHT MANAGEMENT - THE END OF COLLECTING SOCIETIES?" (**Christoph Beat Graber, ed.)** (Lucerne, 2005)

14. *A Viable Rights Clearance Scheme*, 6:2 COPYRIGHT & NEW MEDIA LAW NEWSLETTER 3 (2002)

15. "Copyright and the Use Paradigm," *in* COPYMART: THE PRODUCT AND ITS PROSPECTS: PROCEEDINGS OF THE BERLIN SYMPOSIUM. (Z. Kitagawa, ed.), (Kyoto: IIAS, 2003), 109-116

16. "Traditional Knowledge: A Challenge to the International Intellectual Property System," *in*, 7 INTERNATIONAL INTELLECTUAL PROPERTY LAW AND POLICY. (New York: Juris, 2002). ch 76-1

17. "The TRIPS Agreement: Life After Seattle*?,*" *in* 6 INTERNATIONAL INTELLECTUAL PROPERTY LAW AND POLICY. (New York: Juris, 2001). ch. 40-1

18. *E-Commerce and Intellectual Property: Lock-it Up or License?, in* 6 INTERNATIONAL INTELLECTUAL PROPERTY LAW AND POLICY.  (New York: Juris, 2001). ch. 87-1

19. *Electronic Rights Management Systems*, *in* Y2C: COPYRIGHT LAW 2000 (Jon A. Baumgarten and Marybeth Peters, eds),. (New Jersey: Glasser Legal Works: 2000) (15 pages)

20. *An Overview of TRIPS: Historical and Current Issues*, *in* 5 INTERNATIONAL INTELLECTUAL PROPERTY LAW AND POLICY. (New York: Juris, 2000), ch. 40

21. *Digital Distance Education: Exemption or Licensing?, in*, 4 INTERNATIONAL INTELLECTUAL PROPERTY LAW AND POLICY.  (New York: Juris, 1999), ch. 87

22. *Copyright Aspects of Electronic Publishing*, *in* PROCEEDINGS OF EP'94, (Beijing: The Science Press, 1994) 4-12

23. *ECMS: From Rights Trading to Electronic Publishing, in* THE PUBLISHER IN THE CHANGING MARKETS. PROCEEDINGS OF IPA FOURTH INTERNATIONAL COPYRIGHT SYMPOSIUM. (Tokyo: Ohmsha, 1998). 194-212 (18 pages)

24. *The TRIPS Agreement: Enforcement and Dispute-Settlement Provisions, in* THE PUBLISHER IN THE CHANGING MARKETS. PROCEEDINGS OF IPA FOURTH INTERNATIONAL COPYRIGHT SYMPOSIUM (Tokyo : Ohmsha, 1998). 230-236 (7 pages)

25. « L'état des lieux:  la gestion collective dans le monde, en Europe et en France ».  (Paris: SACEM, 1996).  (11 pages)

26. « Gestion des droits », *in* ACTES DU COLLOQUE LES AUTOROUTES DE L'INFORMATION : ENJEUX ET DÉFIS », HUITIÈMES ENTRETIENS DU CENTRE JACQUES CARTIER RHÔNE-ALPES. (Lyons: Université de Lyon-2, 1996)

27. « Les 'œuvres multimédia' : le point de vue de l'OMPI », *in* LE MULTIMÉDIA : MARCHÉ, DROIT ET PRATIQUES JURIDIQUES. ACTES DU JURISCOPE 94.  (Paris : P.U.F., 1995). (8 pages)

28. « Identificaíción de las obras utilizadas en sistemas digitales », *in* NUM NOVO MUNDO DO DIREITO DE AUTOR.  (Lisbon: COSMOS/Arco-Iris, 1994). (17 pages)

29. "El principio del trato nacional en los acuerdos internacionales de propiedad intelectual", same book—(15 pages)


## Book Reviews

- *T. Scassa and M. Deturbide. Electronic Commerce Law In Canada* (Toronto: CCH, 2004). Reviewed at 42 CAN. BUS. L. J. 292-310 (2005)

- *Le Droit du Commerce Électronique*. (*V. Gautrais, ed.).*  (Montréal, Thémis, 2002. 709 pp.), reviewed at 33 REVUE GÉNÉRALE DE DROIT 489-505 (2003)

## Technical Reports, Law Reform, and Commissioned Research Work

1. *Fair Dealing, the Three Step test and Exceptions in the Canadian* Copyright Act, Report commissioned by Industry Canada, November 2007

2. *Application of an Extended Licensing Regime in Canada: Principles and Issues Related to Implementation*. Department of Canadian Heritage, July 2003*

3. *Collective Management of Copyright and Neighboring Rights in Canada: An International Perspective.* Department of Canadian Heritage, August 2001*

4. *Intellectual Property Practices in the Field of Biotechnology*. Report published by the Trade Directorate, Organization for Economic Co-operation and Development (OECD), Paris 1999. Document No.  TD/TC/WP(98)15/FINAL.(23 pages)

5. THE LAW AND PRACTICE OF DIGITAL ENCRYPTION. (Amsterdam: University of Amsterdam, 1998). (64 pages)

6. *ECMS: The Policy Issues*, *in* IMPRIMATUR CONSENSUS FORUM. 21/22 NOVEMBER 1996. (London: Imprimatur, 1996).

## <u>EXHIBIT B</u>

### Daniel Gervais – Materials Considered

In addition to the materials cited in my declaration, I have considered the following documents:

1.  The Government Response to the Hargreaves Review of Intellectual Property and Growth;

2.  Amazon.com's Kindle Direct Publishing Terms and Conditions, Last Updated February 9, 2012;

3.  Amazon.com's *Search Inside! Publisher Sign-up*, from http://amazon.com/gp/html-forms-controller/SITB_Pub_Signup_Form;

4.  The Amended Settlement Agreement entered into by the parties to the lawsuit *The Authors Guild, Inc., et al. v. Google Inc., et al.*, No. 05 Civ. 8136 (DC) (S.D.N.Y.);

5.  Documents produced by Plaintiffs Norsk Faglitterær Forfatter- og Oversetterforening (The Norwegian Non-Fiction Writers and Translators Association) as AG0004039-4074;

6.  Documents produced by Plaintiffs of Sveriges Författarförbund (The Swedish Writers' Union) as AG0004393-4431; and

7.  Documents produced by Plaintiffs The Writers' Union of Canada as AG0004432-4433.

## <u>EXHIBIT C</u>

**Daniel Gervais – Prior Testimony at Trial or Deposition**

| Proceeding | Court | Reference | Context | Year | On behalf of |
|---|---|---|---|---|---|
| Authors Guild v. Google Inc. | United States District Court, Southern District of New York | No. 05 Civ. 8136 (DC) | Deposition | 2012 | Plaintiff |
| *Elsevier B.V. v. UnitedHealth Group, Inc.* | United States District Court, Southern District of New York | 784 F. Supp. 2d 286 | Filed Report | 2011 | Plaintiff |