**KILPATRICK TOWNSEND & STOCKTON LLP**
Joseph Petersen (JP 9071)
Robert Potter (RP 5757)
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800
Email: jpetersen@kilpatricktownsend.com

Joseph M. Beck (admitted *pro hac vice*)
W. Andrew Pequignot (admitted *pro hac vice*)
Allison Scott Roach (admitted *pro hac vice*)
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: jbeck@kilpatricktownsend.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE AUTHORS GUILD, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> HATHITRUST, ET AL., <br><br> Defendants. | Case No. 11 Civ. 6351 (HB) |

**MEMORANDUM IN SUPPORT OF**
**THE LIBRARIES' MOTION FOR SUMMARY JUDGMENT**
**ON FAIR USE AND LACK OF INFRINGEMENT**
**UNDER SECTION 106 OF THE COPYRIGHT ACT**

# TABLE OF CONTENTS

A.  Digitization for Purposes of Preservation. .................................................3

B.  Google Vastly Expedited Digitization. ....................................................4

C.  The Formation of HathiTrust for Purposes of Improving Scholarship.................4

D.  The Limited Uses of the Works within the HDL................................................5

E.  The Benefits of the HDL's Full-Text Search Functionality. ...................................6

F.  The Groundbreaking Benefits of the HDL for Individuals with Print
    Disabilities. ........................................................................................8

I.  Legal Standard. ...................................................................................9

II. The Libraries' Uses of Plaintiffs' Works Are Protected Fair Uses. ...................................10

    A.  Fair Use and the Purpose of Copyright Law.......................................................10

    B.  Section 107 and the Fair Use Factors. .................................................................10

        1.  The Purpose and Character of the Use Factor Favors Fair Use................11

            a.  The Libraries' Uses Are Favored Preamble Uses and
                Presumptively Fair. ........................................................................11

            b.  Transformative Uses Are Particularly Favored. ...........................11

            c.  The HDL's Search Functionality is Unquestionably
                Transformative..............................................................................12

            d.  Access to the Disabled and Preservation Also Are
                Transformative Uses and Are Otherwise Fair Uses.......................14

        2.  The Nature of the Copyrighted Works Factor Favors the Libraries. .........17

            a.  The Majority of Works in the HDL Are Published and Out
                of Print. ........................................................................................17

            b.  The Majority of Works in the HDL Are Factual Works...............19

            c.  In-Print and Fictional Works Have Limited Significance
                Given the Transformative Nature of the Use................................20

        3.  The Libraries Copy No More of the Books Than Necessary...................20

4.      The Libraries' Uses Do Not Affect the Market For or Value of
        Plaintiffs' Books. ........................................................................................22

C.      Balancing All the Factors ........................................................................................26

III.    The Orphan Works Project. ........................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*A.V. v. iParadigms, LLC,*
   562 F.3d 630 (4th Cir. 2009) ........................................................................ 12, 14

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)......................................................................................... 9

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
   448 F.3d 605 (2d Cir. 2006) ....................................... 12, 13, 15, 20, 22, 23, 24, 26

*Blanch v. Koons,*
   467 F.3d 244 (2d Cir. 2006) .......................................... 10, 12, 17, 19, 21, 24

*Cambridge Univ. Press v. Becker,*
   No. 1:08-CV-1425-ODE,
   2012 WL 1835696 (N.D. Ga. May 11, 2012)................................................. 16, 21

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994)........................................................................ 10, 11, 14, 19, 20

*Duffy v. Penguin Books USA Inc.,*
   4 F. Supp. 2d 268 (S.D.N.Y. 1998) .............................................................. 25

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
   499 U.S. 340 (1991)........................................................................................ 10

*Field v. Google, Inc.,*
   412 F. Supp. 2d 1106  (D. Nev. 2006) ......................................................... 15

*Folsom v. Marsh,*
   9 F. Cas. 342 (C.C.D. Mass. 1841) (No. 4901) ........................................... 14

*Hofheinz v. A & E Television Networks,*
   146 F. Supp. 2d 442 (S.D.N.Y. 2001) .......................................................... 23

*Hofheinz v. Discovery Commc'ns, Inc.,*
   No. 00 Civ. 3802, 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001)................ 11, 23, 24

*Kelly v. Arriba Soft Corp.,*
   336 F.3d 811 (9th Cir. 2003) ........................................................................ 13, 20, 21

*Lennon v. Premise Media Corp.,*
   556 F. Supp. 2d 310 (S.D.N.Y. 2008) .......................................................... 12

*Maxtone-Graham v. Burtchaell,*
   803 F.2d 1253 (2d Cir. 1986) ....................................................................... 9, 17, 19, 20

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471 (2d Cir. 2004) ............................................................ 11, 22

*Perfect 10 v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ............................................... 13, 21, 24

*Rosemont Enters., Inc. v. Random House, Inc.*,
    366 F.2d 303 (2d Cir. 1966) .................................................................. 19

*Sega Enters. Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1993) ............................................................... 20

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) ................................................................. 20

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ........................................... 15, 16, 20, 22, 24, 26

*Sundeman v. Seajay Soc'y, Inc.*,
    142 F.3d 194 (4th Cir. 1998) ................................................................ 20

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg LP*,
    No. 11 Civ. 1006, 2012 WL 1759944 (S.D.N.Y. May 17, 2012) ............................................. 15

*The Authors Guild, Inc. v. Google Inc.*,
    No. 05-cv-8136 (S.D.N.Y. Oct. 28, 2008) .............................................. 17

*Twentieth Century Music Corp. v. Aiken*,
    422 U.S. 151 (1975) ............................................................................... 10

**Statutes**

17 U.S.C. § 107(1) ............................................................................... 11, 26

17 U.S.C. § 108(e) .............................................................................. 27, 28

**Rules**

Fed. R. Civ. P. 56(c) ................................................................................... 9

**Other Authorities**

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[B][5] (2011) .............. 10

H.R. Rep. No. 94-1476 (1976) ................................................................... 16

Matthew Sag, *Copyright and Copy-Reliant Technology*,
    103 Nw. U. L. Rev. 1607 (2009) .......................................................... 21

Pierre N. Leval, *Toward a Fair Use Standard*,
    103 Harv. L. Rev. 1105, 1110 (1990) .................................................... 10

Rebecca J. Rosen, *The Missing 20th Century:*
*How Copyright Protection Makes Books Vanish*, The Atlantic, Mar. 30, 2012......................18

Staff of S. Comm. on the Judiciary (Barbara Ringer),
86th Cong., Renewal of Copyright 31 (Comm. Print 1960)........................................................5

U.S. Const. Art. I § 8, cl. 8................................................................................................................2

Wendy J. Gordon, *Fair Use As Market Failure, A Structural and Economic Analysis of the*
*Betamax Case and Its Predecessors,*
82 Colum. L. Rev. 1600 (1982)...........................................................................................25

## INTRODUCTION

For over three centuries, academic libraries have purchased and preserved books—they purchase millions of books each year—and have recorded and displayed basic information about their holdings to help scholars identify relevant works.

