UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
THE AUTHORS GUILD, INC., et al.,                 :

               Plaintiffs,          :          Index No. 11 Civ. 6351 (HB)

                    :

   - against -                                          :

                    :
HATHITRUST, et al.,                              :

              Defendants.            :
------------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF
# PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

FRANKFURT KURNIT KLEIN & SELZ, P.C.
Edward H. Rosenthal, Esq.
Jeremy S. Goldman, Esq.
Adam Nelson (Law Student)
488 Madison Avenue
New York, New York  10022
Tel.:  (212) 980-0120
Fax:  (212) 593-9175
erosenthal@fkks.com
jgoldman@fkks.com
anelson@fkks.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ......................................................................................2

THE STANDARD ON THIS MOTION..................................................................9

ARGUMENT...........................................................................................................9

I.   PLAINTIFFS HAVE ESTABLISHED THEIR *PRIMA FACIE* CASE OF
     COPYRIGHT INFRINGEMENT AGAINST DEFENDANTS..........................9

     A.   Ownership....................................................................................10

     B.   Copying .......................................................................................11

II.  DEFENDANTS' UNAUTHORIZED REPRODUCTION OF PLAINTIFFS' BOOKS
     THROUGH THEIR MASS DIGITIZATION PROGRAM IS NOT PERMITTED
     UNDER SECTION 108 OF THE COPYRIGHT ACT.......................................11

     A.   The Works Were Digitized for a Commercial Advantage and Thus Were
          Not Permitted Under Section 108(a) ...................................................12

     B.   The Digitization Was Not Permitted Under Any Section 108 Exemption............13

          1.   Defendants' Activities are not Permitted Under Section 108(c) ...............14

          2.   Defendants' Activities are not Permitted Under Section 108(d) or
               (e)........................................................................................15

III. THE MASS DIGITIZATION OF COPYRIGHTED WORKS IS NOT FAIR
     USE.............................................................................................................16

     A.   Purpose and Character .....................................................................17

          1.   Mass Digital Copying is Non-Transformative ...........................................17

          2.   Defendants' Non-Profit Status and Educational Purpose Do Not
               Shield them for Liability for Copyright Infringement................................18

     B.   Nature of Copyrighted Work..............................................................20

     C.   Amount and Substantiality ...............................................................20

D.      Effect of Use on Potential Market ...................................................................21

         1.      Each Unlicensed Digital Copy Represents a Lost Sale ............................22

         2.      Exposure of Works to Unlimited Piracy...................................................23

         3.      Loss of Potential Licensing Revenues.......................................................25

IV.     THE ORPHAN WORKS PROJECT VIOLATES COPYRIGHT LAW .........................28

CONCLUSION ...............................................................................................................30

# TABLE OF AUTHORITIES

**Page**

## CASES

*A&M Records, Inc. v. Napster, Inc.,*
  239 F.3d 1004 (9th Cir. 2001) ....................................................................................19

*Am. Geophysical Union v. Texaco, Inc.,*
  60 F.3d 913 (2d Cir. 1994), *cert. dismissed,* 516 U.S. 1005 (1995)........................17, 18, 19, 25

*Authors Guild v. Google Inc.,*
  770 F. Supp. 2d 666 (S.D.N.Y. 2011) ........................................................7, 8, 9, 28

*Authors Guild v. Google Inc.,*
  No. 05 Civ. 8136 (DC), 2012 WL 1951790 (S.D.N.Y. May 31, 2012) ....................................10

*Basic Books, Inc. v. Kinko's Graphics Corp.,*
  758 F. Supp. 1522 (S.D.N.Y. 1991) ..........................................................................17

*Byrne v. British Broad. Corp.,*
  132 F. Supp. 2d 229 (S.D.N.Y. 2001) ........................................................................19

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994) ........................................................................17, 19, 20

*Craft v. Kobler,*
  667 F. Supp. 120 (S.D.N.Y. 1987) ........................................................................22

*Encyclopaedia Britannica Educational Corp. v. Crooks,*
  542 F. Supp. 1156 (W.D.N.Y. 1982)..........................................................17, 18, 23

*Feist Publications, Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991) ..........................................................................9

*Harper & Row Publishers, Inc. v. Nation Enterprises,*
  471 U.S. 539 (1985) ........................................................................17, 20, 21

*Infinity Broad. Corp. v. Kirkwood,*
  150 F.3d 104 (2d Cir. 1998) ..........................................................................passim

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.,*
  153 F.3d 82 (2d Cir. 1998) ..........................................................................10

iii

*Princeton Univ. Press v. Michigan Document Services, Inc.,*
   99 F.3d 1381 (6th Cir. 1996), *cert. denied,* 520 U.S. 1156 (1997) ......................................13, 18

*Salinger v. Random House, Inc.,*
   811 F.2d 90 (2d Cir.), *cert. denied,* 484 U.S. 890 (1987) ...........................................................22

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
   464 U.S. 417 (1984) ...............................................................................................................21

*UMG Recordings, Inc. v. MP3.com, Inc.,*
   92 F. Supp. 2d 349 (S.D.N.Y. 2000) ........................................................................................17

*WWBITV, Inc. v. Vill. of Rouses Point,*
   589 F.3d 46 (2d Cir. 2009) ......................................................................................................9

**STATUTES**

17 U.S.C. § 106 .........................................................................................................................22

17 U.S.C. § 106(l) ......................................................................................................................11

17 U.S.C. § 107 ....................................................................................................................*passim*

17 U.S.C. § 108 ....................................................................................................................*passim*

17 U.S.C. § 201(d)(1) ................................................................................................................10

17 U.S.C. § 410(c) ......................................................................................................................10

## PRELIMINARY STATEMENT

In Plaintiffs' previously-submitted motion for partial judgment on the pleadings, Plaintiffs explain why Defendants' admissions in their Answer to Plaintiffs' First Amended Complaint are sufficient to establish that nothing in the Copyright Act provides a defense for their mass digitization program or Orphan Works Project. Discovery has only reinforced how brazen Defendants, and their business partner Google, have been in violating the rights of Plaintiffs and other authors by engaging in their unprecedented project to scan millions of copyrighted library books without permission.

