**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE AUTHORS GUILD, *et al.* ) | |
| ) | |
| Plaintiffs, ) | ECF Case |
| ) | |
| v. ) | Case No. 1:11-cv-6351 HB |
| ) | |
| HATHITRUST, *et al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

**BRIEF OF AMICI CURIAE AMERICAN LIBRARY ASSOCIATION, ASSOCIATION OF COLLEGE AND RESEARCH LIBRARIES, ASSOCIATION OF RESEARCH LIBRARIES, AND ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Jonathan Band
 (admitted *pro hac vice*)
JONATHAN BAND PLLC
21 Dupont Circle NW, 8th Floor
Washington, D.C., 20036
Tel: (202) 296-5675
Email: jband@policybandwidth.com

*Counsel for Amici the Library Associations*

*On the brief:*
Corynne McSherry
ELECTRONIC FRONTIER
FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Tel: (415) 436-9333
Email: corynne@eff.org

July 6, 2012

# TABLE OF CONTENTS

INTEREST OF AMICUS ..................................................................................................1

INTRODUCTION ...........................................................................................................2

ARGUMENT ..................................................................................................................3

I.    HDL IS SERVING THE PUBLIC INTEREST.................................................... 3

II.   HDL'S TREMENDOUS PUBLIC BENEFIT TILTS THE FAIR USE ANALYSIS
      FIRMLY IN FAVOR OF FAIR USE.................................................................... 7

      A.    Fair Use Is Designed to Protect the Copyright Balance and Ensure that
            Copyright Serves the Public Interest........................................................ 7

      B.    The Fair Use Factors, Taken Together and Viewed in Light of the Purposes of
            Copyright, Favor a Fair Use Finding ...................................................... 8

      C.    HDL Embodies Widespread and Well-Established Best Practices for Fair Use .. 13

III.  A LEGISLATIVE "FIX" IS BOTH UNNECESSARY AND UNWORKABLE ............ 15

      A.    Congress Is Unlikely to Fix the "Orphan Works" Problem................................. 15

      B.    Even if Congress Did Authorize a Statutory License, the Libraries Could Not
            Afford to Pay for It ........................................................................... 16

IV.   PLAINTIFFS HELPED FOSTER PUBLIC RELIANCE ON THE HATHITRUST
      PROJECT; THE EQUITIES DO NOT FAVOR DEPRIVING THE PUBLIC OF
      THAT RESOURCE. ........................................................................................ 16

CONCLUSION................................................................................................. 19

# TABLE OF AUTHORITIES

## Cases

*American Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994).................................................................... 9

*Authors Guild, Inc. v. Google, Inc.*,
  No. 05-cv-8136-DC (S.D.N.Y. Nov. 13, 2009)...................................... 17, 18

*Berlin v. E. C. Publications Inc.*,
  329 F.2d 541 (2d Cir. 1964).................................................................. 8

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006)................................................................ 8, 9

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)........................................................................... 7, 9

*Golan v. Holder*,
  132 S. Ct. 873 (2012)......................................................................... 2

*Kane v. Comedy Partners*,
  No. 00-cv-158-GBD, 2003 WL 22383387 (S.D.N.Y. Oct. 16, 2003)............ 12

*Mathieson v. Associated Press*,
  No. 90-cv-6945-LMM, 1992 WL 164447 (S.D.N.Y. June 25, 1992)......... 9, 10

*MCA v. Wilson*,
  677 F. 2d 180 (1981)........................................................................ 10, 13

*Perfect 10, Inc. v Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007)............................................................ 9, 10

*Rosemont Enters., Inc. v. Random House, Inc.*,
  366 F.2d 303 (2d Cir. 1966)................................................................. 8, 9

*Time Inc. v. Bernard Geis Assoc.*,
  293 F. Supp. 130 (S.D.N.Y. 1968) ......................................................... 8

*Wright v. Warner Books, Inc.*,
  953 F.2d 731 (2d Cir. 1991)................................................................ 10

## Statutes

17 U.S.C. § 107 ........................................................................................................ 16

## Constitutional Provisions

U.S. Const., Art. I ...................................................................................................... 7

## Legislative Materials

*Hearing on: Competition and Commerce in Digital Books before the H. Comm. on the Judiciary*, 111th Cong. (2009) .......................................................... 16

Orphan Works Act, H.R. 5439, 109th Cong. (2006) ................................................. 15

Orphan Works Act, H.R. 5889, 110th Cong. (2008) ................................................. 15

Shawn Bentley Orphan Works Act, S. 2913, 110th Cong. (2008) ............................. 15

## Other Authorities

Association of Research Libraries, *et al.*, *Code of Best Practices in Fair Use for Academic and Research Libraries* (2012) .......................................................... 13, 14, 15

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2005) ....................... 12

Patricia Aufderheide and Peter Jaszi, *Reclaiming Fair Use* (2011) ............................ 13

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) .................... 8, 10

Siva Vaidhyanathan, *A Risky Gamble with Google*, Chron. Higher Educ. Dec. 2, 2005 ............ 18

**INTEREST OF AMICUS**

The American Library Association ("ALA"), established in 1876, is a nonprofit professional organization of more than 67,000 librarians, library trustees, and other friends of libraries dedicated to providing and improving library services and promoting the public interest in a free and open information society.

