# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------X
THE AUTHORS GUILD, INC., et al.,            :

                 Plaintiffs,                :        Case No. 11-cv-6351(HB)

         v.                                 :

HATHITRUST, et al.,                         :

                 Defendants.                :
-------------------------------------------------------X
```

## DEFENDANT INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Daniel F. Goldstein (admitted *pro hac vice*)
Laura Ginsberg Abelson (admitted *pro hac vice*)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street
Suite 1700
Baltimore, Maryland 21202
Telephone: 410-962-1030
Facsimile:  410-385-0869
dfg@browngold.com
labelson@browngold.com

Robert J. Bernstein (RB 4230)                Peter Jaszi (admitted *pro hac vice*)
THE LAW OFFICE OF ROBERT J. BERNSTEIN        5402 Surrey Street
380 Lexington Avenue, 17th Floor             Chevy Chase, Maryland 20815
New York, New York 10168                     Telephone:  301-656-1753
Telephone:  212-551-1068                     Facsimile:  301-656-7483
Facsimile:  212-551-1001                     pjaszi@wcl.american.edu
rjb@robert-bernsteinlaw.com

*Counsel for National Federation of the Blind,
Georgina Kleege, Blair Seidlitz, and Courtney Wheeler*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ..................................................................................................................... 3

    I.     Plaintiffs are not entitled to summary judgment because they fail to
           address NFB's defenses ................................................................................ 3

         A.    Plaintiffs wrongly analyze the digitization of the HDL in
               isolation when, in fact, its lawfulness turns on the public
               interest in its uses, including that of granting the blind
               unprecedented access to information ...................................................... 4

         B.    Plaintiffs fail to come to grips with the University
               Defendants' rights under the Chafee Amendment and fair
               use, and their legal obligation under the ADA, to afford
               access to the HDL and the impact of those rights and
               obligations in analyzing whether access to the blind is a
               non-infringing use .................................................................................. 7

         C.    Plaintiffs' failure to address why their requested relief may
               trump the civil rights of blind individuals, or explain why
               they would be entitled to equitable relief at all, is fatal to
               their claim for relief .............................................................................. 8

    II.    Plaintiffs fail to present any legal authority to contravene the
           NFB's strong showing of fair use ...................................................... 10

         A.    Notwithstanding the fact-intensive nature of the fair use inquiry, Plaintiffs
               cite no cases with circumstances comparable to the creation and use of a
               digital database to ensure equal access to university library collections by
               blind students and scholars .................................................................. 10

         B.    Plaintiffs ignore current judicial applications of the principle of
               transformative use that encompass non-superseding, productive uses even
               in the absence of changes to the copyrighted works................................ 13

    III.    Plaintiffs provide no evidence that any actual or potential market is
           harmed by providing equal access to the blind through use of the
            HDL. ................................................................................................ 14

CONCLUSION................................................................................................................ 17

# TABLE OF AUTHORITIES

<u>Cases</u>

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ....................................................................................... 12

*A.V. v. iParadigms*,
    544 F. Supp. 2d 473 (E.D. Va. 2008), *aff'd in part*,
    562 F.3d 630 (4th Cir. 2009 ...................................................................................... 11, 13

*American Geophysical Union v. Texaco, Inc.*,
    60 F.3d 913 (2d Cir. 1994), *cert. denied*, 516 U.S. 1005 (1995). .................................... 11

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
    758 F. Supp. 1522 (S.D.N.Y. 1991) .............................................................................. 9, 12

*Bill Graham Archives v. Dorling Kindersley*,
    448 F.3d 605 (2d Cir. 2006) ............................................................................................ 11

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006) .............................................................................................. 7

*Byrne v. British Broad. Corp.*,
    132 F. Supp. 2d 229 (S.D.N.Y. 2001) ............................................................................. 12

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ........................................................................................................... 7

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*,
    150 F.3d 132 (2d Cir. 1998) .............................................................................................. 7

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ........................................................................................................... 9

*Encyclopaedia Britannica Educ. Corp. v. Crooks*,
    542 F. Supp. 1156 (W.D.N.Y. 1982) ............................................................................... 12

*Field v. Google Inc.*,
    412 F. Supp. 2d 1106 (D. Nev. 2006) .............................................................................. 11

*Hofheinz v. Discovery Communications, Inc.*,
    No. 00-3802, 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001) ........................................... 11

*Hounddog Prods., LLC. v. Empire Film Grp., Inc.*,
    826 F. Supp. 2d 619 (S.D.N.Y. 2011) ............................................................................... 9

*Huminski v. Corsones*,
  396 F.3d 53 (2d Cir. 2005)..............................................................................3

