UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
THE AUTHORS GUILD, INC., et al.,                    :
                                                     :
                         Plaintiffs,                 :        Index No. 11 Civ. 6351 (HB)
                                                     :
            - against -                              :
                                                     :
HATHITRUST, et al.,                                  :
                                                     :
                         Defendants.                 :
------------------------------------------------------------X

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' AND DEFENDANT-INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT

FRANKFURT KURNIT KLEIN & SELZ, P.C.
Edward H. Rosenthal, Esq.
Jeremy S. Goldman, Esq.
Adam Nelson (Law Student)
488 Madison Avenue
New York, New York  10022
Tel.:  (212) 980-0120
Fax:  (212) 593-9175
erosenthal@fkks.com
jgoldman@fkks.com
anelson@fkks.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ......................................................................................................... 3

I. DEFENDANTS' DIGITIZATION, REPRODUCTION AND STORAGE OF PLAINTIFFS' WORKS FOR PRESERVATION AND SEARCH PURPOSES ARE NOT PROTECTED FAIR USE ....................................................................................................... 3

    A.    The "Fairness" of Library Reproduction is Governed by Section 108 ................. 3

    B.    Each of the Fair Use Factors Strongly Favors the Plaintiffs ................................ 5

        1.    Factor One:  The Purpose and Character of the Use .................................. 5

        2.    Factor Two:  The Nature of the Copyrighted Works ................................. 8

        3.    Factor Three:  Amount and Substantiality ................................................ 9

        4.    Factor Four:  Effect of Use on Potential Market ....................................... 12

II. THE ORPHAN WORKS PROJECT IS NOT PERMITTED UNDER EXISTING COPYRIGHT LAW .......................................................................................... 17

    A.    Defendants' Orphan Works Project is Not Fair Use ............................................. 17

    B.    The Orphan Works Project is Not Permitted Under Section 108(e) .................... 19

III. THE HATHITRUST'S USES FOR THE VISUALLY-DISABLED ARE NOT PERMITTED BY THE COPYRIGHT ACT ........................................................... 20

    A.    The HDL Uses are Not Permitted By Section 121 ............................................... 20

    B.    The HDL's Uses For the Blind Are Not Protected Fair Use ................................ 23

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Geophysical Union v. Texaco, Inc.*,
  60 F.3d 913 (2d Cir. 1994), *cert. denied*, 516 U.S. 1005 (1995) ................................ 6, 7, 12, 24

*Authors Guild v. Google Inc.*,
  770 F. Supp. 2d 666 (S.D.N.Y. 2011) ................................................................................... 2

*Basic Books Inc. v. Kinko's Graphics Corp.*,
  758 F. Supp. 1522 (S.D.N.Y. 1999) ...................................................................................... 7

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) .................................................................................................. 6

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ............................................................................................................ 5, 8

*Coll. Entrance Examination Bd. v. Pataki*,
  889 F. Supp. 554 (N.D.N.Y. 1995) ..................................................................................... 12

*Craft v. Kobler*,
  667 F. Supp. 120 (S.D.N.Y. 1987) ................................................................................. 18, 19

*D.C. Comics Inc. v. Reel Fantasy, Inc.*,
  696 F.2d 24 (2d Cir. 1982) .................................................................................................. 16

*Field v. Google Inc.*,
  412 F. Supp. 2d 1106 (D. Nev. 2006) ................................................................................. 14

*Fortnightly Corp. v. United Artists Television, Inc.*,
  392 U.S. 390 (1968) ............................................................................................................... 3

*Harper & Row Publishers, Inc. v. Nation Enter.*,
  471 U.S. 539 (1985) ..................................................................................................... passim

*Infinity Broad. Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998) ................................................................................................ 18

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) ......................................................................................... 12, 14

*Krause v. Titleserv, Inc.*,
  402 F.3d 119 (2d Cir.), *cert. denied*, 546 U.S. 1002 (2005) ............................................. 10

*Los Angeles Times v. Free Republic*,
   No. 98 Civ. 7840, 2000 WL 565200 (C.D. Cal. Apr. 4, 2000)................................. 16

*Maxtone-Graham v. Burtchaell*,
   803 F.2d 1253, 1264 n. 8 (2d Cir. 1986), *cert. denied*, 481 U.S. 1059 (1987)........................ 18

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ....................................................................... 11, 14

*Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*,
   288 F.3d 478 (2d Cir. 2002) ......................................................................... 22

*Rogers v. Koons*,
   960 F.2d 301 (2d Cir.), *cert. denied*, 506 U.S. 934 (1992)....................................... 12

*Sega Enters. Ltd. v. Accolade, Inc.*,
   977 F.2d 1510, 1519 n. 5 (9th Cir. 1993) ......................................................... 10

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
   203 F.3d 596 (9th Cir.), *cert. denied*, 531 U.S. 871 (2000).................................... 11

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)............................................................................. 2, 3, 23

*Sundeman v. Seajay Soc'y, Inc.*,
   142 F.3d 194, 1999 (4th Cir. 1998) ............................................................. 11

*UMG Recordings, Inc. v. MP3.com, Inc.*,
   92 F. Supp. 2d 349 (S.D.N.Y. 2000) ............................................................. 7

## STATUTES

Lawton v. Bd. of Med. Examiners, 143 Cal. App. 2d 256, 262-63 (1956) ................................. 15

17 U.S.C. § 102 ....................................................................................... 7

17 U.S.C. § 107(3) ................................................................................. 9, 10

17 U.S.C. § 108(c) ............................................................................. *passim*

17 U.S.C. § 121 ................................................................................. *passim*

U.S. Const. I, § 8 ................................................................................... 1

W. Gordon, Fair Use As Market Value: A Structural and Economic Analyses of the
Betamax Case and Its Predecessors, 82 Colum. L. Rev. 1000 (1982)........................... 15

Pierre Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1111 (1990) ...................... 18

## PRELIMINARY STATEMENT

Plaintiffs – twelve individual authors and eight authors' associations that represent approximately 80,000 authors from around the world – share many of the values expressed by the Defendant libraries and Intervenor representatives of the blind.  Authors recognize the important role that libraries play in preserving the world's written record and providing a means for all members of the public to discover, access and read as many books as possible.  Libraries are important to authorship, both as a resource to help writers create new works of expression and as a channel for realizing the fruits of their labor.  After all, authors are the "contributors to the store of knowledge" that make a library what it is.  *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 546 (1985).  Plaintiffs have no interest in impeding research, allowing rare books to disappear or preventing the visually-disabled from accessing books.

