**KILPATRICK TOWNSEND & STOCKTON LLP**
Joseph Petersen (JP 9071)
Robert Potter (RP 5757)
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800
Email: jpetersen@kilpatricktownsend.com

Joseph M. Beck (admitted *pro hac vice*)
W. Andrew Pequignot (admitted *pro hac vice*)
Allison Scott Roach (admitted *pro hac vice*)
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: jbeck@kilpatricktownsend.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE AUTHORS GUILD, INC., ET AL., <br><br>            Plaintiffs, <br><br>      v. <br><br> HATHITRUST, ET AL., <br><br>            Defendants. | Case No. 11 Civ. 6351 (HB) |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ...............................................................................................................1

I.    The Libraries' Uses of Plaintiffs' Works Are Fair Uses.................................................1

     A.    The Purpose and Character of the Libraries' Uses Justify Copying Millions of Books. ...............................................................................2

     B.    The Nature of the Works Digitized by the Libraries Favors Fair Use....................6

     C.    The Amount Used Was Appropriate...........................................................7

     D.    Defendants Have Not Demonstrated Any Cognizable Fourth Factor Harm. ..........8

         1.    Plaintiffs Have Not Demonstrated Any Actual Past or Present Harm. ................................................................................8

         2.    A Licensing Market Is Not Likely To Be Developed.............................11

         3.    The Libraries' Security Measures Are Robust and Meet or Exceed Recognized Standards.........................................................14

     E.    The Equities Favor the Libraries..............................................................17

II.    The OWP Would Have Been a Fair Use. ......................................................17

III.    Plaintiffs' Motion for Summary Judgment Based on Section 108 is Wrong on the Law and Is Riddled with Questions of Fact..........................................18

     A.    The Unidentified Works. ......................................................................18

     B.    The Identified Works. ..........................................................................19

     C.    The Orphan Works Project: Sections 108(e) and 108(h)...................................21

IV.    Plaintiffs Have Not Met Their Burden of Demonstrating a *Prima Facie* Case of Copyright Infringement For All of the Identified Works. .................................22

     A.    Unregistered Works By Foreign Authors. ...............................................23

     B.    The Unidentified Works. ......................................................................24

CONCLUSION.............................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A.V. v. iParadigms, LLC,*
  562 F.3d 630 (4th Cir. 2009) ........................................................................ 2, 4, 6, 7

*American Geophysical Union v. Texaco, Inc.,*
  60 F.3d 913 (2d Cir. 1994) ........................................................................... 5, 10, 11

*Basic Books, Inc. v. Kinko's Graphics Corp.,*
  758 F. Supp. 1522 (S.D.N.Y. 1991) .......................................................................... 5

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
  448 F.3d 605 (2d Cir. 2006) ..................................................................... 2, 4, 7, 9, 10, 11

*Cambridge Univ. Press v. Becker,*
  No. 1:08-cv-1425, 2012 WL 1835696 (N.D. Ga. May 11, 2012) ........................... 6, 11

*DiMaggio v. Int'l Sports Ltd.,*
  No. 97 Civ. 7767, 1998 WL 549690 (S.D.N.Y. Aug. 31, 1998) ............................... 23

*Encyclopedia Britannica Educational Corp. v. Crooks*
  542 F. Supp. 1156 (W.D.N.Y. 1982) .......................................................................... 5

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991) .................................................................................................. 22

*Folsom v. Marsh* ........................................................................................................... 2

*Hofheinz v. Discovery Commc'ns, Inc.,*
  No. 00 Civ. 3802, 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001) ............................ 6, 9

*Hunt v. Washington State Apple Advertising Commission,*
  432 U.S. 333 (1977) .................................................................................................. 24

*Infinity Broadcast Corp. v. Kirkwood,*
  150 F.3d 104 (2d Cir. 1998) .............................................................................. 5, 6, 8

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.,*
  153 F.3d 82  (2d Cir. 1998) ...................................................................................... 23

*Kelly v. Arriba Soft Corp.,*
  336 F.3d 811 (9th Cir. 2003) ........................................................................ 2, 4, 5, 6, 7

*N. Am. Thought Combine, Inc. v. Kelly,*
  No. 01 Civ. 8112, 2003 WL 355237 (S.D.N.Y. Feb. 18, 2003) ............................... 23

*Plunket v. Doyle*,
  No. 99 Civ. 11006, 2001 WL 175252 (S.D.N.Y. Feb. 22, 2001) ........................................... 23

*Princeton University Press v. Michigan Document Services, Inc.*,
  99 F.3d 1381 (6th Cir. 1996) ..................................................................................... 5, 20

*Sega Enters. Ltd. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1993) ........................................................................................ 7

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
  203 F.3d 596 (9th Cir. 2000) ......................................................................... 7, 8, 13, 14

*Sony Corp. of America v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ........................................................................................................ 2

*Sundeman v. Seajay Soc'y, Inc.*,
  142 F.3d 194 (4th Cir. 1998) .......................................................................................... 7

*UMG Recordings, Inc. v. MP3.com, Inc.*,
  92 F. Supp. 2d 349 (S.D.N.Y. 2000) ............................................................................. 5

**Statutes**

17 U.S.C. § 101 ................................................................................................................ 24

17 U.S.C. § 108(a) ........................................................................................................... 22

17 U.S.C. § 108(c) ........................................................................................................... 20

17 U.S.C. § 108(e) ........................................................................................................... 22

17 U.S.C. § 108(f)(4) ....................................................................................................... 18

17 U.S.C. § 108(h) ..................................................................................................... 21, 22

17 U.S.C. § 410(c) ........................................................................................................... 23

17 U.S.C. § 411 ................................................................................................................. 1

17 U.S.C. § 501(b) ........................................................................................................... 1

**Other Authorities**

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1124 (1990) ............... 10

## PRELIMINARY STATEMENT

Plaintiffs portray this as a fair use case completely without precedent. That is wrong. Analogous cases from the Southern District of New York and the Second Circuit, the acknowledged authorities on copyright, provide the answer as a matter of law: the initial and intermediate scans, as well as the uses of them in the HathiTrust for search, preservation, and the blind, if capable of infringing at all, are fair under 17 U.S.C. § 107.

