UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
THE AUTHORS GUILD, INC., et al.,

      Plaintiffs,                                 Index No. 11 Civ. 6351 (HB)

  - against -

HATHITRUST, et al.,

      Defendants.
------------------------------------------------------------X

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

FRANKFURT KURNIT KLEIN & SELZ, P.C.
Edward H. Rosenthal
Jeremy S. Goldman
Adam Nelson (Law Student)
488 Madison Avenue
New York, New York 10022
Tel.: (212) 980-0120
Fax: (212) 593-9175
erosenthal@fkks.com
jgoldman@fkks.com
anelson@fkks.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT..................................................................................................................................2

I. Fair Use Precedent Does Not Support Defendants' Mass Digitization Program..................................................................................................................2

II. Plaintiffs Have Shown A Likelihood Of Harm ..................................................................4

III. Section 108 Does Not Authorize Mass Digitization Or The Orphan Works Project ................5

IV. Plaintiffs Have Established Prima Facie Copyright Infringement ...........................................7

V. Neither The Americans With Disabilities Act Nor Copyright Law Authorizes The Use Of The HDL For The Blind..................................................................................9

CONCLUSION..............................................................................................................................10

## TABLE OF AUTHORITIES

Page

### CASES

*A&M Records, Inc. v. Napster, Inc.*,
  284 F.3d 1091 (9th Cir. 2002) ...................................................................................9

*Am. Geophysical Union v. Texaco, Inc.*,
  60 F.3d 913 (2d Cir. 1994) .........................................................................................4

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) .......................................................................................3

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) .......................................................................................3

*Campbell v. Acuff Rose Music, Inc.*,
  510 U.S. 574 (1994)) ..................................................................................................4

*Davis v. The Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001) .......................................................................................4

*Encyclopaedia Britannica Corp. v. Crooks*,
  542 F. Supp. 1156, 1187 (W.D.N.Y. 1982) ...............................................................7

*Field v. Google Inc.*,
  412 F. Supp. 2d 1106 (D. Nev. 2006) ........................................................................2

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985) ...................................................................................................1

*Hofheinz v. Discovery Commuc'ns, Inc.*,
  No. 00 Civ. 3802, 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001) ..............................3

*Infinity Broad. Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998) .......................................................................................5

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
  153 F.3d 82 (2d Cir. 1998) .........................................................................................8

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) ......................................................................................2

*NXIVM Corp. v. Ross Inst.*,
  364 F.3d 471 (2d Cir. 2004) .......................................................................................3

*Ortho-O-Vision, Inc. v. HBO*,
   474 F. Supp. 672 (S.D.N.Y. 1979) ......................................................................................... 7

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ............................................................................................... 2

*Sega Enters. Ltd. v. Accolade, Inc.*,
   977 F.2d 1510 n. 5 (9th Cir. 1993) ........................................................................................ 3

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
   203 F.3d 596 (9th Cir. 2000) ................................................................................................. 3

In essence, Defendants' argument is that the number of books they sought to digitize is so breathtakingly large that they could not possibly have afforded the time, effort or money required to determine whether the copying of any particular book was permissible, and that it would have been prohibitively expensive to pay to license the right to digitize all of the books in the HathiTrust Digital Library ("HDL"). This argument turns copyright law on its head, suggesting that if the scope of an appropriation is large enough, the unauthorized use is justified. Defendants contend that authors are wrong to expect the libraries to pay to make digital copies of their copyrighted books, claiming the libraries' uses are transformative. However, making an archival copy of a book to be discovered and read later plainly does not transform the book's original purpose of being discovered and read.

Recognizing the non-transformative nature of the HDL itself, Defendants instead focus on the benefits that the HathiTrust provides to its end users. But "[a]ny copyright infringer may claim to benefit the public by increasing public access to the copyrighted work." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 569 (1985) (holding that the *Nation*'s publication of a description of a pivotal moment in American history – the pardon by President Ford of former President Nixon – was not fair use). Thus, while a musicologist surely would benefit from instantaneous, free access to a database of millions of sound recordings, fair use does not permit file sharing services like Napster or MP3.com. And while a scientist could claim similar value from having more convenient and free access to scientific journals, courts have held that copies of such works must be paid for. Plaintiffs acknowledge that the issues raised by orphan works and how to make more books available to people with print disabilities are important, but current copyright law defines when copies of copyrighted books may be made, who may make them, and the formats in which they may be made. Defendants' use of Plaintiffs' copyrighted books violates those rules and must be enjoined.

