**KILPATRICK TOWNSEND & STOCKTON LLP**
Joseph Petersen (JP 9071)
Robert Potter (RP 5757)
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800
Email: jpetersen@kilpatricktownsend.com

Joseph M. Beck (admitted *pro hac vice*)
W. Andrew Pequignot (admitted *pro hac vice*)
Allison Scott Roach (admitted *pro hac vice*)
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: jbeck@kilpatricktownsend.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE AUTHORS GUILD, INC., ET AL.,<br><br>                Plaintiffs,<br><br>    v.<br><br>HATHITRUST, ET AL.,<br><br>                Defendants. | Case No. 11 Civ. 6351 (HB) |

**REPLY MEMORANDUM IN SUPPORT OF**
**THE LIBRARIES' MOTION FOR SUMMARY JUDGMENT**
**ON FAIR USE AND LACK OF INFRINGEMENT**
<u>**UNDER SECTION 106 OF THE COPYRIGHT ACT**</u>

**TABLE OF CONTENTS**

I.   The Court Need Not, and Should Not, Await Hypothetical Legislation. ..........................1

II.  The Libraries' Uses Are Fair as a Matter of Law. ............................................................2

    A.   The Purpose and Character of the Libraries' Uses Favor Fair Use. ........................2

    B.   The Nature of the Works Favors Fair Use. ..............................................................3

    C.   The Amount Used is Appropriate. ............................................................................4

    D.   Plaintiffs Have Not Demonstrated Any Cognizable Market Harm. ........................5

III. The Orphan Works Project. ...............................................................................................6

IV.  The Libraries Uses for the Blind are Permitted Under Section 121. ..................................8

**TABLE OF AUTHORITIES**

**Cases**

*American Geophysical Union v. Texaco, Inc.*,
    60 F.3d 913 (2d Cir. 1994) .................................................................................... 1, 2, 3

*Authors Guild v. Google, Inc.*,
    770 F. Supp. 2d 666 (S.D.N.Y. 2011) ............................................................................ 2

*Basic Books Inc. v. Kinko's Graphics Corp.*,
    758 F. Supp. 1522 (S.D.N.Y. 1999) ............................................................................... 3

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006) ................................................................................... 3, 4, 8

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006) ........................................................................................... 3

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ................................................................................................... 4, 5

*Capital Cities Cable, Inc. v. Crisp*,
    467 U.S. 691 (1984) ........................................................................................................ 1

*Fortnightly Corp. v. United Artists Television, Inc.*,
    392 U.S. 390 (1968) ........................................................................................................ 1

*Hofheinz v. Discovery Commc'ns, Inc.*,
    No. 00 Civ. 3802, 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001) ...................................... 2

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ........................................................................................... 8

*Law Debenture Trust Co. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010) ............................................................................................ 6

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471 (2d Cir. 2004) ............................................................................................ 2

*Sony Corporation of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) .................................................................................................... 1, 5

*The Authors Guild, Inc. v. Google Inc.*,
    No. 05-cv-8136 (S.D.N.Y. Oct. 28, 2008) ........................................................................ 4

*UMG Recordings, Inc. v. MP3.com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) ................................................................................. 3

**Other Authorities**

142 Cong. Rec. 19,674 (1996) ............................................................................................. 9

I.     **The Court Need Not, and Should Not, Await Hypothetical Legislation.**

Plaintiffs continue to ask this Court to wait for Congress to legislate, citing *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417, 431 (1984). This is curious. For although in *Sony*, Congress had not yet addressed a "new technology"—videotape recorders—both the district court and the Supreme Court found ample Congressional authority to sanction their sale under 17 U.S.C. § 107 as fair use. Plaintiffs actually quote *Sony*: "Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials." (Pls.' Opp'n at 2-3.) They fail to acknowledge, however, that this language was aimed at movie studio **rights holders**—akin to Plaintiffs here—instructing them that their only remedy was to convince Congress to rewrite and restrict the traditionally expansive and flexible fair use doctrine.

Where, as here, Congress has not spoken,[1] courts should "take the Copyright Act . . . as [they] find it," *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 401 (1968) (finding new technology did not infringe copyright holders' rights), rather than close off publicly beneficial uses made possible by a new technology.[2] Even *Texaco*, relied on so heavily by Plaintiffs, recognized that courts are obliged to apply the traditional fair use analysis, even though Congress had provided scant guidance on the "new" technology of photocopying. *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 917 (2d Cir. 1994). Until Congress acts, if ever, Section 107 controls.[3]

---

[1] Plaintiffs reargue that Section 108 provides for the only library uses Congress allows. But this is counter to the express language of Section 108 and Plaintiffs have not presented any arguments that were not already rebutted in the Libraries' Opposition to Plaintiffs' Motion for Partial Judgment on the Pleadings (pp. 2-7).

