IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
THE AUTHORS GUILD, INC., et al.,          :

    *Plaintiffs,*                                          :          Case No. 11-cv-6351(HB)

    v.                                                                :

HATHITRUST, et al.,                                  :

    *Defendants.*                                      :
---------------------------------------------------------------X

**DEFENDANT INTERVENORS' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Daniel F. Goldstein (admitted *pro hac vice*)
Laura Ginsberg Abelson (admitted *pro hac vice*)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street
Suite 1700
Baltimore, Maryland 21202
Telephone: 410-962-1030
Facsimile: 410-385-0869
dfg@browngold.com
labelson@browngold.com

Robert J. Bernstein (RB 4230)
THE LAW OFFICE OF ROBERT J. BERNSTEIN
380 Lexington Avenue, 17th Floor
New York, New York 10168
Telephone: 212-551-1068
Facsimile: 212-551-1001
rjb@robert-bernsteinlaw.com

Peter Jaszi (admitted *pro hac vice*)
5402 Surrey Street
Chevy Chase, Maryland 20815
Telephone: 301-656-1753
Facsimile: 301-656-7483
pjaszi@wcl.american.edu

*Counsel for National Federation of the Blind,
Georgina Kleege, Blair Seidlitz, and Courtney Wheeler*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................... 1

    I.      Section 121 does not deprive the blind of their long-standing fair use rights. .................................................................................................. 2

    II.     Plaintiffs' discussion of fair use does not justify denying blind students and scholars equal access to university library collections through the HDL or barring the digitization of those collections to provide such access. ..................................................................................... 3

           A.     The legislative history of § 107 supports equal access .............................. 3

           B.     Plaintiffs' discussion of the first factor is both factually and legally flawed ................................................................................. 4

           C.     Factor three favors fair use ......................................................... 5

           D.     Factor four favors fair use ........................................................... 6

    III.    In addition to fair use, § 121 independently supports the creation and use of the hdl as a source of accessible texts ..................................... 6

           A.     Because the HDL books are suitable to and made available only to qualified persons, they are in "specialized formats." ............... 7

           B.     The University Libraries are "authorized entities" because they are nonprofit or governmental organizations that have as a primary mission the reproduction and distribution of books in specialized format exclusively for use by the blind ............... 8

CONCLUSION ..................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**

*A.V. v. iParadigms*,
 544 F. Supp. 2d 473 (E.D. Va. 2008), *aff'd in part*,
 562 F.3d 630 (4th Cir. 2009) ................................................................................... 5

*Am. Geophysical Union v. Texaco, Inc.*,
 60 F.3d 913 (2d Cir. 1994), *cert. denied*, 516 U.S. 1005 (1995) ..................................... 2, 5

*City of New York v. Beretta U.S.A. Corp.*,
 429 F. Supp. 2d 517 (E.D.N.Y. 2006) ........................................................................... 2

*Harper & Row Publishers, Inc. v. Nation Enter.*,
 471 U.S. 539 (1985) ................................................................................................. 4

*Kelly v. Arriba Soft*,
 336 F.3d 811 (9th Cir. 2003) ................................................................................. 5, 6

*Kelly v. Arriba Soft*,
 77 F. Supp. 2d 1116 (C.D. Cal. 1999) ............................................................................ 5

*Peralta-Taveras v. Attorney Gen.*,
 488 F.3d 580 (2d Cir. 2007) ........................................................................................ 2

*S.E.C. v. Rosenthal*,
 650 F.3d 156 (2d Cir. 2011) ....................................................................................... 2

**Statutes**

17 U.S.C. § 107 ................................................................................................ 1, 3, 4

17 U.S.C. § 121 ................................................................................................ passim

**Other Authorities**

4 *Patry on Copyright* § 10.52 ................................................................................... 3

Marc Maurer, *Comments on the Topic of Facilitating Access to Copyrighted
 Works for the Blind or Persons with Other Disabilities*, 5 (Apr. 21, 2009),
 http://www.copyright.gov/docs/sccr/comments/2009/maurer.pdf ............................... 8

