C86QautC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    THE AUTHORS GUILD, INC. et al.

 4                  Plaintiffs

 5            v.                        11 CV 6351 (HB)

 6    HATHITRUST, et al.

 7                  Defendants

 8    ------------------------------x
                                      New York, N.Y.
 9                                    August 6 2012
                                      3:15 p.m.
10
      Before:
11                      HON. HAROLD BAER, JR.

12                                    District Judge

13                      APPEARANCES
      FRANKFURT KURNIT KLEIN & SELZ PC
14        Attorneys for Plaintiffs
      EDWARD H. ROSENTHAL
15    JEREMY S. GOLDMAN
      ADAM S. NELSON
16

17    KILPATRICK STOCKTON LLP
          Attorneys for Defendants HathiTrust et al
18    JOSEPH PETERSEN
      JOSEPH M. BECK
19    W. ANDREW PEQUIGNOT
      ALLISON SCOTT ROACH
20

21    BROWN GOLDSTEIN LEVY
          Attorney for Defendant National Federation of the Blind
      DANIEL F. GOLDSTEIN
22

23    ROBERT J. BERNSTEIN
          Attorney for Defendant National Federation of the Blind
24

25
```

C86QautC

```
 1              (In open court)

 2              THE DEPUTY CLERK:  Authors Guild v. HathiTrust.

 3              Counsel for plaintiffs, state your name for the

 4     record.

 5              MR. ROSENTHAL:  Edward Rosenthal from Frankfurt Kurnit

 6     Klein & Selz.  With me are my colleagues Jeremy Goldman and

 7     Adam Nelson, a summer associate in my office.

 8              THE DEPUTY CLERK:  Counsel for defendant.

 9              MR. PETERSEN:  Good afternoon, your Honor.  Joe

10     Petersen for defendant libraries along with my partner Joe

11     Beck, my colleagues Andrew Piquignot and Allison Roach.

12              THE DEPUTY CLERK:  Anybody else?

13              MR. GOLDSTEIN:  For the defendant intervenors, your

14     Honor, good afternoon.  Daniel Goldstein of the firm of Brown

15     Goldstein & Levy.  With me is the attorney Robert Bernstein of

16     the law offices of Robert Bernstein.

17              THE COURT:  I have just a couple of housekeeping

18     thoughts.  I know you have fully briefed motions for judgment

19     on the pleadings.  They are unlikely to be resolved

20     individually, and will likely be folded into these motions for

21     summary judgment, for which my guess is we have several

22     thousand pieces of paper, it seems enough to me.  And, indeed,

23     I don't think that will prejudice anybody.

24              There was another concern at the outset that I thought

25     I would get your responses to.  For some reason the plaintiff
```

C86QautC

| | |
|---|---|
| 1 | was agreeable to have one of the amici and not the other?  I |
| 2 | really was sort of unclear as to why that would be.  Maybe you |
| 3 | could just spend a moment telling me why that is unless you've |
| 4 | re-thought your position. |
| 5 | MR. ROSENTHAL:  Your Honor, we do not have any |
| 6 | objection to any of the amici. |
| 7 | THE COURT:  There are a variety of motions but I think |
| 8 | probably I would be best off if we heard from plaintiff first. |
| 9 | Then we will get to everybody else in due time.  You can |
| 10 | approach your argument anyway you'd like, but I would |
| 11 | appreciate it if you went to the podium to do it. |
| 12 | MR. ROSENTHAL:  Thank you. |
| 13 | Your Honor, defendants in this case have admitted to |
| 14 | having scanned, copied and given to Google more than 10 million |
| 15 | books, more than 7 million of which are protected by copyright |
| 16 | in the United States.  They admit that among those books are |
| 17 | copyrighted books owned by the individual plaintiffs in this |
| 18 | action, as well as books owned in some instances by actually |
| 19 | owned by certain of the associational plaintiffs and books |
| 20 | owned by members of the associational plaintiffs. |
| 21 | The scope of defendant's copying effort is so |
| 22 | overwhelming, the defendants have taken the position in their |
| 23 | papers -- and this is particularly in their opposition to |
| 24 | plaintiff's motion for summary judgment -- that they could not |
| 25 | possibly have spent the time to determine whether there was any |

C86QautC

1    particular reason to copy any particular work because it would

2    have taken much too much time to do so.

3            So, instead of looking to see whether there was a

4    permitted purpose under Section 108 of the Copyright Act or

5    under Fair Use, they worked it out with Google so that Google,

6    for all intents and purposes, back trucks up to library loading

7    docks, copied every book in buildings, in a group of different

8    libraries without any discrimination, any pre-thought

9    whatsoever.

10           Then Google -- and I think this takes real chutzpah,

11   your Honor -- they argue that plaintiffs cannot possibly show

12   market harm in this case because they took so many books that

13   they could not possibly ever have paid for them.  In other

14   words, they said, how could there be a market for 10 million

15   books, we never could have paid to digitize and copy 10 million

16   books.  It would have cost us hundreds of millions of dollars

17   to do so.

18           While it's perfectly clear that there are all sorts of

19   ways that you can buy books -- and that is what libraries are

20   partly in the business of doing -- you can buy books from

21   authors, publishers, rights organizations like the CCC in the

22   United States, or in case of foreign organizations, there are

23   mechanisms set up to allow for rights to be bought, but instead

24   of that -- and you can buy journals.  If you subscribe to a

25   journal, you work it out with the journal.  You get certain

C86QautC

rights.  You can make copies of it.  A certain number of people can use it.  They say, no, we wanted every book in our library so we don't have to pay for any of it, and you can't show market harm because there is no market for copying every book in the library.

In making these arguments, defendants completely ignore the fact that it is authors, our clients and many, many other authors who created the works that fill the libraries of our country, fill the HathiTrust database, and provide the content that the users use.  Authors make money selling books, including libraries.  There are lots of authors for whom -- academic and other authors for whom libraries are a major source of sale.

Defendants also ignore the fact that it is authors who have the right to decide when and whether their books should be copied.  In fact, one of the fundamental rights in Section 106 of the Copyright Act is that the owner of a copyright not only has the right to do things like make copies and make derivative works, it has the right to authorize someone else to make copies.

So defendants have simply overridden the author's right to decide whether they want the books to be digitized, whether they should pay for them --

THE COURT:  Well, doesn't a number of books, the backing up of the trucks to the loading docks, does that have

C86QautC

1   any effect on whether or not they comply with the Fair Use

2   Doctrine?

3            MR. ROSENTHAL:  It has a major impact on whether they

4   complied with Section 108 of the Copyright Act.

5            THE COURT:  How about 107?

6            MR. ROSENTHAL:  Your Honor, there is no case in the

7   Second Circuit where somebody has indiscriminately made copies

8   of millions of books and then said after the copying is made --

9   multiple copies are made, after they've given a copy to a

10   commercial user, they then say, oh, that particular book,

11   there's a Fair Use for copying that particular book because

12   maybe there's some user who might want to use that book.

13            THE COURT:  So you're saying it's the way in which the

14   book comes is sold to the public, the position and terms of

15   whether they've told people beforehand that determines Fair

16   Use?  I might not be stating that terribly well, but you may

17   get my drift.  You may not.

