**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
THE AUTHORS GUILD, INC., et al.,       :
                                             :
      Plaintiffs,                    :
                                           :     **11 CV 6351 (HB)**
              - against -          :
                                           :     **OPINION &**
HATHITRUST, et al.,                  :     **ORDER**
                                           :
      Defendants.                  :
-------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

Before the Court are two motions for judgment on the pleadings and three motions for summary judgment. Defendants include HathiTrust;[1] Mary Sue Coleman, President of the University of Michigan ("UM"); Mark G. Yudof, President of the University of California; Kevin Reilly, President of the University of Wisconsin System; Michael McRobbie, President of Indiana University; and Cornell University (collectively, the "Universities"). Plaintiffs, consisting of individuals and associational organizations, assert claims for copyright infringement for the alleged unauthorized reproduction and distribution of books owned by the Universities. The individual plaintiffs are Trond Andreassen, Pat Cummings, Erik Grundström, Angelo Loukakis, Helge Rønning, Roxana Robinson, André Roy, Jack R. Salamanca, James Shapiro, Danièle Simpson, T.J. Stiles, and Fay Welson, and the associational organizations are The Authors Guild, Inc. ("Authors Guild"), The Australian Society of Authors Limited, Authors' Licensing and Collecting Society ("ALCS"), Union des Écrivaines et des Écrivains Quebecois ("UNEQ"), Sveriges Författarförbund ("SFF"), Norsk Faglitterær Forfatter-og Oversetterforening ("NFF"), and The Writers' Union of Canada ("TWUC") (collectively, "Associational Plaintiffs"). The Authors League Fund ("Authors' Fund") does not seek associational standing, but asserts a claim based on its direct ownership of copyrights. I granted the motion to intervene as defendants by the National Federation of the Blind, Georgina Kleege, Blair Seidlitz, and Courtney Wheeler (collectively, "Defendant Intervenors") on consent in January 2012.

Defendants' motion for judgment on the pleadings, filed in December 2011, seeks the dismissal of the Associational Plaintiffs on standing grounds to the extent they asserted the rights of

---

[1] "HathiTrust" is the name of the service of University of Michigan ("UM") in which the Universities and other institutions participate under agreements with UM. Defs.' J. Pleadings 1 n.1. The Universities consist of UM, the University of California, the University of Wisconsin, Indiana University, and Cornell University.

their members and sought dismissal of claims involving the Orphan Works Project ("OWP") as not ripe for adjudication. For the reasons set forth below, Defendants' motion for judgment on the pleadings is GRANTED in part and DENIED in part. Plaintiffs' motion for judgment on the pleadings insofar as it seeks a ruling that fair use and other defenses are unavailable to the Defendants as a matter of law is DENIED. In June 2012, Defendants, Defendant Intervenors and Plaintiffs each filed motions for summary judgment. Defendants' and Defendant Intervenors' motions for summary judgment are GRANTED, and Plaintiffs' motion for summary judgment is DENIED.

Also before the Court are two unopposed motions for leave to file briefs as amici, brought by the American Library Association, Association of College and Research Libraries, and Association of Research Libraries (the "Library Amici"), and the Digital Humanities and Law Scholars (the "Digital Humanities Amicus"). Both motions are GRANTED.[2]

## BACKGROUND[3]

Defendants have entered into agreements with Google, Inc. ("Google"), that allow Google to create digital copies of works in the Universities' libraries in exchange for which Google provides digital copies to Defendants (the "Mass Digitization Project" or "MDP"). Compl. ¶ 1–2; Pls.' 56.1 ¶ 62; Defs.' 56.1 ¶¶ 30–31.[4] The HathiTrust partnership is in the process of creating "a shared digital repository that already contains almost 10 million digital volumes, approximately 73% of which are protected by copyright." Compl. ¶ 2; *see also* Pls.' 56.1 ¶ 77; Defs.' 56.1 ¶ 42. After digitization, Google retains a copy of the digital book that is available through Google Books, an online system through which Google users can search the content and view "snippets" of the books. Compl. ¶ 51; Pls.' 56.1 ¶ 12. Google also provides a digital copy of each scanned work to the Universities, which includes scanned image files of the pages and a text file from the printed work. Compl. ¶ 52; Pls.' 56.1 ¶ 87; Defs.' 56.1 ¶ 30. According to Plaintiffs, this process effectively creates two reproductions of the original. Compl. ¶ 52. After Google provides the Universities with digital copies of their works, the Universities then "contribute" these digital copies to the HathiTrust Digital Library ("HDL"). *Id.* ¶ 63. The Complaint alleges that in total, twelve unauthorized digital

---

[2] Courts have discretion to allow amicus briefs. *Jamaica Hosp. Med. Ctr., Inc. v. United Health Grp., Inc.*, 584 F. Supp. 2d 489, 497 (E.D.N.Y. 2008). Although Plaintiffs initially did not consent to the filing by the Digital Humanities Amicus, at oral argument they stated that they had no objection. Aug. 6, 2012 Tr. 3:5–6.

[3] Because I have before me both motions for judgment on the pleadings and motions for summary judgment, I cite to both the Complaint and the parties' Rule 56.1 Statements, where appropriate.

[4] References to the "Complaint" are to the first amended complaint.

2

copies are created during this digitization process. *Id.* ¶ 72. Google's use of the digital works is the subject of a separate lawsuit.

For works with known authors, Defendants use the works within the HDL in three ways: (1) full-text searches; (2) preservation; and (3) access for people with certified print disabilities. Defs.' 56.1 ¶ 48.  The full-text search capabilities allow users to search for a particular term across all the works within the HDL. *Id.* ¶ 49. For works that are not in the public domain or for which the copyright owner has not authorized use, the full-text search indicates only the page numbers on which a particular term is found and the number of times the term appears on each page. *Id.* ¶ 50.

In an eloquent oral argument by Mr. Goldstein[5] as well as in Mr. Kerscher's[6] declaration, Defendant Intervenors spelled out where blind scholars stood before digitalization: "Prior to the development of accessible digital books, the blind could access print materials only if the materials were converted to braille or if they were read by a human reader, either live or recorded." Kerscher Decl. ¶ 19; *see also* Aug. 6, 2012 Tr. 41:23–55:25. Absent a program like the MDP, print-disabled students accessed course materials through a university's disability student services office, but most universities are able to provide only reading that was actually required. Kerscher Decl. ¶¶ 32, 36. Print-disabled individuals read digital books independently through screen access software that allows text to be conveyed audibly or tactilely to print-disabled readers, which permits them to access text more quickly, reread passages, annotate, and navigate, just as a sighted reader does with text. *Id.* ¶¶ 20–21, 23. Since the digital texts in the HDL became available, print-disabled students have had full access to the materials through a secure system intended solely for students with certified disabilities. Wilkin Decl. ¶ 105. Many of these works have tables of contents, which allow print-disabled students to navigate to relevant sections with a screen reader just as a sighted person would use the table of contents to flip to a relevant portion. Kerscher Decl. ¶ 34. In other words, academic participation by print-disabled students has been revolutionized by the HDL.

Four of the HathiTrust Universities (all except Indiana University) have also agreed to participate in the OWP, an initiative to "identify and make available to University students, faculty and library patrons full copies of so-called 'orphan works'—works that are protected by copyright but whose rights holders theoretically cannot be located by procedures established by the

---

[5] Daniel Goldstein of Brown Goldstein & Levy, LLP, attorney for the National Federation of the Blind.