About 20 years ago, in support of their efforts to preserve and catalog their books, academic libraries—including Defendants in this action (the "Libraries")—began making digital copies of portions of their collections, including those in copyright. These digital copies serve profoundly important functions for libraries and, more importantly, their patrons:

- **Digitization preserves books.** All printed books are imperiled; they literally disintegrate from use and exposure to oxygen, a process that is greatly hastened for books printed on paper with high acid content (which constitutes the majority of the holdings of academic libraries). Books also are at risk of loss from theft, fire, flood, and other causes.

- **Digitization enables search—without providing direct access to in-copyright material.** Billions of pages of text can be searched in milliseconds, allowing librarians, researchers, scholars, and students to identify relevant books amidst vast collections. Previously, search was limited to a work's bibliographic information—for example, a patron could find the title, author, and general subject matter but little or nothing about the actual contents of the work.

- **Digitization enables students and scholars with print disabilities to read or listen to books.** Through digitization, an authorized patron with a print disability can have immediate access to a work in a format that can be made accessible through a variety of technologies, including software that translates the text into spoken words.

The Libraries' early digitization efforts were inadequate. Because of the size of their collections, the Libraries could not digitize their collections fast enough to preserve them.

Eight years ago, that began to change. First, with the assistance of Google, digitization that would have taken the Libraries literally centuries to complete could be accomplished in less than a decade. Second, with the establishment of the HathiTrust service, more than sixty university and research libraries could store, secure, and search their digital collections in a

1

shared space that ensured the highest degree of security while reducing cost and increasing scholarship. This collaboration permits library patrons to find works that they would otherwise not find and preserves a significant portion of the world's cultural record. It also opens, as never before, the doors of scholarship to individuals with print disabilities.

**Not one line of actual text treated as in copyright is ever displayed to patrons searching through the HathiTrust service** (except those who have certified print disabilities). For all works treated as in copyright, scholars must **check the books out** of the library (as library patrons have done for centuries) or **purchase a new or used copy** if they want to read a book identified through the HathiTrust.

The Libraries' uses for preservation, search, and access to the blind, which are no different in kind than the functions long performed by libraries, serve the Constitutional requirement that copyright law "promote the Progress of Science." U.S. Const. Art. I § 8, cl. 8. These uses do not harm authors; they increase discovery of their works and stimulate new purchases. They are fair uses and lawful reproductions for people with disabilities. These uses are rightfully made without the authorization of the Plaintiffs because they have the authorization of Congress.

The Plaintiffs' belated demand for an extraordinary court order—**nearly seven years after the collaboration with Google began and decades after the Libraries began digitizing works**—impounding and freezing the HathiTrust corpus presents the Court with a stark choice. The Libraries respectfully submit that the Court should hold that the limited uses at issue in this proceeding fall squarely within the Libraries' right of fair use and right to reproduce works for people with disabilities.

## FACTUAL BACKGROUND

**A.     Digitization for Purposes of Preservation.**

Until recently, the Libraries and other large academic and research institutions were annually losing hundreds of thousands of "out-of-print" books, especially those that existed on paper with high acid content.[1] (Wilkin Decl. ¶¶ 25-29.) As of 2004, Michigan estimated that **approximately 3.5 million of its books** were at the most immediate risk of deterioration and, ultimately, loss.[2] (*Id*. ¶ 25.) Nor was disintegration the only threat to books in academic libraries. (*Id*. ¶¶ 30-32.) Millions of volumes in libraries were destroyed during the World Wars, and the collection of the National Library in Sarajevo lost over one million volumes due to shelling in the 1990s.[3]  (*Id*. ¶ 32.) Hurricane Katrina devastated Tulane University's Howard-Tilton Memorial Library, with flooding destroying 90% of the 500,000 volumes in one of the library's collections. (Wilkin Decl. ¶ 31.) Earlier this month, the University of Wisconsin also suffered significant losses to its collection due to severe flooding. (Hensrud Decl. ¶¶ 6-20.) Images of the destruction appear below. Many of these works may be lost forever. (*Id.* ¶ 19.)

 

---

[1] As John Wilkin, Associate University Librarian at the University of Michigan and Executive Director of HathiTrust, explains, paper with high acid content is particularly prone to disintegration and loss as a result of a process called "acid hydrolysis reaction." (*Id.* ¶ 23.) Through this process, paper fibers are repeatedly broken down to the point where the book ultimately disintegrates. (*Id.*)

[2] The University of Michigan's experience is typical of the other Libraries and is set out in detail in the accompanying declaration of John Wilkin.

[3] Perhaps the most famous example of a loss of a library is the destruction of the Library of Alexandria.

### B.       Google Vastly Expedited Digitization.

Prior to Google's involvement, it would have taken Michigan over 1,000 years to digitize its collection. (Wilkin Decl. ¶ 44.) Google digitized most of the collection *in less than a decade*, (*id.* ¶ 45), providing both timely preservation and access to books for the blind and print disabled. (*Id.* ¶ 47.) "[W]e bargained for this right because it was important to us that we had the right to control our own uses and satisfy one of our primary missions of providing specialized services to the blind or other persons with disabilities." (*Id.*)

### C.       The Formation of HathiTrust for Purposes of Improving Scholarship.

In 2008, Michigan formed HathiTrust, named for the Hindi word for elephant, "hathi," evoking the qualities of memory, wisdom, and strength symbolized by elephants. (*Id.* ¶ 53.) Participating members of the HathiTrust project pooled their digitized collections (whether initially digitized by the respective libraries themselves or Google) into a single collection that came to be known as the HathiTrust Digital Library ("HDL"). (*Id.* ¶ 54-55.) There are currently more than sixty institutions participating in HathiTrust, including Michigan, and membership is open to institutions worldwide. (*Id.* ¶ 56.)