For all intents and purposes, Defendants permitted Google to back trucks up to university library loading docks, empty every book from every shelf, drive the trucks to one of several top-secret Google-operated scanning centers, digitize each work, keep a digital copy for Google's own commercial purposes and then return the printed work and a digital copy to Defendants for their own use. Defendants then collected the millions of digitized books into an online repository called HathiTrust, made multiple copies of the repository, and used or threatened to use the books for a variety of purposes, including in connection with their currently "suspended" Orphan Works Project. Google has spent ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on its massive "Library Project," ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Defendants' admissions and the evidence leave no doubt that the libraries overstepped every allowance granted to them in Section 108 of the Copyright Act, which sets forth specific limits on library photocopying and digitizing. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ They

preemptively digitized every book, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and only later tried to find a way to justify their conduct.

Nothing in copyright law permits the unlicensed scanning, copying and use of millions of copyrighted books, whether by a giant commercial entity like Google or a group of university libraries. Defendants' preemptive digitization program has harmed and threatens to further harm Plaintiffs and other owners of copyrighted books digitized by Defendants by, *inter alia*, depriving them of the opportunity to sell printed and/or digital copies of their books to defendant libraries, exposing these books to potentially catastrophic security risks, and undermining copyright owners' ability to decide whether, when and under what circumstances to participate in existing or new licensing opportunities. Plaintiffs' remedies are limited because Defendants are able to hide behind sovereign immunity and do not have to face the prospect of huge money damages. But Defendants are not immune from the Court's power to issue an injunction to stop this illegal conduct.

## STATEMENT OF FACTS

The facts relevant to this motion are set forth in the various declarations of the individual and associational plaintiffs, of experts on issues of collective licensing and security, and in the documents and deposition testimony attached to the Declaration of Edward H. Rosenthal.[1] Certain of the critical facts are summarized below, and others are detailed in the Argument section of this brief.

---

[1] "UF __" refers to the corresponding undisputed fact and supporting evidence set forth on Plaintiffs' Statement of Undisputed Facts ("56.1 Statement"). "Ex. __" refers to the corresponding exhibit to the Declaration of Edward H. Rosenthal dated June 29, 2012. Except where otherwise indicated, capitalized terms shall have the meanings ascribed to them in the Definitions Appendix to the 56.1 Statement.

2

**The Mass Digitization Program**

Defendants have engaged in a mass digitization program ("MDP"), resulting in the scanning into digital format of millions of printed books, the majority of which are protected by copyright in the United States.  UF 77.  Each of these "digitized" books has been incorporated into a digital archive administered by Defendant UM called the HathiTrust Digital Library ("HDL").  UF 74-75.

The genesis of the MDP is the "Google Library Project," pursuant to which Google, in its words, planned to "create an online database of all of the world's books, beginning with agreements with major universities in the United States."  UF 18.  Unlike similar efforts to create digital archives by entities such as Microsoft, UF 8, Google decided that it would not limit its digital library to books in the public domain, but instead would digitize books protected by copyright.  UF 3.  At one point, Google approached the Library of Congress ("LOC") and asked permission to scan all of the LOC's books, including books protected by copyright.  UF 1.  But the LOC declined, citing "copyright issues relevant to mass scanning" and offered to let Google scan public domain works only.  *Id.*

Apparently frustrated by the refusal of the LOC, and then Harvard, UF 5, to permit Google to scan works in-copyright, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ UF 3.  In 2004, Google issued a press release announcing that it was working with various libraries, including UM, to "digitally scan from their collections so that users worldwide could search for them in Google."  UF 6.

Each of the five universities that are defendants in this case entered into a separate "Cooperative Agreement" with Google.  UF 13-17.  Under these agreements, Google undertook responsibility for converting millions of books into digital format from Defendants' vast

collections of printed works. *E.g.*, Ex. 80 ¶ 2.4. Each copy would include a set of image files representing every page of the work and a text file of the words in the book generated through an optical character recognition process. UF 49; Ex. 80 ¶ 2.5.



*Id.* ¶ 3.2; UF 55-58. [redacted] UF 52.

The Google Cooperative Agreements permit Google to keep a digital copy of every work scanned, Ex. 80 ¶¶ 4.5-4.6. [redacted] UF 65-68, 71-72. Thus, Defendants provided an enormous commercial and competitive benefit to Google, [redacted] UF 65-72.

In exchange for allowing Google to digitize millions of their books, Defendants received their own digital copies of the scanned works to store and use. UF 62. This was of tremendous value to Defendants. UF 52-60. Some libraries have estimated the cost of digitizing a single book at approximately $100, UF 53, and one Defendant witness estimated the cost as between $35 and several hundred dollars per book, stating that the figure of $60 per book sounds "a bit low." UF 54. Under any calculation, the value to Defendants resulting from their cooperation with Google can be measured in the hundreds of millions of dollars. There is no question they could not have completed a project of this magnitude without Google. UF 59.

Defendants did not discriminate when determining which books to take from library collections and digitize.  UF 29-43.  ████████████████████████████████ ████████████████████████████████████████████████  *Id.*  A majority of books were selected via "bulk pulls," ██████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████  UF 40, 45.

Google then transported the books to scanning facilities occupied by Google's own personnel and scanning equipment.  UF 46-47. ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████  UF 30, 35-38, 155.  None of the "fair use" factors set forth in 17 U.S.C. § 107 were considered — ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████  UF 35, 39.  Indeed, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████  UF 33-34, 36, 41.  And, of course, no one asked a single copyright owner for permission to copy his or her book.  UF 173.

████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████

████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████



UF 50. ████████████████████████████████████████

███ *Id.* ████████████████████████████████████████

███ *Id.*

## HathiTrust

On October 13, 2008, UM and other schools announced the launch of HathiTrust, which would serve as a shared digital repository for the millions of books digitized as part of the Google Library Project and other mass digitization programs. UF 74. Rather than each school separately downloading and maintaining its own digital library of books scanned by Google, Defendants UC, UW, IU and Cornell, as well as many other Google Library Partners, authorized UM to download the books digitized from their respective collections. UF 62-64. UM then downloaded from Google its own digitized library collection and the collections of the other Defendants and incorporates those books into the HDL. UF 63, 75, 83. According to the HathiTrust website, as of June 28, 2012, the HDL included 10,405,889 total volumes, 5,519,596 book titles, 272,002 serial titles, 3,642,061,150 pages, 466 terabytes, and the digital equivalent of 123 miles and 8,455 tons of materials. Of the 10,405,889 volumes, 3,097,761 volumes (~30% of the total) are treated as in the public domain, meaning that 7,308,128 (~ 70% of the total) are considered to be protected by copyright. UF 77. Four digital copies of each book are maintained by HathiTrust in the HDL, with two such copies stored on servers located in Michigan and Indiana and two additional copies stored on backup tapes. UF 82, 86.