The Association of College and Research Libraries ("ACRL"), the largest division of the ALA, is a professional association of academic and research librarians and other interested individuals. It is dedicated to enhancing the ability of academic library and information professionals to serve the information needs of the higher education community and to improve learning, teaching, and research.

The Association of Research Libraries ("ARL") is an association of 126 research libraries in North America. ARL's members include university libraries, public libraries, government and national libraries. ARL programs and services promote equitable access to and effective use of recorded knowledge in support of teaching and research.

Collectively, these three library associations represent over 100,000 libraries and 350,000 librarians and other personnel that serve the needs of their patrons in the digital age. As a result, the associations share a strong interest in the balanced application of copyright law to new digital dissemination technologies.

The Electronic Frontier Foundation ("EFF") is a member-supported, nonprofit public interest organization dedicated to protecting civil liberties and free expression in the digital world. Founded in 1990, EFF represents more than 19,000 contributing members. EFF's mission is to ensure that the civil liberties and due process guaranteed by our Constitution and laws do not diminish as communication, commerce, government, and much of daily life move online. EFF has contributed its expertise to many cases regarding copyright law and the Internet, as *amicus curiae*, as party counsel, and as court-appointed attorneys *ad litem*.

**INTRODUCTION**

This is a highly unusual case. By virtue of the conduct of a third party not named in this litigation (Google, Inc.), the Defendants, and the Plaintiffs themselves, a resource of world historic significance has been created. The HathiTrust Digital Library ("HDL") consists of more than 10 million digitized volumes gathered from the collections of many of the nation's leading research libraries. HDL assures the preservation of this great storehouse of human knowledge, while simultaneously giving scholars and students an unparalleled ability to search and access the information it contains.

The libraries on their own would never have had the financial resources necessary to create a digital library of this scale and depth of resource and service. Indeed, Plaintiffs concede that "[t]here is no question [the libraries] could not have completed a project of this magnitude without Google. Mem. Law Supp. Pls.' Mot. Summ. J. 4, ECF No. 115.[1] Moreover, Plaintiffs recognize HDL's value and do not seek the typical copyright remedy of destruction. But the path forward Plaintiffs propose – legislation – is no more reasonable.

Fortunately for the public, copyright law has a built-in accommodation for the First Amendment values embodied by this extraordinary repository of knowledge – the fair use right. *See Golan v. Holder*, 132 S. Ct. 873, 890 (2012). Fair use enables the public and libraries to make some uses of copyrighted works without the authorization of copyright owners. Fair use provides the Court with the equitable means to allow the public to benefit from this resource in a manner that respects the law and the interests of authors. Fair use permits HathiTrust, a nonprofit service of the University of Michigan, to possess and maintain the HDL on behalf of a

---

[1] With respect to the 600,000 volumes at the University of Wisconsin digitized by Google, the university library director stated, "[i]t would have been next to impossible for the library to come up with the resources to digitize that amount of material." Jennifer Howard, *Google Begins To Scale Back Its Scanning of Books From University Libraries*, The Chronicle of Higher Education, Mar. 9, 2012, *available at* http://chronicle.com/article/Google-Begins-to-Scale-Back/131109/. With respect to the half a million volumes in the University of Texas Latin American collection, the university library director stated, "'We figured we could do it in a hundred years,' . . . . Google did it in two." *Id.*

2

consortium of libraries. Fair use also defines what HathiTrust is permitted to do with the digital library – internal copying for non-consumptive and consumptive research, full-text access to fragile materials, full-text access for the print disabled, and perhaps in the future full-text access for orphan works. At this point, the Court need only determine whether the current uses are fair. Whether services offered in the future are fair uses can be determined in future cases when there is an actual case in controversy.

## ARGUMENT

### I.   HDL IS SERVING THE PUBLIC INTEREST

As explained in detail in the briefs of Defendants HathiTrust and the National Federation of the Blind, and amici digital humanities and law professors, HDL is serving the public interest in preservation, access and research: all classic fair use purposes. Mem. Supp. Libraries' Mot. Summ. J. 9, ECF No. 112; Def. Intervenors' Mem. Supp. Mot. Summ. J., ECF 105; Amicus Br. Digital Hum. & Law Profs In Part. Supp. of Defs. Mot. For Summ. J.

Moreover, if, as amici expect, Google's practice of providing snippet views is ruled a permissible fair use, HDL could offer the same service, thereby dramatically increasing its public benefits. Amici American Library Association and Association of College and Research Libraries conducted an informal survey asking librarians about their experiences with the Google Books Search ("GBS"), which returns "snippets" or a few sentences in response to search queries. Those responses were enlightening.