*Infinity Broad. Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998)...........................................................................12

*Kelly v. Arriba Soft*,
  336 F.3d 811 (9th Cir. 2003) .........................................................................11

*NXIVM Corp. v. Ross Institute*,
  364 F.3d 471 (2d Cir. 2004)............................................................................7

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .......................................................................13

*Princeton Univ. Press. v. Michigan Document Servs., Inc.*,
  99 F.3d 1381 (6th Cir.), *cert. denied*, 520 U.S. 1156 (1997).........................12

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010)...............................................................................9

*Sealey v. Giltner*,
  116 F.3d 47 (2d Cir. 1997)...............................................................................4

*Sega* v. *Accolade*,
  977 F.2d 1510 (9th Cir. 1993) .......................................................................11

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
  203 F.3d 596 (9th Cir. 2000) .........................................................................11

*Spanierman Gallery, PSP v. Love*,
  320 F. Supp. 2d 108 (S.D.N.Y. 2004)..............................................................3

*UMG Recordings, Inc. v. MP3.com, Inc.*,
  92 F. Supp. 2d 349 (S.D.N.Y. 2000)...............................................................12

*Waldman Pub. Corp. v. Landoll, Inc.*,
  43 F.3d 775 (2d Cir. 1994)...............................................................................9

<u>Statutes</u>

17 U.S.C. § 107.......................................................................................... 1, 13

17 U.S.C. § 107(4)............................................................................................16

17 U.S.C. § 108.......................................................................................... 13, 16

17 U.S.C. § 121 ................................................................................................ 1, 7, 8

17 U.S.C. § 502 ...................................................................................................... 9

17 U.S.C. § 502(a) ................................................................................................. 9

17 U.S.C. § 503 ...................................................................................................... 8

29 U.S.C. § 701 ...................................................................................................... 6

42 U.S.C. § 12101 .................................................................................................. 1

42 U.S.C. § 12132 .................................................................................................. 8

42 U.S.C. § 12182 .................................................................................................. 8

Rules

Fed. R. Civ. P. 56(a) .............................................................................................. 1

Fed. R. Civ. P. 65(d) .............................................................................................. 9

Legislative History

*Copyright Law Revision*, House Rep. No. 94-1476, at 73 (1976) ................................................. 1

Other Authorities

Association of Research Libraries, *Celebrating Research* 10 (2007) ........................................... 12

Gillian Davies, *Copyright and the Public Interest* 138-155 (2d ed. 2002) ................................... 16

Paul Goldstein & Bernt Hugenholtz, *International Copyright: Principles, Law, and Practice* 359-390 (2d ed. 2010) ................................................................................. 16

## PRELIMINARY STATEMENT

Plaintiffs offer no facts, law, or argument to warrant a grant of summary judgment in their favor against Defendant Intervenors (collectively "NFB").  It is not that the facts, law, and argument as to NFB are insufficient or inaccurate; rather, it is that they are altogether absent. Blind and other print-disabled students and scholars do not merit a single mention in Plaintiffs' argument.  Plaintiffs even fail to address the legislative history of the 1976 Copyright Act in which the provision of accessible copies to the blind is specifically noted as a favored fair use.[1] Perhaps Plaintiffs' silence is the product of their recognition that federal law—copyright law, including the Chafee Amendment, 17 U.S.C. § 121, and fair use, 17 U.S.C. § 107, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*—supports the creation and distribution of accessible copies to the blind.  But whatever the reason, the legal effect of Plaintiffs' silence is that their Motion for Summary Judgment must be denied.

Federal Rule of Civil Procedure 56(a) requires that motions for summary judgment "identify[] each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Plaintiffs, however, do not identify, much less challenge, any of the six affirmative defenses put forth by NFB in its Answer, including, notably, that access to the HathiTrust Digital Library ("HDL") by the blind is (a) required by the ADA; (b) permitted by the Chafee Amendment; and (c) a fair use under § 107 of the Copyright Act.

As is apparent from the Table of Contents to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, Plaintiffs' argument relies on the incorrect legal proposition that the digitization of university library collections can be adjudged in isolation from the purposes it will serve.  Plaintiffs' refusal to address the beneficial uses enabled by that digitization leaves

---

[1] *Copyright Law Revision*, House Rep. No. 94-1476, at 73 (1976).

uncontested that the creation, preservation, and use of the HDL to provide equal access for blind students and scholars is a legitimate, noninfringing use.

Plaintiffs' Motion, although not styled as a motion for partial summary judgment on liability, is in fact just that, as it has the further shortcoming that it fails to address altogether the factors that must be addressed when seeking the drastic relief requested in the Complaint, contenting itself with a cryptic reference to a possible subsequent "remedy phase."[2] This is more than a technical critique: copyright remedies that sound in equity, such as impoundment, may not be crafted so to prevent fair and other lawful uses. Thus, Plaintiffs' failure to address the merits of the lawfulness of use by the blind disentitles them to any relief that inhibits use of the HDL by the blind.