No matter how noble their intention may be to increase "the harvest of knowledge," by digitizing, replicating, storing and making various uses of millions of copyrighted books without permission, Defendants give "insufficient deference to the scheme established by the Copyright Act for fostering the original works that provide the seed and substance of this harvest."  *Id.* Defendants' unauthorized digitization and use of copyrighted books in partnership with Google threaten to destabilize the careful equilibrium of copyright law by depriving writers of valuable sale and licensing opportunities and exposing their intellectual property to security risks without accountability.

As the Constitution makes clear, it is Congress that has the power to strike the appropriate balance between the interests of authors in controlling their work and society's often opposing interest of accessing it freely.  U.S. CONST. I, § 8.  Given the difficulty of this task, Congress has repeatedly revisited and amended the copyright law, often in response to technological innovation that opens the door to unprecedented uses of copyrighted works.  *See*

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429-30 (1984).  When new uses emerge with the potential to transform the copyright landscape, the stakeholders express their interests to Congress, which then balances the varied interests through legislation.

Indeed, Congress already has considered and balanced the rights of the various stakeholders in enacting provisions that govern most of Defendants' challenged uses.  In Section 108 of the Copyright Act, Congress addressed the advent of photocopying and then digital technology by providing detailed rules and procedures governing the number of copies that libraries are permitted to make for preservation and replacement purposes.  Similarly, in the so-called Chaffee Amendment enacted as Section 121 of the Copyright Act, Congress created specific statutory provisions to govern which entities may make copyrighted works available to visually-impaired users, and the circumstances and formats in which this may be done.  With respect to "orphan works," Congress has been presented with and proposed a number of legislative solutions.  The fact that Congress has not yet passed legislation, however, cannot justify the self-help initiative of Defendants' Orphan Works Project because, as Judge Chin held in the Google Books case, "the establishment of a mechanism for exploring unclaimed books is a matter better suited for Congress than the Court."  *Authors Guild v. Google Inc.*, 770 F. Supp. 2d 666, 677 (S.D.N.Y. 2011).

The opposition's justifications for Defendants' digitization and use of Plaintiffs' books are barred by clearly-established copyright law, and they may not rely on fair use when Congress has already spoken directly to the challenged conduct.  A group of universities may not rewrite copyright law just because they found a wealthy corporate partner and devised an innovative way to reproduce entire library collections.  "Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials.  Congress has the constitutional authority and institutional ability to accommodate

2

fully the varied permutations of competing interests that are inevitably implicated by such new technology." *Sony*, 464 U.S. at 431; *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 401 (1968) (court refused "to render a compromise decision . . . [to] accommodate various competing considerations of copyright, communications, and antitrust policy.  We decline that invitation.  That job is for Congress.").

## ARGUMENT

### I.  DEFENDANTS' DIGITIZATION, REPRODUCTION AND STORAGE OF PLAINTIFFS' WORKS FOR PRESERVATION AND SEARCH PURPOSES ARE NOT PROTECTED FAIR USE

Defendants' motion for summary judgment primarily is based on the argument that irrespective of the fact that Congress has addressed the digitization, reproduction and storage of copyrighted works in Section 108 of the Copyright Act, their activities constitute fair use under Section 107.  Congress set clear limits on copying for these purposes, so Defendants' argument must fail.

### A.    The "Fairness" of Library Reproduction is Governed by Section 108

The negligible reference by Defendants to Section 108 in their motion papers is telling. In Section 108, Congress balanced the competing interests of rightsholders and libraries by specifying the circumstances under which libraries are permitted to make unlicensed copies of works in their collections for purposes of preservation and replacement.  17 U.S.C. §§ 108(b) & (c).[1]  Section 108 was enacted after a lengthy legislative process to codify precisely what

---

[1] For a detailed discussion of the legislative history, force and application of Section 108 to Defendants' conduct in this case, *see* Memorandum of Law in Support of Plaintiffs' Motion for Partial Judgment on the Pleadings, Dkt. No. 55 ("MJP") at 9-20.  *See also* Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Partial Judgment on the Pleadings, Dkt. No. 67 ("R.MJP") at 9-12; Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("MSJ"), Dkt. No. 115 at 11-16.

constitutes permitted use in connection with most unlicensed library photocopying.  MJP at 9-12.
The statute has been amended several times, including to address digital copying.  *Id.* at 11.

Defendants would have this Court ignore the careful consideration Congress gave to
competing interests in enacting Section 108 by permitting them to digitize all of the books in
their collection under the flag of preservation.  However, as noted by the Register of Copyrights
in denying a request by the Internet Archive (a non-profit digital library) that would have
allowed it to preserve outdated digital media, Congress declined to grant libraries authorization
to engage in "generalized preservation activities."[2]  Instead, the compromise struck by Congress
in Section 108 permits libraries to make up to three copies of a published book – including in
digital format – but only when the book is "damaged" or "deteriorating" and only when, after a
reasonable effort, the library determines that "an unused replacement cannot be obtained at a fair
price."  17 U.S.C. § 108(c).  By indiscriminately digitizing their entire library collections,
including in-print, commercially available books as well as books that are neither damaged nor
deteriorating within the meaning of the statute, Defendants disregard the strictures of Section
108.  If Defendants' preservation needs are not being met by the statutory allowance, their
remedy is to either lawfully purchase digital copies of the books they wish to keep or to petition
Congress to amend the statute.  They may not take copyright law into their own hands.

As shown in Plaintiffs' prior submissions, "fair use privileges are not available on a
broad and recurring basis once the copying permitted by § 108 has occurred . . . . thus leaving
section 107 clearly unavailable as a legal basis for photocopying not authorized by Section 108."
MJP at 22-23 (quoting 1983 REPORT AT 96); *see also* R.MJP at 7-8 (summarizing Register of
Copyrights' 2003 recommendation against "broadening the [preservation] exemption based on

---

[2] Recommendation of the Register of Copyrights in RM 2002-4 (Oct. 27, 2003) 52, *at* http://www.copyright.gov/1201/docs/registers-recommendation.pdf.

fair use" given that "Congress specifically addressed the making of preservation copies by libraries and archives when it amended §108"). Thus, this Court need not engage in the factor-by-factor fair use analysis proposed by Defendants. But even if such analysis is conducted, Defendants have not met their burden to show that their mass and preemptive digitization program is a fair use.