Plaintiffs focus on the "millions" of books in the HathiTrust Digital Library ("HDL"), but never tell the Court that **these books can only be searched, never read**.[1] Plaintiffs' expert speculates about a risk of security breaches, but names not one breach and acknowledges he is unfamiliar with the industry standard security protocols HathiTrust uses. And Plaintiffs all but ignore both the benefits to the public and the transformative nature of the Libraries' uses.

On one thing, however, Plaintiffs and the Libraries apparently agree: this Court can decide the issue of fair use under 17 U.S.C. § 107 as a matter of law. For the reasons that follow, however, Plaintiffs' summary judgment motion, insofar as addressed to the Section 108 issue, should be denied because it is wrong on the law and is riddled with questions of fact.

## ARGUMENT

### I.    The Libraries' Uses of Plaintiffs' Works Are Fair Uses.

For purposes of this motion, the Libraries do not dispute that Plaintiffs have met their *prima facie* burden to prove registration (17 U.S.C. § 411) and that they are the legal or beneficial copyright holder (17 U.S.C. § 501(b)) for **some** of the allegedly infringed works. (*See infra* Section IV at 22.) Anyone, however, even a commercial company acting for profit, "may

---

[1] The UM Library also provides equal access to users with print disabilities, itself a favored fair use. See Defendant Intervenors' memorandums of law in support of their motion for summary judgment and in opposition to Plaintiffs' motion for summary judgment, with which the Libraries fully concur. In addition, the UM Library enables library patrons to access—one page at a time—digital copies of a small number of books in its collection that were identified as lost, stolen, or damaged and deteriorating beyond use and also were determined to be out of print (no copy could be readily purchased). No other HathiTrust members participate in these uses through HathiTrust.

reproduce a copyrighted work for a 'fair use.'" *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984). In this case, we have non-profit libraries acting for non-profit purposes.

### A.      The Purpose and Character of the Libraries' Uses Justify Copying Millions of Books.

Plaintiffs essentially argue that, even in the absence of any demonstrable harm (*see infra* Section I.D at 8), no purpose could ever justify copying millions of works—not even for non-expressive, non-superseding uses that benefit the public. This is simply incorrect.

Millions of copyrighted works were copied in *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-22 (9th Cir. 2003), *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1163-68 (9th Cir. 2007), and *A.V. v. iParadigms, LLC*, 562 F.3d 630, 638-45 (4th Cir. 2009), for non-expressive, non-superseding uses and the copying was found to be fair. As the Second Circuit recognized in *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608-11 (2d Cir. 2006), and again in *Blanch v. Koons*, 467 F.3d 244, 251-53 (2d Cir. 2006), works put to a "different purpose" do not "supersede the objects" of the original work (Justice Story's words in *Folsom v. Marsh*, the first fair use case); rather, these uses for different purposes are "transformative" and fair.

The heart of this fair use inquiry is not numbers. Rather, it is this: Is the original purpose of a book (reading) the same as the Libraries' purposes (preservation and search)? The Libraries respectfully submit that the purposes are quite different. Electronic search (which is not an infringement), and the scans that enable search, do not substitute for reading any more than flipping cards stored in wooden drawers bearing the title, author, and subject matter of a particular book (as shown on page 7 of the Libraries' MSJ) substituted for reading the book. Preservation merely makes future discovery, reading, and learning possible.

Copying **millions** of books for search, preservation, and access to the blind is not only fairer than making ten copies of only **one** book for the purpose of unauthorized sales; it is the difference between fair use and infringement. The distinction between infringement and fair use is not the number of works that were copied, but rather the purpose and character of the uses, and it is their re-purposing that make the Libraries' uses transformative and fair.

It is true that the Libraries scanned millions of print books. They have millions of books on their shelves. Why do they have so many books? As John Wilkin testified, "[l]ibrarians cannot reliably predict which works may be of scholarly interest in ten, fifty, or one hundred years." (Wilkin Decl. ¶ 18.) Libraries purchase a broad range of books "because of the mere *possibility* that a particular work on a seemingly obscure topic may be valuable to a future student or scholar" (*id.* ¶ 19), and because they "have no assurance that a work will remain available after it is first published" (*id.* ¶ 20). In fact, the majority are quickly out of print and can become difficult if not impossible to purchase, so many must be purchased that may rarely be read. (*Id.*)

Then why did the Libraries scan so many books? Because even if the Libraries could have identified and scanned only non-renewed and other public domain works, making only those public domain works searchable would have resulted in incomplete or inaccurate research.

For example, the Libraries could not have predicted that author Margaret Leary would need *History of the Standard Oil Company* for her research, or that Princeton historian Stanley Katz would need *Universal Human Rights: Origins and Development* for his—books they would not have found without search. (Leary Decl. ¶¶ 10-13; Katz Decl. ¶¶ 14-17.) They also cannot predict whether a blind student at the University of Michigan will need a specific book on literary theory or medieval history for her term paper that is due in one week—insufficient time

to convert the book into an accessible format. (Wilkin Decl. ¶ 102.) Of course, the Libraries also cannot predict which books will be destroyed by flooding or in many cases, given the size of their collections, by deterioration. (*Id.* at ¶ 26.)

It bears repeating: courts have had no difficulty finding copying of millions of works for search or other non-expressive uses to be fair use. In *Kelly* and *Perfect 10*, the courts held that search engines that copied vast numbers of copyrighted images across the Internet in order to make them findable were fair uses **because the purpose of the copying—search—was not the same as the purpose of the images—expression**. *Kelly*, 336 F.3d at 818-22; *Perfect 10*, 508 F.3d at 1163-68. Similarly, in *iParadigms*, copying countless student papers for a plagiarism-detection service was a fair use because the purpose of the copying—detecting cheating—was different from the academic purpose for which the papers were prepared. *iParadigms*, 562 F.3d at 638-45.

Plaintiffs argue that the Libraries' uses are not fair because they "have not **added** anything new" to the books. (Pls.' Br. at 18 (emphasis added).) But this is an outdated and unnecessarily restrictive view of fair use that is not required in any of the Circuits that have addressed the issue—not in the Second, not in the Ninth, not in the Fourth. The central question in each case, as noted above, is whether the new use is for a "different purpose." *Bill Graham Archives*, 448 F.3d at 609 (nothing added to reproduced copyrighted posters); *see also Kelly*, 336 F.3d at 818-19 (noting added to reproduced copyrighted photographs); *Perfect 10*, 508 F.3d at 1165-66 (same); *iParadigms*, 562 F.3d at 639 (nothing added to copied student papers).