## ARGUMENT

## I. FAIR USE PRECEDENT DOES NOT SUPPORT DEFENDANTS' MASS DIGITIZATION PROGRAM

None of the cases upon which Defendants or Intervenors rely support the unprecedented mass digitization and permanent storage of millions of copyrighted books.

**Search Engine Cases.** In the three search engine cases from the Ninth Circuit, it was held that a search engine does not commit copyright infringement by copying Web pages for the purpose of creating a search index that simply points users to the location of an image or other file previously posted on the Internet.[1] Here, in contrast, the millions of print books copied by Google and Defendants were not already available on the Internet, but were offline and accessible only if purchased or borrowed from a library. By scanning the books without authority, Defendants usurp authors' rights to control the digital reproduction of their work and expose them to security risks that previously did not exist. Moreover, unlike HathiTrust's perpetual storage of high resolution image files and text files of every book, the Web pages copied by a search engine are incidental to the search function. As noted by one court, after copying full size images onto its server for the purpose of creating "thumbnails," the search engine deleted the original copy from its server. *See Kelly*, 336 F.3d at 815. Thus, even if this Court joins the Ninth Circuit in holding that the creation of a search index can be transformative, the permanent storage of the indexed books is not.

**Reverse Engineering Cases.** In the two reverse engineering cases cited by Defendants and Intervenors, the courts held that fair use permits a software company to create an "intermediate copy" of an entire software program for the purpose of extracting the non-

---

[1] *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003); *Field v. Google Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006).

protectible elements to develop a new, non-infringing work.[2] These cases are plainly inapposite, as the copies stored by HathiTrust are the exact opposite of "intermediate" – they are retained for the very purpose of preserving them for "future discovery, reading and learning[.]" Def. Opp. at 2. See Wilkin Decl. ¶ 54 (HathiTrust serves "our common goals of collecting, organizing, securing, preserving and, consistent with applicable law, sharing the record of human knowledge").

**"Different Purpose" Cases.** Each of the Second Circuit cases cited by Defendants exemplifies quintessential fair use – where a secondary user takes a limited portion of copyrighted material and incorporates it into a new expressive work that serves a "purpose separate and distinct from the original."[3] See Bill Graham, 448 F.3d at 609-10 (seven images of event posters and tickets reduced to thumbnail size and incorporated along with 2000 other images in a 480-page biography of the Grateful Dead); Blanch, 467 F.3d at 253 (magazine photograph of woman's sandal-clad legs altered and incorporated by artist into painting "as fodder for his commentary on the social and aesthetic consequences of mass media"); NXIVM, 364 F.3d at 477 (excerpts of manual quoted by website for purpose of criticizing business seminar as a form of mind control); Hofheinz, 2001 WL 1111970, at *2 (three clips from alien invasion film totaling 48 seconds incorporated into hour-long documentary exploring the alien visitation genre). In stark contrast, Defendants copy millions of books in their entirety, without commenting on them or creating any new expressive work, and do so primarily for "future

---

[2] See Sega Enters. Ltd. v. Accolade, Inc., 977 F.2d 1510 (9th Cir. 1993); Sony Computer Entm't, Inc. v. Connectix Corp., 203 F.3d 596 (9th Cir. 2000).

[3] Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605 (2d Cir. 2006); see Blanch v. Koons, 467 F.3d 244 (2d Cir. 2006); NXIVM Corp. v. Ross Inst., 364 F.3d 471 (2d Cir. 2004); Hofheinz v. Discovery Commuc'ns, Inc., No. 00 Civ. 3802, 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001).

retrieval and reference." *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 919 (2d Cir. 1994).