[2] *Fortnightly* prompted rights holders to secure a change in the law when the 1976 Copyright Act was enacted. *See Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 709 (1984) (recognizing *Fortnightly* was superseded by statute).

[3] Judge Chin deferred to Congress in rejecting the Google Books settlement because it involved a forward-looking "opt-out" class action settlement that would have permitted commercial uses of entire texts and that also raised

II.     **The Libraries' Uses Are Fair as a Matter of Law.**

    A.     **The Purpose and Character of the Libraries' Uses Favor Fair Use.**

The Libraries do not contend, as Plaintiffs suggest, that merely because a use falls within Section 107's favored examples, it is automatically a fair use. (Pls.' Opp'n at 5.) But these Congressionally-sanctioned purposes of "research," "teaching," and "scholarship" clearly are favored **under factor one**, and immediately and forcefully push the calculus in favor of fair use. *See Hofheinz v. Discovery Commc'ns, Inc.*, No. 00 Civ. 3802, 2001 WL 1111970, at *3 (S.D.N.Y. Sept. 20, 2001) (Baer, J.); *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004). Thus, at a minimum, the Libraries' uses are presumptively fair under factor one.

Plaintiffs cite *Texaco* to argue that the Libraries' "preservation" is not a fair use. (Pls.' Opp'n at 6.) But Texaco was circulating monthly journal issues and encouraging its employees to photocopy and "archive" the articles, or even the entire issue, for later reading. Texaco attempted to justify this later use—i.e., **reading the entire reproduced articles**—under fair use as a form of "preservation," but the court held that the predominant and real purpose of Texaco's copying was to supplant the need to purchase additional journal copies. *Texaco*, 60 F.3d at 919.

The purpose of the Libraries' preservation uses is not to make these scans available to be read—the original purpose of the books—unless and until there is an independent, lawful basis for doing so. For example, if a book is stolen, the Libraries may invoke Section 108(c) to replace the book—a right they could not exercise if the book had not been preserved digitally and was out of print (as are most in-copyright books) at the time a replacement was needed. The same purpose would be served if, for example, a flood damaged a library's only out-of-print copy. Preserving books also ensures that they still exist when they enter the public domain, which may

---

antitrust concerns. *See Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 677 (S.D.N.Y. 2011). Those issues are not present here.

2

be long after the books have gone out of print. Because preserving these books does not by itself allow anyone to read them (when the Libraries want additional copies to be read, they buy them), preservation does not, as with Texaco's use, supersede any existing use of the books. *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608-11 (2d Cir. 2006); *Blanch v. Koons*, 467 F.3d 244, 251-53 (2d Cir. 2006).

Plaintiffs argue that the Libraries' search index—which merely identifies the number of times a term appears on a page **but permits no reading**—is analogous to photocopying articles for reading, *Texaco*, 60 F.3d at 923; to the sale of coursepacks containing large excerpts, *Basic Books Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1530-31 (S.D.N.Y. 1999); and to a subscription music service providing access to entire sound recordings, *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000). Yet the difference between simply finding a potentially relevant book through search—but not allowing the book to be read (the Libraries' use)—and making available copies of entire songs to listen to them and of books to read them (Texaco's, Kinko's, and MP3.com's uses)—is obvious.

Plaintiffs also purport to quote "copyright scholars" for the proposition that indexing is a substitute for books. (Pls.' Opp'n at 7.) In fact, the language they quote is taken from an advocacy "statement of position" submitted by the Presidents of American Book Publishers Council, Inc. and American Textbook Publishers Institute, two for-profit trade associations. (Petersen Reply Decl. ¶ 2, Ex. A.) The "copyright scholars" are, in fact, interested industry participants that were merely lobbying for Plaintiffs' view of the law.

B.   **The Nature of the Works Favors Fair Use.**

Plaintiffs **do not dispute** that the majority of works in the HathiTrust Digital Library (the "HDL") are (1) published, (2) out of print, and (3) non-fiction. Each of these undisputed facts

3

favors fair use.[4] (Libraries' MSJ 17-19.) Moreover, as explained in the Libraries' Opposition (p. 7), the Libraries could not parse through millions of books to identify the small number that were in print and fictional—even if it made any sense to create an incomplete search index (and it would make no sense, obviously). And even for that small number of works that may be fiction and still in print, factor two offers minimal support for Plaintiffs' claims given the transformative nature of the uses. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994); *Bill Graham Archives*, 448 F.3d at 612.