**Rules**

Rule 56 .................................................................................................................................. 6

**Legislative History**

142 Cong. Rec. S9066 (daily ed. July 29, 1996) ........................................................... 7, 9

*Copyright Law Revision*, House Rep. No. 94-1476 (1976) .......................................... 3, 4

**PRELIMINARY STATEMENT**

It is now unanimous. Plaintiffs have joined all Defendants in recognizing that there is a powerful public interest in accessibility for the blind.[1] To effectuate this critical public interest in equality, the revolutionary access provided by the HDL must be recognized for what it is: a use that is fair under 17 U.S.C. § 107 and lawful under 17 U.S.C. § 121.

Plaintiffs' acknowledgement of the public interest in affording the blind access to the HDL tips the first fair use factor irretrievably in favor of Defendant Intervenors (hereinafter "NFB"). So Plaintiffs attempt to take fair use out of the case by advancing an unfounded assertion that the Chafee Amendment ("Chafee" or "§ 121") preempts § 107. Plaintiffs offer no support for this new theory—one that posits Congress, in enacting § 121, hung a sign over the doctrine of fair use, which was designed to adapt to new circumstances and technologies, reading: "SIGHTED PEOPLE ONLY—THE BLIND NEED NOT APPLY." Barring the application of fair use to the blind would mean that if the Court found that text searching and data mining were fair uses for library patrons, these uses would nonetheless be denied to blind scholars. But the statutory language and legislative record is bereft of evidence that § 121 was designed to narrow the rights of the blind, and deprive them of those benefits the dynamic doctrine of fair use may confer over time on the sighted reading public.

Plaintiffs' attempt to address NFB's rights of fair use directly fares no better. Notably, Plaintiffs do not contest the undisputed facts detailing the great difficulty blind people have faced in accessing books for academic use.[2] Rather, Plaintiffs persist in relying on a single

---

[1] *See* Pls.' Opp'n to Defs.' and Def.-Intervenors' Summ. J. Mots. (hereinafter "Pls.' Opp'n") at 24 (conceding that "Defendants' uses for the blind admittedly serve a purpose that benefits society"); Second Decl. of Paul Aiken (hereinafter "Aiken Decl."), July 20, 2012, ¶ 3 ("The Guild (and authors generally) are strong advocates for making all books accessible to everyone.").
[2] *See* Pls.' Counter-Statement in Resp. to Def. Intervenors' Statement of Undisputed Facts at ¶¶ 8-14, 24-41.

distinguishable case,[3] while ignoring more recent pertinent cases addressing transformative use. Finally, Plaintiffs resort to an untenable reading of legislative history and an unsuccessful effort to establish market harm to the sales of large-print books. What remains at the end is a straightforward application of fair use: access to a trove of previously unavailable information for the blind and other individuals with print disabilities.

In addition to fair use, Chafee is an autonomous basis for granting judgment for NFB. Plaintiffs' crabbed interpretation of § 121 runs counter to the statute's plain meaning and creates absurd results not intended by Congress. This Court must reject Plaintiffs' overly narrow reading of Chafee because it threatens to curtail the civil rights of blind and thus fails "to promote the ends of justice."[4]

I.   **Section 121 does not deprive the blind of their long-standing fair use rights.**

Plaintiffs' argument that § 121 somehow preempts the field of copyright exceptions for the blind has no support in the plain language of § 121. Therefore, no additional statutory interpretation is necessary.[5] Furthermore, Plaintiffs' interpretation would bar the everyday occurrences that allow the blind access to printed information. For example, without fair use no employer could scan a relevant technical manual into an accessible format for use by a blind employee (including, even, the manufacturer's directions on how to use the office scanner). Likewise, without fair use a sighted parent could not record a book for her blind child to enjoy.