18            MR. ROSENTHAL:  I'm not sure I do, your Honor, but

19   what I'm saying is, first of all, our position in this case is

20   that Congress in Section 108 of the Copyright Act -- I'll talk

21   about Fair Use in a second -- in 108 made very, very specific

22   rules about when books could be copied, digitally or otherwise.

23   It had to be only under certain circumstances when there was a

24   lost book or a need to replace a book or a deteriorated book.

25   There were only a certain number of copies could be made, and

C86QautC

1    they had to look first to see whether they could buy a book on

2    the market first.  They did none of that, your Honor, so the

3    backing up by the Trust --

4            THE COURT:  So you believe without -- I don't want to

5    cut you off, but you're sort of saying it, if I follow you,

6    that without having complied with 108, 107 doesn't really

7    matter.

8            MR. ROSENTHAL:  There are circumstances where 107

9    might matter in the case of an individual book, perhaps there

10   would be some situation where Fair Use would still govern even

11   if somebody hadn't literally followed the exact provisions of

12   108.  But 108 was Congress's way, after years and years of

13   debate with all of the stakeholders at the table -- authors,

14   publishers, libraries, archives -- all of the users at the

15   table Congress got together and said how are we going to permit

16   libraries and what circumstances to make copies of works?

17   That's what 108 was.

18           So, for defendants to say that you can now throw out

19   all of 108 because it's all a Fair Use simply doesn't work

20   under the Copyright Act, the legislative history or just kind

21   of common sense, your Honor, because it just subsumes the

22   entire rule.  If when Congress said you can only make limited

23   copies for limited purposes under limited circumstances and

24   you're now allowed to say we can copy every book without even

25   looking, without checking, that would completely eviscerate the

C86QautC

1   whole purpose of Section 108.

2            Your Honor, I am sure in a few moments -- defendants

3   have a presentation for us, and I am sure we are going to see

4   some of the things that the HathiTrust Digital Library, which

5   is what they call the place they put all these books could be

6   used, as an index so that you can find books, so that if

7   somebody using the index can find a book, find out what library

8   it is

9            THE COURT:  Isn't that true?  Isn't that what they

10  did?

11           MR. ROSENTHAL:  That is partly what they did, your

12  Honor.  But what they are not going to show you is how there

13  are multiple copies of these works made sitting on databases

14  attached to the internet.  What they're not going to show you

15  is how they gave Google a copy of every single one of these

16  works.  What they're not going to show you is how a work with a

17  switch, you can switch the designation of a book.  I am using

18  the word switch a little bit metaphorically, but you can switch

19  a book from not being viewable to being viewable by the public,

20  which is what defendants intended to do in their orphan works

21  program where they intended to make works available for viewing

22  and downloading if they determined it was a work where you

23  couldn't find the author.

24           So, while there clearly are uses of the HathiTrust

25  database that do not necessarily cause extreme harm or concern,

C86QautC

1    they're not showing you how the fact that they made the

2    HathiTrust database is in fact the act of copying.  In fact,

3    your Honor, under the case law, it's not the fact that some end

4    user might some day be able to make good use of a work that's

5    the critical test.  The critical test is whether the copier has

6    a Fair Use in making that copy.  Every situation, there's going

7    to be somebody, except make just blatant piracy, there is going

8    to be somebody out there who could possibly make use of a work

9    that was made out of copyright infringement.

10         THE COURT:  I have not memorized 108, but my

11   understanding of all of what you said may be so about it, but

12   that Congress also indicated that 108 was in no way to affect

13   Fair Use.  Am I making that up or dreaming it?

14         MR. ROSENTHAL:  There is a provision that said that it

15   does not affect plaintiff -- it does not affect the rights

16   under Section 107, the Fair Use section, but that doesn't mean

17   that you get to simply ignore 108 completely and make copies of

18   millions of books.

19         THE COURT:  What does it mean?

20         MR. ROSENTHAL:  It means that there may be situations

21   where a library could make a copy of a book for some reason or

22   other where it would not necessarily be an infringement of

23   copyright to do so.  For example, if there were some sort of

24   exhibition going on in the library and somebody wanted to make

25   a digital display so they could put it in some sort of

C86QautC

1    exhibition.  I'm just throwing that out there without much

2    thought.  Or some other situation where there might be some

3    reason to use part of a work under a Fair Use circumstance, and

4    there might be some reason why there was a need to use some

5    part of some work, but not millions and millions of books

6    without looking, without checking.

7            That upsets the balance that Congress enacted in

8    Section 108; and that balance is what Congress has done again

9    and again when it's been faced with the intersection of new

10   technologies and existing owners.  It has to weigh the balance

11   of the owners with a new technology.

12           THE COURT:  I understand your argument -- I think I

13   do -- but how would purchasing authorized copies of additional

14   works, electronic war print, have allowed defendants to create

15   a searchable database or provide access to copyrighted works to

16   blind students?

17           MR. ROSENTHAL:  How would the defendants --

18           THE COURT:  I mean, you argue that the defendants

19   can't make unauthorized copies to save the expense of

20   purchasing authorized copies, right?

21           MR. ROSENTHAL:  Yes.

22           THE COURT:  So, I guess the question is, how would

23   purchasing authorized copies of additional works have allowed

24   defendant to create a searchable database to provide access to

25   copyrighted works for blind students, for instance?

C86QautC

1          MR. ROSENTHAL:  Well, the issue of the blind is

2    governed by another section of the copyright law, Section 121,

3    which again very carefully delineates the circumstances under

4    which an authorized entity -- and the defendants here are not

5    an authorized entity -- can make copies of works in certain

6    formats for use by visually disabled students or otherwise.

7          And, again, in that instance, Congress weighed the

8    rights of the various stakeholders, including profound concerns

9    over security which were governed by saying it has to be in

10   certain specified formats, and the interest of the visually

11   disabled and came up in Section 121 with a mechanism for

12   deciding when and how that could be allowed.

13         Also, defendants could have gone to individual rights

14   holders and asked individual rights holders for permission to

15   have their books made available under certain circumstances for

16   visually disabled students.  They didn't do that.  They just

17   copied everything.  Had that done that --

18         THE COURT:  You think that would have made it OK if

19   they had gone and asked?

20         MR. ROSENTHAL:  If they had asked permission of rights

21   holders and rights holders gave --

22         THE COURT:  I don't even think that's conceivable, but

23   I gather you do.

24         MR. ROSENTHAL:  How do I think it's conceivable?  It

25   might be difficult for them to get every single author of every

C86QautC