[6] George Kerscher, Ph.D., Senior Officer of Accessible Technology at Learning Ally (formerly known as Recording for the Blind & Dyslexic), which creates recorded copies of print materials for print-disabled persons, and Secretary General of the DAISY Consortium (Digital Accessible Information System) and President of the International Digital Publishing Forum (IDPF), which are international organizations that work to promote accessibility in electronic publishing.

HathiTrust." Compl. ¶ 3. The original process to determine which works would be included as orphan works ("Orphan Works") involved a decision as to whether a work was commercially available for sale, and if not, an attempt to contact the copyright holder. *Id.* ¶ 74; Pls.' 56.1 ¶ 114; Defs.' 56.1 ¶ 79. If that attempt failed, then HathiTrust would list the bibliographical information for the work on the HathiTrust Orphan Candidates webpage for ninety days, after which time the work would have become available for "Full view" on HathiTrust to UM students, professors, and other authenticated users and visitors to libraries at UM's campuses. Compl. ¶ 74; Pls.' 56.1 ¶ 114. UM intended to allow "access to orphan works for the purpose of online review, with the number of users permitted to view a given work limited at any one time to the number of copies held by the UM library." Defs.' 56.1 ¶ 81. Other schools subsequently announced participation in this project. Compl. ¶ 75. After the filing of the original complaint in this action, UM announced that the OWP would be temporarily suspended because the procedures used to identify Orphan Works had apparently allowed many works to make their way onto the Orphan Works Lists in error. *Id.* ¶ 78; Defs.' 56.1 ¶¶ 83–84. UM has not yet provided a new process for identifying Orphan Works, or even a timeline for when that might happen, "although it continues to study ways to improve the orphan identification process." Defs.' 56.1 ¶ 84.

By their Complaint, Plaintiffs seek (1) a declaration that the systematic digitization of copyrighted materials without authorization violates Sections 106 and 108 of the Copyright Act, (2) an injunction to prevent the reproduction, distribution, or display of Plaintiffs' or other copyrighted works except as provided by § 108, (3) an injunction to prohibit Defendants' provision of works to Google for digitization without authorization, (4) a declaration that the OWP will infringe the copyrights of Plaintiffs and others, (5) an injunction that prohibits Defendants from proceeding with the OWP, and (6) the impoundment of all unauthorized digital copies within Defendants' possession.

## MOTIONS FOR JUDGMENT ON THE PLEADINGS
### I. DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants seek dismissal of the Associational Plaintiffs on standing grounds to the extent they assert the rights of their members. Defendants argue that the Associational Plaintiffs are precluded from representation of their members on both constitutional and statutory bases. The Associational Plaintiffs respond that they are ideally suited to represent the largely identical copyright claims of their members. Pls.' Opp'n to Defs.' J. Pleadings 4. They do not, however, address the crux of Defendants' argument, which is that the Copyright Act simply does not include

this type of standing.[7] I hold that the Associational Plaintiffs have satisfied Article III standing requirements and that the issues pertaining to the rights of their members are therefore justiciable. As a matter of statutory standing under the Copyright Act, however, the domestic Associational Plaintiffs are precluded from enforcing those rights. The issue of statutory standing for the foreign associations has not been properly presented to the Court, and I decline to speculate on the operation of those foreign laws.

Defendants further seek dismissal of claims involving the OWP as not ripe for adjudication. Plaintiffs' claims concern the OWP as it may exist in the future, not as it existed before HathiTrust abandoned the original program. As I later explain, I do not know and cannot anticipate whether the features of that hypothetical program will raise the same issues that possibly defeated the first OWP, assuming there will even be a renewed OWP.

## A. Legal Standard

"A Rule 12(c) motion for judgment on the pleadings based upon a lack of subject matter jurisdiction is treated as a Rule 12(b)(1) motion to dismiss the complaint." *United States v. Comprehensive Cmty. Dev. Corp.*, 152 F. Supp. 2d 443, 448–49 (S.D.N.Y. 2001). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.*

## B. Constitutional and Prudential Standing of the Associational Plaintiffs

For reasons similar to those stated by the court in the suit against Google brought by many of the same associations, the constitutional basis for standing is satisfied. *Author's Guild v. Google, Inc.*, Nos. 05 Civ. 8136 & 10 Civ. 2977, 2012 WL 1951790, at *6 (S.D.N.Y. May 31, 2012). To assert standing as a representative of its members, an association must meet the constitutional requirements described by the Supreme Court in *Washington State Apple Advertising Commission v. Hunt*, 432 U.S. 333, 343 (1977). In *Hunt*, the Supreme Court explained that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have

---

[7] I gave Plaintiffs numerous opportunities to address this issue, which included a letter to the parties dated July 12, 2012. Plaintiffs failed to respond to Defendants' argument that the text of the Copyright Act precludes associational standing. At oral argument on the parties' motions for summary judgment, I again questioned Plaintiffs about their position with respect to Defendants' statutory standing argument. Plaintiffs' attorney responded that, "the question of whether or not a third prong of the *Hunt* Test as to whether the individual author has itself have to have a right is prudential." Aug. 6, 2012 Tr. 22: 19–22. While I agree that the third prong of the *Hunt* test is prudential, this once again fails to answer the question of whether Congress has precluded associational standing in the text of the Copyright Act itself, a question of statutory interpretation and one that Plaintiffs have repeatedly sidestepped or obfuscated.

standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id*. Defendants challenge the first and third prongs.

As to the first prong, Defendants argue that the Associational Plaintiffs "have not made any specific allegations with respect to any copyright works held by their members." Defs.' Mem. J. Pleadings 9. In *Building 7 Construction Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Devopment, Inc.*, 448 F.3d 138, 145 (2d Cir. 2006), the Second Circuit held that plaintiffs asserting associational standing need not "name names" in the complaint. Defendants' argument that this case is distinguishable solely because it involved a different statute is unpersuasive.

As to the third prong, Defendants argue that the individual participation of the Associational Members will be required to demonstrate that Plaintiffs hold valid copyrights and to evaluate the fair-use defense. Defs.' Mem. J. Pleadings 10–13. "[T]he third prong of the associational standing test is 'prudential,' not constitutional, and is 'best seen as focusing on . . . matters of administrative convenience and efficiency.' " *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F. 3d 218, 229 (2d Cir. 2011) (quoting *United Food & Commercial Workers Union Local 751 v. Brown Grp. Inc.*, 517 U.S. 544, 555–56 (1996)). "[T]he fact that a limited amount of individuated proof may be necessary does not in itself preclude associational standing." *Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*, 990 F. Supp. 245, 249 (S.D.N.Y. 1997); *see also N.Y. State Nat'l Org. of Women v. Terry*, 886 F.2d 1339 (2d Cir. 1989). Where an association seeks an injunction or declaration that an entire practice is unlawful, courts have concluded that the individual proof required is limited. *Nat'l Ass'n of Coll.*, 900 F. Supp. at 250 (explaining that associational standing would facilitate adjudication better than "requiring duplicative proof" from each member). The recent decision in *Google*, 2012 WL 1951790, at *5–6, addressed nearly identical arguments about the third prong of *Hunt*. The *Google* Court concluded that the limited amount of individual proof required to establish copyright ownership and the fair-use defense was insufficient to defeat associational standing. *Id.* Likewise, the Associational Plaintiffs here satisfy the *Hunt* test; both Article III and the prudential third prong of *Hunt* are satisfied.