The concept underlying the formation of HathiTrust is simple: it did not make sense for each research library to maintain its own digitized collection of works. (*Id.* ¶ 54-55.) By pooling resources, HathiTrust members could better serve their common goals of providing secure, long-term storage for the works, comprehensive research and discovery tools, and access to works in the public domain and to students and faculty with print disabilities. (*Id.*)

The HDL now totals more than ten million works published over many centuries, in a multitude of languages, covering almost every subject imaginable. (*Id.* ¶¶ 57-61.)

**D.     The Limited Uses of the Works within the HDL.**

The Libraries only make the following uses of works presumed to be in copyright:[4]

- **Full-Text Search.** The Libraries' patrons may search for one or more terms or phrases across all works within the HDL. For those works that are not in the public domain or for which the copyright holder has not expressly authorized use, the search results indicate **only** the page numbers on which a term is found within a particular book and the number of times it appears on each page. **Search results do not show sentences, "snippets," or other selections of text, and patrons do not have electronic access to any copyrighted content** within such works (unless they are users with certified print disabilities). In other words, there is no copyrighted text displayed on the computer screen or available for print.

- **Preservation.** As noted, the HDL is a safeguard against the ongoing loss of print books and enables the Libraries to make copies for, among other Section 108 purposes, replacing a work that is damaged, deteriorated, lost, or stolen, and a replacement copy cannot be obtained at a fair price.

- **Access for persons with print disabilities.** As authorized entities under Section 121 and consistent with Section 107, the Libraries have, for many years, converted works into alternative formats for the blind and other persons with disabilities that prevent them from accessing printed materials.[5]

(*Id.* ¶ 68.)

These uses do not harm markets—whether actual or potential—for in-copyright material. "[I]f the HDL has any impact whatsoever on the University Library's acquisition of in-copyright material, it has a positive effect on our purchasing." (*Id.* ¶ 70.) This is because "scholars, students, and other patrons are more likely to discover and use works that they can locate

---

[4] As noted *infra*, there is considerable difficulty in determining the copyright status of works published between 1923 and 1963. For purposes of the HDL and this motion, the Libraries conservatively assume that many books published during this time period may still be protected by copyright (even though a Copyright Office report indicated that only 7% are still in copyright). *See* Staff of S. Comm. on the Judiciary (Barbara Ringer), 86th Cong., Renewal of Copyright 31, at 220 (Comm. Print 1960).

[5] Although Michigan previously developed a project called the "Orphan Works Project" ("OWP"), **not a single patron has been given access to a single work** through the OWP and it is at best unclear whether or how the OWP will continue. Michigan took great pains in formulating the OWP to protect the legitimate rights of authors and submits that had the project proceeded, would have been lawful under—among other provisions—Sections 107, 108, and 121 of the Copyright Act. Given the suspended status of the OWP, the Libraries believe that its legality is not ripe for judicial determination, and the Libraries' motion on that ground remains pending before the Court. If the Court nevertheless decides to address the OWP, Section III discusses why it (1) does not infringe a single right under Section 106 and (2) is also a fair use.

through digital search" and "[s]uch increased demand for works invariably translates into increased purchases." (*Id.* ¶ 71; *see also* Leary Decl. ¶ 15 ("During the course of my research on Cook, I purchased at least two books . . . that I found via HathiTrust or Google search-only searches. Of course, had I not discovered these works through my research, I would never have purchased them."); Waldfogel Decl. ¶ 50 ("I conclude that a service offering searchability inside books, like the HathiTrust does, would very likely benefit rights holders by stimulating demand for their works.").)

        **E.**      **The Benefits of the HDL's Full-Text Search Functionality.**

Full-text searching easily constitutes the most significant advance in library search technology in the last five decades. (Wilkin Decl. ¶ 75.) Rather than combing through paper, card, or electronic catalog records and attempting to discern from author, title, and subject heading whether the work itself may be of interest, scholars can go to the HDL website and search—**but not read or copy**—the actual text of copyrighted books and journals. (*Id.* ¶ 76.) As Mr. Wilkin describes, the search results display bibliographic information—including title, author, publisher, and publication date—for in-copyright books containing the search term. (*Id.* ¶ 77.) The search results also display the page numbers on which the term is found within the book and the number of times it appears on each page, thereby, providing some clues as to how useful the book might be. (*Id.*) The text itself, however, is not made digitally available (readable or downloadable) unless it is determined that it is in the public domain or unless the rights holder has given permission to provide access to the work's content. (*Id.* ¶ 81.)

The HathiTrust search functionality represents a dramatic step forward in the evolution of academic search. Library search once looked like this (on the following page):

 

It can now be performed anywhere with an Internet connection yielding, in milliseconds, results like this:





Absent search, the information within these resources is invisible, or nearly so. For example, Dr. Stanley Katz, the renowned American historian, was able to discover books supporting his research on international human rights issues that he did not find without full-text search. (Katz Decl. ¶¶ 14-17.) Author Margaret Leary used HathiTrust search to discover otherwise unknown books for her own book on the Michigan law graduate and donor, William W. Cook. (Leary Decl. ¶¶ 10-13.)

The HDL also empowers scholars to perform types of inquiries that previously were all but impossible. (Smalheiser Decl. ¶¶ 25-29.) For example, a digital research method called "text mining" is already proving itself a powerful and important tool for scholarly research. (*Id*. ¶¶ 3-6.) The goal of text mining is to find patterns and connections from large databases of textual material. (*Id*. ¶¶ 3-4.) To provide a few examples, Dr. Swanson (mentor for Dr. Smalheiser) used text mining to propose ways to ameliorate Raynaud's syndrome and migraine headaches. (*Id.* ¶ 13.) Dr. Smalheiser himself used this procedure to identify a class of molecule involved in Huntington's Disease. (*Id.* ¶ 17; *see also* Petersen Decl. ¶ 24, Ex. W (Peter Leonard & Timothy R. Tangherlini, *Trawling in the Sea of the Great Unread* at 2-3 ("Text-mining techniques . . . contribute significantly to a scholar's ability to understand the relationships between the works in this collection, thereby holding out the promise that one can develop a more encompassing understanding of a particular field.").)