Members of HathiTrust pay fees to UM for their participation in the service. In 2011, HathiTrust reported ████████████████████████████████████████

▬▬▬▬▬▬ UF 79, 81.  It is not uncommon for UM to generate more revenue than expenses from the HathiTrust operation.  UF 80.

### Plaintiffs' Books Were Scanned and Copied

Plaintiffs in this action include twelve individual authors ("Author Plaintiffs") and eight authors' rights organizations ("Associational Plaintiffs").  FAC ¶¶ 12-33.  Plaintiffs have collectively identified 116 books (the "Infringed Books") in which they own the copyright and which were digitized by Defendants as part of the Google Library Project without Plaintiff's authorization.  UF 138-153.  Defendants admit that each of the Infringed Books was scanned and incorporated into the HDL.  UF 156-172.

Just as described above with respect to digitization in general, neither Defendants nor Google conducted any pre-digitization assessment of any of the criteria in Sections 108 or 107 of the Copyright Act to determine whether any of the Infringed Books qualified for the protections provided by those sections.  In fact, sixty-five of the Infringed Books were included for scanning simply because they happened to be in a library building where Google was collecting every work, shelf-by-shelf via bulk pulls.  UF 40.  Twelve of the works were selected by Google on a "pick list" of candidate works for digitization.  UF 42.  Only one book was "Self-Selected":  Ex. 73, No. 2(i).  (Defendants have not indicated how the remainder were selected.)

### The Orphan Works Project

An orphan work is a work that is still under copyright protection but for which the author or rightsholder cannot be found.  UF 114.  The issue of whether special rules should be applied to increase the availability and utility of orphan works has been the subject of discussion and debate for many years, as well as the subject of various legislative solutions proposed in, but never enacted by, Congress.  *See Authors Guild v. Google Inc.*, 770 F. Supp. 2d 666, 677

(S.D.N.Y. 2011) (the "Google Books" case).  Indeed, one of the key aspects of the attempted

settlement of the Google Books case was a mechanism to help resolve the orphan works issue.

*Id.*  But the Amended Settlement Agreement ("ASA") was rejected by Judge Chin, who stated

that "the establishment of a mechanism for exploiting unclaimed books is a matter better suited

for Congress than the Court."  *Id.*

   Unhappy with Judge Chin's rejection of an agreement that would have addressed the

orphan works issue, UM decided to take the law into its own hands by initiating its own program

-- the Orphan Works Project ("OWP") -- pursuant to which it unilaterally set rules defining the

circumstances under which a book would be considered an orphan candidate, made an attempt to

locate the copyright owner and then if it could not find the owner, listed the candidate on one or

more websites.  UF 115.  Under the OWP, if the copyright owner did not come forward and

claim rights in the book within 90 days, UM would make the book available for display and

download to tens of thousands of UM students, faculty and library users.  UF 74, 116.

   After UM published its first list of orphan candidates, and in all likelihood as a result of

the publicity surrounding the commencement of this lawsuit, various copyright holders whose

works had been listed as orphan candidates and were about to be made available for free by UM

came forward.  UF 125; Aiken Decl. ¶ 23.  Indeed, Paul Aiken, the Executive Director of

Plaintiff The Authors Guild, states that he was able to locate the author of one such candidate,

Plaintiff J.R. Salamanca, in a matter of minutes simply by typing "book author salamanca" into

Google's search engine.  *Id.* ¶ 24.  By the end of that day, Mr. Aiken confirmed that Mr.

Salamanca was alive and living in Maryland, that his books certainly were not orphaned and that

a contract to publish one of his novels as an e-book had just been signed.  *Id.*

Defendants admit that Mr. Salamanca's *Lost Country* and *Good Troupers All* by Gladys Malvern, whose copyright is owned by Plaintiff ALF, were digitized and listed as orphan work candidates in the OWP.  UF 121-122.  Both of these works would have been made available as part of the OWP if Defendants received no opposition.  *Id.*

The OWP was suspended after Plaintiffs filed this action and shortly before the first supposed orphan works were to have been made available to UM users.  UM admitted that it had made "a number of errors, some of them serious," resulting in several books whose authors could have been easily located being wrongfully included in this list of orphan candidates.  UF 123-125.  UM has made clear that it intends to proceed with the OWP in the future.  UF 127.

## THE STANDARD ON THIS MOTION

Summary judgment shall be granted pursuant to Fed. R. Civ. P. 56(a) if the court, having drawn all reasonable inferences in favor of the non-moving party, determines that no reasonable trier of fact could find in its favor.  *See, e.g., WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009).

For the reasons set forth below, there are no genuine issues of material fact and this Court should grant summary judgment finding that Defendants have infringed Plaintiffs' copyrights.

## ARGUMENT

### I.

### PLAINTIFFS HAVE ESTABLISHED THEIR *PRIMA FACIE* CASE OF COPYRIGHT INFRINGEMENT AGAINST DEFENDANTS

To establish a *prima facie* case of copyright infringement, a plaintiff needs to prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *See Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Plaintiffs have established both elements.

9

A.     **Ownership**

The twelve Author Plaintiffs and four of the Associational Plaintiffs claim ownership

over the copyrights in 116 Infringed Books. UF 138-153. Copyright registration certificates,

which establish *prima facie* evidence of copyright ownership, 17 U.S.C. § 410(c), have been

submitted along with sworn testimony by each of the five American authors [UF 139, 142, 145,

146, 148], one U.K. author [UF 149] and the two American associations [UF 150, 151]. Each

foreign author has submitted sworn testimony that he or she owns of the copyrights to his or her

Infringed Books [UF 138, 140, 141, 143, 144, 147, 149], establishing ownership under the law of

each person's respective country. *See Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,

153 F.3d 82, 94 (2d Cir. 1998) (foreign law governs copyright ownership). Finally, the four

Associational Plaintiffs have submitted proof that they acquired the copyrights in certain

Infringed Books by will or other conveyance from a deceased author [UF 150-153]. *See* 17

U.S.C. § 201(d)(1).