*First*, GBS has become an important means for libraries to identify valuable research sources. One librarian for a small "chronically-underfunded tribal college library characterized GBS as "a lifesaver" and "indispensable":

> Because my students, and even some of my faculty members, face significant challenges and barriers to accessing resources (including transportation challenges, limited or no internet access, etc.), Google Book Search helps us find if resources exist, to identify if those resources may be helpful to their academic purposes, and get us started on the path to access through other means if not our own library. . . . I cannot overemphasize how much more difficult my job would

be and how lacking my faculty's and students' experiences would be without access to a free tool like Google Book Search.

Statement of Melissa Pond, Director of Library Services, Leech Lake Tribal College, Cass Lake, Minnesota (on file with amici).

That resource is valuable not just for research, but also for developing curricula and collections:

> [GBS] has led us to several titles that my faculty have gladly and gratefully ordered for their private research collections and helped me to identify the best uses of our very, very limited collection development resources.

> [For example] one of our science faculty instructors was looking to put together a course on Indigenous astronomy (also called ethnoastronomy and star knowledge and also related to the term archaeoastronomy) and was curious as to what resources existed on the topic. Google Books helped me identify several resources that the instructor purchased for his own personal professional development library and for our LLTC campus library.

*Id*. Thus, GBS's public benefits accrue, in turn, to copyright holders who received royalties when books are purchased *as a result* of research using GBS.

Sometimes, GBS can be used to identify material that is housed by the library itself but nonetheless hard to find. Jill Gremmels, Director of the Davidson College Library, used GBS to find sources in her own stacks:

> A couple of years ago I was helping a Davidson student look for information on a speech that Khrushchev made to the National Press Club. It wasn't one of his famous, shoe-pounding speeches. We struggled mightily for a long time, until we looked at Google Books. There we found a reference to the speech in a book that seems to be one of the important biographies of Khrushchev, and we had the book. So the student went to the shelf, picked up the book, and got the info he needed.

Statement of Jill Gremmels, Library Director, Davidson College, Davidson, North Carolina (on file with amici).

*Second*, and relatedly, librarians can then decide whether to request those books via interlibrary loan. Such decisions can be vital to conserving strapped library budgets and speeding research. At the University of Guam, for example, getting books through interlibrary loan can

4

take weeks, with significant postage costs. By using GBS to identify the specific chapters needed, the library can narrow its request and obtain the material in a day or two. Statement of Paul Drake, User Services and Document Delivery Librarian, University of Guam, Guam (on file with amici).

*Third,* GBS has become a crucial tool for finding and checking citations. One example involved Lisa Hinchliffe, Coordinator for Information Literacy Services and Instruction at the University of Illinois at Urbana-Champaign. Ms. Hinchliffe notes that she has used GBS "to find full citations and or corrected citations to works I see in bibliographies, to verify quotations and particularly when I am reviewing a manuscript and want to confirm that the author has cited the original correctly, to determine where a quotation is from when a full cite isn't given." She also uses it to decide whether to buy a book and call for it via interlibrary loan. Statement of Lisa Hinchliffe, Coordinator for Information Literacy Services and Instruction, University of Illinois at Urbana-Champaign, Urbana, Illinois (on file with amici).

The ability to efficiently check citations saves libraries (and scholars) both money and time. One library described working with a historian to check a citation where the historian had only a quotation in a paper copy of a single page of an older multi-volume biography of President Abraham Lincoln. Using GBS, they were able to track down the quotation and a full citation for the original source. Without GBS, the scholar would have had to wait for a print interlibrary loan and might not have been able to access the texts at all. Statement of Scott Vine, Information Services Librarian and Deputy College Librarian, Franklin & Marshall College, Lancaster, Pennsylvania (on file with amici). Instead, the scholar was able to complete the research quickly and move on to the rest of the project.

*Fourth*, GBS is thoroughly integrated into the educational system – it is part of the library school curriculum, included in research methods taught to students at all levels and integrated into online library catalogs. Indeed, one librarian believes it is simply "unethical not to teach Google Books. We often teach it before our own library catalog." Statement of Elizabeth Kocevar-Weidinger, Instruction/Reference and Interim E-Resources Services Librarian,

Longwood University, Farmville, Virginia (on file with amici). Here, too, that education and use can lead to book sales that would not have occurred but for the use of GBS. For example, one librarian described a senior student in a Gender, Women's and Sexuality Studies who reported that she bought the books she planned to use in research after discovering them via GBS because she liked to own copies that she could mark up. Statement of Barbara Fister, Library Professor, Gustavus Adolphus College, Saint Peter, Minnesota (on file with amici).

And there is a further public benefit to GBS: authors and readers can use it to consult a vast array of texts without leaving their living rooms. As author Sean Wilsey predicted in 2006:

> What I never have enough of as a writer is time. Writing, for me, is all about finding the time to write . . . a universal library of scanned and searchable books would be the greatest imaginable gift to writers and future readers alike. It will help us do what we do.

Sean Wilsey, *Why John Updike Is So Wrong About Digitized Books*, Time, May 31, 2006.[2]

It turns out that Wilsey was right. Author Warren Kozak had this to say about using the service while writing a new book:

> I'm writing a biography, so I . . . typed in my subject's name [into GBS]. Instantly, I got all these references to books where he appeared. Each reference would give me the two to three pages where he was the subject, and I could tell from reading that short synopsis whether the book was something I could use. I went out and bought books, borrowed books from libraries, and even tracked down some from my own collection that I hadn't realized before were relevant.