Surprisingly, the facts put forward by Plaintiffs do, in some instances, bolster the NFB's (and the University Defendants') fair use rights. For example, their lengthy description of the comprehensive nature of the copying that produced the HDL[3] underlines a central fact—that this resource will enable truly equal participation by the blind in research and other scholarly activities. Likewise, Plaintiffs' discussion of the substantial expense that went into the comprehensive scanning and OCR conversion of the library collections supports the already established facts that no market exists or can be expected to arise for providing the blind with an accessible academic library collection.

At the same time, Plaintiffs fail to address—because they cannot come to grips with—the last decade or more of fair use jurisprudence establishing that the fairness of copying must be assessed in light of the purposes for which the copies ultimately are used; not, as Plaintiffs would

---

[2] Pls.' Mem. in Supp. of Summ. J. Mot. at 10.
[3] *Id.* at 3-6.

have it, in isolation from it.[4]  Plaintiffs, having chosen not to contest the proposition that access

to the blind is a lawful and publicly desirable use that furthers the goals of copyright, are faced

with a question they cannot answer:  how could the goal of equal access for blind students and

scholars be met other than through the comprehensive digitization of university libraries?

Because the answer is that there is no other way in which this goal can be accomplished,

Plaintiffs' attempt to separate the legality of the creation of the HDL from the benefits associated

with its intended use must fail.[5]  As a result, the digitization of the collections and their use to

provide equal access to the blind are conjoined fair uses.

## ARGUMENT

**I.    Plaintiffs are not entitled to summary judgment because they fail to address NFB's defenses.**

As the movants, Plaintiffs carry the burden of establishing that they are entitled to

summary judgment.[6]  Because Plaintiffs do not address any of the defenses raised by NFB in its

Answer, the motion fails.[7]  Furthermore, as the Second Circuit has noted, "[a] party has no

obligation to respond to grounds that the moving party does not raise in a summary judgment

---

[4] *See* discussion in Point III of Defendant Intervenors' Memorandum of Law in Support of Motion for Summary Judgment, at pp. 14-26.

[5] Although the NFB here addresses the beneficial use to provide equal educational opportunity for blind students and scholars, the additional beneficial uses of text searching and data mining–both done without displaying even one sentence of any copyrighted work–are each fair uses of the HDL that independently suffice to justify its creation.  The NFB specifically adopts and incorporates by reference the facts, arguments, and authorities set forth by the University Defendants in their opening and opposition briefs.

[6] *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005).

[7] *See Spanierman Gallery, PSP v. Love*, 320 F. Supp. 2d 108, 112-13 (S.D.N.Y. 2004) (rejecting plaintiffs' motion for summary judgment in part because plaintiffs "failed to address the affirmative defenses in Defendants' answer").

motion."[8]  Accordingly, NFB's defenses are not at issue and Plaintiffs have forfeited their right

to summary judgment on defenses related to blind individuals' access to the HDL.

Plaintiffs wholly ignore the compelling public interest in providing the blind and other

individuals with print disabilities access to the unprecedented quantity of information available

to them through the HDL.[9]  Rather than attempt to challenge this point, Plaintiffs focus instead

on the creation of the HDL, treating it as a discrete activity entirely removed from its purposes

and subsequent uses.  Plaintiffs presume that the public interest in accessibility for the blind has

no bearing on the legal status of the copying or current use of the digitized works.  They are

mistaken.  The public interest in promoting equal access to information for the blind weighs

heavily on (1) the legality of the University Defendants' conduct in allowing Google to digitize

the books; (2) whether granting blind individuals access to the HDL is permissible; and (3) the

scope and propriety of any equitable relief to which the Plaintiffs might otherwise be entitled.

> ### A.   Plaintiffs wrongly analyze the digitization of the HDL in isolation when, in fact, its lawfulness turns on the public interest in its uses, including that of granting the blind unprecedented access to information.

As Plaintiffs themselves admit in their memorandum in support of their summary

judgment motion, "it is the purpose for which the Defendant libraries digitized and used the

Infringed Books that is at issue here."[10]  Nevertheless, Plaintiffs ignore evidence that one of the

University Defendants' primary purposes in partnering with Google to digitize their library

collections was to make the wealth of information contained in their collections available to the

blind.  The University of Michigan, which was the lead institution in the collection digitization

---

[8] *Sealey v. Giltner*, 116 F.3d 47, 52 (2d Cir. 1997).

[9] *See* Decl. of George Kerscher (hereinafter "Kerscher Decl."), June 28, 2012, ¶ 51 (describing the HDL as providing "an unparalleled opportunity to achieve true equality in higher education for blind and print-disabled students and scholars").

[10] Pls.' Mem. in Supp. of Summ. J. Mot. at 19 (emphasis removed).