      **B.**     **Each of the Fair Use Factors Strongly Favors the Plaintiffs**

          **1.**     **Factor One:  The Purpose and Character of the Use**

Defendants assert that their uses are "presumptively fair" because they are the type of uses (teaching, scholarship and research) that are included in the preamble to Section 107. Def. Mem. at 11. The Supreme Court, however, has rejected this reading of Section 107, holding that the preamble was not intended "to single out any particular use as presumptively a 'fair use'," as the "drafters resisted pressures from special interest groups to create presumptive categories of fair use[.]" *Harper & Row*, 471 U.S. at 561. To the contrary – "the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement, any more than the commercial character of a use bars a finding of fair use." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584 (1994).[3]

Amici Curaie American Library Association, *et al.* contend that the public benefit of the HDL – a in particular, the search functionality – trumps authors' exclusive rights under the Copyright Act. *See* ALA Br. at 3-15. However, "to propose that fair use be imposed whenever the social value of dissemination outweighs any detriment to the artist would be to propose depriving copyright owners of their right in the property precisely when they encounter those users who could afford to pay for it." *Harper*, 471 U.S. at 559 (internal citations and quotations

---

     [3] As Plaintiffs demonstrated in their motion for summary judgment, Defendants' commercial arrangement with Google also weighs against fair use. *See* MSJ at 18-20.

omitted).  The cases cited by *amici*, including *Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006), and others, *see* ALA Br. 8-9, involved the *limited use* of a *single* work in order to create a new expressive work that was found to benefit the public.[4]  Here, in contrast, Defendants digitize, store and use the entirety of *millions* of books in a manner that impacts the rights of authors around the world.  Any public benefit is outweighed by the actual and potential harm to authors' interests caused by Defendants' unlawful conduct.

Defendants further attempt to defend their mass digitization of copyrighted books by claiming that "preserving books for future lawful uses" is transformative of the books' original expressive purpose.  Def. Mem. at 15.  But the Second Circuit has squarely rejected this argument, holding that a research library does not transform a journal article when it makes an "archival" photocopy of it for the purpose of "future retrieval and reference."  *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 919 (2d Cir. 1994), *cert. denied*, 516 U.S. 1005 (1995).

Here, the transformative purpose argument is even weaker than in *Texaco* because Defendants admit that one of the core functions of academic libraries is to "preserve" books and "acquire works to satisfy anticipated future demand by University Library patrons . . . not just for current students and faculty, but also for future generations."  Wilkin Decl. ¶¶ 11-12, 17.  There is nothing transformative about a library taking a print copy of a book that it acquired for preservation purposes and converting it into digital format for the exact same purpose.  Like the library in *Texaco* that photocopied articles and stored them for later use, "the predominant archival purpose of the copying tips the first factor against the copier, despite the benefit of a more usable format."  *Texaco*, 60 F.3d at 924.

---

[4] The search engine cases, including *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), which involve materials already available on the Internet, are distinguishable on these and other grounds, as discussed below.

Defendants also claim that "the HDL's search functionality is unquestionably transformative." Def. Mem. at 12. However, the creation of a search index is not a transformative use of the indexed book. The HathiTrust index is automatically created through a process by which all the words of a book "are read by a machine that registers their positions . . . in the binary index data." Wilkin Tr. 230:20-24. Using the index, it is possible for a computer "to put the words back in order beginning to end," albeit without any formatting such as punctuation, capitalization of paragraph breaks. *Id.* 235:1-6. Thus, the index "merely transforms *the material object* embodying the intangible article that is the copyrighted original work." *Texaco*, 60 F.3d at 923; *see* 17 U.S.C. § 102 (copyright protection subsists in works that can be "perceived, reproduced, or otherwise communicated . . . *with the aid of a machine or device*") (emphasis added).

As recognized over fifty years ago by copyright scholars, search "indexing offers a substitute to the user for taking a book in his hand and turning the pages." REPORT OF THE REGISTER OF COPYRIGHTS ON THE GENERAL REVISION OF THE U.S. COPYRIGHT LAW: PART 4 (1961) at 270. "The inescapable point" of computerized search is "to substitute for books and to make multiple copies of books unnecessary." *Id.* A search index is thus analogous to articles that are photocopied by a research library "into a form more easily used in a laboratory," *Texaco*, 60 F.3d at 923, excerpts of books that are repackaged into anthology form, *see Basic Books Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1530-31 (S.D.N.Y. 1999), or a website that allows users to access their music collection from anywhere, *see UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000). As Defendants' own witnesses acknowledge, without full-text search, researchers identify relevant sources by taking out multiple books from the library and leafing through the pages and indices to determine whether the work contains information of interest. *See, e.g.*, Declaration of Stanley Katz ¶ 6. A search

index serves the same function, obviating the need for researchers to request as many books from the library, and therefore harming authors who rely on sales of books to make a living.

The HDL is not transformative because it "merely 'supercedes the objects of the original creation'" rather than "altering the first with new expression, meaning or message." *Campbell*, 510 U.S. at 579 (quoting *Folsom v. March*, 9 Fed. Cas. 342, 348 (No. 4, 901 C.C.D. Mass. 1841) (Story, J.)). Defendants do not transform the works they digitize. They simply create a new format for the existing works.

### 2.      Factor Two:  The Nature of the Copyrighted Works

Defendants argue that the fact that the majority of the works in the HDL are out-of-print favors a finding of fair use. This illustrates the problem with Defendants' failure to consider Section 108, which permits libraries to make copies of out-of-print books that are damaged, deteriorating, lost or stolen. *See* 17 U.S.C. § 108(c). Defendants admit, however, that *all* of the books in a particular library building or section were digitized and copied, including in-print, commercially available ones. *See* Plaintiffs' 56.1 Statement of Uncontested Fact ("UF") 29-43. In other words, Defendants made digital copies of millions of books without giving any consideration whatsoever to a book's print status, physical condition, or commercial availability.[5]

---

[5] The HDL contains far more in-copyright material than Defendants suggest. Defendants cite to a 1960 Copyright Office study which found that only 7% of works had their copyrights renewed, leaving the remainder in the public domain. Yet, Defendants' lead witness acknowledges that such early estimates are "pretty wild" and that HathiTrust's own research found that approximately 45% of works published between 1923 and 1963 were in-copyright. *See* Exhibits A and B to the Declaration of Jeremy S. Goldman ("Goldman Decl."). Moreover, only 21% of the books in the HDL were published during the 1923-1963 time period, whereas more than 40% were published in or after 1978. *Id.*, Ex. B at 5. Virtually all of these later works are still protected by copyright.