Plaintiffs tellingly ignore these cases. They instead cite a string of inapposite authority where the defendants copied all or almost all of the copyrighted works—and used them for the **identical purpose as the original work**.

- In *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1994), the defendant Texaco, a for-profit company, was systematically reproducing entire journal articles and distributing them to its employees, thus supplanting the need to pay for licenses that existed for the same use.

- In *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998), the defendant contemporaneously retransmitted copyrighted radio broadcasts over a telephone line, for profit, and customers of the service were listening to these transmissions for the same entertainment purpose of the original broadcasts.

- In *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381 (6th Cir. 1996) and *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522 (S.D.N.Y. 1991), the defendants, for-profit copy shops, were copying large excerpts from books, compiling them in "coursepacks," and selling them to students.

- In *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000), the defendant MP3.com, a for-profit subscription service, was making full copies of copyrighted sound recordings available for download and use.

- In *Encyclopedia Britannica Educational Corp. v. Crooks*, 542 F. Supp. 1156 (W.D.N.Y. 1982), the defendant distributed full copies of taped television programs.

By contrast, the Libraries **do not display one line of expressive content from books treated as in copyright** (except as noted in note 1, *supra*), and unlike those cases, any search results provided by the Libraries cannot serve the same purpose as the original works.[2] *See Kelly*, 336 F.3d at 819 (distinguishing *Infinity* and *MP3.com*: "Those cases are inapposite . . . because the resulting use of the copyright work in those cases was the same as the original use.").

The fairness of the Libraries' uses is strongly buttressed by the fact that their purpose in scanning the books in the HDL was to facilitate "**scholarship**," "**research**," and "**teaching**," all favored "purposes" expressly endorsed verbatim in the preamble for Section 107. Plaintiffs suggest that it is the HathiTrust users and not the Libraries that are favored under Section 107 because only the users engage in scholarship, research, and teaching. (Pls.' Br. at 19.) Plaintiffs'

---

[2] Even if the Libraries displayed short "snippets" of text (as Google does) to contextualize search results, that also would not serve the same original expressive purposes of the books.

proposed distinction, if it is one, is without a difference; the categories of exemplary uses described in Section 107 focus on the "purpose" of the use, not the user. Plaintiffs cannot dispute that the Libraries' sole "purposes" for the HDL are favored under Section 107.[3] This fact alone weighs heavily in favor of fair use. *Hofheinz v. Discovery Commc'ns, Inc.*, No. 00 Civ. 3802, 2001 WL 1111970, at *3 (S.D.N.Y. Sept. 20, 2001) (Baer, J.); *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004); *accord Cambridge Univ. Press v. Becker*, No. 1:08-cv-1425, 2012 WL 1835696, at *24 (N.D. Ga. May 11, 2012) (finding fair use in part because the uses by Georgia State University were for preamble purposes and of a nonprofit educational nature).[4]

### B.   The Nature of the Works Digitized by the Libraries Favors Fair Use.

Plaintiffs apparently do not dispute that the majority of the works in the HDL are out of print; many are orphan works or are no longer subject to copyright protection at all; and most also are factual rather than creative in nature. (Libraries' MSJ at 17-19.) Nor do Plaintiffs dispute that all these undisputed facts favor fair use. And even for the minority of works that are fiction, the Libraries' uses (except as noted in note 1, *supra*) are non-expressive; search results simply reveal facts, regardless of the nature of the work. *See iParadigms*, 562 F.3d at 641 (noting that "even if the plaintiffs' works were highly creative in nature, iParadigms' use of the plaintiffs' works was not related to the creative core of the works").

---

[3] The Second Circuit's decision in *Infinity* is inapposite. The court did not address Section 107's favored categories at all. Rather, the court merely held that the defendant could not rely on the transformative uses of its users when its own use was non-transformative. *Infinity*, 150 F.3d at 108. As discussed *infra* and in the Libraries' MSJ, the Libraries' uses easily stand on their own footing as transformative.

[4] Plaintiffs refer to surplus revenue generated by the HathiTrust in an attempt to suggest that the service is for profit (Pls.' Br. at 6-7), but this surplus exists simply because many of the operational expenses (e.g., replacing servers) are not incurred annually and were not included in these figures. (Rosenthal Decl. ¶ 11, Ex. 9 (Wilkin Dep. 206:8-21, Apr. 25, 2012).) The HathiTrust "only take[s] in enough money to run the enterprise" (*id.* at 247:12-13), and thus is clearly not for profit. Moreover, copying even by for-profit companies for commercial purposes to facilitate fair uses by third parties is fair. *Kelly*, 336 F.3d at 818 (search engine copied countless photographs to make them findable by third parties); *Perfect 10*, 508 F.3d at 1166 (same).

Plaintiffs do argue, without case support, that factor two should not favor fair use simply because the Libraries did not perform an individual analysis of each work before scanning. If Plaintiffs' view of the law were correct—if an entity relying on fair use needed to parse each work to determine whether it were non-fiction, out of print, or in the public domain before using it—a socially beneficial service the scale of the HathiTrust would never exist. The purpose of a searchable database like the HDL is to make available knowledge discoverable, and to do it completely and comprehensively, on topics ranging from anthropology to zoology, **not just works of a certain nature** (e.g., factual or currently published). An electronic corpus that could be searched only for arbitrarily scanned authors would be far less useful, and probably harmful in an age when so many students "do not read it if it is not online."

### C.    The Amount Used Was Appropriate.

The third fair use factor is at worst neutral where the amount copied was necessary or appropriate for the purpose. *Bill Graham Archives*, 448 F.3d at 613, *Kelly*, 336 F.3d at 821; *Perfect 10*, 508 F.3d at 1167; *iParadigms*, 562 F.3d at 642. Plaintiffs ignore this settled law, and instead simply argue that factor three disfavors fair use because the Libraries copied the entire books. But copying **entire works** was fair in *Bill Graham Archives*, *Kelly*, *Perfect 10*, and *iParadigms*. Similarly, "intermediate copying" of entire works is fair use where the copying is necessary to engage in non-infringing uses. *See, e.g.*, *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1526-27 (9th Cir. 1993) (copying entire software program for purposes of reverse engineering was fair use); *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 605-06 (9th Cir. 2000) (same); *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 206 (4th Cir. 1998) (fair use to copy fragile manuscript so that author of critical review could study it without damaging the original).