## II. PLAINTIFFS HAVE SHOWN A LIKELIHOOD OF HARM

Stripped of all of the rhetoric, Defendants' argument on the fourth (market harm) factor comes down to the disturbing notion that the number of books in the HDL is so voluminous that a licensing scheme could never emerge. Put another way, Defendants argue that since they took more than they ever could afford, they should not have to pay anything at all. Had Defendants decided to copy a particular category of works (*e.g.*, a set of scientific journals, or books from a specific country), they could have entered into a license permitting such use. The fact that Defendants chose to copy everything should not be grounds for them to do it for free.[4]

Defendants claim that authors are not entitled to a license fee for the digital copies of the books the libraries created because their use is purportedly transformative. But Defendants' use is not transformative because the secondary use (digitizing books for collection, discovery and preservation) merely supersedes the original (buying books for collection, discovery and preservation), serving as a market substitute. Under this circumstance, it is likely that "cognizable [actual] market harm to the original will occur." *Davis v. The Gap, Inc.*, 246 F.3d 152, 176 (2d Cir. 2001) (quoting *Campbell v. Acuff Rose Music, Inc.*, 510 U.S. 574, 591 (1994)).

In any event, Plaintiffs, in the declarations they have submitted in connection with this motion, have shown both actual and potential market harm. During his deposition, Plaintiff and

---

[4] Defendants mischaracterize the testimony of the witness from the Copyright Clearance Center ("CCC") when they state that the CCC does not offer licenses for the various uses claimed by Defendants, such as text searching. Waldfogel Decl. ¶ 17. What the witness actually said is that the CCC enters into licenses for the digitization and reproduction, and does not control the way the licensee then uses the licensed material. *See* Haber Tr. 19:7-13.

Pulitzer winner T.J. Stiles addressed Defendants' claim that, in essence, says that "now that we've illegally made a copy of your book, what harm is it to you how we use it?" as follows:

> You shouldn't have it in the first place. It's like saying now that I've stolen your baseball, what harm is it to you that we go and play a ballgame with it? Well, you've taken it from me. Even worse, I sell these products for a living . . . . [Y]ou're stealing off my baseball cart and saying, well, hey, now that I've got it, why can't I play a ballgame? Why can't I play catch? What harm is it to you; you're not playing with it. But that's my livelihood. I sell these things. I make them for sale. . . . So we begin with an act of theft.

Stiles Tr. 180:10-181:5.

Defendants give short shrift to Plaintiffs' profound concerns over security, ignoring the continuing and widespread reports of security breaches at university libraries and major corporations. Despite acknowledging that "online books can never be entirely secure on the Internet," Def. Opp. at 15, they expect Plaintiffs to trust that the libraries' security protocols are adequate to protect their unprecedented collection of digitized books without any accountability in the event of a breach. *See* Second Aiken Decl. ¶¶ 15-20 (describing importance of security protocols and accountability in Google Books settlement). This is especially troubling given the sovereign immunity of most Defendants.[5]

### III. SECTION 108 DOES NOT AUTHORIZE MASS DIGITIZATION OR THE ORPHAN WORKS PROJECT

Defendants have the burden of proving their affirmative defense that Section 108 permits the libraries' unauthorized use of the copyrighted works. Answer at 23 ¶ K. *See Infinity Broad.*

---

[5] Defendants' strained argument that Plaintiffs should not complain about the HDL's search function because some authors permit Amazon to allow searches within their works is addressed in Plaintiffs' brief in support of their motion for summary judgment at p. 27. Defendants do not seem to comprehend that there is a world of difference between licensing a particular use as part of an agreement that includes compensation, accountability and other benefits to the author, and having the HDL take and use what it wants without permission and for free.

*Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998) (burden of proving affirmative defense to claim of copyright infringement is on its proponent). Defendants have failed to prove that *any* of the books digitized as part of the Google Library Project were copied in accordance with the procedures or conditions set forth in Section 108.

Among other things, the evidence shows:

- Defendants authorized Google to retain digital copies of the books for its own commercial purposes in violation of Section 108(a)(1)'s prohibition against making copies for an "indirect commercial advantage." UF 65-72.

- Only published works were digitized as part of the Google Library Project, thus foreclosing Defendants from relying on Section 108(b). UF 154-155; Clancy Tr. 45:3-46:8 (head of Google Books project testifying he is unaware of any unpublished books that are in the database).

- No book was digitized as part of the Google Library Project "solely for the purpose of replacement of a copy" that was "damaged, deteriorating, lost, or stolen," as the physical condition of the book was not a factor in the selection process, thus precluding Defendants from relying on Section 108(c). UF 29-43.