### C. The Amount Used is Appropriate.

As in the "intermediate copying" cases (Libraries' MSJ at 20-21), a copy of the book had to be made to permit the use; and here that copy **must** be maintained to enable the current use, as well as future lawful uses.[5]

Plaintiffs attempt to sidestep the fact that HathiTrust search does not display any expressive elements from the scanned books by focusing on the "input" for the search index (in order to provide accurate search results, the entire work is included in the index). (Pls.' Opp'n at 9-10.) But the authority they cite for the "input view" addresses Section 106, not Section 107. The Libraries do not dispute that scanning an entire work may equate to a technical "reproduction" under Section 106, but a fair use of a copyrighted work is not an infringement.[6]

---

[4] That 76% of Plaintiffs' cherry-picked books for this litigation may be works of fiction **hardly refutes Plaintiff Authors Guild's admission that** "[a]pproximately 75% of the Books in United States libraries are out-of-print and have ceased earning any income at all for their Rightsholders." Mem. of Law in Supp. of Pls.' Mot. For Prelim. Settlement Approval at 27, *The Authors Guild, Inc. v. Google Inc.*, No. 05-cv-8136 (S.D.N.Y. Oct. 28, 2008).

[5] The Libraries create two files when they scan a book: (1) an image file and (2) a text file. (Wilkin Suppl. Decl. ¶ 2.) The image file shows the text as it appears in the book, thus preserving its integrity for replacement purposes. (*Id.* ¶ 3.) This file is then converted into searchable text using Optical Character Recognition (OCR) software. (*Id.* ¶ 2.) The OCR software is not flawless; the text file frequently contains typographical errors. (*Id.* ¶ 4.) As a result, the image file remains the authoritative representation of the printed book. (*Id.* ¶ 6.) Both the image file and the text file are offered to the print disabled because different disabilities may benefit from different formats. (*Id.* ¶¶ 7-8.)

[6] The three-decade-old statements in the CONTU Report as to the possible application of fair use are directed towards a database, unlike here, "providing access to the work" (pp. 39-40), and thus are factually distinguishable.

### D. Plaintiffs Have Not Demonstrated Any Cognizable Market Harm.

Plaintiffs previously acknowledged that they bear the initial burden of "showing by a preponderance of the evidence that some meaningful likelihood of future harm exists." (Pls.' MSJ at 21 (quoting *Sony*, 464 U.S. at 451).) Now, though, Plaintiffs attempt to retreat from that position, relying on *Campbell*. (Pls.' Opp'n at 12 n.9). But *Campbell*'s rejection of an evidentiary presumption under the fourth factor was limited to commercial uses, *see Campbell*, 510 U.S. at 591 (noting that the lower court had applied "a presumption about the effect of **commercial** use, a presumption which **as applied here** we hold to be error") (emphasis added), and thus did not upset *Sony*'s directive as to non-commercial uses.

Regardless, the Libraries have proved there is no cognizable fourth factor harm to any existing or potential market for Plaintiffs' works. In an unavailing effort to create a fact issue, Plaintiff T.J. Stiles invites the Libraries to take a license for a digital edition of his book (Pls.' Opp'n at 13)—but Stiles' license is for reading the text. Similarly, a CCC license that also authorizes copying for reading does not establish a market merely for preservation, search, and access to the print disabled. The Libraries do take ebook licenses, but those licenses are wholly insufficient for the Libraries' purposes, and the Libraries must, therefore, exercise their fair use rights in order to provide benefits for which no license is available.

Plaintiffs complain about possible security risks from HathiTrust that are equally if not more likely to occur as a result of Plaintiffs' own digital sales through Amazon. HathiTrust employs robust security measures and industry best practices to greatly reduce any possibility of unauthorized access (Snavely Decl. ¶ 14; Wilkin Decl.¶¶ 93-99), and the HDL has been certified as a trustworthy digital repository by the Center for Research Libraries through their rigorous assessment program (Snavely Decl. ¶ 9; Wilkin Decl. ¶ 91). Plaintiffs' reference to the HathiTrust Penetration Report, an internal evaluation to identify potential **enhancements** to

5

HathiTrust's security, is misleading. The overwhelming majority of the "risks" identified in the Report are not risks related **in any way** to unauthorized access to in-copyright material, and the prompt implementation of an outer firewall eliminated the few issues that presented a **theoretical and remote** possibility of unauthorized access to HDL content. (Snavely Decl. ¶ 22.)