---

[3] *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1994), *cert. denied*, 516 U.S. 1005 (1995).
[4] *City of New York v. Beretta U.S.A. Corp.*, 429 F. Supp. 2d 517, 524 (E.D.N.Y. 2006) (observing that a "court may consider the language of [a] statute in light of broader congressional policies and Congress' awareness of its own responsibility to promote the ends of justice in the federal court system").
[5] *See Peralta-Taveras v. Attorney Gen.*, 488 F.3d 580, 584 (2d Cir. 2007) (noting that "where the statutory language provides a clear answer, [the inquiry] ends there") (internal quotation marks omitted).

2

Because statutes should be interpreted so as to avoid absurd results,[6] the relationship between § 121 and § 107 must be additive rather than substitutional.

Plaintiffs' argument is also contradicted by clear evidence that (1) Congress intended to reach accessibility when it incorporated fair use into the statute; and (2) § 121 was not intended to strip the blind of fair use rights, but to further enhance access.  Indeed, Congress enacted § 121 to provide a safe harbor for reproduction and distribution of texts to the blind.[7]

II.     **Plaintiffs' discussion of fair use does not justify denying blind students and scholars equal access to the HDL or barring digitization to provide such access.**

Plaintiffs do not acknowledge that relevant and governing fair use cases look to a use's ultimate purpose and then if that purpose is lawful, consider whether the copying is necessary or appropriate to accomplish that purpose.[8]  The inadequacy of the few other points Plaintiffs assert at pages 23 and 24 of their opposing memorandum (which constitutes the entirety of their specific response to the NFB's fair use arguments), is addressed below.

   A.   **The legislative history of § 107 supports equal access.**

At page 23 of their opposing memorandum, Plaintiffs misread § 107's legislative history, claiming that it limits fair use to "the making of a single copy or phonorecord by an individual as a free service for blind persons would properly be considered a fair use under section 107."[9] Here HDL ensures the ability of each student and scholar to locate and obtain *a single copy* of any work in the digitized collection so that she may conduct her education and research on an equal footing with the sighted.  The House Report contains no limitation regarding how that copy is to be made or the size of the corpus from which the copy is provided.  Nor should it matter

---

[6] *See S.E.C. v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011).
[7] *See* NFB's Memo. in Supp. of Summ. J. Mot. at 14; *see also* 4 *Patry on Copyright* § 10.52 ("Specific types of uses—Blind persons") at 10-155, 156.
[8] *See* NFB's Memo. in Supp. of Summ. J. Mot. at 18-22.
[9] Pls.' Opp'n at 23 (citing *Copyright Law Revision*, House Rep. No. 94-1476, at 73 (1976)).

how or by whom the copy derived from the HDL is delivered. The end use—providing timely access to a copy of a work that a blind student can read—is the same and remains a fair use within the intent of the House Report.

Moreover, as the House Report on § 107 also states: "[T]here is no disposition to freeze the doctrine [of fair use] in the statute, especially during a period of rapid technological change . . . . [T]he courts must be free to adapt the doctrine to particular situations on a case-by-case basis."[10] Thus, the example of fair use in the House Report does not limit what might later be considered a fair use for the purpose of accessibility. The digitization of entire library collections was likely beyond the collective consciousness of Congress in 1976; but providing broad judicial discretion to interpret and apply § 107 flexibly in light of technological change was foremost among legislative concerns, as explicitly set forth in the legislative history. The specific reference to free copies for the blind as exemplary of fair use, and the prescription to accommodate technological change leaves no room to doubt that using the HDL to provide equal access for the blind to academic materials is well within the intent of Congress in enacting § 107.