```
 1    single book to agree to do that, but they could have asked lots
 2    of different organizations, lots of different authors, lots of
 3    different publishers for that right.  Authors traditionally
 4    have provided works for visually disabled people for no charge.
 5    There are provisions in publishing agreements allowing
 6    publication in Braille and other formats, but just because you
 7    can do it doesn't mean you're allowed to do it.  In those
 8    circumstances, there would have been --
 9            THE COURT:  Just because you can ask doesn't
10    necessarily mean you have to ask.
11            MR. ROSENTHAL:  Well, that's true, your Honor, but
12    the -- I'm sorry, I lost my train of thought.
13            It is true, but, your Honor, if somebody had asked for
14    permission for visually disabled to use under certain
15    circumstances with certain accountability, such as careful
16    security provisions, making sure the formats were correct,
17    making sure that there were protections against unauthorized
18    use, then that might have been worked out.
19            In fact, in the proposed settlement of the *Google*
20    *Books* case, which was rejected by the Court, but which was
21    backed by the visually disabled, including the National
22    Federation for the Blind as well as the Authors Guild, there
23    was a very detailed mechanism for making books available for
24    visually disabled users.
25            So it's not that it's impossible to do it.  It may be
```

C86QautC

1    impossible to do on a scale that the defendants want here which

2    is every single book ever published.

3            THE COURT:  I'm not sure that the every single book

4    ever published has much to do with my concern.  You have to

5    read these laws, it seems to me, in conjunction with other

6    laws.  If you do read the copyright law and juxtapose it with

7    the American Disabilities Act, it seems to me that you now have

8    the ability to provide equal access to the blind, and that you

9    have an obligation to do so, or the defendant has an obligation

10   to do so.  What do you think about that?

11           MR. ROSENTHAL:  I think there is a problem with that

12   argument which basically says that once you've done something

13   illegal, like make multiple copies of all of the books, then

14   you're going to argue well now that we've done this, we have to

15   make it available to everyone.

16           THE COURT:  I didn't think this was their argument.

17           MR. ROSENTHAL:  I think that basically is, and under

18   the ADA, every entity with 15 or more employees would be

19   required then to make their books available to visually

20   disabled if they were there.  So, once the use has been made,

21   once you've made the copies, then you have to provide them to

22   the visually disabled.

23           THE COURT:  But that's only if you've broken the law.

24   My concern is whether looking at the ADA and juxtaposing it

25   with your concerns, they did break the law or they didn't.  It

C86QautC

1    seems to me that there is a good argument to the effect that

2    they didn't break the law in the first place and then you

3    wouldn't have any argument at all.

4         MR. ROSENTHAL:  If they didn't break the law by making

5    the copies --

6         THE COURT:  Yes.

7         MR. ROSENTHAL:  -- giving it to Google.

8         THE COURT:  Yes.

9         MR. ROSENTHAL:  Keeping them on their servers, doing

10   the orphan works program.

11        THE COURT:  Mr. Rosenthal, this is not a trick

12   question.  All I'm trying to understand is how you interplay

13   your concerns about the copyright law with Congress's concerns

14   about the Americans with Disabilities Act.  And I don't know

15   how you do that.  It's just a question.

16        MR. ROSENTHAL:  Your Honor, I understand the question,

17   but the question really is which does the tail wag the dog or

18   does the dog wag the tail.  Here, the copying of all these

19   works is illegal.  Now it exists, and now they're saying, well,

20   since we have this gigantic database, we have to make it

21   available for the visually disabled.  That's essentially their

22   argument.  Our position is they had no right to do this in the

23   first place.

24        THE COURT:  I think I got it.

25        MR. ROSENTHAL:  Your Honor, none of the authors in

C86QautC

this case, none of the organizations have any interest in

depriving visually disabled people of access to works.  The

question is under what circumstances do we do it, under what

accountability and under what security.

         And it's interesting, your Honor, that while we hear a

lot about the visually disabled in this case, there are only 32

registered visually disabled users at the University of

Michigan who even signed up for the years the HathiTrust has

been in place, who even signed up for the right to do this.  So

we're not disrespecting that right.  It's incredibly important

to them.  This is not really what this case is about.

         THE COURT:  The fact that they didn't sign up doesn't

really mean that there aren't an awful lot more of them.

         MR. ROSENTHAL:  I imagine there are a lot more of

them, but they're not pining for use of the HathiTrust digital

database, despite all we saw in the papers what a wonderful

tool it is.

         THE COURT:  You may well be right about that.  I don't

really know.  My guess is this is an advantage that they didn't

have before, so that all of them would, if they were aware of

it, at least sign up for the idea that they should have it.  Be

that as it may --

         MR. ROSENTHAL:  Your Honor, when we talk about -- I

think our papers address the 108 issues.  We've briefed it more

than once, to put it mildly, about how the defendants have

C86QautC

1    walked all over the requirements of Section 108.  So I want to

2    talk about a little bit about Fair Use.

3           Our position is there is no Fair Use justification for

4    making millions of copies, but if you look at the Fair Use

5    factors, the first and most critical factor is, is this

6    transformative.  In this case, the cases cited by defendants

7    from the Second Circuit are all the kind of cases that we've

8    all had, Fair Use cases we've all had for years.  It is the use

9    of a piece or maybe a couple of pieces of preexisting material

10   in a completely different work.

11          For example, they cite the *Bill Graham Archives* case

12   over and over again.  That case involved seven thumbnail-sized

13   pictures of Grateful Dead posters in a 400-plus page book with

14   2,000 images, *A Biography of The Grateful Dead*.  They cite your

15   Honor's *Hofheinz* decision which was the use of 40 something

16   seconds of clips from horror movies and a documentary about

17   horror movies.  Those are the typical Fair Use cases where

18   somebody uses one piece of preexisting material or a few pieces

19   in some completely new work.  Those cases are not cases like

20   this where somebody is taking millions of copies.

21          And there is nothing transformative about what the

22   defendants did here.  I'm talking about what the defendants

23   did, not some theoretical end user.  Defendants' libraries are

24   in the business of buying books for preservation and collection

25   purposes.  They are the centers of education.  They buy books

C86QautC

1    from authors.  Authors sell books.  Many authors sell books,

2    more books to libraries more than anybody else.

3        The HathiTrust digital archive makes additional copies

4    of books for exactly that same purpose -- to preserve and to

5    collect.  That's not transformative.  Just as the use in the

6    *MP3.COM* case in this district where defendants made MP3 copies

7    of CDs, that's not transformative because you're simply taking

8    the existing work, you're putting it into a different format

9    but the purposes of the use is exactly the same thing.  It's

10   not transformative.

11       The case that should be governing this court is the

12   *Texaco* case, *Geophysics v. Texaco* where Texaco made multiple

13   copies of scholarly journals that they had bought for

14   preservation and archival purposes.  The Court said that's not

15   Fair Use.  It's not transformative.  You're keeping them for

16   the exact same purpose

17       THE COURT:  What do you think about *Perfect 10 v.*

18   *Amazon*?  Doesn't that seem to you to be fairly close to this

19   fact pattern?  Maybe not the gigantic numbers here, but

20   certainly wholesale copying.

21       MR. ROSENTHAL:  *Perfect 10*, your Honor, is a case that

22   has similarities but is different in some incredibly important

23   ways.  The most important way is that in that case and the

24   other Ninth Circuit cases that dealt with search engines, in

25   those cases, the works were already on the internet in digital

C86QautC

1    form.  So, when Google does its search engine and makes

2    thumbnails so people can find and point users to where it

3    already is on the internet, the works are already there.  The

4    rights holders have authorized the works to be on the internet.

5    They are there.

6          The situation is very, very different with books.

7    Authors spend years creating books, while most of what's on the

8    internet may be -- not everything -- very quickly.  Authors do

9    not permit digital copies of their work to just sit on the

10   internet where they can be used and copied and viewed by people

11   without payment.

12         So, the whole underlying premise of *Perfect 10* and the

13   other search engine cases are that was a means by which

14   thumbnails were made to find on the internet something that was

15   already there.  In this case, the books are not already on the

16   internet.  They're not available.  There is no digital copy --

17         THE COURT:  Here the concept was, as it was in *Kelly*,

18   as I understand it, and I am not a big expert in this area, as

19   you can probably glean from my questions, it seems to me that

20   what was happening in *Kelly* was not far off here.  In other

21   words, there was found to be transformative and all there was

22   copying to produce exact replicas just like this of artistic

23   works and displayed in thumbnail form on the internet so as to

24   facilitate searches, which is essentially what I thought the

25   defendant was doing here, was putting up enough to facilitate a

19

C86QautC

1    search.

2            MR. ROSENTHAL:  So there are several distinctions, one

3    of which was the distinction about the works in *Perfect 10* or

4    *Arriba* were already on the internet.

5            THE COURT:  I didn't forget what you said.

6            MR. ROSENTHAL:  Also in those cases, the works were

7    copied for purposes of making thumbnails, and then they were --

8    at least in one case explicitly, but I think it's true in all

9    of them -- discarded.  So nobody kept multiple copies of the

10   entire works on servers where they would be theoretically

11   available and pose a security risk for users everywhere.  The

12   thumbnails are not --

13           THE COURT:  I'm not sure what the security risk that

14   you keep talking about is.

15           MR. ROSENTHAL:  Your Honor, so there are multiple

16   copies of the HathiTrust database sitting on servers at the

17   University of Michigan and University of Indiana.  There are a

18   number of, I think over 90, people at those universities who

19   have access to that database and can view full -- can view

20   those files, both the image and text files, fully.  So there is

21   a risk there.  There is the risk of hacking or otherwise theft

22   into the libraries.

23           Every day we're reading in the papers situations

24   where, the recent one with Linked-In and there have been issues

25   at the major technology companies.  People are hacking into

C86QautC

1    systems and stealing digital works.

2              There was the situation at MIT referred to in our

3    papers where somebody broke into the MIT library, with the idea

4    of stealing millions of books and making them publicly

5    available on a web site.

6              So, unlike images in situations like *Arriba* or *Perfect*