## C. Statutory Standing of the Associational Plaintiffs

Copyright is a "creature of statute." *Stewart v. Abend*, 495 U.S. 207, 251 (1990). It "does not exist at common law—it originated, if at all, under the acts of [C]ongress." *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 663 (1834). As a result, "[n]o one can deny that [Congress has] the power to

prescribe the conditions on which such right shall be enjoyed." *Id.* at 663–64. Congress may define standing as to a particular cause of action more narrowly than what is constitutionally permitted.[8] The unfortunate nomenclature is somewhat misleading. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 (1998) ("[A]n issue of statutory standing . . . has nothing to do with whether there is case or controversy under Article III."); *see also* Radha Pathak, *Statutory Standing and the Tyranny of Labels*, 62 OKLA. L. REV. 89, 91 (2009). Whether Congress intended to provide statutory standing to associations is determined by the language of congressional enactments.[9]

The Court has subject-matter jurisdiction over the members' individual copyright enforcement actions because the Associational Plaintiffs satisfy constitutional and prudential standing requirements and are therefore "entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). As to the issue of statutory standing—and as will be discussed more fully below—the domestic Associational Plaintiffs simply may not assert the cause of action on which the third-party enforcement of its members' copyrights depend. Put another way, those Associational Plaintiffs can win on behalf of only themselves, but can lose on behalf of their members as well.

Even though Defendants have successfully raised a fair-use defense as to the MDP and the HDL (discussed later), the questions of statutory standing and the merits of this case do not overlap and will be discussed separately. *Cf. Steel Co.*, 523 U.S. at 97 n.2 ("[D]epending upon the asserted basis for lack of statutory standing, [the merits inquiry and the statutory standing inquiry] are sometimes identical, so that it would be exceedingly artificial to draw a distinction between the two."); *Roberts v. Hamer*, 655 F.3d 578, 580 (6th Cir. 2011) ("The question [of whether a party has statutory standing] is closely related to the merits inquiry (oftentimes overlapping it) and is

---

[8] *Compare Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997) (holding that Title II of the Americans with Disabilities Act ("ADA") "evinces a congressional intention to define standing to bring a private action . . . as broadly as is permitted by Article III" (citation omitted)), *with Small v. Gen. Nutrition Cos., Inc.*, 388 F. Supp. 2d 83, 92 (E.D.N.Y. 2005) (declining to extend Title II's broad standing provision to Title III based on statutory language and limiting standing to a plaintiff who "himself must currently be suffering or be about to suffer discrimination"). Title II of the ADA provides a remedy to "any person alleging discrimination on the basis of disability." 42 U.S.C. § 12133. Title III provides a cause of action "to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination." 42 U.S.C. § 12188(a)(1).

[9] *See N.Y. Metro Area Postal Union v. Potter*, No. 00 Civ. 8538, 2003 WL 1701909, at *2 (S.D.N.Y. Mar. 31, 2003) (concluding labor organization lacked standing to pursue claim under the Family and Medical Leave Act provision that provided a private right of action to an "eligible employee"); *see also United Food & Commercial Worker Union, Local 1564 of N.M. v. Albertson's, Inc.*, 207 F.3d 1193, 1201 (10th Cir. 2001) (concluding that Congress intended to bar labor organizations from suing on behalf of their members in Fair Labor Standards Act cases); *Reid v. Dep't of Commerce*, 793 F.2d 277, 282 (Fed. Cir. 1986) (concluding that labor organization did not have standing to bring suit under Civil Service Act provision allowing for suits by "an employee").

analytically distinct from the question whether a federal court has subject-matter jurisdiction to decide the merits of a case.").

### 1. Statutory Standing Under U.S. Law

Although Article III is satisfied, the Authors Guild, the Australian Society of Authors Limited, and TWUC (collectively, "U.S. Associational Plaintiffs") lack statutory standing.[10] The Copyright Act's standing clause explicitly limits who may enforce copyright claims: "the legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). Courts in the Second Circuit have not explicitly addressed the issue of whether associational standing is permissible under the Copyright Act, but the language from several Second Circuit decisions suggests that there is no statutory standing for associations. *See ABKO Music Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991) ("[T]he Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf."); *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 n.3 (2d Cir. 1982); *Plunket v. Doyle*, No. 09 Civ. 11006, 2001 WL 175252, at *5 (S.D.N.Y. Feb. 22, 2001) (explaining that standing is limited to "(1) owners of copyrights and (2) persons who have been granted exclusive licenses by owners of copyrights" (internal quotation and citation omitted)).

The limited case law available outside of this Circuit also suggests that statutory standing for associations is not permitted.[11] In *Silvers v. Sony Pictures Entertainment Inc.*, the court observed that although "[t]he statute does not say expressly that *only* a legal or beneficial owner . . . is entitled to sue . . . Congress' explicit listing of who *may* sue for copyright infringement should be understood as an *exclusion of others* from suing for infringement." 402 F.3d 881, 885, 890 (9th Cir. 2005) (en banc) (concluding that the language and history of the Act precluded assignment of an accrued copyright claim by a party that was neither a legal or beneficial owner of the copyright); *see also Mullen v. Soc'y of Stage Directors & Choreographers*, No. 06 C 6818, 2007 WL 2892654, *4

---

[10] Certain of the foreign associations claim that they have standing by operation of foreign law. That argument is addressed *infra* in Motions for Judgment on the Pleadings Section II.C.2.

[11] In both *Olan Mills, Inc. v. Linn Photo Co.*, 795 F. Supp. 1423, 1427 (N.D. Iowa 1991), *rev'd on other grounds*, 23 F.3d 1345 (8th Cir. 1994), and *Google*, 2012 WL 1951789, at *6, the courts concluded that the constitutional standing requirements were satisfied as to associations that asserted copyright claims. The issue of whether Congress intended to provide a cause of action to associations, and so whether there was statutory standing, was not before the court in either case. Although courts must raise Article III standing requirements *sua sponte*, *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006), there is no similar requirement that they raise a statutory standing problem, which speaks to whether or not the elements of the cause of action are satisfied. Radha Pathak, *Statutory Standing and the Tyranny of Labels*, 62 OKLA. L. REV. 89, 114–15 (2009).

(N.D. Ill. Sept. 30, 2007) ("[I]f USA [a guild] sought a declaratory judgment of copyright infringement or damages for copyright infringement against Plaintiffs, it would surely fail for lack of standing because it is [not] an 'owner' nor is it a 'beneficial owner' (e.g. a licensee) of any copyright at issue under the Copyright Act.").