**F.    The Groundbreaking Benefits of the HDL for Individuals with Print Disabilities.**

For centuries, people with a broad range of disabilities have been denied equal access to library collections and, therefore, to the full promise of an education. (Wilkin ¶ 101.) This is particularly true in a university, where the written record is at the heart of the scholarly pursuit. (*Id.*) Given the number of works a student must review to write a typical term paper, she may

have to wait weeks or even months for all requested works to be converted into Braille or audio recording formats—works that she has not yet even been able to determine will be of any use. (*Id.* ¶ 102.) Even digitizing the works on a book-by-book basis can take many weeks, which makes pursuing postsecondary education that much more difficult for a student with a print disability.[6] (*Id.*)

The public benefits from the Libraries' limited uses of book scans are indisputable. Unfindable print books can be found—yet only read in the print copy. Men and women who cannot see or turn physical pages are afforded equal access to the cultural record. Thousands of books that would have been lost each year are preserved. Older, out-of-print, rarely checked-out, and public-domain books, formerly banished to offsite storage facilities, are again discovered, purchased, and used. Authors—as well as the public—benefit.

## ARGUMENT

### I.    Legal Standard.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and these principles "apply with equal vigor to the fair use determination," *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1257-58 (2d Cir. 1986).

---

[6] In order to use the HDL's accommodations, a person with a print disability must obtain certification from a qualified expert who in turn informs the Michigan library the individual has a certified print disability. (*Id.* ¶ 105.) Michigan explains the digital library to the patron, describes appropriate uses of the service (including warnings about copyright infringement), and enables the patron to get secure digital access to the library. (*Id.*) With digital access, a print-disabled patron can perceive the works within the HDL using adaptive technologies such as software that translates the text into spoken words. (*Id.*)

II.     **The Libraries' Uses of Plaintiffs' Works Are Protected Fair Uses.**

A.     **Fair Use and the Purpose of Copyright Law.**

"The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science . . . .'" *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991) (alteration in original) (quoting U.S. Const. Art. I § 8, cl. 8). "[P]rivate motivation must ultimately serve the cause of promoting **broad public availability** of literature, music, and the other arts." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) (emphasis added and footnote omitted).

Fair use furthers this central purpose, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994), and "is necessary to achieve the objectives of that law," *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006) (internal quotation and citation omitted). For this reason, fair use "should not be considered a bizarre, occasionally tolerated departure from the grand conception of the copyright monopoly," Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1110 (1990).

B.     **Section 107 and the Fair Use Factors.**

Congress flatly states in Section 107 that copying for the purposes of "scholarship," "teaching," or "research" are examples of fair use and then directs courts to evaluate four "factors": (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *Blanch*, 467 F.3d at 251. Courts should consider the factors consistently with the public interest. 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[B][5] (2011).

10

1.      **The Purpose and Character of the Use Factor Favors Fair Use.**

   a.      **The Libraries' Uses Are Favored Preamble Uses and
            Presumptively Fair.**

The Libraries' uses—for "teaching," "scholarship," and "research"—perfectly match the

codified examples of what Congress intended to be fair uses. As such, these specifically

sanctioned uses necessarily inform the meaning of "the purpose and character of the use" and all

but end the factor one analysis. Indeed, as this Court (and the Second Circuit) has held, factor

one strongly favors fair use where the use falls within the categories listed in Section 107.

*Hofheinz v. Discovery Commc'ns, Inc.*, No. 00 Civ. 3802, 2001 WL 1111970, at \*3 (S.D.N.Y.

Sept. 20, 2001) (Baer, J.); *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004). This key

factor, therefore, heavily favors the Libraries on its face, a conclusion buttressed by the fact that

the Libraries' uses are for "nonprofit educational purposes," the antithesis of the types of

commercial uses that can weigh against fair use under factor one. *See* 17 U.S.C. § 107(1)

(contrasting commercial uses with nonprofit educational uses).

   b.      **Transformative Uses Are Particularly Favored.**

Fair use is more than the hallmark examples Congress named in the statute. Scholarship,

teaching, and research are "illustrative and not limitative." *Campbell*, 510 U.S. at 577. A further

central inquiry under factor one is whether the use "adds something new, with a further purpose

or different character, altering the first with new expression, meaning, or message." *Id.* at 579

(citing Leval, *supra*, at 1111). Such uses have been termed "transformative" (or "productive").

"Transformative" does not mean that the original work must be physically altered; rather,

the issue is whether the new use is for an "entirely different purpose and meaning" irrespective

of whether changes are made to the original work. For example, in *Bill Graham Archives*, the

Second Circuit held that the defendants' unauthorized use of entire (although reduced size)

11

copies of copyrighted concert posters to illustrate points in a book was "transformatively different from the original expressive purpose" of the posters. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006). This was because defendants' use of the poster image "to document and represent the actual occurrence" of the concerts was different from the "dual purposes of artistic expression and promotion" of the original use. *Id.*; *see also Blanch*, 467 F.3d at 253 (including unedited photograph in collage was for transformative purpose of commenting on the social and aesthetic consequences of mass media); *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 324 (S.D.N.Y. 2008) ("To be transformative, it is not necessary that defendants alter the music or lyrics of the song. . . . Defendants' [unaltered] use is nonetheless transformative because they put the song to a different purpose . . . .").[7]

### c.    The HDL's Search Functionality is Unquestionably Transformative.

Using a computer to search a book for a word is not the same as reading a book. Instead of making books readable for their expressive, aesthetic, or instructional value, the HDL finds the pages where a search term appears. **HathiTrust has never made a single line of any books treated as in-copyright available to be read** (other than for the purpose of providing access to the blind).[8] (Wilkin Decl. ¶ 16.) Copying works in order to provide discovery tools that identify relevant works—as distinct from making the text of the works themselves accessible— unquestionably serves a different function than that served by the original works.

---

[7] See also the Fourth Circuit's decision in *A.V. v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009), where there was extensive unauthorized copying and archiving of student papers by a plagiarism detection service that compared a student's writing with previously-submitted papers. *Id.* at 634. The Fourth Circuit summarily dismissed the plaintiffs' argument that the use was not transformative, finding that a use "can be transformative in function or purpose without altering or actually adding to the original work." *Id.* at 639.

[8] Although the HDL search results do not display a single line of text for works treated as in-copyright, the Libraries are confident that the "snippets" provided by Google are a fair use as well.

As explained by Dr. Katz, "[s]ophisticated digital searching over the text of large numbers of books has permitted me to search for specific words or names (or words or names in relation to each other) that simply was not possible using a library card catalog, the electronic OPAC, or other bibliographic resources." (Katz Decl. ¶ 9.) Margaret Leary also notes: "**In seven years of research, I did not find [the] information anywhere else**." (Leary Decl. ¶ 13 (emphasis added).) In each case, the researcher located a physical copy of the book and read the relevant portions there, not online.