In addition to the copyrights directly held by Plaintiffs, the Associational Plaintiffs

collectively represent more than 70,000 authors worldwide who in turn hold rights to hundreds

of thousands of books, many of which have been unlawfully copied by Defendants. FAC ¶¶ 12-

20. Defendants have moved to dismiss the Associational Plaintiffs for lack of standing, which is

the subject of a separate motion by Defendants pending before this Court. On the instant

summary judgment motion, the Associational Plaintiffs do not seek to establish copyright

ownership over the works of their members that were infringed by Defendants. Rather, they

propose to do so at the remedy stage to the extent the Court deems it necessary in fashioning an

injunction. *See Authors Guild v. Google Inc.*, No. 05 Civ. 8136 (DC), 2012 WL 1951790, at *11

(S.D.N.Y. May 31, 2012) (denying Google's motion to dismiss associations for lack of standing

and noting that members of association may have to submit proof of beneficial ownership at the remedy stage).

**B.**     **Copying**

Defendants admit that each of the Infringed Books whose copyrights are owned by the Author Plaintiffs were "digitized and included in the HDL" and the HathiTrust website shows that the same is true of all of the Infringed Books.  UF 156-171.  This scanning and copying was undertaken without permission by or compensation to any of the Plaintiffs.  UF 173.  Moreover, Google has retained at least one copy of each of these works and Defendants have made multiple additional copies.  UF 48, 86.  Defendants admit that the image and text files that were generated by the digitization process implicate the right to reproduction referenced in 17 U.S.C. § 106(l). UF 172.

Thus, Plaintiffs have established their *prima facie* case for copyright infringement.

**II.**

**DEFENDANTS' UNAUTHORIZED REPRODUCTION OF PLAINTIFFS' BOOKS THROUGH THEIR MASS DIGITIZATION PROGRAM IS NOT PERMITTED UNDER SECTION 108 OF THE COPYRIGHT ACT**

In Plaintiffs' MJP, which is pending before this Court, Plaintiffs explain why Defendants' admitted digitization and use of millions of copyrighted books, including Plaintiffs' books, far exceed the provisions governing the reproduction of books by libraries set forth in Section 108 of the Copyright Act.  In their opening brief in support of that motion, Plaintiffs describe in detail the legislative history of Section 108, and how that section was enacted by Congress after decades of contentious debate and negotiation among authors, librarians and other parties with stakes in the literary marketplace.  The brief shows how Section 108 was designed to address new issues being raised by rapid advancements in computer and photocopying technology that

11

both made it easier for libraries to serve the public and for infringers to misuse copyrighted materials.

Over objections from libraries, Congress accepted the Copyright Office's recommendation to codify what constitutes permitted use in connection with most unlicensed library photocopying.  Section 108, which had been amended four times since it was enacted as part of the Copyright Act of 1976, carefully delineates the conditions and circumstances under which libraries and archives are allowed to duplicate copyrighted materials, including the digitization of copyrighted books and the use of "orphan works" in the last twenty years of their copyright term.

Plaintiffs respectfully refer the Court to their prior submissions in connection with the MJP and incorporate them by reference herein.  Plaintiffs stand by their position that the conduct to which Defendants admitted in their Answer is more than sufficient to establish that they have exceeded the limitations of Section 108, and that Defendants cannot rely on the "savings clause" in Section 108(f)(4) to justify as fair use a project that exceeds practically every limitation in the library exemption.  The discovery process only served to adduce additional facts demonstrating just how callous Defendants have been in their disregard for the requirements of that section.

A.   **The Works Were Digitized for a Commercial Advantage and Thus Were Not Permitted Under Section 108(a)**

Discovery has made clear that Defendants cannot claim the protection of Section 108 because that section only is available if the reproduction or distribution is "made without any purpose of direct or indirect commercial advantage."  17 U.S.C. § 108(a).  Even if the defendant libraries do not themselves have a commercial purpose, Google certainly does.  UF 65-72.  As set forth above, the participation by Defendants in the Google Library Project provided enormous commercial and competitive benefits to Google, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

 *Id.*

The Legislative History of the 1976 Copyright Act makes clear that "[i]t would not be possible for a non-profit institution, by means of contractual arrangements with a commercial copying enterprise, to authorize the enterprise to carry out copying and distribution functions that would be exempt if conducted by the non-profit institution itself." H.R. Rep. No. 1476, 94th Cong., 2d Sess. at 74 (1976). *See Princeton Univ. Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, 1389 (6th Cir. 1996) (copy shop's unlicensed reproduction of course materials for students is not fair use). Plainly, Defendants may not take advantage of the special exemptions in 108 with their commercial partner Google in tow.

**B.      The Digitization Was Not Permitted Under Any Section 108 Exemption**

Section 108 only allows copies of *un*published works to be made for "preservation purposes." 17 U.S.C. § 108(b). There is no dispute that all of the Infringed Books -- indeed, all of the books digitized by Google -- are published. UF 154-155. Section 108 grants libraries permission to copy published books only under three conditions: (1) to replace works that are damaged, deteriorating, lost or stolen and cannot be replaced through lawful purchase pursuant to §§ 108(c); (2) to fulfill requests from patrons or other libraries pursuant to § 108(d) & (e); or (3) to make limited uses of out-of-print works that are in the last twenty years of their copyright term under § 108(h).[2] Defendants' admissions demonstrate their failure to comply with any of these provisions. Discovery resolves any doubt.

---

[2] Defendants have not argued, nor can they show, that either the mass digitization that occurred as part of the Google Library Project or the threatened dissemination of purportedly orphaned copyrighted works as part of the OWP is sanctioned by Section 108(h), which addresses orphan works during the last 20 years of the term of copyright. *See* Pont IV, *infra*.

1.      **Defendants' Activities are not Permitted Under Section 108(c)**

*First,* Defendants blatantly exceed Section 108's three-copy allowance provided in 17

U.S.C. § 108(c) by permitting digital copies to be retained by or at: (1) Google; (2) HathiTrust's

primary servers in Ann Arbor; (3) HathiTrust's mirror site in Indianapolis; (4) one set of backup

tapes located in Ann Arbor; and (5) a second set of backup tapes located in Ann Arbor.[3] UF 48,

86.