Statement of Warren Kozak (on file with amici). Contacted several years later, Kozak continues to praise the service, stating that it saved him "an incredible amount of time" and, while he hadn't used it recently, he "definitely would not want to lose the service." Statement of Warren Kozak (on file with amici).

Science journalist and author Annalee Newitz shares this view. She uses the service regularly to verify scientific claims and explore alternative viewpoints. As she notes, a great deal

---

[2] Available at http://www.time.com/time/arts/article/0,8599,1199593,00.html#ixzz1xu9wqZIW.

of scientific literature is housed in books, which are often expensive and not easily accessible

online.

> I started using Google Books as soon as it was available. As a science journalist, I
> need to do a lot of digging to make sure what I am saying is accurate, understand
> the research I am reporting on, and discover contradictory points of view. Google
> Books helps me identify sources, check for accuracy and decide if it is worthwhile
> to travel to the nearest academic library to obtain the book, or even buy it. Over
> the years, I have purchased dozens as a result of using Google Books.

Statement of Annalee Newitz (on file with amici). Thus, as Wilsey puts it, "[authors] have most

to benefit and the least to lose from bookscanning."

HDL is not Google Books: it does not provide snippets as part of its search results.

However, it could easily begin to do so and offer the same benefits.[3] Moreover, some of the

benefits described above can be achieved through HDL's existing search functionality, without

snippet display. HDL directs the user to the book and page number where the information sought

may appear. The user still has to consult the physical book to obtain the information, but HDL

greatly assists the user by pointing her to the appropriate books and pages.

## II.   HDL'S TREMENDOUS PUBLIC BENEFIT TILTS THE FAIR USE ANALYSIS FIRMLY IN FAVOR OF FAIR USE.

### A.   Fair Use Is Designed to Protect the Copyright Balance and Ensure that Copyright Serves the Public Interest.

Fair use has been part of U.S. copyright law since its inception, precisely because it helps

ensure that copyright serves, rather than thwarts, its purpose of promoting expression and

innovation. "From the infancy of copyright protection, some opportunity for fair use of

copyrighted materials has been thought necessary to fulfill copyright's very purpose, '[t]o

promote the Progress of Science and useful Arts.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S.

569, 575 (1994), *quoting* U.S. Const., Art. I, § 8, cl. 8 (alteration in original). The Second Circuit

has noted how copyright must serve the public benefit:

---

[3] As noted above, amici expect that Google will prevail in its fair use litigation concerning GBS.
But if it does not, the public interest in HDL providing search capability becomes all the more
compelling.

> As Judge Leval observed in his seminal law review article on the subject, the law of copyright "is intended to motivate the creative activity of authors and inventors by the provision of a special reward . . . . The monopoly created by copyright thus rewards the individual author in order to benefit the public."

*Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006) (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1108 (1990)) (ellipsis in original). Thus, "courts in passing upon particular claims of infringement must occasionally subordinate the copyright holder's interest in a maximum financial return to the greater public interest in the development of art, science and industry." *Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966) (quoting *Berlin v. E. C. Publications Inc.*, 329 F.2d 541, 544 (2d Cir. 1964)). As *Rosemont* stated:

> Whether the privilege may justifiably be applied to particular materials turns initially on the nature of the materials, *e.g.*, whether their distribution would serve the public interest in the free dissemination of information and whether their preparation requires some use of prior materials dealing with the same subject matter. Consequently, the privilege has been applied to works in the fields of science, law, medicine, history and biography.

*Rosemont*, 366 F.2d at 307 (biography of Howard Hughes was a fair use); *see also Time Inc. v. Bernard Geis Assoc.*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968) (in finding fair use of the Zapruder films, noting the "public interest in having the fullest information available on the murder of President Kennedy").

**B.**    **The Fair Use Factors, Taken Together and Viewed in Light of the Purposes of Copyright, Favor a Fair Use Finding**

Defendants themselves have explained in detail why fair use shelters HDL, and amici will not replicate that argument here. Rather, we focus on two factors to which the public interest is particularly relevant: purpose and market harm.

Consideration of the public interest is an integral part of the analysis of factor one, the purpose and character of the secondary use. Even in cases where the user has a commercial motive, courts give precedence to a significant public benefit. In *Blanch v. Koons*, for example, the Second Circuit held that the first factor favored the defendant despite his commercial and

profitable use of the plaintiff's image in a "pop art" painting, noting that, "courts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest." *Blanch*, 467 F.3d at 253 (quoting *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994)); s*ee also Rosemont*, 366 F.2d at 307 ("[W]e conclude that whether an author or publisher has a commercial motive or writes in a popular style is irrelevant to a determination of whether a particular use of copyrighted material in a work which offers some benefit to the public constitutes a fair use."); *Mathieson v. Associated Press*, No. 90-cv-6945-LMM, 1992 WL 164447, at *3 (S.D.N.Y. June 25, 1992) (under the first factor, it was fair use and "a matter of legitimate public interest" for the Associated Press to illustrate a news article with copyrighted photos from a sales brochure depicting Oliver North). Where, as here, the use is also noncommercial, the public benefit tilts the scale even further towards the fairness of the use.