that led to the creation of the HDL, worked to negotiate the accessibility of the digital books to individuals with print disabilities even during the preliminary negotiations with Google over the digitization of the University's library.[11]  The University Librarian and Dean of Libraries at the University of Michigan, Paul Courant, also confirmed that one of the reasons the University of Michigan asked Google for a digital copy of the works was "to provide accessibility to people with print disabilities."[12]  The University bargained for the right to keep a digital copy of the works to "ensure that students and faculty with print disabilities had access to works within the HDL on par with their non-disabled peers."[13]  The University did so in furtherance of one of its "primary missions of providing specialized services to the blind or other persons with disabilities."[14]

Rather than contest or otherwise address this laudable goal, Plaintiffs merely ignore the evidence and assert that the University Defendants were motivated only by a "commercial purpose."[15]  Given the HDL project leaders' statements as to the fundamental importance of accessibility goals in undertaking  the digitization project, Plaintiffs' characterization of the University Defendants' motivation as "commercial" is unsupported by the evidence, all of which is entirely to the contrary.

Despite its beneficial and lawful uses, Plaintiffs repeatedly point to the quantity of books copied to create the HDL as evidence of its illegality.  Yet the quantity of books is necessary and

---

[11] Dep. of John P. Wilkin (hereinafter "Wilkin Dep."), Apr. 25, 2012, at 35:18-36:9; 43:13-25, 136:14-20 (attached as exhibit to Pls.' Summ. J. Mot.); Decl. of Marc Maurer (hereinafter "Maurer Decl."), June 27, 2012, ¶ 14.

[12] Dep. of Paul Courant (hereinafter "Courant Dep."), Apr. 24, 2012, at 86:17-25 – 87:1-13 (attached as exhibit to Pls.' Summ. J. Mot.)

[13] Decl. of John P. Wilkin (hereinafter "Wilkin Decl."), June 28, 2012, at ¶ 47 (attached as exhibit to Defs.' Summ. J. Mot.)

[14] *Id.*

[15] Pls.' Mem. in Supp. of Summ. J. Mot. at 19.

appropriate to fulfilling the goal of equal access to information for the blind.  Just as a book that is missing pages prevents the reader from learning all the information the book has to offer, so, too, a digital library that is missing books that are present in the physical library impedes the discovery of knowledge—or worse, leads to error.  Suppose both a blind and a sighted student were tasked with writing research papers for a class on fifteenth century English literature.  The sighted student would have the benefit of the library's entire collection of books on fifteenth century English literature.  She could peruse the collection, confident that she could access all relevant books in the library's possession.  If the entire library collection were digitized in an accessible format, then the blind student would have the same opportunity.  But if, because the library fears embarking on too large of a digitization project, only a small section of the collection has been digitized, the blind student would be at a severe disadvantage in gathering information for his research paper.[16]  Only *complete* access to the libraries' collection ensures equality of opportunity for the blind student, as mandated by the ADA and Rehabilitation Act of 1976, 29 U.S.C. § 701, *et seq.*  Furthermore, the comprehensiveness of the HDL would allow blind students and scholars not only to *catch up* to their sighted peers by offering an alternative to searching through card catalogs and library stacks to locate books on a particular topic; it would allow them to *keep up*, by engaging in the kind of innovative text mining research described in the *amicus* brief of Digital Humanities and Law Scholars.[17]  Therefore, to actualize

---

[16] *See* Decl. of Georgina Kleege (hereinafter "Kleege Decl."), Dec. 5, 2011, ¶¶ 5-7 (attached as Abelson Decl. Ex. D) (detailing extraordinary difficulty in accessing books from library for research without access to HDL); Decl. of Blair Seidlitz (hereinafter "Seidlitz Decl."), Dec. 6, 2011, ¶¶ 5-7 (attached as Abelson Decl. Ex. E) (same); Decl. of Courtney Wheeler (hereinafter "Wheeler Decl."), Dec. 6, 2011, ¶¶ 7-8 (attached as Abelson Decl. Ex. F) (same).
[17] *See* Brief of Digital Humanities and Law Scholars as *Amici Curiae* in Partial Support of Defendants' Motion for Summary Judgment at 3-11.

the permissible and important purpose of providing blind individuals with equal access to

information, the complete and large-scale digitization of the entire library collection is necessary.