Defendants further claim that the majority of books in the HDL are factual works. As Plaintiffs pointed out in their motion for summary judgment, because Defendants indiscriminately copied books without regard for their nature, they cannot meet their burden of showing that this factor weighs in their favor. MSJ at 20. In any event, 76% of Plaintiffs' books at issue are works of fiction, *see* Goldman Decl. ¶ 6, and the Supreme Court made clear that copyright's mission to "reward[] the individual author in order to benefit the public. . . applies equally to works of fiction and nonfiction" and that the "[c]reation of a nonfiction work, even a compilation of pure fact, entails originality." *Harper*, 471 U.S. at 546-47.

The indiscriminate digitization and copying of millions of books weighs the second fair use factor weighs strongly against Defendants.

### 3.     Factor Three:  Amount and Substantiality

The third factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). There is no dispute that Defendants caused millions of books in their collections to be scanned and that the HDL contains high resolution image files and text files containing every word of every page of every book in the collection. It would be difficult to imagine a case where the third factor weighed more heavily in favor of the Plaintiffs. Defendants' attempts to avoid that obvious conclusion must fail.

First, Defendants argue that although they scanned and kept copies of the entire books, the Court should only consider their "expressive" uses of the copied works. Def. Mem. at 21. In other words, they contend that they should be judged not by the amount that they *import* into the HDL for preservation purposes, but by the amount that they ultimately *export* from the HDL. Defendants' lack of authority to support this proposition is not surprising. The question of "whether copyright liability should attach at the input or output stage of use in conjunction with a computer – *i.e.*, at the time a work is placed in machine-readable form in a computer memory or

when access is sought to the work existing in computer memory," was "the primary source of

disagreement regarding copyright protection for works in computer-readable form" during the

negotiations that led to the 1976 Copyright Act.[6]  This disagreement eventually was decided in

favor of the "input view," as Section 106 of the Copyright Act was written to "prohibit the

unauthorized *storage* of a work within a computer memory, which would be merely one form of

reproduction, one of the exclusive rights granted by copyright."  *Id.* (emphasis added).

Moreover,

> [m]aking a copy of an entire work would normally, subject to some possible
> exception for fair use, be considered exclusively within the domain of the
> copyright proprietor.  One would have to assume, however, that *fair use would
> apply rarely to the reproduction in their entirety of such compendious works as
> data bases.*

*Id.* (emphasis added).  Thus, Defendants' claim that fair use permits the storage of a massive

"dark archive" of copyrighted works is belied by the clear Congressional intent.

Defendants further argue that they "have copied no more than is essential for their fair

uses" because "search of only partially-digitized texts would obviously lead to incomplete and

inaccurate results."  Def. Mem. at 21.  Defendants miss the point.  Notwithstanding whether the

HathiTrust search index is in and of itself transformative, the third factor weighs heavily against

Defendants because they go way beyond indexing entire books by generating and retaining

image and text files comprising every page of every book.  The permanent storage of four

complete copies of every digitized book for "preservation" purposes stands in stark contrast to

---

[6] *See* Final Report of the National Commission on New Technological Uses of
Copyrighted Works (July 31, 1978), p. 39, *available at* http://digital-law-
online.info/CONTU/PDF/index.html ("CONTU Report").  "Congresses, the courts, and
commentators have regarded the CONTU Report as the authoritative guide to congressional
intent."  *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1519 n. 5 (9th Cir. 1993); *see
Krause v. Titleserv, Inc.*, 402 F.3d 119, 128 (2d Cir.), *cert. denied*, 546 U.S. 1002 (2005) ("We . .
.  look to the CONTU Report for indications of Congressional intent.").

the "intermediate copying" that was at issue in each of the cases cited by Defendants.[7]  *See Sega*,

977 F.2d at 1526-27 (copying of software program for purposes of extracting unprotected

elements of the code); *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 605-06

(9th Cir.), *cert. denied*, 531 U.S. 871 (2000) (same); *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d

194, 1999 (4th Cir. 1998) (copying of unpublished book for purposes of creating critical review

to avoid damaging the fragile original manuscript); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508

F.3d 1146 (9th Cir. 2007) (copying, storage and display of "thumbnail" sized version of

copyrighted photographs for purposes of creating Internet search index).  In each of those cases,

the secondary user's reproduction of the underlying work was incidental to the ultimate purpose

of the copying; here, the storage of the works in perpetuity is fundamental to the purpose.

     Even if the indexing process requires Defendants to create an "intermediate" digital copy

of the book to stage it for indexing, once the words of a book are recorded in the index, the

image and text files are no longer necessary for the operation of the search feature.  *See* Wilkin

Tr. 228:15-236:12.[8]  Although Defendants may argue that fair use permits them to make an

intermediate copy of a work for purposes of enabling full text search or so-called "non-

consumptive research":

---

    [7] The argument by amicus curiae Digital Humanities and Law Scholars ("DHLS") that
the copying of metadata does not infringe Plaintiffs' rights (DHLS Br., pp. 14-19), similarly
misses the point.  Defendants have not simply copied metadata, they have made and kept
multiple image and text files of every page of every book and made these files available to
numerous library users.

[8]



> [t]o satisfy the criteria of fair use, any copies created for such research purposes should be destroyed upon completion of the research project for which they were created.  Should the individual or institution carrying on this research desire to retain the copy for archival purposes or future use, it should be required to obtain permission to do so from the copyright proprietor.

CONTU Report at 40.  *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 815 (9th Cir. 2003) (noting that once the search engine created a thumbnail version of the indexed image, "the program *deletes the full-sized originals from the server*") (emphasis added).