Scanning only every tenth page or only the first 25 pages of each book could cause a researcher at Michigan's medical school to miss new treatments for Raynaud's syndrome or migraine headaches. (*Cf.* Smalheiser ¶¶ 11-13.) Similarly, preserving only every third chapter would not permit the University of Wisconsin Superior to replace a book damaged by floodwaters. (*See* Hensrud Decl. ¶¶ 7-19.)

Finally, Plaintiffs also fail to recognize that, irrespective of the amount copied, the third factor focuses on **expressive** uses of the work. *See Blanch*, 467 F.3d at 257-58. Here, when a search is performed, only computers "read" the words on the page.[5] The output of the HDL— bibliographic information and the number of times a search term appears on a page—is limited to uncopyrightable facts, and these non-expressive uses do not conflict with Plaintiffs' statutory rights.[6] (*See* Br. of Digital Humanities and Law Scholars (ECF No. 123) at 11-19.)

### D. Defendants Have Not Demonstrated Any Cognizable Fourth Factor Harm.

Plaintiffs concede that it is their burden to show "by a preponderance of the evidence that *some* meaningful likelihood of future harm exists," (Pls.' Br. at 21 (citing *Sony*, 464 U.S. at 451)), but given Plaintiffs' deposition testimony and discovery responses, Plaintiffs fail to meet their burden.

### 1. Plaintiffs Have Not Demonstrated Any Actual Past or Present Harm.

Plaintiffs admit they cannot identify (a) "**any** specific, quantifiable past harm, or any documents relating to any such past harm" of any kind[7] or (b) "**any** revenue or other earnings of any kind generated or expected to be generated in whole or in part" for archiving, research, full-

---

[5] Thus, in *Infinity*, relied upon by Plaintiffs, where the entire works were made available, the third factor rightly tilted against fair use. *Infinity*, 150 F.3d at 109-10.

[6] Again, even if the Libraries displayed short snippets of text to contextualize search results, that also is a non-expressive use.

[7] (Petersen Decl. ¶¶ 2 - 21, Ex. A - T (responses to Interrogatory No. 5) (emphasis added).)

text search, or use by the blind.[8] Instead, Plaintiffs resort to the same circular argument previously rejected by this Court and other courts: that because the Libraries could have purchased a digital copy of Plaintiffs' books—at least if and when available in "ebook" format— or sought a license to scan the book where a digital copy was not available, they have lost a sale. (Pls.' Br. at 22-23.)

In the first place, Plaintiffs have not identified a single ebook license that permits the Libraries' uses. The only example Plaintiffs provide is an ebook license from Amazon to an ebook purchaser, which in fact **does not** permit ebook purchasers to make the Libraries' uses. (*See* Petersen Opp'n Decl. ¶ 11, Ex. J (granting license to use the digital copy **solely** on Amazon's reading device and software).) And even if Plaintiffs come up with a different license, that license, like Amazon's, would cover full-text reading and therefore would not establish a market solely for search and preservation. So much for the Libraries purchasing ebook licenses.

As for the license that might have been, if a copyright holder could simply point to the **hypothetical possibility** of licensing a work—even when no license exists and there are no concrete plans to offer one—factor four would always weigh against fair use. *Bill Graham Archives*, 448 F.3d at 614 (noting that the fourth factor would always favor the copyright holder "were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use") (internal quotation and citation omitted); *Hofheinz*, 2001 WL 1111970, at *6 (Baer, J.) (refusing to "eviscerate" fair use by recognizing this type of purported harm) (internal quotation and citation omitted); Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev.

---

[8] (*Id.* ¶¶ 2 - 18, Exs. A - Q (responses to Request Nos. 8 - 11); ¶¶ 19 - 21, Exs. R - T (responses to Request Nos. 4 - 7 (misnumbered in Plaintiffs' responses)).)

1105, 1124 (1990) ("By definition every fair use involves some loss of royalty revenue because the secondary user has not paid royalties.") (footnote omitted).

Equally unavailing is Plaintiffs' argument, offered without any evidence whatsoever, that the HathiTrust somehow undermines existing licenses under which Plaintiffs' works are indexed for search by Amazon. (Pls.' Br. at 27.) But Amazon does not pay authors for search—and authors freely grant the right to search—because that helps sell books.[9] In other words, search alone has no licensable market value. Similarly, by helping students and scholars find relevant works they would otherwise never find, the HDL is complementary to, not superseding of, Plaintiffs' efforts and actually may help authors sell books, which benefits Plaintiffs' markets rather than harming them. (Waldfogel Decl. ¶ 50; Wilkin Decl. ¶ 71; Leary Decl. ¶ 15.) *See also Bill Graham Archives*, 448 F.3d at 614 n.5 (noting that the defendant's use of a reduced size image might help that plaintiff's copyrighted poster market by causing someone to "seek more than a 'peek'").

Plaintiffs rely heavily on *Texaco* (involving a commercial, non-transformative use by a for-profit entity) to claim that the Court should recognize a market for the Libraries' uses. But *Texaco* held that "a particular unauthorized use should be considered 'more fair'" where, as here, "there is no ready market or means to pay for the use." *Texaco*, 60 F.3d at 931. In *Texaco*, the "ready market" was a license from the Copyright Clearance Center ("CCC"), a licensing entity that offered licenses for the exact use made by Texaco. *Id.* (noting that a license was available to copy the articles at issue). Here, ███████████████████████████████████████

---

[9] Plaintiffs are unpersuasive in arguing that the HDL harms such licenses when they are not even aware they have granted them. Pat Cummings, an officer of Plaintiff Authors Guild, who has at least two works within Amazon's "Search Inside" Program, testified at deposition that she was unaware Amazon had made digital copies of her works available for full-text searching, and had never directly authorized it to do so. (Rosenthal Decl. ¶ 5, Ex. 1 (Cummings Dep. 68:9-69:18; 106:1-19; 107:15-108:7, May 22, 2012).)