- No book was digitized as part of the Google Library Project upon the library having, "after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price," thus precluding Defendants from relying on Section 108(c). UF 29-43.

- HathiTrust retains four digital copies of every book digitized and Google keeps another, in violation of Section 108(c)'s three-copy limitation. UF 51, 86.

- HathiTrust grants "privileged access" to the HDL to at least 93 people located throughout the country, in violation of Section 108(c)(2)'s prohibition against making digital copies available to the public outside the premises of the library. UF 100-101.

The libraries' claim that their preservation goals warrant the pre-emptive digitization of the books in their collections reads Section 108 out of the Copyright Act. Def. Opp. at 20-21. When Congress enacted Section 108, books were equally at risk of destruction from the use of acidic paper and unforeseeable disasters. Yet, Congress declined to grant libraries the right to

engage in "generalized preservation activities,"[6] instead opting for a system that carefully balances the interests of libraries with the interests of authors who make a living in part by selling books to libraries. The HDL, if permitted to proceed, would upset this balance.

It is not at all surprising that Defendants more or less walk away from the Orphan Works Project ("OWP"), relegating this once major initiative to a couple of paragraphs, and, remarkably, repeating their proposal that they be permitted to file a brief defending the legality of the OWP at some later time. Def. Opp. at 17-18. Defendants have no justification for a program that makes copyrighted works fully available for view and download.[7]

## IV. PLAINTIFFS HAVE ESTABLISHED PRIMA FACIE COPYRIGHT INFRINGEMENT

Defendants allege that Plaintiffs have not established various categories of copyright ownership. First, they claim that the Court should not consider the 55 infringed books that Plaintiffs identified during discovery in addition to the 61 that were listed in the First Amended Complaint. Def. Opp. at 22-23. However, Plaintiffs identified these 55 works months ago in direct response to Defendants' First Set of Interrogatories. *See* Rosenthal Decl. Exs. 47, 53, 56, 65.[8]

---

[6] *Recommendation of the Register of Copyrights in RM 2002-4* (Oct. 27, 2003) 52, *at* http://www.copyright.gov/1201/docs/registers-recommendation.pdf ("2003 Register Report").

[7] Defendants' attempt to pigeonhole the Orphan Works Project into Section 108(e) remains unpersuasive for the reasons discussed in Plaintiffs' prior submissions. *See* MJP Reply at 11-12; Pl. Opp. Mem. at 19. Defendants' new attempt to rely on Section 108(h) to defend the OWP is puzzling. To the extent an orphan work is in the last twenty years of its copyright term and the libraries follow the other requirements of Section 108(h), Plaintiffs would not object to its use and the injunction could be crafted accordingly.

[8] In any event, courts have the power to issue injunctions that extend to works that are not identified in the lawsuit. *See Encyclopaedia Britannica Corp. v. Crooks*, 542 F. Supp. 1156, 1187 (W.D.N.Y. 1982) (granting injunction encompassing 126 of plaintiffs' videotapes in addition to the 19 films involved in the suit); *Ortho-O-Vision, Inc. v. HBO*, 474 F. Supp. 672, 685-86 (S.D.N.Y. 1979) (enjoining infringement of HBO's future registered works).

Defendants also complain that Plaintiffs submitted no legal authority to explain how each foreign country's law establishes the foreign authors' copyrights in the Infringed Books. This is easily resolved, as copyright vests initially in the author under the relevant foreign laws.[9] With respect to the Associational Plaintiffs in Canada and Australia that own copyrights which were bequeathed to them, the relevant laws permit the assignment of copyrights.[10] Defendants' claim that Plaintiffs did not prove the foreign works are not "United States works" is incorrect because each foreign Plaintiff submitted a sworn interrogatory response identifying the country in which each foreign work was first published. *See* Rosenthal Decl., Schedule A to Exs. 11, 19, 22, 26, 29, 40, 46, 56, 65. Defendants submit no contrary evidence.