Plaintiffs portray Dr. Waldfogel's report as predicated on the notion "that it is permissible to steal the goods if it is too expensive to buy them." (Pls.' Opp'n at 15.) But in order to buy something, there must be an existing market. There is no existing market **for the Libraries uses**, and one will never exist because the transaction costs are simply too high. (Waldfogel Decl. ¶ 44.) If Plaintiffs really believe the non-profit Libraries are in a position to pay for a project costing at least $569 million (Pls.' Opp'n at 16), they have a grossly exaggerated idea about the resources of colleges and universities. Without fair use, this market failure will cause the valuable uses afforded to the public by the HDL to disappear.

## III.   The Orphan Works Project.

Plaintiffs do not dispute that the proposed, but suspended, OWP **has not infringed a single right under Section 106** (because no orphan work was ever distributed, displayed, or performed); and the Libraries are entitled to summary judgment on this basis for the Libraries' activities to date. (Libraries' MSJ at 27.)

Plaintiffs entire argument assumes that the Libraries will make works available **in the future** through the OWP.[7] If the Court decides that the OWP is ripe for adjudication and is thus forced to deal in these hypotheticals, the only "facts" available to the Court are the Libraries' stated (and undisputed) intentions. If dealing in hypotheticals, the Court can only assume that the OWP would operate as contemplated.

---

[7] Because Plaintiffs' "Opposition" largely reargues their affirmative motion on the OWP, Plaintiffs should be reminded that the Court needs to draw all factual inferences in the Libraries' favor before it can grant Plaintiffs' motion. *See Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010).

Thus, the Court would need to assume that the "orphan work" being made available through the OWP would be a true orphan work, i.e., that no copyright holder would ever be found. The Court would also need to assume in the hypothetical only one copy of the orphan book, at the University of Michigan ("UM") library (the only school participating), and that because it was an orphan work, it was not available new for purchase and would not be republished, if at all, until it fell into the public domain. If Student A had checked out the one copy of that out-of-print orphan work in the library, then the only way that Student B, who also needed the same work for a paper due the next day, could complete his/her assignment would be to find Student A and go to his/her dorm room and take the book—or thanks to the OWP, read it online, one page at a time, with a copyright notice displayed on the computer screen.[8] The only available "facts"— assumptions based on the Libraries' undisputed, contemplated uses— demonstrate that the OWP would satisfy both Sections 107 and 108(e).

Such a clearly favored educational, research, and scholarly use under the preamble of Section 107 satisfies factor one (the purpose of the use); it also benefits the public because it makes possible a different use: reading by someone who would not otherwise have the opportunity to read the book. And of course, it is a noncommercial use under factor one. As for the second factor (nature of the work)—and again assuming all hypothetical material facts as contemplated by the OWP—by making available non-fiction, out-of-print works, the Libraries would engage in a favored second factor use. (Libraries' MSJ at 17-19.) And contrary to Plaintiffs' *ad hominem* treatment of the third factor (amount used), what would be "absurd" would be to make available online to that hapless Student B only a few sentences from the book. In other words, what would be made available someday if the OWP is revived would only be

---

[8] Regrettably, if there were only one copy of the book at Ann Arbor, and if a Student C also needed that same book, he/she would not be able to read it online at the same time as Student B—so modest and restrictive was the contemplated OWP.

what was appropriate, neutralizing the third factor. *See Bill Graham Archives*, 448 F.3d at 613; *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2003). As for the fourth factor (harm to the market), there plainly is no adverse market effect to a copyright holder who cannot be located and therefore could not authorize reprinting of his/her out-of-print book. In short, no copyright holder, means no possible reprinting of the out-of-print book, means no market effect when the scan was read by Student B.

As for Section 108(e), the Libraries' initial scans are lawful fair use under Section 107 (and in some cases under other sections of Section 108). The scans would only be made available as part of the OWP (if ever) once it was determined that an unused copy could not be obtained at a fair price; and they would only be distributed to the student, one page at a time, with copyright notice, upon that student's search request, **all exactly as provided** in Section 108(e).

## IV. The Libraries Uses for the Blind are Permitted Under Section 121.

The Libraries, acting through the HathiTrust service, are "authorized entities" under Section 121 (in the same way the Library of Congress acting through the National Library Service is an authorized entity). A "primary mission" of the HathiTrust is to provide access to the blind and other persons with disabilities. (Wilkin Decl. ¶¶ 100-106.) Indeed, Plaintiffs **admit** that "[o]ne of the primary goals of HathiTrust has always been to enable people who have print disabilities to access the wealth of information within library collections" and that HathiTrust "was designed specifically to enable libraries to make their collections accessible in digital format to print-disabled readers." (Pls.' Resp. to Undisputed Facts Nos. 58, 61; *see also* Petersen Reply Decl. ¶ 4, Ex. C at 4.) The fact that HathiTrust has to date only provided access to print-disabled students and faculty at the UM does not support Plaintiffs' argument that this is not a "primary" mission. After developing its pilot accessibility services at UM, HathiTrust aims to