### B. Plaintiffs' discussion of the first factor is both factually and legally flawed.

Notwithstanding their admission that uses for the blind "serve a purpose that benefits society," Plaintiffs argue that these uses are not fair because they "exceed the allowances of Section 121" and constitute "an attempt to avoid paying the customary fee."[11] But Plaintiffs' attempted syllogism is flawed for two reasons: (i) § 121 does not limit § 107; and (ii) *there is no customary fee*. As the evidence clearly establishes,[12] there is no market of any significance for books for the blind, and even less commercial interest in the contents of university libraries that

---

[10] House Rep. No. 94-1476, at 65-66.
[11] Pls.' Opp'n at 24 (citing *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 562 (1985)).
[12] *See* NFB's Opp'n to Pls.' Summ. J. Mot. at 14.

are comprised of scholarly works. Therefore, under the reasoning of the "customary fee" quote from *Harper & Row*, cited by Plaintiffs, the absence of a customary fee favors fair use.

Transformative use is the watchword of contemporary fair use jurisprudence in the Second Circuit and beyond. As to NFB, Plaintiffs rely only on *Texaco*,[13] to suggest that "there is nothing transformative about converting the words on a printed page into digital text . . . ."[14] But for the blind, this is not a mere change of "medium," but a repurposing of the underlying works so that they can now be put into service for the entire community of scholars comprising a university and not just the sighted. It is this transformational repurposing that places the HDL squarely within the modern view of fair use.[15]

### C. Factor three favors fair use.

Plaintiffs' discussion of factor three—the amount and substantiality of the portion used—never discusses *iParadigms*, analyzed at length by the NFB, which stands for the principle that if a use has a lawful and socially beneficial purpose, copying necessary for that purpose, even if it runs to millions of documents is a fair use.[16]

Plaintiffs attempt, unsuccessfully, to distinguish *Kelly v. Arriba Soft*,[17] where the defendant created a database of two million photographs[18] for a lawful purpose (permitting users to research information about the photographs).[19] The court held that gathering full copies of the photographs from numerous websites and maintaining thumbnail versions of them on its website

---

[13] *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1994), *cert. denied*, 516 U.S. 1005 (1995).
[14] Pls.' Opp'n at 24.
[15] *See* NFB's Memo. in Supp. of Summ. J. Mot. at 18-22; NFB's Opp'n to Pls.' Summ. J. Mot. at 10-13.
[16] *See A.V. v. iParadigms*, 544 F. Supp. 2d 473, 478, 483-84 (E.D. Va. 2008), *aff'd in part*, 562 F.3d 630 (4th Cir. 2009).
[17] 336 F.3d 811 (9th Cir. 2003).
[18] *See* District Court opinion in *Arriba Soft,* 77 F. Supp. 2d 1116, 1117 (C.D. Cal. 1999).
[19] *Arriba Soft*, 336 F.3d at 818-20.

was fair use because the purpose of the use was lawful.[20]  Plaintiffs argue that because Arriba Soft deleted the full-sized images after it had collected them and placed thumbnail version in its database, that it is somehow improper for the HDL to maintain text and image files of its books.[21]  But the court specifically noted that retention of the full size copies was unnecessary to the research purpose for which users visited Arriba Soft's site.[22]  In contrast, it is essential that the HDL retain the text and image files so as to provide blind students and scholars with equal access to the contents of the university libraries.[23]

### D. Factor four favors fair use.

Plaintiffs make assertions regarding potential market harm that do not survive scrutiny or must be rejected for Plaintiffs' failures to comply with their discovery obligations and the requirements of Rule 56.  Plaintiffs never identified alleged harm to a "large-type book" market in their discovery responses.  Thus, no Defendant has had an opportunity to probe this belated assertion and these discovery violations are grounds to exclude consideration of any such harm.  In addition, Plaintiffs provide no acceptable factual support under Rule 56(c)(1)(A).  Instead, they merely quote unsubstantiated testimony by the Association of American Publishers before a House Subcommittee, which is not the kind of materials the Rule allows.   Finally, Plaintiffs' claim of harm to a large-print market is simply wrong as a matter of fact.[24]

### III. In addition to fair use, § 121 independently supports the creation and use of the HDL as a source of accessible texts.