7    *10* where there is already an imagine on the internet and all

8    Google is doing is pointing you to that, here they are putting

9    the works of authors at a significant security risk because

10   with a thing like a book, once it's out, if books start finding

11   their way onto the kind of peer-to-peer files sharers, the

12   Napsters of the world, the genie can't be put back in the

13   bottle, and the damage to authors can be tremendous.  All of

14   that is done without the authors having a say in whether or how

15   that is going to be done.

16             When Congress passed 108 and Section 121, it thought

17   very carefully about the market for the books and the security

18   risks.  That is why Section 108 was amended to allow digital

19   copying under very specific limited circumstances as part of

20   the DMCA with a balance with the rights of libraries and

21   archives and the concerns about marketing security of the

22   authors.

23             That tension has been going on since at least 1961

24   when the Copyright Act of 1976 first began to be considered

25   when the various stakeholders argued about the issues of the

C86QautC

1   libraries being able to make full copies and what the

2   implications of that were going to be for market and security

3   purposes.  121 and 108 reflected Congress's balancing of those

4   interests.  Defendants have upset that balance.

5         So I just wanted to talk for a moment about market

6   harm because defendants, and we touched on already defendants,

7   argue that, as I started at the very beginning here, that there

8   is no market for any of -- there can't be a market because the

9   use was so great that they couldn't possibly have afforded to

10   pay for all those works or it would have been unwieldy to do

11   so.

12         Defendants in this case have put forth declarations

13   from numerous authors and rights organization representatives

14   that show that authors are damaged because they sell books to

15   libraries and this took sales away, because they have the right

16   to decide when they do and don't want digital copies to be made

17   of their works, because there are merging works, there are

18   merging markets for digital works that are popping up all the

19   time now.  As the world has changed and more and more people

20   are going back and looking at works that may be out of print or

21   may not be selling and making them digitally available,

22   defendants are threatening that market and because of the

23   security interest that we talked about at some length here.

24         THE COURT:  I don't like to beat this to death, but I

25   spoke to you earlier, but I wrote you in July and you wrote

C86QautC

1    back about my concern that the Copyright Act precludes

2    associational standing, and I got back a letter from you, but

3    in each time that we talk about -- and, again, it's probably my

4    fault because of my naivety about copyright law -- but each

5    time that you responded with arguments they did about Hunt and

6    the Constitution, but that really wasn't my question.

7            My question really is do they have standing or do

8    associations have standing under the copyright law in the first

9    place, because that would get rid of my whole lawsuit here, and

10   I could go on to other things.  Well --

11           MR. ROSENTHAL:  It wouldn't get rid of your whole

12   lawsuit.

13           THE COURT:  No, I said it qualifying.

14           MR. ROSENTHAL:  There would be lots of plaintiffs and

15   also associational plaintiffs.

16           THE COURT:  116.

17           MR. ROSENTHAL:  That own works themselves.

18           But, yes, your Honor, they do have standing,

19   constitutionally and otherwise, because the question of whether

20   or not a third prong of the Hunt Test as to whether the

21   individual author has itself have to have a right is

22   prudential, it's something the Court can decide in the interest

23   of equity and of judicial efficiency whether or not it makes

24   sense to have those rights adjudicated in one place.

25           THE COURT:  Judicial efficiency would get rid of it.

C86QautC

1            MR. ROSENTHAL:  The reasons that we wrote the letters

2      to you, your Honor, the whole reason -- and I may be saying

3      something the Court knows -- the reason we wrote the letters

4      was because between the time we filed our motion for judgment

5      on the pleadings, or defendants moved for judgment on the

6      pleadings and we opposed on the associational standing ground,

7      and there were three briefs in that matter, Judge Chin in

8      *Google Books* case faced with the same issue decided that the

9      associational plaintiffs did have standing to go forward in

10     spite of the fact --

11           THE COURT:  That was a little different.

12           MR. ROSENTHAL:  It's different in the sense it's a

13     class action rather than individual actions, but he went out of

14     his way to say that because defendants had not bothered to look

15     before they copied everything, that it wouldn't be fair to now

16     make every single association come in and prove that every

17     single member owned his work at this stage of the case.

18           Your Honor, I submit that if there is a finding for

19     plaintiffs in this case, we can have a mechanism, as there was

20     in the *Itar-Tass* case the Second Circuit wrote about or the

21     *Napster* case.  There could be a mechanism by which, if there

22     are really challenges to the ownership by the associations to

23     those works, we can address them at the remedy phase.  Most of

24     them are foreign owners where there is no U.S. copyright

25     required, but we can come in and show exactly which works are

C86QautC

1   owned and they can say whether they are or aren't in the

2   HathiTrust database.  We don't have to do this stage and

3   deprive all these authors of the right for their day in court

4   because judicial efficiency would be very hard for all of them

5   to come in and start bringing claims.

6          THE COURT:  That's one type of judicial efficiency.

7          MR. ROSENTHAL:  Well, right.

8          Finally, I just want to talk about marketing works for

9   one moment because it tends to get forgotten and defendants in

10  their briefing have put it at the very end of their brief, and

11  basically said if you are really going to address that we

12  should have more briefing, which is really astonishing given

13  the fact I think we filed six briefs already in this case.

14         Orphan works -- there is simply no justification for

15  defendant's orphan work program.  They came up with a system

16  where they identified works where they said we can't find the

17  owners, and if no owner comes forward in 90 days, we're going

18  to make them available for viewing and downloading in certain

19  circumstances.  We filed this lawsuit in that immediate time

20  frame, at least two of the plaintiffs works were found to be

21  orphan works.  People came out of the woodwork and said, wait a

22  minute.  Those aren't orphans.  In one of your declarations,

23  the head of the Author Guild explained that he was able to find

24  the owner of one of the orphan works with a Google search in a

25  matter of minutes.

C86QautC

        Now defendants have said we've suspended the orphan
works program, therefore, you can't adjudicate it here.
Despite numerous opportunities, they've never said they ended
it.  They simply said we're not going to do it now.  We're
figuring out how to re-figure it and we'll do it later.

        The orphan works program essentially is taking
copyrighted works, making them fully available without
permission, without compensation, without accountability to
copyright owners.  Congress has had orphan work legislation
before it and hasn't acted yet.  That doesn't give the
defendants the right to simply decide it is time to take the
law in their own hands and decide, OK, Congress won't do it,
we're going to do it ourselves.  So the orphan works program,
leaving aside everything else in this case, is a clear
copyright infringement.

        THE COURT:  Thank you.

        I will be glad to hear from your adversary, if one or
more of them have something to say.

        MR. PETERSEN:  Thank you, your Honor.  I know there
are a lot of facts for your Honor, but I think the easiest fact
in terms of resolution of the motions is really this, this core
fact, your Honor:  You cannot read plaintiffs books through the
HathiTrust Digital Library unless you are print disabled.  The
HathiTrust Digital Library does not distribute plaintiffs
works, it does not display plaintiffs works, but scholars can

C86QautC

1    use the HathiTrust Digital Library to find books but not to

2    read them, for purposes of scholarship and to paraphrase

3    Wordsworth "to voyage the seas of thought."

4            What is the HathiTrust?  Your Honor, the HathiTrust is

5    a collection of books in digital format that are put to very

6    discrete, very limited uses.  And there are three, your Honor:

7    There's search; there's providing access to the print disabled,

8    which my colleague, Mr. Goldstein, will talk about in more

9    detail; and there's preservation.

10           Now, we submitted a declaration from a remarkable

11   scholar named Dr. Stanley Katz of Princeton.  There is a lot

12   remarkable about Dr. Katz, but one of the most remarkable

13   things through our declarations, he talks about the evolution

14   of library search starting back in the early 1950s when he was

15   an undergraduate and how that process worked and continuing

16   right through the current day.  He talks about the

17   transformative changes in scholarship that are wrought by full

18   text digital searching.  He talks about in the Fifties that

19   when he wanted to find a book, he had to go -- we all remember

20   books from university -- had to go to that card catalog system,

21   flip through it with very limited information -- information

22   such as author, and subject matter and publisher, and so if

23   some piece of information you were looking for was in the book,

24   but it wasn't captured in that card --

25           THE COURT:  Are you saying, Mr. Petersen, the fact

C86QautC

 1    that it isn't there in toto, the books, but rather these are

 2    sort of like indexes that makes the copyright law unusable in

 3    this case?

 4              MR. PETERSEN:  I'm saying it's a transformative

 5    purpose, your Honor.  My clients have not copied books for

 6    purposes of allowing people to come in and read it.  That would

 7    be copyright infringement.  I think in that case plaintiffs

 8    would be right in they're saying that's theft.  But that is not

 9    this case, your Honor.  It's a use to help people discover

10    books, but not to read them.

11              THE COURT:  What about his position that you didn't

12    ask anybody for permission, including authors, and you went

13    right ahead and copied maybe we can argue what copy means,

14    7 million books?

15              MR. PETERSEN:  That's the nature of Fair Use, your

16    Honor.

17              THE COURT:  That's Fair Use.

18              MR. PETERSEN:  That is Fair Use, your Honor.  I would

19    just like to address, since your Honor brought it up, this

20    concept of, well, you can't copy lots and lots of books, and if

21    you do, that is not entitled to Fair Use.  As your Honor picked

22    up earlier, *Kelly Arriba Soft* dealt with millions of works that

23    were copied in connection with that search index in *Kelly*

24    *Arriba Soft*.  The *iParadigms* case in the Fourth Circuit dealt

25    with a hundred thousand student papers uploaded to that server

C86QautC

1    per day.  In fact, there was a very interesting point made in

2    the Court of Claims back in the Seventies about the number of

3    works that are copied in Fair Use.  The Court said, and I'll

4    quote: "In view of the large numbers of scientific personnel

5    served in great size of the libraries, the amount of copying

6    does not seem to us to have been excessive or disproportionate.

7    The important factor is not the absolute amount."  And it goes

8    on.  That's *Williams & Wilkins v. U.S.* 487 F. 2d 1345.