The Copyright Act is based on Congress's power "[t]o promote the Progress of Science . . . , by securing for limited Times to Authors . . . the exclusive Right to . . . their . . . Writings." U.S. Const. art. I, § 8, cl. 8. The basic purpose of copyright—to provide a limited monopoly for authors primarily to encourage creativity—further suggests that Congress did not intend for third-party enforcement of those rights. *See Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) ("The sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors."); *see also Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) ("When technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose."). Regardless of whether associational standing is constitutional, I am convinced that Congress did not intend for associations to enforce the rights of their members, and so the U.S. Associational Plaintiffs lack standing under the Copyright Act.[12]

### 2. Statutory Standing Under Foreign Law

Under the "national treatment" principle of the Berne Convention, Berne Convention art. 5(1), and the Universal Copyright Convention ("UCC"), "an author who is a national of one of the member states of either Berne or the UCC, or one who first publishes his work in any such member state, is entitled to the same copyright protection in each other member state as such other state accords to its own nationals." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 89 (2d Cir. 1998) (quoting NIMMER ON COPYRIGHT § 1.05 (1998)). The Second Circuit in *Itar-Tass* affirmed the district court's holding that a reporters' organization had standing to assert claims on behalf of its members after noting that Russian copyright law "authorizes the creation of organizations 'for the collective administration of the economic rights of authors . . . in cases where the individual exercise thereof is hampered by difficulties of a practical nature.' " *Id.* at 90–94 (quoting Russian Copyright Law, art. 44(1)). The Second Circuit wrote, "UJR, the reporters' organization, may well be able in this litigation to protect the rights of the reporters whose articles

---

[12] My conclusion that the Copyright Act precludes associational standing in no way curtails the right of associations who own their own copyrights from asserting infringement claims as to those copyrights. Four of the Associational Plaintiffs, the Authors Guild, ALF, TWUC and ASA, assert a right to sue because they own and control copyrights that were digitized by Defendants.

were copied." *Id.* Although not explicit, the Second Circuit's decision in *Itar-Tass* supports the view that whether a foreign association has satisfied the statutory standing requirements necessary to assert a claim is determined by foreign law.

Four of the Associational Plaintiffs, ALCS, UNEQ, NFF and SFF, assert that they have standing to sue on behalf of their members under foreign law.[13] In total, the parties provide about three paragraphs of analysis on this issue. Defendants object that UNEQ, NFF and SFF lack standing because they have submitted interrogatories that admit that they are not the legal or beneficial owner of any works alleged to have been infringed by Defendants. Defs.' Reply to Defs.' J. Pleadings 4 n.4 (citing *Itar-Tass*, 153 F.3d at 91; Petersen Decl. ¶¶ 4–6; Petersen Decl. Ex. C UNEQ: Canada, at 5–6; Petersen Decl. Ex. D SFF: Sweden, at 5–6; Petersen Decl. Ex. E NFF: Norway, at 5–6). However, Defendants do not challenge the actual foreign law basis for the assertion of statutory standing by these three associations, *see Itar-Tass*, 153 F.3d at 93, nor do they offer any other argument as to why ALCS does not have statutory standing. As I explained earlier, Article III is satisfied as to the Associational Plaintiffs and the statutory standing requirements are "closely related to the merits inquiry . . . and analytically distinct from the question whether a federal court has subject-matter jurisdiction." *Roberts*, 655 F.3d at 580. I decline to raise any other objections to the statutory standing of UNEQ, NFF, SFF or ALCS *sua sponte*, and Defendants' motion for judgment on the pleadings is denied as to these associations. *Cf. 181 East 73rd Street Co. v. 181 East 73rd Tenants Corp.*, 954 F.2d 45, 49 n.9 (2d Cir. 1992) ("This argument was not made by the parties and we decline to raise it *sua sponte*.").

---

[13] *See* Petersen Decl. Ex. F ALCS: UK at 5 ("Plaintiff has the right, by virtue of a mandate executed by certain of its members, including members whose works were digitized and reproduced by Defendants without authorization, to bring an action on behalf of such members against Defendants for infringing such members' copyrights."); Rosenthal Decl. Ex. C ALCS: U.K., Copyright, Designs and Patents Act (1988) § 101A (permitting a non-exclusive licensee to bring an action for copyright infringement if the "infringing act was directly connected to a prior licensed act of the licensee" and the license is in writing and "expressly grants the non-exclusive licensee a right of action under this section"); Rosenthal Decl. Ex. D UNEQ: Québec, Professional Syndicates Act, R.S.Q., ch. S-40, § 9(11) ("Professional syndicates may appear before the courts and acquire, by gratuitous or onerous title, any property suited to their particular objects . . . and in particular . . . (11) exercise before any court of law, all the rights of their members with respect to acts directly or indirectly prejudicial to the collective interest of the profession which they represent."); Rosenthal Decl. Ex. E NFF: Norwegian Copyright Act §§ 38a, 38b (permitting an organization, "in the absence of any objection from the rightholder, [to] demand that a user who has not entered into [] an agreement . . . be prohibited by a court judgment from unlawfully exploiting a work"); Rosenthal Decl. Ex. F SFF: Sweden Member Agreement §§ 1, 2, 5 ("[T]he Author assigns the Organization, or the one the Organization puts in its stead, the right to independently manage the copyright of the Author's published works.").

**D. Ripeness of the Orphan Works Project**

The Complaint requests a declaration that the "distribution and display of copyrighted works through the HathiTrust Orphan Works Project will infringe the copyrights of Plaintiffs and others likely to be affected" and an injunction that prohibits the OWP. Compl. Demand for Relief (a)(ii), (b)(iii). Plaintiffs seek a ruling on the OWP as it *will* exist, and not specifically as it existed at the moment that the initial complaint was filed. *See also* Pls.' Mem. J. Pleadings 24–25 ("Absent an injunction, Defendants will proceed with the OWP and infringe the copyrights of Plaintiffs, the Associational Plaintiffs' members and other unsuspecting authors and rights holders."). Adjudication as to the OWP is not ripe for judicial review.[14]

"Article III of the Constitution limits the jurisdiction of the federal courts to cases or controversies 'of sufficient immediacy and reality' and not 'hypothetical or abstract dispute[s].' " *See, e.g.*, *Hayes v. Carlin Am., Inc.*, 168 F. Supp. 2d 154, 159 (S.D.N.Y. 2001) (internal citations omitted). "Ripeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005). The determination of whether a claim is ripe is a two-prong inquiry that requires courts to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

The claims here are not fit for adjudication. Were I to enjoin the OWP, I would do so in the absence of crucial information about what that program will look like should it come to pass and whom it will impact. *Hayes*, 168 F. Supp. 2d at 160 (concluding that a claim seeking declaratory judgment that plaintiff was the holder of the right to collect royalties during the copyright renewal term for works in their original term was not ripe because the court did not know whether a dispute would remain, whether it would involve the same parties, or what the relevant facts would be once the renewal term was reached). In addition, Plaintiffs suffer no hardship from litigation of this claim after Defendants release the details of their new OWP and a revised list of Orphan Work Candidates. If and when that time comes, they can request relief. "In assessing the possible hardship to the parties resulting from withholding judicial resolution, we ask whether the challenged action

---

[14] Because I conclude that my review of the OWP is precluded on ripeness grounds, I need not address Defendants other arguments in opposition to my review of the OWP. Defendants argue that all of the Plaintiffs lack standing as to the OWP because the program was discontinued before any works became available and at the time that Plaintiffs filed the initial complaint, they failed to identify any of their works that were included in the program. Finally, Defendants argue that the OWP claims are moot.

creates a direct and immediate dilemma for the parties. The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." *Connecticut v. Duncan*, 612 F.3d 107, 115 (2d Cir. 2010) (quoting *Simmonds v. INS*, 326 F.3d 351, 360 (2d Cir. 2003)). The "mere possibility" that one of Plaintiffs' works might be included on a future list of orphan works or made available is not enough. Defendants' motion for judgment on the pleadings as to the OWP is granted.