The Ninth Circuit's decision in *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003) (which the Second Circuit panel in *Bill Graham Archives* cited favorably), confirms that copying for purposes of search is a transformative use. Arriba Soft copied the plaintiff's photographs—and millions of other copyrighted photographs—from websites for the purpose of facilitating search, producing exact but smaller, lower-resolution versions of the originals ("thumbnail" images), and made the thumbnail images available as search engine results on the defendant's website. *Arriba Soft*, 336 F.3d at 815-16.

Although the defendant in *Arriba Soft*, like the defendant in *Bill Graham Archives*, made "exact replications" of the plaintiff's entire works, the court held that the defendant's use was transformative because the defendant's images "served an entirely different function than [the plaintiff's] original images." *Id.* at 818. In words that resonate here, the defendants' copying was for the purpose of "improving access to information on the internet versus artistic expression." *Id.* Here, library patrons do not get to see even a low-resolution or reduced-size copy of books; they get to see unprotected *titles* of books and the *page numbers* where their search terms appear.

The Ninth Circuit in *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), came to the same conclusion about different (transformative) uses of exact copies when it judged

Google's indiscriminate copying of Internet content to make it findable: "Although an image may have been created originally to serve an entertainment, aesthetic, or informative function, a search engine **transforms the image into a pointer directing a user to a source of information**." *Id.* at 1165 (emphasis added); *see also A.V. v. iParadigms, LLC*, 562 F.3d 630, 640 (4th Cir. 2009) (finding defendant's copying and archiving of student papers "was completely unrelated to expressive content and was instead aimed at detecting and discouraging plagiarism").

Like the copying in those cases—each of which was by a commercial entity—the Libraries' copying to enable search (but not reading) serves "an entirely different function" than the expressive purpose of the books.[9] The Libraries' uses are unquestionably transformative and the first fair use factor overwhelmingly supports fair use.

### d. Access to the Disabled and Preservation Also Are Transformative Uses and Are Otherwise Fair Uses.

Making books available to the blind and disabled is transformative because the use serves a different, underserved audience otherwise unable to access the overwhelming majority of works in their print format. It hardly "'supersede[s] the objects' of the original creation," in Justice Story's words, *Campbell*, 510 U.S. at 579 (citing *Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) (No. 4901)), when authors themselves do not seem to care that the blind cannot access their works, (Petersen Decl. ¶ 22, Ex. U (Cummings Dep. 56:23-57:3, May 22, 2102: Q: "So, you do not believe the print disabled should have access to those works?" A: "No."); ¶ 23, Ex. V (Rønning Dep. 80:21-25, May 29, 2012: Q: "[Y]ou have no understanding of how a U.S. student . . . with a print disability would obtain access to your works." A: "No. Why

---

[9] Most of the works in the HDL were digitized by Google. Additional copies were made by the HathiTrust to facilitate search, ensure preservation, provide access to the print disabled, permit research, and maintain adequate backups for those purposes. These copies were necessary in order to make favored uses and were in no sense commercial.

should I?"). Providing access to the print disabled unlocks these books and thus departs from and transforms their original purpose and character.

The preservation of an archive of books that otherwise would be lost is equally transformative because the purpose of preserving books for future lawful uses is "transformatively different from the original expressive purpose" of the books. *See Bill Graham Archives*, 448 F.3d at 609; *cf. Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1118-19 (D. Nev. 2006) (finding Google's "caching" of websites was transformative because the archival copy allowed researchers to access information that was otherwise inaccessible, and thus served a different purpose than the artistic function of the copyrighted works).

Even if the Court holds that copying for purposes of preservation and providing access to the print disabled are not transformative uses, these uses are still protected fair use. While a determination that a use is transformative is typically dispositive, the converse is not true. Because the ultimate inquiry in each case is whether the use is beneficial to society, uses that are not transformative but benefit the public are often held to be fair use. For example, in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), the Supreme Court held that private copying of television broadcasts to view at a later time (i.e., "time shifting") benefited society and, thus, was a protected fair use **even though the copyrighted works were being used for the identical purpose**. *Id.* at 449, 454 (noting that the noncommercial character of the use rendered it presumptively fair); *see also, e.g., Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg LP*, No. 11 Civ. 1006, 2012 WL 1759944, at *3-4, *6 (S.D.N.Y. May 17, 2012) (posting full versions of earnings calls, while not transformative, was nonetheless a fair use because it advanced the public interest of disseminating financial news).

Copying in order to permit reading by the blind and copying for preservation are in fact mentioned by Congress as fair use. With respect to the blind: "Another special instance illustrating the application of the fair use doctrine pertains to the making of copies or phonorecords of works in the special forms needed for the use of blind persons." H.R. Rep. No. 94-1476, at 73 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5686; *see also Sony*, 464 U.S. at 455 n.40 ("Making a copy of a copyrighted work for the convenience of a blind person is expressly identified by the House Committee Report as an example of fair use, with no suggestion that anything more than a purpose to entertain or to inform need motivate the copying."). As for preservation, Congress noted (in connection with movies in danger of disintegration): "The efforts of the Library of Congress, the American Film Institute, and other organizations to rescue and preserve this irreplaceable contribution to our cultural life are to be applauded, and the making of duplicate copies for purposes of archival preservation certainly falls within the scope of 'fair use.'" H.R. Rep. No. 94-1476, at 73 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5687.

In sum, the Libraries' uses are uses Congress named as fair; they are transformative; and they are made by non-profit educational institutions. Factor one "strongly favors" the Libraries. *See Cambridge Univ. Press v. Becker*, No. 1:08-CV-1425-ODE, 2012 WL 1835696, at *24 (N.D. Ga. May 11, 2012) (finding fair use for the vast majority of alleged infringements because they were preamble uses and were made by a non-profit educational institution).

2.      **The Nature of the Copyrighted Works Factor Favors the Libraries.**

a.      **The Majority of Works in the HDL Are Published and Out of Print.**

Copying published works is more likely to be a fair use than copying unpublished works. *Blanch*, 467 F.3d at 256 (fact that plaintiff's work was published favored the defendants). Virtually all works allegedly infringed are published—which tilts in the Libraries' favor.