*Second,* Defendants admit, as does Google, that ████████████████████

████████████████████████████████████████, thus breaching

Section 108's mandate that replacement copies be made only of works that are "damaged,

deteriorating, lost, or stolen." 17 U.S.C. § 108(c). UF 30, 31, 34, 35, 36, 38. Although

Defendants may argue that certain of the works digitized by Google, including some of the

Infringed Books, are in poor physical condition, the testimony of John Wilkin, Executive

Director of HathiTrust, makes clear that any evaluation of the Infringed Books was conducted in

response to Plaintiffs' discovery requests, not prior to the digitization of those works. UF 110.

The Copyright Act, however, does not permit this kind of pre-emptive digitization. *See* MJP

Reply Br. at 2-4.

*Third,* Defendants admit, as does Google, ████████████████████████████

████████████████████████, thereby violating Section

108's requirement that no work be copied until "the library or archives has, *after* a reasonable

effort, determined that an unused replacement cannot be obtained at a fair price." 17 U.S.C. §

---

[3] As Defendants admit that each digital copy includes "a set of image and OCR files," it
may be more accurate to state that Defendants have created at least *ten copies* of each work,
comprising five sets of image files (i.e., photographic reproductions of the printed pages) and
five sets of text files containing the text of the book obtained through "OCR," or optical
character recognition, technology. Answer ¶ 52.

108(c)(1) (emphasis added).  UF 30, 35, 37, 38.  Again, to the extent Defendants checked the

availability and pricing of new copies of the Infringed Books, they did so only in response to

Plaintiffs' discovery requests after the Infringed Books had already been digitized.  UF 110.[4]

    *Finally,* Defendants admit that the digital copies were not confined to the library premises

where they originated, but have been copied and distributed to various locations around the

country, in violation of Section 108's strict prohibition against making digital copies "available

to the public in that format outside the premises of the library or archives in lawful possession of

such copy." 17 U.S.C. § 108(c)(2).  UF 88, 89, 91, 92.  Defendants' failure to meet this

requirement is not merely some technical violation.  Congress imposed these restrictions on

digital copies to protect rightsholders against the risks of security breaches and Internet piracy.

*See* MJP at 14-17.  As discussed in the expert report of Professor Benjamin Edelman and below

in connection with Defendants' fair use defense, Defendants subject the copyrights of Plaintiffs

and millions of other affected rightsholders to grave potential harm.  *See infra* Point III.D.2.

    **2.      Defendants' Activities are not Permitted Under Section 108(d) or (e)**

    Sections 108(d) and (e) cannot possibly sanction Defendants' mass digitization of

copyrighted works.  *See* MJP at 17.  Each of those sections are limited to circumstances in which

a "user makes his or her request" for a particular library book or periodical.  17 U.S.C. § 108(d)

& (e).  Defendants do not and could not contend that the digitized books were requested by any

particular "user," as required by the statute.  Rather, the record establishes that pursuant to the

Google Cooperative Agreements, the Infringed Books and millions of other books were

systematically emptied off of library shelves, loaded onto trucks and shipped to Google to be

---

[4] When Defendants finally did evaluate the physical condition and availability of the
Infringed Books, they determined that the majority of them were *not* deteriorating or damaged
and that many could be purchased for under $20.  UF 111, 112.

scanned *en masse*. UF 29-50. Moreover, given that both HathiTrust and Google retained several copies of each digitized book, Defendants do not comply with the mandate in Section 108(d) and (e) that any copy made in response to a user request must become the property of the user. *See* 17 U.S.C. § 108(d)(1) & (e)(1). UF 51, 86. Nor can Defendants show that copies of an "entire work" were made only after the library had "first determined, on the basis of a reasonable investigation, that a copy [] of the copyrighted work cannot be obtained at a fair price[.]" 17 U.S.C. § 108(e). UF 30, 35, 37, 38.

## III.

### THE MASS DIGITIZATION OF COPYRIGHTED WORKS IS NOT FAIR USE

As set forth above, Section 108 explicitly delineates the extent to which libraries are permitted to make unauthorized reproductions of copyrighted works in print and digital formats and the legality of Defendants' mass digitization program should be evaluated against those specific provisions. Plaintiffs stand by the main point of their MJP that Defendants' preemptive and mass digitization of millions of books cannot possibly be considered fair use, and a detailed analysis of the four factors in Section 107 is not required. Nevertheless, should the Court determine that it is necessary to separately analyze whether Defendants' MDP and OWP fall within the zone of fair use, the outcome will be the same.

Section 107 provides that "[i]n determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include" –

(1)     the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)     the nature of the copyrighted work;

(3)     the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)     the effect of the use upon the potential market for or value of the copyrighted work."

17 U.S.C. § 107.  These factors "are not meant to be exclusive." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 550 (1985).

As shown below, Defendants fail to meet their burden to establish this affirmative defense to Plaintiffs' claim of copyright infringement. *See generally Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1994), *cert. dismissed*, 516 U.S. 1005 (1995) (research libraries' systematic photocopying of journal articles for archival purposes is not fair use); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000) (Rakoff, J.) (Internet company's mass copying of CDs onto servers for "instant listening service" by CD owners is not fair use); *Encyclopaedia Britannica Educational Corp. v. Crooks*, 542 F. Supp. 1156 (W.D.N.Y. 1982) (board of education's large-scale reproduction of videotapes is not fair use).

**A.     Purpose and Character**

**1.     Mass Digital Copying is Non-Transformative**

In order to determine the purpose and character of the use, the Court must examine "whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with *new expression, meaning, or message*; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (citations omitted; emphasis added); *see Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522 (S.D.N.Y. 1991) ("The copyright law, through the fair use doctrine, has promoted the goal of encouraging *creating expression and integrity* by ensuring those who produce *intellectual works* may benefit from them.") (emphasis added).

Defendants have not added anything new to the Infringed Books. Rather, they merely have arranged for the mechanical conversion of printed books into digital form. This process cannot be seen as transformative because it does not add any "new information, new aesthetics, new insights and understandings," to the books. Pierre Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990). *See Texaco*, 60 F.3d 913 at 924 ("photocopying merely transforms *the material object* embodying the intangible article that is the copyrighted original work") (emphasis added); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (retransmission of radio broadcast, which merely repackages the original, is not transformative because it adds "neither new expression, new meaning nor new message"); *Princeton Univ. Press v. Michigan Document Services*, Inc., 99 F.3d 1381, 1389 (6th Cir. 1996), *cert. denied*, 520 U.S. 1156 (1997) ("mechanical 'transformation'" of photocopying "bears little resemblance to the creative metamorphosis accomplished by the parodists in the Campbell case"). While services like HathiTrust "may be innovative, they are not transformative." *UMG*, 92 F. Supp. at 351 (rejecting defendant's claim that the conversion of CDs into computer files so that users can enjoy their sound recordings over the Internet is transformative, holding that "this is simply another way of saying that the unauthorized copies are being retransmitted in another medium – an insufficient basis for any legitimate claim of transformation").