The fact that the noncommercial, publicly beneficial use is transformative further supports a fair use finding. *See Campbell*, 510 U.S. at 579. *Perfect 10, Inc. v Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), provides persuasive authority that the use here is transformative. Perfect 10, the plaintiff, marketed and sold copyrighted images of nude models. Other publishers had reproduced some of those images and Google Image search results, in turn, provided thumbnails from those websites. The Ninth Circuit found that Google's use of thumbnails was "highly transformative": it transformed the image into a "pointer directing a user to a source of information." *Perfect 10*, 508 F.3d at 1165. The court stressed, moreover, the social benefit of that transformation. *Id*. ("[A] search engine provides social benefit by incorporating an original work into a new work, namely, an electronic reference tool."). That benefit, in the court's view, titled the first factor firmly in Google's favor:

> We conclude that the significantly transformative nature of Google's search engine, *particularly in light of its public benefit*, outweighs Google's superseding and commercial uses of the thumbnails in this case. . . . the transformative nature of Google's use is more significant than any incidental superseding use or the minor commercial aspects of Google's search engine and website. Therefore, this factor weighs heavily in favor of Google.

*Id*. at 1166-67 (emphasis added).

That reasoning applies here. Among HDL's various services is an electronic reference tool, providing page numbers that allow the viewer to track down more information. That reference work is already providing an enormous public benefit and will continue to do so as more students, researchers, and general readers incorporate it into their everyday practice.

The public benefit of a given use (or lack thereof) is equally relevant to the fourth fair use factor, the effect of the use upon the potential market of the copyrighted work. This factor requires the court "to balance 'the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied.'" *Wright v. Warner Books, Inc.*, 953 F.2d 731, 739 (2d Cir. 1991) (quoting the district court's opinion in that case and affirming the lower court's fair use finding for a biography of Richard Wright); *see also MCA v. Wilson*, 677 F. 2d 180, 183 (1981) ("[W]here a claim of fair use is made, a balance must sometimes be struck between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied."); *Mathieson*, 1992 WL 164447, at *8 (fourth factor analysis must consider "the benefit gained by the public when the use is held to be fair").

Here, that balance again favors the Defendants. The public derives tremendous benefit from HDL, and authors stand to gain very little if the public is deprived of this resource. "The fourth factor disfavors a finding of fair use only when the market is impaired because the quoted material serves the consumer as a substitute, or, in Story's words 'supersede[s] the use of the original.'" Leval, *supra* at 1125 (alteration in original). HDL is hardly a market substitute for its current uses. Libraries do not pay for the "right" to preserve the works in their collections. Moreover, libraries do not pay for the "right" to provide copies to the print disabled. With respect to its search function, while HDL allows the public to *search* all of the books in its digital library, it provides only page numbers of in-copyright works. Mem. Supp. Libraries' Mot. Summ. J. 11, ECF No. 112. As noted above, amici believe the fair use doctrine authorizes a great deal more and look forward to a ruling in the related GBS litigation.

10

Plaintiffs may argue that HDL impairs their ability to license their works for just this purpose, *i.e.*, creating a searchable digital library, and that the public can still benefit if only the works are licensed. However, it does not appear that any entity exists that is willing to pay the monumental costs of a licensing regime. Certainly libraries would be unable to afford the licenses and the cost of administering them. Between 2008 and 2010, research library budgets fell from a median of $24 million to $22.7 million. Sara Hebel, *State Cuts Are Pushing Public Colleges into Peril*, Chron. of Higher Ed. (Mar. 14, 2010).[4] Moreover, the trend of state spending on higher education not keeping up with enrollment growth and inflation, which was exacerbated during the recession, suggests that many library budgets, particularly those in state institutions, will not recover any time soon. *Id.* Funding per public full-time equivalent student dropped by 26.1 percent from 1990–1991 to 2009–2010. John Quinterno & Viany Orozco, *The Great Cost Shift: How Higher Education Costs Undermine the Future Middle Class*, Demos (Apr. 3, 2012).[5] Total fiscal support for higher education declined by another 7.6 percent from fiscal year 2011 to fiscal year 2012, with cuts occurring in 41 states. Caralee Adams, *State Funding for Higher Ed. Drops by 7.6 Percent in a Year*, Education Week (June 27, 2012).[6] The average return on university endowments is lower, and federal stimulus funds for education are running low. Congress has made it clear that it will not increase its support for research universities to make up for the decline of state funding. Paul Basken, *Lawmakers Offer Struggling Research Universities Sympathy, Not Cash*, The Chronicle of Higher Education (June 27, 2012).[7] Likewise, the funding of state libraries has decreased by 24.1 percent over the past decade, resulting in a significant reduction in staff. Press Release, Inst. of Museum and Library Servs.,

---

[4] Available at http://chronicle.com/article/In-Many-States-Public-High/64620.