      **B.**      **Plaintiffs fail to come to grips with the University Defendants' rights under the Chafee Amendment and fair use, and their legal obligation under the ADA, to afford access to the HDL and the impact of those rights and obligations in analyzing whether access to the blind is a non-infringing use.**

Plaintiffs' summary judgment motion incorrectly presumes that the University

Defendants' act of copying the books is the only issue before the court.  Yet the legal status of

the original digitization process itself is not dispositive of whether the books can now be used for

a purpose that greatly benefits the public good—equal access for individuals with disabilities—

the demonstrable lawfulness of which—it bears repeating—is undisputed by Plaintiffs.[18]

Nowhere in their summary judgment motion do the Plaintiffs dispute NFB's assertion

that fair use, considered in light of its legislative history, clearly applies to uses of the HDL that

promote equality of access to blind students and scholars.[19]  Furthermore, NFB asserts in its

Answer that the Chafee Amendment[20] provides a source of authorization, in addition to fair use,

for digitizing and providing blind students and scholars with accessible versions of copyrighted

books in university libraries.[21]  Yet Plaintiffs' Motion for Summary Judgment also fails entirely

to address this contention.  The Chafee Amendment permits "authorized entitie(s)," such as the

University Defendants, "to reproduce or distribute copies . . . of a previously published, non-

---

[18] *See NXIVM Corp. v. Ross Institut*e, 364 F.3d 471, 479 (2d Cir. 2004) ("[T]he bad faith of a defendant is not dispositive of a fair use defense."); *see also Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006) ("We are aware of no controlling authority to the effect that the failure to seek permission for copying, in itself, constitutes bad faith."); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 146 (2d Cir. 1998) ("[B]eing denied permission to use a work does not weigh against a finding of fair use.") (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n. 18 (1994)).

[19] *See* NFB's Answer at 19; NFB's Opp. to Pls.' Mot. for Partial J. on the Pleadings at 6-7.

[20] 17 U.S.C. § 121.

[21] *See* NFB's Answer at 20.

dramatic literary work . . . in specialized formats exclusively for use by the blind or other persons with disabilities."[22]  Although Plaintiffs assert that they seek summary judgment on the legality of the reproduction of the libraries' collections, they fail to raise a single argument in response to NFB's Chafee Amendment defense.  As such, Plaintiffs are not entitled to summary judgment on this critical issue.

NFB also identifies the ADA as a defense in its Answer.[23]  Now that the HDL exists, the University Defendants are obligated under the ADA to provide access to the digitized works to the blind.[24]  Again, rather than contest this point or otherwise engage with it, the Plaintiffs simply ignore it.  Not once have Plaintiffs disputed that the ADA imposes a requirement upon the University Defendants to provide equal opportunity for blind individuals by granting them access to the HDL.

### C.  Plaintiffs' failure to address why their requested relief may trump the civil rights of blind individuals, or explain why they would be entitled to equitable relief at all, is fatal to their claim for relief.

Plaintiffs fail to offer any justification for the draconian relief they request in their Complaint.  Nor do they attempt to explain why it is in the public's interest to bar the blind from obtaining equal access to information through their use of the HDL, the effective result of the impoundment they demand.  Instead, Plaintiffs simply assume that if they can prove that the digitization itself violated the Copyright Act, then they are automatically entitled to their requested relief.

Yet even for relief available at the court's discretion under 17 U.S.C. § 503(b), such as the impoundment Plaintiffs request, "[t]he standard for granting this [relief] mirrors the standard

---

[22] § 121(a).

[23] NFB's Answer at 20.

[24] *See* 42 U.S.C. §§ 12132, 12182 (requiring both public and private universities to provide blind and sighted members of their community with equal access to university libraries).

for granting injunctive relief."[25]   In the context of injunctive relief under 17 U.S.C. § 502, the

Supreme Court has noted that although the Copyright Act provides that courts "may" grant such

relief, it does not automatically flow from a finding of liability.[26]   Instead, the traditional four-

factor test for determining the propriety of injunctive relief—the likelihood of irreparable injury,

the inadequacy of remedies available at law, the balance of hardships, and the public interest—

applies.[27]   Furthermore, any relief granted must be "narrowly tailored to fit specific legal

violations,"[28] and should not impose unnecessary burdens on lawful activity."[29]   Thus, courts

may not bar uses that are fair or otherwise noninfringing.[30]

Plaintiffs put forth no argument as to why they are entitled to any relief against the

NFB,[31] much less injunctive relief.   Nor do they address why they are entitled to an order that

would completely eliminate the *sole* method available to blind students and scholars to obtain

equal access to the wealth of information contained in university library collections.  Plaintiffs

fail to acknowledge this question, apparently because they are without an answer.  In the absence

---

[25] *Hounddog Prods., LLC. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 633-34 (S.D.N.Y. 2011).

[26] 17 U.S.C. § 502(a); *see eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392 (2006); *Salinger v. Colting*, 607 F.3d 68, 78 (2d Cir. 2010).

[27] *See eBay Inc.*, 547 U.S. at 391-92 (applying four-factor test that considers likelihood of irreparable injury, inadequacy of remedies available at law, the balance of hardships, and the public interest in context of copyright case); *Salinger*, 607 F.3d at 78 (observing that "*eBay* strongly indicates that the traditional principles of equity . . . are the presumptive standard for injunctions in any context").