Thus, the third factor also weighs heavily against Defendants because they reproduced and kept multiple copies of every book in these libraries and also because their storage of the image and text files "is not reasonable in relation to the purpose of the copying."  *Rogers v. Koons*, 960 F.2d 301, 311 (2d Cir.), *cert. denied*, 506 U.S. 934 (1992) (as sculptors' copying of photograph "nearly in toto" was "much more than necessary . . . it is not really the parody flag that [the sculptors] are sailing under, but rather the flag of piracy").

### 4.     Factor Four:  Effect of Use on Potential Market

In their motion for summary judgment, Plaintiffs set forth and described in detail several categories of actual or potential harm that result from Defendants' unlicensed digitization and use of their books.  *See* MSJ at 21-28.  Defendants' claim that their uses do not impact the market for or value of Plaintiffs' books is belied by the evidence, and Defendants fail to meet *their* burden of proving that the fourth factor weighs in favor of fair use.[9]

---

[9] Defendants' assertion that Plaintiffs carry the burden of proof on the fourth factor because their uses are purportedly noncommercial "cannot be squared with the Supreme Court's recent statement in *Campbell* that '[s]ince fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets.'"  *Coll. Entrance Examination Bd. v. Pataki*, 889 F. Supp. 554, 571 (N.D.N.Y. 1995); *see also Texaco*, 60 F.3d at 918 (proponent of fair use "typically carries the burden of proof as to all issues in the dispute").  In any event, given Defendants' business relationship with Google, Defendants' uses cannot be considered to be noncommercial.  *See* MSJ at 18-20.

*First*, Plaintiffs demonstrated that they lost the opportunity to sell or license to the Defendant libraries digital copies of their books for inclusion in the HDL.  *See* MSJ at 22-23. Although Defendants point out that Plaintiffs initially stated in their discovery responses that "*to date*, Plaintiff[s] [have] not identified any specific, quantifiable past harm, or any documents relating to any such past harm" resulting from Defendants' unlicensed digitization activities, Def. Mem. at 22 (emphasis added; italicized portion in original but omitted by Defendants), Plaintiffs subsequently identified such specific, quantifiable damage.  For example, during his deposition, Plaintiff T.J. Stiles explained his loss of revenue as follows:

> In fact I can identify very specifically the loss of the revenue to be derived from the sale of one digital edition of the book.  Which as mentioned is commercially available, has been for approximately two years, and which could easily have been legally acquired for archival or other purposes.  And yet the HathiTrust instead has without my permission digitized my book when it could very easily and very inexpensively have purchased a legal copy.  So in a sense, speaking colloquially, one copy of my book has been stolen.

Stiles Tr. 163:1-10; *see also* Stiles Decl., Exs. 6 and 9 (documents showing the revenue lost due to Defendants' unlicensed copying).  Defendants' claim that they "continue to purchase books, even books that have already been digitized" (UM spent $24 million in 2011), Def. Mem. at 23, actually *supports* Plaintiffs' claim because it demonstrates that libraries traditionally buy books for their collections, but instead opted to allow Google to scan and keep a copy (representing another lost sale) without compensating rightsholders.

*Second*, Plaintiffs showed that by allowing Google to scan and keep digital copies of Plaintiffs' books, and then by replicating and storing their own digital copies on multiple servers connected to the Internet, Defendants expose Plaintiffs' intellectual property to significant security risks that, if realized, would have catastrophic effects on the book market.  *See* MSJ at 23-24; Edelman Decl.; Waldfogel Decl. at 4 (noting that pirate music or movie sites "cannibalize

13

demand for the underlying works"). Defendants' brief does not address the market harm that would flow from a security breach, even though ███████████████████████████████████████████████████████████████████████████████████████████████████████.

The security risks created by Defendants' retention of digital copies of millions of copyrighted books further distinguishes this dispute from the various cases cited by Defendants, Intervenors and *Amici*. For example, in each of the search engine cases, the plaintiffs' copyrighted materials were already published on the Web. *See Kelly*, 336 F.3d at 815 (photographs at issue were located on plaintiff's or other websites); *Perfect 10*, 508 F.3d at 1157 (images republished on the Internet without plaintiff's authorization); *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1113 (D. Nev. 2006) (plaintiff "published his works on pages where they were accessible, for free, to the world"). Thus, when the search engines in those cases indexed the copyright owners' materials, they did not create a new security risk because the content already was freely accessible. Copyright-protected books, on the other hand, are not generally published on the Internet, so when a digital copy is made and stored, a completely new risk of unauthorized access arises.

*Third*, Plaintiffs established that Defendants' activities have eliminated or usurped various licensing opportunities that are presently available to authors or are likely to be developed. *See* MSJ at 25-28. Among other things, Professor Daniel Gervais explained that existing collective licensing systems, both here and abroad, provide a means by which Defendants could have obtained a license to engage in various uses of copyrighted books. *See* Gervais Decl., *passim*. Indeed, Associational Plaintiffs from the U.K., Quebec, Sweden and Norway submitted testimony showing that they could have negotiated the digitization rights either directly or by acting as an intermediary for their members. *See* ALCS Decl. ¶ 9; UNEQ

14

Decl. ¶ 7; SFF Decl. ¶ 7; NFF ¶ 7.  Professor Gervais stated that a licensing system could arise in the U.S., Gervais Decl. ¶ 33, and the Amended Settlement Agreement ("ASA") in the Google Books case exemplifies how such a system might operate.  *See* MSJ at 26-27.