████.[10] (Petersen Opp'n Decl. ¶ 9, Ex. H (Haber Dep. 13:23-24:23, June 4, 2012).) This admission plainly distinguishes *Texaco*, which involved a license already in existence. *See Bill Graham Archives*, 448 F.3d at 615 n.6 (noting that *Texaco* involved direct evidence of lost licensing revenue); c*f. Cambridge Univ. Press*, 2012 WL 1835696, at *35-36 (finding copying by Georgia State University a fair use where plaintiffs failed to satisfy their burden to establish that CCC provided "reasonably efficient, reasonably priced, convenient access" to digital copies).

Moreover, the Second Circuit has subsequently held that a copyright holder cannot preempt "transformative markets"—i.e., that even actual harm in a transformative market is not cognizable under the fourth factor. *See Bill Graham Archives*, 448 F.3d at 614-15 (distinguishing *Texaco* as not involving a transformative use). Indeed, in *Bill Graham Archives*, the plaintiff offered to license the images at issue, but the parties could not agree on price and the defendant relied on fair use instead. *Id.* at 614. Nonetheless, the Second Circuit held that the plaintiff could not preempt the market for a transformative use by offering to license the use. *Id.* at 614-15.

## 2.    A Licensing Market Is Not Likely To Be Developed.

Plaintiffs argue, again relying on the discredited (see note 10) Gervais' declaration, that even if CCC does not currently offer a license for preservation, search, and access to the blind (████████████), it could eventually develop a license. ████████████ ████████████████. (Petersen Opp'n Decl. ¶ 9, Ex. H (Haber Dep. 13:23-24:23, June 4, 2012).) This admission refutes Gervais' speculation that a market is likely to be developed.

---

[10] Plaintiffs' suggestion based on the testimony of its purported expert, Daniel Gervais, that CCC presently licenses uses for preservation, search, and access to the blind (Pls.' Br. at 26) is therefore incorrect.

Moreover, Plaintiffs have failed to explain how CCC, or any collective licensing entity, could possibly aggregate the rights to all of the millions of volumes within the HathiTrust that are potentially still in copyright—many of which are out of print or orphan works for which a rights holder, by definition, might never be found. As Professor Bernt Hugenholtz notes, an organization such as the CCC without a Congressional mandate to grant licenses permitting digitization could not possibly license the Libraries' uses of all their holdings.[11] (Hugenholtz Decl. ¶ 11.) In sum, "voluntary collective licensing of complete library holdings is destined to fail." (*Id.* ¶ 23.)

Apart from the uncertainty of ever **finding** all copyright holders, the **costs** are also prohibitive for an entity such as the CCC. In his expert declaration, Dr. Joel Waldfogel conservatively estimates that it would cost a staggering **$569 million** merely to identify all copyright holders and to seek a license from each of the rights holders to the works within the HDL, and this **does not even include any license fees** such rights holders might demand. (Waldfogel Decl. ¶ 24.) An entity such as CCC would need to incur these same transaction costs (which Gervais implicitly acknowledges would be cost prohibitive for the Libraries)—assuming the rights holder could even be found. There is no suggestion that CCC could afford this upfront cost given its annual revenue (after royalty distributions) of approximately $68 million (which of course also covers salaries and other overhead) (Petersen Opp'n Decl. ¶ 10, Ex. I); or that CCC could charge a license fee solely for search and preservation (but no reading of content) sufficient to recoup these costs that anyone realistically would be willing to pay.

---

[11] Contrary to the implication in Gervais' report, most European countries lack the legal mandate to license the digitization of entire library collections. (Hugenholtz Decl. ¶¶ 20-24.) And even in countries where there is a legal mandate, the legislation was enacted for the purpose of authorizing access to the text itself, not just research and preservation. (*Id.* ¶¶ 25-28.)

Plaintiffs suggest that, in any event, the proposed settlement agreement in the Google Books case would have represented "a ready market or means to pay for the use" made by the Libraries. (Pls.' Br. at 26.) Apart from the fact that the terms of the 300-plus page proposed settlement embraces different licenses and multiple different issues, the settlement was rejected. A proposed, unperformed release and settlement agreement between litigating parties that was rejected by the court hardly shows a market for digitization of printed works solely for search, preservation, and access to the blind.

Plaintiffs argue, almost as an afterthought, that non-consumptive research may represent an "emerging field" and that those researchers someday might pay for licenses from authors. Plaintiffs' "facts" supporting this argument are limited to the following testimony from Plaintiff T.J. Stiles (which he paraphrased in his declaration):

> Despite my own uncertainty about the actual means and uses of non-consumptive research, I must add that I think it's a very exciting field, it's very interesting and as an author, it sounds like a tremendous emerging market that I would love to license to be – my books to be taken advantage of in such manner.

(Rosenthal Decl. ¶ 3, Ex. 3 (Stiles Dep. 35:9-15, May 31, 2012).) In other words, Plaintiffs again rely on conjecture rather than evidence of any actual or likely-to-be-developed market. But conjecture is plainly insufficient to establish cognizable harm. *See Sony*, 464 U.S. at 451, 454 (endorsing the District Court's conclusion: "Harm from time-shifting is speculative and, at best, minimal."); *Blanch*, 467 F.3d at 258 n.9 (rejecting speculative harm to potential market for photograph); *Perfect 10*, 508 F.3d at 1168 (rejecting "hypothetical" harm to market for thumbnail images on mobile phones). Moreover, Plaintiffs' speculation is contradicted by their own testimony. John White, an experienced literary agent currently representing Plaintiff J.R. Salamanca, admitted at deposition that he has never received any licensing offers for non-consumptive research, that he knows no copyright holder who has, and that he is unaware of any

entity anywhere who would even offer such a license. (Rosenthal ¶ 6, Ex. 4 (White Dep. 90:23-91:16, June 8, 2012).)

Finally, the Gervais report implies that this Court should deny fair use in order to prompt Congress to develop a collective licensing scheme. As such, the argument tells an Article III judge not to utilize the authority already granted by Congress in Section 107 and, in effect, to "punt"—with a hope that Congress will catch the ball. Of course, this is the same argument other copyright plaintiffs have made when they wanted to oppose fair use as applied to a new technology, going back to the Sony Betamax case (where the movie studios, unwilling to demand the destruction of videotape recorders, urged the Court to leave it to Congress to address the issues). The Supreme Court, however, empowered without further legislation than Section 107, upheld the sale of videotape recorders by a for-profit entity even though they were being used to copy complete motion pictures. *Id.* at 455. Respectfully, it is even easier for this Court to find fair use—without waiting on Congress—than it was for the district court that did so (and was affirmed by the Supreme Court) in *Sony*. Here, unlike in *Sony*, the copies were made for transformative uses by non-profit universities and can only be read by people with print disabilities.