Finally, Defendants challenge Plaintiffs' ability to obtain an injunction that extends to the works of the members of the Associational Plaintiffs, arguing it is improper to address these works at the remedy stage. Def. Opp. at 24. Yet, in *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82 (2d Cir. 1998), the Second Circuit sanctioned precisely this approach. In that case, the district court ruled that the Union of Journalists of Russia ("UJR") had standing to bring copyright infringement claims on behalf of its members, but that "since UJR declined to furnish a list of its members, the Court was unable to frame an injunction that would be narrowly tailored and sufficient to give defendants notice of its scope." *Id.* at 94. The Second Circuit held that despite the association's "unwillingness to disclose its entire membership list, it might be possible to frame some form of injunctive relief that affords protection for those author-members that UJR is willing to identify." *Id.* Here, each of the Associational Plaintiffs produced in a

---

[9] *See* Canadian Copyright Act, R.S., c. C-43, § 13(1); U.K. Copyright, Designs and Patents Act 1988 CHAPTER 48, § 11(1); Swedish Copyright Legislation Act 1960:729, Ch. 1, Art. 1(1)); Norwegian Copyright Act, Chapter 1 § 1; Australian Copyright Act of 1968 § 35(2).

[10] *See* Canadian Copyright Act R.S., § C-43, s. 13(6); Australian Copyright Act of 1968 § 196(1).

8

discovery a list of its members, which is more than the court in *Itar-Tass* had available to fashion an injunction that extends to the members' works. *See* Declaration of Jeremy S. Goldman dated July 27, 2012, Exs. A1-A7; *see also A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1096 (9th Cir. 2002) (describing injunction phase in which parties ordered to collaborate to identify infringing files for removal from database).

## V. NEITHER THE AMERICANS WITH DISABILITIES ACT NOR COPYRIGHT LAW AUTHORIZES THE USE OF THE HDL FOR THE BLIND

Intervenors incorrectly argue that Plaintiffs have not addressed their affirmative defenses. Plaintiffs' motion for partial judgment on the pleadings, as well as their opposition to Defendants' and Intervenors' motions for summary judgment, meticulously addressed the affirmative defenses relating to the use of the HDL by the blind, including the defenses arising under the Chafee Amendment and the Americans with Disabilities Act ("ADA"). *See* MJP Reply (Dkt. 67) at 12-14; Pl. Opp. Mem. (Dkt. 135) at 20-24. Specifically, Plaintiffs explained how the Chafee Amendment, 17 U.S.C. § 121, which was the product of a compromise struck between groups representing the blind (including the NFB) and rightsholders, permits a "very narrow definition" of "authorized entities" – meaning a "handful" of non-profit organizations with a "primary mission" to serve the blind – to reproduce copyrighted works in a "specialized format for use exclusively for the blind." Pl. Opp. Mem. 20-22. In other words, it defines *who* may make the copies and in *what* format the copies may be made.

Plaintiffs further explained that the "very narrow definition" of "authorized entities" set forth in the Chafee Amendment cannot reasonably be interpreted to include every entity that is covered by the ADA, because this would have the absurd result of turning every public entity and place of "public accommodation" into an authorized entity with a "primary mission" of serving the blind. Plaintiffs showed that the HDL does not comply with the conditions of

9

Section 121 because the Defendant libraries are not "authorized entities" and because the digitized books stored in the HDL are not in a "specialized format" but comprise image and text files accessible to people with and without sight. Finally, Plaintiffs demonstrated that while fair use has been invoked to make a single copy of a single work in response to a request by a single blind person, Intervenors provide no support for the alarming proposition that fair use permits a library to preemptively digitize, store and provide access to millions of copyrighted books without permission, much less that the ADA *compels* a library to do so when presented with the opportunity.

## CONCLUSION

The creative output of Plaintiffs and millions of other writers fill the shelves of the Defendant libraries. Without authors, there would be no books, no libraries and no HathiTrust. For the foregoing reasons and the reasons set forth in Plaintiffs' prior submissions, Defendants' mass digitization and orphan works projects are not protected as fair use nor under any other provision of the copyright law. The Court should enter summary judgment in favor of Plaintiffs.

Dated:  New York, New York
        July 27, 2012

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By: /s/ Edward H. Rosenthal
    Edward H. Rosenthal
    Jeremy S. Goldman

488 Madison Avenue
New York, New York  10022
Tel.: (212) 980-0120
Fax: (212) 593-9175
erosenthal@fkks.com
jgoldman@fkks.com

*Attorneys for Plaintiff*