8

provide similar specialized services to the blind and other persons with disabilities at other member institutions.[9]

The sixty-one individuals without print disabilities who have permission to access HDL content do not disqualify the Libraries as authorized entities. These individuals—IT staff, researchers making copyright determinations, OWP investigators, and UM staff performing quality review, digitization, and cataloging functions for the HDL—are granted limited administrative access for the performance of their duties. (Rosenthal Decl. ¶ 73, Ex. 71 (Interrogatory No. 2(l)); ¶ 77, Ex. 75 (Interrogatory No. 3(l)); ¶ 11, Ex. 9 (Wilkin Dep. 190:21-192:19).) These individuals are essential to the operation of the HathiTrust service (including the operation of specialized accessibility services for the blind and other people with disabilities), and make it possible for HathiTrust to provide accessibility services under Section 121. (*See* Second Suppl. Fruchterman Decl. ¶¶ 1-2 ("[I]f blind people could easily and automatically gain full access to printed books and graphics, they wouldn't need the help of sighted people to enter, proofread, format or describe such books to create accessible versions.").)

Plaintiffs' proposed interpretation of "specialized format" also would eviscerate Section 121. First, Plaintiffs assertion that electronic text is not a specialized format is simply wrong.[10] (Pls.' Opp'n at 22.) Second, the Libraries do not fall outside Section 121 because they provide image files to the print disabled. (*Id.*) The OCR text file that HathiTrust maintains (see note 5, *supra*) allows screen-readers and text-to-speech software to convert the text into an accessible format. (Wilkin Reply Decl. ¶¶ 7-8.) For print-disabled students whose disability allows them to

---

[9] (Rosenthal Decl. ¶ 11, Ex. 9 (Wilkin Dep. 217:8 - 218:7); Petersen Reply Decl. ¶ 3, Ex. B ("These [specialized access] mechanisms, which have been deployed at the University of Michigan, are sufficiently generalized to provide access at partner institutions . . . .").)

[10] Such an interpretation is the only one in which Section 121 can achieve its purposes of "end[ing] the unintended censorship of blind students' access to current information" and "permit[ting] the speedy access to information that blind people need." 142 Cong. Rec. 19,674 (1996) (Sen. Chafee's statement in which he describes "specialized formats" as including "new digital formats that can be used for special software.").

9

read an image file (enlarged or otherwise optimized for the student's disability), HathiTrust can provide access more equivalent to their sighted peers. (*Id.*) For example, the image file, in contrast to the text file, provides print-disabled students with access to graphs and illustrations that can be critically important in fields such as mathematics and physics. (*Id.*) The fact that sighted people may be able to use screen-readers and text-to-speech software does not make those formats any less "specialized" than would a Braille book be less "specialized" simply because it may be read by a sighted parent learning Braille alongside a blind child.

While Plaintiffs claim they did not bring this lawsuit to impede the access of the visually disabled to books (which is questionable given their deposition testimony),[11] that is exactly what would result from Plaintiffs' unnecessarily restrictive interpretation of copyright law.

| | |
|---|---|
| DATED: July 27, 2012<br>New York, New York | Respectfully Submitted,<br><br>/s/ Joseph Petersen<br>Joseph Petersen (JP 9071)<br>Robert Potter (RP 5757)<br>1114 Avenue of the Americas<br>New York, New York 10036<br>Telephone: (212) 775-8700<br>Facsimile: (212) 775-8800<br>Email: jpetersen@kilpatricktownsend.com<br><br>Joseph M. Beck (admitted *pro hac vice*)<br>W. Andrew Pequignot (admitted *pro hac vice*)<br>Allison Scott Roach (admitted *pro hac vice*)<br>KILPATRICK TOWNSEND & STOCKTON LLP<br>1100 Peachtree Street, Suite 2800<br>Atlanta, Georgia 30309-4530<br>Telephone: (404) 815-6500<br>Facsimile: (404) 815-6555<br>Email: jbeck@kilpatricktownsend.com<br><br>*Attorneys for Defendants* |

---

[11] (Petersen Decl. ¶ 22, Ex. U (Cummings Dep. 56:23-57:3, May 22, 2102: Q: "So, you do not believe the print disabled should have access to those works?" A: "No."); ¶ 23, Ex. V (Rønning Dep. 80:21-25, May 29, 2012: Q: "[Y]ou have no understanding of how a U.S. student . . . with a print disability would obtain access to your works." A: "No. Why should I?").)