Section 121 authorizes qualifying institutions to "*reproduce* or to *distribute*" copies for qualifying users" (emphasis added).  Because the libraries making up the HathiTrust are

---

[20] *Id.* at 818-22.
[21] Pls.' Opp'n at 12 (citing *Arriba Soft*, 336 F.3d at 815).
[22] *Arriba Soft*, 336 F.3d at 818, 821.
[23] *See* Supplemental Decl. of John Wilkin (hereinafter "Wilkin Supp. Decl."), July 26, 2012, ¶¶ 7-8.
[24] Decl. of Frederic K. Schroeder, July 23, 2012, ¶¶ 13, 19.

"authorized entities" under § 121, many of the ways in which its digital files can be provided to qualified blind and print-disabled students and scholars are statutorily authorized.[25]

### A.    Because the HDL books are suitable to and made available only to qualified persons, they are in "specialized formats."

Plaintiffs' complaint that the "digitized books stored in the HDL are not in 'specialized formats exclusively for use by the blind or other persons with disabilities'" misses the mark.[26] Although the quotation from § 121(a) is accurate, Plaintiffs' interpretation is not, in part because under the precisely-worded definition of "specialized formats" in § 121(d)(4)(A) the book scans stored in the HDL can be made available as e-books that the blind can read using specialized software, or for low vision individuals as image files. How material is stored in the HDL is irrelevant. Instead, the question is whether the material is made available only to qualified readers in formats that would allow them access to content they would not otherwise have.

Plaintiffs also suggest that "specialized formats" must be ones that only the blind use, thus eliminating from the statute every format but braille. However, § 121(d)(4)(A) states that a "specialized format" includes "audio, or digital text[.]" Indeed, Senator Chafee specifically mentioned "new digital formats that can be used for special software."[27] And, of course, the blind must use special software to access electronic texts—either text-to-speech software or magnification software or both. Plaintiffs' interpretation produces perverse results; it would disqualify not only digital texts, but audio recordings of books simply because it is also possible for sighted individuals to use them. Thus, § 121 anticipates that electronic book formats are "specialized" only in the sense that, unlike print books, they are appropriate for use by the blind.

---

[25] Even if the University Defendants were not authorized entities under § 121, the digitization of their libraries would still be permissible as a fair use, but an authorized entity, would have to be identified that had the capacity to distribute these digital books to the blind.
[26] Pls.' Opp'n at 22.
[27] 142 Cong. Rec. S9066 (daily ed. July 29, 1996) (statement of Sen. John H. Chafee).

Plaintiffs also attempt to argue that the scans are not "exclusively for use by the blind," because 61 sighted individuals have access to the HDL text and image files, even though they only enjoy "administrative rights" and not for expressive purposes.[28] At a practical level, ensuring that the content of a print book is accurately made accessible to a blind person requires, at least for now, that some sighted persons participate in the process.[29]

Plaintiffs read "digital text files" out of § 121 by over-reading the statutory exclusion of large-print books from "specialized formats," noting that digital files can be enlarged by low vision readers using screen magnification software. The legislative history demonstrates that the exclusion was intended only to protect hard copy, large print book market.[30] Of course, that a consumer can also enlarge an e-book, just as he can enlarge a print book with a magnifying glass, does not, as Plaintiffs suggest, take digital formats out of Chafee.

Plaintiffs incorrectly attribute to NFB's President, Marc Maurer, an assertion that there are "serious doubts" that § 121 applies to books in electronic formats.[31] Not so. Dr. Maurer noted that "questions" have been raised (primarily by publishers) about the interpretation of § 121, which he then answers with a reading of the statute that includes e-texts.[32]

> B. **The University Libraries are "authorized entities" because they are nonprofit or governmental organizations that have as a primary mission the reproduction and distribution of books in specialized format exclusively for use by the blind.**

NFB has previously argued that the meaning of the term "authorized entity" includes university libraries. As an exercise in hyperbole, Plaintiffs suggest that NFB's interpretation would automatically cover every entity subject to the ADA. Of course, many entities subject to