9           So Fair Use is not a game of numbers, your Honor.  If

10   I take one copy of one word of some best seller and I scan it

11   and put it on the internet, that's infringement.

12          If I take, as the libraries have done, the entire

13   corpus of works and put them to very limited uses, that's Fair

14   Use.  There's no harm to a market, as I'll go into detail in a

15   moment.  It's transformative purpose.  It's Fair Use, your

16   Honor.

17          Your Honor, with the Court's indulgence -- and

18   plaintiff's counsel alluded to it -- I would like to show a

19   demonstration, if your Honor would find it helpful just to put

20   this service in context if that would be OK.

21          THE COURT:  I can't tell if I will find it helpful

22   yet, but I'll be glad to watch.

23          MR. PETERSEN:  Thank you, your Honor.

24          Just to start before we actually could play just to

25   set this up.  Imagine, your Honor, you're a student at the

C86QautC

1    University of Michigan's pharmacology department, and you want

2    to learn about medicines that could cause anaphylactic shock.

3    Anaphylactic shock is a extreme allergic reaction that in

4    certain circumstances could cause death.  So if you're that

5    student and you have a term paper due and you're talking about

6    drug interactions that could cause an individual to go into

7    anaphylactic shock, under the old way of searching, searching

8    the bibliographic information author, subject matter, you could

9    run a search that would look a bit like this.

10           What this is showing on a HathiTrust word site, there

11   are two tabs, there's a catalog search tab which is a way to

12   search that runs before the HathiTrust full text searching

13   mechanism.  And if you enter anaphylactic shock -- this is in

14   our papers of John Wilkins' declaration -- there are screen

15   shots of this.  We are going to show you how it actually works

16   essentially in realtime.  Those are the fields that you're

17   limited to in a catalog search.  Go back up, you search all

18   fields and you hit search, and you return three books.  Those

19   are the books that have anaphylactic shock essentially in the

20   subject matter.

21           Now, in contrast, a search over the actual corpus, the

22   full text of these works, enter the same search term in full

23   text search, anaphylactic shock, it finds, as you can see, far

24   more works.  You can then do refined searches and it actually

25   will narrow it down, but it shows you the body of scholarship

C86QautC

1    that would be available to that student of Michigan in the

2    pharmacology department if they wanted to learn about

3    anaphylactic shock.

4         Now, focusing on this particular book, it happens to

5    be in copyright.  You can see full view is not available.

6    There is no way for that student to read that work online.

7    It's not available to be read.

8         If the student wanted to find that book, I'm going to

9    show you in a moment how the student would do it.  Go in, do a

10   world Cat search, find the nearest library close to us, and

11   there they are, it's at SUNY's Health Science Center in

12   Brooklyn.  If you want a copy of that work, the student has to

13   go and check out that work.  If it's available and it's in

14   print, and you can find it through Amazon, they could buy that

15   work.  It's a new service with tremendous power and potential.

16   But the way to actually get the book is the same way it always

17   worked:  You need to go to your library or you need to buy the

18   book.  It's the fundamental reason why when plaintiffs talk

19   about theft and stolen, that they're fundamentally wrong.

20        The interesting thing is plaintiffs in response to all

21   the proofs that we put in, they said, I think, they said we

22   applaud the value to the HathiTrust.  We share authors after

23   all, we share the values of the HathiTrust, but this is our

24   property, and we have the right to say no one can use it

25   without our permission.  It is essentially -- and in fact, a

C86QautC

1  board member of plaintiff's Authors Guild goes so far --

2  plaintiffs quote this in their papers.  Not only did he say it

3  during a deposition, but they've actually highlighted it in

4  their reply papers.  He said, it's my baseball, and you can't

5  take my baseball.  It's my baseball.

6       Your Honor, copyright does not arise from natural law

7  conceptions of property ownership.  That is never the way

8  copyright law has worked.  It's a creature of statute with a

9  carefully calibrated mission to promote the progress of

10  science.

11       As the Court explained in the *Sony Betamax* case, "The

12  monopoly privileges that Congress may authorize were neither

13  unlimited nor primarily designed to provide a special private

14  benefit.  Rather, the limited grant is a means by which an

15  important public policy may be achieved."

16       Now, your Honor, we briefed extensively the four Fair

17  Use factors.  Your Honor is aware that in this circuit, as most

18  circuits, factor one is the most critical factor, the purpose

19  and character of the use.  Here it is overwhelmingly

20  significant that my clients are non-profit actors, and the

21  purposes behind this service are for scholarship, teaching and

22  research preamble uses that are called out in Section 107 as

23  tilting strongly in favor of finding for the plaintiffs on the

24  all important factor one.  There really can be no question that

25  what the libraries are doing is transformative, your Honor, and

C86QautC

1    your Honor is exactly right to bring up *Arriba Soft* and talk

2    about in that case the Ninth Circuit found that "approving

3    access to information on the internet versus artistic

4    expression is a different type of purpose."  When we talk about

5    purpose and character and transformative use, what we're

6    talking about does the new use supersede the old or does it add

7    something new.

8         Judge Posner, I think, put it in the *Ty* case extremely

9    aptly, what we're talking about does the new use substitute for

10   the old --

11        THE COURT:  Mr. Rosenthal believes that the

12   distinction that in these cases it was already on the internet

13   is determinative so that the transformative element really is

14   not satisfied.

15        MR. PETERSEN:  But there is no reason for believing

16   that, your Honor.

17        THE COURT:  Well, I am trying to get your thoughts on

18   that.

19        MR. PETERSEN:  I understand, and I'm sorry, your

20   Honor, I will get there.  It is essentially -- the most

21   fundamental point is these were published works.  So the fact

22   that they were published on the internet in *Perfect 10* and

23   *Kelly v. Arriba Soft* versus here published and in the library's

24   collection, they purchased these books.  That's the fundamental

25   thing.  These aren't unpublished works.  They concede that

C86QautC

1    these are all published works.

2              Ordinarily when we deal with the internet, case law

3    from kind of pre-internet age is applied to the internet.

4    Courts look at it and say there is no reason to treat it any

5    differently because it's on the internet.  Here, it is somewhat

6    slightly more unusual that you have these cases that came out

7    on the internet, but there really is no reason they wouldn't

8    apply physically.  It just so happened that we had these cases

9    come out first about the internet and then we have this

10   technology that allows us to digitize published works the

11   physical works.

12              THE COURT:  I didn't mean to interrupt you if I did.

13              MR. PETERSEN:  Absolutely fine, your Honor.

14              Also, want to talk a little bit about market harm.

15   The fourth Fair Use factor, the market harm factor, examines

16   the effect of the use on the potential market for value of

17   copyrighted work.

18              Plaintiffs concede that there is no licensing market

19   for digitization of library collections for the purposes set

20   out in the HathiTrist.  We asked them very detailed

21   interrogatories about how they're harmed by the service.  What

22   they told us was they could not identify "any specific

23   quantifiable past harm or any documents relating to any such

24   past harm of any kind.  They couldn't identify any revenues or

25   other earnings of any kind generated or expected to be

C86QautC

1   generated in whole or in part for archiving research, full text

2   search or use by the blind."

3          So the question becomes is a market likely to develop.

4   For that we retain the services of a renowned economy, Joel

5   Waldfogel.  Dr. Waldfogel examined the market in detail.  He

6   looked at what the cost would be under a licensed model.  If a

7   player came in and said we want to run a business about this.

8   We're going to get these rights.  We're going to have this

9   digitized corpus and we're going to license entities like the

10  libraries.  What he determined is just the digitization alone

11  being $569 million.  That's not even addressing all the

12  transaction costs that would entail actually licensing these

13  works and all the license fees.

14         Then he compared the types of licensing revenue that

15  such an actor could actually receive from libraries, parties

16  that were not interested in licensing the work for purposes of

17  providing access to the work themselves, but simply to allow

18  searches to be done and simply to preserve those works and

19  simply to enable the print disabled to receive those works.

20         THE COURT:  One of the things that Mr. Rosenthal

21  mentioned -- not exactly, but close -- is concern about the

22  digital, digital sayings creating some new security risks for

23  all of the digital works.  What is your view on that issue?

24         MR. PETERSEN:  Your Honor, the libraries very deeply

25  share that concern.  I think any organization that guards

C86QautC

1   information on the internet such as banking, so much now is

2   done where people can access information.  I can sit home in my

3   house on the weekend and tap into our work database.  It has

4   all this confidential information.  There are tremendous

5   amounts of expertise developed to protect that sort of

6   information -- banking, to allow me to tap into my firm's

7   network remotely, to protect things as the HathiTrust library.

8        The interesting thing about plaintiff's submission on

9   the point of security is that plaintiffs have submitted

10  testimony from an economist that says, oh, this could be

11  hacked.  That's essentially it.  He was actually examined in

12  the Google case, and they said is this your expertise, and you

13  examined Michigan security protocols, and he admitted he wasn't

14  really that familiar with Michigan security protocols.  Then he

15  also said something that I find remarkable from a witness

16  submitted on summary judgment.  He said, I wouldn't be the

17  person to do that, but I could find you someone who could.

18       So we in response to that submitted a detailed

19  declaration from Cory Snavely from the University of Michigan.

20  He has firsthand knowledge of the all of the security

21  protocols.  He talks in detail all of the steps that are taken

22  to protect the security of the corpus, all the firewalls, all

23  the login identifications, all the login information that's

24  created.  And the proof is in the pudding, your Honor, because

25  there has never been a breach.  There's no evidence there has

C86QautC

been a breach that has allowed any unauthorized individual to

access any copyrighted material.  That's the most fundamental

point.

The HathiTrust has been certified by a reliable

repository, by the Center for Research Libraries.  So, it's

certified, we spend a tremendous amount of effort protecting

it, and it's really no different than other databases that are

kept confidential and privileged.

That doesn't mean hackers aren't out there.  Just like

banks do, just like my employer does, just like it's done day

in and day out in this country in the global economy, steps are