## II. PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiffs' motion for partial judgment on the pleadings seeks a ruling that "Defendants' admitted systematic reproduction, distribution, and use of millions of copyright-protected books are not shielded by the First Amendment, the fair-use defense, or any other provision of the Copyright Act." Pls.' Mem. J. Pleadings 1.

### A. Legal Standard

A motion for judgment on the pleadings enables the moving party to have the court rule preferably in its favor based on the merits of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). The court applies the same standard in a Rule 12(c) motion as it does in a Rule 12(b)(6) motion, and the court must accept as true the allegations contained in the pleading and draw all reasonable inferences in favor of the non-moving party. *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011). "A party is entitled to judgment on the pleadings only if it is clear that no material issues of fact remain to be resolved and that it is entitled to judgment as a matter of law." *Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*, 724 F. Supp. 2d 407, 414 (S.D.N.Y. 2010).

### B. Availability of Fair-Use Defense

Section 107 provides a defense to a claim of copyright infringement on the grounds of fair use. Section 108 of the Copyright Act accords libraries the right to make a limited number of copies of certain works for specified purposes, and it explicitly states that "[n]othing in this section . . . in any way affects the right of fair use as provided by section 107." 17 U.S.C. § 108(f)(4). In spite of the clear language that Section 108 provides rights to libraries *in addition* to fair-use rights that might be available, Plaintiffs argue that I should find that the Section 107 fair-use defense is precluded by Section 108 in this case.[15]

---

[15] Plaintiffs also argue that this program is "systematic" in violation of Section 108(g). Pls.' Reply to Pls.' J. Pleadings 11. Defendants respond that "systematic" means reproducing a single work repeatedly, rather than reproducing all the works in their libraries. Defs.' Opp'n to Pls.' J. Pleadings (citing 17 U.S.C. § 108(g) (prohibiting systematic reproduction of "the same material")). I agree.

In support of their argument, Plaintiffs first argue that "the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 344 (1992). Because Section 108 provides "highly-specific rules governing the extent to which libraries are permitted to make digital copies of works in their collection," Plaintiffs argue that Section 107 is unavailable as a defense. Pls.' Mem. J. Pleadings 21. However, the doctrine that the specific governs the general applies when "applying a general provision . . . would undermine *limitations* created by a more specific provision." *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996) (emphasis added); *see also Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1521 (9th Cir. 1993) (rejecting argument that Section 117, which permits the owner of a computer program to make certain copies, preempts the fair-use defense under Section 107). Here, fair use does not undermine Section 108, but rather supplements it.

Plaintiffs also argue that the legislative history suggests that fair use is not available as a defense for Defendants. They cite a 1983 Report on Section 108, in which the Copyright Office stated: "[M]uch of '108' photocopying would be infringing but for the existence of that section, thus leaving section 107 often clearly unavailable as a basis for photocopying not authorized by section 108." Pls.' Mem. J. Pleadings 22–23 (quoting REGISTER OF COPYRIGHTS, REPORT OF THE REGISTER OF COPYRIGHTS, LIBRARY REPRODUCTION OF COPYRIGHTED WORKS (17 U.S.C. 108), at 96 (1983)).[16] Defendants respond that the Report merely concludes that courts should take "into account the '108' copying that has already occurred" when they evaluate the assertion of fair use for library photocopying. LIBRARY REPRODUCTION OF COPYRIGHTED WORKS 98.[17]

The briefs submitted by Defendant Intervenors and the Library Amici, to whom I granted leave to file a memorandum as amici curiae, further convince me that fair use is available as a defense for the Defendants, and nothing Plaintiffs submitted convinces me that fair use is unavailable as a defense, or that the manner of reproduction is prohibited simply because it does not fall within Section 108.

---

[16] Plaintiffs also cite the Second Circuit's decision in *Universal City Studios, Inc. v. Colrey*, 273 F.3d 429 (2d Cir. 2001), in support of this reading of the Copyright Act. In that case, the Second Circuit analyzed a fair-use savings clause contained in the Digital Millennium Copyright Act ("DMCA") in evaluating a claim under Section 1201 for circumventing technical measures that control access to a copyrighted work. The savings clause there indicated that "[n]othing in this section shall affect rights, remedies, limitations or defenses to copyright infringement, including fair use, under this title." 17 U.S.C. § 1201(c). The Second Circuit interpreted the clause as meaning that fair use was available as a defense to a claim of copyright infringement for material obtained by the circumvention, but not to the unlawful circumvention itself. *Corley*, 273 F.3d at 443.

[17] This does not suggest that Congress intended to preclude the fair-use defense where a library's actions fall outside of Section 108. *See* H.R. Rep. No. 94-1476, at 78–79 (1976) ("Nothing in section 108 impairs the applicability of the fair-use doctrine to a wide variety of situations involving photocopying or other reproduction by a library of copyrighted material in its collections, where the user requests the reproduction for legitimate scholarly or research purposes.").

**C. Availability of Other Defenses**

Plaintiffs barely address the other proposed defenses asserted by Defendants to protect the MDP and OWP. In one paragraph, Plaintiffs argue that Section 108 prevents libraries from asserting other potential rights and defenses besides fair use, including Sections 109 (first sale), 110 (exemptions of certain performances and displays), and 121 (reproductions for the blind) and the First Amendment. Pls.' Mem. J. Pleadings 23. No case law is cited. Plaintiffs' motion for judgment on the pleadings that Defendants have no defenses available to them as a matter of law is denied.

## MOTIONS FOR SUMMARY JUDGMENT
### I. LEGAL STANDARD

A district court may not grant summary judgment if there exists a genuine issue of material fact. *See Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "For summary judgment purposes, a 'genuine issue' exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor." *Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co.*, 421 F. Appx. 52, 53 (2d Cir. 2011) (internal citations omitted). "Fair use is a mixed question of law and fact." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985). Courts resolve fair use at the summary judgment stage where there are no genuine issues of material fact. *See Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998); *see also Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 117 (2d Cir. 1998) (affirming district court's grant of summary judgment where defendant asserted fair-use defense).

### II. FAIR USE

To establish a *prima facie* case of copyright infringement, a plaintiff must demonstrate "ownership of a valid copyright" and "copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Plaintiffs identify 116 works (the "Identified Works") as to which they assert direct ownership of the copyrights and allege that Defendants copied the works. Defendants concede that Plaintiffs have established a *prima facie* case of infringement as to some of these works.[18] Fair use is one defense to the establishment of a *prima facie* case of copyright infringement; it permits copies made for purposes

---

[18] Defendants challenge Plaintiffs' allegation that they have established a *prima facie* case of infringement as to several of the foreign works because Plaintiffs fail to provide proof of ownership under foreign law or proof that the works do not qualify as United States works. *See, e.g.*, Defs.' Opp'n to Pls.' 56.1 ¶¶ 138, 140, 143. Defendants also challenge several of the other claims of copyright ownership. *See, e.g., id.* ¶ 142 (challenging ownership by Robinson because the copyright registrations "were not obtained within five years after the first publication of the work").

of scholarship, teaching, and research. 17 U.S.C. § 107. It is Defendants' burden to establish this affirmative defense to Plaintiffs' claims of copyright infringement. *See Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 918 (2d Cir. 1994). A defendant need not prevail with respect to each of the four enumerated fair-use factors to succeed on a fair-use defense. *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004). Rather, the factors are "explored and weighed together, in light of copyright's purpose." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 569 (1994). "The ultimate focus is the goal of copyright itself, whether 'promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it.' " *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, No. 11 Civ. 1006, 2012 WL 1759944, at *3 (S.D.N.Y. May 17, 2012) (quoting *Castle Rock Entm't*, 150 F.3d at 141; U.S. Const. art, 1, § 8, cl. 8). Plaintiffs, Defendants, and Defendant Intervenors have each filed motions for summary judgment that argue that there is no genuine issue of material fact as to the fair-use factors.