Moreover, "[a] key, though not necessarily determinative, factor in fair use is whether or not the work is available to the potential user. If the work is 'out of print' and unavailable for purchase through normal channels, the user may have more justification for reproducing it than in the ordinary case . . . ." S. REP. NO. 94-473, at 64 (1975) (1975 WL 370213); *see also Maxtone-Graham*, 803 F.2d at 1264 n.8 (explaining that the fact plaintiff's book was out of print provided additional support for finding fair use). Plaintiff Authors Guild has acknowledged that "[a]pproximately 75% of the Books in United States libraries are out-of-print and have ceased earning any income at all for their Rightsholders," a fact that favors fair use copying of them. Mem. of Law in Supp. of Pls.' Mot. For Prelim. Settlement Approval at 27, *The Authors Guild, Inc. v. Google Inc.*, No. 05-cv-8136 (S.D.N.Y. Oct. 28, 2008). (*See also* Wilkin Decl. ¶ 66 ("It is my understanding that the vast majority of works in the corpus are now out of print (and, in fact, for older works within the collection, have been out of print for decades).").)

Many of these out-of-print works are also in the public domain—although it is difficult to confirm which books are and which ones are not. Works published between 1923 and 1963 entered the public domain unless they were renewed, and the vast majority were not renewed. For example, a 1960 Copyright Office study found that only 7% of books were renewed. *See* Staff of S. Comm. on the Judiciary (Barbara Ringer), 86th Cong., Renewal of Copyright 31, at 220 (Comm. Print 1960). Since the Copyright Office records prior to January 1, 1978 are not

completely or reliably digitized, however, the process of confirming whether a work was renewed requires manually checking the physical records at the Copyright Office in Washington, D.C. for each work, an impossible task given the number of works within the HDL corpus. And of course, even if a search confirmed that the work was renewed and still subject to copyright protection, there is no guarantee that a subsequent search would identify the current rights holder (which given the life-plus-70-year copyright term could be grandchildren, ex-spouses, creditors, bankruptcy trustees, or defunct publishers).

The HDL currently contains millions of works published during the 1923-1963 time period. If only 7% of these works are still subject to copyright protection, then well over a million books currently being treated as in copyright are actually in the public domain.

The uncertainty about whether a book published between 1923 and 1963 is still in copyright, coupled with the difficulty of locating the author or his/her heirs decades after publication, has had a devastating effect on the availability of new printings of out-of-print books during those 40 years, as reflected in the following chart from Professor Paul Heald at University of Illinois College of Law, which shows a pronounced drop-off in the publication of older books upon approaching the 1923 boundary (on the following page):[10]

---

[10] *See* Rebecca J. Rosen, *The Missing 20th Century: How Copyright Protection Makes Books Vanish*, The Atlantic, Mar. 30, 2012, http://www.theatlantic.com/technology/archive/2012/03/the-missing-20th-century-how-copyright-protection-makes-books-vanish/255282/#. Professor Heald's study involved the random selection of 2,500 fiction books available for purchase new from Amazon. The y-axis indicates the number of books in the sample that were first published during each decade reflected on the x-axis.



Fearful of expansive copyright infringement lawsuits by the tiny, all but unknowable minority who may have renewed their copyrights, publishers simply stopped printing them, thereby further reducing availability, a key issue for factor two.

> **b.    The Majority of Works in the HDL Are Factual Works.**

The second factor recognizes "that some works are closer to the core of intended copyright protection than others," *Campbell*, 510 U.S. at 586, and copying factual works is more likely to be fair use than copying creative works. *Blanch*, 467 F.3d at 256 (citation omitted); *see also Maxtone-Graham*, 803 F.2d at 1263; *Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966).

As explained in Mr. Wilkin's declaration, an analysis of the call numbers within the HDL corpus reveals that less than 9% of the corpus consists of prose fiction, poetry, and drama. The remainder, approximately 90% of the corpus consists of factual works such as books and journals in the humanities, social sciences, and physical sciences. (Wilkin Decl. ¶ 67.) Since the vast majority of works within the HDL corpus are factual, the Libraries' fair use rights with respect to such works are commensurately broad.

c.      **In-Print and Fictional Works Have Limited Significance Given the Transformative Nature of the Use.**

Because the Libraries' uses are transformative, the fact that a small minority of works may be in print or fictional, and thus less susceptible to fair use under factor two, offers little support for Plaintiffs' claims. *See Campbell*, 510 U.S. at 586 (noting that this factor is unlikely to "separat[e] the fair use sheep from the infringing goats" where the use is transformative); *Bill Graham Archives*, 448 F.3d at 612 (noting that "the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose").

3.      **The Libraries Copy No More of the Books Than Necessary.**

The third factor focuses on whether the amount of copying was reasonable in relation to its purpose. *Sony*, 464 U.S. at 449-50. "There are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use," *Maxtone-Graham*, 803 F.2d at 1263, and "the extent of permissible copying varies with the purpose and character of the use," *Campbell*, 510 U.S. at 586-87. The crux of the inquiry is whether "**no more was taken than necessary**." *Id.* at 587 (emphasis added). In some cases, it is "necessary" to copy, and even display, entire works. *See Bill Graham Archives*, 448 F.3d at 613; *Arriba Soft*, 336 F.3d at 821.

This treatment of the third factor highlights that the proper focus of fair use is logically on the "use" and not the copying that enabled the use. As such, courts have recognized, for example, that "intermediate copying" of entire works is not infringing where the copying is necessary to engage in fair use. *See, e.g.*, *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1526-27 (9th Cir. 1993) (copying entire software program for purposes of reverse engineering was fair use); *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 605-06 (9th Cir. 2000) (same); *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 206 (4th Cir. 1998) (fair use to copy fragile manuscript so that author of critical review could study it without damaging the

20

original). "It would severely restrict scholarly pursuit, and inhibit the purposes of the Copyright Act, if a fragile original could not be copied to facilitate literary criticism." *Id.* at 206; *cf. Perfect 10*, 508 F.3d at 1169 (finding incidental copying to assist computer users' access to the Internet was a transformative fair use). Similarly, the Libraries' digitization of entire books is justified by their fair uses of the digital copies.

The third factor typically is concerned only with **expressive** uses of copied works. *See* Matthew Sag, *Copyright and Copy-Reliant Technology*, 103 Nw. U. L. Rev. 1607, 1650 (2009) ("The issue at the heart of the third factor is not simply what percentage of the copyright owner's original work has been taken, but what proportion of the work's expressive value has been appropriated."). For example, in *Blanch*, the artist Jeff Koons scanned the plaintiff's entire photograph (as well as many other images from advertisements), yet in evaluating factor three the Second Circuit emphasized that Koons ultimately had not incorporated the most expressive aspects of the photograph into his artwork. *Blanch*, 467 F.3d at 257-58 (concluding that the third factor "weighs distinctly in Koons's favor); *cf. Cambridge Univ. Press*, 2012 WL 1835696, at *43, *passim* (copying of works that were made available online but never accessed was *de minimis* and therefore non-infringing without the need even to consider fair use).