### 2. Defendants' Non-Profit Status and Educational Purpose Do Not Shield them for Liability for Copyright Infringement

Plaintiffs do not dispute that Defendants are academic and educational institutions. This does not, however, mean that a ▮▮▮▮▮▮▮ operation involving the systematic reproduction of millions of copyright-protected books into digital format -- something that had never been done before -- is fair use. *See Encyclopaedia Britannica*, 542 F. Supp. at 1175 ("[T]he massive scope of the videotape copying and the highly sophisticated methods used by the defendants in

producing and distributing these copies cannot be deemed reasonable, even under the most favorable light of fair use for non-profit educational purposes"); *see also Campbell*, 510 U.S. at 584 ("[T]he mere fact that a use is educational and not for profit does not insulate it from a finding of infringement, any more than the commercial character of a use bars a finding of fair use"); *Texaco*, 60 F.3d at 922 (systematic photocopying and archiving of journal articles to facilitate "research in the sciences . . . might well serve a broader public purpose" but does not constitute fair use).

While Defendants may argue that their *patrons* use HathiTrust for the purposes set forth in the preamble to Section 107 ("for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research"), it is the purpose for which the Defendant *libraries* digitized and used the Infringed Books that is at issue here. In other words, fair use must be judged by the conduct of the infringer, not the final user. Otherwise, any reproduction of educational, informational or artistic material could be justified as benefitting the public. *See Infinity*, 150 F.3d at 108 (rejecting broadcaster's argument that his unauthorized retransmissions of plaintiff's programming constituted fair use based on the acts of the end-users); *Byrne v. British Broad. Corp.*, 132 F. Supp. 2d 229, 234 (S.D.N.Y. 2001) (non-profit organization BBC "enjoys no special immunity from determinations of copyright infringement" as "question under factor one is the purpose and character of the use, not of the alleged infringer"). Here, Defendants agreed to allow Google to digitize their library collections for the purpose of receiving their own digital copies that carry enormous value. They cannot escape the commercial purpose of that transaction. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001) ("Commercial use is demonstrated by a showing that repeated

and exploitative unauthorized copies of copyrighted works were made to save the expense of purchasing authorized copies.").

Accordingly, the first factor weighs heavily against Defendants.

**B.      Nature of Copyrighted Work**

The second statutory factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586.  Still, the principle of "reward[ing] the individual author in order to benefit the public . . . applies equally to works of fiction and nonfiction." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 546 (1985) (internal citation and quotation marks omitted).  In this case, the millions of works digitized as part of the Google Library Project include every conceivable type of book -- from fiction to non-fiction to cook books. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ UF 35.  Rather, most of the books were "selected" because they happened to be on a particular shelf of a particular library.  UF 40.  Under the unusual circumstances of this case, where Defendants indiscriminately scanned millions of books ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ they cannot meet their burden of showing that the nature of the copyrighted work favors a finding of fair use.

**C.      Amount and Substantiality**

The third factor considers whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," or "the quantity and value of the materials used are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (internal quotation marks and citations omitted).  This factor "recognizes that the more of a copyrighted work that is taken, the less likely the use is to be fair, and that even a less substantial taking may

20

be unfair if it captures the essence of the copyrighted work." *Infinity*, 150 F.3d at 109. "Though not an absolute rule, 'generally, it may not constitute a fair use if the entire work is reproduced.'" *Id.* (quoting 4 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT, § 13.05[A][3] at 13-178 (1997)).

Here, there is no dispute that Defendants collected millions of books from their library collections and shipped them to Google, which then scanned each and every page of every book and stored the resulting image files and text files created through an optical character recognition process onto multiple servers in multiple locations. It would be difficult, if not impossible, to think of a situation where the third factor weighs more heavily against Defendants.

## D.   Effect of Use on Potential Market

The fourth fair use factor, "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4),

> requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringed, but also "whether unrestricted and wide-spread conduct of the sort engaged in by defendant . . . would result in a substantially adverse impact on the potential market" for the original.

*Campbell*, 410 U.S. at 590 (quoting NIMMER, § 13.05[A][4]). The copyright holder need not show either "actual present harm" or "with certainty that future harm will result," but rather "a showing by a preponderance of the evidence that *some* meaningful likelihood of future harm exists." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984) (emphasis in original). Courts must consider not only any damage caused to the original work, but also any harm to the market for derivative uses. *Harper*, 471 U.S. at 568. As with the other fair use factors, Defendants bear the burden of showing that their use does not harm Plaintiffs' interests.

*Infinity*, 150 F.3d at 110.  Defendants fail to meet that burden here in light of following

categories of actual or potential harm caused by their unlicensed mass digitization.[5]

### 1.     Each Unlicensed Digital Copy Represents a Lost Sale

Defendants' digitization and archiving of the Infringed Books caused actual harm to

Plaintiffs' own market and potential market for book sales.  The majority of the Infringed Books

are in-print and commercially available for purchase.  UF 174.  Many are available for sale in

digital format.  *Id.*  Each digital copy of a book that Defendants created – for preservation,

archiving or any other purpose – rather than purchasing it through lawful channels, represents a

lost sale to the book's rightsholders.  UF 128; *see also* Stiles Decl. ¶¶ 11-12.  Defendants

digitized millions of works translating to millions of dollars in lost sales, a figure that goes even

higher when one considers that Defendants made four digital copies of each work.  To the extent

a particular book was no longer in print or was unavailable for sale in digital format when

Defendants sought to create a digital copy (though of course Defendants admit they never

checked), they could have negotiated a license to do so, either separately with each

author/publisher (as Google has done in its Google Books Partner Program [UF 11]) or

collectively through a collective rights society (as libraries in Norway and Sweden have done,

[SFF Decl.; NFF Decl.; Gervais Decl.]).