[5] Available at http://www.demos.org/publication/great-cost-shift-how-higher-education-cuts-undermine-future-middle-class.

[6] Available at http://blogs.edweek.org/edweek/college_bound/2012/01/_in_a_commentary_by.html?utm_source=twitterfeed&utm_medium=twitter.

[7] Available at http://chronicle.com/article/Lawmakers-Offer-Struggling/132659/?cid=at&utm_source=at&utm_medium=en.

State Library Agencies Continue to Provide Valuable Services Despite Severe Cuts in Funding and Staff (Feb. 6, 2012).[8]

At the same time, other library costs have increased dramatically. For example, between 1986 and 2010, research library expenditures on academic journals increased 379 percent, more than double the rate of overall library expenditures.  *See* Association of Research Libraries, *Expenditure Trends in ARL Libraries*, 1986-2010.[9] In 1986, journal subscriptions represented 16.8 percent of median research library expenditures; by 2010, journal subscriptions grew to 31.1 percent of expenditures. *Id*. At one Big Ten university, "if the average changes in library budgets were compared to the average increase in serial costs from the years 2001-2005, the entire library budget would be consumed by journal costs by the year 2014." Glenn S. McGuigan & Robert D. Russell, *The Business of Academic Publishing: A Strategic Analysis of the Academic Journal Publishing Industry and its Impact on the Future of Scholarly Publishing*, 9 Electronic J. Acad. Special Librarianship 3 (2008). And, of course, journal costs are only the tip of the iceberg that is threatening library budgets. In short, libraries do not have the resources to pay license fees for the "right" to index the books in their collections.

Further, courts have properly rejected similar circular arguments that the fair use privilege should be rejected because the use deprives the copyright owner of license fees. *Kane v. Comedy Partners,* No. 00-cv-158-GBD, 2003 WL 22383387, at *7 (S.D.N.Y. Oct. 16, 2003) (to avoid danger of circularity, copyright owner not entitled to license fees for uses that otherwise qualify as fair uses); *see also* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05(A)(4) (2005) ("[I]t is a given in every fair use case that plaintiff suffers a loss of a *potential* market if that potential is defined as the theoretical market for licensing the very use at bar").

---

[8] Available at
http://www.imls.gov/state_library_agencies_continue_to_provide_valuable_services.aspx?CategoryId=1&F_All=y.
[9] Available at http://www.arl.org/stats/annualsurveys/arlstats/arlstats10.shtml.

Finally, authors benefit substantially from the service, as readers, researchers, and librarians use HDL to find, and often purchase, books of interest. "The less adverse effect that an alleged infringing use has on the copyright owner's expectation of gain, the less public benefit need be shown to justify the use." *MCA*, 677 F.2d at 183. Where, as here, there is no meaningful adverse effect, the use is surely justified.

### C.   HDL Embodies Widespread and Well-Established Best Practices for Fair Use

Plaintiffs assert that HathiTrust's activities fall far beyond the bounds of fair use. In fact, HDL's design and elements reflect a widespread fair use consensus among libraries, as embodied in the Association of Research Libraries' *Code of Best Practices in Fair Use for Academic and Research Libraries*.

The development of the Code was prompted by Professor Michael Madison's insight (following a review of numerous fair use decisions) that the courts were

> implicitly or explicitly, asking about habit, custom, and social context of the use, using what Madison termed a 'pattern-oriented' approach to fair use reasoning. If the use was normal in a community, and you could understand how it was different from the original market use, then judges typically decided for fair use.

Patricia Aufderheide and Peter Jaszi, *Reclaiming Fair Use* 71 (2011). Based on this insight, with the goal of making fair uses analysis more predictable for librarians, the Association of Research Libraries undertook an effort to "document[] the considered views of the library community about best practices in fair use, drawn from the actual practices and experience of the library community itself." Association of Research Libraries, *et al.*, *Code of Best Practices in Fair Use for Academic and Research Libraries* 3 (2012). The resulting Code of Best Practices identified "situations that represent the library community's current consensus about acceptable practices for the fair use of copyrighted materials and describes a carefully derived consensus within the library community about how those rights should apply in certain recurrent situations." *Id.*

Many of the activities that are the subject of this litigation are consistent with the ARL Code of Best Practices. For example, the Code declares that "[i]t is fair use for libraries to

13

develop and facilitate the development of digital libraries of collection items to enable

nonconsumptive analysis across the collection for both scholarly and reference purposes." *Id.* at

25. The Code explains:

> librarians have always played an important role in conducting and supporting scholarship in disciplines that examine trends and changes across broad swaths of information, e.g., information science, linguistics, bibliography, and history of science.