[28] *Waldman Pub. Corp. v. Landoll, Inc.,* 43 F.3d 775, 785 (2d Cir. 1994); *see also* Fed. R. Civ. P. 65(d) ("Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained.").

[29] *Waldman Pub. Corp.*, 43 F.3d at 785.

[30] *See Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1542 (S.D.N.Y. 1991) (refusing to enjoin all conduct at issue because some "may fall within fair use requirements" and the "court is not in the position, for example, to enjoin uses which are fair . . .").

[31] The NFB also agrees with and incorporates by reference the arguments of the University Defendants that demonstrate their educational, research uses of the HDL and the digitization of library collections to facilitate those uses are noninfringing and fair uses.

of any justification for a proposed remedy that would thwart the civil rights of blind individuals and set them back significantly in their efforts to achieve true equality of opportunity, Plaintiffs' request for relief should be rejected for the same reason as their argument against fair use: they both disserve the public interest and impede the goals of copyright.

## II.    Plaintiffs fail to present any legal authority to contravene the NFB's strong showing of fair use.

The cases Plaintiffs cite in support of their argument against fair use are not only inapposite; they fail to fully reflect the emphasis that contemporary case law places on transformative use and ignore the importance of the purpose of the use in evaluating the fairness of the copying.

### A.    Notwithstanding the fact-intensive nature of the fair use inquiry, Plaintiffs cite no cases with circumstances comparable to the creation and use of a digital database to ensure equal access to university library collections by blind students and scholars.

Not only do Plaintiffs concede, by not addressing, that equal access for the blind to university library collections is a paradigmatic example of educational fair use; they also fail to present any relevant legal authorities in opposition to the contemporary, prevailing view that intermediate copying, including creation of a digitized database, undertaken to enable beneficial lawful use is itself a fair use.  Instead, Plaintiffs mistakenly place their exclusive reliance on cases more than a decade old involving the reproduction of substitute copies for primarily commercial purposes.  The circumstances of these cases have no bearing on whether the creation of the HDL to enable equal access by the blind, data mining, and other noninfringing uses is itself fair use.  Plaintiffs do not even challenge, much less discuss, more recent authorities on fair use that directly support the creation and use of the HDL as lawful activities, including *Bill*

*Graham Archives*,[32] *Arriba Soft*,[33] *iParadigms*,[34] *Sega v Accolade*,[35] *Sony v. Connectix*,[36] *Field v. Google*,[37] and *Hofheinz v. Discovery Communications, Inc.*[38]

Instead, Plaintiffs cite inapposite cases such as *American Geophysical Union v. Texaco, Inc.*,[39] mischaracterizing their factual bases and holdings.  For example, Plaintiffs claim that *Texaco* supports the proposition that "systematic photocopying and archiving of journal articles to facilitate 'research in the sciences . . . might well serve a broader public purpose' but does not constitute fair use."[40]  In fact, the quoted portion is from the court's discussion of whether Texaco's activities were commercial in nature, which the court concludes that they were.[41]  The issue of copying in a nonprofit university setting is neither presented nor decided in *Texaco*.  Rather, *Texaco* involved research scientists employed by a multi-national oil company that systematically photocopied articles from multiple journals with the ultimate purpose of enriching the corporate coffers.[42]  Plaintiffs further mischaracterize *Texaco* as involving "research libraries' systematic photocopying of journal articles . . . ."[43]  The corporate library involved in that case, however, falls far outside the conventional understanding of research libraries as "distinguished by the breadth and quality of their research-oriented collections as well as the characteristics and magnitude of the multidisciplinary communities they serve [including

---

[32] *Bill Graham Archives v. Dorling Kindersley*, 448 F.3d 605 (2d Cir. 2006).

[33] *Kelly v. Arriba Soft*, 336 F.3d 811 (9th Cir. 2003).

[34] *A.V. v. iParadigms*, 544 F. Supp. 2d 473 (E.D. Va. 2008), *aff'd in part,* 562 F.3d 630 (4th Cir. 2009).

[35] *Sega v. Accolade*, 977 F.2d 1510 (9th Cir. 1993).

[36] *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000).

[37] *Field v. Google Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006).

[38] No. 00-3802, 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001).

[39] 60 F.3d 913 (2d Cir. 1994), *cert. denied*, 516 U.S. 1005 (1995).

[40] Pls.' Mem. in Supp. of Summ. J. Mot. at 19 (quoting *Texaco*, 60 F.3d at 922).

[41] *See Texaco*, 60 F.3d at 922.

[42] *See id.* at 915-16, 921-22.

[43] Pls.' Mem. in Supp. of Summ. J. Mot. at 17.