      Defendants rely heavily on a report by Professor Joel Waldfogel in support of their argument that the "insurmountable barrier" purportedly caused by the "prohibitively high transaction costs associated with seeking licenses for millions of books . . . . prevents any market from forming and supports fair use."  Def. Mem. at 25; *see also* ALA Br. at 16 (arguing that libraries cannot afford to pay licensing fees).  This is a peculiar argument which is predicated on the disturbing notion that it is permissible to steal the goods if it is too expensive to buy them.  However, "[b]ecause obedience to the law might be inconvenient or expensive is not a valid excuse for flouting a statute."  *Lawton v. Bd. of Med. Examiners*, 143 Cal. App. 2d 256, 262-63 (1956).  Defendants provide no authoritative support for the proposition that high transaction costs may warrant a use that would otherwise constitute copyright infringement.[10]

      In addition, Dr. Waldfogel analyzed only whether the "the ability to search digitized books [] could be undertaken as a viable and licensed commercial enterprise."  Waldfogel Decl. at 2 ¶ 4.  Yet, HathiTrust admittedly provides many other services, including the storage of

---

[10] Defendants' only citation for this proposition is to a 1982 law review article by Professor Wendy Gordon entitled *Fair Use As Market Value:  A Structural and Economic Analyses of the Betamax Case and Its Predecessors*, 82 Colum. L. Rev. 1000 (1982).  Their quote from this article is taken out of context, and ignores Professor Gordon's detailed analysis of the development of potential markets and the impact on the fair use analysis.  At one point, Professor Gordon suggests that copyright owners might want to set up collection and enforcement mechanisms such as clearinghouses, but might need a judicial declaration of infringement in order to make this happen.  *Id.* at 1621.  She goes on to warn of the dangers to the incentives authors have to create new works if compensation is denied.  *Id.* at 1621-22 ("To argue that copyright owners need receive no compensation for additional uses of their works would overlook the possibility that such compensation may change the patterns of production in a desirable way.  Stimulation of such response is after all, a basic goal of copyright law.").

millions of digitized books for future use, and any licensing arrangement would likely include the grant of additional rights that would improve the economic feasibility of the project. *See, e.g.*, Aiken Decl. ¶¶ 14-17 (describing rights licensed in ASA). Dr. Waldfogel also wrongly assumes that a separate license agreement would have to be obtained from each and every rightsholder, when in fact collective licensing systems allow for the rights to thousands of works to be collectively negotiated.[11] *See* Gervais Decl. ¶ 34; Haber Tr. 27:3-13 ███████

███████

███████ ). In addition, Dr. Waldfogel assumes that creating a searchable database would not be "commercially viable" because the revenues would not cover the costs. Waldfogel Decl. at 4. But Defendants are non-profit libraries that receive money from funding sources like university and state budgets, not by generating revenue from end users of their services. *See* Wilkin Tr. 247:2-16 ("The word profit doesn't have any meaning with regard to the enterprise which is a nonprofit enterprise[.]").

Finally, Dr. Waldfogel opines that "a service offering searchability inside books, like HathiTrust does, would very likely benefit rights holders by stimulating demand for their works." Waldfogel Decl. ¶ 50. However, "[c]ourts have routinely rejected the argument that a use is fair because it increases demand for the plaintiff's copyrighted work." *Los Angeles Times v. Free Republic*, No. 98 Civ. 7840, 2000 WL 565200 (C.D. Cal. Apr. 4, 2000); *see D.C. Comics*

---

[11] Dr. Waldfogel claims that the Copyright Clearance Center ("CCC") "does not offer licenses for searchable databases of textual works, nor does it currently have any plans to offer such licenses." Waldfogel Decl. ¶ 17. This mischaracterizes the testimony of the CCC witness, who in fact stated ███████ Abelson Decl., Ex. A (Haber Tr.) 19:7-13.

16

*Inc. v. Reel Fantasy, Inc.,* 696 F.2d 24, 28 (2d Cir. 1982) ("Since one of the benefits of

ownership of copyrighted material is the right to license its use for a fee, even a speculated

increase in DC's comic book sales as a consequence of RFI's infringement would not call the

fair use defense into play as a matter of law.  The owner of the copyright is in the best position to

balance the prospect of increased sales against revenue from a license.")

    Accordingly, the fourth factor, like all of the other fair use factors, strongly favors the

Plaintiffs.

## II.  THE ORPHAN WORKS PROJECT IS NOT PERMITTED UNDER EXISTING COPYRIGHT LAW

    Rather than defending the merits of the OWP, Defendants primarily rely on their still-

pending motion for partial judgment on the pleadings, which argued that the OWP issue is not

ripe for adjudication; [12] the scant justification that Defendants do provide is inadequate to meet

their burden of showing that the OWP is protected fair use or otherwise permissible.

### A.    **Defendants' Orphan Works Project is Not Fair Use**

    None of the fair use factors supports the legality of the OWP.  As to the first factor,

Defendants cryptically state that the OWP would "be a transformative new use of an otherwise

unused (because unavailable) book (factor one)."  Def. Mem. at 28.  To the extent that this

rationale is comprehensible, it is wrong as a matter of law.  To scan an out-of-print book into

digital format and publish it on the Internet for the purpose of allowing people to read it – which

---

[12] As Plaintiffs demonstrated in opposition to that motion, Plaintiffs include authors whose books were wrongly identified as orphan works, Defendants have expressed their intent to resume the program, UF 127, and Plaintiffs seek injunctive relief, which by definition targets prospective conduct.  Pl. Opp. Br. at 21, Dkt. No. 50.  There is no question that the OWP presents a live case and controversy on which the Court may enter judgment.  Furthermore, Plaintiffs object to Defendants' request that they be permitted additional briefing on this issue. From the outset of this litigation, the OWP has been a fundamental aspect of Plaintiffs' claim, and there are no grounds for conducting summary judgment in piecemeal.

is of course the book's original purpose – "merely repackages or republishes the original." Pierre Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990). "There is neither new expression, new meaning nor new message. In short, there is no transformation." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (citations omitted).

The second factor similarly disfavors fair use. The works that Defendant UM intended to distribute as part of the OWP included fictional novels such as *The Lost Country* by Plaintiff J.R. Salamanca and non-fiction books written in fictional style such as *Good Troupers All* by Gladys Malvern, whose copyright is owned by Plaintiff ALF. Both of these works contain expressive content that is at the heart of copyright protection. Defendants' claim that courts afford greater latitude to copying works that are out-of-print is unavailing where, as in the case of the OWP, the entire work is copied. *See Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1264 n. 8 (2d Cir. 1986), *cert. denied*, 481 U.S. 1059 (1987) (borrowing of 4.3% of words of out of print copyrighted book that included interviews of women discussing their experiences with abortion was fair use).

With respect to the third factor, Defendants claim, without support, that "no more would have been copied than is necessary (factors two and three)." Def. Mem. at 28. This is an absurd argument given that under the OWP, the entire work has already been digitized and would be made available in full. UF 114, 116. Given the absence of any transformative properties, the use of the entire work weighs strongly against fair use.