### 3.   The Libraries' Security Measures Are Robust and Meet or Exceed Recognized Standards.

Plaintiffs, relying only on the declaration of Professor Benjamin Edelman, an economist, argue that there is a possible risk that the HDL will be hacked. (Pls.' Br. at 23-24.) Edelman admits "I don't know about all of the security systems that [the Libraries] have." (Snavely Decl. ¶ 8, Ex. A (Edelman Dep. at 248:11-12).) He also confesses that if a company asked him to conduct an evaluation of its security measures, "I don't think I would be the best person to evaluate their security systems, but I think I would be able to assist them in selecting an

appropriate person." (*Id.* at 288:15-18.) Nonetheless, these deficiencies do not stop him from speculating about possible risks posed by the HDL. As Cory Snavely, the individual in charge of ensuring the security of the works within the HDL, notes: "[Edelman's approach is akin to assessing the safety of commercial air travel by summarizing the ways in which a plane may fall from the sky without taking note of all of the steps taken by the aviation industry to guard against such calamity." (*Id.* ¶ 6.)

Plaintiffs argue that digital files might somehow, someday be extracted from the HDL and unlawfully distributed due to failures in security, rogue employees, or malicious hackers. (*See* Edelman Decl. ¶¶ 16-21.) But as Mr. Snavely observes, "the Libraries began the digitization project at issue in this lawsuit more than seven years ago and in all that time there is absolutely no reason to believe that anyone has managed to pierce Michigan's or the HDL's security protections and obtain unauthorized access to the text of a single in-copyright work." (Snavely Decl. ¶ 9.) In fact, the security issues identified by Edelman are obvious to experts in computer security and, as set out in Mr. Snavely's declaration, Michigan has taken extensive precautions to minimize them, if not eliminate them altogether. (*See id.* ¶¶ 6-27.)

Edelman notes that when John Grisham's *Calico Joe* was recently the bestselling hardcover novel in the country, as many as eight different illegal digital copies of the book were available through multiple websites. (Edelman Decl. at ¶ 11). But *Calico Joe* is **not** one of the works within the HDL, and thus all Edelman has established is that online books can never be entirely secure on the Internet. This is neither news, nor an argument that the Libraries' security is inadequate. Indeed, anybody with an off-the-shelf scanner can take a print copy of *Calico Joe* and make an illegal digital copy.

Edelman says that authors are only willing to suffer the security risks of online services such as Amazon "if they receive contractual guarantees as to the steps being taken to mitigate that risk, or if they receive appropriate compensation if that occurs." (Edelman ¶ 27.) Yet Amazon's license agreement for its "Search Inside" program—through which numerous Plaintiffs license digital copies of their works—offers **no** contractual guarantees as to risk mitigation, nor **any** compensation at all in case of breach. (*See* Rosenthal Decl. ¶ 106, Ex. 104 ("Amazon.com will employ available technologies to hinder downloading of the displayed portions of each Book. . . . Your sole and exclusive remedy for a breach of this agreement is to discontinue the Program with respect to your Books.").) Moreover, fair uses require neither contracts nor compensation.

The HDL maintains rigorous security protocols, and has been certified as a trustworthy digital repository after an in-depth audit by the Center for Research Libraries. (Snavely Decl. ¶ 7; Wilkin Decl. ¶¶ 91-99.) There is no evidence that any digital copies have ever been hacked from the HDL. (Snavely Decl. ¶ 7.) Plaintiffs have offered nothing to suggest that HathiTrust is any less secure than the leading online retailers and service providers, or that authors are offered any greater protections elsewhere on the Internet.

Plaintiffs heap speculation on top of speculation by arguing that a ruling in the Libraries' favor "would encourage far less sophisticated providers" to make the same uses. (Pls.' Br. at 24.) Plaintiffs' speculation requires imagining an unsophisticated provider with millions of dollars to spend on scanning and storing millions of books for search and preservation. But even then, who would not secure those works once they were scanned? Plaintiffs have identified no such animal.

In any event, the Court need not wade through this guesswork because the security measures are not relevant to this fair use analysis. This is not a secondary liability case where

Plaintiffs plead that the Libraries have facilitated or induced others' infringement of their works. Indeed, there is no allegation that a single in-copyright work has been made available through the HDL due to inadequate security measures, much less that any infringement was induced.

### E.   The Equities Favor the Libraries.

As noted by amici:

> When Plaintiffs sued Google in 2005, they could have sought preliminary relief – but they chose not to. When the Plaintiffs entered into settlement discussions with Google, they could have demanded that Google cease scanning books and providing copies of the scans to libraries – but they chose not to. During the course of the three years of settlement negotiations with Google, they could have demanded that Google discontinue scanning – but they chose not to. When the Plaintiffs agreed to a settlement with Google in 2008, they once again could have insisted that Google cease scanning pending approval of the settlement – but they chose not to.

(Br. of Am. Library Ass'n, et al. (ECF No. 121) at 17.) In the meantime, the Libraries continued, with Plaintiffs' full knowledge, to make fair use scans and fair uses of their scans. Yet Plaintiffs, during those seven years, did not make a single objection to the Libraries—the same years in which the Libraries were expending scarce resources creating the infrastructure to securely store the works.

As a matter of simple "equity," Plaintiffs are not now entitled to an unprecedented equitable remedy that would freeze these beneficial uses in a dark archive under yet-to-be-created-by-this-Court security protocols; nor to an order that would freeze them indefinitely, or until Congress acts, if ever.

## II.   The OWP Would Have Been a Fair Use.

The only "fact" Plaintiffs have cited to enjoin the suspended OWP is the unsupported, hypothetical harm that could arise (1) if the OWP were someday were revived; (2) if a book were someday misidentified as an "orphan work;" and (3) if that misidentified book were someday made available to the University of Michigan students and faculty on a highly limited, one-

digital-copy-per-print-copy basis. Even if all those "ifs" occurred, the "harm" would not be irreparable (or enjoinable) because the misidentified book would be taken down the same day a copyright holder was found. Plaintiffs' argument is itself an argument that the OWP issue is moot and a concession that what they really want is a declaratory judgment of a non-justiciable dispute.