---

[28] *See* Dep. of John P. Wilkin, Apr. 25, 2012, at 190:21-192:19 (attached as exhibit to Pls.' Summ. J. Mot.).
[29] *See* Second Supplemental Decl. of James Fruchterman, July 24, 2012, at ¶¶ 1-2.
[30] Pls.' Opp'n at 24.
[31] Pls.' Opp'n at 22.
[32] Marc Maurer, *Comments on the Topic of Facilitating Access to Copyrighted Works for the Blind or Persons with Other Disabilities*, 5 (Apr. 21, 2009), http://www.copyright.gov/docs/sccr/comments/2009/maurer.pdf.

the ADA are neither nonprofits nor governmental agencies as Chafee requires. Moreover, most entities required to provide equal access to programs and activities, do not operate libraries and thus would not have "a primary mission" to provide access to library books. Moreover, a library that had not digitized its collection could assert an "undue burden," and therefore not have equal access as its primary mission. In short, NFB's proposed definition does not at present encompass any additional existing entities beyond the University Libraries participating through the HathiTrust. Even under the Plaintiffs' view of the scope of "authorized entity," any nonprofit or governmental entity could decide to undertake as a primary mission the activities encompassed by Chafee, because that is all the statute requires.[33] Plaintiffs' assertion that Congress intended the exemption to be narrower lacks a textual basis and boundaries as to how much narrower. Plaintiffs' suppositions should not exclude university libraries that have taken extensive steps over time to assure the highest possible levels of accessibility for blind students and scholars—including participation in the digitization project that led to the HDL.

      Plaintiffs' objections to the application of the Chafee Amendment are no barrier to the entry of summary judgment. Plaintiffs have offered no evidence to contradict the factual record, particularly the evidence that accessibility was a central objective behind the creation of the HDL.[34] Indeed, Plaintiffs agree that "[o]ne of the primary goals of the HathiTrust has always been to enable people who have print disabilities to access the wealth of information within library collections."[35]

---

[33] Plaintiffs insist that Senator Chafee suggested that there should only be a "handful" of "authorized entities," incorrectly citing 142 Cong. Rec. S. at 9764. He did not. *See* 142 Cong. Rec. S9066.
[34] *See* NFB's Opp'n to Pls.' Summ. J. Mot. at 4-5.
[35] Pls.' Counter-Statement in Resp. to Defs.' Statement of Undisputed Facts at ¶ 61. Plaintiffs also admit that the "HDL was designed specifically to enable libraries to make their collections accessible in digital format to print-disabled readers. *Id.* at ¶ 58.

At the end of the day, NFB is entitled to summary judgment because Plaintiffs lay claim to a property right not granted them by copyright law—to prevent the blind from having access to library collections.  While they disclaim an intent to prevent such access, they imply that it is theirs to grant or deny as a matter of grace.  It is not.

## CONCLUSION

For the reasons set forth above, and in NFB's opening memorandum of law, NFB's Motion for Summary Judgment should be granted.

Dated: July 27, 2012

        Respectfully submitted,

By:_____/s/_____
Daniel F. Goldstein (admitted pro hac vice)
Laura Ginsberg Abelson (admitted pro hac vice)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street
Suite 1700
Baltimore, Maryland 21202
Telephone:  410-962-1030
Facsimile:  410-385-0869
dfg@browngold.com
labelson@browngold.com

Robert J. Bernstein (RB 4230)
THE LAW OFFICE OF ROBERT J. BERNSTEIN
380 Lexington Avenue, 17th Floor
New York, NY 10168
Telephone: 212-551-1068
Facsimile:  212-551-1001
rjb@robert-bernsteinlaw.com

Peter Jaszi (admitted pro hac vice)
5402 Surrey Street
Chevy Chase, Maryland 20815
Telephone: 301-656-1753
Facsimile:  301-656-7483
pjaszi@wcl.american.edu

*Counsel for Defendant Intervenors*