done taken to protect these databases that are vital and

crucial to our ability to compete in the global marketplaces to

have these services, to leverage the benefits of them, and to

attempt to mitigate the risk --

THE COURT:  It's balancing issue, and you come out on

your side.

MR. PETERSEN:  Very much so, your Honor.

THE COURT:  Another point that was raised both at oral

argument here today and I guess in the briefs, essentially your

adversary -- I'm not sure how it plays out actually, but I

thought I would get your view, essentially the plaintiff is

saying that you're saying that it was OK for the libraries to

purloin all these works because they couldn't afford to buy

them.  You heard him say how expensive it would be if they were

C86QautC

1    to go out and you were to go out and try and buy them.  I am

2    not sure how that cuts.  But what is your thought about it in

3    any event?

4          MR. PETERSEN:  Your Honor, I think it is an

5    interesting rhetorical device.  Really what we are talking

6    about, and we submitted a declaration from the economist,

7    talking about the market is very pointed evidence going to is a

8    market likely to develop.  On that issue, it's entirely

9    appropriate to have someone look at the costs.  If no market is

10   ever going to develop, well then there's no fourth factor harm.

11         So it's going to a very particular issue that's

12   relevant to the Fair Use analysis, which is if this was not

13   Fair Use, wouldn't a couple years where we have some

14   organization.

15         Your Honor, we also deposed a representative of

16   Copyright Clearance Center and asked Copyright Clearance Center

17   about their plans to exploit these types of markets.  For

18   example, the questioning was put to that witness, is there

19   anything in the 2011 to 2013, three year strategic plan

20   regarding CCC licensing the use of digitized versions of

21   textual works in connection with full text searching.  And

22   while the CCC designated that transcript confidential, and so I

23   can't say it in open court, it absolutely does, your Honor,

24   it's in our papers, it does undercut entirely the notion that

25   some market is going to develop.

C86QautC

1          The other interesting thing I hear plaintiffs saying

2     in their papers, although it wasn't really said today, was this

3     notion of don't rule, your Honor, in favor of Fair Use, even

4     when the factors point in that direction.  Give Congress a

5     chance to look at this.  Those are the exact same arguments

6     that were made in the *Sony Betamax* case in the early Eighties.

7     This is what they urged the trial court and all the courts, and

8     the trial court and Supreme Court both disagreed this is new

9     technology.  It's new.  We need time to analyze it.  It's

10    policy.  Let Congress do it.

11         Both the trial court and the Supreme Court in *Sony*

12    said no, that's not what judges do.  I apply current law, and

13    the fact that it's a new technology and the fact that Congress

14    may or may not act, that's not relevant.  What is relevant is

15    let me look at Section 107.  Let me apply the Fair Use factors

16    and let me see which direction they point.  The court did that,

17    and now 30 some odd years after *Sony Betamax* Congress still has

18    not acted about this new technology of VCRs, your Honor.

19         I also want to briefly address an argument that I

20    heard plaintiff's counsel make about we care about providing

21    access to the blind and print disabled.  The thing about that

22    is I examined, I deposed the secretary of the Authors Guild,

23    Pat Cummins.  I also deposed another one of the plaintiffs,

24    Mr. Ronning.  And I put those questions directly to them.  I

25    asked Ms. Cummins:  So you do not believe the print disabled

C86QautC

should have access to these works?  Her answer was a flat no.

I asked Mr. Ronning:  You have no understanding of how a U.S.

student with a print disability would obtain access to your

works.  His answer:  No.  Why should I?

So, maybe plaintiff's counsel shares this goal

providing access to print disabled, but my examination of these

witnesses tell me that the actual authors themselves do not,

unfortunately.

I want to say just a little bit, your Honor, about the

orphan works project.  It's a project that never went forward

to the second phase.  There were two phases to it.  One is to

do research to identify potential orphans, but then as the

project was announced, we extremely limited distribution on a

one-to-one basis so for as many copies as that library had, it

would be distributed once an orphan was identified in public

comment, the project never went past public comment phase.

They stopped it.  John Wilkins gave declaration testimony

saying, we do not know whether or how the NWP will continue.

There has never been a distribution of a work pursuant to the

OWP.  So we believe it's not ripe for adjudication, and there

has been no infringement of a 106 right.  So, if any party is

entitled willed to summary judgment, it's the libraries on that

issue.

If your Honor is to entertain and take the facts as

the libraries stated as to how that project would have worked

C86QautC

1    back when it was contemplated to go forward, our papers lay out

2    why those uses are in fact protected by Fair Use and actually

3    are protected under 108 as well.

4          Your Honor, plaintiffs ask this Court for equitable

5    relief, but the equities are not in their favor.  It has been

6    years now, six, seven years since the digitization was

7    announced --

8          THE COURT:  You think all these authors are supposed

9    be to be essentially without their copyright, that doesn't give

10   them any equitable role in this decision that I have to make?

11         MR. PETERSEN:  Well, they certainly is a legal claim.

12         THE COURT:  Forgetting the legal claim.

13         MR. PETERSEN:  But that's what I want to address, your

14   Honor, because the equities are this:  All this time for all

15   these years, the libraries have been building this database of

16   works making limited uses and investing in protecting these

17   works.  It was only a year ago that the authors saw fit to sue

18   the libraries.  So all that time of building this database and

19   working, the libraries did nothing.  Now they ask for --

20         THE COURT:  Isn't this a little sort of sea change in

21   one the libraries are doing as opposed to what they have been

22   doing when these copyrights were issued years and years and

23   years ago?  You don't think your demonstration is something

24   that is relatively new?  I think you just got finished telling

25   me how new that was.

C86QautC

1          MR. PETERSEN:  That service went live in '08, your

2     Honor.

3          THE COURT:  Yes, and that's relatively new in my book,

4     but I'm older than you are, I guess.

5          MR. PETERSEN:  Well, your Honor, essentially they seek

6     this extraordinary relief of impounding and appraising all

7     these works, all of these marvelous works that gave birth to

8     all these wonderful scholarships to be put to new uses like

9     text mining, as we talk about in Dr. Smalheiser's (ph)

10     declaration.  Their premise for doing so as, Mr. Styles (ph)

11     said, it's their baseball, but copyright is never treated, the

12     holders of copyrights as the owner of a baseball.  Copyright

13     has always sought to achieve to allow people to use works that

14     ultimately is benefiting the public, not harming authors, and

15     serving the progress of science.

16          Your Honor, that is exactly what we have here.  We are

17     benefiting the progress of science and are not harming authors

18     and using these works in new transformative ways.  We

19     respectfully urge that your Honor grant our summary judgment

20     motion.

21          THE COURT:  Let me hear a few words from

22     Mr. Goldstein.

23          MR. GOLDSTEIN:  Thank you, your Honor.  Good

24     afternoon.

25          THE COURT:  Good afternoon.

C86QautC

1          MR. GOLDSTEIN:  The blind don't have a plan B, sir.

2     The only way for blind scholars to have equal access to the

3     content of research libraries, the only way for blind scholars

4     to have the same opportunities as their sighted peers to

5     conduct research is to do exactly what the HathiTrust has done

6     here; that is, not only to digitize university collections --

7          THE COURT:  How is it as we heard a moment ago that so

8     few people are interested in this phenomenal opportunity?

9          MR. GOLDSTEIN:  It's not so few people are interested,

10    your Honor.  It is that so far the only school -- the

11    University of Michigan is the only school in the HathiTrust

12    that has taken the steps that were we're talking about here.

13         THE COURT:  But even there, even in the University of

14    Michigan.

15         MR. GOLDSTEIN:  It is a relatively new phenomenon

16    still, and --

17         THE COURT:  So is the Ford but everybody knew about

18    it.

19         MR. GOLDSTEIN:  Perhaps, your Honor, but the blind

20    have no less curiosity or desire to succeeded academically than

21    anybody else, and this tool is a powerful tool.  So I don't

22    know where the 32 number comes from.

23         I do know though that even if the incidents of

24    blindness goes down greatly and so we have smaller numbers, it

25    is not at the end of the day a question of how many blind

C86QautC

1    people there are in the general population but what are the

2    opportunities we give to those who are blind.

3            The HathiTrust has done more than just digitize its

4    collection.  It's done so in a way that a blind person's

5    software can either localize the content or can see it on a

6    Braille display.  The significance of that I think can be well

7    stated from recognizing, it's thought of as an ordinary thing,

8    I suppose, that for well over a century every day at the

9    Universities of Michigan, California, Wisconsin or any of the

10   other HathiTrust schools, freshman, graduate students,

11   professors with endowed shares and all manner of other

12   scholars, walk into their school libraries and can mine the

13   best reserve of knowledge and maybe even wisdom contained in

14   those libraries.  There were two reason they can do that.  One

15   is that they are members of those communities.  And the other

16   is that they're sighted.  And good comes out of those

17   activities every day.

18           Sight was required and had always necessarily been so

19   until now, but now these universities have made digital scans

20   of this collective and collective knowledge, and not just any

21   scans, but scans the blind can read.

22           Can there be any questions whether the numbers 32 or

23   15 or 5,000, but that the good that comes out of the research

24   and scholarship will be multiplied by adding others to that

25   daily occurrence, adding the blind and the many others with

C86QautC

1    print disabilities to those who already engage in that

2    activity.

3            Now that it is possible for blind scholars to have

4    this opportunity, we would submit that they also have the

5    right, and that is where Mr. Rosenthal and I seem to part

6    company.  I am glad that there are authors whose intentions are

7    good, but the time has long past that we have to be dependent

8    on the kindness of strangers.  This is a matter of rights.  The

9    right stems from societal commitment to equal access, one that

10   it has found its voice in numerous enactments in Congress; not

11   just the Americans With Disabilities Act that you mentioned

12   earlier, the Rehabilitation Act of 1976, and in the Doctrine of

13   Fair Use, because that has always granted the right to make

14   socially beneficial uses of copyright works without permission

15   and the Chafee unit.

16           As its preamble proclaims, the ADA is intended as a

17   clear and comprehensive national mandate for the elimination of

18   discrimination against people with disabilities.  Thus, the arc

19   of the law is towards facilitating our shared goal of