**A. Purpose and Character of the Use**

The first fair-use factor considers the "purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The MDP was undertaken with several goals in mind. The MDP allows scholars to identify relevant works far more efficiently. Defs.' 56.1 ¶¶ 18–23. In addition, the program helps Defendants preserve their collections in the face of normal deterioration during circulation, natural disasters, or other catastrophes that decimate library collections, as well as loss due to theft or misplacement. *Id.* ¶¶ 2, 11–13, 15.[19] The program provides print-disabled individuals with "access to the wealth of information within library collections." *Id.* ¶¶ 61–66; *see also* Defendant Intervenors 56.1 ¶ 1. Where the purpose of the use is for scholarship and research—uses explicitly mentioned in the preamble to Section 107—the Second Circuit has concluded that the first factor "tilt[s] in the defendants' favor." *NXIVM Corp.*, 364 F.3d at 477.[20]

---

[19] The argument that preservation on its own is a transformative use is not strong. *See Texaco*, 60 F.3d at 924 ("[T]he predominant archival purpose of the copying tips the first factor against the copier."). However, the Supreme Court's decision in *Sony Corp. of America v. Universal City Studios, Inc.*, a case in which the Court held that private copying of television broadcasts for later viewing was a protected fair use, focused on the noncommercial nature of the use. 464 U.S. 417, 449, 454 (1984). Likewise, the preservation purposes of the Defendants are noncommercial in nature. *See* H.R. Rep. No. 94-1476, at 73 (1976) ("The efforts of the Library of Congress, the American Film Institute, and other organizations to rescue and preserve this irreplaceable contribution to our cultural life are to be applauded, and the making of duplicate copies for purposes of archival preservation certainly falls within the scope of 'fair use.' ").

[20] As explained in Motions for Summary Judgment Section III, *infra*, to the extent that the copying allows print-disabled individuals access to "previously published, non-dramatic literary work[s]" on an equal footing with sighted individuals, it is also potentially permitted under the Chafee Amendment. *See* 17 U.S.C. § 121. The ADA also provides strong support for the conclusion that the provision of access to print-disabled persons is a protected fair use.

The character of the use also suggests that the first prong is satisfied. Several university libraries have entered into agreements with Google whereby Google converts the hard-copy works in their libraries into digital format. Defs.' 56.1 ¶ 30. For works that are not in the public domain or for which an author has not "expressly authorized use," a search for a particular term reveals the pages on which the term is found and the number of times the term is found on each page. *Id.* ¶ 50. No actual text from the book is revealed, *id.* ¶ 52, except to print-disabled library patrons at UM.[21]

Transformative uses are likely to satisfy the first factor. *Campbell*, 510 U.S. at 575 ("The central purpose of this investigation is to see . . . whether the new work merely supersede[s] the objects of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.' ") (internal citations and quotation marks omitted). A transformative use may be one that actually changes the original work. However, a transformative use can also be one that serves an entirely different purpose. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006) (affirming district court's conclusion that the use of entire copyrighted concert posters in a book "to document and represent the actual occurrence" of the concerts was different from the "dual purposes of artistic expression and promotion of the original use"). The use to which the works in the HDL are put is transformative because the copies serve an entirely different purpose than the original works: the purpose is superior search capabilities rather than actual access to copyrighted material. The search capabilities of the HDL have already given rise to new methods of academic inquiry such as text mining.[22]

Several courts have upheld wholesale copying of works where the use and purpose for the copies was clearly distinguishable from those of the original. *See A.V. v. iParadigms, LLC*, 562 F.3d 630, 640 (4th Cir. 2009) (concluding that copying and archiving of student papers "was completely unrelated to expressive content and instead aimed at detecting and discouraging plagiarism"); *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (finding that Google's copying

---

[21] Other Defendants in HathiTrust may provide such access in the future. For a description of the way in which UM's provision of access to print-disabled individuals has already revolutionized access for its users, see *supra* Background and see *infra* Motions for Summary Judgment Section III.

[22] Mass digitization allows new areas of non-expressive computational and statistical research, often called "text mining." One example of text mining is research that compares the frequency with which authors used "is" to refer to the United States rather than "are" over time. *See* Digital Humanities Amicus Br. 7 ("[I]t was only in the latter half of the Nineteenth Century that the conception of the United States as a single, indivisible entity was reflected in the way a majority of writers referred to the nation.").

of Internet content to make it searchable was transformative because "a search engine transforms the image into a pointer directing a user to a source of information"); *Kelly v. Arriba Soft Corp.*, 336 F. 3d 811, 819 (9th Cir. 2003) (finding that copying to produce exact replicas of artistic works displayed in thumbnail form on the internet to facilitate searches was transformative because it was "unrelated to any aesthetic purpose").[23] Plaintiffs' argument that the use is not transformative merely because defendants have not added anything "new" misses the point. *Perfect 10*, 508 F.3d at 1164 ("[E]ven making an exact copy of a work may be transformative so long as the copy serves a different function than the original work.").[24]

Plaintiffs also argue that Defendants are not shielded from charges of copyright infringement by virtue of their status as educational non-profits. The cases they cite in support of this claim are cases where the use being made by the non-profit was not transformative, as it is here. *See, e.g.*, *Encyclopedia Britannica Educ. Corp. v. Crooks*, 542 F. Supp. 1156, 1179 (W.D.N.Y. 1982) (concluding that fair use did not protect the actions of defendants, a non-profit educational organization, who videotaped plaintiff's television programs, copied them, and distributed them to be shown in schools). Likewise, Plaintiffs' argument that Defendants had a primarily "commercial" purpose when they allowed Google to digitize their libraries is without merit. Although Plaintiffs quote *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001), for the point that Defendants cannot make "unauthorized copies of copyrighted works . . . to save the expense of purchasing authorized copies," this argument too is off the mark as to what Defendants use the copies for. While additional copies might have sufficed were Defendants' goal solely preservation, the purchase of additional paper copies, or even electronic copies, would not have allowed Defendants to create a searchable inventory of their works or provide access to print-disabled individuals on an equal footing with sighted individuals.  Defendants satisfy the first factor not

---

[23] Although Plaintiffs assert that the decisions in *Perfect 10* and *Arriba Soft* are distinguishable because in those cases the works were already available on the internet, Aug. 6, 2012 Tr. 19:2–4, I fail to see why that is a difference that makes a difference. As with Plaintiffs' attempt to bar the availability of fair use as a defense at all, this argument relies heavily on the incorrect assumption that the scale of Defendants' copying automatically renders it unlawful. Further, the student papers uploaded to a website to check for plagiarism in the *iParadigms* case were not available on the internet prior to the copying. 562 F.3d at 634.

[24] The cases Plaintiffs cite are easily distinguishable. For example, in *Texaco*, 60 F.3d at 913, a corporation made photocopies of copyrighted articles for use by its researchers. The court concluded that the majority of the copies served "the same basic purpose that one would normally seek to obtain the original—to have it available on his shelf for ready reference." *Id.* at 919. Likewise, in *UMG Recordings, Inc. v MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000), the court found that conversion of CDs into computer files for use by users over the internet was not transformative because the use to which the copies were put was not different than the use for the originals.

merely because they are non-profit institutions, but because the use to which the copies have been put is transformative.