The Libraries' uses for search and preservation do not display **any** protected text from the scanned books—not even a snippet—and therefore cannot be said to **use** the expressive elements of the works. Moreover, the Libraries have copied no more than is essential for their fair uses. The entire texts of Plaintiffs' works must be digitized for preservation purposes. And search of only partially-digitized texts would obviously lead to incomplete and inaccurate results. *See Arriba Soft*, 336 F.3d at 821 ("If Arriba only copied part of the image, it would be more difficult to identify it, thereby reducing the usefulness of the visual search engine."). Imagine, for

21

example, preserving only every third chapter or searching only the first 100 pages of a book. Factor three is at worst neutral.

> **4.     The Libraries' Uses Do Not Affect the Market For or Value of Plaintiffs' Books.**

The fourth factor asks "whether the secondary use usurps the market of the original work." *NXIVM*, 364 F.3d at 482. The "markets" at issue are "only those that creators of original works would in general develop or license others to develop." *Campbell*, 510 U.S. at 592; *Bill Graham Archives*, 448 F.3d at 614 (noting that only "traditional, reasonable, or likely to be developed markets" are relevant under the fourth factor). Because the Libraries' uses are noncommercial, Plaintiffs carry the burden of "showing by a preponderance of the evidence that some meaningful likelihood of future harm exists." *Sony*, 464 U.S. at 451. "[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." *Id.* at 450, 454 (noting that in light of the societal benefits of time-shifting, the copyright holder needed to demonstrate a likelihood of harm).

Plaintiffs **admit** they are unable to identify "**any specific, quantifiable past harm, or any documents relating to any such past harm**" resulting from the Libraries' uses of their works. (Petersen Decl. ¶¶ 2 - 21, Exs. A - T (responses to Interrogatory No. 5) (emphasis added).) Indeed, two Plaintiffs deposed in this action—including the Secretary of Plaintiff Authors Guild, Pat Cummings—confessed to not even being aware of the Libraries' uses of in-copyright works within the HDL, a fact that evidences they have not suffered any demonstrable harm from the Libraries digitization of their works. (*See id.* ¶ 22, Ex. U (Cummings Dep. 19:3-9, May 22, 2012;  Q: "[D]o you have any understanding of the use made by the libraries with respect to the digitized works in the HathiTrust Corpus?" A: "I don't know what uses they're

22

making of it.”); ¶ 23, Ex. V (Rønning Dep. 52:8-14, May 29, 2012; Q: “[D]o you have any

understanding of the types of uses made by my clients with respect to the in copyright—the

works that are presumed to be in copyright that are included in the HathiTrust digital library?” A:

“No.”).) Instead, Plaintiffs argue they will suffer only prospective, unrealized harms.

     In the first place, there is no harm. The Libraries continue to purchase books, even books

that have already been digitized. (Wilkin Decl. ¶¶ 72-74.) Last year alone, Michigan spent over

24 million dollars on library hardcopy and electronic acquisitions. (*Id.* ¶ 14.)

     Second, were some market effect to emerge, any such harm is irrelevant to the fair use

analysis because the Libraries’ uses are transformative and thus any harm arises, if at all, in a

“transformative [i.e., unprotected] market.” *See Bill Graham Archives*, 448 F.3d at 614

(“Appellant asserts that it established a market for licensing its images, and in this case expressed

a willingness to license images to DK. Neither of these arguments shows impairment to a

traditional, as opposed to a transformative market.”). Plaintiffs cannot preempt markets that

currently do not exist by speculating that they might one day develop a licensing scheme for

these uses; nor can they disrupt what is otherwise a fair use, even if a market is conceivable.

     If this were not the case, a plaintiff would always point to the use made by the defendant

and claim that licensing revenue would be lost if the defendant’s conduct were deemed a fair use;

a plaintiff could simply “boot-strap the specter of a fair use holding . . . as reason why the use

was not a fair use to begin with.” *Hofheinz v. A & E Television Networks*, 146 F. Supp. 2d 442,

449 (S.D.N.Y. 2001) (use of movie footage in television biography program a fair use). This

would “eviscerate” fair use “since every copyright infringer seeking protection of the fair use

doctrine could have potentially sought a license from the owner of the infringed work.” *Hofheinz*

*v. Discovery Commc’ns, Inc.*, 2001 WL 1111970, at *6 (Baer, J.) (internal quotation and citation

omitted); *see also Bill Graham Archives*, 448 F.3d at 614 (noting that the fourth factor would always favor the copyright holder "were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use") (internal quotation and citation omitted).

Third, Plaintiffs' alleged "prospective" harm to a "potential" market is pure conjecture, as shown by their own evidence. Plaintiffs have not produced in discovery:

(1)     any business plans for licensing the digitization of books; or

(2)     any plans for the use books for preservation and research purposes; or

(3)     any analysis of their costs for licensing such markets or anticipated revenues; or

(4)     any communications with entities that might collectively license these rights; or

(5)     any analysis of the substantial limitations that such an entity would face in terms of the number of works it could foreseeably license.

Plaintiffs also have not identified "any revenue or other earnings of any kind generated or expected to be generated in whole or in part" for archiving, research, full-text search, or use by the blind. (Petersen Decl. ¶¶ 2 -18, Exs. A – Q (responses to Request Nos. 8 -11); ¶¶ 19 – 21, Exs. R – T (responses to Request Nos. 4 – 7 (misnumbered in Plaintiffs' responses)).)

Plaintiffs' speculative, generalized allegations fall short of satisfying their burden of "showing by a preponderance of the evidence that some meaningful likelihood of future harm exists." *Sony*, 464 U.S. at 451, 454 (endorsing the District Court's conclusion: "Harm from time-shifting is speculative and, at best, minimal."); *see also Blanch*, 467 F.3d at 258 & n.9 (rejecting speculative harm to potential market for photograph); *Perfect 10*, 508 F.3d at 1168 (rejecting "hypothetical" harm to market for thumbnail images on mobile phones). And of course, the fact that the majority of works digitized by the Libraries are out of print also supports the absence of any adverse effect on Plaintiffs' market. *See Hofheinz v. Discovery Commc'ns, Inc.*, 2001 WL

24

1111970, at *6 (Baer, J.) (noting that if there were a market for the plaintiff's film, which was not being sold or rented, it was diminutive); *Duffy v. Penguin Books USA Inc.*, 4 F. Supp. 2d 268, 275 (S.D.N.Y. 1998) (noting that because the plaintiff's book was out of print at the time of the alleged infringement, there was no market harm).