---

[5] In addition to causing direct economic harm, Defendants disregard one of the
fundamental rights of a copyright owner:  the right to decide not to make his work available or to
decide whether or when to do so.  UF 135.  *See* 17 U.S.C. § 106 (granting copyright holders
exclusive right "to do and to *authorize*. . ."); *Salinger v. Random House, Inc.*, 811 F.2d 90, 99
(2d Cir.), *cert. denied*, 484 U.S. 890 (1987) (effect on "potential market" for works "is not
lessened by the fact that their author has disavowed any intention to publish them during his
lifetime" as author "has the right to change his mind" and is "entitled to protect his *opportunity*
to sell his [works]"); *Craft v. Kobler*, 667 F. Supp. 120, 129 (S.D.N.Y. 1987) ("The fact that
plaintiff's books are out of print and that Craft testified he had no interest in writing further on
Stravinsky is not determinative.  As public interest in Stravinsky increases, the Craft-Stravinsky
books may be reissued.").

In short, Defendants caused direct harm to Plaintiffs' sales by creating unlicensed scans of books rather than purchasing copies or obtaining licenses to do so. *See Encyclopaedia Britannica*, 542 F. Supp. at 1169-70 ("It is totally unreasonable to expect educational institutions to pay for licensing agreements or videotape copies marketed by the plaintiffs when these same works can be obtained and copied with the proper equipment for nothing. The cumulative effect of the [Board of Education]'s massive videotape copying indicates that there would be no market whatsoever for plaintiffs' videotape sales or licensing agreements if off-the-air videotaping of plaintiffs' works is permitted to continue in unregulated fashion.")

2.     **Exposure of Works to Unlimited Piracy**

By digitizing, copying, transferring, storing and allowing various levels of online access to the Infringed Books, Defendants and Google expose Plaintiffs' property to immense security risks that have the potential to cannibalize the book market through the same type of widespread Internet piracy that decimated the music industry. *See* Edelman Decl. (detailing security risks caused by Defendants); UF 100-109, 134. When Congress amended Section 108 to begin permitting libraries to make copies of certain works in digital format, it expressly recognized "the potential harm to the copyright owner's market" that would ensue if patrons were able to obtain "unlimited access to digital copies from any location," thereby "facilitating immediate, flawless and widespread reproduction and distribution" of copyrighted works. S. Rep. No. 190, 105th Cong., 2d Sess. 61-62 (1998).

As the expert report of Professor Benjamin Edelman demonstrates, Defendants not only digitized millions of works that were not authorized for reproduction by Plaintiffs or permitted pursuant to Section 108, they also violated Section 108's mandate that any digital copies remain securely within the walls of the library building. *See* Edelman Decl., *passim*. In addition to

permitting Google to scan, copy, store and make various uses of millions of digitized library books (which carry their own security risks), Defendants admit to creating at least four separate instances of the 466-terabyte database of 10.4 million books (approximately seventy percent of which are considered in-copyright), each of which is stored on a separate system located in Ann Arbor or Indianapolis.  UF 77-82.  Each copy of the database is connected to a "campus network" and the primary and mirror HathiTrust sites include World Wide Web server, creating additional risk of exposure.  UF 88-90; *see* Laura N. Gasaway (Co-Chair, Section 108 Study Group), *America's Cultural Record: A Thing of the Past?*, 40 Hous. L. Rev. 643, 656 (2003) (observing that Congress intended that any digital copies "could be used only within the library premises and not on a campus network or the World Wide Web").  Furthermore, nearly one hundred people located in Michigan, New York, Minnesota, Wisconsin and California have "privileged access" to the HDL, which means they have the ability view, print and download any work in the database through an Internet connection.  UF 100-101.

It is not only the security practices of Defendants that are at issue here, though the record raises many such concerns.  *See, e.g.,* UF 107 (███████████████████████████████ ██████████).  When evaluating the fairness of a challenged use, courts must consider "whether unrestricted and wide-spread conduct of the sort engaged in by defendant . . . would result in a substantially adverse impact on the potential market."  *Campbell*, 410 U.S. at 590.  Even if Defendants claim that they adequately secure Plaintiffs' works, an adverse ruling would encourage far less sophisticated providers to digitize, copy, store and make similar uses of in-copyright books, thereby subjecting the property to whatever security measures such providers do or do not employ.  *See* Edelman Decl. ¶ 25.

### 3.   Loss of Potential Licensing Revenues

It is well established that the "impact on potential licensing opportunities for traditional, reasonable or likely to be developed markets should be legally cognizable when evaluating a secondary user's 'effect upon the potential market for or value of the copyrighted work.'" *Texaco*, 60 F.3d at 930.  The undisputed evidence establishes that Defendants' activities will harm Plaintiffs by undermining existing and emerging licensing opportunities.

In *Texaco*, the Second Circuit considered whether a corporate library's systematic photocopying of scientific journal articles for research and archival purposes was fair use.  60 F.3d at 91.  In analyzing whether it was appropriate for the district court to have considered the increase in publishers' revenue that would result if Texaco's unauthorized copying was not permitted as fair use, the Second Circuit observed that "the publishers still have not established a conventional market for the direct sale and distribution of individual articles[.]"  *Id.* Nevertheless, the court found that "they have created, primarily through [the Copyright Clearance Center ("CCC")], a workable market for institutional users to obtain licenses for the right to produce their own copies of individual articles via photocopying."  *Id.*  The court reasoned that

> it is not unsound to conclude that the right to seek payment for a particular use tends to become legally cognizable under the fourth fair use factor when the means for paying for such a use is made easier.  This notion is not troubling: it is sensible that a particular unauthorized use should be considered "more fair" when there is no ready market or means to pay for the use, while such an unauthorized use should be considered "less fair" when there is a ready market or means to pay for the use.

*Id.* at 930-931.

Here, there is a "ready market or means" for Defendants' use.  As described in detail in the expert report of Professor Daniel Gervais, "collective management systems provide a market-based mechanism by which libraries could compensate authors and rightsholders in exchange for

a license to mass digitize and make various uses of copyrighted books in their collections."
Gervais Decl. ¶ 9.  Just as in *Texaco*, the CCC and other collective management organizations
around the world "presently license the same general type of copyrighted content as the material
copied through the Google Library Project."  *Id.*  For example, authors and their associational
representatives in Norway and Sweden, including Plaintiffs in this litigation, have entered into or
are finalizing license agreements to permit their national libraries to digitize entire collections of
books in exchange for royalty payments.  UF 137.  Google recently announced that in France "it
had an industrywide book-scanning agreement in place to cover works that are out of print but
still under copyright – a category that covers most of the world's books," and that Google was
"interested in exporting these deals elsewhere."  Eric Pfanner, *Google Has Deal in France For
Book-Scanning Project*, N.Y. TIMES, June 12, 2012, at B5.