*Id.* at 24. And that:

> Nonconsumptive uses are highly transformative. Digitizing and indexing works for purposes such as statistical meta-analysis and search creates a powerful new scholarly resource that is not at all a mere substitute for the original work. The analyses facilitated by scanning for nonconsumptive use do not use the works for their original intended purposes; no person ever "reads" the underlying work or works. Instead, this kind of analysis focuses on the underlying facts about a collection of works (how many times a word appears across an author's body of work, how frequently scientists used a particular species of mouse as test subject, and so on) rather than the protected expression of any single work. Courts have found search engines, which copy millions of web pages into their indexed databases in order to help users find relevant sites, to be fair uses for precisely this reason.

*Id.* at 25. As explained in more detail in the amicus brief submitted by the Digital Humanities

and Law Professors, these are precisely the types of uses HDL enables.

The Code also addresses access to materials to students and faculty with disabilities. The

Code explains:

> Print-disabled academic and research library patrons require access to readable text in order to function as full members of an academic community; likewise, hearing-disabled patrons require captioned audiovisual materials, while those with physical disabilities may require the electronic delivery of materials outside the library setting.

*Id.* at 21. HDL, of course, does just that. Mem. Supp. Libraries' Mot. Summ. J. 9, ECF No. 112.

Finally, the Code addresses preservation, stating that "It is fair use to make digital copies

of collection items that are likely to deteriorate, or that exist only in difficult-to-access formats,

for purposes of preservation, and to make those copies available as surrogates for fragile or

otherwise inaccessible materials." *Id*., *supra*, at 18. Again, HDL serves that very purpose. Mem. Supp. Libraries' Mot. Summ. J. 3, ECF No. 112.

## III.   A LEGISLATIVE "FIX" IS BOTH UNNECESSARY AND UNWORKABLE

### A.   Congress Is Unlikely to Fix the "Orphan Works" Problem

Perhaps recognizing that a U.S. federal district court would be reluctant to order the destruction of over 10 million digital books under the management of research libraries, Plaintiffs seek the unusual remedy of the court impounding the digital library "pending an appropriate act of Congress." Plaintiffs in their motion for judgment on the pleadings reference the orphan works bills considered by Congress in 2006 and 2008, suggesting that Congressional resolution of the copyright issues relating to HDL is likely.

Although this case is not in its remedial stage, the Court should be aware of the implausibility of the remedy proposed by Plaintiffs as it considers the equities of fair use. The legislative solution envisioned by Plaintiffs overlooks the substance of the orphan works legislation as well as its fate. The legislation would have limited the remedies for infringement if the user made a reasonably diligent search for the copyright owner prior to commencing the use. A user would have had to bear the significant cost of searching for the copyright owner before making any use a work; and if the copyright owner emerged after the use occurred, the user would have had to pay the owner reasonable compensation. Even this legislation, which was very protective of the interests of the absent copyright owners and had the support of the Copyright Office, the publishers, and the library associations, failed to pass Congress because of the opposition of photographers and illustrators. *See* Orphan Works Act, H.R. 5439, 109th Cong. (2006); Orphan Works Act, H.R. 5889, 110th Cong. (2008); Shawn Bentley Orphan Works Act, S. 2913, 110th Cong. (2008).

There is no reason to assume that legislation resolving the copyright issues relating to HDL would fare better than the orphan works legislation did in 2008. The vociferous opposition of some authors' groups to the Google Books Settlement (notwithstanding Plaintiffs' support of the settlement) indicates the high probability that a constituency will emerge to oppose forcefully

any legislation that would attempt to address the copyright issues relating to HDL. Moreover, the copyright issues relating to HDL are far broader than the scope of the orphan works legislation, which did not address mass digitization, nor access for the print disabled. A comprehensive legislative solution satisfactory to Plaintiffs would require enactment of a compulsory license such as the Scandinavian-style extended collective license of the variety addressed by Professor Daniel Gervais. The prospects of Congressional adoption of such a complex regulatory approach is completely speculative.[10]

Fortunately, a legislative solution already exists: the fair use doctrine, codified at 17 U.S.C. § 107. This Court should use the equitable power granted it by Congress in section 107 to allow HathiTrust to continue to maintain the digital library and to offer socially valuable services that cause Plaintiffs no economic harm, such as search, non-consumptive research, access to full text by the print disabled, and access to the full text of orphan works.

**B.      Even if Congress Did Authorize a Statutory License, the Libraries Could Not Afford to Pay for It**

In the unlikely event that Congress cleared a new legal path allowing HDL to be brought back online, any solution short of an outright exception would be beyond the financial means of U.S. libraries. The U.S. library community would not have the resources to afford an approach that involved an upfront compulsory license fee or a search for an absent copyright owner. As explained above, library budgets are already unable to keep up with existing costs. A statutory remedy that is premised, as Plaintiffs likely would demand, on the assumption that libraries can and should incur new license or other fees would be no solution at all.

---

[10] At a hearing in 2009 on the Google Books Settlement, then-Register of Copyrights Marybeth Peters suggested that a statutory compulsory license for the mass digitization of books might be inconsistent with international treaty obligations. *Hearing on: Competition and Commerce in Digital Books before the H. Comm. on the Judiciary*, 111th Cong. 66 (2009). At the very least, Register Peters believed that such a statutory compulsory license would subject the United States to "diplomatic stress." *Id.* at 8.