scholars] who are actively engaged in research and teaching and who have high levels of need and expectations for library collections and services."[44]

Plaintiffs also rely on similarly distinguishable cases involving:

- copy shops that mass produce, for their own profit, course packs containing substantial portions of copyrighted textbooks and journal articles;[45]

- a commercial service capturing CBS radio station broadcasts and transmitting them telephonically for simultaneous play, in direct competition with CBS;[46]

- internet music distributors profiting from their copying and distribution of multitudinous recordings of popular music;[47]

- a board of education that made or directed the making of voluminous off-the-air copies of educational television programs; and then, in direct competition with plaintiffs, who actively distributed and licensed educational audiovisual materials, reproduced and distributed the complete copies for viewing throughout nineteen school districts;[48] and

- a commercial broadcasting company that made an unauthorized copy of a song and, again without permission, used it three times in a television program.[49]

In contrast to these substitutional commercial uses of the plaintiffs' works in a manner directly harming their actual, primary markets, the use of the HDL by blind students and scholars is for the entirely educational and nonprofit purpose of achieving equal educational opportunity, and does not cause any actual or potential market harm. Thus, the completely inapposite circumstances in Plaintiffs' cases shed no light on the *ad hoc,* fact-intensive, fair use inquiry that

---

[44] Association of Research Libraries, *Celebrating Research* 10 (2007).

[45] *Princeton Univ. Press. v. Michigan Document Servs., Inc.,* 99 F.3d 1381 (6th Cir.), *cert. denied*, 520 U.S. 1156 (1997); *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1552 (S.D.N.Y. 1991). Significantly, both decisions leave unaddressed the question of whether similar photocopying on the part of a non-profit college or university would constitute fair use.

[46] *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998).

[47] *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000).

[48] *Encyclopaedia Britannica Educ. Corp. v. Crooks*, 542 F. Supp. 1156 (W.D.N.Y. 1982).

[49] *Byrne v. British Broad. Corp.*, 132 F. Supp. 2d 229 (S.D.N.Y. 2001).

favors the blind student's and scholars' use and the digitization of the university library collections.[50]

**B.      Plaintiffs ignore current judicial applications of the principle of transformative use that encompass non-superseding, productive uses even in the absence of changes to the copyrighted works.**

Plaintiffs apply an overly narrow and incorrect understanding of transformative use. They further fail to recognize that the creation of the HDL was no mere "mechanical conversion" of the library collections.  Although the digitization of individual items in library collections certainly adds value in ways that mere photocopying does not,[51] it is the creation of a comprehensive searchable archive that makes the HDL new, useful, and uniquely valuable to the blind.  It is too late to argue, as Plaintiffs appear to do, that transformative uses must be expressive ones.  They choose to ignore the past decade of authority that demonstrates that the transformative use rationale applies with full force to uses that repurpose copyrighted material without creating new works.[52]  Section 107 exists to promote socially beneficial uses of protected content.  Benefit can come in many forms.  For example, in analyzing fair use, courts value the "highly transformative" contributions made by new indexing tools and research databases.[53]

---

[50] Plaintiffs persist in their efforts to dissuade the Court from examining the fair use factors by arguing, incorrectly, that 17 U.S.C. § 108 precludes consideration of fair use despite its clear language to the contrary.  Pls.' Memo in Supp. of Summ. J. at 16.  This effort at avoidance likely indicates Plaintiffs' inability to marshal any case law or factual support for their fair use arguments.

[51] *See* Kerscher Decl. ¶¶ 21-25 (describing distinct advantages of digital texts for the blind).

[52] *See* Section III. B.1. of NFB's Mem. in Supp. of Summ. J. Mot. at 18-22.

[53] *iParadigms*, 544 F. Supp. 2d at 482; *see Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165-66 (9th Cir. 2007) (amended decision).

**III.     Plaintiffs provide no evidence that any actual or potential market is harmed by providing equal access to the blind through use of the HDL.**

Pure speculation cannot establish harm to actual or potential markets cognizable under the fourth fair use factor.  But Plaintiffs not only rely upon impermissible speculation; they simply ignore the evidence.  The declarations of George Kerscher, James Fruchterman, and Dr. Marc Maurer all unequivocally establish that there has never been, nor is there ever likely to be, a market for a digital database of library collections accessible to blind students and scholars.[54]

# Confidential / Redacted.[55]

More damning, Plaintiffs disregard their own interrogatory answers that state, *inter alia*:

[B]y tradition and industry practice, authors generally do not receive royalties for the licensing and sale of works distributed in specialized formats exclusively for use by the blind or other persons with disabilities.[56]

[and]

[Plaintiffs] have not identified any specific, quantifiable past harm, or any documents relating to any such past harm, suffered as a result of the actions of Defendants in making books in fully accessible formats available for library lending to persons who cannot access print versions of such books.[57]

---

[54] *See* Kerscher Decl. ¶¶ 41-50; Maurer Decl ¶¶ 9, 20-23, 25-29, 31-38; Decl. of James Fruchterman (hereinafter "Fruchterman Decl.), June 28, 2012, ¶ 29.