Finally, Defendants assert, again without support, that "should a holder of copyright in an out-of-print-book ever identify herself, the book would be removed and the original or new publisher could bring a new edition or give back into print (i.e., the effect on the market would be positive) (factor four)." *Id.* This argument ignores the fact that distributing free digital copies of out-of-print books undermines efforts to bring those books back into print and undercuts

future book sales.  *See Craft v. Kobler*, 667 F. Supp. 120, 129 (S.D.N.Y. 1987) (fact that a book is out-of-print is "not determinative" of the fourth factor, as a book may be republished at any time or reissued in response to increased public interest in the subject matter).  Once digital copies are circulated for free, it will be difficult or impossible to put the genie back in the bottle.  The two Plaintiffs' works that were identified as orphan candidates are prime examples, as unbeknownst to Defendants, one book was recently republished in digital format [White Decl. ¶¶ 7-10] and the other has been the subject of interest to be republished [ALF Decl. ¶¶ 12-17].

**B.**     **The Orphan Works Project is Not Permitted Under Section 108(e)**

Defendants also attempt to defend the OWP by relying on Section 108(e), which permits libraries to make a copy of a work in response to a request from a library patron or interlibrary loan, provided that certain criteria are met.  Defendants made the same argument in opposition to Plaintiffs' motion for partial judgment on the pleadings.  *See* Def. Opp. Br., Dkt. No. 65, at 17-18.  As Plaintiffs established in their reply to that argument, Defendants' own description of the requirements of Section 108(e) confirms that the OWP cannot possibly comply with the statute.  R.MSJ at 11-12.  In short, the OWP violates Section 108(e) because works are digitized without a user request, without a determination that a new or used copy of the book can be obtained at a fair price,[13] and without any copies that are distributed as part of the OWP becoming the property of the recipient.  *Id.*

---

[13] As Peter Hirtle, Senior Policy Advisor for Defendant Cornell admits, although it would be more efficient "if libraries could pre-emptively digitize copyrighted works, store them safely, conduct the market test when an [interlibrary loan] request arrives, and then deliver the book to the user if no copy can be found. . . this is not what the law currently allows."  Peter B. Hirtle, *Digital ILL and the Open Library*, October 23, 2007; *see* R.MJP at 2.  Moreover, even if the law did permit pre-emptive digitization, which it does not, Defendants' orphan candidates list identified books that *are* available for purchase at a fair price.  For example, Plaintiffs' counsel purchased on Amazon.com for $0.70 plus $3.99 Shipping & Handling a used copy of *Good Troupers All* by Gladys Malvern, whose copyright is owned by Plaintiff ALF).  *See* Goldman Decl. ¶ 5, Ex. C.

### III.  THE HATHITRUST'S USES FOR THE VISUALLY-DISABLED ARE NOT PERMITTED BY THE COPYRIGHT ACT

Plaintiffs did not bring this lawsuit to impede the access of the visually disabled to books and other printed materials.  *See* Second Declaration of Paul Aiken submitted herewith.  But improving such access does not require – and certainly cannot justify – the copying of millions of books by Defendants in an indiscriminate fashion unrelated to the particular need or request of an individual.

The HDL in its present form violates key provisions of the "Chafee Amendment," which was added to the Copyright Act in 1996 with Intervenor The National Federation for the Blind's ("NFB") endorsement to permit a narrowly-defined group of "authorized entities" to reproduce copyrighted works in "specialized formats exclusively for use by blind or other persons with disabilities."  17 U.S.C. § 121.  Using the digitized books in the HDL to provide access to the blind also is not a fair use under Section 107.  Thus, although Plaintiffs are willing to work with Intervenors to establish a system that grants the blind the access they seek while protecting the interests of authors, the present use infringes Plaintiffs' copyrights and should be enjoined.

#### A.      The HDL Uses are Not Permitted By Section 121

Section 121(a) of the Copyright Act provides:

> Notwithstanding the provisions of section 106, it is not an infringement of copyright for an *authorized entity* to reproduce or to distribute copies or phonorecords of a previously published, nondramatic literary work if such copies or phonorecords are reproduced or distributed in *specialized formats* exclusively for use by blind or other persons with disabilities.

17 U.S.C. § 121(a) (emphasis added).[14]

---

[14] The term "authorized entity" is defined to mean "a nonprofit organization or a governmental agency that has a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities."  *Id.* § 121(d)(1).  "[S]pecialized formats" includes only "braille, audio, or digital text which is exclusively for use by blind or other persons with disabilities."  *Id.* § 121(d)(4)(A).

Defendants exceed the rights granted by the Chafee Amendment in two material ways. *First*, the Defendant libraries are not "authorized entities" within the meaning of the statute because they do not have "a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities." *See* 17 U.S.C. § 121(d)(4). The legislative history makes clear that Congress intended only "a handful of nonprofit organizations" such as the National Library Service to be included within the "very narrow definition" of "authorized entities" under the Chafee Amendment. 142 Cong. Rec. S. at 9764.[15] It cannot be that every university library in the country qualifies as one of these "handful of nonprofit organizations" and the claim by the University of Michigan that one of the goals of the HDL was to enable persons with print disabilities to access library works, Wilkins Decl. ¶100, even if true, does not make this a primary mission, particularly when one considers that only 32 blind students and faculty at UM have sought and obtained privileged access. UF 102.

To avoid the narrow definition of "authorized entity," Intervenors argue that because the American Disabilities Act ("ADA") imposes certain equal access obligations on "public entities" and places of "public accommodation," each Defendant library must have "a primary mission" to serve the needs of the blind and is therefore an "authorized entity." Intervenors Mem. at 12. Under this interpretation, every public library, university, state and local government, employer with more than 15 employees, and public transportation service (among many others) would

---

[15] In response to opposition by rightsholders groups, including the Association of American Publishers ("AAP"), Section 121 replaced an earlier proposed bill that would have permitted any "non-profit organization" to make copies for the blind. *See Intellectual Property and the National Information Infrastructure: The Report of the Working Group on Intellectual Property Rights*, Sept. 1995, *available at* http://www.uspto.gov/web/offices/com/doc/ipnii/rec.pdf.

have a primary mission to serve the blind and therefore become an "authorized entity."[16]  This cannot have been the legislative intent because it would cause the broad application of the ADA to swallow the narrow definition of "authorized entity" in Section 121.  *See Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 489 (2d Cir. 2002) (rejecting blind student's interpretation of futility exception that would swallow the exhaustion requirement in Individuals with Disabilities Education Act).