If the Court disagrees with the Libraries' pending Motion for Judgment on the Pleadings and determines that the OWP is ripe for adjudication, the Libraries respectfully reiterate their request to fully brief the issue.

### III.    Plaintiffs' Motion for Summary Judgment Based on Section 108 is Wrong on the Law and Is Riddled with Questions of Fact.

Plaintiffs reassert their baseless argument that Section 108 of the Copyright Act preempts application of Section 107. As the Libraries explained, the language of Section 108 says just the opposite: "Nothing in this section [108] . . . **in any way** affects the right of fair use as provided by section 107." [12] 17 U.S.C. § 108(f)(4) (emphasis added).

### A.    The Unidentified Works.

Plaintiffs' argument that the Section 108 defense might not apply to a small handful of the books in the HDL ignores the "hundreds of thousands of works" they seek to address at the "remedy stage." Aside from being flatly unable to establish a *prima facie* infringement claim for these unidentified works, Plaintiffs cannot possibly defeat the Section 108 defense so long as these works remain unidentified. With absolutely no facts in the record for hundreds of thousands of unknown works, Plaintiffs cannot establish that none of them were digitized by one of the Libraries pursuant to Section 108's preservation and replacement procedures, separate and apart from Google (i.e., as part of the Libraries' own preservation programs).

---

[12] The point is addressed more fully in the Libraries' Opposition to MJP (pp. 2-6) rather than being reiterated here.

Moreover, Plaintiffs have not even began to establish for summary judgment purposes that **none** of the **unidentified** works:

- were unpublished, such that Section 108(b) would not apply;

- were created as replacements for damaged, deteriorating, lost, or stolen books for which unused replacements could not be obtained at a fair price under Section 108(c); or

- were in the last twenty years of copyright protection and unavailable for purchase when they were digitized, and permissibly reproduced for preservation, scholarship, or research purposes under Section 108(h).

### B.    The Identified Works.

Plaintiffs do not even establish that Section 108 cannot apply to the Libraries' uses of all of the works identified in the First Amended Complaint (the "Identified Works"). In fact, Section 108 can provide the rights for some of the Libraries' uses, even though it is not the source for all of the rights the Libraries exercise.

As explained in greater detail in the Libraries' Opposition to MJP, Plaintiffs have not established that none of the Libraries' reproductions of the Identified Works were permitted under Section 108(c). First, the Plaintiffs cannot establish that the Libraries' reproductions were made for purposes of "indirect commercial advantage." To the contrary, the HDL copies at issue were made—and are used—in furtherance of the Libraries' nonprofit educational mission, without any purpose of commercial advantage. (*See* Libraries' Opposition to MJP at 11-12.) Plaintiffs' citation to law relevant to commercial copy shops (Pls.' Br. at 13) is inapposite. The legislative history cited by Plaintiffs discusses a non-profit institution's use of a commercial copying enterprise to copy and distribute copyrighted material to patrons, a fact pattern distinct on many levels, the most important of which is that copyrighted material in the HDL are never

19

made available to users.[13] Plaintiffs' citation to *Princeton University Press* (which is a fair use case not a Section 108 case) is even further off-base. It is undisputed that neither the Libraries nor Google are selling unauthorized copies of copyrighted works for a profit, the activity at issue in that case.

As to the requirement that digital 108(c) copies not be made available to the public outside the premises of the library, Plaintiffs misunderstand the statute. It does not restrict the location in which the file containing the digital copy can be **stored**, only the physical area in which the digital copy is **made available** to the public to be viewed and read. Plaintiffs have not shown that digital copies of the Identified Works have been made available to the public **at all** (because they have not been), let alone outside of the Libraries' premises. (*See* Libraries' Opposition to MJP at 15-16.)

Plaintiffs also have failed to establish that none of the Libraries' reproductions of the Identified Works were for the purpose of replacing a book that was "damaged, deteriorating, lost, or stolen." 17 U.S.C. § 108(c). As Plaintiffs note, many of the Identified Works are in poor physical condition (more than a third of the Identified Works are damaged or deteriorating),[14] and Plaintiffs have not shown for summary judgment purposes that such books were not in a similarly poor condition at the time they were digitized. Similarly, Plaintiffs have not established on summary judgment that the Libraries failed to determine that new copies could not be obtained at a "fair price."

Plaintiffs assert that in any event, the Copyright Act does not permit "pre-emptive digitization," i.e., digitizing works for preservation purposes before they have been lost, stolen, damaged, or deteriorated. (Pls.' Br. at 14.) In the first place, an out-of-print book (the majority of

---

[13] Except for students and faculty at the University of Michigan who are certified to have print disabilities and are unable to read and use the University's library collection in hardcopy form.

[14] (Rosenthal Decl. ¶¶ 76, 79, 81, Exs. 74, 77, 79 (response to Request for Admission No. 8).)

books in the HDL are out of print) cannot be conjured up for scanning after it has been stolen and then retroactively preserved. It is equally obvious that in many cases, "pre-emptive" digitization of deteriorating books is the only effective method for preservation given the scale of the Libraries' collections. (Wilkin Decl. ¶ 26.) This is because the decay of library books, especially those printed on acidic paper, is inevitable (and was occurring faster than the Libraries could keep up with before Google stepped in). (*Id.* ¶¶ 22-26.) It also is true that an entire library collection can suffer catastrophic damage all at once and unexpectedly. (*See generally* Hensrud Decl.) If the only copy of a book is lost or stolen, or has been damaged or deteriorated to the point that it cannot be used by readers, and if a replacement cannot be obtained because the book is out of print, then an existing archival digital copy may be the only opportunity to have available the contents of the book for posterity.

C.     **The Orphan Works Project: Sections 108(e) and 108(h).**

In challenging the suspended OWP under Section 108, Plaintiffs focus only on the initial digitization of works included in the HDL, ignoring the fact that **the OWP has not enabled one patron to access a book**. As discussed *supra* and in the Libraries' MSJ, however, that initial digitization of the works in the HDL is permitted by Section 107 (*see supra* Section I; Libraries' MSJ at 10-26) and Section 108 (*see supra* Section II.A-C). In addition, Section 108(h) would apply to works identified as orphan works and made available during the last twenty years of their copyright term. *See* 17 U.S.C. § 108(h)(1).