20   eradicating, where possible, spurious discrimination.

21           And with respect to copyright law, I would suggest,

22   your Honor, it's pertinent to remember what the Second Circuit

23   has told us in the *Bill Graham Archives* case where they said,

24   and I quote, "The ultimate test of Fair Use is whether the

25   copyright laws goal promoting the progress of science would be

C86QautC

 1   better served by allowing the use than by preventing it."

 2          When Mr. Rosenthal rises in rebuttal, he must

 3   acknowledge that the goal of promoting the progress of science

 4   would be better served by affording the blind the opportunity

 5   to engage in research on an equal footing with their sighted

 6   peers.

 7          Only very rarely, your Honor, do occasions arise to

 8   transform one of our national ideals from intention to reality.

 9   This case is such a rare occasion.  The Authors Guild has said

10   to you that this case is not about cutting off use to the

11   blind.  From the perspective of the blind, this case is about

12   nothing but.  He says that it is not their intention to cut off

13   use for the blind, but what they ask for is to cut off use for

14   the blind.

15          When you asked what was plan B, what would be the

16   other way of doing this, he espoused the notion of getting

17   releases from more than 7 million rights holders.  You have the

18   70 percent he says that are in copyright, but then you've got

19   books that have illustrations and other pages that are owned by

20   a different copyright owner.  So getting releases from more

21   than 7 million rights owners, many of whom are unknown, whose

22   works are now orphans.  And I don't know, given the cost, how

23   he proposes this would be done.  The blind didn't have a

24   problem paying my $350 pro hac vice fee, but $569 million to do

25   the digitizing after getting the rights releases is a bit of a

C86QautC

steep price.

THE COURT:  And the Bench and Bar Fund wants to thank you for the $350.

MR. GOLDSTEIN:  Thank you, your Honor.  I didn't think that should go unmentioned.

So the Authors Guild are trying to interpose themself between the blind and the contents of the library which would prevent the ideal from being realized.  What's disturbing about this, Judge, is that doing so will not work any benefits for the Authors Guild, even though letting in the blind would work no harm on the Authors Guild.  What do the plaintiffs get from denying access to the blind?

This is a critical factor in two ways:  One is the obvious issue of market harm under Fair Use.  Another is that their motion did not address the question of equitable relief, but we know the first requirement of equitable relief, and that is that you must show an irreparable injury, one that will happen or has happened, and they can't show that they're entitled to equitable relief because they have never shown that they are injured.

In fact, the record is to the contrary.  We asked interrogatories of the Authors Guild, and two of the answers I'd like to read you in part because they simply take care of the issue forever.  We asked them about their revenues from sales to the blind of digital copies.  And they said

C86QautC

1   "Plaintiffs respond that by tradition and industry practice,

2   authors generally do not receive royalties for the licensing

3   and sale of works distributed in specialized formats

4   exclusively for use by the blind or others with disabilities.

5   Accordingly, for the purpose of this litigation, plaintiffs are

6   not claiming that any revenues or other earnings of any kind

7   were generated or are expected to be generated, in whole or in

8   part, by the reproduction or distribution by defendants,"

9   meaning the HathiTrust "of copies of plaintiffs works for use

10  by the blind or other visually disabled persons."

11          In other words, they have just said, we won't lose one

12  penny of revenue because the HathiTrust is making these books

13  available to the blind.

14          We also asked them about the market for these books,

15  and they said they have not identified any specific

16  quantifiable past harm or any document relating to any such

17  past harm suffered as a result of the actions of defendants in

18  making books in fully accessible formats available for

19  libraries lending to persons who cannot access print versions

20  of such books.  Or taking out lawyer-ese and putting in human

21  being language, they said what the HathiTrust is doing for the

22  blind hasn't hurt us economically, and we have no expectation

23  that it will.

24          Mr. Rosenthal mentioned the question of security and

25  the risk of security.  I would like to address that briefly.

C86QautC

1    The Authors Guild is not suggesting that if the digital copies

2    are gotten rid of, that the libraries also get rid of their

3    print books.  How hard is it if they got the relief that they

4    asked for?  How hard would it be for a pirate to pirate a book

5    from the University of Michigan library?  Well, you'd need a

6    Xerox machine.  Not hard to do at all.

7         Or if you wanted to put it on the internet, what would

8    you have to do?  You'd have to ask that Kinkos or Fed Ex do

9    they also have a flat bed scanner?  They would say yes.  You

10   would scan the book in, and then you would put it up on the

11   internet.  Indeed, every time a best seller like Harry Potter

12   goes out in print, pirate copies go out on the internet.  So if

13   you get rid of the HathiTrust, you do nothing in that regard.

14        Now, the value that lies in the HathiTrust is in the

15   searching that Mr. Petersen has referred to and the data mining

16   and the access to the blind, but these are things for which

17   there is no market.

18        I also point out, the only record about piracy here is

19   what we made with the declaration of Mr. Fruchterman.

20   Mr. Fruchterman runs Book Share, which is Chafee authorized

21   entity.  Unlike the libraries here, which has what I would call

22   boring books, the Book Share houses the hot books, the best

23   sellers, and Mr. Fruchterman doesn't use any security other

24   than what's called a fingerprint.  That is, if somebody makes a

25   copy, somebody from the blind or other print disability makes

C86QautC

1    an unauthorized copy, it shows up with that fingerprint and you

2    can go back to the person who made the unauthorized copy and

3    take appropriate action.  What he said was, it's turned out

4    over years of experience that piracy is rare -- excuse me --

5    unauthorized copying is rare and none of it was done with the

6    intention of piracy.

7          THE COURT:  Tell me something that may really not have

8    a great deal of relevancy, but with respect to the Chafee

9    amendment that you've now mentioned a couple of times, are all

10   libraries authorized entities under the Chafee amendment?  I

11   gather plaintiff does not think so.

12         MR. GOLDSTEIN:  They are not.  They have to become

13   one, and that involves a couple of things:  To become an

14   authorized entity, first of all, you have to be either a

15   governmental entity or a non-profit.  I should explain an

16   authorized entity doesn't mean there's some third party out

17   there that says bless you, my son, you are now an authorized

18   entity.  There is no external designated agency.  You have to

19   make a non-profit or governmental entity.

20         Then what you have to do is to have as a primary

21   mission the reproduction and distribution of books in

22   specialized formats exclusively for use by the blind.  I didn't

23   see the primary mission.  It's a primary mission.  All of these

24   universities operating through the HathiTrust are susceptible

25   to being -- the significance of the Chafee to this case is not

C86QautC

1   just to distribution of University of Michigan students.  If

2   Chafee applies, the University of Michigan can, as I understand

3   it, will make these books available to the blind of the United

4   States as required in the -- in the manner required by Chafee,

5   which is you have to have through a competent authority

6   certified proof that you are blind or otherwise print disabled,

7   which is what they are already doing at University of Michigan.

8   You go to the disability student services office, you present

9   your ophthalmologist's certificate or your neurologist's

10  certificate, whatever the nature of your print disability, and

11  you have to be certified and register.  Then you have access to

12  the books.

13          So, can these entities be unauthorized entities if

14  they choose to be?  The answer is absolutely.  Because they

15  meet all of the qualifications.  If there is one fact here that

16  makes this totally susceptible to resolution on summary

17  judgment, it is this:  The Rule 56.1 statement that was done by

18  the universities extensively describe how the -- it was the

19  intention from the beginning to make these books available and

20  accessible to the blind.  They did not contest the statement

21  that the HDL was designed specifically to enable libraries to

22  make their collections accessible in digital format to print

23  disabled readers.  They didn't contest also that one of the

24  primary goals, one of the primary goals of the HathiTrust has

25  always been to enable people who have print disabilities to

C86QautC

1    access the wealth of information within library collections.

2    With those two statements undisputed, it is imponderable to me

3    how the argument can be made that these entities aren't

4    qualified authorized entities.

5          If I could return, I wanted to make a final point on

6    this no harm issue.  I think the precedent for where the

7    Authors Guild is in this case is the one found Aesop's fable of

8    the dog and the manger.  The dog kept the hay away from the

9    horse, even though the dog could not eat the hay.  This is very

10   much what it seems to me that the Guild is doing here because

11   in denying access to the blind, they will reap nothing.

12         On Fair Use, Mr. Petersen talked to you in great

13   detail about that, so I just want to make a few points I think

14   are very important.  One is that making accessible digital

15   scans for the blind is transformative.  The Authors Guild

16   actually hasn't argued otherwise in its pleadings, and it's

17   presented no evidence to the contrary.  And they couldn't.

18   Reading a print book is a visual experience, so it's beyond the

19   ken of those who can't see.  So if you make a print book, one

20   that a blind person can read, you transform it.  And the

21   conversion from print to digital is simply a means to a new

22   use, a new purpose that couldn't be accomplished in its

23   original format.

24         Dr. Maurer put it well in his declaration where he

25   said blind students compete under a severe handicap, not for

C86QautC

lack of sight, but to lack of accessed information in a world
in which information is the key to success.

You asked a question, or you mentioned after
Mr. Rosenthal talked about how this was all done without
permission, and I would note that Fair Use doesn't require
permission, but you asked a question about that.  The Second
Circuit has said -- and I don't think there is a question of
bad faith here -- but even when there is, the bad faith of a
defendant is not dispositive of Fair Use defense.  That was in
the *NXIVM Corporation v. Ross Institute* case where there was no
question but that there, unlike the libraries, the copies were
purloined.  They took copies they didn't have a right to take,
unlike the libraries books, and the Court still upheld Fair
Use.

On the volume of copying, Mr. Rosenthal's theme when
he stood up, the volume of copying required to give the blind
equal access to the library is what's in the library.  The
needs of a blind scholar are coextensive with those of a
sighted scholar, and what's appropriate to be in the research
libraries collection for the sighed is appropriate for the
blind scholar as well.

I'm reminded of a store of a constituent asking
Abraham Lincoln how long his legs were, and he said "long
enough to reach the ground."  That's how comprehensive this
copying is, as much as necessary.

C86QautC