The use of digital copies to facilitate access for print-disabled persons is also transformative.[25] Print-disabled individuals are not considered to be a significant market or potential market to publishers and authors. Def. Intervenors' MSJ 6 (citing Kerscher Decl. ¶ 17, 34). As a result, the provision of access for them was not the intended use of the original work (enjoyment and use by sighted persons) and this use is transformative. *See, e.g.*, *Perfect 10*, 508 F.3d at 1165. Even if it were not, "[m]aking a copy of a copyrighted work for the convenience of a blind person is expressly identified by the House Committee Report as an example of a fair use, with no suggestion that anything more than a purpose to entertain or to inform need motivate the copying." *Sony Corp. of Am. v. Universal City Studios, Inc*, 464 U.S. 417, 455 n.40 (1984).

## B. Nature of the Copyrighted Works

"[S]ome works are closer to the core of intended copyright protection than others." *Campbell*, 510 U.S. at 586. Copying factual works is more likely fair use than copying creative works. *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006). However, where a use is transformative, the nature of the copyrighted works is not likely to "separate the fair use sheep from the infringing goats." *Campbell*, 510 U.S. at 586; *see also Harper & Row*, 471 U.S. at 546. Here, Plaintiffs identify 116 works that they allege were unlawfully digitized by Defendants as part of the MDP. Pls.' 56.1 ¶¶ 138–53. Approximately 76 percent of the identified works are fiction. Goldman Decl. ¶ 6. In the HDL as a whole, approximately 9 percent consists of prose fiction, poetry, and drama. Wilkin Decl. ¶ 67. Because the use is transformative, intended to facilitate key-word searches or access for print-disabled individuals, the second factor is not dispositive. *Bill Graham*, 448 F.3d at 612 ("[T]he second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose.").

## C. Amount of the Work Copied

The third fair-use factor considers whether the amount of copying was reasonable in relation to the purpose. *Sony*, 464 U.S. at 449–50. "[T]he extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586–87. The question is whether "no more was taken than necessary." *Id.* at 587. Sometimes it is necessary to copy entire works. *Bill Graham*, 448 F.3d at 613; *Arriba Soft*, 336 F.3d at 821. "Intermediate" copies may not be infringing when

---

[25] Plaintiffs suggestion at oral argument that print-disabled individuals could have "asked permission" of all the rights holders whose works comprise the HDL borders on ridiculous. Aug. 6, 2012 Tr. 11:13–12:8.

that copying is necessary for fair use. *See Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 206 (4th Cir. 1998) (finding that it was fair use to copy fragile manuscript so that the author of a critical review could study it without inflicting damage). Here, entire copies were necessary to fulfill Defendants' purposes of facilitation of searches and access for print-disabled individuals. *See Arriba Soft*, 336 F.3d at 821 ("If Arriba only copied part of the image, it would be difficult to identify it, thereby reducing the usefulness of the visual search engine."). Plaintiffs argue that Defendants did not need to retain copies to facilitate searches; however, the maintenance of an electronic copy was necessary to provide access for print-disabled individuals.[26]

## D. Impact on the Market for or Value of the Works

The fourth factor examines "whether the secondary use usurps the market of the original work." *NXCIM Corp.*, 364 F.3d at 482. Courts consider "only those [markets] that the creators of original works would in general develop or license others to develop." *Campbell*, 510 U.S. at 591, 592 ("[W]hen . . . the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred."). Where a use is noncommercial, as it is here, the plaintiff must show "by a preponderance of the evidence that some meaningful likelihood of future harm exists", *Sony*, 464 U.S. at 451, a test Plaintiffs fail at least on this fact pattern.[27]

Plaintiffs allege market harm on several distinct bases. First, they argue that "[e]ach digital copy of a book that Defendants created . . . rather than [purchased] through lawful channels, represents a lost sale." Pls.' MSJ 22. This argument ignores the fact that purchase of an additional copy would not have allowed either full-text searches or access for the print-disabled individuals, two transformative uses that are central to the MDP.

Plaintiffs' second argument is that Defendants have "expose[d] Plaintiffs' property to immense security risks that have the potential to cannibalize the book market through . . . widespread internet piracy." *Id.* at 23. However, the expert economist that Plaintiffs rely on in support of this argument admitted that he was unfamiliar with the security procedures in place at the Universities. Edelman Dep. at 248:11–12 ("I don't know about all of the security systems that [the

---

[26] Not to mention that it would be a tremendous waste of resources to destroy the electronic copies once they had been made for search purposes, both from the perspective of the provision of access for print-disabled individuals and from the perspective of protecting fragile paper works from future deterioration.

[27] Plaintiffs argue that Defendants uses cannot be considered noncommercial because of their relationship with Google. Pls.' Opp'n to Defs.' MSJ 12. Although the relationship between Google and Defendants is potentially relevant to the uses of the works made by Google, that issue is not before this Court. My determination that the Defendants' uses are noncommercial relies on the uses actually made by Defendants in this case, that is, text searches, access for print-disabled persons, and preservation.

Libraries] have."). Defendants respond with a declaration from the individual in charge of security for the works in the HDL, who describes the security measures in place, Snavely Decl. ¶¶ 6–27, and notes that the Libraries have been certified as a trustworthy depository by the Center for Research Libraries. *Id.* ¶ 7; Wilkin Decl. ¶¶ 91–99. Plaintiffs' unsupported argument fails to demonstrate a meaningful likelihood of future harm.

Finally, Plaintiffs argue that "Defendants activities will harm Plaintiffs by undermining existing and emerging licensing opportunities" such as a "collective management system [which would] permit certain of the activities of the Defendants in this case while providing compensation to copyright owners." Pls.' MSJ 25–27. Plaintiffs admit that they cannot identify "any specific, quantifiable past harm, or any documents relating to such past harm." Petersen Decl. ¶¶ 2–21.[28] Plaintiffs' argument about a potential market is conjecture. *Perfect 10*, 508 F.3d at 1168 (rejecting argument that there was hypothetical harm to the market for thumbnail images on mobile phones). "Were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth factor would *always* favor the copyright owner." *Bill Graham*, 448 F.3d at 614 (citation omitted). A copyright holder cannot preempt a transformative market. *Id.* Although Plaintiffs cite the Second Circuit's decision in *Texaco*, 60 F.3d at 930, for the proposition that this Court ought to consider the "impact on potential licensing opportunities," they omit the remainder of the quote, which concludes that courts should consider "only traditional, reasonable or likely to be developed markets."[29] Because I conclude that at least two of the uses are transformative—that is, the provision of search capabilities and access for print-disabled individuals—any harm arises, if at all, to a "transformative market." *Bill Graham*, 448 F.3d at 614 ("Appellant asserts that it established a market for licensing its images, and in this case expressed a willingness to license images. . . . Neither of these arguments shows impairment to a traditional, as opposed to a transformative market."). A use that "falls within a transformative market" does not cause the copyright holder to "suffer market harm due to the loss of license fees."*Id.* at 615.