Finally, there is no viable market likely to be developed for licensing preservation, print-disabled access, or search for the books in the HDL. This is because of the prohibitively high transaction costs associated with seeking licenses for millions of books. Dr. Joel Waldfogel, Frederick R. Kappel Professor of Applied Economics at the University of Minnesota, conservatively estimates that that cost of securing permission from every possible rights holder for books in the HDL would be $569 million—**and that does not even include the cost of any licensing fee to the rights holder**. (Waldfogel ¶¶ 22-24.) And the estimate assumes each rights holder can be identified (*id.* ¶ 24); of course, as noted previously, they cannot (*id.* ¶¶ 18-20).

As Dr. Waldfogel concludes: "The costs associated with creating and maintaining a service like the HathiTrust would exceed any potential revenue that such a venture could earn. Thus, I conclude that the creation and offering of a service with the functionality of the HathiTrust, but with licensed content, is not a commercially viable endeavor (i.e., an endeavor where the revenues could cover the costs)." (*Id.* ¶ 7.) This insurmountable barrier prevents any market from forming and supports fair use. *See* Wendy J. Gordon, *Fair Use As Market Failure, A Structural and Economic Analysis of the Betamax Case and Its Predecessors*, 82 Colum. L. Rev. 1600, 1618, 1628 (1982) (noting that where there are prohibitively high transaction costs, a market failure results and courts should allow fair use).

Plaintiffs appear to be relying on speculation that Congress will eventually step in and form a market, e.g., by creating a compulsory licensing system. (*See* First Am. Compl. ¶ 6.) As

the Supreme Court noted in *Sony*, "it is not [the court's] job to apply laws that have not yet been written." *Sony*, 464 U.S. at 456. The need for payment to rights holders through a compulsory license or otherwise only becomes an issue if the Libraries' activities are not a fair use because **fair uses require neither payment nor permission**. *See* 17 U.S.C. § 107 ("[T]he fair use of a copyrighted work . . . is not an infringement of copyright.").

### C.     Balancing All the Factors.

"The ultimate test of fair use . . . is whether the copyright law's goal of promoting the Progress of Science . . . would be better served by allowing the use than by preventing it," *Bill Graham Archives*, 448 F.3d at 608 (quotation marks omitted; ellipsis in original), but fair use also is an "equitable rule of reason," *Sony*, 464 U.S. at 448. Thus, the equities between the parties may come into play in the fair use analysis.

Here, Plaintiffs were aware of the Libraries' digitization at least as early as 2004 when Google publicly announced its agreement with Michigan (among other academic libraries) to digitize its collection—nearly seven years before this lawsuit was filed. Yet during this period in which the Libraries were expending considerable resources digitizing their collections and creating the infrastructure to securely store the works, and despite the fact that Plaintiff Authors Guild in 2005 filed a lawsuit against Google based on its digitization of these materials, Plaintiffs did not make a single objection to the Libraries. Now that Plaintiffs have filed a lawsuit against the Libraries, one would assume that each Plaintiff would at least be familiar with the Libraries' uses of their works, yet at least two deposed Plaintiffs—including an officer of Plaintiff Authors Guild—are not.[11] In view of Plaintiffs' delay, the Libraries' expenditures during the seven years when Plaintiffs were on notice, and the cavalier attitude of at least some Plaintiffs as to the reason for this lawsuit, the equities favor the Libraries.

---

[11] To reduce costs, the Libraries only deposed four Plaintiffs.

### III.  The Orphan Works Project.

As the court is aware, the Libraries have suspended any plans to make any works available through the Orphan Works Project (OWP), and the project may never resume. (Wilkin Decl. ¶¶ 114-16.) For that reason, as addressed in the Libraries' pending motion, the issue is not ripe for adjudication. But even if the Court disagrees and considers now Plaintiffs' infringement claims with respect to the project, there is no justiciable issue as to the infringement of any copyright by the OWP.

This is because not one single orphan works candidate—i.e., **not one single out-of-print book whose copyright holder could not be located—has ever been distributed, displayed, or performed to anyone**. That material fact is undisputed. (*Id.* ¶ 116.) As a result, the Libraries are entitled to summary judgment that **the OWP has not infringed a single right under Section 106** of a single book copyright.

As for whether the hypothetical OWP is a fair use: if the OWP were ever implemented in the manner previously contemplated (i.e., if one single out-of-print but in-copyright work whose copyright holder could not be found despite a rigorous search were ever made available for a student or researcher to view subject to copyright warnings and in full compliance with 17 U.S.C. § 108(e), then a federal court **at that time** could evaluate whether making available such a work for the purposes of research and scholarship—Congressionally-endorsed uses—was or was not a fair use.

Finally, should the Court decide the OWP is ripe for a fair use determination, we would respectfully request that the parties be permitted to fully brief the issue. We would only note at

27

this time that such use (as contemplated) is permitted under Section 108(e);[12] would be for purposes expressly endorsed by Congress in Section 107; would be non-commercial; and would be a transformative new use of an otherwise unused (because unavailable) book (factor one). Since the work would be out of print, it would be more susceptible to fair use, and no more would have been copied than is necessary (factors two and three). And of course, should a holder of copyright in an out-of-print book ever identify herself, the book would be removed and the original or a new publisher could bring a new edition back into print (i.e., the effect on the market would be positive) (factor four).

## CONCLUSION

Both the first and fourth factors weigh strongly in favor of fair use, and the second and third factors tilt in the same direction. The factors and the public interest advanced by these uses demonstrate that the Libraries are entitled to summary judgment on fair use and infringement for the OWP as a matter of law.

DATED:  June 29, 2012
      New York, New York

Respectfully Submitted,

Joseph Petersen (JP 9071)
Robert Potter (RP 5757)
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800
Email: jpetersen@kilpatricktownsend.com

Joseph M. Beck (admitted *pro hac vice*)
W. Andrew Pequignot (admitted *pro hac vice*)
Allison Scott Roach (admitted *pro hac vice*)
KILPATRICK TOWNSEND & STOCKTON LLP

---

[12] *See* Prudence Adler, Jonathan Band, & Brandon Butler, *Resource Packet on Orphan Works: Legal and Policy Issues for Research Libraries*, Association of Research Libraries, 5-9 (Sept. 13, 2011), http://www.arl.org/bm~doc/resource_orphanworks_13sept11.pdf.

1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: jbeck@kilpatricktownsend.com

*Attorneys for Defendants*