      Although Judge Chin ultimately rejected the Amended Settlement Agreement entered
into by Plaintiff The Authors Guild and other the parties in the Google Books case, the proposed
resolution provides more compelling evidence that "there is a ready market or means to pay for
the use" that Defendants want to make.  *See* Aiken Decl., Ex. A.  Among other things, the ASA
provided a mechanism to compensate the millions of authors whose copyrighted works had been
digitized by Google and Defendants without authorization.  Aiken Decl. ¶ 15.  Under the ASA,
the class of affected authors and rightsholders would have granted a license to Google to digitize
works and sometimes sell, display, and make certain non-display uses of the works it had
scanned.  *Id.*  The ASA expressly authorized Google and its partner libraries (which would have
included UM and the other Defendants in this litigation) to index the contents of the digitized
works for search purposes and to allow researchers to conduct "non-consumptive research" using
the digitized corpus.  *Id.*  The ASA would have covered both in-print and out-of-print works,

26

including so-called "orphan works," *id.*, and also would have included a comprehensive security protocol for Google and any partner institutions. In exchange for these and other rights that would have been granted as part of the ASA, Google agreed to pay $45 million into a settlement fund to make cash payments to rightsholders – at least $60 per principal work. *Id.* The ASA would also have provided a revenue share in which rightsholders would have received most of the subscription, sales, reproduction, and advertising revenue generated by the digitized books. *Id.* Thus, the ASA shows how a collective management system might work to permit certain of the activities of Defendants in this case while providing compensation to copyright owners.

Defendants' various unauthorized uses of the Infringed Books also undermine existing licenses for the use of Plaintiffs' books. For example, rightsholders routinely grant online distributors a license to index their books and make them searchable as part of a commercial arrangement intended to promote book sales. UF 131, Stiles Decl. ¶ 14; Rosenthal Decl., Ex. 104 (Amazon Search Inside License). Defendants also permit full-text searching, but without a license, and not as part of an effort targeted at selling the books and providing revenue to the author. UF 93. Courts have held that a secondary use which replaces a comparable service licensed by the copyright holder, even without charge, may cause market harm. *See Infinity*, 150 F.3d at 111 (unlicensed retransmission of radio broadcast over telephone "listen lines" undermined copyright holder's ability to exploit and control that use; although copyright holder provided a comparable service to its customers at no additional cost, defendant's use "replaces" the broadcaster "as the supplier of those broadcasts to meet the demand of his customers"); *U.S. v. ASCAP*, 599 F. Supp. 2d a415, 422, 432 (S.D.N.Y. 2009) (fourth factor weighed against fair use where performance rights organization established existence of market for ringtone previews

27

by showing that musicians generally granted a license to online distributors to allow their users to search for and play ringtone clips for promotional purposes).

Defendants also permit the Infringed Books to be used for non-consumptive research, an emerging field that represents another potential licensing stream for authors. UF 130. *See UMG*, 92 F. Supp. at 352 (defendant is not free "to usurp a further market that directly derives from reproduction of plaintiffs' copyrighted works . . . even if the copyright holder had not yet entered the new market at issue, for a copyrightholder's 'exclusive' rights, derived from the Constitution and the Copyright Act, include the right, within broad limits, to curb the development of such a derivative market by refusing to license a copyrighted work or by doing so only on terms the copyright owner finds acceptable").

The fourth factor, like all of the factors in this fair use analysis, weighs against Defendants. Accordingly, the fair use defense must fail in its entirety.

## IV.

## THE ORPHAN WORKS PROJECT VIOLATES COPYRIGHT LAW

In rejecting the ASA, Judge Chin emphasized that "the establishment of a mechanism exploiting unclaimed books is a matter more suited for Congress than this Court." The court reasoned:

> The questions of who should be entrusted with guardianship over orphan books, under what terms, and with what safeguards are matters more appropriately decided by Congress than through an agreement among private, self-interested parties. Indeed, the Supreme Court has held that "it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives."

*Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 677 (S.D.N.Y. 2011). The court noted "longstanding efforts" by Congress to pass legislation to address the orphan works problem, including "Orphan Books" bills that were proposed in 2006 and 2008 but were never enacted.

28

*Id.* at 678; *see Golan*, 132 S. Ct. at 893-894 (favorably citing Judge Chin's conclusion that the orphan works issue requires legislative resolution).[6]

For the reasons set forth above in Plaintiffs' general analysis of Defendants' digitization program, the OWP simply cannot be fair use. Once again, Defendants fail to meet their burden on any fair use factor. There is nothing transformative about making copyrighted works available in digital form to tens of thousands of people without compensation; Defendants have indiscriminately chosen works without any consideration of their nature or purpose; the entire works have been copied; and the effect on the potential market for or value of the copied work could be devastating. UF 133. Moreover, Defendants' OWP is inimical to Section 108(h)'s explicit limitation of libraries' use of orphan works to the twenty year period preceding the end of their copyright term.

---

[6] Paul Courant, the visionary behind the OWP, admits that UM decided to proceed with the OWP on the heels of Judge Chin's decision. UF 115. Defendants simply took copyright law into their own hands, apparently hoping that no copyright "parents" would emerge to stand up for the rights of their purportedly-orphaned children. Defendants' judgment, like the process they followed in misidentifying orphans, had a number of "errors, some of them serious." UF 123.

## <u>CONCLUSION</u>

Defendants have exceeded the limitations on copying and digitization in Section 108, and their conduct is neither fair use nor protected under any other provision of copyright law. Summary judgment should be granted to Plaintiffs.

Dated: New York, New York
      June 29, 2012

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By: _____
      Edward H. Rosenthal, Esq.
      Jeremy S. Goldman, Esq.
      Adam Nelson (Law Student)

488 Madison Avenue
New York, New York  10022
Tel.:  (212) 980-0120
Fax:  (212) 593-9175
erosenthal@fkks.com
jgoldman@fkks.com

*Attorneys for Plaintiffs*

30