IV.   **PLAINTIFFS HELPED FOSTER PUBLIC RELIANCE ON THE HATHITRUST PROJECT; THE EQUITIES DO NOT FAVOR DEPRIVING THE PUBLIC OF THAT RESOURCE.**

As the Court performs the equitable analysis that is at the heart of the fair use calculus, it should be aware that the current situation – where the Court must consider the legality of an existing digital library of over 10 million books – is in large measure the result of litigation choices made by the Plaintiffs. This case, of course, is born of the Google Books Project, which has been the subject of litigation since 2005. When Plaintiffs sued Google in 2005, they could have sought preliminary relief – but they chose not to. When the Plaintiffs entered into settlement discussions with Google, they could have demanded that Google cease scanning books and providing copies of the scans to libraries – but they chose not to. During the course of the three years of settlement negotiations with Google, they could have demanded that Google discontinue scanning – but they chose not to. When the Plaintiffs agreed to a settlement with Google in 2008, they once again could have insisted that Google cease scanning pending approval of the settlement – but they chose not to. In short, Plaintiffs' litigation decisions over the past seven years have allowed Google to scan millions of books in the collections of their partner libraries, and to provide copies of those scans to the libraries.

Moreover, the structure of HDL is the result of the settlement that Plaintiffs agreed to and attempted to convince class members and the presiding judge to accept. Under the agreements between Google and its partner libraries, Google had the obligation to provide each library with a scan of the books that that library made available to Google for scanning. The settlement, by contrast, allowed for the creation of a "Research Corpus," a set of all the scans made by Google in connection to the Library Project. Amended Settlement Agreement, at 1.132, 7.2(d), *Authors Guild, Inc. v. Google, Inc.*, No. 05-cv- 8136-DC (S.D.N.Y. Nov. 13, 2009). The Research Corpus could be housed at two host sites selected by the libraries participating in the Library Project. Amended Settlement Agreement, *Google*, at 7.2(d)(ii) (No. 05-cv- 8136-DC). HDL consists primarily of the Research Corpus contemplated by the settlement. Accordingly, it is completely

disingenuous for Plaintiffs to express shock at the "massive infringement" represented by HDL, when it is a product of the settlement they helped design.[11]

Under the settlement, the qualified researchers could use the Research Corpus for "non-consumptive research," computational analysis of the books that does not require the reading of the books' intellectual content. Amended Settlement Agreement, *Google*, at 1.93 (No. 05-cv-8136-DC). This is precisely one of the major uses of HathiTrust today. But the Research Corpus played another, more profound role in the architecture of the settlement. During the extensive public debate over the Library Project, some authors expressed concern that a single corporation would have exclusive control over a vast digital library of all published books. *See, e.g.*, Siva Vaidhyanathan, *A Risky Gamble with Google*, Chron. Higher Educ. Dec. 2, 2005, at B7-10. In essence, they worried about the privatization of knowledge. The settlement addressed that problem by creating the Research Corpus as an alternative digital library under the control of the nation's most respected libraries – the very entities that had served as the custodians of the books contained in the digital library. The Research Corpus represented a fail-safe that would protect the interests of the plaintiffs to the Google litigation – including the Plaintiffs here – and the public at large in the event that Google went out of business or became "evil" by restricting access to or otherwise misusing the contents of the digital library.

Judge Chin rejected the settlement. But that does not mean that this valuable resource that resulted, in significant part, from Plaintiffs' own litigation decisions should be destroyed or "mothballed" until Congress takes action. The Court has the equitable power to find that the existence and use of HDL is a fair use. As explained above, the public interest and core fair use principles counsel firmly in favor of doing so.

---

[11] Similarly, Plaintiffs' concerns about the "potentially catastrophic security risks," Plaintiffs Motion for Summary Judgment at 2, ring hollow given that HDL implements the same security measures imposed by the settlement on the Research Corpus. Amended Settlement Agreement, *Google*, at 8.2 (No. 05-cv-8136-DC).

**CONCLUSION**

For the foregoing reasons, Amici urge the Court to grant Defendants' motion for summary judgment.

Dated: July 6, 2012                           Respectfully submitted,

                                              s/ Jonathan Band
                                              Jonathan Band
                                               (admitted *pro hac vice*)
                                              JONATHAN BAND PLLC
                                              21 Dupont Circle NW, 8th Floor
                                              Washington, D.C., 20036
                                              Tel: (202) 296-5675
                                              Email: jband@policybandwidth.com

                                              *Attorneys for Amici the Library Foundations*

                                              *On the brief*:
                                              Corynne McSherry
                                              ELECTRONIC FRONTIER
                                              FOUNDATION
                                              454 Shotwell Street
                                              San Francisco, CA 94110
                                              Tel: (415) 436-9333
                                              Fax: (415) 436-9993
                                              Email: corynne@eff.org

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2012, I electronically filed the foregoing with the Clerk of the Court for the United States District Court, Southern District of New York by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: July 6, 2012

By: /s/ Jonathan Band
Jonathan Band