[55] **Confidential / Redacted**.
[56] Pls.' Resps. to Interrog. No. 1 in Pls.' Objections and Resps. to NFB's First Set of Interrogs. and Document Reqs., dated May 8, 2012 (attached as Exhibit C to Abelson Decl.) (hereinafter "Pls.' Resp to NFB Interrog. No. _").
[57] Pls.' Resp. to NFB Interrog. No. 5.

The absence of any existing or potential market for a digital database of library collections accessible to the blind underscores that use of the HDL by blind students and scholars serves a vital public need and thereby constitutes a wholly different purpose for the use of university library collections.  Blind students and scholars can now replace the long-standing academic void resulting from inaccessibility with the cultural cornucopia made available to them by the HDL.

Faced with such clear evidence establishing that use of the HDL to provide equal access to university library collections for the blind constitutes a revolutionary advancement that will cause no harm to current or reasonably foreseeable future markets for Plaintiffs' works, Plaintiffs resort to a combination of further speculation and irrelevant comparisons in a fruitless attempt to construct a case for market harm.  But Plaintiffs' speculations, and those of their declarant Professor Edelman, about fictional leakage from the HDL into an entirely hypothetical illicit market for scholarly, specialized, and out-of-print works,[58] are without any evidentiary basis.  To the contrary, there is strong evidence to suggest that years of making unencrypted digital copies of current bestsellers widely available to the blind, subject only to a  "social" digital rights management ("DRM") plan designed to discourage (but not actually prevent) downstream misuse, has not led to any commercially significant level of infringement.[59]  If bestsellers available to the blind are not being unlawfully redistributed in significant numbers, granting blind individuals access to the HDL's collection, which has less immediate and obvious commercial or audience appeal, should have an even more minute impact on legitimate markets.

Moreover, it is irrelevant to the case at hand that in other countries, licensing-based approaches have been suggested or even adopted to cover the making and use of digital copies

---

[58] Pls.' Mem. in Supp. of Summ. J. Mot. 23-24.
[59] Supplemental Decl. of James Fruchterman, July 17, 2012, ¶¶ 3, 9, 13-15.

from print material found in academic libraries.[60]  Few, if any, foreign copyright systems are

squarely premised on a clear recognition of the paramount importance of promoting cultural

progress.[61]  And only a small handful of countries (such as Israel and the Philippines) recognize

fair use; instead, most national laws include lists of specific, often narrow, exceptions.[62]  It is

precisely this special feature of U.S. law, however, that insulates the HDL itself, as well as those

who use the HDL for purposes such as promoting accessibility, against infringement liability.  In

other words, it is the very existence of fair use that makes it unnecessary to consider alternative

approaches to authorization in this country, whatever popularity they may have in Europe.

Markets that might be constructed to extract rents for what would otherwise be fair uses have no

place in a consideration of section 17 U.S.C. § 107(4).[63]

---

[60] Pls. Mem. in Supp. of Summ. J. Mot. 25-26 (citing Professor Daniel Gervais).

[61] Indeed, the significance of the public interest in copyright is a subject of lively debate in many European "authors' rights" jurisdictions.  *See, e.g.*, Gillian Davies, *Copyright and the Public Interest* 138-155 (2d ed. 2002) (reviewing the controversy in French law).

[62] *See generally*, Paul Goldstein & Bernt Hugenholtz, *International Copyright: Principles, Law, and Practice* 359-390 (2d ed. 2010).

[63] For these same reasons, the Court must reject Plaintiffs' argument that 17 U.S.C. § 108 does not apply to use of the HDL by the blind because the copying was done for a commercial purpose.  Use of the database by the blind for equal access is as far removed from a commercial purpose as any that could be imagined.

## CONCLUSION

For the reasons set forth herein, the Court should deny Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

By:_____/s/_____
Daniel F. Goldstein (admitted pro hac vice)
Laura Ginsberg Abelson (admitted pro hac vice)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street
Suite 1700
Baltimore, Maryland 21202
Telephone:  410-962-1030
Facsimile:  410-385-0869
dfg@browngold.com
labelson@browngold.com

Robert J. Bernstein (RB 4230)
THE LAW OFFICE OF ROBERT J. BERNSTEIN
380 Lexington Avenue, 17th Floor
New York, NY 10168
Telephone: 212-551-1068
Facsimile:  212-551-1001
rjb@robert-bernsteinlaw.com

Peter Jaszi (admitted pro hac vice)
5402 Surrey Street
Chevy Chase, Maryland 20815
Telephone: 301-656-1753
Facsimile:  301-656-7483
pjaszi@wcl.american.edu

*Counsel for Defendant Intervenors*