*Second*, the digitized books stored in the HDL are not in "specialized formats exclusively for use by blind or other persons with disabilities."  17 U.S.C. § 121(a).  The HDL grants privileged access to the complete images and text of the scanned books to 93 individuals, only 32 of whom are blind.  UF 100-02.  This fact alone negates the possibility that the HDL provides a "specialized format exclusively for use by blind" because people without print disabilities are using the same format.  The NFB has itself acknowledged that Section 121 creates serious doubt as to "whether it can be extended to the production of e-text," for this very reason.  *See* Marc Maurer (President of NFB), *Comments on the Topic of Facilitating Access to Copyrighted Works for the Blind of Persons with Other Disabilities*, Apr. 21, 2009, *at* http://www.copyright.gov/docs/sccr/comments/2009/maurer.pdf.  Moreover, even if the text files in the HDL did constitute a "specialized format," which they do not, Defendants unquestionably violate Section 121 by storing and permitting persons with print disabilities to view the high resolution images of every scanned page of every book in the HDL.  *Compare* 17 U.S.C. § 121(d)(4)(B) (permitting only "print instructional materials" to be reproduced into "large print book" format), *with* Wilkin Tr. 214:12-21 (testifying that HathiTrust provides the print-disabled with access to the image files "to have them, for example, enlarged").

---

[16] *See* U.S. Equal Employment Opportunity Commission, *Americans with Disabilities Act: Questions and Answers*, May 2002, *at* http://www.ada.gov/q&aeng02.htm.

**B.**     <u>**The HDL's Uses For the Blind Are Not Protected Fair Use**</u>

Notwithstanding NFB's endorsement of the Chafee Amendment, Intervenors argue that even if the Defendant libraries are not "authorized entities" within the meaning of Section 121, the use of the HDL by blind persons constitutes fair use under Section 107.  Intervenors' Mem. at 16.  This argument fails for many of the same reasons that Defendants' uses for the blind are not covered by the Chafee Amendment.

The legislative history cited by Intervenors supports the proposition that the making of a *single copy of a single work at the request of a blind individual* is fair use.  *See* Intervenors Mem. at 17 n. 73 (citing House Rep. No. 94-1476 at 73, which states: "While *the making of multiple copies* or phonorecords of a work for general circulation *requires the permission of the copyright owner*, a problem addressed in [a previous proposed section addressing copies for the blind], the making of a *single copy* or phonorecord by *an individual* as a free service for a blind persons would properly be considered a fair use under section 107.") (emphasis added).[17]  There is no support for Intervenors' or Defendants' claim that fair use permits university libraries to preemptively digitize, store and replicate millions of copyrighted books in a digital format that includes universally-readable image and text files in case a person with a print disability may one day request access to one of the works.

---

[17] Intervenors' reliance on *Sony,* 464 U.S. at 417, is misplaced.  Intervenors Mem. at 17. In that case, each time the Supreme Court references copies for the blind it refers to the making of a single copy for one individual blind person.  *See Sony*, 464 U.S. at 455 ("Making *a copy* of a copyrighted work for the convenience of *a blind person* is expressly identified by the House Committee Report as an example of fair use."); *id.* at 465, n. 12 ("For example, 'the making of *a single copy* or phonorecord *by an individual* as a free service for *a blind person'* would be a fair use'"); *id.* at 470, n. 21 ("The mention in the Senate and House Reports of situations in which copies for private use would be permissible under the fair use doctrine-for example, the making of *a free copy for a blind person*.") (emphasis added).

Application of the four factors in Section 107 confirms that the HDL's uses for the blind do not constitute fair use.  With respect to the first factor, Defendants' uses for the blind admittedly serve a purpose that benefits society, but because they exceed the allowances of Section 121, Defendants are seeking to avoid paying the customary fee.  *See Harper & Row*, 471 U.S. at 562 ("The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.").  Furthermore, there is nothing transformative about converting the words on a printed page into digital text as changing the medium of a work does not transform it.  *Texaco*, 60 F.3d at 924.

The analysis of the second and third factors is no different than the analysis of the HDL above.  The works copied include a large variety of books including highly expressive works, both fiction and non-fiction.  And, once again, millions of books were copied in their entirety by Defendants, and HathiTrust grants persons with print disabilities access to the full text of those works, as well as the image files.

Finally, with respect to potential market harm, in addition to the various harms discussed above and in Plaintiffs' motion for summary judgment, HathiTrust's provision of image files to persons with print disabilities for the purpose of allowing them to create large print versions of the books creates "an infrastructure that would directly compete with and impair important growth businesses of publishers for [] large-type books[.]"  *Statement of the Association of American Publishers on the NII Copyright Protection Act of 1995 before the House Subcommittee on Courts and Intellectual Property*, Feb. 8, 1996, *available at* http://judiciary.house.gov/legacy/441.htm (testifying that one of the key changes to the original proposed bill was to "avoid impairing large-type" publishing).

24

## CONCLUSION

The digitization and copying of millions of books cannot be justified under existing copyright law, even if it might benefit some particular user who would like access to some particular work.  Defendants' and amici curiae's lack of faith in Congress notwithstanding (*see* ALA Br. at pp. 15-16), copyright law has been revisited and amended on numerous occasions to reflect changing circumstances and technologies.  Impatience with the legislative process cannot serve as an excuse to ignore the rights of authors and to fundamentally reshape copyright law. Defendants' and Intervenors' motions must be denied, and summary judgment granted to Plaintiffs.

Dated: New York, New York
       July 20, 2012

FRANKFURT KURNIT KLEIN & SELZ, P.C.


By:_____
       Edward H. Rosenthal, Esq.
       Jeremy S. Goldman, Esq.
       Adam Nelson (Law Student)

       488 Madison Avenue
       New York, New York  10022
       Tel.:  (212) 980-0120
       Fax:  (212) 593-9175
       erosenthal@fkks.com
       jgoldman@fkks.com

       *Attorneys for Plaintiff*