More importantly, Plaintiffs fail to address application of Section 108(e) to the **use** of those digital copies that was originally envisioned as part of the OWP. It is that contemplated use—delivering on a tightly limited basis in response to a user's search request the watermarked text of identified orphan works carrying notices of copyright restrictions—that is the basis for

Plaintiff's claim that the OWP will infringe copyrights. That use, should it ever come to pass, would be permitted under Section 108(e) and/or Section 108(h):

- The Libraries are open to the public and would be making noncommercial educational uses without any purpose of direct or indirect commercial advantage (*see* 17 U.S.C. § 108(a)(1), (a)(2));

- The OWP research and orphan work identification procedures would constitute a reasonable investigation that a copy of the work was not subject to normal commercial exploitation (*see* 17 U.S.C. § 108(h)(2)(A)) and could not be obtained at a fair price (*see* 17 U.S.C. §§ 108(e) ), (h) (2)(B);

- The copy of the identified orphan work would be delivered electronically to the user in response to the user's search request (*see* 17 U.S.C. § 108(e));

- The electronic copy delivered to the user would become the property of the user, stored in the user's computer's random access memory and also capable of being downloaded one page at a time and saved indefinitely (*see* 17 U.S.C. § 108(e) (1) );

- The copy would include a copyright notice (*see* 17 U.S.C. § 108(a) (3) );

- The University of Michigan would have no notice that the user intended to use the copy for a purpose other than private study, scholarship, or research (*see* 17 U.S.C. § 108(e) (2) );

- The HathiTrust website would display a warning of copyright in accordance with the requirements of the Register of Copyrights (*see id.*); and

- If a copyright holder were to be identified at any time, the work would be removed from the OWP (*see* 17 U.S.C. § 108(h)(2)(C)).

## IV.    Plaintiffs Have Not Met Their Burden of Demonstrating a *Prima Facie* Case of Copyright Infringement For All of the Identified Works.

As part of a *prima facie* case of copyright infringement, Plaintiffs must both allege and prove they are the legal or beneficial copyright holder for the works at issue. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

In the first place, the Court should reject Plaintiffs' belated attempt to inject additional works into this case through their summary judgment motion that were not properly alleged in

the First Amended Complaint.[15] *DiMaggio v. Int'l Sports Ltd.*, No. 97 Civ. 7767, 1998 WL 549690, at *2 (S.D.N.Y. Aug. 31, 1998) (Baer, J.) (dismissing copyright claim for failure to identify the works subject to the claim); *see also Plunket v. Doyle*, No. 99 Civ. 11006, 2001 WL 175252, at *4 (S.D.N.Y. Feb. 22, 2001) (same); *N. Am. Thought Combine, Inc. v. Kelly*, No. 01 Civ. 8112, 2003 WL 355237, at *2 (S.D.N.Y. Feb. 18, 2003) (same). Although the Libraries have not challenged the sufficiency of Plaintiffs' **pleadings** for the **Identified Works**, Plaintiffs have not satisfied their *prima facie* burden of **proof of infringement** for all of the Identified Works.[16]

### A.     Unregistered Works By Foreign Authors.

Plaintiffs have not met their burden of proving that they hold the copyrights in the unregistered Identified Works written by foreign authors. First, without a U.S. copyright registration, there is not any *prima facie* evidence that the authors hold the copyright. 17 U.S.C. § 410(c). Second, as Plaintiffs have pointed out, the question of whether a foreign author is the legal or beneficial copyright holder is governed by foreign law. (Pls.' Br. at 10.) Plaintiffs have not submitted any legal authority explaining how the copyright laws operate in these countries, and they cannot satisfy their burden with conclusory declaration statements. *See Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92-93 (2d Cir. 1998).

Moreover, these foreign-authored works are exempt from the registration requirement **only** if they do not qualify as "United States works." A "United States work" is defined in the Copyright Act as a work first published:

(a)     in the United States;

---

[15] At the time Plaintiffs filed their First Amended Complaint, they were aware (or should have been aware through a simple search on the HathiTrust website) that these additional works were included in the HDL.

[16] Although the additional works Plaintiffs seek to inject through their summary judgment motion are not properly before the Court because Plaintiffs failed to plead them, Plaintiffs also have not satisfied their *prima facie* burden of proof of infringement for all of these works.

> (b)     simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;
>
> (c)     simultaneously in the United States and a foreign nation that is not a treaty party; or
>
> (d)     in a foreign nation that is not a treaty party, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States;

17 U.S.C. § 101. Plaintiffs have not even attempted to establish that each Identified Work without a U.S. copyright registration is not a "United States work." As a result, Plaintiffs have failed to establish a *prima facie* case of copyright infringement for these works.

## B.     The Unidentified Works.

Plaintiffs also contend that they are entitled to bring claims on behalf of tens of thousands of unidentified member authors with respect to hundreds of thousands of unidentified works. As the Libraries explained in their pending Motion for Judgment on the Pleadings, the Court should dismiss these works from the case because Plaintiffs are not the legal or beneficial copyright holder, and thus they lack statutory standing under Section 501(b) of the Copyright Act. Plaintiffs also have not satisfied the constitutional and prudential requirements for standing, which are summarized in the three-part test set forth in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977).

Recognizing they are on quicksand, Plaintiffs have not moved for summary judgment that these unknown works were infringed, arguing instead that the Court should address these works at the remedy stage. (Pls.' Br. at 10.) This is absurd. Plaintiffs' inability to make out a *prima facie* case—even for all of the cherry-picked works identified in the First Amended Complaint—merely highlights the inappropriateness of Plaintiffs' novel attempt to prove copyright infringement of unidentified authors of unidentified works.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied.

DATED:  July 20, 2012
        New York, New York

Respectfully Submitted,

Joseph Petersen (JP-9071)
Robert Potter (RP 5757)
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800
Email: jpetersen@kilpatricktownsend.com

Joseph M. Beck (admitted *pro hac vice*)
W. Andrew Pequignot (admitted *pro hac vice*)
Allison Scott Roach (admitted *pro hac vice*)
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: jbeck@kilpatricktownsend.com

*Attorneys for Defendants*

25