```
1        I have already addressed the market harm issue.  There
2   is none here.  I would just note that we heard from
3   Mr. Rosenthal again this notion that it's the right of the
4   copyright holder to decide when and whether to make a
5   copyrighted material available to somebody.  We have had this
6   notion before of absolute rights when it came to private
7   property.  The first time I heard it was 50 or 60 years ago in
8   the context of "I have the right to refuse service in my
9   establishment to whomsoever I choose."
10        And our collective response was legislation that said,
11  no, the rights of private property must be exercised in the
12  context of our greater society and its requirements.
13        Well, long before that, Fair Use set that same balance
14  that the rights of public interest are balanced against the
15  rights of the copyright holder.  And Fair Use is just such a
16  limitation.  Here it allows the blind access to materials
17  because that vindicates a public interest, an interest that
18  even the Authors Guild admits exists, and, again, does no harm
19  to the copyright holder.
20        I'd like to turn a little bit to Chafee.
21  Mr. Rosenthal said in his briefs that Chafee are all the rights
22  that a blind person gets.  There is no Fair Use for blind
23  persons.  I submit to your Honor that it was not the intention
24  of Senator Chafee and his fellow legislators to create a ghetto
25  in which the blind must remain untouched by the volume of Fair
```

54

C86QautC

1    Use, but rather to create an opportunity for the blind.

2              Mr. Rosenthal says that the blind therefore may never

3    have Fair Use access to dramatic literary works since those

4    aren't covered by the Chafee amendment.  Well, certainly I

5    guess it's a risk since maybe a blind Greek might be inspired

6    by dramatic literary works the tales of Ulysses, Penelope and

7    Telemachus.  Where would we be then?

8              I can only paraphrase Jerry Ford and say that if John

9    Chafee were alive today, he would be rolling over in his grave

10   at the Authors Guild's characterization of his amendment.  It

11   was Senator Chafee who said the amendment was to help end the

12   unintended censorship of the blind.  There is not one jot or

13   tittle in the record to support the mean-spirited notion that

14   Congress wanted to cut off the blind from Fair Use.

15             It's not the first time the arguments has been made.

16   We've all heard about how 108 means no Fair Use, but it's

17   failed before in CN Enterprises, the argument was that 117

18   meant that 107 didn't apply, and the court said that bordered

19   on the frivolous, and it does.

20             I've talked a little about use the University of

21   Michigan and the HathiTrust schools operating through the

22   HathiTrust can be Chafee entities.  Let me also address this

23   question that they raise about that these are not specialized

24   formats.

25             The referenced to specialized formats for exclusive

C86QautC

1   use by the blind does not mean a format that only the blind can

2   use.  To conflate them, as the Authors Guild suggests, would

3   mean that authorized audio books would have to be a frequency

4   only the blind people can hear.

5           THE COURT:  Mr. Goldstein, I think your adversary

6   really does deserve some time, and there are only ten minutes

7   left on my clock, so I think we ought to give him an

8   opportunity, as much as I enjoy listening to your argument.

9           MR. GOLDSTEIN:  I'm sorry, your Honor.  May I have 30

10  seconds to conclude?

11          THE COURT:  Sure.

12          MR. GOLDSTEIN:  I would just point out that Mr. Akin

13  in his second declaration acknowledges that in the settlement

14  agreement with Google that what the law requires from Chafee

15  was being followed in that settlement agreement, and that is

16  what the University of Michigan is doing today.

17          When something new comes along, your Honor -- and what

18  the HathiTrust has done is undisputedly new -- part of the

19  challenge for a court is to harmonize new developments with the

20  existing fabric of rights and obligations, and when possible

21  reach a coherent and sensible result that is consistent with

22  the applicable statutes, case law language, reason and common

23  sense.  We submit that what is sought here is what does so, and

24  we ask that summary judgment be entered in our favor.  Thank

25  you.

C86QautC

|    |    |
|----|----|
| 1  | THE COURT:  You have ten minutes for all your rebuttal |
| 2  | and hopefully you won't need it all. |
| 3  | MR. ROSENTHAL:  I don't think I will need it all, your |
| 4  | Honor. |
| 5  | Mr. Petersen talked about the *Sony* case.  And the fact |
| 6  | that *Sony* basically made a decision about copyright law in |
| 7  | terms of VCRs.  *Sony* case was a case where Congress had not |
| 8  | spoken on the issue.  Supreme Court explicitly said that in its |
| 9  | decision that that was a case where you had new technology and |
| 10 | you did not have congressional resolution of it.  It said |
| 11 | normally Congress sits down -- just like we're saying happens |
| 12 | in this case -- sits down and has the various stakeholders come |
| 13 | up and describe their interests, and Congress comes up with |
| 14 | something.  *Sony* had nothing at that point and Supreme Court |
| 15 | had to decide whether time shifting was in fact a Fair Use. |
| 16 | Here the situation couldn't be more different.  Here |
| 17 | Congress has spoken.  Congress, after 40 or 50 years of |
| 18 | consideration and amendment, has Sections 108 that governs when |
| 19 | libraries archives can and can't make copies.  A very, very |
| 20 | different situation.  It also makes the situation very |
| 21 | different from the *Arriba* and other Ninth Circuit search engine |
| 22 | cases because those are cases where Congress hasn't spoken. |
| 23 | Congress hasn't talked about whether it is or isn't permissible |
| 24 | for a search engine to make copies of image files and thumbnail |
| 25 | form to aid in searching on the internet.  Congress has decided |

C86QautC

1  that libraries cannot make multiple copies, multiple digital or

2  other copies of works without going through certain steps.  The

3  same with Section 121 where, whatever the spirit might be of

4  senator Chafee, Section 121 sets forth which entities are

5  allowed to make copies for visually disabled and what formats

6  they may be in.

7       Your Honor, there has been a lot of talk that somehow

8  the Authors Guild being painted as this horrible anti-blind

9  organization, and even I think rather offensive quotes from a

10 couple of witnesses, Pat Cummins who is a children's book

11 author, it's easy for a good lawyer like Mr. Petersen some have

12 her say something she doesn't quite understand.  Mr. Ronning is

13 a Norwegian.  None of those people were expressing disinterest

14 in the rights of the visually disabled.  That is just not the

15 case.

16      This is not a case where there is a question that a

17 particular work might be made available to a particularly

18 visually disabled student in need.  This is a case where many

19 copies were made where copies were given to Google, where the

20 copies view full text and image files remained on servers

21 irrespective of any particular need or use by any particular

22 visually disabled students.  As I said earlier, in a remedy

23 phase of this case, the parties can sit down and figure out a

24 way where visually disabled users can have access to digital

25 copies of works when needed because I understand the current

C86QautC

1   situation where it's difficult to have them because of the time

2   it takes to get a copy of a particular work makes it difficult.

3   But that doesn't justify making millions of copies just because

4   somebody might someday need one.

5        That is a perfectly appropriate situation, just as in

6   the Google book settlement, the parties sat down.  The Authors

7   Guild was a party to that, the University of Michigan was a

8   party to discussion in the Google book settlement, and the

9   National Federation for the Blind spoke out in favor of the

10  Google settlement, which included mechanisms for making books

11  available to visually disabled and accountability for those

12  uses.

13       This is not a situation where we are trying to make it

14  impossible for the visually disabled ever to have access to a

15  book, but it is a situation where they can't justify the acts

16  of the infringer just because there are users who may benefit

17  from the infringing conduct.

18       A couple of other quick points, your Honor.  As for

19  the estoppel argument, which I can't recall which defense

20  counsel made, and somehow this has been going on for years,

21  your Honor, there were settlement discussions in the Google

22  Books case until March of 2011 when the settlement was

23  rejected.  Just A couple of months later, the HathiTrust

24  University of Michigan announced the Google Books project, and

25  decided it was going to go ahead and make books available for

C86QautC

1    full -- for display and view and possible download in spite of

2    the rights of copyright owners.  That's when this lawsuit

3    started.  Nobody was sitting on their rights for years.  There

4    was a resolution in the works that just didn't happen.

5         Then I also wanted to point out that as opposed to the

6    arguments made by defendants and intervenors, there are markets

7    developing for use of digital copies and plaintiff's expert Dan

8    Nocera, spoke about them at length when he talked about

9    clearing houses, when he talked about the developments in

10   foreign countries of rights organizations that exist to allow

11   users like libraries to have the right to make digital copies

12   and use them under appropriate agreements with compensation and

13   with appropriate security and with accountability.

14        Finally on *Arriba Soft*, nobody goes to a web site to

15   buy the web site.  It's very, very different.  People go to

16   books, if people get books in order to read them and books are

17   purchased.  Nobody purchases a web site.  It's very, very

18   different in the situation when the Ninth Circuit in those

19   cases where a search engine points a user to a web site and

20   then the user can go look at that web site to a situation where

21   somebody is finding a book that it might otherwise purchase.

22        So, your Honor, I don't think that those cases are

23   applicable here.  It is a very, very different situation.  And

24   as far as the argument that anybody can go into a library and

25   make a Xerox copy of a book and put it on the internet.  That's

C86QautC

1    true, anybody can do that.  That's the same argument with music

2    and the same argument with other kinds of art forms.  There is

3    a very big difference between a person making a digital copy

4    and posting it on the internet with somebody having access to

5    millions of copies all at once where all of a sudden the entire

6    HathiTrust Digital Library is on some server in some country

7    where this court or no court in the United States may have

8    jurisdiction and suddenly people are able to see the fruits of

9    our plaintiffs and other authors labors for free to copy, to

10   download, to print and to read, taking money out of the mouths

11   of our clients.  It's a very different situation.

12        One-off copying is always going to be a problem.  It

13   is a problem for authors and publishers, chasing pirates and

14   infringers.  Just like in the music world it's problem for the

15   music copyright owners to chase down people who put works on

16   peer-to-peer share files, and in those cases the courts have

17   enjoined the existence of the peer-to-peer files because they,

18   among other things, allow this mass potential piracy.

19        I think if there are no further questions, I will stop

20   speaking.

21        THE COURT:  Well, I have some questions, but I am
     going to try and work them out after all the learning that you
22   all have left me with, and read the transcript.  If I have some
     after that, I may ask or write you another letter, hopefully
23   with a little better answer.  Have a good evening.  Everybody.
     Thank you very much
24        (Adjourned)

25