Defendants offer substantial evidence that it would be prohibitively expensive to develop a market to license the use of works for search purposes, access for print-disabled individuals, or preservation purposes. Waldfogel Decl. ¶¶ 7, 22–24 (estimating that the costs of such a license as to

---

[28] The deposition of one of the Plaintiffs, in which he states that "colloquially, one copy of my book has been stolen," May 31, 2012 Stiles Dep. Tr. 163:10, is unpersuasive because, as noted, the purchase of an additional copy would not have allowed Defendants to make the transformative uses of the works that they sought.

[29] The use in *Texaco* was also a commercial, non-transformative use by a for-profit entity. 60 F.3d at 931.

the works in the HDL would be in the neighborhood of $569 million and that the potential revenue generated would not cover these costs so it was not a "commercially viable endeavor"). This also assumes that the holder of each copyright could be identified, *id.* ¶ 24, a tenuous assumption to say the least. Plaintiffs characterize this as an argument that "it is permissible to steal the goods if it is too expensive to buy them." Pls.' MSJ 15. However, Defendants argue that the high costs will prohibit the formation of a viable market *in the first place*, and as a consequence there will be no one to buy the goods from. Although Plaintiffs assert that the Copyright Clearance Center ("CCC") could eventually develop a license for the uses to which Defendants put the works, *see* Gervais Decl., the CCC has no plans to provide for or develop such a license. Petersen Opp'n Decl. ¶ 9. Even if Congress will eventually find a way to regulate this area of the law, "it is not the [court's] job to apply laws that have not yet been written." *Sony*, 464 U.S. at 456.

The provision of access for print-disabled individuals likewise does not significantly impact a market. Kerscher Decl. ¶ 34. At oral argument, Plaintiffs repeatedly emphasized that "only 32" print-disabled students had signed up to participate in the program at the UM. *See, e.g.*, Aug. 6, 2012 Tr. 15:6–7. This argument only emphasizes that print-disabled individuals are a tiny minority, and the development of a market to provide them with access on the scale of the MDP is consequently almost impossible to fathom.[30] This argument overlooks the fact that it is minorities such as this that Congress sought to protect through enactments like the ADA.

**E. Balancing the Fair-Use Factors**

The totality of the fair-use factors suggest that copyright law's "goal of promoting the Progress of Science . . . would be better served by allowing the use than by preventing it." *Bill Graham*, 448 F.3d at 608 (quotation marks omitted). The enhanced search capabilities that reveal no in-copyright material, the protection of Defendants' fragile books, and, perhaps most importantly, the unprecedented ability of print-disabled individuals to have an equal opportunity to compete with their sighted peers in the ways imagined by the ADA protect the copies made by Defendants as fair use to the extent that Plaintiffs have established a *prima facie* case of infringement.[31] In addition to the briefs submitted by the parties, the two memoranda filed by amici further confirm that the underlying rationale of copyright law is enhanced by the HDL. *See* Library Amici Br. ("The public derives tremendous benefit from HDL, and authors stand to gain very little if the public is deprived

---

[30] Plaintiffs also argue that nonconsumptive research such as text mining, *see supra* note 22 and accompanying text, causes harm because authors might one day pay for licenses to use works in this manner. Again, the harm identified here is "speculative, and, at best, minimal." *Sony*, 464 U.S. at 454 (citation omitted).

[31] *See supra* note 18 and accompanying text.

of this resource."); Digital Humanities Amicus Br. (describing the use of metadata and text mining, which "could actually enhance the market for the underlying work, by causing researchers to revisit the original work and reexamine it in more detail"). Although I recognize that the facts here may on some levels be without precedent, I am convinced that they fall safely within the protection of fair use such that there is no genuine issue of material fact. I cannot imagine a definition of fair use that would not encompass the transformative uses made by Defendants' MDP and would require that I terminate this invaluable contribution to the progress of science and cultivation of the arts that at the same time effectuates the ideals espoused by the ADA.[32]

## III. ACCESS FOR PRINT-DISABLED INDIVIDUALS: THE ADA & COPYRIGHT LAW

The provision of equal access to copyrighted information for print-disabled individuals is mandated by the ADA and the Rehabilitation Act of 1976. The impetus for the ADA was Congress' explicit conclusion that people with disabilities historically had been denied "the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous." 42 U.S.C. § 12101(a)(8); Maurer Decl. ¶ 7 ("[Blind students] compete under a severe handicap. That handicap is not lack of sight, but a lack of access to information in a world in which information is the key to success."). To begin to remedy this injustice, the ADA "provide[s] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Id.* § 12101(b)(1). Congress imposed on institutions an obligation to provide equal access and recognized that "technological advances . . . may require public accommodations to provide auxiliary aids and services in the future which today they would not be required because they would be held to impose undue burdens on such entities." H.R. Rep. 101-485(II), at 108 (1990).

Under the Chafee Amendment to the Copyright Act, "authorized entit(ies)" are permitted "to reproduce or distribute copies . . . of a previously published, non-dramatic literary work . . . in specialized formats exclusively for use by the blind or other persons with disabilities." 17 U.S.C. § 121. An "authorized entity" is a nonprofit organization or governmental agency "that has a primary mission to provide specialized services relating to training, education, or adaptive reading or information access needs of blind or other persons with disabilities." *Id.* at § 121(d)(1). The ADA requires that libraries of educational institutions have a primary mission to reproduce and distribute

---

[32] As noted *supra* Motions for Judgment on the Pleadings Section II.B, Congress expanded the copying permitted to libraries with the enactment of Section 108. I need not decide if the MDP fits within the parameters of 17 U.S.C. § 108 because it unquestionably fits within the definition of fair use. *See* 17 U.S.C. § 108(f)(4) (stating that this section "in [no] way affects the right of fair use as provided by section 107").

their collections to print-disabled individuals, making each library a potential "authorized entity" under the Chafee Amendment. So far, only UM has made its works available to print-disabled individuals, and its Declarations make it clear that it had a primary goal to improve access for print-disabled individuals. Kerscher Decl. ¶ 30. I conclude that UM has "a primary mission" to provide access for print-disabled individuals, and it is consequently an authorized entity. The provision of access to previously published non-dramatic literary works within the HDL fits squarely within the Chafee Amendment, although Defendants may certainly rely on fair use, as explained above, to justify copies made outside of these categories or in the event that they are not authorized entities.[33]

## CONCLUSION

I have considered the parties' remaining arguments and find them to be without merit. For the foregoing reasons, Plaintiffs' motions are DENIED. Defendants' motion for judgment on the pleadings is GRANTED in part and DENIED in part: the Associational Plaintiffs have Article III standing; the U.S. Associational Plaintiffs lack statutory standing; and Plaintiffs' OWP claims are not ripe. Defendants' and Defendant Intervenors' motions for summary judgment are GRANTED: their participation in the MDP and the present application of the HDL are protected under fair use. The two unopposed motions for leave to file briefs as amici are GRANTED. The Clerk of the Court is instructed to close the seven open motions, close the case, and remove it from my docket.

**SO ORDERED.**

Date: 10 10 12
New York, New York

**HAROLD BAER, JR.**
**United States District Judge**

---

[33] Plaintiffs' suggestion at oral argument that the Chafee Amendment defines the outer bounds of protected copying on behalf of print-disabled individuals, Aug. 6, 2012 Tr. 21:3–4, is without merit. Nothing in the Chafee Amendment indicates an intent to preclude a fair-use defense as to copies made to facilitate access for the blind that do not fall within its ambit.